Jason S. Brookner (TX Bar No. 24033684)
Aaron M. Kaufman (TX Bar No. 24060067)
Amber M. Carson (TX Bar No. 24075610)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 954-4135
Facsimile:   (214) 953-1332
Email:       jbrookner@grayreed.com
             akaufman@grayreed.com
             acarson@grayreed.com

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:       joshua.sussberg@kirkland.com
             ross.fiedler@kirkland.com

-and-

Lindsey Blumenthal (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       lindsey.blumenthal@kirkland.com

*Proposed Co-Counsel for the Debtors and
Debtors in Possession*

*Proposed Co-Counsel for the Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZIPS CAR WASH, LLC, *et al.*,[1] | ) | Case No. 25-80069-11 (MVL) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**NOTICE OF REVISED PROPOSED ORDER GRANTING
THE DEBTORS' DIP FINANCING MOTION AND CASH COLLATERAL MOTION**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Zips Car Wash, LLC (3045); Express Car Wash Holdings, LLC (6223); Zips 2900 Wade Hampton, LLC (N/A); Zips 3107 N. Pleasantburg, LLC (N/A); Zips 6050 Wade Hampton, LLC (N/A); Zips Operating Holdings, LLC (2161); Zips Portfolio I, LLC (9999); Zips Portfolio II, LLC (1864); Zips Portfolio III, LLC (N/A) and Zips Portfolio IV, LLC (N/A).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 8400 Belleview Drive, Suite 210, Plano, Texas 75024.

**PLEASE TAKE NOTICE** that attached to this Notice as **<u>Exhibit A</u>** is a revised proposed order granting the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Term Loan Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket Nos. 21 and 22].

**PLEASE TAKE FURTHER NOTICE** that attached to this Notice as **<u>Exhibit B</u>** is a redline of the revised proposed order marked against the version filed at Docket Nos. 21 and 22.

[*Remainder of page intentionally left blank*]

4924-1415-8871

Dated: February 7, 2025
Dallas, Texas

/s/ Jason S. Brookner

| | |
|---|---|
| **GRAY REED** | **KIRKLAND & ELLIS LLP** |
| Jason S. Brookner (TX Bar No. 24033684 ) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Aaron M. Kaufman (TX Bar No. 24060067) | Joshua A. Sussberg, P.C. (*pro hac vice* pending) |
| Amber M. Carson (TX Bar No. 24075610) | Ross J. Fiedler (*pro hac vice* pending) |
| 1601 Elm Street, Suite 4600 | 601 Lexington Avenue |
| Dallas, Texas 75201 | New York, New York 10022 |

GRAY REED
Jason S. Brookner (TX Bar No. 24033684 )
Aaron M. Kaufman (TX Bar No. 24060067)
Amber M. Carson (TX Bar No. 24075610)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:     (214) 954-4135
Facsimile:     (214) 953-1332
Email:     jbrookner@grayreed.com
          akaufman@grayreed.com
          acarson@grayreed.com

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     joshua.sussberg@kirkland.com
          ross.fiedler@kirkland.com

-and-

Lindsey Blumenthal (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile     (312) 862-2200
Email     lindsey.blumenthal@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

## Certificate of Service

I certify that on February 7, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

/s/ Jason S. Brookner
Jason S. Brookner

**Exhibit A**

**Proposed DIP Order**

4924-1415-8871

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZIPS CAR WASH, LLC, *et al.*,[1] | ) | Case No. 25-80069 (MVL) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER**
**(I) AUTHORIZING DEBTORS TO OBTAIN**
**POSTPETITION FINANCING PURSUANT**
**TO SECTION 364 OF THE BANKRUPTCY CODE,**
**(II) AUTHORIZING THE USE OF CASH COLLATERAL**
**PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE,**
**(III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION TERM**
**LOAN SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF**
**THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS,**
**(V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Zips Car Wash, LLC (3045); Express Car Wash Holdings, LLC (6223); Zips 2900 Wade Hampton, LLC (N/A); Zips 3107 N. Pleasantburg, LLC (N/A); Zips 6050 Wade Hampton, LLC (N/A); Zips Operating Holdings, LLC (2161); Zips Portfolio I, LLC (9999); Zips Portfolio II, LLC (1864); Zips Portfolio III, LLC (N/A) and Zips Portfolio IV, LLC (N/A). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 8400 Belleview Drive, Suite 210, Plano, Texas 75024.

Upon the *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Term Loan Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "<u>DIP Motion</u>") filed by the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Cases</u>"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rules 2002-1, 4001-1, and 5005-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "<u>Local Rules</u>") and the Procedures for Complex Cases in the Northern District of Texas (the "<u>Complex Case Procedures</u>"), seeking the entry of an interim order (this "<u>Interim Order</u>") and, following the Final Hearing, a final order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>"), which, among other things:

(i)    authorizes the Debtors to obtain senior secured priming and superpriority postpetition financing, in the form of a senior secured, super priority delayed draw term loan facility (the "<u>DIP Facility</u>"), pursuant to the terms of (x) the DIP Orders, (y) that certain *Senior Secured Super-Priority Priming Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "<u>DIP Credit Agreement</u>"),[2] by and among Zips Car Wash LLC, as Borrower, the other

---

[2]    Capitalized terms used but not yet defined herein shall have the meanings ascribed to them elsewhere in this Order or in the DIP Credit Agreement, as applicable.

Debtors party thereto, as Guarantors, Brightwood Loan Services LLC, as administrative agent and collateral agent (the "DIP Agent"), and the lenders party thereto from time to time (each, a "DIP Lender," and collectively, the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties"), substantially in the form attached hereto as **Exhibit A**, and (z) the other Loan Documents (collectively, together with the DIP Credit Agreement, the "DIP Loan Documents") in an aggregate principal amount of up to $82.5 million, consisting of (a) an aggregate principal amount of $30 million of new money loans to be provided under the DIP Credit Agreement, with (i) $20 million being made available to the Debtors following the entry of this Interim Order and (ii) the remaining $10 million being made available to the Debtors following the entry of the Final Order, in accordance with the Approved Budget (subject to Permitted Variances) and the DIP Orders) (the "New Money DIP Loans") and (b) subject to entry of the Final Order, a roll up of the outstanding term loans under the Prepetition Term Loan Credit Agreement (such loans, the "Prepetition Term Loans") in an aggregate principal amount of $52.5 million (the "Roll Up DIP Loans," and together with the New Money DIP Loans, the "DIP Loans," and any Claims arising out of the DIP Loans, the "DIP Claims") into DIP Obligations.

(ii)    approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents and authorizes and directs the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents and the DIP Orders;

(iii)    subject and subordinate to the Carve Out in all respects, grants adequate protection to the Prepetition Term Loan Secured Parties for any diminution in value of their respective

interests in the applicable Prepetition Term Loan Collateral, including[3] as a result from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Term Loan Collateral, including Cash Collateral, subject to the restrictions set forth in the DIP Loan Documents and the DIP Orders;

(iv)    subject and subordinate to the Carve Out in all respects, grants (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, automatically perfected, valid, enforceable, non-avoidable, and fully perfected Liens on all of the DIP Collateral and the proceeds thereof, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens and shall be junior solely to any valid, enforceable and non-avoidable Liens that are (A) in existence on the Petition Date, (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition Term Loan Liens after giving effect to any intercreditor or subordination agreement (all such Liens, collectively, the "Prepetition Prior Liens") and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including, upon entry of this Interim Order, any actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral, and upon entry of the Final Order, the proceeds of Avoidance Actions (but, for the avoidance of doubt, not the Avoidance Actions themselves);

---

[3]    As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

(v)    solely upon entry of the Final Order, authorizes the waiver of (x) the Debtors' right, pursuant to section 506(c) of the Bankruptcy Code, to surcharge the Prepetition Term Loan Collateral with respect to the Prepetition Term Loan Secured Parties and to surcharge the DIP Collateral with respect to the DIP Secured Parties, and (y) any rights of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(vi)    solely upon entry of the Final Order, finds that neither the DIP Lenders nor the Prepetition Term Loan Lenders, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Term Loan Collateral, as applicable;

(vii)    authorizes and directs the Debtors to make non-refundable, irrevocable, and final payments on account of any fees, expenses, and other amounts payable under, and in accordance with, the DIP Loan Documents as such become due and payable;

(viii)    authorizes the Debtors to use the proceeds of the DIP Facility and "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), in each case in accordance with the Approved Budget (subject to Permitted Variances), the DIP Loan Documents, and this Interim Order;

(ix)    subject to the terms and provisions of the DIP Orders, modifies the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and the DIP Loan Documents;

(x)    schedules a final hearing on the DIP Motion (the "Final Hearing") to be held no later than thirty (30) calendar days after the Petition Date to consider entry of the Final Order, which Final Order shall be in form and substance (including with respect to any subsequent modifications made in response to any objections of other parties in interest or as required by this Court)

acceptable to the DIP Agent (acting at the direction of the Required Lenders, under, and as defined in, the DIP Credit Agreement (the "Required DIP Lenders")); and

(xi)    provides for the immediate effectiveness of this Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the DIP Motion, the DIP Credit Agreement, the *Declaration of Daniel Aronson in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Term Loan Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*, the *Declaration of Kevin Nystrom in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Term Loan Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*, and the *Declaration of Kevin Nystrom, Chief Transformation Officer of Zips Car Wash, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14], and the evidence submitted or proffered at the hearing to consider this Interim Order (the "Interim Hearing"); and appropriate and sufficient notice of the DIP Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules, and no other further notice being necessary or required; and it appearing that approval of the relief requested in the DIP Motion is necessary on an interim basis to avoid immediate and irreparable harm to the Debtors and otherwise is fair and reasonable under the circumstances and in the best

interests of the Debtors, their creditors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A. **Petition Date**. On February 5, 2025 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Texas (this "Court"). The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No statutory committee of unsecured creditors (to the extent such committee is appointed, the "Committee"), trustee, or examiner has been appointed in the Cases.

B. **Jurisdiction and Venue**. This Court has core jurisdiction over the Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and the Local Rules.

C. **Notice**. Proper, timely, adequate and sufficient notice of the DIP Motion and the Interim Hearing has been provided under the circumstances in accordance with the

---

[4] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the

DIP Motion with respect to the relief requested at the Interim Hearing is or shall be required.  The

interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors

and their estates pending the Final Hearing, for purposes of Bankruptcy Rule 6003.

        D.      **Debtors' Stipulations**.  Subject to the rights of all parties in interest,

including those that are specifically set forth in Paragraph 5 of this Interim Order, the Debtors, on

their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (this

paragraph D shall be referred to herein as the "Debtors' Stipulations") as follows:

       (i)      Prepetition Term Loan Credit Agreement and Prepetition Term Loan Documents.

Pursuant to that certain Credit Agreement, dated as of August 30, 2016 (as amended by the First

Amendment to Credit Agreement, dated as of March 10, 2017, the Second Amendment to Credit

Agreement, dated as of September 27, 2017, the Third Amendment to Credit Agreement, dated as

of January 16, 2019, the Fourth Amendment to Credit Agreement, dated as of March 13, 2019, the

Fifth Amendment to Credit Agreement, dated as of May 29, 2019, the Sixth Amendment to Credit

Agreement, dated as of January 16, 2020, the Seventh Amendment to Credit Agreement, dated as

of May 4, 2020, the Eighth Amendment, dated as of December 21, 2020, the Ninth Amendment,

dated as of May 26, 2021, the Tenth Amendment, dated as of July 13, 2021, the Eleventh

Amendment, dated as of August 17, 2021, the Twelfth Amendment, dated as of October 18, 2021,

the Thirteenth Amendment, dated as of October 20, 2021, the Fourteenth Amendment, dated as of

December 21, 2021, the Fifteenth Amendment, dated as of February 11, 2022, the Sixteenth

Amendment, dated as of May 10, 2022, the Seventeenth Amendment, dated as of July 13, 2022,

the Eighteenth Amendment dated as of August 24, 2022, the Nineteenth Amendment dated as of

October 4, 2022, the Twentieth Amendment dated as of December 30, 2022, the Twenty-First

Amendment dated as of May 15, 2023, the Twenty-Second Amendment dated September 26, 2023, the Twenty-Third Amendment dated November 17, 2023, the Waiver and Twenty-Fourth Amendment to Credit Agreement dated as of March 12, 2024, and Twenty-Fifth Amendment to Credit Agreement and Consent dated as of September 4, 2024, and as it may further be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Documents"), among (a) Zips Car Wash, LLC, as borrower, Zips Operating Holdings, LLC, Zips Portfolio I, LLC, Zips Portfolio II, LLC, Zips Portfolio III, LLC, Zips Portfolio IV, LLC, Zips 2900 Wade Hampton, LLC, Zips 6050 Wade Hampton, LLC, and Zips 3107 N. Pleasantburg, LLC, (b) the lenders party thereto from time to time (collectively, the "Prepetition Term Loan Lenders"), and (c) Brightwood Loan Services LLC, as administrative agent (in such capacity, the "Prepetition Term Loan Agent," and together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties"), the Prepetition Term Loan Lenders agreed to extend loans and other financial accommodations to the borrower pursuant to the Prepetition Term Loan Documents.  All obligations of the Debtors arising under the Prepetition Term Loan Credit Agreement (including all the "Obligations" as defined therein) or the other Prepetition Term Loan Documents shall collectively be referred to herein as the "Prepetition Term Loan Obligations."

(ii)    Prepetition Term Loan Liens and Prepetition Term Loan Collateral.  Pursuant to the Security Documents (as defined in the Prepetition Term Loan Credit Agreement) (collectively, as such documents may have been amended, restated, supplemented, or otherwise modified from

9

time to time, the "<u>Prepetition Term Loan Collateral Documents</u>"), and to secure the Prepetition

Term Loan Obligations, the Prepetition Term Loan Lenders were granted a security interest in and

continuing Lien (the "<u>Prepetition Term Loan Liens</u>") on all present and future assets and properties

of the Borrower and the Guarantors (as defined in the Prepetition Term Loan Credit Agreement)

(which, for the avoidance of doubt, includes Cash Collateral and excludes Excluded Assets (as

defined in the Prepetition Term Loan Credit Agreement)) and all proceeds, products, accessions,

rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or

arising.  All "Collateral" as defined in the Prepetition Term Loan Credit Agreement granted or

pledged pursuant to any Prepetition Term Loan Collateral Document or any other Prepetition Term

Loan Document shall collectively be referred to herein as the "<u>Prepetition Term Loan Collateral</u>."

As of the Petition Date, (I) the Prepetition Term Loan Liens (a) are legal, valid, binding,

enforceable, and perfected Liens, (b) were granted to, or for the benefit of, the Prepetition Term

Loan Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to

avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable

non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and

subordinate only to (A) the DIP Liens, (B) the Carve Out, and (C) the Prepetition Prior Liens, and

(II) (w) the Prepetition Term Loan Obligations constitute legal, valid, and binding obligations of

the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition

Term Loan Documents (other than in respect of the stay of enforcement arising from section 362

of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any

of the Prepetition Term Loan Obligations exist, (y) no portion of the Prepetition Term Loan

Obligations or any payments made to any or all of the Prepetition Term Loan Secured Parties are

subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination,

attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind

pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) each of the Guarantees

(as defined in the Prepetition Term Loan Credit Agreement) shall continue in full force and effect

to unconditionally guaranty the Prepetition Term Loan Obligations notwithstanding any use of

Cash Collateral permitted hereunder or any financing and financial accommodations extended by

the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Loan

Documents.

(iii)      <u>Amounts Owed under Prepetition Term Loan Documents</u>.  As of the Petition Date,

the applicable Debtors owed the Prepetition Term Loan Secured Parties, pursuant to the Prepetition

Term Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect

of loans made, letters of credit issued, and other financial accommodations made by the Prepetition

Term Loan Secured Parties, (x) an aggregate principal amount of not less than $638,325,145.56[5]

on account of the outstanding Prepetition Term Loans, *plus* (y) all accrued and hereafter accruing

and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys',

accountants', and financial advisors' fees and expenses that are chargeable or reimbursable under

the Prepetition Term Loan Documents), and other amounts now or hereafter due under the

Prepetition Term Loan Documents.

(iv)      <u>Release of Claims</u>.  Subject to Paragraph 5 below and entry of this Interim Order,

in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each

Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the

Prepetition Term Loan Secured Parties and their respective affiliates, assigns or successors and,

---

[5]      The aggregate principal amount of the outstanding Prepetition Term Loans excludes default interest, with respect
to which the DIP Secured Parties and the Prepetition Term Loan Secured Parties have reserved all rights.

with respect to each of the foregoing, their respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives (all of the foregoing, and in each case in their respective capacities as such, collectively, the "Prepetition Term Loan Secured Party Releasees") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition Term Loan Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition Term Loan Documents, the Prepetition Term Loan Obligations, the Prepetition Term Loan Liens, or the debtor-creditor relationship between any of the Prepetition Term Loan Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (I) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (II) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Term Loan Obligations or any payments or other transfers made on account of the Prepetition Term Loan Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Term Loan Liens securing the Prepetition Term Loan Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Term Loan Secured Party Releasees.

E.      **Cash Collateral**.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, whether as original Prepetition Term Loan Collateral or proceeds thereof, constitutes Cash Collateral of the Prepetition Term Loan Secured Parties.

F.      **No Control**.  None of the Prepetition Term Loan Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors or any of their affiliates.

G.      **Findings Regarding the DIP Facility**.

(i)      Need for Postpetition Financing.  The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, (a) permit the orderly continuation of the operation of their businesses, (b) maintain business relationships with vendors, suppliers, and customers, (c) make payroll, (d) make capital expenditures and satisfy other working capital needs, and (e) pay the costs of administration and otherwise preserve the value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to preserve the enterprise value of the Debtors' estates.  Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

(ii)      No Credit Available on More Favorable Terms.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents,

including the DIP Liens and the DIP Superpriority Claims, (b) allowing the DIP Secured Parties to provide the loans and other financial accommodations under the DIP Facility (including, subject to entry of the Final Order, the Roll Up DIP Loans) on the terms set forth herein and in the DIP Loan Documents, and (c) granting to the Prepetition Term Loan Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the Prepetition Term Loan Adequate Protection and, subject to entry of the Final Order, the conversion of certain Prepetition Term Loan Obligations into the Roll Up DIP Loans (all of the foregoing described in clauses (a), (b), and (c) above, collectively, the "DIP Protections").

        H.      **Interim Financing**.  During the Interim Period, the DIP Secured Parties and the Prepetition Term Loan Secured Parties are willing to provide financing to the Debtors and/or consent to the use of Cash Collateral by the Debtors, each as applicable, subject to (i) the entry of this Interim Order, and (ii) the terms and conditions of this Interim Order and the DIP Loan Documents.

        I.      **Adequate Protection for Prepetition Term Loan Secured Parties**.  The Prepetition Term Loan Secured Parties have agreed to permit the Debtors to use the Prepetition Term Loan Collateral, including the Cash Collateral, during the Interim Period, subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated hereby provides for a priming of the Prepetition Term Loan Liens pursuant to section 364(d) of the Bankruptcy Code.  Solely to the extent of any Diminution in Value, the Prepetition Term Loan Secured Parties are entitled to the adequate protection as set forth herein, including, subject to the entry of the Final Order with respect to any Roll Up DIP Loans until the conclusion of the Challenge Period, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on

the DIP Motion and on the record presented to this Court at the Interim Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition Term Loan Secured Parties. Prepetition Term Loan Lenders holding 100% of the aggregate principal balance of the Prepetition Term Loans (which Prepetition Term Loan Lenders accordingly constitute "Required Lenders," as defined in the Prepetition Term Loan Credit Agreement) have expressly consented to the entry of this Interim Order and the relief provided herein and pursuant to the terms of the Prepetition Term Loan Credit Agreement, the consents of such Prepetition Term Loan Lenders are binding on all Prepetition Term Loan Secured Parties. Notwithstanding anything to the contrary herein, the Prepetition Term Loan Secured Parties' consent to the DIP Facility and to the priming of the Prepetition Term Loans by the DIP Liens is expressly limited to the present DIP Facility and the DIP Liens securing the same and shall not be applicable to any other debtor-in-possession credit facility, even if such contains substantially the same economic terms as the DIP Facility.

J.    **Section 552**.  Subject to the entry of the Final Order, in light of the subordination of their Liens and superpriority administrative claims to the Carve Out and the DIP Liens, each of the Prepetition Term Loan Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply.

K.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)    The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Interim Order.

(ii)     The terms and conditions of the DIP Facility (including, subject to the entry of the Final Order, the Roll Up DIP Loans) as set forth in the DIP Loan Documents and this Interim Order, and the fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Loan Documents and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.   Such terms and conditions are supported by reasonably equivalent value and fair consideration.

(iii)     The DIP Secured Parties, the Prepetition Term Loan Secured Parties, and the Debtors, with the assistance and counsel of their respective advisors, have acted in good faith and at arm's length in, as applicable, negotiating, consenting to, and/or agreeing to, the DIP Facility (including, subject to the entry of the Final Order, the Roll Up DIP Loans), the Debtors' use of the DIP Collateral and the Prepetition Term Loan Collateral (including Cash Collateral), the DIP Loan Documents and the DIP Protections (including the Prepetition Term Loan Adequate Protection). The DIP Obligations (including all advances that are made at any time to the Debtors under the DIP Loan Documents and including, subject to entry of the Final Order, the Roll Up DIP Loans) and the Debtors' use of the DIP Collateral and the Prepetition Term Loan Collateral (including Cash Collateral) shall be deemed to have been extended and/or consented to by the DIP Secured Parties and the Prepetition Term Loan Secured Parties for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(e) of the Bankruptcy Code and this Interim Order, and, accordingly, the DIP Liens, the DIP Superiority Claims, the Prepetition Term Loan Adequate Protection and the other DIP Protections shall be entitled to the full protection of

section 364(e) of the Bankruptcy Code and this Interim Order in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

L.      **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates, their businesses and properties, and their ability to successfully sell their assets or otherwise preserve the enterprise value of the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.  Based on all of the foregoing, sufficient cause exists for immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition Term Loan Secured Parties, and the DIP Secured Parties to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.      **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.  Any objections to the DIP Motion (and all reservation of rights included therein) with respect to the entry of this Interim Order that have not otherwise been withdrawn, waived, or settled, are hereby denied and overruled in all respects.

17

2.    **DIP Loan Documents and DIP Protections**.

(i)    <u>Approval of DIP Loan Documents</u>.  The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Interim Order, to incur the DIP Obligations (including, subject to the entry of the Final Order, to convert $52.5 million of the outstanding amount of the Prepetition Term Loans to DIP Loans), in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Interim Order and the DIP Loan Documents.  The Debtors are hereby authorized and directed to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including, as applicable, all closing fees, administrative fees, commitment fees, and reasonable and documented out-of-pocket attorneys', financial advisors' fees, and disbursements arising under the DIP Loan Documents and this Interim Order (subject to the requirements of Paragraph 19 hereof), which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect.  Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid, and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms.

(ii)    <u>DIP Obligations</u>.  For purposes of this Interim Order, the term "<u>DIP Obligations</u>" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and the other DIP Loan Documents (including all "<u>Obligations</u>" as

defined in the DIP Credit Agreement, and subject to the entry of the Final Order, the Roll Up DIP Loans) and shall include the principal of, interest on, and fees, costs, expenses, and other charges owing in respect of, such amounts (including any reasonable and documented out-of-pocket attorneys', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents and/or this Interim Order), and any obligations in respect of indemnity claims, whether contingent or otherwise. Notwithstanding anything to the contrary herein, the relative rights and priorities of the DIP Secured Parties in respect of the DIP Collateral shall be as provided in the DIP Loan Documents.

(iii)    <u>Authorization to Incur DIP Obligations and Use Cash Collateral</u>. To prevent immediate and irreparable harm to the Debtors' estates and to enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, during the period from the entry of this Interim Order through and including the earliest to occur of (a) the entry of the Final Order, or (b) the Termination Declaration Date, in each case unless extended by written agreement of the DIP Agent and the Prepetition Term Loan Agent (the period from the entry of this Interim Order through and including such earliest date, the "<u>Interim Period</u>"), the Borrower is hereby authorized (x) to use Cash Collateral and (y) to borrow under the DIP Facility; *provided* that (i) the aggregate outstanding amount for all such New Money DIP Loan borrowings shall not exceed $20 million during the Interim Period, with $10 million of such New Money DIP Loans available upon entry of the Final Order; and (ii) any proposed use of the proceeds of the DIP Loans or the use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget, subject to Permitted Variances and the Budget Covenants. Following the entry of the Final Order, the Borrower's authority to incur further DIP Obligations, if any, and use further Cash Collateral will be governed by the terms of

such Final Order and the DIP Loan Documents.  All DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the Guarantors under, and as defined in, the DIP Credit Agreement, as further provided in the DIP Loan Documents.

(iv)   <u>Roll Up DIP Loans</u>.  Subject to the entry of the Final Order, and subject to Paragraph 5 of this Interim Order, $52.5 million of the Prepetition Term Loans shall immediately, automatically, and irrevocably be deemed to have been converted into DIP Obligations and, except as otherwise provided in the Final Order and the DIP Loan Documents, shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under the Final Order and the DIP Loan Documents.  The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Term Loan Secured Parties as DIP Lenders to fund amounts and provide other consideration to the Debtors under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Term Loan Obligations.  The Prepetition Term Loan Secured Parties would not otherwise consent to the use of their Cash Collateral, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without the inclusion of the Roll Up DIP Loans in the DIP Obligations upon entry of the Final Order.  Moreover, the roll-up of the Prepetition Term Loan Obligations in the amount of the Roll Up DIP Loans into DIP Obligations will enable the Debtors to obtain urgently needed financing to administer these chapter 11 cases to fund their operations.

(v)   <u>Budget</u>.  Attached hereto as **Exhibit B** is a rolling 13-week cash flow budget (the "<u>Initial Approved Budget</u>"), that reflects on a line-item basis the Debtors' (a) weekly projected cash receipts, (b) weekly projected disbursements (including a forecasted cash balance as well as a line-item report setting forth the estimated fees and expenses to be incurred by each of

20

Kirkland & Ellis LLP, AlixPartners, LLP, and Evercore Group L.L.C. on a weekly basis), and (c) the weekly outstanding principal balance of the loans made under the DIP Facility and all unrestricted cash on hand.  Commencing on the first Thursday that is four weeks following the Petition Date and continuing every other weekly anniversary thereafter (*i.e.*, biweekly), the Debtors shall prepare and deliver to the DIP Agent, the United States Trustee, and counsel to the Committee an updated "rolling" 13-week budget, which, once approved in writing (which may be by email) by the DIP Agent (at the direction of the Required Lenders under the DIP Credit Agreement) shall supplement and replace the Approved Budget or Supplemental Approved Budget, as applicable, then in effect (each such updated budget that has been approved in writing (which may be by email) by the DIP Agent (at the direction of the Required Lenders under the DIP Credit Agreement), a "Supplemental Approved Budget") without further notice, motion, or application to, order of, or hearing before, this Court; *provided*, *however*, that unless and until the DIP Agent has approved such updated budget in writing (which may be by email), in accordance with the foregoing, the Debtors shall still be subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect as consented to in writing by the DIP Agent (at the direction of the Required Lenders under the DIP Credit Agreement) in accordance with this Interim Order; *provided*, *further*, that within five (5) Business Days after receipt by the DIP Agent of each updated Budget, the DIP Agent shall deliver notice to the Debtors indicating whether such updated Budget is in form and substance satisfactory to the DIP Agent.  The Initial Approved Budget, as modified by all Supplemental Approved Budgets that are expressly consented to in writing in accordance with the foregoing, shall constitute the "Approved Budget."  Commencing on the first Thursday that is two weeks following the Petition Date and continuing on each weekly anniversary thereafter, the Debtors shall prepare and

deliver simultaneously to the DIP Agent and the Prepetition Term Loan Agent a variance report/reconciliation report certified by an authorized representative of the Debtors, in form and detail acceptable to the DIP Agent setting forth on a line-by-line basis (A) the actual revenues received, and disbursements made, by the Debtors for such immediately preceding week, (B) the variance in dollar amounts of such actual revenues and disbursements for each weekly period from those reflected for the corresponding period in the Approved Budget (inclusive of Allowed Professional Fees), (C) a description of the nature of any positive or negative variance with respect to the revenue or disbursement and (D) whether the Debtors complied with the budget covenant for the applicable testing period.  Notwithstanding anything to the contrary in this Interim Order, the professional fees, costs and expenses of the DIP Secured Parties' advisors and the Prepetition Term Loan Secured Parties' advisors, respectively, shall be due, payable and paid in accordance with the terms of this Interim Order notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget, and the Debtors shall not be deemed to have breached the terms of the Approved Budget or the Budget Covenants to the extent the actual amount of such fees, costs and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.

(vi)    <u>Budget Covenants</u>.  The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget (subject to Permitted Variances) (and in the case of the costs and expenses of the DIP Secured Parties and Prepetition Term Loan Secured Parties, in accordance with the DIP Loan Documents and this Interim Order without being limited by the Approved Budget), subject to the following Permitted Variances, which shall be tested initially on the first Thursday following the first three full weeks following the Petition Date

(the "First Testing Date") (testing the period from the Petition Date through and including the last Saturday just prior to the First Testing Date (such initial testing period, the "First Testing Period")) and continuing on each weekly anniversary thereafter (each, a "Subsequent Testing Date") (in each case, testing the trailing four-week period ending on the last Business Day before the applicable Subsequent Testing Date (each, a "Testing Period")):   (a) for the First Testing Date, actual disbursements of the Debtors (excluding any restructuring professional fees of the Debtors) shall not exceed 120% on a cumulative basis as set forth in the Approved Budget during the First Testing Period; (b) for each Subsequent Testing Date, actual disbursements of the Debtors (excluding any restructuring professional fees of the Debtors) shall not exceed 115% on a cumulative basis as set forth in the Approved Budget during each subsequent Testing Period, as applicable; (c) for the First Testing Date, actual receipts of the Debtors shall not be less than 80% on a cumulative basis as set forth in the Approved Budget during the First Testing Period; and (d) for each Subsequent Testing Date, actual receipts of the Debtors shall not be less than 85% on a cumulative basis as set forth in the Approved Budget during each subsequent Testing Period, as applicable.  The foregoing budget-related covenants are collectively referred to herein as the "Budget Covenants."

(vii)     Interest, Fees, Costs, Indemnities, and Expenses.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  The Debtors shall pay all reasonable and documented fees, costs, indemnities, expenses (including reasonable and documented out-of-pocket legal and other professional fees and expenses of the DIP Agent), and other charges payable under the terms of the DIP Loan Documents as and when due thereunder. Without limiting the scope in any way of the Carve Out, all such fees, costs, indemnities, expenses

and disbursements, whether incurred, paid, or required to be paid prepetition or postpetition and whether or not budgeted in the Approved Budget, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Agent and/or its professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Loan Documents, and, subject to the provisions of Paragraph 19(ii) with respect to the fees and expenses of the Lender Professionals, shall be non-refundable and not subject to challenge in any respect.

(viii)   <u>Use of DIP Facility and Proceeds of DIP Collateral</u>.  The Borrower shall apply the proceeds of all DIP Collateral solely in accordance with this Interim Order, the DIP Loan Documents, and the Approved Budget (subject to Permitted Variances).  Without limiting the foregoing, and without limiting the scope and implementation of the Carve Out, the Debtors shall not be permitted to make any payments (from the DIP Collateral, the proceeds of DIP Loans, or otherwise) on account of any prepetition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except (a) with respect to the Prepetition Term Loan Obligations as set forth in this Interim Order and a Final Order; (b) as provided in any order of the Court granting typical "first-day" relief in these Cases (collectively, the "<u>First Day Orders</u>"), which First Day Orders shall be in form and substance acceptable to the DIP Agent and the Prepetition Term Loan Agent; (c) as expressly provided in other motions, orders, and requests for relief, each in form and substance acceptable to the DIP Agent and the Prepetition Term Loan Agent with respect to any provisions that affect the rights or duties of the DIP Secured Parties or the Prepetition Term Loan Secured Parties; or (d) as otherwise contemplated by the *Joint Plan of Reorganization of Zips Car Wash, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (the "<u>Plan</u>")

or the DIP Credit Agreement, without giving effect to any amendment or waiver thereof to which the Prepetition Term Loan Agent has not consented in writing.

(ix)     <u>Conditions Precedent</u>.  Neither the DIP Secured Parties nor the Prepetition Term Loan Secured Parties have an obligation to extend credit under the DIP Facility or permit use of any DIP Collateral or Prepetition Term Loan Collateral or any proceeds thereof, including Cash Collateral, as applicable, during the Interim Period unless and until all conditions precedent to the extension of credit and/or use of DIP Collateral, Prepetition Term Loan Collateral or proceeds thereof under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and the Prepetition Term Loan Agent in accordance with the DIP Loan Documents or Prepetition Term Loan Credit Agreement, as applicable, and this Interim Order.

(x)     <u>DIP Liens</u>.  As security for the DIP Obligations, effective as of the Petition Date, the following security interests and Liens, which shall immediately, upon entry of this Interim Order, and without any further action by any Person, be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable, are hereby granted by the Debtors to the DIP Agent, for itself and the other DIP Secured Parties (all such security interests and Liens granted to the DIP Agent for the benefit of all the DIP Secured Parties pursuant to this Interim Order and the DIP Loan Documents, the "<u>DIP Liens</u>"), on all property of the Debtors (except, for the avoidance of doubt, Express Car Wash Holdings, LLC), now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, securities and other investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper,

documents of title, letters of credit, letter of credit rights, supporting obligations, proceeds of leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, permits, franchise rights, capital stock and other equity interests of subsidiaries and in other entities, tax and other refunds, insurance proceeds, commercial tort claims, causes of action, and proceeds relating thereto, rights under section 549 of the Bankruptcy Code (whether received by judgment, settlement or otherwise), all other Collateral (as defined in the DIP Loan Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located, including Avoidance Actions (defined below) (all of the foregoing collateral collectively referred to as the "DIP Collateral"); *provided*, *however*, that (i) the DIP Liens on the proceeds of Avoidance Actions shall be subject to the entry of the Final Order and (ii) the DIP Secured Parties shall only avail themselves of Avoidance Action proceeds on a "last look" basis, and only if all other DIP Collateral is inadequate to indefeasibly repay the DIP Obligations in full; *provided*, *further*, that the DIP Collateral shall not include (i) leasehold interests of non-residential real property unless the applicable lease permits the granting of such liens (but shall include the proceeds of the sale or disposition of such leases) and (ii) any security deposits (in possession of the landlord) or the Debtors' interests, if any, in pre-paid rent, if such deposits are not property of the Debtors' estates unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; *provided*, *further*, that the DIP Liens and Prepetition Term Loan Adequate Protection Liens shall extend to any such security deposits or pre-paid rent upon reversion thereof to the Debtors, if at all; *provided*, *further*,

26

any liens granted pursuant to the Orders relating to the Debtors' insurance policies or to any

insurance proceeds therefrom shall, to the extent applicable and related to any leasehold interests

of non-residential real property, be subject to the terms of the applicable leases and applicable law,

and shall not interfere with any rights held by a landlord under such policies to any such insurance

proceeds for damage to landlord's property:

(I)   subject only to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, perfected, binding, continuing, enforceable, and non-avoidable first priority Lien on all unencumbered DIP Collateral, including, subject to the entry of the Final Order, the proceeds of each of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law (collectively, the "Avoidance Actions," which for avoidance of doubt, excludes the Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise;

(II)   pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable Lien upon all DIP Collateral that is subject solely to the Prepetition Prior Liens, which DIP Lien shall be junior only to such Prepetition Prior Liens and the Carve Out; and

(III)   subject to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming Lien on all other DIP Collateral (including Cash Collateral), which DIP Lien (x) shall be senior to the Prepetition Term Loan Adequate Protection Liens and senior and priming to (A) the Prepetition Term Loan Liens and (B) any Liens that are junior to the Prepetition Term Loan Liens or the Prepetition Term Loan Adequate Protection Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A) and (B), collectively, the "Primed Liens").

(xi)   DIP Lien Priority.   Notwithstanding anything to the contrary contained in this

Interim Order or the DIP Loan Documents, but subject in all respects to the Carve Out, the DIP

Liens granted to the DIP Agent for the benefit of the DIP Secured Parties shall in each and every

case be first priority senior Liens that (a) are subject only to the Prepetition Prior Liens, and to the

extent provided in this Interim Order and the DIP Loan Documents, shall also be subject to the

Carve Out, and (b) except as provided in the immediately preceding sub-clause (a), are senior to all prepetition and postpetition Liens or other interests of any kind of any other person or entity whatsoever (including the Primed Liens and the Prepetition Term Loan Adequate Protection Liens), whether created voluntarily or involuntarily (including by order of a court).

(xii)   <u>Enforceable Obligations</u>.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto (including any trustee or other estate representative in any Successor Case, and their creditors and other parties in interest, in accordance with their terms.  Subject to the provisions of Paragraph 2(iv) hereof with respect to the Roll Up DIP Loans, no obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, surcharge, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(xiii)   <u>Superpriority Administrative Claim Status</u>.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed superpriority administrative claims against each of the Debtors' estates pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject and subordinate to the Carve Out, over all claims against the Debtors or their estates of any kind or nature whatsoever

(including the Prepetition Term Loan Adequate Protection Superpriority Claims), whether now existing or hereafter arising, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment (the "DIP Superpriority Claims").   The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order and on a "last look" basis, any proceeds of or property recovered in connection with the pursuit of Avoidance Actions.   Other than as expressly provided in the DIP Credit Agreement and/or this Interim Order with respect to the Carve Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or *pari passu* with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising under the DIP Loan Documents and/or this Interim Order.

(xiv)   Priority of DIP Liens and DIP Superpriority Claims.   Subject to the Challenge Period described in Paragraph 5 of this Interim Order, the DIP Liens and the DIP Superpriority Claims: (a) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code and, subject to and upon the entry of the Final Order, shall not be subject to surcharge under section 506(c) of the Bankruptcy Code and the "equities of the case" exception of section 552 of

29

the Bankruptcy Code, (b) shall not be subordinate to, or *pari passu* with, (x) any Lien that is

avoided and preserved for the benefit of the Debtors and their estates under section 551 of the

Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect

subsidiary thereof against any Debtor or any of such Debtor's property, (c) shall be valid and

enforceable against any trustee or any other estate representative elected or appointed in the Cases,

upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in

any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the

dismissal of any of the Cases, and (d) notwithstanding anything to the contrary in any orders of

this Court in any of the Cases, shall be senior to any administrative claims arising under any such

orders unless otherwise specifically set forth therein.

    (xv)    Notwithstanding anything to the contrary herein, in the DIP Orders, or in the DIP

Documents, Express Car Wash Holdings, LLC is not a guarantor or obligor under the DIP Credit

Agreement, and no liens (including adequate protection liens), claims, or interests shall attach to,

or be granted with respect to, Express Car Wash Holdings, LLC or any of its assets.

    3.    **Adequate Protection for Prepetition Term Loan Secured Parties**.

In consideration for the use of the Prepetition Term Loan Collateral (including Cash Collateral)

and the priming of the Prepetition Term Loan Liens, the Prepetition Term Loan Agent, for the

benefit of the Prepetition Term Loan Secured Parties, shall receive the following adequate

protection (collectively referred to as the "Prepetition Term Loan Adequate Protection"):

    (i)    Prepetition Term Loan Adequate Protection Liens.  Solely to the extent there is a

diminution in value of the interests of the Prepetition Term Loan Secured Parties in the Prepetition

Term Loan Collateral (including Cash Collateral) from and after the Petition Date, whether or not

resulting from the use, sale, or lease by the Debtors of the applicable Prepetition Term Loan

Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition Term Loan Liens thereto and to the Carve Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("Diminution in Value"), the Prepetition Term Loan Agent, for the benefit of all the Prepetition Term Loan Secured Parties (including on account of the Roll Up DIP Loans until the Challenge Period Termination Date), is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "Prepetition Term Loan Adequate Protection Liens"), which Prepetition Term Loan Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition Term Loan Liens and the Carve Out.

(ii)     Prepetition Term Loan Adequate Protection Superpriority Claims.  To the extent of Diminution in Value, the Prepetition Term Loan Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Prepetition Term Loan Adequate Protection Superpriority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 7), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and the Carve Out to the extent provided herein and in the DIP Loan

Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, the proceeds of all Avoidance Actions); *provided*, *however*, that the Prepetition Term Loan Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Prepetition Term Loan Adequate Protection Superpriority Claims unless and until all DIP Obligations (including, subject to entry of the Final Order, the Roll Up DIP Loans) have been Paid in Full. Subject to the relative priorities set forth above, the Prepetition Term Loan Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis. For purposes of this Interim Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations and/or Prepetition Term Loan Obligations, as applicable, (a) the indefeasible payment in full in cash of such obligations, (b) the termination or cash collateralization, in accordance with the DIP Loan Documents or Prepetition Term Loan Documents, as applicable, of all undrawn letters of credit outstanding thereunder, and (c) the termination of all credit commitments under the DIP Loan Documents and/or Prepetition Term Loan Documents, as applicable.

(iii)    Priority of Prepetition Term Loan Adequate Protection Liens and Prepetition Term Loan Adequate Protection Superpriority Claims. Subject to the Challenge Period provided herein, the Prepetition Term Loan Adequate Protection Liens and the Prepetition Term Loan Adequate Protection Superpriority Claims (a) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (b) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens

or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (c) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases, and (d) notwithstanding anything to the contrary in any orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such orders unless otherwise expressly set forth therein.

(iv)  <u>Professional Fees</u>.  Subject to Paragraph 19(ii) of this Interim Order, without limiting any rights of the Prepetition Term Loan Secured Parties under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement for obtaining the consent of the Prepetition Term Loan Secured Parties to entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall pay or reimburse in cash the Prepetition Term Loan Secured Parties for any and all reasonable and documented fees, costs, and out-of-pocket expenses and charges (including the reasonable and documented fees, costs and out-of-pocket expenses of one lead counsel, one local counsel, and one financial advisor), including any unpaid fees, costs and expenses accrued prior to the Petition Date, in each case without further action of any kind, including notice, hearing, motion, application or order of the Bankruptcy Court.

(v)  The Debtors shall deliver to the Prepetition Term Loan Secured Parties all information, reports, documents and other materials that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents.

(vi)  Notwithstanding the Payment in Full of the DIP Obligations and the termination of the DIP Loan Documents, the covenants set forth in the DIP Loan Documents and any order of this Court relating thereto shall continue in full force and effect for the benefit of the Prepetition

Term Loan Secured Parties, and may be enforced by the Prepetition Term Loan Agent.  Unless otherwise expressly set forth herein, any consent or approval rights or similar rights granted or referenced in this Interim Order in favor of any or all of the DIP Agent, the other DIP Secured Parties, the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties may be exercised (or not exercised) in the sole discretion of such party.

(vii)    Consent to Priming and Adequate Protection.  The Prepetition Term Loan Agent, on behalf of the Prepetition Term Loan Secured Parties, consents to the Prepetition Term Loan Adequate Protection and the priming provided for herein; *provided*, *however*, that such consent of the Prepetition Term Loan Agent to the priming of the Prepetition Term Loan and the use of Cash Collateral is expressly conditioned upon the entry of this Interim Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents; *provided*, *further*, that such consent shall be of no force and effect in the event this Interim Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition Term Loan Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not approved.

(viii)    Right to Seek Additional Adequate Protection.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, this Court finds that the adequate protection provided herein is reasonable to protect the interests of the Prepetition Term Loan Secured Parties.  However, the Prepetition Term Loan Agent, on behalf of the Prepetition Term Loan Secured Parties, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any additional or alternative adequate

34

protection; *provided* that any such additional or alternative adequate protection shall at all times be subordinate and junior to the Carve Out and claims and Liens of the DIP Secured Parties granted under this Interim Order and the DIP Loan Documents; *provided*, *further*, that nothing in this paragraph shall authorize the Prepetition Term Loan Agent or Prepetition Term Loan Secured Parties to deny the Debtors access to Cash Collateral or DIP Loans in accordance with the Approved Budget, subject to any permitted variance, pursuant to the terms of this Interim Order during the pendency of such request for additional or alternative adequate protection.  The consent of the Prepetition Term Loan Secured Parties to the priming of the Prepetition Term Loan Liens by the DIP Liens and the Debtors' use of Cash Collateral on the terms set forth herein does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Term Loan Secured Parties that their respective interests in the Prepetition Term Loan Collateral are adequately protected pursuant to this Interim Order or otherwise.

      4.     **<u>Automatic Postpetition Lien Perfection</u>.**  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the Prepetition Term Loan Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction, (b) obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and the DIP Agent and, after Payment in Full of the DIP Facility, the Prepetition Term Loan Agent, shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts and commodities accounts within the meaning of such Uniform Commercial Code and other law) or (c) taking any other action to validate or perfect the DIP Liens and the Prepetition Term Loan Adequate Protection Liens or to entitle the DIP Liens and the Prepetition

Term Loan Adequate Protection Liens to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Term Loan Agent (in the latter case, solely with respect to the Prepetition Term Loan Adequate Protection Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Petition Date. The applicable Debtors shall execute and deliver to the DIP Agent and/or the Prepetition Term Loan Agent, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection and priority of the DIP Liens and the Prepetition Term Loan Adequate Protection Liens, as applicable, granted pursuant hereto. Without limiting the foregoing, each of the DIP Agent and the Prepetition Term Loan Agent may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized and hereby is directed to file or record such copy of this Interim Order. To the extent that the Prepetition Term Loan Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition Term Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtors' insurance policies, and the

secured party under each such Prepetition Term Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents and second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Prepetition Term Loan Secured Parties.  The Prepetition Term Loan Agent shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

5. **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**. Except as otherwise set forth herein, the admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations, are and shall be binding upon the Debtors, their estates, and any of their respective successors and assigns, including, without limitation, any chapter 7 or chapter 11 trustee, responsible person, examiner with expanded powers, or other estate representative in all circumstances and for all purposes.  The admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations, shall also be binding upon all creditors and other parties in interest and all of their respective successors and assigns, including, without limitation, any statutory or non-statutory committees appointed in the Cases, including the Committee (if appointed), and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes unless:  (a) such party in interest with the requisite standing commences an adversary proceeding or contested matter by the earlier of (i) seventy-five (75) calendar days after the entry of this Interim Order or, solely with respect to the Committee, if such Committee is appointed

more than fifteen (15) calendar days after entry of this Interim Order, within sixty (60) calendar days after the appointment of the Committee, and (ii) the date that is established as the deadline for filing objections to confirmation of a chapter 11 plan in any of the Cases (the time period established by the foregoing clauses (i) and (ii), the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (A) no Challenge is properly raised during the Challenge Period or (B) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, the "Challenge Period Termination Date")), either (x) challenging or otherwise objecting to the admissions, stipulations, findings, or releases contained in this Interim Order, including the Debtors' Stipulations, or (y) against any or all of the Prepetition Term Loan Secured Parties in connection with or related to the Prepetition Term Loan Obligations, or the actions or inactions of any of the Prepetition Term Loan Secured Parties arising out of or related to the Prepetition Term Loan Obligations or the Prepetition Term Loan Documents, including any claim against any or all of the Prepetition Term Loan Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Term Loan Obligations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition Term Loan Secured Parties) (each such adversary proceeding or contested matter a "Challenge"); and (b) a final, non-appealable judgment is entered in favor of the plaintiff in any such timely filed Challenge sustaining such challenge (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge"); *provided* that any pleadings filed in any Challenge shall set forth with specificity the basis for such Challenge (and any such Challenge not so specified prior to the Challenge Period shall be deemed forever waived, released, and barred).

(i)      If any such Challenge is timely and properly filed prior to the Challenge Period by the Committee or any other statutory or non-statutory committee appointed or formed in the Cases or any other person or entity with requisite standing, the admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on each other statutory or non-statutory committee appointed or formed in the Cases or any other person or entity, except to the extent that such admissions, stipulations, findings, or releases contained in this Interim Order, including the Debtors' Stipulations, were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable judgment of a court of competent jurisdiction.

(ii)      If no such Challenge is timely and properly filed prior to the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then (a) the admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations (and the release provisions contained therein), shall remain binding and preclusive on the Debtors and all parties in interest in the Cases or any Successor Cases, including the Committee (if appointed), any chapter 11 or chapter 7 trustee, and any other person or entity; (b) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (c) all payments made to or for the benefit of the Prepetition Term Loan Secured Parties pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance; and (d) all of the Prepetition Term Loan Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code (which claims and Liens shall have been deemed satisfied to the extent the Prepetition Term Loan Obligations are converted into

39

Roll Up DIP Loans as provided herein). Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (a) through (d) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (a) through (d) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.

(iii)    The Challenge Period may be extended (a) with the written consent of the Prepetition Term Loan Agent in its sole discretion or (b) pursuant to an order of the Court entered before the expiration of the applicable Challenge Period for good cause shown upon an application for extension filed and served by a party in interest; *provided* that an extension pursuant to the foregoing clause (b) shall only be applicable to such party in interest and the particular Challenge set forth in such application; *provided*, *further*, that the timely filing of a motion seeking standing to file a Challenge before the expiration of the Challenge Period, which attaches a draft complaint setting forth the legal and factual bases of the proposed Challenge, shall toll the Challenge Period only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by the Bankruptcy Court.

(iv)    Nothing in this Interim Order vests in or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if appointed) or any other statutory or non-statutory committee appointed or formed in the Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations, and the Debtors, the DIP Agent, the DIP

Lenders, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing reserve all of their rights to contest on any grounds any Challenge. The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 5 or to require or permit an extension of the Challenge Period Termination Date.

(v)    Any successor to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Cases or any Successor Cases) shall be bound by the terms of this Interim Order and the Final Order to the same extent as the Debtors, including with respect to the Debtors' Stipulations, to the extent and on the terms approved by this Interim Order and the Final Order.

6.    **Carve Out**.

(i)    Carve Out. As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the

Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(ii)    Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (a) be deemed a draw request and notice of borrowing by the Debtors for New Money DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding Term Loan Commitments (as defined in the DIP Credit Agreement), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute New Money DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any

42

Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at an institution acceptable to the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for New Money DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding Term Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute New Money DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at an institution acceptable to the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent gives such notice to such Term Loan Lenders (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for New Money DIP Loans under the DIP Facility, any termination of the Term Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding Term Loan Commitment (on a pro rata basis based on the then outstanding Term Loan Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such

borrowing in accordance with the DIP Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Term Loan Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Term Loan Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Term Loan Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Term Loan Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 6, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph 6, prior to making any payments to the DIP Agent or the Prepetition Term Loan Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Term

Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Term Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Term Loan Obligations.

(iii)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(iv)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Agent, DIP Lenders, or the Prepetition Term Loan Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the

Prepetition Term Loan Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(v)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(vi)     Notwithstanding anything to the contrary in this Interim Order, the Debtors' obligations to the DIP Secured Parties and Prepetition Term Loan Secured Parties and the liens, security interests, and superpriority claims granted herein, under the DIP Documents, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Prepetition Term Loan Adequate Protection Liens, the Primed Liens, the Prepetition Term Loan Adequate Protection Superpriority, and the Prepetition Term Loan Obligations, shall be subject in all respects and subordinate to the Carve Out.

7.     **Waiver of 506(c) Claims**.  Except to the extent of Carve Out, and without limiting the scope of thereof, subject to the entry of the Final Order, and as a further condition of (i) the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Secured Parties and the Prepetition Term Loan Secured Parties to the payment of the Carve Out to the extent provided herein) and (ii) the Debtors' use of Cash Collateral pursuant to this Interim Order and the Final Order, (a) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or

recovered from or against any or all of the DIP Secured Parties and/or the Prepetition Term Loan Secured Parties, the Prepetition Term Loan Collateral, the DIP Collateral and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition Term Loan Agent, and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties.

8.      **After-Acquired Property**.  Except as otherwise expressly provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date (or a valid, enforceable and unavoidable Lien that is perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code) that is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

9.      **Protection of DIP Secured Parties' and Prepetition Term Loan Secured Parties' Rights**.

(i)      Subject to and without limiting the scope of the Carve Out, unless the DIP Agent and the Prepetition Term Loan Agent shall have provided their prior written consent or all DIP Obligations and Prepetition Term Loan Obligations have been Paid in Full, there shall not be entered in any of these Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (a) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest

or other Lien on all or any portion of the DIP Collateral or Prepetition Term Loan Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Term Loan Liens, the Prepetition Term Loan Adequate Protection Liens, the Prepetition Term Loan Adequate Protection Superpriority Claims and/or the other DIP Protections; (b) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations and the Prepetition Term Loan Obligations or as otherwise permitted in the DIP Loan Documents and this Interim Order, or (c) any modification of any of the DIP Secured Parties' or the Prepetition Term Loan Secured Parties' rights under this Interim Order, the DIP Loan Documents or the Prepetition Term Loan Documents with respect to any DIP Obligations or Prepetition Term Loan Obligations.

(ii)     The Debtors (and/or their legal and financial advisors in the case of clauses (b) through (d) below) will, whether or not the DIP Obligations have been Paid in Full, (a) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents, (b) reasonably cooperate with, consult with, and provide to the DIP Secured Parties and the Prepetition Term Loan Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon request by any of the DIP Secured Parties or the Prepetition Term Loan Secured Parties) to provide under the DIP Loan Documents, the Prepetition Term Loan Documents (in the absence of the pendency of these Cases) or the provisions of this Interim Order, (c) permit consultants, advisors and other representatives (including third party representatives) of each of the DIP Agent and the Prepetition Term Loan Agent to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, as and to the extent required by the DIP Loan Documents and/or the Prepetition Term Loan Documents, (d) permit the

DIP Agent and the Prepetition Term Loan Agent and their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, and (e) permit the DIP Agent and the Prepetition Term Loan Agent to conduct, at their discretion and the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and the Prepetition Term Loan Collateral. Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent, the Prepetition Term Loan Agent, or their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product, as determined by the Debtors in their sole discretion.  For the avoidance of doubt, the Prepetition Term Loan Agent shall have the same access and cooperation rights as the DIP Agent for purposes of this subparagraph (ii).

10.    **Proceeds of Subsequent Financing**.    Without limiting the provisions and protections of the Carve Out and Paragraph 9 above, if at any time prior to the Payment in Full of all the DIP Obligations and the Prepetition Term Loan Obligations (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full and then to the Prepetition Term Loan Obligations until Paid in Full.

11.    **Cash Collection**.  From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or Prepetition Term Loan Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same deposit accounts into which the collections and proceeds of the Prepetition Term Loan Collateral were deposited under the Prepetition Term Loan Documents (or in such other accounts as are designated by the DIP Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall be subject to the control of the DIP Agent and the Prepetition Term Loan Agent, and the funds in such accounts may be used by the Debtors in accordance at all times with the Budget and otherwise to the extent provided in this Interim Order and the DIP Loan Documents.  Subject to, and without limiting the scope of, the Carve Out, upon the direction of the DIP Agent or, following Payment in Full of the DIP Obligations, the Prepetition Term Loan Agent, at any time after the occurrence of a Termination Event and subject to the provisions of Paragraph 6 hereof, all proceeds in the Cash Collection Accounts shall be remitted to the DIP Agent for application to the DIP Obligations until Payment in Full and then to the Prepetition Term Loan Agent for application to the Prepetition Term Loan Obligations until Payment in Full, and the DIP Agent and the Prepetition Term Loan Agent shall be entitled to take all action that is necessary or appropriate to effectuate the foregoing.  Unless otherwise agreed to in writing by the DIP Agent and the Prepetition Term Loan Agent, the Debtors shall maintain no accounts except those identified in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to (A) Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting Related Relief* filed contemporaneously

herewith (the "Cash Management Order").  The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Agent or, following Payment in Full of the DIP Obligations, the Prepetition Term Loan Agent.

12.      **Disposition of DIP Collateral; Credit Bid**.

(i)      Unless the DIP Obligations and the Prepetition Term Loan Obligations are Paid in Full upon the closing of a sale or other disposition of the DIP Collateral or Prepetition Term Loan Collateral, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or any Prepetition Term Loan Collateral (or enter into any binding agreement to do so) without the prior written consent of the DIP Agent and the Prepetition Term Loan Agent (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or Prepetition Term Loan Secured Party or any order of this Court), except as permitted in the DIP Loan Documents and/or the Prepetition Term Loan Documents, as applicable, and this Interim Order. Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral outside the ordinary course of business shall be remitted to the DIP Agent for application to the DIP Obligations and then to the Prepetition Term Loan Obligations, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents or the Prepetition Term Loan Documents, as the case may be.  In addition, the Debtors are authorized and directed to enter into such blocked account agreements (with cash dominion, if the DIP Agent so elects) with the DIP Agent and such financial institutions as the DIP Agent may require, and, if it so elects, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the

Prepetition Term Loan Agent is a party without the need to enter into new blocked account agreements.

(ii)        Subject to Paragraph 5 of this Interim Order, (a) upon entry of this Interim Order, the DIP Agent (at the direction of the Required DIP Lenders (as defined in the DIP Credit Agreement)) shall have the right to credit bid, in accordance with the DIP Loan Documents, on a dollar for dollar basis, up to the full amount of the DIP Obligations (including any accrued interest and expenses and, subject to entry of the Final Order, the Roll Up DIP Loans) in any sale of the DIP Collateral under or pursuant to (1) section 363 of the Bankruptcy Code, (2) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code to the extent any sale contemplated thereunder does not result in Payment in Full of all of the DIP Obligations on the effective date of such plan, or (3) a sale or disposition by a chapter 7 trustee under section 725 of the Bankruptcy Code, and (b) subject to the preservation of rights provided in Paragraph 5 of this Interim Order, the Prepetition Term Loan Agent (acting at the direction of the applicable required lenders) shall have the right to credit bid up to the full amount of the Prepetition Term Loan Adequate Protection and the Prepetition Term Loan Obligations in the sale of any Prepetition Term Loan Collateral whether pursuant to (1) section 363 of the Bankruptcy Code, (2) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (3) a sale or disposition by a chapter 7 trustee for the Debtors under section 725 of the Bankruptcy Code and each of the DIP Agent and the Prepetition Term Loan Agent, in their respective capacities as such, shall be deemed a qualified bidder (or such analogous term or capacity) in connection with any such sale and any such credit bid shall be deemed to constitute a qualified bid, regardless of whether any qualified bid requirements are satisfied (such a credit bid described in this Paragraph 12, the "Credit Bid").

52

13.     **Termination Events**.  The following shall constitute a termination event under this Interim Order and the DIP Loan Documents unless waived in writing by each of the DIP Agent and the Prepetition Term Loan Agent (each, a "Termination Event"):

(i)     The occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement, as set forth therein and as set forth in **Exhibit C** attached hereto (a "DIP Default Termination Event"), including, for avoidance of doubt, the failure to obtain entry of the Final Order, in form and substance acceptable to the DIP Agent and the Prepetition Term Loan Agent on or within thirty (30) calendar days of the Petition Date.

(ii)    Any other material breach or default by any of the Debtors of the terms and provisions of this Interim Order, which material breach or default or is not cured or waived within five (5) calendar days of the Debtors having received actual notice of the occurrence thereof.

(iii)   The Debtors' failure to timely and strictly comply with any of the obligations and deadlines set forth in **Exhibit D** attached hereto (the "Milestones"), absent the written waiver or extension of any such Milestone by the DIP Agent (acting at the direction of the Required DIP Lenders), which may be by email.  The Debtors shall provide notice of any such waiver or extension (which may be by email) to the Court, the United States Trustee, and counsel to the Committee (if appointed) and shall file such notice on the docket of the Cases.

14.     **Rights and Remedies Upon Termination Event**.

(i)     Upon the occurrence and during the continuance of a Termination Event, the DIP Agent may, by written notice to the Debtors, their counsel, counsel for the Committee, and the United States Trustee (which may be by email and shall be filed on the docket of these Cases): (a) declare all DIP Obligations to be immediately due and payable, (b) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent

53

any such commitment remains; or (c) declare a termination, reduction, or restriction of the ability

of the Debtors to use any Cash Collateral (any such declaration, a "Termination Declaration," and

the date of any such Termination Declaration, the "Termination Declaration Date").

(ii)    During the five (5) calendar day period after a Termination Declaration Date, the

Debtors, the Committee, and any party in interest shall, upon request, be entitled to an emergency

hearing before this Court solely for the purpose of (i) contesting whether a Termination Event has

occurred and is continuing and/or (ii) solely with respect to the Debtors, seeking authorization for

the non-consensual use of Cash Collateral, and the DIP Secured Parties and the Prepetition Term

Loan Secured Parties shall be deemed to have consented to any such emergency hearing.  During

such five (5) calendar day period, unless the Court has entered an order to the contrary or otherwise

fashioned an appropriate remedy, including whether Termination Event has occurred and is

continuing, the Debtors may not use Cash Collateral or any amounts previously or thereafter

advanced under the DIP Credit Agreement (except with respect to the Carve Out) except to pay

payroll and other expenses that are critical to keep the business of the Debtors operating, solely in

accordance with the Approved  Budget.

(iii)    Five (5) calendar days following the Termination Declaration Date, unless prior to

such time this Court determines that a Termination Event has not occurred and/or is not continuing

or authorizes the Debtors to use Cash Collateral on a non-consensual basis, the DIP Agent is hereby

granted relief from the automatic stay (other than with respect to the payment of the Carve Out as

provided in this Interim Order), without further notice, hearing, motion, order, or other action of

any kind, to the extent necessary to permit the DIP Secured Parties to exercise all rights and

remedies under this Interim Order, the DIP Loan Documents and/or applicable non-bankruptcy

law (other than those rights and remedies against the DIP Collateral and with respect to the

Debtors' use of Cash Collateral, as provided in Paragraph 14(ii) above), including the right (in each case subject to the Carve Out) to (a) terminate the DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the other DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations, and/or (b) foreclose on, or otherwise enforce and realize on, its DIP Liens on all or any portion of the DIP Collateral, including, without limitation, by collecting accounts receivable and applying the proceeds thereof to the DIP Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral.  Notwithstanding anything to the contrary herein, upon the occurrence and continuation of a Termination Event, the DIP Agent, the DIP Lenders, and the Prepetition Term Loan Secured Parties may enter upon the Debtors' leased premises only as provided by:  (i) the applicable lease or a separate written agreement by and between the applicable landlord and the DIP Agent or the DIP Lenders; (ii) applicable non-bankruptcy law; or (iii) an order of the Court entered at a hearing upon no less than five (5) days' notice by the DIP Agent to the landlord for the affected leased premises.

(iv)     Other than with respect to the payment of the Carve Out as provided in this Interim Order, upon the effectiveness of any relief from the automatic stay with respect to the DIP Facility pursuant to Paragraph 14(iii) hereof, the Prepetition Term Loan Agent shall have relief from the automatic stay to the same extent as the DIP Agent, and without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on its Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens on, all or any portion of the DIP Collateral or Prepetition Term Loan Collateral (including by collecting accounts receivable and applying the proceeds thereof to the Prepetition Term Loan Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral or Prepetition

Term Loan Collateral) or otherwise exercise remedies against the DIP Collateral or Prepetition

Term Loan Collateral permitted by this Interim Order, the Prepetition Term Loan Documents

and/or applicable non-bankruptcy law; *provided*, *however*, that any such foreclosure or other

enforcement by the Prepetition Term Loan Agent of any Prepetition Term Loan Liens or any

Adequate Protection Replacement Liens or any other such exercise of remedies by the Prepetition

Term Loan Agent against the DIP Collateral or Prepetition Term Loan Collateral shall not interfere

with or otherwise be inconsistent with any foreclosure or other enforcement by the DIP Agent of

any DIP Liens or other DIP Protections or any other exercise of remedies by the DIP Agent, and

any proceeds received by the Prepetition Term Loan Agent in connection with such foreclosure,

enforcement or other exercise of remedies shall be turned over to the DIP Agent for application to

the DIP Obligations until Paid in Full.

(v)     Subject to the provisions of Paragraph 5 hereof, and subject to, and without limiting

the scope of, the Carve Out, all proceeds realized in connection with the exercise of the rights and

remedies of the DIP Secured Parties or the Prepetition Term Loan Secured Parties, as applicable,

shall be turned over <u>first</u> to the DIP Agent for application to the DIP Obligations under, and in

accordance with the provisions of, the DIP Loan Documents and this Interim Order until Payment

in Full of all of the DIP Obligations and <u>then</u> to the Prepetition Term Loan Agent for application

to the Prepetition Term Loan Obligations under, and in accordance with the provisions of, the

Prepetition Term Loan Documents and this Interim Order until Payment in full of the Prepetition

Term Loan Obligations.

(vi)    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby

modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to

(a) permit the Debtors to grant the Prepetition Term Loan Adequate Protection Liens and the DIP

Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition

Term Loan Secured Parties under the DIP Loan Documents, the DIP Facility, and this Interim

Order, (b) authorize the DIP Secured Parties and the Prepetition Term Loan Secured Parties to

retain and apply payments made in accordance with the DIP Loan Documents, the Prepetition

Term Loan Documents and/or this Interim Order, (c) to permit each of the DIP Agent, the other

DIP Secured Parties, the Prepetition Term Loan Agent and the other Prepetition Term Loan

Secured Parties to perform any act authorized under this Interim Order and the DIP Loan

Documents, and (d) otherwise to the extent necessary to implement and effectuate the provisions

of this Interim Order and the DIP Loan Documents.

15.     **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary,

no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any

retainer held by any professionals for the below-referenced parties), Prepetition Term Loan

Collateral, or any portion of the Carve Out may be used by (a) any Debtor, Committee, or trustee

or other estate representative appointed in the Cases or any Successor Cases, or any other person,

party, or entity (including any of the Debtors' Professionals, the Committee's Professionals or any

committee member) to investigate or prosecute any Challenge (including any litigation or other

action) in connection with the value of the Prepetition Term Loan Collateral or the DIP Collateral

(or to pay any professional fees and disbursements incurred in connection therewith) at any time;

or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in the

Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtors'

Professionals, the Committee's Professionals or any committee member) to (or to pay any

professional fees and disbursements incurred in connection therewith): (i) request authorization to

obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of

the Bankruptcy Code, or otherwise, other than from the DIP Secured Parties, or to seek any

modification to this Interim Order not approved by the DIP Agent (after having obtained the

approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, to the extent

such modification would affect the rights of any of the Prepetition Term Loan Secured Parties, the

Prepetition Term Loan Agent; (ii) investigate (except as set forth below), assert, join, commence,

support, or prosecute any action for any claim, counter-claim, action, proceeding, application,

motion, objection, defense, or other contested matter seeking any order, judgment, determination,

or similar relief against, or adverse to the interests of, any or all of the DIP Secured Parties, the

Prepetition Term Loan Secured Parties, their respective affiliates, assigns or successors and the

respective officers, directors, employees, agents, attorneys, representatives and other advisors of

the foregoing, with respect to any transaction, occurrence, omission, action, or other matter

(including formal or informal discovery proceedings in anticipation thereof), including (A) any

Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy

Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP

Obligations and/or the Prepetition Term Loan Obligations, or the validity, extent, and priority of

the DIP Liens, the Prepetition Term Loan Liens, or the Prepetition Term Loan Adequate Protection

Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the

DIP Liens, the other DIP Protections, the Prepetition Term Loan Liens, the Prepetition Term Loan

Adequate Protection Liens, or the other Prepetition Term Loan Adequate Protection; (D) except

to contest in good faith the occurrence or continuance of any Termination Event as permitted in

Paragraph 14 of this Interim Order or, with respect to the Debtors, seek authorization of the

non-consensual use of Cash Collateral, any action seeking, or having the effect of, preventing,

hindering, or otherwise delaying any or all of the DIP Secured Parties', and, after the Payment in

Full of the DIP Obligations, the Prepetition Term Loan Secured Parties', assertion, enforcement, or realization on the Cash Collateral, the DIP Collateral or the Prepetition Term Loan Collateral in accordance with the DIP Loan Documents or the Prepetition Term Loan Documents, as applicable, or this Interim Order); and/or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties hereunder or under the DIP Loan Documents or the Prepetition Term Loan Documents, as applicable, or any payments made thereunder or in respect thereof; *provided*, *however*, up to $75,000 in the aggregate of any DIP Collateral, any Prepetition Term Loan Collateral, any Cash Collateral and proceeds of the DIP Facility may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims and/or Liens of the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents (but not the claims and/or Liens of the DIP Agent and the other DIP Secured Parties) so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person (other than the Prepetition Term Loan Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Agent and the Prepetition Term Loan Agent; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral or Prepetition Term Loan Collateral, unless otherwise permitted hereby, without the prior written consent of the DIP Agent and the Prepetition Term Loan Agent.

16.   **Proofs of Claim**.  The Prepetition Term Loan Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition Term Loan Secured Parties in respect of all Prepetition Term Loan Obligations.  In addition, the

Prepetition Term Loan Secured Parties and the DIP Secured Parties will not be required to file any request for allowance and/or payment of any administrative expenses, and this Interim Order is deemed to constitute a timely filed request for allowance and/or payment of any Prepetition Term Loan Obligations constituting administrative expenses or any DIP Obligations, as applicable. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, the Prepetition Term Loan Agent, for the benefit of itself and the other Prepetition Term Loan Secured Parties, and the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby authorized and entitled, but not required, in its respective sole discretion to file (and amend and/or supplement, in its discretion) in each of the Cases or Successor Cases (a) in the case of the Prepetition Term Loan Agent, a proof of claim and/or aggregate proofs of claim in respect of any Prepetition Term Loan Obligations, and (b) in the case of each of the Prepetition Term Loan Agent and the DIP Agent, a request or aggregate requests for allowance and/or payment of any portion of the Prepetition Term Loan Obligations constituting administrative expenses or any DIP Obligations, as applicable.

17. **Preservation of Rights Granted Under the Interim Order**.

(i)    <u>No Non-Consensual Modification or Extension of Interim Order</u>.   Subject to Paragraph 14 of this Interim Order, the Debtors shall not seek to amend, modify, or extend this Interim Order (including through any chapter 11 plan of reorganization) without the prior written consent of the DIP Agent and the Prepetition Term Loan Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured Parties or any of the Prepetition Term Loan Secured Parties.  In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority,

allowability, enforceability, or non-avoidability of any advances, payments, or use of cash authorized or made hereby or pursuant to the DIP Loan Documents, or Lien, claim, priority or other DIP Protections authorized or created hereby or pursuant to the DIP Loan Documents. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or any DIP Protections (including the Prepetition Term Loan Adequate Protection) incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agent or the Prepetition Term Loan Agent, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the original provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order), and the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall be entitled to all of the DIP Protections (including the Prepetition Term Loan Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted pursuant to section 364(e) of the Bankruptcy Code, this Interim Order, or the DIP Loan Documents.

(ii)   Dismissal. If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (a) the DIP Protections (including the Prepetition Term Loan Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the

DIP Secured Parties and the Prepetition Term Loan Secured Parties, respectively, shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order) until all DIP Obligations and all Prepetition Term Loan Obligations have been Paid in Full, and such order of dismissal shall so provide (in accordance with sections 105 and 349 of the Bankruptcy Code), and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections (including the Prepetition Term Loan Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties, respectively.

(iii)     <u>Survival of Interim Order</u>.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections (including the Prepetition Term Loan Adequate Protection), and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case or Successor Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases or any Successor Case in this Court, or terminating the joint administration of these Cases or any Successor Case or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections (including the Prepetition Term Loan Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP

Secured Parties and the Prepetition Term Loan Secured Parties, respectively, shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such DIP Protections (including the Prepetition Term Loan Adequate Protection), and such other rights, remedies, Liens priorities, privileges, protections and benefits, shall continue in full force and effect in these proceedings and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order. Pursuant to any chapter 11 plan of reorganization with respect to any of the Debtors, the DIP Obligations shall not be discharged by the entry of an order confirming any such chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

18. **Insurance Policies**. Until such time as all DIP Obligations are Paid in Full (or as otherwise agreed in writing by the DIP Agent, as applicable, in respect of the applicable obligations owed to them), the Debtors shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Loan Documents. Upon entry of this Interim Order, to the fullest extent permitted by applicable law, the DIP Agent, the other DIP Secured Parties, the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, and the Debtors shall take such actions as are reasonably requested by the DIP Agent or the Prepetition Term Loan Agent from time to time to evidence or effectuate the foregoing.

19. **Other Rights and Obligations**.

(i) Expenses. As provided in the DIP Loan Documents (and without limiting the Debtors' respective obligations thereunder), the applicable Debtors will pay all reasonable and

63

documented expenses incurred by the DIP Secured Parties (including the reasonable and documented fees and out-of-pocket expenses of counsel for the DIP Secured Parties, including those of Paul Hastings LLP, as lead counsel, the "Lender Professionals"), in connection with these Cases, in accordance with the procedures set forth in Paragraph 19(ii) below, including the preparation, execution, delivery, and administration of the DIP Loan Documents, this Interim Order, the Final Order, and all other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with these Cases, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

(ii)      Notice of Professional Fees.  The Lender Professionals shall not be required to comply with the United States Trustee fee guidelines, submit invoices to this Court, or submit its time entries to any party in interest.  In accordance with the Complex Case Procedures, the Lender Professionals shall submit summary invoices to the Debtors, the United States Trustee, counsel for any Committee, and such other parties as this Court may direct not with not less than ten (10) days for recipients to object to payment of such invoices.  The summary invoices shall include (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested; *provided*, *however*, that such summary invoices shall not include any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.  If the Debtors, United States Trustee, or any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve

such objection within ten (10) days of receipt of such invoices, then the Debtors, United States Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professionals an objection (the "Fee Objection") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed. All such unpaid fees, costs, expenses, and charges of the DIP Agent that have not been disallowed by this Court on the basis of an objection filed by the Debtor, the United States Trustee, or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Interim Order. Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent or the other DIP Secured Parties in connection with or with respect to the DIP Facility, the DIP Credit Agreement, or the other DIP Loan Documents are hereby approved in full and are non-refundable and shall not otherwise be subject to any Challenge or contest whatsoever.

(iii)    Binding Effect. Subject only to Paragraph 5 above, the provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties

in interest in these Cases and any Successor Cases, including the DIP Secured Parties, the

Prepetition Term Loan Secured Parties, any Committee, and the Debtors and their respective

estates, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed

or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of

the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal

representative of any of the Debtors or with respect to the property of the estate of any of the

Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case

or Successor Case; *provided*, *however*, that the DIP Secured Parties and the Prepetition Term Loan

Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any

financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates

of the Debtors in any Case or Successor Case.

(iv)     No Waiver.  The failure of the Prepetition Term Loan Secured Parties or the DIP

Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim

Order, the Prepetition Term Loan Documents, the DIP Loan Documents or otherwise (or any delay

in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder,

thereunder, or otherwise.  Nothing contained in this Interim Order (including the authorization of

the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in

law or equity to any Prepetition Term Loan Secured Party or any DIP Secured Party, including

rights of a party to a swap agreement, securities contract, commodity contract, forward contract,

or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto

as permitted by law (or the right of a Debtor to contest such assertion).  Except as prohibited by

this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute

a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the Prepetition

66

Term Loan Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (a) request conversion of the Cases or any Successor Cases to cases under chapter 7, dismissal of the Cases or any Successor Cases, or the appointment of a trustee or examiner in the Cases or any Successor Cases, or to oppose the use of Cash Collateral in any Successor Case or on terms other than those set forth in this Interim Order, (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (c) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition Term Loan Secured Parties, respectively, under the DIP Loan Documents or the Prepetition Term Loan Documents, the Bankruptcy Code or otherwise.  Except to the extent otherwise expressly provided in this Interim Order or by law, neither the commencement of the Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents or with respect to any non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition Term Loan Documents, applicable law, or equity.

(v)      No Third-Party Rights.  Except as explicitly provided for herein or in any DIP Loan Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall not (a) be deemed to be in control of the operations of the Debtors or to be acting as a

"responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(vi)     <u>No Marshaling</u>.  Upon entry of the Final Order, neither the DIP Secured Parties nor the Prepetition Term Loan Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Term Loan Collateral, as applicable; *provided* that the DIP Claims may be collected out of the proceeds of any Avoidance Actions only on a "last look" basis to the extent that all other DIP Collateral is inadequate to indefeasibly repay the DIP Obligations in full.

(vii)    <u>Amendments</u>.  The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver (a) increases the interest rate (other than as a result of the imposition of the default rate), (b) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facility, (c) shortens the Maturity Date (as defined in the DIP Credit Agreement), or (d) adds or amends (in any respect unfavorable to the Debtors) any Event of Default.  No such material amendment, modification, supplement, or waiver of any of the provisions of the DIP Loan Documents shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, except as provided herein, approved by this Court.  Notwithstanding the foregoing, no amendment, modification, supplement,

68

or waiver of any of the provisions of this Interim Order or the DIP Loan Documents that would directly and adversely affect the rights or interests of the Prepetition Term Loan Secured Parties, as applicable, shall be effective unless also consented to in writing by the Prepetition Term Loan Agent on behalf of the Prepetition Term Loan Secured Parties (after obtaining the approval of the requisite Prepetition Term Loan Secured Parties under the Prepetition Term Loan Credit Agreement).

(viii)    <u>Inconsistency</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.  In the event of any inconsistency between the terms or conditions of this Interim Order and the terms or conditions of any other order entered by this Court in these Cases, including in the nature of a "first day order", the provisions of this Interim Order shall govern and control unless otherwise agreed in writing by the DIP Agent.

(ix)    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of the Petition Date immediately upon execution hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(x)    <u>Reservation of Rights</u>.  Nothing in this Interim Order shall be deemed to constitute the consent of the DIP Secured Parties or the Prepetition Term Loan Secured Parties, and each of the foregoing expressly reserve the right to object to entry of any Order of the Bankruptcy Court that provides for the sale or other disposition of all or substantially all of the assets of the Debtors

(or any other sale or other disposition of assets of any of the Debtors outside the ordinary course of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations, the Prepetition Term Loan Obligations, and the Prepetition Term Loan Adequate Protection and all of the foregoing are Paid in Full on the closing date of such sale.

(xi)    <u>Headings</u>.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

20.    **<u>Final Hearing</u>**

(i)    The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [___], 2025, at [___:___ _.m.] (prevailing Central time) at the United States Bankruptcy Court for the Northern District of Texas.  The proposed Final Order shall be substantially the same as the Interim Order except that (a) those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (b) where appropriate, references to this Interim Order shall be changed to references to the Final Order.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(ii)    <u>Final Hearing Notice</u>.  As soon as reasonably practicable following entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (a) notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>") and (b) a copy of this Interim Order on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or

Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court by no later than [__:__ _.m.] (prevailing Central time) on [__], 2025, which objections shall be served, so that the same are received on or before such date by, (a) the Debtors, 8400 Belleview Drive, Suite 210, Plano, Texas 75024, Attn.:  Kevin Nystrom (knystrom@alixpartners.com); (b) proposed co-counsel to the Debtors (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:  Joshua Sussberg, P.C. (jsussberg@kirkland.com), and Ross J. Fiedler (ross.fiedler@kirkland.com), (ii) Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.:  Lindsey Blumenthal (lindsey.blumenthal@kirkland.com), and (iii) Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201 Attn.:  Jason S. Brookner (jbrookner@grayreed.com), Amber M. Carson (acarson@grayreed.com),; (c) the Office of the United States Trustee for the Northern District of Texas, 1100 Commerce Street, Room 976, Dallas, Texas 75242, Attn.:  Meredyth A. Kippes, Trial Attorney (meredyth.kippes@usdoj.gov); (d) counsel for the Prepetition Term Loan Secured Parties and the DIP Secured Parties, Paul Hastings LLP, 515 S. Flower Street, 25th Floor, Los Angeles, California 90071, Attn: Justin E. Rawlins (justinrawlins@paulhastings.com), 200 Park Ave, New York, New York 10166, Attn: Robert Nussbaum (robertnussbaum@paulhastings.com), Matt Friedrick (matthewfriedrick@paulhastings.com), and Paul Hastings LLP, 2001 Ross Ave., Suite 2700, Dallas, Texas 75201, Attn: Charles Persons (charlespersons@paulhastings.com); and (e) any statutory committee appointed in these Cases, and such objections shall be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Texas , in each case to

allow actual receipt of the foregoing by no later than [__], 2025, at [__:__ _.m.] (prevailing Central time).

21.     **<u>Retention of Jurisdiction</u>**.  This Court has and will retain exclusive jurisdiction to with respect to the interpretation, implementation, and enforcement this Interim Order according to its terms.

# # # END OF ORDER # # #

Submitted by:

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Aaron M. Kaufman (TX Bar No. 24060067)
Amber M. Carson (TX Bar No. 24075610)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:    (214) 954-4135
Facsimile:    (214) 953-1332
Email:        jbrookner@grayreed.com
              akaufman@grayreed.com
              acarson@grayreed.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Ross J. Fiedler (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com
              ross.fiedler@kirkland.com

-and-

Lindsey Blumenthal (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile     (312) 862-2200
Email         lindsey.blumenthal@kirkland.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

## EXHIBIT A

## DIP Credit Agreement

*Agreed Form*

**SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

**Dated February [7], 2025 and**

**BY AND BETWEEN**

**ZIPS CAR WASH, LLC**
**as Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the
Bankruptcy Code,**

**ZIPS OPERATING HOLDINGS, LLC,**
**as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code**

**THE OTHER LOAN PARTIES WHICH ARE PARTY HERETO,**

**THE LENDERS WHICH ARE PARTY HERETO**

**AND**

**BRIGHTWOOD LOAN SERVICES LLC**
**as Administrative Agent**

# TABLE OF CONTENTS

**Page**

## ARTICLE I DEFINITIONS AND OTHER TERMS

| | | |
|---|---|---|
| 1.1 | Defined Terms | 2 |
| 1.2 | Other Interpretive Provisions | 32 |
| 1.3 | Accounting Terms; Payment Dates | 33 |
| 1.4 | References to Agreements, Laws, Etc | 33 |
| 1.5 | Times of Day | 33 |

## ARTICLE II THE ADVANCES

| | | |
|---|---|---|
| 2.1 | The Advances | 33 |
| 2.2 | Election by Borrower | 38 |
| 2.3 | Payments | 38 |
| 2.4 | Setoff; etc | 39 |
| 2.5 | Sharing | 39 |
| 2.6 | [Reserved] | 40 |
| 2.7 | Lending Branch | 40 |
| 2.8 | Application of Payments and Collections | 40 |
| 2.9 | [Reserved] | 41 |
| 2.10 | Defaulting Lenders | 41 |
| 2.11 | Rates | 42 |
| 2.12 | Benchmark Replacement Setting for Term Loans | 43 |

## ARTICLE III CONDITIONS PRECEDENT

| | | |
|---|---|---|
| 3.1 | Conditions Precedent to Effectiveness | 44 |
| 3.2 | Conditions Precedent to All Advances Other Than On The Closing Date | 46 |

## ARTICLE IV REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 4.1 | Organization; etc | 47 |
| 4.2 | Due Authorization | 47 |
| 4.3 | Subsidiaries | 48 |
| 4.4 | Validity of the Agreement | 48 |
| 4.5 | Financial Statements | 48 |
| 4.6 | Litigation; etc | 49 |
| 4.7 | Compliance with Law | 49 |
| 4.8 | ERISA Compliance | 49 |
| 4.9 | Title to Assets | 49 |
| 4.10 | Use of Proceeds | 50 |
| 4.11 | Governmental Regulation | 50 |
| 4.12 | Margin Stock | 50 |
| 4.13 | Investment Company Act | 50 |
| 4.14 | Accuracy of Information | 50 |
| 4.15 | Tax Returns; Audits | 51 |

i

4.16    Environmental and Safety Regulations..................................................................51
4.17    Payment of Wages; Labor Matters ........................................................................51
4.18    Intellectual Property .............................................................................................52
4.19    Projections ...........................................................................................................52
4.20    [Reserved] ............................................................................................................52
4.21    [Reserved] ............................................................................................................52
4.22    Brokers' Fees .......................................................................................................52
4.23    Deposit Accounts .................................................................................................52
4.24    [Reserved] ............................................................................................................53
4.25    Material Contracts ................................................................................................53
4.26    Valid Liens ...........................................................................................................53
4.27    Foreign Assets Control Regulations and Anti-Money Laundering .......................53
4.28    Patriot Act ............................................................................................................53
4.29    Insurance ..............................................................................................................53
4.30    SBA Matters .........................................................................................................54

## ARTICLE V CERTAIN AFFIRMATIVE COVENANTS

5.1    Financial Information; etc.....................................................................................55
5.2    Maintenance of Existence; etc ..............................................................................58
5.3    Maintenance of Properties ....................................................................................58
5.4    Payment of Liabilities ..........................................................................................59
5.5    Compliance with Laws .........................................................................................59
5.6    Books and Records; Inspection Rights; etc ...........................................................59
5.7    Insurance ..............................................................................................................60
5.8    ERISA ..................................................................................................................60
5.9    Additional Subsidiary Guarantors ........................................................................61
5.10    [Reserved] ............................................................................................................61
5.11    [Reserved] ............................................................................................................61
5.12    Further Assurances ...............................................................................................61
5.13    SBA Matters .........................................................................................................61
5.14    OFAC; Patriot Act ...............................................................................................62
5.15    Sale-Leaseback Accounting Treatment .................................................................62
5.16    [Reserved] ............................................................................................................62
5.17    Weekly Process Calls............................................................................................62
5.18    [Reserved] ............................................................................................................62
5.19    [Reserved].............................................................................................................62
5.20    Company Financial Advisor ..................................................................................62
5.21    Bankruptcy Related Matters ..................................................................................63

## ARTICLE VI FINANCIAL COVENANTS AND NEGATIVE COVENANTS

6.1    [Reserved]..............................................................................................................64
6.2    Limitations on Indebtedness ..................................................................................64
6.3    Liens......................................................................................................................66
6.4    Sales of Assets ......................................................................................................69
6.5    Liquidations, Mergers and Consolidations .............................................................69
6.6    Investments ...........................................................................................................70
6.7    Transactions with Affiliates...................................................................................70
6.8    70
6.9    70

| 6.10 | Restricted Payments | 71 |
|------|---------------------|----|
| 6.11 | Payments in Respect of Certain Indebtedness | 71 |
| 6.12 | Change in Business | 71 |
| 6.13 | Changes in Accounting, Name and Jurisdiction of Organization | 71 |
| 6.14 | No Negative Pledges | 72 |
| 6.15 | Holding Company Status | 72 |
| 6.16 | Use of Proceeds | 73 |

## ARTICLE VII EVENTS OF DEFAULT

| 7.1 | Events of Default | 75 |
|-----|-------------------|----|
| 7.2 | Action If Event of Default | 81 |
| 7.3 | Remedies | 81 |
| 7.4 | Bankruptcy Code and Other Remedies | 82 |

## ARTICLE VIII THE ADMINISTRATIVE AGENT

| 8.1 | Appointment and Authorization | 83 |
|-----|-------------------------------|----|
| 8.2 | Power | 84 |
| 8.3 | Interest Holders | 84 |
| 8.4 | Employment of Counsel; etc | 84 |
| 8.5 | Reliance | 85 |
| 8.6 | General Immunity | 85 |
| 8.7 | Credit Analysis | 85 |
| 8.8 | Administrative Agent and Affiliates | 86 |
| 8.9 | Indemnification | 86 |
| 8.10 | Security Documents | 87 |
| 8.11 | Collateral Matters | 87 |
| 8.12 | Action by the Administrative Agent | 87 |
| 8.13 | Successor Administrative Agent | 89 |
| 8.14 | [Reserved] | 89 |
| 8.15 | Erroneous Payments. | 89 |

## ARTICLE IX MISCELLANEOUS

| 9.1 | Waivers, Amendments; etc | 92 |
|-----|--------------------------|----|
| 9.2 | Payment Dates | 93 |
| 9.3 | Notices | 94 |
| 9.4 | Costs and Expenses | 94 |
| 9.5 | Indemnification | 94 |
| 9.6 | Severability | 96 |
| 9.7 | Headings | 96 |
| 9.8 | Governing Law | 96 |
| 9.9 | Successors and Assigns | 96 |
| 9.10 | Execution in Counterparts | 99 |
| 9.11 | Several Liability | 100 |
| 9.12 | Financial Information | 100 |
| 9.13 | Entire Agreement | 100 |
| 9.14 | Other Relationships | 100 |
| 9.15 | Consent to Jurisdiction | 100 |
| 9.16 | Waiver of Jury Trial | 101 |

9.17    USA Patriot Act .................................................................................................................101
9.18    Confidentiality ...................................................................................................................101
9.19    Replacement of Lenders .....................................................................................................102
9.20    Keepwell ...........................................................................................................................102
9.21    Electronic Execution of Assignments and Certain Other Documents .......................................103

## ARTICLE X TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    Taxes .................................................................................................................................103
10.2    Illegality ............................................................................................................................108
10.3    Inability to Determine Rates ...............................................................................................109
10.4    Increased Costs ..................................................................................................................110
10.5    Funding Losses ..................................................................................................................111
10.6    Mitigation Obligations; Replacement of Lenders ..................................................................111
10.7    Survival .............................................................................................................................112

SCHEDULE I -          Lenders/Commitments
SCHEDULE I-A   -      Units
SCHEDULE 1.1   -      [Reserved]
SCHEDULE 4.9   -      [Reserved]
SCHEDULE 4.17 -       Labor Matters
SCHEDULE 4.23 -       Deposit Accounts
SCHEDULE 6.2(a)      -      Existing Indebtedness
SCHEDULE 6.2(s)      -      Existing Letters of Credit
SCHEDULE 6.3   -      Existing Liens
SCHEDULE 6.6   -      Permitted Investments
SCHEDULE 6.7   -      Affiliate Transactions
SCHEDULE 9.3   -      Administrative Agent's Office; Certain Addresses for Notices


ANNEX I          -      List of Jurisdictions in which the Borrower is Qualified to Do Business
ANNEX II         -      List of Subsidiaries; Jurisdictions of Incorporation and Qualification to do
                        Business
ANNEX III        -      Initial Budget


EXHIBIT A        -      Form of Term Note
EXHIBIT B        -      [Reserved]
EXHIBIT C        -      Form of Guaranty
EXHIBIT D        -      Form of Notice of Borrowing
EXHIBIT E        -      Form of Assignment and Assumption Agreement
EXHIBIT F        -      Compliance Certificate

## SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") effective as of the [7]th day of February, 2025, by and between **ZIPS CAR WASH, LLC** ("Borrower"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), **ZIPS OPERATING HOLDINGS, LLC** ("Holdings"), as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), the other Loan Parties party hereto, each as a debtor and debtor-in-possession in the Chapter 11 Cases (as defined below), the Lenders now or hereafter parties hereto, and **BRIGHTWOOD LOAN SERVICES LLC**, in its capacity as Administrative Agent for the Lenders.

**WHEREAS**, on February 5, 2025 (the "Petition Date"), Holdings and the other Loan Parties (each, a "Chapter 11 Debtor" and, collectively, the "Chapter 11 Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") initiating cases under title 11 of the United States Code (the "Bankruptcy Code") (collectively the "Chapter 11 Cases"), and each Chapter 11 Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower has asked the Lenders to provide the Borrower with a senior secured super-priority priming debtor-in-possession term loan credit facility consisting of (a) $30,000,000 in aggregate principal amount of "new money" term loans (the "New Money Term Loans") and (b) $52,500,000 in aggregate principal amount of "roll up" term loans pursuant to which Prepetition Facility Obligations will be deemed "rolled up" and shall automatically be deemed to be substituted and exchanged, and paid-off and discharged, in exchange therefor ((a) and(b) collectively the "DIP Facility");

**WHEREAS**, the Lenders are willing to make the foregoing facilities available to the Borrower, subject to the terms and conditions set forth in this Agreement and the DIP Orders;

**WHEREAS**, subject to the terms of the Loan Documents and the DIP Orders, the Borrower and the Guarantors have agreed to secure all of their Obligations under the Loan Documents by granting to the Administrative Agent, a security interest in and lien upon substantially all of their existing and after-acquired personal property; and

**WHEREAS**, the Borrower and each Guarantor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of the loans and other financial accommodations to the Borrower as provided in this Agreement.

**NOW, THEREFORE**, in consideration of the terms and conditions contained herein, and of any loans or extensions of credit heretofore, now or hereafter made to or for the benefit of the Borrower by the Lenders and the Administrative Agent, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND OTHER TERMS

1.1    **Defined Terms.**  The following terms when used in this Agreement shall, except

1

where the context otherwise requires, have the following meanings:

"Acquisition" means (whether by purchase, exchange, issuance of Equity Interests or Equity Interests Equivalents, merger, reorganization, joint venture or otherwise) any transaction, or any series of related transactions by which the Borrower directly or indirectly (i) acquires any Person, which Person shall then become consolidated with the Borrower in accordance with GAAP, (ii) acquires all or substantially all of the assets of any Person or any business, division or product line thereof or the acquisition of a portfolio of Real Property rent or leases of Real Property, (iii) acquires in excess of 50% of the Equity Interests or Equity Interests Equivalents of any Person or otherwise causing such Person to become a Subsidiary of the Borrower, or (iv) merges, consolidates or otherwise enters into any other business combination with any Person to effect any of the transactions referred to in clauses (i), (ii) or (iii) above.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" means Brightwood Loan Services LLC, as Administrative Agent for the Lenders, or any successor Administrative Agent hereunder.

"Administrative Questionnaire" means an administrative questionnaire to be completed and provided to the Administrative Agent in form and substance as provided by the Administrative Agent.

"Advance" means one or more advances under the Term Loan Commitments and any Roll-Up Term Loan Advance.

"Affiliate" shall include, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with such Person.  For purposes of this definition, a Person shall be deemed to control another Person if the controlling Person owns or controls directly or indirectly twenty percent (20%) or more of the shares of stock, other Equity Interests or Equity Interests Equivalents or voting powers of the controlled Person.

"Aggregate Commitments" means the Commitments of all Lenders.

"Agreement" means this Credit Agreement as originally executed and as amended, modified or supplemented from time to time.

"Applicable Margin" means:

(a)   for the New Money Term Loans, (x) with respect to any Term SOFR Loan, 7.25% per annum and (y) with respect to any Base Rate Loan, 6.25% per annum, and

(b)   for the Roll-Up Term Loans, (x) with respect to any Term SOFR Loan, 7.25% per annum and (y) with respect to any Base Rate Loan, 6.25% per annum.

"Applicable Period" means:

(i)     with respect to the Variance Report following the first full week following the Petition Date, the period from the Petition Date to the Saturday immediately prior to such required date of delivery of such Variance Report,

(ii)    with respect to the Variance Report following the first two full weeks following the Petition Date, the two-week period ending on the Saturday immediately prior to such required date of delivery of such Variance Report,

(iii)   with respect to the Variance Report following the first three full weeks following the Petition Date, the three-week period ending on the Saturday immediately prior to such required date of delivery of such Variance Report and

(iv)    with respect to each week thereafter, the four-week period ending on the Saturday immediately prior to such require date of delivery of such Variance Report.

"Applicable Term Loan Percentage" means with respect to any Term Loan Lender at any time, the percentage (carried out to the ninth decimal place) of the total Term Loan Commitments and the outstanding principal amount of the Term Loans represented by such Term Loan Lender's Term Loan Commitment and outstanding principal amount of the Term Loans owed to such Lender at such time.  If the Term Loan Commitments of each Term Loan Lender have been terminated or if the Aggregate Commitments have expired, then the Applicable Term Loan Percentage of each Term Loan Lender shall be determined based on the Applicable Term Loan Percentage of such Term Loan Lender most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Term Loan Percentage of each Lender is set forth opposite the name of such Lender on **Schedule I** or in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable.

"Approved Budget" means the then most current budget prepared by the Borrower and approved by the Required Lenders in accordance with Section 5.1(m).  As of the Closing Date, the Approved Budget is the Initial Budget.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"ASC" means Atlantic Street Capital Management, LLC, a Delaware limited liability company ("ASCM"), and any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control (in each case by way of equity ownership or general partner status) with, ASCM and is organized primarily for making equity investments in one or more portfolio companies.  For the avoidance of doubt ASC shall include all partners, employees, directors and agents of ASC.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 9.9(b).

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest

period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.12(d).

"Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the sum of (x) the Adjusted Term SOFR calculated for each such day based on an Interest Period of three months determined two (2) Business Days prior to such day (but for the avoidance of doubt, not less than one percent (1.0%) per annum), plus (y) one percent (1.0%), in each instance, as of such day. For the avoidance of doubt, the Base Rate shall not at any time be less than 2.00% per annum. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate, the Adjusted Term SOFR shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR, as the case may be.

"Base Rate Loan" means any Advance accruing interest by reference to the Base Rate.

"Base Rate Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Benchmark" means, with respect to Term Loans, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.12.

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)      the sum of (i) Daily Simple SOFR and (ii) the Term SOFR Adjustment for an interest period of one month or three months, as applicable; or

(b)      the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

4

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means a date and time determined by the Administrative Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available

5

Tenor of such Benchmark (or such component thereof);

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12.

"Borrower" means Zips Car Wash, LLC.

"Brightwood" means Brightwood Loan Services LLC and any Affiliate thereof.

"Business Day" means any day on which commercial banks and foreign exchange markets are open for business in New York, New York.

"Capital Lease" means, with respect to any Person, a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board) is required to be, classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligations" means, for any period for which the amount thereof is to be determined, any obligation of such Person to pay rent or other amounts under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Carve-Out" shall have the meaning assigned to such term in the DIP Orders.

"Casualty Event" means any event that gives rise to the receipt by any Loan Party of any insurance proceeds (including business interruption insurance proceeds) or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Challenge Period" shall have the meaning assigned to such term in the DIP Orders.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, order, policy, rule, regulation or treaty, (b) any change in any law, order, policy, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, regulations or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, regulations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" shall have the meaning specified in the recitals to this Agreement.

"Chapter 11 Debtors" shall have the meaning specified in the recitals to this Agreement.

"Change of Control" means the occurrence of any of the following: (i) the Permitted Holders cease to own and control, directly or indirectly, greater than fifty percent (50%) of the Equity Interests and Equity Interests Equivalents of Holdings, or (ii) Holdings ceases to own and control, directly or indirectly, one hundred percent (100%) of the Equity Interests and Equity Interests Equivalents of the Borrower.

"Closing Date" means February [7], 2025.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all present and future assets and properties of the Borrower and the Guarantors, whether real or personal, tangible or intangible, in which Liens are granted or purported to be granted pursuant to the Security Documents; provided, that Collateral shall not include any Excluded Assets.

"Commitment" means, for each Lender, the aggregate amount of such Lender's commitment to fund Loans as set forth on **Schedule I**, as such amount may be modified from time to time pursuant to the terms hereof.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

7

"Company Financial Advisor" means AlixPartners, LLP or such other financial advisor reasonably acceptable to the Required Lenders.

"Compliance Certificate" means a certificate in substantially the form set forth as **Exhibit F**, completed and signed by a Responsible Officer of the Borrower.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan of Reorganization under section 1129 of the Bankruptcy Code, which Confirmation Order shall be in form and substance acceptable to the Required Lenders, and upon the entry thereof, shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Required Lenders (which may be provided via email by counsel to the Required Lenders).

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 10.5 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "controlled" has the meaning correlative thereto.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debtor Professionals" means, collectively, Kirkland & Ellis LLP and Gray Reed, as

8

counsel to the Loan Parties, Evercore Group, L.L.C., as financial advisor to the Loan Parties, AlixPartners, LLP, as financial advisor to the Loan Parties, Kroll Restructuring Administration LLC, as claims and noticing agent to the Loan Parties, Hilco Real Estate, LLC, as real estate consultant and advisor to the Loan Parties, C Street Advisory Group, LLC, as strategic and communications advisor to the Loan Parties, and PwC US Tax LLP, as tax advisor to the Loan Parties (and/or such other professionals as are or may be retained by the Loan Parties from time to time).

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Default" means any Event of Default and any event which with the giving of notice or lapse of time, or both, would become an Event of Default.

"Default Interest" shall have the meaning set forth in Section 2.1(i)(3).

"Default Rate" means a simple interest rate per annum equal to the sum of the otherwise then applicable interest rate plus two percent (2%). With respect to amounts bearing interest at the Default Rate, for purposes of the foregoing sentence, the words "otherwise then applicable interest rate" shall be deemed to mean the Base Rate plus the Applicable Margin with respect to Base Rate Loans and the Adjusted Term SOFR plus the Applicable Margin with respect to Term SOFR Loans, as applicable.

"Defaulting Lender" means, subject to Section 2.10(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans, including participations in respect of Letters of Credit, within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit) within two (2) Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation

of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.10(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each Lender promptly following such determination.

"DIP Orders" means the Interim DIP/Cash Collateral Order and/or the Final DIP/Cash Collateral Order, as applicable and as the context requires.

"DIP Superpriority Claims" shall have the meaning assigned to such terms in the DIP Orders.

"Disbursements Variance" has the meaning assigned thereto in Section 5.1(n).

"Disposition" means any sale, transfer, lease, exclusive license or other disposition of any property by any Person (including by way of issuance of Equity Interests of any Person). "Dispose" has the meaning correlative thereto.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any Equity Interests or Equity Interests Equivalent into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition,

(a)     matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments),

(b)     provides for the scheduled payments of dividends in cash,

(c)     is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests of the applicable Person and except as permitted by clause (a) above), in whole or in part, or

(d)     is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests or Equity Interests Equivalents that would constitute Disqualified Equity Interests, in the case of each of clauses (a), (b), (c) and (d) hereof, prior to the date that is ninety-one (91) days after the latest Maturity Date at the time of issuance;

provided that if such Equity Interests or Equity Interests Equivalents are issued pursuant to a plan for the benefit of future, current or former employees, directors, or officers of Holdings, the Borrower or its Subsidiaries or by any such plan to such employees, directors or officers, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Holdings, the Borrower or any Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's or officer's termination, death or disability.

"Dollars" or "$" means the basic unit of the lawful currency of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States of America.

"ECP Rules" means the final rules issued jointly by the Commodity Futures Trading Commission and the Securities and Exchange Commission as published in 77 FR 30596 (May 23, 2012), as may amended, modified or replaced from time to time.

"Eligible Assignee" means any Person (other than a natural person) that meets the requirements to be an assignee under Section 9.9 (subject to such consents, if any, as may be required under Section 9.9(b)); provided that (x) a Defaulting Lender and (y) neither the Loan Parties or any of their Subsidiaries or direct or indirect parent companies nor ASC or any of its Affiliates or Subsidiaries shall, in any case, be an Eligible Assignee.

"Equipment" means all equipment, furniture and fixtures held or maintained at the Real Property or otherwise used in the ownership or operation of the Units, together with all additions and accessions thereto and replacements therefor.

"Equity Interests" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Equity Interests Equivalents" means all securities convertible into or exchangeable for Equity Interests and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Equity Interests, whether or not presently convertible, exchangeable or exercisable.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations promulgated and rulings issued thereunder and under the Code, in each case as in effect from time to time.  References to sections of ERISA shall be construed to also refer to any successor sections.

"ERISA Affiliate" means any Person, including Affiliates or Subsidiaries of the Borrower, that is a member of any group of organizations or a controlled group of trades or businesses, as described in Sections 414(b), 414(c), 414(m) or 414(o) of the Code or Section 4001 of ERISA, of which the Borrower is a member.

"Erroneous Payment" has the meaning assigned to it in Section 8.15(a).

11

"Erroneous Payment Deficiency Assignment" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Impacted Class" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Return Deficiency" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Subrogation Rights" has the meaning assigned to it in Section 8.15(d).

"Escrow Account" has the meaning assigned to it in the Prepetition Term Loan Documents.

"Event of Default" means any Event of Default described in Article VII.

"Excluded Assets" means any of the following:

    (a)    [reserved];

    (b)

        (i)    [reserved],

        (ii)    [reserved],

        (iii)    [reserved],

        (iv)    margin stock,

        (v)    [reserved]; and

    (c)    any "intent-to-use" application for registration of a trademark filed pursuant to section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" or "Amendment to Allege Use" pursuant to section 1(d) of the Lanham Act, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law;

    (d)    [reserved];

    (e)    [reserved];

    (f)    [reserved];

    (g)    [reserved];

    (h)    [reserved];

    (i)    [reserved]; and

(j)      [reserved].

"Excluded Swap Obligation" means, with respect to Borrower, any Affiliate of Borrower or Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Borrower, such Affiliate or such Guarantor of, or the grant by such Borrower, such Affiliate or such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Borrower's, such Affiliate's or such Guarantor's failure for any reason not to constitute an "Eligible Contract Participant" as defined in Section 1a(18) of the Commodity Exchange Act (and the regulations thereunder), as further defined and modified by the ECP Rules (determined after giving effect to Section 9.20 and any other keepwell, support or other agreement for the benefit of such Borrower, such Affiliate or such Guarantor and any and all Guarantees of such Borrower's, such Affiliate's or such Guarantor's Swap Obligations by any other Borrower, Affiliate or the Guarantor), at the time the applicable Swap Obligation was entered into and at such other relevant time as provided in the ECP Rules or any other applicable law and to the extent that the providing of such Guarantee or the granting of such security interest by such Borrower, such Affiliate or such Guarantor would violate the ECP Rules or any other applicable law.  If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such Guarantee or Lien is or becomes excluded in accordance with the first sentence of this definition.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 9.19), or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 10.1(a)(ii), (a)(iii) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 10.1(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing reasonably selected by it.

"Final DIP/Cash Collateral Order" means the order entered by the Bankruptcy Court in the Chapter 11 Cases approving the DIP Facility and the Debtors' use of cash collateral, in each case, on a final basis, in form and substance acceptable to the Administrative Agent and the Required Lenders, which, upon entry thereof, shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Required Lenders and, solely to the extent any such reversal, vacation, stay, amendment, supplement or other modification affects the rights or obligation of the Administrative Agent, such Administrative Agent.

"First Day Orders" means all material orders entered by the Bankruptcy Court pursuant to motions filed on or about the Petition Date by the Chapter 11 Debtors for which approval is sought at the "first day" hearing. The First Day Orders must be reasonably acceptable to the Required Lenders.

"Flood Insurance Laws" collectively, (i) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" means a rate of interest equal to 1.00% per annum.

"Foreign Lender" means, with respect to any Borrower (a) if such Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time; provided, that no change in the accounting principles used in the preparation of any financial statement hereafter adopted by the Borrower or any other Loan Party shall be given effect for purposes of measuring compliance with any provision of this Agreement unless the Borrower, Administrative Agent and the Required Lenders agree to modify such provisions to

reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP; provided, further that no effect shall be given to any change in GAAP for purposes of measuring compliance with any provision of this Agreement that would require leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee(s)" means all direct and indirect guarantees, sales with recourse, endorsements (other than for collection or deposit in the ordinary course of business) and other obligations (contingent or otherwise, including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) by any Person to pay, purchase, repurchase or otherwise acquire or become liable upon or in respect of any Indebtedness of any other Person, and, without limiting the generality of the foregoing, all obligations (contingent or otherwise) by any Person to purchase products, supplies or other tangible property or services for any Person under agreements requiring payment therefor regardless of the non-delivery or non-furnishing thereof, or to make investments in any other Person, or to maintain the capital, working capital, solvency or general financial conditions of any other Person, or to indemnify any other Person against and hold him harmless from damages, losses and liabilities, all under circumstances intended to enable such other Person or Persons to discharge any Indebtedness or to comply with agreements relating to such Indebtedness or otherwise to assure or protect creditors against loss in respect of such Indebtedness. The amount of any Guarantee shall be deemed to be the amount of the Indebtedness of, or damages, losses or liabilities of, the other Person or Persons in connection with which the Guarantee is made or to which it is related unless the obligations under the Guarantee are limited to a determinable amount, in which case the amount of such Guarantee shall be deemed to be such determinable amount. The term "Guarantee" as a verb has a corresponding meaning. For the avoidance of doubt, the keepwell provided by Borrower, any Affiliate of Borrower or any Guarantor in Section 9.20 shall constitute a Guarantee.

"Guarantor(s)" means, collectively, (i) Holdings, (ii) any Domestic Subsidiary that becomes a Guarantor in accordance with Section 5.9, and (iii) any other Person who executes and delivers a Guaranty of the Obligations, jointly and severally.

"Guaranty" means, individually or collectively, as the case may be, the Guaranty made by the Guarantors in favor of Administrative Agent for the benefit of the Secured Parties in form substantially as attached hereto as **Exhibit C**.

"Holdings" means Zips Operating Holdings, LLC, a Delaware limited liability company.

"Impacted Loans" has the meaning set forth in Section 10.3(b).

"Improvements" means the buildings, and other facilities, amenities and improvements to be erected on the Real Property.

"Indebtedness" means, as to any Person at a particular time, without duplication, the following:

(a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b) the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c) net obligations of such Person under any Swap Contract;

(d) all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses payable in the ordinary course of business and (A) not overdue by more than 90 days or (B) to the extent overdue by more than 90 days, are being contested by such person by appropriate proceedings in good faith), (ii) any earn-out obligation to the extent such obligation is not required to be reflected on such Person's balance sheet in accordance with GAAP, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business);

(e) indebtedness in respect of the foregoing (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f) all Capital Lease Obligations;

(g) all obligations of such Person in respect of Disqualified Equity Interests;

(h) the principal balance of synthetic leases or other off-balance sheet financing arrangements; and

(i) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of consolidated Indebtedness.  The amount of

any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) (to the extent that such Indebtedness is non-recourse to such Person for amounts in excess of the value of the property securing such Indebtedness) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Parties" has the meaning specified in Section 9.5.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower or Guarantor under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Initial Budget" means a 13-week cash flow projection as attached to Annex III.

"Initial Term Loan" means Loans made pursuant to Section 2.1(a)(1).

"Initial Term Loan Advance" has the meaning specified in Section 2.1(a)(1).

"Initial Term Loan Commitment" means, for each Lender, the aggregate amount appearing opposite of such Lender's name under the heading "Initial Term Loan Commitments" as set forth on **Schedule I** or as set forth in an Assignment and Assumption Agreement delivered pursuant to Section 9.9(b), as such amount may be modified from time to time pursuant to the terms hereof, including as a result of any Incremental Term Loans. As of the Closing Date, the aggregate Initial Term Loan Commitments are $30,000,000.

"Initial Term Loan Lender" means each Lender that has an Initial Term Loan Commitment or to which an Initial Term Loan is owed.

"Interest Payment Date" has the meaning set forth in Section 2.1(i)(4)(C).

"Interest Period" means with respect to any Term SOFR Loan, the period commencing on the date the relevant Advance is made and ending on the date which is one (1), three (3) or six (6) months thereafter, as selected by the Borrower by irrevocable written notice to the Administrative Agent not less than three (3) Business Days prior to the date the relevant Advance is made and each subsequent one (1), three (3) or six (6) month period thereafter, as selected by the Borrower by irrevocable written notice to the Administrative Agent not less than three (3) Business Days prior to the last day of the then-current Interest Period with respect thereto. For purposes of determining an Interest Period, a month means a period starting on one day in a calendar month and ending on a numerically corresponding date in the next calendar month. Notwithstanding the foregoing, however, (i) any applicable Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any applicable Interest Period which begins on a day for which there is no numerically corresponding day in the calendar month during which such Interest Period is to end shall (subject to clause (i) above) end on the last day of such calendar month, (iii) no Interest Period shall extend beyond the Maturity Date, as applicable, or such earlier date as would interfere

with the Borrower's repayment obligations hereunder, (iv) [reserved] or (v) no tenor that has been removed from this definition pursuant to <u>Section 2.12(d)</u> shall be available for specification by the Borrower in such written notice to the Administrative Agent. For the avoidance of doubt, notwithstanding any selection by Borrower of an Interest Period of longer than one (1) month, interest shall be payable on each Loan in accordance with <u>Section 2.1(i)(4)(C)</u>. The Parties hereby acknowledge and agree that the Interest Period commencing on August 30, 2024 shall be three (3) months with respect to all Term SOFR Loans continued on such date.

"<u>Interim DIP/Cash Collateral Order</u>" means an order entered by the Bankruptcy Court in the Chapter 11 Cases approving the DIP Facility and the Debtors' use of cash collateral, in each case, on an interim basis, which order shall be in form and substance acceptable to the Administrative Agent and the Required Lenders and shall be in full force and effect, and shall not, subject to entry of the Final DIP/Cash Collateral Order, be reversed, stayed, amended, supplemented or otherwise modified without the prior written consent of the Required Lenders and, solely to the extent any such reversal, vacation, stay, amendment, supplement or other modification affects the rights or obligations of any Administrative Agent, such Administrative Agent.

"<u>Investment</u>" means, with respect to any Person, any loan, advance or extension of credit (other than to customers in the ordinary course of business) by such Person to, or any Guarantee or other contingent liability with respect to the capital stock, Indebtedness or other obligations of, or any contributions to the capital of, any other Person, or any ownership, purchase or other acquisition by such Person of any interest in any capital stock, limited partnership interest, general partnership interest, or other securities of any such other Person, other than an Acquisition; and "<u>Invest</u>," "<u>Investing</u>" or "<u>Invested</u>" means the making of an Investment.

"<u>Issue</u>" means, with respect to any Letter of Credit, to issue, extend the expiration date of, renew (including by failure to object to any automatic renewal on the last day such objection is permitted), increase the face amount of, or reduce or eliminate any scheduled decrease in the face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing. The terms "<u>Issued</u>", "<u>Issuance</u>" and "<u>Issuer</u>" have correlative meanings.

"<u>Knowledge</u>" of the Borrower or Holdings means the actual knowledge of any Responsible Officer of the Borrower or Holdings, as applicable.

"<u>Laws</u>" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"<u>Leases</u>" means each operating lease related to a Unit.

"<u>Lender Professionals</u>" means, collectively, Paul Hastings LLP, as counsel (and/or such other professionals as are or may be retained by the Required Lenders from time to time).

"Lenders" means (i) each Term Loan Lender and (ii) each Roll-Up Term Loan Lender, as the context may require.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Letter of Credit" means documentary or standby letters of credit Issued for the account of the Borrower by L/C Issuers, and bankers' acceptances issued by the Borrower, for which the Prepetition Secured Parties have incurred Letter of Credit Obligations.

"Lien" means, with respect to any interest in Property (whether real, personal or mixed and whether tangible or intangible) (a) any interest or right which secures the payment of Indebtedness or an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute or contract, and whether or not choate, vested or perfected, including any such interest or right arising from a mortgage, charge, pledge, negative pledge or other agreement not to lien or pledge, assignments, security interest, conditional sale, levy, execution, seizure, attachment, garnishment, conditional sale, Capital Lease or trust receipt, or arising from a lease, consignment or bailment given for security purposes, and (b) any exception to or defect in the title to or ownership interest in such Property, including, as applicable, reservations, rights of entry, possibilities of reverter, encroachments, easements, rights of way, restrictive covenants, leases and licenses.  For purposes of this Agreement, the Borrower or any Subsidiary shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, Capital Lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"Loan" means, individually or collectively, as the case may be, each Term Loan.

"Loan Document(s)" means, individually or collectively, as the case may be, this Agreement (including, for the avoidance of doubt, any amendment of this Agreement), any Notes, the Guaranty, each Security Document, and all other documents, agreements and certificates executed or delivered in connection with or contemplated by this Agreement or any other document evidencing or securing a Loan or any other document that is mutually agreed by the Loan Parties and the Required Lenders to constitute a Loan Document, each as may be amended, modified or supplemented from time to time.

"Loan Party" means the Borrower and the Guarantors.

"Master Agreement" has the meaning set forth in the definition of Swap Contract.

"Material Adverse Occurrence" means any fact, circumstance or occurrence of any nature whatsoever (including any adverse determination in any litigation, arbitration, governmental investigation or proceeding) which taken alone or in combination with any other fact, circumstance or occurrence could reasonably be expected to have a material adverse effect on the (a) business, assets, financial condition or results of operations of Holdings, the Borrower and its Subsidiaries, taken as a whole, (b) rights and remedies of the Administrative Agent, taken as a whole, under any Loan Documents, (c) ability of the Loan Parties, taken as a whole, to perform their payment obligations under any Loan Documents or (d) or on the ability of the Loan Parties, taken as a

whole, to perform their payment obligations to the Lenders, in each case, under the Loan Documents (in each case, other than (i) the commencement of a proceeding under the Bankruptcy Code and the filing of the Chapter 11 Cases, (ii) the events and conditions related to or that led to the commencement of the Chapter 11 Cases, (iii) events that customarily and reasonably result from the commencement of the Chapter 11 Cases (in each case, other than matters affecting the Loan Parties that are not subject to the automatic stay) and any action required to be taken under the Loan Documents or under an order of the Bankruptcy Court, and (iv) the consummation of the transactions contemplated or actions required to be taken pursuant to by the First Day Orders, any order entered in the Chapter 11 Cases, or the Plan of Reorganization; (v) any matters disclosed in any first day pleadings or declarations and (vi) any matters publicly disclosed prior to the filing of the Chapter 11 Cases or the Plan of Reorganization); provided that, financial and market conditions engendered by the Covid-19 pandemic shall not be given effect in determining whether a Material Adverse Occurrence has occurred under clause (a) above.

"Material Contract" means, as to each Loan Party, any acquisition supply, construction/development, franchise, purchase, service, employment, management, tax, indemnity, shareholder, lease of Real Property or other agreement or contract the termination of which, other than in accordance with its terms, would reasonably be expected to result in a Material Adverse Occurrence.

"Material Real Property" means any fee-owned Real Property having a fair market value in excess of $500,000 as of the date the acquisition thereof.

"Maturity Date" means:

(a)    October [7], 2025,

(b)    the effective date of a chapter 11 plan of the Chapter 11 Debtors, which has been confirmed by an order entered by the Bankruptcy Court in any of the Chapter 11 Cases;

(c)    the date on which all Loans are accelerated as a result of an Event of Default that has occurred and is continuing;

(d)    the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Chapter 11 Debtor, and

(e)    the closing of any sale of assets of the Chapter 11 Debtors pursuant to section 363 of the Bankruptcy Code, which when taken together with all other sales of assets since the Petition Date, constitutes a sale of all or substantially all of the assets of the Chapter 11 Debtors.

"Milestones" has the meaning assigned thereto in the DIP Orders.

"Modified GAAP" means GAAP; provided that (a) sale-leaseback transactions in any financial statement shall be presented assuming that all consummated sale-leaseback transactions are successful sale-leaseback transactions for accounting purposes (i.e. consistent with the historical financial reporting practice of the Borrower prior to October 4, 2022) and (b) no effect shall be given to any change in GAAP for purposes of financial reporting or measuring compliance with any provision of this Agreement resulting from the effectiveness of Accounting Standard

Codification 842 (or any other accounting standards codification with substantially similar effect) that would (i) require the presentation of sale-leaseback transactions in a manner inconsistent with the presentation of sale-leaseback transactions described in clause (a) or (ii) otherwise cause leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"Moody's" means Moody's Investors Service, Inc., or any successor to the rating agency business thereof.

"Multiemployer Plan" means any multiemployer plan as defined in Sections 3(37) or 4001(a)(3) of ERISA of, or contributed to by, the Borrower, any of its Subsidiaries or any ERISA Affiliate.

"Net Cash Proceeds" means:

(a)    with respect to any Disposition by the Borrower or any Subsidiary or any Casualty Event, the aggregate cash or cash equivalents proceeds (including cash or cash equivalents proceeds received pursuant to policies of insurance (including business interruption insurance) and by way of deferred payment of principal pursuant to a note, installment receivable or otherwise, but only as and when received) received by any Loan Party pursuant to such Disposition or Casualty Event net of (i) the reasonable direct costs relating to such Disposition or Casualty Event actually incurred by the Borrower or any Subsidiary (including sales commissions and legal, accounting and investment banking fees, commissions and expenses), (ii) any portion of such proceeds deposited in an escrow account pursuant to the documentation relating to such Disposition or Casualty Event (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to the applicable Loan Party), (iii) taxes paid or reasonably estimated by any Loan Party to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), (iv) amounts necessary to pay federal, state and local income taxes (if any) imposed on such Disposition or Casualty Event; provided that to the extent any such amounts are not in fact used to so pay taxes, any amount so deducted shall be included as Net Cash Proceeds and be subject to Section 2.1(l)(4), and (v) amounts required to be applied to the repayment of any principal amounts of Indebtedness (other than the Obligations) secured by a Lien on the asset subject to such Disposition or Casualty Event; and

(b)    with respect to any issuance of debt securities or other incurrence of Indebtedness (other than Indebtedness incurred in accordance with Section 6.2), the aggregate cash proceeds received by Holdings, the Borrower or any Subsidiary pursuant to such issuance or receipt, net of the reasonable direct costs paid or reasonably estimated by any Loan Party to be payable as a result thereof relating to such issuance (including reasonable sales and underwriter's commission).

"New Money Term Loans" has the meaning assigned to such term in the recitals hereto.

"New Unit" a carwash facility acquired, leased or constructed by the Borrower or any Affiliate thereof that is not a Unit on the Closing Date.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with

the terms of <u>Section 9.1</u> and (b) has been approved by the Required Lenders.

"<u>Non-Defaulting Lender</u>" means, at any time, each Lender that is not a Defaulting Lender at such time.

"<u>Note(s)</u>" means, individually or collectively, as the case may be, the Term Notes and such other promissory notes accepted by the Lenders in exchange for or in substitution of any such Notes.

"<u>Notice of Borrowing</u>" means the notice in the form of **Exhibit D** attached hereto to be delivered to the Administrative Agent pursuant to <u>Section 2.1</u> or such other form as may be reasonably approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer of the Borrower.

"<u>Obligations</u>" means (i) all Loans, Advances, debts, liabilities, payment and performance obligations, covenants and duties of every kind, nature and description owing by the Borrower or the Guarantors to the Administrative Agent, the Lenders, any Lender of any kind or nature, present or future, arising under this Agreement or any other Loan Document, whether direct or indirect (including those acquired by permitted assignment or participation), absolute or contingent, liquidated or unliquidated, due or to become due, now existing or hereafter arising and however acquired, (ii) all Rate Hedging Obligations owing at any time or from time to time by the Borrower or the Guarantors, or any of them, to the Lenders, any Lender or any Affiliate of any Lender (excluding, as to any Borrower or Guarantor, any Excluded Swap Obligations), (iii) all obligations of the Borrower or any Guarantor under any Related Treasury Management Arrangement and (iv) all Erroneous Payment Subrogation Rights. The term includes all principal, interest, fees, charges, expenses, reasonable attorneys' fees, fees, costs and expenses owing to the Lender Professionals or as a reimbursement to the Lenders or Agent in respect of the Lender Professionals and any other sum chargeable (including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, including the Chapter 11 Cases, regardless of whether allowed or allowable in such proceeding) to the Borrower or the Guarantors under this Agreement or any other Loan Document or in connection with any Rate Hedging Obligation or Related Treasury Management Arrangement.

"<u>Official Committee</u>" means any official committee of unsecured creditors appointed in any of the Chapter 11 Cases.

"<u>Organizational Documents</u>" means (a) with respect to any corporation or company, its certificate or articles of incorporation, organization or association and its bylaws, (b) with respect to any limited partnership, its certificate or declaration of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, and (d) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, and in the case of any Foreign Subsidiary, any analogous organizational documents. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, enforced any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are imposed with respect to an assignment (other than an assignment made pursuant to Section 10.6).

"Parent Entity" means any direct or indirect parent of the Borrowers, including, for the avoidance of doubt, Holdings.

"Payment Recipient" has the meaning assigned to it in Section 8.15(a).

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Periodic Term SOFR Determination Day" has the meaning set forth in the definition of "Term SOFR".

"Permitted Holders" means the direct and indirect holders of Equity Interests or Equity Interests Equivalents of Holdings on the Closing Date.

"Permitted Indebtedness" has the meaning set forth in Section 6.2.

"Permitted Investment" means any of the following Investments made by the Borrower or any of its Subsidiaries in any Person: (i) obligations, with a maturity of less than two years from the date of acquisition thereof, issued by or unconditionally guaranteed by the United States of America or an agency or instrumentality thereof backed by the full faith and credit of the United States of America; (ii) direct obligations of any state of the United States, any subdivision or agency thereof or any municipality therein which are rated by S&P or Moody's in one of the top two rating classifications and maturing within two years of the date of acquisition thereof; (iii) certificates of deposit or banker's acceptances, maturing within two years of the date of acquisition thereof, issued by commercial banks organized under the laws of the United States or any state thereof, having capital, surplus and undivided profits aggregating not less than $100,000,000 or such lesser amount approved by Lenders in their reasonable discretion so as to attempt to accommodate Investments made with minority owned commercial banks and whose unsecured long-term debt is rated in one of the top two rating classifications by S&P or Moody's; (iv) commercial paper of any corporation organized under the laws of the United States or any state thereof, rated in one of the top two rating classifications by S&P or Moody's and with a maturity of less than 270 days from the date of acquisition thereof; (v) Investments existing as of the date of this Agreement and set forth on Schedule 6.6; (vi) extensions of trade credit arising or acquired in the ordinary course of business, and Investments received in settlements in the ordinary course of business of such extensions of trade credit; (vii) Investments by any Loan Party in any other Loan Party; (viii) loans or advances to employees of the Borrower or any of its Subsidiaries

to finance travel, entertainment and relocation expenses in the ordinary course of business as presently conducted in an aggregate amount not to exceed $50,000 at any one time outstanding; (ix) [reserved]; (x) [reserved]; (xi) Investments received in connection with the bankruptcy or reorganization of suppliers and customers or in the settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment; (xii) advances of payroll payments to employees in the ordinary course of business not to exceed $100,000 in the aggregate amount outstanding at any time; (xiii) promissory notes and other non-cash consideration received in connection with Dispositions permitted under Section 6.4; (xiv) [reserved]; (xv) [reserved]; (xvi) Guarantees by the Borrower or any of its Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; (xvii) [reserved]; (xviii) other Investments by the Borrower and its Subsidiaries in an aggregate amount not to exceed $250,000 at any one time outstanding; and (xix) [reserved].

"Permitted Lien" has the meaning set forth in Section 6.3.

"Permitted Variance" means (x) with respect to the Disbursements Variance and the Receipts Variance, applicable to the Variance Report required to be delivered on March 6, 2025, 20.00%; and (y) with respect to the Disbursements Variance and the Receipts Variance applicable to any Variance Report delivered thereafter, 15.00%.

"Person" means any natural person, corporation, firm, joint venture, partnership, limited partnership, limited liability company, association, trust or other entity or organization, whether acting in an individual, fiduciary or other capacity, or any government or political subdivision thereof or any agency, department or instrumentality thereof.

"Petition Date" has the meaning assigned to such term in the recitals hereto.

"Plan" means each employee benefit plan (as defined in Section 3(3) of ERISA) whether now in existence or hereafter instituted, of, or contributed to by, the Borrower or any ERISA Affiliate.

"Plan of Reorganization" means a plan of reorganization under the Chapter 11 Cases (including all related schedules, supplements, exhibits and orders, as applicable), which shall have been approved in writing (which may be by email) by the Administrative Agent (acting at the discretion of the Required Lenders).

"Prepetition Facility Agent" means Brightwood Loan Services LLC, in its capacity as administrative agent and collateral agent under the Prepetition Facility Credit Agreement.

"Prepetition Facility Collateral" means the "Collateral" as defined in the Prepetition Facility Credit Agreement.

"Prepetition Facility Credit Agreement" means that certain Credit Agreement dated as of August 30, 2016 (as amended by the First Amendment to Credit Agreement, dated as of March 10, 2017, the Second Amendment to Credit Agreement, dated as of September 27, 2017, the Third Amendment to Credit Agreement, dated as of January 16, 2019, the Fourth Amendment to Credit

Agreement, dated as of March 13, 2019, the Fifth Amendment to Credit Agreement, dated as of May 29, 2019, the Sixth Amendment to Credit Agreement, dated as of January 16, 2020, the Seventh Amendment to Credit Agreement, dated as of May 4, 2020, the Eighth Amendment, dated as of December 21, 2020, the Ninth Amendment, dated as of May 26, 2021, the Tenth Amendment, dated as of July 13, 2021, the Eleventh Amendment, dated as of August 17, 2021, the Twelfth Amendment, dated as of October 18, 2021, the Thirteenth Amendment, dated as of October 20, 2021, the Fourteenth Amendment, dated as of December 21, 2021, the Fifteenth Amendment, dated as of February 11, 2022, the Sixteenth Amendment, dated as of May 10, 2022, the Seventeenth Amendment, dated as of July 13, 2022, the Eighteenth Amendment dated as of August 24, 2022, the Nineteenth Amendment dated as of October 4, 2022, the Twentieth Amendment dated as of December 30, 2022, the Twenty-First Amendment dated as of May 15, 2023, the Twenty-Second Amendment dated September 26, 2023, the Twenty-Third Amendment dated November 17, 2023, the Waiver and Twenty-Fourth Amendment to Credit Agreement dated as of March 12, 2024, Twenty-Fifth Amendment to Credit Agreement and Consent dated as of September 4, 2024, as modified by that certain Forbearance and Consent Agreement, dated as of October 16, 2024 (as amended by the Amendment No. 1 to Forbearance & Consent Agreement, dated November 16, 2024 and the Amendment No. 2 to Forbearance & Consent Agreement, dated December 16, 2024), and as further amended, restated, amended and restated, modified, or supplemented from time to time, by and among the Holdings, the Borrower, the other Loan Parties party thereto, the lenders from time to time party thereto and Prepetition Facility Agent.

"Prepetition Facility Documents" means the "Loan Documents" as defined in the Prepetition Facility Credit Agreement.

"Prepetition Facility Loans" means the "Loans" as defined in the Prepetition Facility Credit Agreement.

"Prepetition Facility Obligations" means the "Obligations" as defined in the Prepetition Facility Credit Agreement.

"Prepetition Facility Secured Parties" means, collectively, the "Secured Parties" as defined in the Prepetition Facility Credit Agreement.

"Prepetition Term Loan Adequate Protection" shall have the meaning assigned to such term in the DIP Orders.

"Prepetition Term Loan Adequate Protection Liens" shall have the meaning assigned to such term in the DIP Orders.

"Prepetition Term Loan Documents" means the Loan Documents with respect to the Prepetition Facility Credit Agreement.

"Prepetition Term Loan Obligations" means the Obligations as defined in the Prepetition Facility Credit Agreement.

"Prime Rate" means the rate of interest quoted in *The Wall Street Journal* (or another national publication reasonably selected by the Administrative Agent) as the U.S. "Prime Rate."

"<u>Proceeding</u>" has the meaning ascribed to it in <u>Section 9.5</u>.

"<u>Property</u>" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, and any right in respect of any of the foregoing.

"<u>Qualified ECP Guarantor</u>" means, at any time, each Borrower, Affiliate of Borrower or Guarantor with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"<u>Qualified Equity Interests</u>" means any Equity Interests or Equity Interests Equivalents that are not Disqualified Equity Interests.

"<u>Rate Hedging Obligations</u>" means any and all obligations of Borrower, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) under Swap Contracts which are entered into or maintained by any Borrower, Guarantor or any of their Affiliates with the Administrative Agent or a Lender or an Affiliate of the Administrative Agent or a Lender and which are not prohibited by the express terms of the Loan Documents.

"<u>Real Property</u>" means all real property or interests therein wherever situated now, heretofore or hereafter owned or ground (or space) leased by the Borrower pledged to Administrative Agent for the benefit of the Secured Parties as Collateral under any of the Security Documents.

"<u>Recipient</u>" means the Administrative Agent or any Lender or any other recipient of any payment to be made by or on account of any obligation of any Borrower or Guarantor hereunder.

"<u>Receipts Variance</u>" has the meaning assigned thereto in <u>Section 5.1(n)</u>.

"<u>Register</u>" has the meaning ascribed to it in <u>Section 9.9(d)</u>.

"<u>Regulation D</u>," "<u>Regulation T</u>," "<u>Regulation U</u>" and "<u>Regulation X</u>" means Regulation D, Regulation T, Regulation U and Regulation X, respectively, of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"<u>Related Indemnified Party</u>" has the meaning ascribed to it in <u>Section 9.5</u>.

"<u>Related Treasury Management Arrangement</u>" means all arrangements for the delivery of cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements, to or for the benefit of any Borrower, Guarantor or any of their Affiliates which are now or hereafter entered into or maintained with a Lender, the Administrative Agent or an Affiliate of a Lender or the Administrative Agent.

"<u>Remedies Notice Period</u>" has the meaning assigned to such term in Section 8.02.

26

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve Bank of New York, or any successor thereto.

"Rent Deferral Note" means that certain Promissory Note and Loan Agreement entered into by and among the Zips Tenant Parties and the STORE Capital Landlord on May 4, 2020 (as in effect on the date thereof without giving effect to any modifications, consents, amendments or waivers thereto that are adverse to the Lenders in any respect without the prior written consent of the Administrative Agent).

"Rent Deferral Subordination Agreement" means that certain subordination agreement entered into by and among the Zips Tenant Parties and the STORE Capital Landlord in favor of Administrative Agent (for the benefit of the Secured Parties) on May 4, 2020.

"Rent Deferral Subordinated Indebtedness" means all unsecured loans, advances and other amounts among the Zips Tenant Parties and the STORE Capital Landlord evidenced by and pursuant to the terms of the Rent Deferral Note.

"Required Lenders" means Lenders holding (a) more than fifty percent (50%) of the sum of the Term Loan Commitments of all Lenders plus the unpaid principal balance of the Term Loans or (b) if the Commitments have been terminated, more than fifty percent (50%) of the aggregate outstanding principal amount of the Term Loans; provided that if there are at least two Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Required Lenders" must include at least two Lenders. The Commitments and Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Resignation Effective Date" has the meaning specified in Section 8.13(a).

"Responsible Officer" means the chief executive officer, president, senior vice president, senior vice president (finance), vice president, chief financial officer, treasurer, manager of treasury activities or assistant treasurer or other similar officer or Person performing similar functions of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party. To the extent requested by the Administrative Agent, each "Responsible Officer" will provide an incumbency certificate and to the extent requested by the Administrative Agent, appropriate authorization documentation, in form and substance reasonably satisfactory to the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"Roll-Up Term Loan" means Loans made pursuant to Section 2.1(b).

"Roll-Up Term Loan Advance" has the meaning specified in Section 2.1(b).

"Roll-Up Term Loan Lender" means each Lender to which a Roll-Up Term Loan Advance is owed.

"SBIA" means the Small Business Investment Act of 1958, as amended.

"S&P" means Standard & Poor's Ratings Services, a division of the McGraw Hill Companies, Inc., or any successor to the rating agency business thereof.

"SDN List" has the meaning set forth in Section 4.27.

"Secured Parties" means, collectively, with respect to each of the Security Documents, the Administrative Agent, the Lenders, and each Affiliate of the Administrative Agent or any Lender, which Affiliate is party to any Rate Hedging Obligations or any Related Treasury Management Arrangement and each agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 8.10.

"Security Agreement" means the Security Agreement dated as of the Closing Date, entered into by the Borrower and the Guarantors in favor of the Administrative Agent for the benefit of the Secured Parties, as it may be amended, modified, restated or replaced from time to time.

"Security Documents" means and refer to the DIP Orders, Security Agreement, the Guarantees and each other assignment, pledge or security agreement, instrument, certificate, financing statements, filings or document pursuant to which the Borrower, any Guarantor or any other Person shall grant or convey to the Administrative Agent or the Lenders a Lien in Collateral as security for all or any portion of the Obligations, whether now or hereafter in existence, as said agreements or documents may be amended, modified, restated or replaced from time to time, each in form and substance reasonably satisfactory to the Administrative Agent.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"Specified Loan Party" means any Borrower, Affiliate of Borrower or Guarantor that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 9.20).

"St. Louis Sale" has the meaning assigned to it in the Prepetition Term Loan Documents.

"Subsidiary" of any Person means (i) any corporation of which more than 50% of the outstanding Equity Interests and Equity Interests Equivalents of any class or classes having ordinary voting power for the election of directors (irrespective of whether or not at the time Equity Interests or Equity Interests Equivalents of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is now or hereafter owned directly or indirectly by such Person, by such Person and one or more of its Subsidiaries, or by one or more of such Person's other Subsidiaries, (ii) any partnership, association, limited liability company, joint venture or other entity in which such Person, such Person and one or more of its Subsidiaries, or one or more of its Subsidiaries, is either a general partner or has an equity or voting interest of more than 50% at the time, and (iii) any other entity which is directly or indirectly controlled by such Person or one or more Subsidiaries of such Person or both; provided that, unless

otherwise specified, any reference to "Subsidiary" means a Subsidiary of the Borrower.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligations" means with respect to any Borrower or Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, as amended from time to time.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" means, collectively, the Initial Term Loan Advance and any Roll-Up Term Loan Advance made by Lenders to Borrower as described in Section 2.1(a) and Section 2.1(b), respectively.

"Term Loan Commitment" means, for each Lender, such Lender's, Initial Term Loan Commitment.

"Term Loan Lender" means each Lender that has a Term Loan Commitment or to which a Term Loan is owed.

"Term Note" has the meaning set forth in Section 2.1(a)(4).

"Term SOFR" means,

(a)      for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day.

"Term SOFR Adjustment" means, for any calculation with respect to a Term SOFR Loan or a Base Rate Loan (if based on Adjusted Term SOFR), a percentage per annum as set forth below for the applicable Interest Period:

| Interest Period | Period |
|---|---|
| One month | 0.10% |
| Three months | 0.15% |
| Six months | 0.25% |

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR (other than pursuant to clause (ii)(c) of the definition of "Base Rate").

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Transactions" means:

(a) the execution and delivery of the Loan Documents, the creation of the Liens pursuant to the Security Documents, the incurrence of the DIP Facility and the funding of the Initial Term Loans on the Closing Date,

(b) the consummation of the other transactions contemplated by this Agreement on the Closing Date,

(c) the consummation of any other transactions in connection with the foregoing, and

(d) the payment of the Transaction Expenses related thereto, in each case, subject to the entry of, and consistent with and as provided in, the DIP Orders, the Confirmation Order and any other applicable orders entered in the Chapter 11 Cases.

"Updated Budget" shall have the meaning set forth in Section 5.1(m).

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unit" means, collectively, the property comprising the carwash locations described on **Schedule I-A** and the property comprising any New Unit.

"United States" and "U.S." mean the United States of America.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned thereto in Section 10.1(e)(2)(B)(3).

"Variance Report" has the meaning assigned thereto in Section 5.1(n).

"Variance Report Deadline" has the meaning assigned thereto in Section 5.1(n).

**1.2    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     All undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Uniform Commercial Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Uniform Commercial Code, the definition contained in Article or Division 9 shall control.

(c)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(1)     The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(2)     References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(3)     The term "including" is by way of example and not a limitation.

(4)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(e)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.3    Accounting Terms; Payment Dates**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, Modified GAAP, except as otherwise specifically prescribed herein.  Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending December 31 or fiscal quarter ending March 31, June 30, September 30 or December 31 of the Borrower.

**1.4    References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document shall be construed as referring to such agreement, instrument or other document as may be from time to time amended, restated, amended and restated, supplemented or otherwise modified, extended, refinanced or replaced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications, extensions, refinancings or replacements set forth herein or in any Loan Document) and (b) any reference to any law in any Loan Document shall include all statutory and regulatory provisions

32

consolidating, amending, replacing, supplementing or interpreting such law.

    **1.5**    **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

**ARTICLE II**
**THE ADVANCES**

    **2.1**    **The Advances**.

        (a)    Term Loan.

        (1)    Subject to the terms and conditions set forth herein, the Initial Term Loan Lenders severally agree to make Advances under the Initial Term Loan Commitments to the Borrower on the Closing Date and on a single occasion following the satisfaction of the conditions set forth in Section 3.2, collectively, in an aggregate principal amount not to exceed the Initial Term Loan Commitment (the "Initial Term Loan Advances"); provided, that (i) the aggregate principal amount of Initial Term Loan Advance borrowed on the Closing Date shall not exceed $20,000,000 and (ii) the aggregate principal amount of Initial Term Loan Advance borrowed following the Closing Date shall not exceed $10,000,000 and shall be subject to the satisfaction of the conditions set forth in Section 3.2.  The execution and delivery of this Agreement by the Borrower and the satisfaction of all conditions precedent pursuant to Article III shall be deemed to constitute the Borrower's request to borrow the Initial Term Loan Advance on the Closing Date.  The Initial Term Loan Commitment shall be automatically reduced on a dollar-for-dollar basis by the aggregate principal amount of Initial Term Loans borrowed.  The Term Loans may be borrowed as, converted to and continued as Term SOFR Loans and/or Base Rate Loans. Once paid, the Term Loans may not be re-borrowed.

        (2)    [Reserved].

        (3)    The Borrower's obligation to pay the principal of, and interest on, any Term Loan shall be evidenced by the records of the Term Loan Lenders and by a term loan promissory note(s) in form substantially as attached hereto as **Exhibit A** (the "Term Note").  The entries made in the Register shall (absent manifest error) be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that the failure or delay of the Term Loan Lenders in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

        (b)    Roll-Up Term Loans. Subject to the terms and conditions of the DIP Orders and the funding of the Initial Term Loans, without any further action by any party to this Agreement or the Loan Documents, the Bankruptcy Court or any other Person, on each date of borrowing of Initial Term Loans, Prepetition Term Loan Obligations of the Initial Term Lenders in an amount equal to 1.75 *multiplied by* the aggregate principal amount of Initial Term Loans advanced by each such Initial Term Loan Lender on such date shall be automatically deemed to constitute term loans under this Agreement pursuant

to the terms of the Final DIP/Cash Collateral Order (the "Roll-Up Term Loan Advance") upon the entry of the Final DIP/Cash Collateral Order. The Administrative Agent (i) shall be entitled to conclusively rely on the deliver of a schedule of such Roll-Up Term Loans prepared by the Lender Professionals without investigation, (ii) shall incur no liability for acting in reliance upon such schedule delivered to it by the Lender Professionals, and (iii) is hereby directed by the Borrower and the Lenders to update the Register to reflect the allocations of Roll-Up Term Loans set forth in such schedule. The Roll-Up Term Loans may be borrowed as, converted to and continued as Term SOFR Loans and/or Base Rate Loans.

(c)     [Reserved].

(d)     [Reserved].

(e)     [Reserved].

(f)     Optional Termination or Reduction of Commitments. The Borrower may, upon written notice to the Administrative Agent, terminate, or from time to time permanently reduce, the unused Initial Term Loan Commitment; provided that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $100,000 in excess thereof, and (iii) any such partial reduction shall reduce the Initial Term Loan Commitments of each Lender ratably based on such Lender's Applicable Term Loan Percentage (measured solely with respect to Initial Term Loan Commitments and without regard to the principal amount of Term Loans). The Administrative Agent shall promptly notify the Lenders of any termination or reduction of unused Commitments under this Section 2.1(f).

(g)     Notes. If requested by any Lender, the Advances made by such Lender shall be evidenced by, and be payable in accordance with the terms of the Term Note issued to such Lender made by the Borrower payable to the order of such Lender in a principal amount equal to the Commitment of such Lender; subject, however, to the provisions of such Note to the effect that the principal amount payable thereunder at any time shall not exceed the then unpaid principal amount of the Advances made by such Lender. The Borrower hereby irrevocably authorizes each Lender to make or cause to be made, at or about the time of each Advance made by such Lender, an appropriate notation on the records of such Lender, reflecting the principal amount of such Advance, and such Lender shall make or cause to be made, on or about the time of receipt of payment of any principal of any Advance, an appropriate notation on its records reflecting such payment and such Lender will, prior to any transfer of any of such Note, endorse on the reverse side thereof the outstanding principal amount of the Advances evidenced thereby. Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances. The aggregate amount of all Advances set forth on the Register shall be conclusive evidence of the principal amount owing and unpaid on such Lender's Note, absent manifest error.

(h)     Promise to Pay. The Borrower hereby promises to pay in full to the

34

Administrative Agent for the benefit of the Lenders the amount of all Obligations, including the principal amount of all Loans, together with accrued interest, fees and other amounts due thereon, all in accordance with the terms of this Agreement. All outstanding Obligations, including the outstanding principal amount of all Loans, together with unpaid accrued interest, fees and other amounts due thereon, shall be due and payable in full on the Maturity Date.

(i)    <u>Interest on Advances</u>. The Borrower agrees to pay interest on the aggregate outstanding principal amount of the Advances until paid in full as follows:

(1)    <u>Term Loan</u>.

(A)    The Term Loans shall bear interest at the rates of, at Borrower's election pursuant to an appropriately delivered Notice of Borrowing, (I) with respect to Term SOFR Loans, the Adjusted Term SOFR plus the Applicable Margin, and (II) with respect to Base Rate Loans, the Base Rate plus the Applicable Margin.

(2)    [<u>Reserved</u>].

(3)    <u>Default Interest</u>. While an Event of Default exists and is continuing or after acceleration, at the option of the Administrative Agent or the Required Lenders, the Borrower shall pay interest ("<u>Default Interest</u>") with respect to the principal of, or interest on, each Loan, any fee or any other amount payable by the Borrower hereunder that is not paid when due at the Default Rate. All Default Interest under this clause (A) shall be payable as PIK Interest.

(4)    <u>Payment Dates</u>. Interest accrued on each Loan shall be payable, without duplication:

(A)    on the Maturity Date;

(B)    in respect of any Loan, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan, on the principal amount so paid or prepaid; and

(C)    subjection to <u>clause (k)</u> below, in respect of (i) any Base Rate Loan, on the last Business day of each month thereafter, and (ii) any Term SOFR Loan, at the end of each Interest Period and, in addition, at the end of 90 days in the case of a six-month Interest Period (together with the applicable Maturity Date, each an "<u>Interest Payment Date</u>").

The Administrative Agent shall determine each interest rate applicable to the Loan in accordance with the terms hereof and, upon any rate change, shall promptly notify the Borrower of such rate in writing (or by telephone, promptly confirmed in writing). Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(j)    <u>Calculation of Interest</u>. All computations of interest for Base Rate

Loans (including Base Rate Loans determined by reference to the Adjusted Term SOFR) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.3, bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(k)    PIK Interest. On each Interest Payment Date, unless otherwise elected by the Borrower in its sole discretion to be paid in cash, the full amount of accrued and payable interest shall be capitalized ("PIK Interest") (by adding the PIK Interest due on such Interest Payment Date to the principal amount of the outstanding Term Loans on such Interest Payment Date and such additional principal shall automatically constitute part of the principal amount of the Term Loan for purposes hereunder, including the accrual of interest thereon at the interest rate applicable to such Term Loan) unless the Borrower provides the Administrative Agent written notice of such election not to cause such interest to be capitalized as provided in this clause at least one (1) Business Day prior to the applicable Interest Payment Date (in which case such interest shall be due and payable on such Interest Payment Date in cash); provided, however, that any interest paid in connection with a prepayment of the Term Loans, shall be payable all in cash, at the Adjusted Term SOFR or the Base Rate, as applicable. Each Lender may determine in its sole discretion to record its PIK Interest as an increase in principal in the schedule annexed to its Notes or may request that such PIK Interest be evidenced by one or more additional Notes issued on the applicable Payment Date in the principal amount of such PIK Interest; provided, further, that the failure to request or obtain a promissory note to evidence the amount of such outstanding PIK interest shall not impair in any manner the enforceability of the Obligation of the Borrower with respect to the payment thereof or the accrual of interest with respect thereto.

(l)    Prepayment. Prepayments of the Loans shall be (or in the case of Section 2.1(l)(1), may be) made as set forth below:

(1)    The Borrower shall have the right, by giving written notice to the Administrative Agent (which such written notice shall be in a form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer) by not later than 1:00 p.m. on the fifteenth (15th) day preceding the date of such prepayment, to prepay all or any portion of the aggregate principal amount of any Loan, without premium or penalty. Each partial prepayment shall be in an aggregate principal amount of not less than $500,000 and shall be accompanied by accrued interest to the date of prepayment on the amount prepaid. Borrower shall reimburse the Lenders and the Administrative Agent on demand for any amounts set forth in, and to the extent required by, Section 10.5. Except as provided in the immediately succeeding sentence, voluntary prepayments of Term Loans shall be applied

to reduce the repayments required by <u>Section 2.1(h)</u> in the inverse order of maturity (including the payment owing on the Maturity Date).

(2)    [Reserved].

(3)    [Reserved].

(4)    [Reserved].

(5)    No later than three (3) days following the receipt by Holdings or any of its Subsidiaries of Net Cash Proceeds of any Indebtedness (except for Permitted Indebtedness) by Holdings or any of its Subsidiaries, the Borrower shall make a mandatory prepayment of the Term Loans in an amount equal to 100.0% of such Net Cash Proceeds.

(6)    [Reserved].

(7)    No later than the day that a Change of Control or a sale of all or substantially all of the assets of the Borrower in a single or a series of related transactions occurs, the Borrower shall prepay the Loans, plus accrued and unpaid interest thereon, together with any other then outstanding Obligations.

(8)    Each prepayment made pursuant to <u>Section 2.1(l)</u> shall be accompanied by accrued interest to the date of prepayment on the amount prepaid. To the extent applicable, the Borrower shall reimburse the Lenders and the Administrative Agent on demand for amounts set forth in and, to the extent required by, <u>Section 10.5</u>. Borrower shall give the Administrative Agent prior written notice of any event or circumstances reasonably likely to give rise to a mandatory prepayment obligation under this <u>Section 2.1(l)</u> (including the date and an estimate of the aggregate amount of such mandatory prepayment) at least five (5) Business Days prior thereto; <u>provided</u> that the failure to give such notice shall not constitute a Default or an Event of Default but shall not relieve the Borrower of its obligation to make such mandatory prepayments.

(m)    In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

**2.2    <u>Election by Borrower</u>**.

(a)    <u>Interest Rate for Advances</u>.  The Borrower may, upon irrevocable written notice to the Administrative Agent, elect (i) as of any Business Day, to convert any Term Loans (or any part thereof in an aggregate amount of not less than $100,000 or a higher integral multiple of $50,000) that (1) are Base Rate Loans into Term SOFR Loans

or (2) are Term SOFR Loans into Base Rate Loans, or (ii) as of the last day of the applicable Interest Period, to continue any Term Loans that are Term SOFR Loans having Interest Periods expiring on such day (or any part thereof in an aggregate amount not less than $100,000 or a higher integral multiple of $50,000) as Term SOFR Loans with a new Interest Period; provided that any conversion of a Term SOFR Loan on a day other than the last day of an Interest Period therefor shall be subject to Section 10.5.

(b)     Lenders' Records.  The Borrower hereby irrevocably authorizes the Administrative Agent to make, or cause to be made, an appropriate notation on the Register, reflecting the date and original principal amount of each Advance made by any Lender, the dates for each period when such Advance is being maintained as a Term SOFR Loan, the interest rate for each such period and the dates of principal and interest payments on such Advance.  The Register shall be conclusive evidence of the status of such Lender's Advances, absent manifest error.  Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances.

2.3     **Payments**.  Any other provision of this Agreement to the contrary notwithstanding, the Borrower shall make each payment of interest on and principal of the Notes, and fees and other payments due under this Agreement (except as otherwise expressly provided herein), in immediately available funds to the Administrative Agent at its office referred to in Section 9.3 not later than 2:00 p.m. on the date when due.  Subject to Section 10.1 (Taxes) hereof, payments by the Borrower under this Agreement shall be made without offset, counterclaim or other deduction and in such amounts as may be necessary in order that all such payments shall not be less than the amounts otherwise specified to be paid under this Agreement and the Notes.  The Administrative Agent will promptly thereafter distribute like funds ratably to each Lender (unless such amount is not to be shared ratably in accordance with the terms hereof).

2.4     **Setoff; etc**.  Upon the occurrence and during the continuance of an Event of Default, each Lender and the Administrative Agent are hereby authorized at any time and from time to time, without prior notice to the Borrower (any such notice being expressly waived by the Borrower), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or Administrative Agent to or for the credit or the account of the Borrower or any of its Subsidiaries, including specifically any amounts held in any account maintained at such Lender or Administrative Agent, against any and all amounts which may be owed to the Administrative Agent or the Lenders, or any of them, by the Borrower, in connection with this Agreement or any Loan Document; provided that no Lender shall exercise any such right without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).  The rights of the Lenders and the Administrative Agent under this Section 2.4 are in addition to other rights and remedies (including other rights of set-off) which the Lenders and the Administrative Agent may have under applicable law.  Each Lender and the Administrative Agent agrees, severally and not jointly, to use reasonable efforts to notify the Borrower of any exercise of its rights pursuant to this Section 2.4, provided, however, that failure to provide such notice shall not affect any Lender's or the Administrative Agent's rights under this Section 2.4 or the effectiveness of any action taken pursuant hereto; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.10 and, pending such

payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

2.5    <u>**Sharing**</u>.  If any Lender shall obtain any payment (whether voluntary, involuntary, by application of offset or otherwise) on account of the Loans made by it in excess of such Lender's ratable share of payments on account of the Loans obtained by all the Lenders, such Lender shall purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; <u>provided</u> that, (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this <u>Section 2.5</u> shall not be construed to apply to (x) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to any Borrower or any Guarantor or any Affiliate thereof (as to which the provisions of this <u>Section 2.5</u> shall apply).  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this <u>Section 2.5</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including the right to setoff) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

2.6    <u>**[Reserved]**</u>.

2.7    <u>**Lending Branch**</u>.  Subject to the provisions of <u>Section 10.6(a)</u>, each Lender may, at its option, elect to make, fund or maintain its Loans hereunder at the branch or office specified on the signature pages hereto or such other of its branches or offices as such Lender may from time to time elect.

2.8    <u>**Application of Payments and Collections**</u>.

(a)    <u>Order of Application of Payments</u>.  Subject to the provisions of subsection (b) below, all payments and prepayments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied, <u>first</u> to pay principal of and interest on any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, <u>second</u> ratably to pay all other Obligations in respect of fees, expenses, reimbursements or indemnities then due and payable, <u>third</u> ratably to pay interest then due in respect of the Loans, and <u>fourth</u> to pay the principal of the Loans then due and payable, and in the case of any prepayment of Term Loans, in the inverse order of maturity (including the payment owing on the Maturity Date).

(b)    <u>Application of Payments After an Event of Default</u>.  After the occurrence of an Event of Default and while the same is continuing, the Administrative Agent shall, unless the Administrative Agent and the Lenders shall agree otherwise, apply all payments and prepayments in respect of any Obligations in the following order:

(1)    to pay interest on and then principal of any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

(2)    to pay Obligations in respect of any fees, expense reimbursements or indemnities then due to the Administrative Agent;

(3)    ratably to pay Obligations in respect of any fees, expenses, reimbursements or indemnities (other than principal and interest) payable to the Lenders;

(4)    to the payment of interest on all Loans and any amounts due pursuant to <u>Sections 10.4</u> and <u>10.5</u>, to be allocated among the Lenders pro rata based on the respective aggregate amounts of such accrued interest and amounts owed to them; and

(5)    to the payment of the outstanding principal amounts of all Loans to be allocated among the Lenders, pro rata based on the respective outstanding principal amounts described in this clause (5) payable to them;

(c)    Each of the Lenders hereby irrevocably designates the Administrative Agent its attorney in fact for the purpose of receiving any and all payments to be made to such Lender in respect of Obligations held by it, and hereby directs each payor of any such payment to make such payment to the Administrative Agent.  Each of the Lenders hereby further agrees that if, notwithstanding the foregoing, it should receive any such payment (including by set-off), it shall hold such payment in trust for, and promptly deliver such payment to, the Administrative Agent.

(d)    The Administrative Agent shall promptly distribute to each Lender at its primary address set forth on the appropriate signature page hereof or at such other address as a Lender may notify the Administrative Agent in writing, such funds as such Lender may be entitled to receive.

**2.9    [Reserved].**

**2.10    Defaulting Lenders.**

(a)    <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(1)    <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and <u>Section 9.1</u>.

(2)      Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 2.4 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 3.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(3)      Certain Fees.  No Defaulting Lender shall be entitled to receive any fee payable under Section 2.6 for any period during which that Lender is a Defaulting Lender and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender.

(b)      [Reserved].

(c)      Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with, with respect to Term Loans, their Applicable Term Loan Percentages whereupon such Lender will cease

to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and <u>provided</u>, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**2.11**   <u>**Rates**</u>.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

**2.12**   <u>**Benchmark Replacement Setting for Term Loans**</u>.

(a)   <u>Benchmark Replacement</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Term Loan Lenders without any amendment to, or further action or consent of any other party to, this

Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Required Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable, at the option of the Borrower, on a monthly or quarterly basis.

(b)       Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)       Notices; Standards for Decisions and Determinations.       The Administrative Agent will promptly notify the Borrower and the Term Loan Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to paragraph (d) below and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Term Loan Lender (or group of Term Loan Lenders) pursuant to this Section 2.12, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.12.

(d)       Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (x) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (y) if a tenor that was removed pursuant to clause (x) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

43

(e)   Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a Term SOFR Loan of, conversion to or continuation of Term SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

## ARTICLE III
## CONDITIONS PRECEDENT

**3.1   Conditions Precedent to Effectiveness**.  The effectiveness of this Agreement and the obligation of the Lenders to make any Advance on the Closing Date, is subject to the following conditions precedent:

(a)   The Administrative Agent shall have received copies (in sufficient number for each of the Lenders to receive a copy) of all of the following, each dated the Closing Date or such earlier date as approved by the Administrative Agent and each in form and substance reasonably satisfactory to the Administrative Agent in all respects:

(1)   This Agreement, appropriately completed and duly executed by the parties hereto;

(2)   The Notes, to the extent requested, appropriately completed and duly executed by the Borrower;

(3)   The Guaranty, appropriately completed and duly executed and delivered by each of the Guarantors;

(4)   The Security Agreement, appropriately completed and duly executed by the parties thereto;

(5)   Uniform Commercial Code financing statements authorized by the applicable Loan Party as debtor, and naming the Administrative Agent as secured party with respect to the Collateral;

(6)   An incumbency certificate of the Borrower;

(7)   a correct and complete copy of the resolutions of its members or shareholders authorizing the execution, delivery and performance of the Loan Documents to which it is a party, and such resolutions have not been subsequently modified or repealed; and

(8)   A Notice of Borrowing appropriately completed and duly executed by the Borrower.

(b)      Payment by the Borrower of all fees due on or prior to the Closing Date in accordance with the provisions of Section 2.6 which payment shall be nonrefundable;

(c)      Payment by the Borrower of all reasonable costs and expenses of the Administrative Agent and the Lenders (including reasonable and documented fees and expenses of the Lender Professionals) incurred in connection with the preparation and execution of the Loan Documents and incident to all proceedings in connection with, transactions contemplated by, and documents relating to this Agreement and the Loan Documents, which payment shall be nonrefundable;

(d)      All first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Required Lenders;

(e)      The Plan of Reorganization and related disclosure statement shall have been filed by the Chapter 11 Debtors with the Bankruptcy Court;

(f)      The Bankruptcy Court shall have entered the Interim DIP/Cash Collateral Order no later than three (3) Business Days after the Petition Date (or such longer period agreed to by the Required Lenders), which Interim DIP/Cash Collateral Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders;

(g)      The Administrative Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interest in, the Collateral, in each case, as set forth in and having the priorities set forth in the DIP Orders;

(h)      The Administrative Agent and the Required Lenders shall have received the Initial Budget, which shall be in form and substance acceptable to the Required Lenders; and

(i)      The Borrower and each of the Guarantors shall have provided the documentation and other information to the Administrative Agent (to the extent reasonably requested by the Administrative Agent in writing at least five (5) Business Days prior to the Closing Date) that are required by regulatory authorities under the applicable "know-your-customer" rules and regulations, including the PATRIOT Act, in each case at least two (2) Business Days prior to the Closing Date;

The making of the Advance hereunder shall not constitute a waiver by the Administrative Agent or any Lender of any right which the Administrative Agent or such Lender may have in the event that any certificate, agreement, financial statement or other document delivered pursuant to this Section 3.1 or otherwise in connection with the transactions contemplated by this Agreement shall prove to have been false or misleading in any respect.

**3.2** **Conditions Precedent to All Advances Other Than On The Closing Date**.  The obligation of the Lenders to make any Advance, other than Advances to be made on the Closing Date, including the Initial Term Loan Advances, shall be further subject to the satisfaction of each of the following conditions immediately prior to or contemporaneously with each such Advance, unless waived in writing by the Administrative Agent:

(a)    [Reserved];

(b)    The Bankruptcy Court shall have entered the Final DIP/Cash Collateral Order, which shall have been entered no later than thirty (30) days after the Petition Date and which shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders;

(c)    The Administrative Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interest in, the Collateral, in each case, as set forth in and having the priorities set forth in the Final DIP/Cash Collateral Order;

(d)    A Notice of Borrowing appropriately completed and duly executed by the Borrower, which must be provided to the Administrative Agent at least five (5) Business Days prior to the applicable Initial Term Loan Advance funding date (or such shorter period as the Required Lenders shall agree);

(e)    The representations and warranties set forth in Article IV and in each of the other Loan Documents are true and correct in all material respects on the date of and after giving effect to the making of the Advance (except, in the case of any representation and warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or period, as the case may be) and any representation and warranty that is qualified by references to materiality or Material Adverse Occurrence or similar term or qualification, shall be true and correct in all respects, except that the representations and warranties set forth in Section 4.5 as to the financial statements of the Borrower shall be deemed to be updated to refer to the audited and unaudited financial statements of the Borrower, as the case may be, most recently delivered to the Administrative Agent pursuant to Section 5.1;

(f)    No Default or Event of Default shall then have occurred and be continuing on the date of the making of the Advance.

The delivery of a Notice of Borrowing by the Borrower shall constitute a certification by the Borrower, binding upon the Borrower as to the matters set forth in subsections (b) and (c) above.

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and each of the Lenders that as of the Closing Date and as of the date of each Advance,

**4.1** **Organization; etc**. Each Loan Party is a debtor in the Chapter 11 Case. Each Loan Party is a limited liability company or corporation, as the case may be, validly organized and existing and in good standing under the laws of the state of its organization, subject to the entry of the DIP Orders and any restrictions arising on account of such Loan Party's status as a "debtor" under the Bankruptcy Code, has full power and authority to own its property and conduct its business as conducted by it and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence. A list of jurisdictions in which such Loan Party is qualified to do business is set forth in <u>Annex I</u>. Subject to the entry of the DIP Orders, each Loan Party has full power and authority to enter into and to perform its obligations under the Loan Documents to which it is a party and, in the case of the Borrower only, to request Advances under this Agreement. Subject to the entry of the DIP Orders, each Loan Party has all licenses, permits and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its Property, except for permits, licenses, and rights the failure of which to have or obtain would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Occurrence.

**4.2** **Due Authorization**. Subject to entry of the DIP Orders, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party (a) have been duly authorized by all necessary corporate or limited liability company action, as the case may be, (b) do not and will not conflict with, result in any violation of or constitute any default under, (i) any provision of the organizational, constitutive or governing documents (including, as applicable, articles of organization and operating agreements) of such Loan Party, (ii) any other material agreement binding on or applicable to such Loan Party, or (iii) subject to the entry of the DIP Orders, any of their respective Property, or any law or governmental regulation or court decree or order binding upon or applicable to such Loan Party, or any of the Property and (c) will not result in the creation or imposition of any Lien on any of such Loan Party's Property pursuant to the provisions of any agreement binding on or applicable to such Loan Party, or any Property, except any such Liens created pursuant to the Security Documents in favor of the Administrative Agent, for the benefit of the Secured Parties and Permitted Liens, except with respect to any breach, contravention or violation referred to in clauses (b) (ii) and (b)(iii), to the extent that such breach, contravention or violation would not reasonably be expected to result in a Material Adverse Occurrence.

**4.3** **Subsidiaries**. As of the Closing Date, no Loan Party has any Subsidiaries except those listed on <u>Annex II</u>, which correctly sets forth the name of each Subsidiary, the jurisdiction of its incorporation and the percentage ownership of each Subsidiary which is owned, of record or beneficially, by such Loan Party and/or one or more of its Subsidiaries. Each Loan Party and its Subsidiaries has good and marketable title to all of the Equity Interests or Equity Interests Equivalents it owns in each of its Subsidiaries, free and clear of any Lien (other than any Liens in

favor of the Administrative Agent for the benefit of the Secured Parties and inchoate Permitted Liens) and all such shares have been duly issued and are fully paid and non-assessable. Each Loan Party has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and is duly licensed or qualified and in good standing in each other jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence. As of the Closing Date, a list of the jurisdictions in which each Loan Party is qualified to do business is set forth on the attached <u>Annex II</u>. Each Loan Party has full power and authority to own and operate its properties, to carry on its business as now conducted and to enter into and perform the Loan Documents to which it is a party. Each Loan Party has all licenses, permits, and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its properties, except for permits, licenses, and rights the failure of which to have or obtain, individually or in the aggregate, is not, and will not result in, a Material Adverse Occurrence.

**4.4** **Validity of the Agreement**. Upon entry by the Bankruptcy Court of the DIP Orders, each Loan Document is the legal, valid and binding obligation of each Loan Party and is enforceable in accordance with its terms except that, as to enforcement of remedies.

**4.5** **Financial Statements**.

(a)    The most recent financial statements furnished pursuant to <u>Section 5.1(a)</u> (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b)    The most recent financial statements furnished pursuant to <u>Section 5.1(b)</u> (i) were prepared in accordance with Modified GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes.

**4.6** **Litigation; etc**. Except for the Chapter 11 Cases, there is no action, suit, claim, demand, disputes, cause of action, proceeding, arbitration or investigation at law or equity, or before or by any federal, state, local or other governmental department, commission, court, tribunal, board, bureau, agency or instrumentality, domestic or foreign, pending, or to the Knowledge of the Loan Parties, threatened in writing, against or affecting any Loan Party or any of its Properties, which if determined adversely would reasonably be expected to result in a Material Adverse Occurrence.

**4.7** **Compliance with Law**. Subject to entry of the DIP Orders, no Loan Party is (a) in default or breach with respect to any judgment, order, writ, injunction, rule, regulation or decree of any court, governmental authority, department, commission, agency or arbitration board or tribunal or (b) in violation of any law, rule, regulation, ordinance or order relating to its or their

48

respective businesses, in each case of (a) and (b) above, the breach, default or violation of which would reasonably be expected to result in a Material Adverse Occurrence.

**4.8** **ERISA Compliance**. With respect to each Plan which is an employee pension benefit plan (as defined in Section 3(2) of ERISA) that is intended to be qualified under Section 401(a) of the Code, the Internal Revenue Service has issued a determination that each such Plan is qualified in form under Section 401(a) and related provisions of the Code, and that each related trust or custodial account is exempt from taxation under Section 501(a) of the Code, and nothing has occurred since the date of that determination that could reasonably be expected to adversely affect the qualified status of such Plan. All Plans comply with ERISA and other applicable laws, except as would not reasonably be expected to result in a Material Adverse Occurrence. There exist with respect to the Loan Parties no Multiemployer Plans, for which a material withdrawal or termination liability may be incurred. There exist with respect to all Plans or trusts: (a) no failure to satisfy the minimum funding standard within the meaning of ERISA, whether or not waived; (b) no termination of any Plan or trust which would result in any material liability to the PBGC or any "reportable event," as that term is defined in ERISA, which is likely to constitute grounds for termination of any Plan or trust by the PBGC; (c) no "prohibited transaction," as that term is defined in ERISA, which is likely to subject the Borrower to any material tax or penalty on prohibited transactions imposed by Section 4975 of the Code, and (d) no pending disputes, arbitrations, claims, suits, grievances or governmental audits involving any Plan (other than routine claims for benefits payable under any such Plan) that could reasonably be expected (individually or in the aggregate) to result in a Material Adverse Occurrence.

**4.9** **Title to Assets**. Each Loan Party holds or will hold title to the Collateral, including any owned Real Property in fee simple and good, legal and marketable title to any Equipment, in each case and used in its business and pledged as Collateral for the Obligations, free and clear of all Liens except for Permitted Liens and other encumbrances permitted pursuant to Section 6.3, except where the failure to have such title would not reasonably be expected to result in a Material Adverse Occurrence. Except for Uniform Commercial Code financing statements evidencing Permitted Liens, or Uniform Commercial Code financing statements for which terminations will be tendered to the Administrative Agent prior to or contemporaneously with the first Advance for any Unit, no financing statement under the Uniform Commercial Code as in effect in any jurisdiction and no other filing which names any Loan Party as debtor or which covers or purports to cover any of the Collateral, including Real Property or Equipment pledged as Collateral for the Obligations, will be effective and on file in any state or other jurisdiction, and no Loan Party will sign or authorize any such financing statement or filing or any security agreement authorizing any secured party thereunder to file any such financing statement or filing other than in favor of Administrative Agent.

**4.10** **Use of Proceeds**. Proceeds of Advances of the Initial Term Loan Advance will be used to fund (i) ongoing working capital requirements of the Borrower and its Subsidiaries and for other general corporate purposes, and (ii) the payment of fees, premiums, accrued and unpaid interest, expenses and other similar transaction costs related to the foregoing, in each case, subject to the Approved Budget and Permitted Variances.

**4.11** **Governmental Regulation**. No Loan Party is required to obtain any material consent, approval, authorization, permit or license which has not already been obtained from, or

effect any material filing or registration (other than the filing of the Uniform Commercial Code financing statements) which has not already been effected with, any federal, state or local regulatory authority in connection with the execution and delivery of this Agreement or the performance, in accordance with their respective terms, of this Agreement or any other Loan Document except for any consent, approval, authorization, permit or license, the failure of which to obtain or make would not reasonably be expected to result in a Material Adverse Occurrence.

4.12    **Margin Stock**.  No part of any Advance shall be used at any time by any Loan Party to purchase or carry margin stock (within the meaning of Regulations T, U and X) or to extend credit to others for the purpose of purchasing or carrying any margin stock.  No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purposes of purchasing or carrying any such margin stock.  No part of the proceeds of any Advance will be used by any Loan Party for any purpose which violates, or which is inconsistent with, any regulations promulgated by the Board of Governors of the Federal Reserve System.

4.13    **Investment Company Act**.  No Loan Party is registered or required to be registered as an "investment company," or an "affiliated person" of, or a "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.  The making of the Advances, the application of the proceeds and repayment thereof by the Borrower and the performance by each Loan Party of the transactions contemplated by this Agreement will not violate any provision of said Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.

4.14    **Accuracy of Information**.  All written information heretofore furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders for purposes of or in connection with this Agreement or any transaction contemplated by this Agreement is, and all other such information furnished by or on behalf of such Loan Party to the Administrative Agent is, when considered as a whole, complete and correct in all material respects and did not, when delivered, contain any untrue statement of material fact or omit to state a fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements have been made (after giving effect to all supplements thereto).

4.15    **Tax Returns; Audits**.  Each Loan Party has filed all material federal, state and local tax returns and other material reports which are required to be filed, and has paid all material taxes as shown on said returns and on all assessments received by any such Person (except for any assessments which are being contested in good faith by appropriate proceedings that will prevent a forfeiture or sale of any property and for which an adequate reserve has been provided on the books of such Loan Party in accordance with GAAP, or the nonpayment of which is permitted or required under the Bankruptcy Code), to the extent that such taxes have become due or has obtained extensions with respect to the filing of such returns and has made provision in accordance with GAAP for the payment of taxes anticipated to be payable in connection with such returns. Each Loan Party has made all material required withholding deposits.

4.16    **Environmental and Safety Regulations**.  Each Loan Party is in compliance with all requirements of applicable federal, state and local environmental, pollution control, health and safety statutes, laws and regulations except for any noncompliance which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Occurrence and is not,

to the knowledge of each Loan Party, the subject of any federal or state investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, except for any investigation which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence. The Borrower further represents and warrants that the Real Property and its intended use complies with all applicable laws, governmental regulations and the terms of any enforcement action by any federal, state, regional or local governmental agency regarding all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus under such laws, except in each case for any noncompliance which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence. Each Loan Party further represents and warrants that no written notice, demand, request for information, citation, summons or order has been issued, no complaint has been filed, no penalty has been assessed and, to the knowledge of each Loan Party, no investigation or review is pending or threatened by any governmental or other entity with respect to any alleged failure by such Loan Party to comply in any respect with any of such environmental laws, except in each case which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence (each of the foregoing, an "<u>Environmental Action</u>").

      **4.17**    **<u>Payment of Wages; Labor Matters</u>**.  The Borrower is in compliance with the Fair Labor Standards Act, as amended, in all material respects, and the Borrower has paid all minimum and overtime wages required by law to be paid to their respective employees. There are no strikes, work stoppages, slowdowns or lockouts existing, pending or, to the Knowledge of the Loan Parties, threatened against or involving any Loan Party or any Subsidiary of any Loan Party, except for those that would reasonably be expected to result in a Material Adverse Occurrence. Except as set forth on <u>Schedule 4.17</u>, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Loan Party or any Subsidiary of any Loan Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Loan Party or any Subsidiary of any Loan Party and (c) to the knowledge of any Loan Party, no such representative has sought certification or recognition with respect to any employee of any Loan Party or any Subsidiary of any Loan Party.

      **4.18**    **<u>Intellectual Property</u>**.  Each Loan Party owns, possesses or has the right to use all material licenses and rights to all patents, trademarks, trademark rights, trade names, trade name rights, trade dress, service marks, domain marks and copyrights necessary to conduct their business in all material respects as now being conducted, to the Knowledge of the Loan Parties, without material conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, in each case of all of the foregoing, except where the failure to own, possess or have the right to use such intellectual property, or conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, would not reasonably be expected to result in a Material Adverse Occurrence. All such material licenses and rights with respect to patents, trademarks, trademark rights, trade names, trade name rights, service marks and copyrights are, to the Knowledge of the Loan Parties, in full force and effect in all material respects.

51

**4.19**   **Projections**.  The budget projections of the Borrower, furnished annually to the Administrative Agent, consisting of balance sheets, cash flow statements and income statements of the Borrower and its Subsidiaries after giving effect to the making of the Advances hereunder and the application of the proceeds thereof, together with supporting details and a statement of underlying assumptions, have been prepared in the light of the past business history of the Borrower and its Subsidiaries and on the basis of the assumptions set forth therein, which assumptions are in the opinion of the Borrower reasonable at the time such budget projections were prepared (it being recognized that budget projections may differ from actual results and such differences may be material and such budget projections are subject to significant uncertainties and contingencies which are beyond the Borrower's control and no assurance can be given that any particular projection will be realized).

**4.20**   **[Reserved]**.

**4.21**   **[Reserved]**.

**4.22**   **Brokers' Fees**.  Except for fees payable to the Administrative Agent and the Lenders, none of the Loan Parties or any of their respective Subsidiaries has any obligation to any Person in respect of any finder's, broker's or investment banker's fee in connection with the transactions contemplated hereby.

**4.23**   **Deposit Accounts**.  Schedule 4.23 lists all banks and other financial institutions at which any Loan Party maintains deposit or other accounts as of the Closing Date, and such Schedule correctly identifies the name, address and any other relevant contact information reasonably requested by the Administrative Agent with respect to each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

**4.24**   **[Reserved]**.

**4.25**   **Material Contracts**.  All of the Material Contracts are in full force and effect and no Loan Party is in default under any Material Contract and, to the best of the Borrower's Knowledge, no other Person that is a party thereto is in material default under any of the Material Contracts.

**4.26**   **Valid Liens**.  Subject to the entry of the DIP Orders, the Security Agreement and each other Security Document delivered pursuant hereto will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties to the secure the Obligations, valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interest in, the Collateral, having the priorities set forth in the DIP Orders and, for the avoidance of doubt, are subject to the Carve Out in all respects.

**4.27**   **Foreign Assets Control Regulations and Anti-Money Laundering**.  The Borrower is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  The Borrower (i) is not a Person designated by the U.S. government on the

list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is not a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is not controlled by (including by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

**4.28**   **Patriot Act**.  The Loan Parties, each of their Subsidiaries and, to their knowledge, each of their Affiliates, are in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations.  No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

**4.29**   **Insurance.**  The Borrower and its Subsidiaries maintain insurance policies with respect to their respective properties and business, in each case in compliance with Section 5.7.

**4.30**   **SBA Matters.**  Each of Holdings and the Borrower acknowledges that Brightwood Capital SBIC I, LP is, and certain other Lenders may from time to time be or become, a Small Business Investment Company (as defined in the SBIA), subject to the rules and regulations contained in and promulgated under the SBIA. As of the Closing Date, each of Holdings and the Borrower, together with its "affiliates" (for purposes of this paragraph only, as that term is defined in Title 13, Code of Federal Regulations, §121.103), is a Small Business Concern (as defined in the SBIA). Neither Holdings nor any of its Subsidiaries presently engages in, and shall not hereafter engage in, any activities for which a Small Business Concern is prohibited from engaging in under the SBIA, nor shall any such Person use directly or indirectly the proceeds of the Loans for any purpose for which a Small Business Investment Company is prohibited from providing funds by the SBIA. The representations made by Holdings and Borrower in the SBA forms delivered on the Closing Date pursuant to Section 5.13 (or such later date of delivery) shall be deemed to be representations made by Holdings and Borrower as of the Closing Date (or such later date) under this Section 4.29.

**4.31**   **Budget; Variance Report**.  The Initial Budget, each Approved Budget and each Updated Budget is based upon good faith estimates and assumptions believed by management of the Loan Parties to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Administrative Agent and the Lenders that such financial information as it relates to future events is not to be viewed as fact, such financial information as it relates to future events are subject to uncertainties and contingencies, many of which are beyond the Loan Parties' control, no assurance can be given that such financial information as it relates to future events will be realized and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein and such differences

may be material.  From and after the delivery of any Variance Report in accordance with this Agreement, such Variance Report shall be true, complete and correct in all material respects and fairly represent in all material respects the results of operations of the Loan Parties and their respective Subsidiaries for the period covered thereby and in the detail to be covered thereby.

**4.32**      **Orders**.  The Interim DIP/Cash Collateral Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Required Lenders, amended or modified and no appeal of such Interim DIP/Cash Collateral Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.  After entry of the Final DIP/Cash Collateral Order, the Final DIP/Cash Collateral Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and the Required Lenders, amended or modified and no appeal of such Final DIP/Cash Collateral Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

**4.33**      **Bankruptcy Matters**.

(a)      The Chapter 11 Cases were validly commenced on the Petition Date, and (x) proper notice under the circumstances of the motion seeking approval of the Loan Documents and entry of the DIP Orders was given, and (y) the hearing for the approval of the Interim DIP/Cash Collateral Order has been held by the Bankruptcy Court.

(b)      After the entry of the DIP Orders, and subject to the terms of the DIP Orders, the Obligations will constitute a DIP Superpriority Claim and the liens securing the Obligations shall be senior secured, valid, enforceable, and automatically and properly perfected priming liens on the Collateral, having the priorities set forth in the DIP Orders, subject in all respects to the Carve-Out and other exceptions set forth in the DIP Orders and the Loan Documents.

### ARTICLE V
### CERTAIN AFFIRMATIVE COVENANTS

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Loan shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**5.1**      **Financial Information; etc**.  The Borrower will furnish to the Administrative Agent copies of the following financial statements, reports and information:

(a)      [reserved];

(b)      (i) as soon as available and in any event within sixty (60) days after the end of each fiscal quarterly period of each fiscal year of the Borrower, consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period

54

in the preceding fiscal year, accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with Modified GAAP for such period, (subject to year-end adjustments and the lack of footnotes), and a written management's discussion and analysis of the financial condition and results of operations for such fiscal quarter and the then elapsed portion of the fiscal year, as compared to the comparable periods in the previous fiscal year and budgeted amounts, and (ii) as soon as available and in any event within seventy (70) days after the end of each fiscal quarterly period of each fiscal year of the Borrower and no later than ten (10) days after delivery of reports pursuant to clause (i), a site-level "databook" for the last month of such fiscal quarter (substantially in the same form as has been previously delivered to the Administrative Agent) detailing the following information by site: for each Unit and with respect to each such quarterly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (e) volume of retail traffic, (f) volume of total traffic, (g) chemical expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(c)      (i) as soon as available and in any event within forty-five (45) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower, (x)consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, (y) a certificate of a Responsible Officer of the Borrower providing reasonably detailed information demonstrating compliance with the covenant set forth in Section 6.1(c) for each test date during the preceding month, and (ii) as soon as available and in any event within fifty-five (55) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower and no later than ten (10) days after delivery of the reports and certificates pursuant to clause (i), a site-level "databook" for such fiscal month (substantially in the same form as has been previously delivered to the Administrative Agent) detailing the following information by site: for each Unit and with respect to each such monthly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (e) volume of retail traffic, (f) volume of total traffic, (g) chemical expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(d)      with each financial statement required by Section 5.1(a) and Section 5.1(b) (other than the last fiscal quarter of such year) to be delivered to the Administrative Agent, a Compliance Certificate signed by a Responsible Officer of the Borrower;

(e)      promptly after the Borrower knows or has reason to know that any

55

Default has occurred and is continuing or Material Adverse Occurrence has occurred, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice of such Default or Material Adverse Occurrence describing the same in reasonable detail and a description of the action that the Borrower has taken and proposes to take with respect thereto;

(f)    promptly after receipt thereof, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, all final letters and reports to management of the Borrower prepared by its independent certified public accountants and the responses of the management of the Borrower thereto;

(g)    promptly following the commencement of any litigation, suit, administrative proceeding or arbitration relating to the Borrower or any of its Properties which if adversely determined would reasonably be expected to result in a Material Adverse Occurrence or otherwise relating in any way to the transactions contemplated by this Agreement, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice thereof describing the allegations of such litigation, suit, administrative proceeding or arbitration and the Borrower's response thereto;

(h)    promptly following the commencement of any Environmental Action, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice describing the allegations of such Environmental Action;

(i)    promptly following the occurrence of, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, any "reportable event" or "prohibited transaction" or the imposition of a withdrawal or termination liability within the meaning of ERISA in connection with any Plan or Multiemployer Plan that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower, and, when known, any action taken by the Internal Revenue Service, Department of Labor or PBGC that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower with respect thereto;

(j)    [reserved];

(k)    from time to time (but no more frequently than one time per fiscal quarter) upon the reasonable request of Administrative Agent, the Borrower shall make appropriate members of management available at reasonable times during normal business hours for a telephone conference to discuss with Administrative Agent and the Lenders the financial condition and operations of the Borrower and its Subsidiaries;

(l)    [reserved];

(m)    Updated Budgets. no later than 5:00 p.m. (New York City time), commencing on March 6, 2025 and on every other Thursday thereafter (e.g., once every two weeks) thereafter, (i) a supplement to the Approved Budget (the "Updated Budget") covering the weeks thereafter required to cause such Approved Budget, together with the

Updated Budget, to cover the immediately prospective thirteen-week period from such Updated Budget, in each case consistent with the form and detail set forth in the Initial Budget and including a forecasted cash balance as well as a line-item report setting forth the estimated fees and expenses to be incurred by each professional advisor on a weekly basis; provided that

(i) the Updated Budget will only become the Approved Budget upon written approval of the Required Lenders (which notice may be provided by any of the Lender Professionals on their behalf via e-mail), and if no such approval is provided, the Initial Budget or the most-recent approved Updated Budget shall remain the Approved Budget, and

(ii) the Required Lenders shall not have any obligation to approve any Updated Budget;

(n)      Variance Reporting.  no later than 5:00 p.m. (New York City time) every Thursday, commencing with February 20, 2025 (each such Thursday, the "Variance Report Deadline"), the Loan Parties shall deliver to the Lender Professionals a variance report, each in form and detail reasonably acceptable to the Administrative Agent and the Required Lenders (each, a "Variance Report"), in each case, setting forth the cash balance as of the end of each week therein and the difference between, on a line-by-line and aggregate basis:

(1)      actual operating receipts and budgeted operating receipts on a line-item basis as set forth in the Approved Budget in effect for the relevant periods (the "Receipts Variance"),

(2)      actual operating disbursements and budgeted operating disbursements on a line-item basis as set forth in the Approved Budget (excluding, for the avoidance of doubt, professional fees of the Chapter 11 Debtors) (the "Disbursements Variance"),

(3)      actual accrued fees of each of the Debtor Professionals owed by the Chapter 11 Debtors, in each case, for the Applicable Period, and together with a reasonably detailed explanation of such Receipts Variance and Disbursements Variance (it being understood that for purposes of the Permitted Variance testing in Section 6.18, such Receipts Variance and Disbursements Variance shall be measured on an aggregate (and not line-item) basis); and

(o)      such other information with respect to the financial condition and operations of the Borrower as the Administrative Agent or any Lender may reasonably request.

**5.2      Maintenance of Existence; etc**.  Each Loan Party shall maintain and preserve its existence, and qualification and good standing in all states in which such qualification and good standing are required in order to conduct its business and own its property as conducted and owned in such states, except where the failure to do so would not reasonably be expected to result in a Material Adverse Occurrence.

**5.3**    **Maintenance of Properties**.  Each Loan Party will maintain or cause to be maintained in the ordinary course of business in good repair, working order and condition (reasonable wear and tear excepted) all material Properties used in their respective businesses (whether owned or held under lease), and from time to time make or cause to be made all necessary repairs, renewals, replacements, additions, betterments and improvements thereto, except to the extent the failure to maintain such Properties would not reasonably be expected to result in a Material Adverse Occurrence.

**5.4**    **Payment of Liabilities**.  Each Loan Party shall pay and discharge as the same may become due and payable, all material taxes, assessments and other governmental charges or levies against or on any of its Property, as well as all other lawful claims of any kind which, if unpaid, might become a Lien upon any such Property; provided, however, that the foregoing shall not require such Loan Party to pay any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested diligently in good faith by appropriate proceedings that will prevent a forfeiture or sale of any such Property and an adequate book reserve in accordance with GAAP shall have been set aside with respect thereto, but (with respect to claims that are not Taxes, assessments and other governmental charges or levies) only so long as such claim does not become a Lien on any assets of such Loan Party.

**5.5**    **Compliance with Laws**.  Each Loan Party shall carry on its business activities in substantial compliance with all applicable federal or state laws and all applicable rules, regulations and orders of all governmental bodies and offices having power to regulate or supervise its business activities, including all applicable environmental, pollution control, health and safety statutes, laws and regulations, except in each case where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence; provided that nothing in this Section 5.5 shall impair the obligations of the Loan Parties in Section 5.15.  Each Loan Party shall maintain all material rights, liens, permits, certificates of compliance or grants of authority necessary for the conduct of its business, except where the failure to maintain would not reasonably be expected to result in a Material Adverse Occurrence.  Each Loan Party agrees that the Real Property and its intended use will comply at all times with all applicable laws, governmental regulations and the terms of any enforcement action now or hereafter commenced by any federal, state, regional or local governmental agency, including all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended from time to time), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus, except where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence.

**5.6**    **Books and Records; Inspection Rights; etc**.  Each Loan Party shall keep (a) a system of accounting administered in accordance with GAAP and (b) books and records reflecting all of its business affairs and transactions in accordance with GAAP.  Each Loan Party shall permit the Administrative Agent (accompanied by any Lender) or any representative thereof, at reasonable times and intervals, during normal business hours and upon reasonable notice to the Borrower, to visit the offices of such Loan Party, discuss financial matters with Responsible Officers of such Loan Party and with its independent public accountants (and by this provision

each Loan Party authorizes its independent public accountants to participate in such discussions) and examine any of the such Loan Party's books and other company records in a non-disruptive manner; provided, that unless an Event of Default has occurred and is continuing there shall be no more than one such inspection or visit per year.  Notwithstanding anything to the contrary in this Section 5.6, no Loan Party will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information, that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) the disclosure of which is restricted by binding agreements with a third party that is not a controlled Affiliate of any Loan Party.

5.7    **Insurance**.  Each Loan Party will:

(a)    Maintain insurance including, but not limited to, business interruption coverage, and public liability coverage insurance from responsible companies in such amounts and against such risks to such Loan Party as is prudent and reasonably satisfactory to the Administrative Agent; provided that the Administrative Agent acknowledges that the insurance maintained by the Loan Parties as of the Closing Date is satisfactory;

(b)    Keep its tangible assets insured by responsible companies against loss or damage by fire, theft, burglary, pilferage, loss in transit, explosions and hazards in amounts which are prudent for the carwash industry, in accordance with industry standards, all premiums thereon to be paid by the Loan Parties;

(c)    With respect to each Unit, if at any time the area in which any Improvements located on such Unit is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), (i) obtain flood insurance in such total amount as required by Flood Insurance Laws, and otherwise comply with the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent, including a copy of the flood insurance policy and a declaration page relating to the insurance policies required by this Section 5.7 which shall (a) identify the addresses of each parcel of Real Property located in a special flood hazard area, (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (c) provide that the insurer will give the Administrative Agent thirty (30) days written notice of cancellation or non-renewal and shall include evidence of annual renewals of such insurance and (iii) shall be otherwise in form and substance satisfactory to the Administrative Agent;

(d)    Require that each insurance policy for the Collateral provide for at least thirty (30) days' prior written notice to the Administrative Agent of any termination of or proposed cancellation or non-renewal of such policy, or material reduction in coverage, and name the Administrative Agent for the Secured Parties as additional named loss payee or additional named insured, as applicable;

    **5.8**    <u>**ERISA**</u>.  The Borrower agrees that all assumptions and methods used to determine the actuarial valuation of employee benefits, both vested and unvested, under any Plan, and each such Plan, will comply in all material respects with ERISA and other applicable laws.

    (a)    The Borrower will not at any time permit any Plan to:

    (1)    engage in any "prohibited transaction" for which an exemption is not available as such term is defined in Section 4975 of the Code or in Section 406 of ERISA;

    (2)    fail to satisfy the minimum funding standard as such term is defined in Section 302 of ERISA, whether or not waived;

    (3)    be terminated under circumstances which are likely to result in the imposition of a lien on the property of the Borrower pursuant to Section 4068 of ERISA, if and to the extent such termination is within the control of the Borrower; or

    (4)    be operated or administered in a manner which is not in compliance with ERISA or any applicable provisions of the Code;

if the event or condition described in (1), (2), (3) or (4) above would reasonably be expected to subject the Borrower to a Material Adverse Occurrence.

    (b)    Upon the request of the Administrative Agent or any Lender, the Borrower will furnish a copy of the annual report of each Plan (Form 5500) required to be filed with the Internal Revenue Service.  Copies of such annual reports shall be delivered no later than thirty (30) days after the date the copy is requested.

    **5.9**    <u>**Additional Subsidiary Guarantors**</u>.  The Borrower shall not form or acquire any Subsidiaries following the Closing Date.

    **5.10**    <u>**[Reserved]**</u>.

    **5.11**    <u>**[Reserved]**</u>.

    **5.12**    <u>**Further Assurances**</u>.  Promptly upon reasonable request by the Administrative Agent, the Borrower shall (and, subject to the limitations hereinafter set forth, shall cause the other Loan Parties to) take such additional actions and execute such documents as the Administrative Agent may reasonably request from time to time in order (i) to carry out the purposes of this Agreement or any other Loan Documents; <u>provided</u>, that the Borrower and the other Loan Parties shall not be obligated to take any such actions or execute such documents to the extent that such actions or documents would impose any additional obligations not set forth herein on such Loan Party, (ii) to subject to the Liens in the Collateral granted by any of the Security Documents any of the Collateral and (iii) to perfect and maintain the validity, effectiveness and priority of the Liens granted by any of the Security Documents and the Liens intended to be created thereby.

    **5.13**    <u>**SBA Matters**</u>.  Each of Holdings and Borrower will, and will cause each of its Subsidiaries to: (a) upon the request of any Lender that is a Small Business Investment Company

(as defined in the SBIA), repay such Lender's Loan in full (including the applicable prepayment fee), in immediately available funds, in the event that Borrower or any other Loan Party changes the nature of its business within one year after the Closing Date (or, if applicable, any later borrowing date hereunder) in a manner that would cause such Lender to have provided funds to Borrower or any other Loan Party pursuant to this Agreement or any other Loan Document in violation of 13 C.F.R. §§ 107.700-107.760 (as amended from time to time); (b) upon the request of any Lender that is a Small Business Investment Company or the SBA, (i) submit to such Lender and/or the SBA timely and accurate compliance reports at such times and in such form and containing such information as the SBA may determine to be necessary to enable the SBA to ascertain whether Borrower and each other Loan Party have complied or are complying with 13 C.F.R. Part 112 ("Part 112"), (ii) submit to such Lender such information as may be necessary to enable such Lender to meet its reporting requirements under Part 112, and (iii) permit the SBA to have access with advance written notice and during normal business hours to such of its books, records, accounts and other sources of information, and its facilities as may be pertinent to ascertain compliance with Part 112. Where any information required of the Borrower or any other Loan Party is in the exclusive possession of any other agency, institution or Person and such agency, institution or Person shall fail or refuse to furnish this information, Borrower and each other Loan Party shall so certify in its report and shall set forth what efforts it has made to obtain this information; and (c) upon any Lender's request, take any and all actions required to permit any Lender to comply with SBIA and applicable law, in the event such Lender is restricted or prohibited from holding Loans or Qualified Equity Interests in any Loan Party or any Affiliate thereof as a result of any noncompliance thereunder.

**5.14** **OFAC; Patriot Act**. The Loan Parties shall, and shall cause their Subsidiaries to, comply with the laws, regulations and executive orders referred to in <u>Section 4.27</u> and <u>Section 4.28</u> (subject to any materiality qualifiers set forth in such <u>Section 4.27</u> and <u>Section 4.28</u>).

**5.15** **Sale-Leaseback Accounting Treatment**. The Loan Parties shall, and shall cause their Subsidiaries to, employ best efforts to ensure that sale-leaseback transactions from time to time are treated as successful sale-leaseback transactions for GAAP accounting purposes. To the extent any sale-leaseback transactions are determined to be failed sale-leaseback(s) for accounting purposes under GAAP, Borrower shall promptly notify Administrative Agent (on behalf of itself and the Lenders).

**5.16** **[Reserved]**.

**5.17** **Weekly Process Calls**. The Company Financial Advisor (and Evercore Group, L.L.C. if requested by the Administrative Agent or the Required Lenders) shall host weekly conference calls with the Lenders and the Lender Professionals (which shall be organized by the Administrative Agent) to review the operations of the Loan Parties, Updated Budgets and Variance Reports and any other information reasonably requested by any Lender or the Administrative Agent at times reasonably acceptable to the Administrative Agent and the Borrower.

**5.18** **[Reserved]**.

5.19    **[Reserved]**.

5.20    **Company Financial Advisor.**

(a)    At all times, the Loan Parties shall have engaged the Company Financial Advisor on terms reasonably satisfactory to the Required Lenders, including with respect to scope of work, and the Company Financial Advisor shall remain engaged in accordance with the terms of its engagement letter and this Section 5.20.  The Bankruptcy Court shall have entered an order approving the retention of the Company Financial Advisor.

(b)    [Reserved].

(c)    The Loan Parties will authorize and instruct the Company Financial Advisor to share with the Administrative Agent, among other information, all budgets, records, projections, financial information, reports and other information relating to the Collateral, the financial condition, operations and prospects of the Loan Parties and their Affiliates and such other information as reasonably requested by the Administrative Agent from time to time; *provided*, *however*, that the Loan Parties and the Company Financial Advisor shall not, and shall not be required to, share any such information that is confidential or subject to attorney client or similar privilege or constitutes attorney work-product (as determined by the Loan Parties upon the advice of counsel).

(d)    All fees and expenses of the Company Financial Advisor shall be solely the responsibility of the Loan Parties and in no event shall the Administrative Agent or any Lender have any obligation, liability, or responsibility of any kind or nature whatsoever for the payment of any such fees, expenses, or other obligations, nor shall the Administrative Agent nor any Lender have any obligation or liability to the Loan Parties, their Affiliates, or any other Person by reason of any acts or omissions whatsoever of the Company Financial Advisor at any time.

5.21    **Bankruptcy Related Matters**.

(a)    The Loan Parties shall cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Obligations and/or the Loan Documents, the Prepetition Term Loan Obligations and applicable loan documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (iv) any Plan of Reorganization and/or any disclosure statement related thereto, (v) orders concerning the financial condition of the Chapter 11 Debtors, or other Indebtedness of the Chapter 11 Debtors and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Chapter 11 Debtors, to be in accordance with the terms of this Agreement in all material respects and acceptable to the Required Lenders;

(b)    The Loan Parties shall comply in all material respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

(c)　　The Loan Parties shall deliver to the Administrative Agent and the Lender Professionals not less than two (2) Business Days (or, if not reasonably practicable as a result of exigent circumstances, as soon as reasonably practicable) prior to any filing, copies of all proposed material pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases, and shall consult in good faith with the Lender Professionals and the Required Lenders regarding the form and substance of any such document; and

(d)　　The Loan Parties shall, if not otherwise provided through the Bankruptcy Court's electronic docketing system, deliver to the Administrative Agent and to the Lender Professionals promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest.

## ARTICLE VI
## FINANCIAL COVENANTS AND NEGATIVE COVENANTS

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Advance shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**6.1**　　**[Reserved].**

**6.2**　　**Limitations on Indebtedness**.  The Loan Parties shall not, and shall not permit any of their Subsidiaries to, create, assume, incur, issue, guarantee or otherwise become or remain obligated in respect of, or permit to be outstanding, any Indebtedness, except the following (the "Permitted Indebtedness"):

(a)　　Indebtedness outstanding on the date hereof and listed on **Schedule 6.2(a)** and any refinancings, refundings, renewals or extensions thereof; provided that the principal amount of such Indebtedness is not increased from the original principal balance except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder;

(b)　　the Obligations (including, for the avoidance of doubt, the Carve Out);

(c)　　Indebtedness representing deferred compensation to employees of any Loan Party incurred in the ordinary course of business or other similar arrangements incurred by such Person in connection with the any Permitted Acquisitions, Affiliate Acquisition or any other Investment expressly permitted hereunder;

(d)　　[reserved];

(e)     Indebtedness in the form of trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice, which Indebtedness shall not be secured by a Lien on any Property of the Borrower or its Subsidiaries;

(f)     Indebtedness of any Loan Party owed in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business or consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(g)     Indebtedness of a Loan Party in respect of performance bonds, bid bonds, appeal bonds, completion guaranties, surety bonds and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business, and any extension, renewal or refinancing thereof to the extent not provided to secure the repayment of other Indebtedness and to the extent that the amount of refinanced Indebtedness is not greater than the amount of Indebtedness being refinanced;

(h)     Indebtedness of a Loan Party arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(i)     Indebtedness consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(j)     Liens securing the Carve Out;

(k)     Guarantee(s) of any Loan Party incurred in the ordinary course of business in respect of obligations to suppliers, customers, franchisees, lessors and licensees;

(l)     obligations arising under any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantee(s) thereof;

(m)     Indebtedness of any Loan Party owing to another Loan Party;

(n)     Indebtedness (and Guarantees thereof) in respect of Swap Contracts designed to hedge against Holdings', the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks, in each case not for speculative purposes;

(o)      [reserved];

(p)      [reserved];

(q)      Guarantees by any Loan Party in respect of Indebtedness of any Loan Party otherwise permitted hereunder; <u>provided</u> that if such Indebtedness is subordinated to the Obligations, such Guarantee shall be subordinated to the same extent;

(r)      Indebtedness supported by a Letter of Credit, in a principal amount not to exceed the face amount of such Letter of Credit;

(s)      Indebtedness with respect to letters of credit set forth in the Approved Budget (including those listed on **<u>Schedule 6.2(s)</u>**);

(t)      Indebtedness for Real Property Taxes; <u>provided</u> the payment thereof is not required to be made pursuant to <u>Section 5.4</u>;

(u)      [reserved];

(v)      Rent Deferral Subordinated Indebtedness; <u>provided</u> that (i) the aggregate outstanding principal amount of all such Indebtedness shall not exceed $2,433,069.18 at any time outstanding, (ii) the proceeds of such Indebtedness are used solely for the purposes described in Section 3 of the Rent Deferral Note (as in effect on May 4, 2020) and (iii) all such Indebtedness is unsecured and subordinated the Obligations on terms and conditions set forth in the Rent Deferral Subordination Agreement;

(w)      [reserved]; and

(x)      any other unsecured Indebtedness of any Loan Party; <u>provided</u> that the aggregate outstanding principal amount of all such unsecured Indebtedness shall not exceed $250,000 at any time.

**6.3**    <u>Liens</u>.  The Loan Parties shall not, and will cause their Subsidiaries not to, create, incur, assume or permit to exist or to be created or assumed any Lien on Real Property or Equipment pledged as Collateral, whether now owned or hereafter acquired, except the following (the "<u>Permitted Liens</u>"):

(a)      Liens existing on the Closing Date and set forth on **<u>Schedule 6.3</u>**;

(b)      Liens arising by operation of law on the Real Property for real estate taxes and Liens securing Taxes, assessments or governmental charges or levies or the claims or demands of contractors, materialmen, mechanics, carriers, warehousemen, landlords and other like Persons; <u>provided</u> the payment thereof is not required to be made pursuant to <u>Section 5.4</u> hereof;

(c)      Liens incurred or deposits made in the ordinary course of business (1) in connection with workmen's compensation, unemployment insurance, social security and other like laws or (2) to secure the performance of letters of credit, bids, tenders, sales

contracts, leases, statutory obligations, surety, appeal and performance bonds and other similar obligations not incurred in connection with the borrowing of money, the obtaining of advances or the payment of the deferred purchase price of the Real Property or Equipment and, in the case of this clause (2) only, not in excess of $500,000 in the aggregate outstanding at any one time;

(d)      attachments, judgment and other similar Liens arising in connection with court proceedings, provided the execution or other enforcement of such Liens is stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings in such manner as not to have the Real Property or Equipment subject to such Liens forfeitable in accordance with <u>Section 5.4</u>;

(e)      easements, rights-of-ways, reservations, exceptions, minor encroachments, rights of entry, restrictive covenants, licenses, restrictions and similar charges created or incurred in the ordinary course of business and not in connection with Indebtedness, and which in the aggregate do not materially detract from the value of any Real Property or materially impair or interfere with its use in the business operations of the Borrower and its Subsidiaries; including any such items included as exceptions in the title policy obtained by Administrative Agent related to the Real Property;

(f)      Liens in favor of the Borrower or any Guarantor;

(g)      Liens (i) in favor of the Administrative Agent for the benefit of the Secured Parties or otherwise to secure the Obligations, and (ii) securing the Obligations pursuant to the Loan Documents and Liens granted as adequate protection on account of the secured Prepetition Indebtedness pursuant to the DIP Orders;

(h)      Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(i)      Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(j)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(k)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)      precautionary Uniform Commercial Code and similar filings;

(m)    Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted hereunder;

(n)    Liens on Property constituting Goods (as defined in the applicable Uniform Commercial Code), excluding inventory, but including Equipment and Fixtures (as defined in the applicable Uniform Commercial Code), securing obligations under leases of Units entered into in the ordinary course of business;

(o)    Liens existing on property at the time of (and not in contemplation of) its acquisition or existing on the property of any Person at the time such Person becomes (and not in contemplation of such Person becoming) a Guarantor, in each case after the Closing Date; provided that (A) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Guarantor) and (B) the Indebtedness secured thereby is permitted under Section 6.2(o);

(p)    Liens in respect of the cash collateralization of Letters of Credit and letters of credit permitted by Section 6.2(s);

(q)    Liens (i) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(r)    Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 7.1(h);

(s)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and not securing Indebtedness prohibited by this Agreement;

(t)    [reserved];

(u)    the modification, replacement, renewal or extension of any Lien permitted by this Section 6.3; provided that (i) such Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 6.2;

(v)    non-exclusive licenses or sublicenses of intellectual property granted in the ordinary course of business; and

(w)    "Replacement Liens" set forth and as defined in the DIP Orders.

67

**6.4** **Sales of Assets**.  The Loan Parties shall not, and will cause their Subsidiaries not to, make any Dispositions, except for:

(a) Dispositions in the ordinary course of business and consistent with past practice; provided, that any Disposition, or series of related Dispositions, of property or assets with a fair market value in excess of $100,000 shall be set forth in the Approved Budget;

(b) Asset Sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required Lenders;

(c) Dispositions of Property to the Borrower or any Subsidiary that is a Loan Party;

(d) to the extent constituting a Disposition, any Loan Party and its Subsidiaries may enter into an consummation transactions expressly permitted by Section 6.3, Section 6.6 or Section 6.10;

(e) [reserved];

(f) Dispositions in connection with the unwinding of any Swap Contract;

(g) [reserved];

(h) to the extent set forth in the Approved Budget (subject to the Permitted Variances), Dispositions of any Property with a fair market value (as determined by the Borrower in its reasonable judgment) not to exceed $100,000 in the aggregate for all such Dispositions in any fiscal year; and

(i) the St. Louis Sale; provided, that (i) all of the conditions thereto set forth in the Prepetition Term Loan Documents shall have been satisfied or waived by the Required Lenders in writing (which may be via email), including, without limitation, satisfaction of the receipt of the minimum amount of St. Louis Sale Proceeds, (ii) all of the Net Cash Proceeds thereof shall be immediately deposited into a segregated account of which the Administrative Agent shall have a valid, fully perfected Lien and which account shall be subject to a deposit account control agreement in favor of the Administrative Agent, which shall be in form and substance acceptable to the Administrative Agent and the Required Lenders, and (iii) such proceeds shall not be used for any purpose, except to be applied to repay the Term Loans and after the repayment in full thereof to be applied to repay the Prepetition Term Loan Obligations, in each case, pursuant to the Plan of Reorganization on the effective date thereof.

**6.5** **Liquidations, Mergers and Consolidations**.  Except as permitted pursuant to Sections 6.6 and 6.8 and except for the merger, consolidation or amalgamation of any Loan Party or any Subsidiary of any Loan Party into any other Loan Party, the Loan Parties shall not, and will cause their Subsidiaries not to, liquidate or dissolve itself (or suffer any liquidation or dissolution) or otherwise wind up, or consolidate with or merge into any other Person.

**6.6**    **Investments**.  The Loan Parties shall not, and will cause their Subsidiaries not to, permit to exist any Investment, except that, so long as no Event of Default then exists or is caused thereby, the Borrower and its Subsidiaries may make Permitted Investments.

**6.7**    **Transactions with Affiliates**.  The Loan Parties shall not, and will cause their Subsidiaries not to, enter into any material transaction (including the purchase, sale or exchange of Property, the rendering of any service, the making of any Investment in an Affiliate or the repayment of any Indebtedness owed to an Affiliate) with an Affiliate (other than any such transactions among the Loan Parties), other than:

(a)    any transaction set forth explicitly in the Approved Budget;

(b)    any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on Schedule 6.7 and

(c)    to the extent the Borrower uses commercially reasonable efforts to disclose in writing to the Administrative Agent at least five (5) Business Days prior to the consummation thereof, any material transaction in the ordinary course of business and pursuant to the reasonable requirements of the Loan Parties and their Subsidiaries business, upon terms which are fair and reasonable to the Loan Parties and their Subsidiaries and which are not less favorable to the Loan Parties and their Subsidiaries than would be obtained in a comparable transaction with a Person not an Affiliate.

**6.8**    **Acquisitions**. The Loan Parties shall not, and will cause their Subsidiaries not to, make any Acquisitions.

**6.9**    **Amendment and Waiver**. The Loan Parties shall not, and will cause their Subsidiaries not to, enter into any material amendment of, or agree to or accept or consent to any material waiver of any of the material provisions of its Organizational Documents.

**6.10**    **Restricted Payments**.  The Loan Parties shall not, and will cause their Subsidiaries not to, declare, pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests or Equity Interests Equivalents of any Loan Party or any direct or indirect parent thereof, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Loan Parties or any of their Subsidiaries (collectively, "Restricted Payments"):

(a)    Restricted Payments to Holdings or any Subsidiary (or, in the case of non-Wholly Owned Subsidiaries, to Holdings and to each other owner of Equity Interests of such Subsidiary) on a pro rata basis (or more favorable basis from the perspective of Holdings or such Subsidiary) based on their relative ownership interests; provided that, with regard to the repurchase of Equity Interests, so long as any repurchase of its Equity Interests from a Person that is not Holdings or a Subsidiary is permitted under Section 6.04;

(b)    [reserved]; and

(c)      Restricted Payments to permit (a) any Parent Entity or (b) ASC - Zips Holdings, Inc. to pay franchise taxes and other similar taxes and expenses, in each case, in connection with the maintenance of its legal existence and tax compliance expenses in the ordinary course of business; provided, that all such Restricted Payments shall be permitted solely to the extent approved by an order of the Bankruptcy Court acceptable to the Required Lenders and set forth in the Approved Budget.

**6.11** **Payments in Respect of Certain Indebtedness**.  The Loan Parties shall not, and will cause their Subsidiaries not to, (i) pay interest on any Indebtedness for borrowed money of the Loan Parties or their Subsidiaries or (ii) prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment of, any Indebtedness for borrowed money of the Loan Parties or their Subsidiaries, except

(a)      payments with respect to the Term Loans;

(b)      the roll up pursuant to Section 2.1(b); and

(c)      payments provided for in the DIP Orders.

**6.12** **Change in Business**.  The Loan Parties shall not, and will cause their Subsidiaries not to, engage in any line of business that is substantially different from those lines of business carried on by it on the Closing Date (or any reasonable extension thereof) or are ancillary, corollary, complimentary or related thereto.

**6.13** **Changes in Accounting, Name and Jurisdiction of Organization**.  The Loan Parties shall not, and will cause their Subsidiaries not to, (i) change their fiscal year, (ii) change its name as it appears in official filings in its jurisdiction of organization or (iii) change its jurisdiction or form of organization, in the case of clauses (ii) and (iii), without at least ten (10) Business Days' prior written notice to the Administrative Agent and the acknowledgement of the Administrative Agent that all actions reasonably required by the Administrative Agent have been completed.

**6.14** **No Negative Pledges**.  No Loan Party shall, and shall not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Subsidiary to pay dividends or make any other distribution on any of such Subsidiary's Equity Interests or Equity Interests Equivalents or to pay fees, including management fees, or make other payments and distributions to the Borrower or any Subsidiary, except pursuant to the terms of the Loan Documents.  No Loan Party shall, and shall not permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any contractual obligation prohibiting or otherwise restricting the existence of any Lien upon any Collateral in favor of the Administrative Agent to secure the Obligations, whether now owned or hereafter acquired except (i) in connection with any document or instrument governing Liens permitted herein, provided that any such restriction contained therein relates only to the Property subject to such Permitted Liens or (ii) with consent of the Administrative Agent.  Nothing in this Section 6.14 shall prohibit (1) this Agreement or any of the other Loan Documents, (2) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted hereunder pending the consummation of such sale, (3) restrictions imposed by applicable law, (4) any agreement in effect at the time a

Person first became a Subsidiary of any Loan Party, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary and such restrictions are limited to such Subsidiary and its Subsidiaries, (5) in the case of any Subsidiary that is not a wholly-owned Subsidiary of Holdings, restrictions and conditions imposed by its organizational documents or any related joint venture, shareholder or similar agreements, or (6) contained in any financing documentation governing Indebtedness permitted to be incurred hereunder that are incurred by a Subsidiary that is not required to be a Guarantor, so long as such restrictions operate only upon the occurrence and during the continuance of an event of default under the documentation governing such Indebtedness and only impose restrictions on such Subsidiary and its Subsidiaries.

    **6.15**   **Holding Company Status**.  Notwithstanding anything contained in this Agreement or the other Loan Documents to the contrary, Holdings shall not:

        (a)    own or acquire any assets other than the Equity Interests and Equity Interests Equivalents of its Subsidiaries that are Loan Parties or become Loan Parties in accordance with the terms hereof and its own Equity Interests or Equity Interests Equivalents, and, to the extent cash is temporarily transferred through Holdings to effectuate a transaction expressly permitted by this Agreement, such cash during such transfer,

        (b)    incur any liabilities other than (i) minimal liabilities necessary to maintain its separate organizational existence and to pay reasonable overhead expenses of Loan Parties and their Subsidiaries and (ii) those incurred under or permitted by this Agreement and the other Loan Documents to which it is a party,

        (c)    incur any Indebtedness other than the Obligations and Guarantees of the other Loan Parties' obligations permitted by this Agreement,

        (d)    engage in any trade, business or operations (other than acting as a holding company for the equity of its Subsidiaries) and any administrative activities incidental or reasonably related thereto,

        (e)    merge, amalgamate or consolidate with any other Person,

        (f)    sell or otherwise transfer any of its assets,

        (g)    permit or suffer to exist any Lien on any of its assets other than Permitted Liens, or

        (h)    accept or receive any Loans or Collateral (other than distributions that are expressly permitted by Section 6.12); provided that nothing herein shall prevent Holdings from incurring liabilities with respect to Taxes as required by Law.

    **6.16**   **Use of Proceeds**.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, use the proceeds of the Advances other than for lawful purposes and in accordance with Sections 4.10 and 4.12.

**6.17**   **Milestones**.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, fail to comply with any of the Milestones, except with the prior written waiver or extension by the Required Lenders (and such waiver or extension may be delivered on the behalf of the Required Lenders by one of the Lender Professionals via email.

**6.18**   **Permitted Variance**.  Commencing with the Variance Report to be delivered on or about March 6, 2025, no Loan Party shall, nor shall it permit any of its Subsidiaries to, permit (i) the Receipts Variance or (ii) the Disbursements Variance, in each case, on an aggregate basis with respect to any Applicable Period, to exceed the Permitted Variance.

**6.19**   **Chapter 11 Cases**.  No Loan Party shall, nor shall it permit any of its Subsidiaries to:

(a)   except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority claim which is pari passu with, or senior to, the Obligations (except as may be set forth in the DIP Orders or the Loan Documents);

(b)   incur, create, assume, suffer to exist or permit or file any motion seeking, any lien which is pari passu with, or senior to, the Liens granted hereunder (except as may be set forth in the DIP Orders or the Loan Documents (including the Carve Out));

(c)   make or permit to be made any amendment, modification, supplement or change to the DIP Orders, as applicable, (other than technical modifications to correct grammatical, ministerial or typographical errors) without the prior written consent of the Required Lenders;

(d)   (A) make payments under any management incentive, severance, retention or other bonus or compensation plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, (a) in amounts and on terms and conditions that (i) are approved by order of the Bankruptcy Court after notice and hearing, (ii) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance (including, pursuant to the Permitted Variance), of the Approved Budget, and (iii) as approved in writing by the Required Lenders, or (B)(1) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (2) pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case, unless in the ordinary course of business or otherwise agreed by the Required Lenders in writing (which may be via email);

(e)   except as expressly set forth in the DIP Orders, commence any adversary proceeding, contested matter or other action (or otherwise support any party) asserting any claims or defenses or otherwise against (or asserting any surcharge under section 506(c) of the Bankruptcy Code or otherwise against) the Administrative Agent, any Lender, any other Secured Party and any Prepetition Term Loan Secured Parties, the other Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Term

Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby;

(f) except as expressly set forth in the DIP Orders and solely to the extent of the budgeted amount set forth therein with respect to an Official Committee investigation prior to the end of the Challenge Period, use any cash collateral, proceeds of the Loans, or any cash or other amounts to (i) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the Liens securing the Loans, the Liens securing the Prepetition Term Loan Obligations or the Obligations hereunder, (ii) investigate or initiate any claim or cause of action against any of the Administrative Agent, the Administrative Agent or the Lenders or Prepetition Term Loan Secured Parties, (iii) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the Lenders or the Prepetition Term Loan Secured Parties, (iv) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the Loan Documents and the DIP Orders) that are senior to or pari passu with the Liens securing the Prepetition Term Loan Obligations, the DIP Superpriority Claims or the Prepetition Term Loan Adequate Protection Liens or claims granted under the DIP Orders or (v) take any other actions prohibited by the DIP Orders; or

(g) (i) without the express written consent of the Required Lenders, file any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties, without consulting with the Lenders and providing the Lenders two (2) Business Days' (or as soon thereafter as is practicable) notice and the opportunity to review and comment on each such motion or (ii) seek the entry of any order by the Bankruptcy Court over the express objection of the Required Lenders (with notification by email being sufficient and without the need of any formal pleading).

## ARTICLE VII
## EVENTS OF DEFAULT

**7.1** **Events of Default**. The term "Event of Default" means any of the following events occurring for whatever reason, whether voluntary or involuntary, effected by operation of law, judgment, order or otherwise:

(a) A failure to pay when and as due any principal amount of the Loans;

(b) A default in the payment when and as due of any interest on the Loans or of fees or other amounts payable to the Lenders pursuant to this Agreement and such failure continues for period of three (3) Business Days after delivery of written notice to Borrower;

(c) A default in the due performance and observance of any of the covenants or agreements contained in:

(1) Sections 5.1(e) (solely with respect to delivery of a notice of a Default), 5.2, 5.14, 5.16, 5.18, 5.19, 5.20 or Article VI,

(2)      Sections 5.1, 5.17 or 5.21 and such failure continues for a period of three (3) Business Days; or

(3)      of any of the other covenants contained in this Agreement or any other Loan Document and such failure continues for a period of five (5) Business Days;

(d)      [reserved];

(e)      So long as the enforcement of remedies is not subject to the automatic stay as a result of the Chapter 11 Cases (including for the avoidance of doubt, any Prepetition Term Loan Obligations), the Borrower or any Subsidiary thereof (i) fails to make any payment beyond the applicable grace period, if any, in respect of its Indebtedness (other than the Obligations) having an aggregate outstanding principal amount (individually or in the aggregate with all other such Indebtedness as to which such a failure shall exist) in excess of $1,000,000 or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that such failure is unremedied and is not waived by the holders of such Indebtedness prior to the termination of the Commitments and acceleration of the Loans pursuant to Section 7.2;

(f)      [Reserved];

(g)      [Reserved];

(h)      So long as the enforcement of remedies is not subject to the automatic stay as a result of the Chapter 11 Cases (including for the avoidance of doubt, any Prepetition Term Loan Obligations), one or more judgments (i) for the payment of money in an aggregate amount in excess of $1,000,000 (other than any such judgment covered by insurance (other than under a self-insurance program) to the extent a claim therefor has been made in writing and liability therefor has not been denied by the insurer), shall be rendered against any Loan Party and the same shall remain undischarged for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of a Loan Party to enforce any such judgment or (ii) in the case of non-monetary judgments, which would reasonably be expected to result in a Material Adverse Occurrence, and which, in any case, remains undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder);

(i)     Any Loan Document or any material provision of any Loan Document shall at any time and for any reason cease to be valid and binding on or enforceable against any Loan Party party thereto or any Loan Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any security interest and Lien on the Collateral purported to be granted to the Administrative Agent for the benefit of the Secured Parties by any Security Document shall for any reason (other than as expressly permitted hereunder or pursuant to the terms thereof) cease to be in full force and effect or create a valid security interest in any material portion of the Collateral or such security interest shall for any reason (other than the failure of the Administrative Agent to take any action within its control) cease to be a perfected security interest with the priority stated in the Security Documents, except (in each case) (x) to the extent that any such grant, perfection or priority is not required pursuant to the terms hereof or the Security Documents and (y) to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(j)     The occurrence of a Change of Control;

(k)     Any representation or warranty made or deemed made by any Loan Party in this Agreement or any other Loan Document shall be untrue, incorrect or misleading in any material respect when made or deemed made;

(l)     There shall be at any time any failure to satisfy the minimum funding standard as defined in ERISA or in Section 412 of the Code, whether or not waived, with respect to any Plan maintained by the Borrower, or to which the Borrower has any liabilities, or any trust created thereunder that would reasonably be expected to result in a Material Adverse Occurrence; or a trustee shall be appointed by PBGC or a federal district court to administer such Plan; or PBGC shall institute proceedings to terminate any such Plan; or the Borrower shall incur any liability to PBGC in connection with the termination of any such Plan; or any Plan or trust created under any Plan of the Borrower shall engage in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which would subject the Borrower to the tax or penalty on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code that results in a Material Adverse Occurrence;

(m)     Chapter 11 Events of Default.  Unless otherwise waived or consented to, in each case, in writing by the Required Lenders, any of the following shall have occurred in the Chapter 11 Cases:

(1)     the Closing Date shall not have occurred within three (3) Business Days after the date of entry of the Interim DIP/Cash Collateral Order (or such later date as the Required Lenders may agree in their sole discretion);

(2)     [Reserved].

(3)     The Bankruptcy Court shall have failed to enter the Final DIP/Cash Collateral Order within thirty (30) days after the Petition Date and which shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have

been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders;

(4)    the filing by any Chapter 11 Debtor of any chapter 11 plan or any amendment thereof or supplement thereto (other than the Plan of Reorganization), that is inconsistent in any material respect with the Plan of Reorganization to which the Required Lenders do not consent in writing;

(5)    the Interim DIP/Cash Collateral Order (a) at any time ceases to be in full force and effect (other than through the entry of the Final DIP/Cash Collateral Order) or (b) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Required Lenders;

(6)    except with the prior written consent of the Required Lenders, the entry of an order in any of Chapter 11 Cases (a) staying, reversing, amending, supplementing, vacating or otherwise modifying any of the Loan Documents, the Interim DIP/Cash Collateral Order or the Final DIP/Cash Collateral Order (as applicable), or (b) impairing or modifying any of the liens, security interests, claims, rights, remedies, privileges, benefits or protections granted under the Loan Documents or under the DIP Orders to the Secured Parties or the Prepetition Term Loan Secured Parties;

(7)    the failure of any of the Chapter 11 Debtors to comply with any of the terms or conditions of the Interim DIP/Cash Collateral Order or the Final DIP/ Cash Collateral Order;

(8)    the dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a Chapter 7 case;

(9)    the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Chapter 11 Debtor in the Chapter 11 Cases;

(10)    the entry of an order in any of the Chapter 11 Cases authorizing the Chapter 11 Debtors (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment in full in cash of all Obligations under this Agreement (without the prior written consent of the Required Lenders); or (ii) to grant any Lien, other than Liens expressly permitted under this Agreement and the DIP Orders, upon or affecting any Collateral, in each case, except as contemplated by the Interim DIP/Cash Collateral Order;

(11)    (a) the consensual use of prepetition cash collateral is terminated or modified, or (b) the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of cash collateral other than as provided in this Agreement and the DIP Orders, in each case, without the prior written consent of the Required Lenders;

(12)    except for the Carve-Out, and except as expressly permitted hereunder or in the DIP Orders, the entry of an order in any of the Chapter 11 Cases granting any claim against any Chapter 11 Debtor entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is pari passu with or senior to the claims of the Secured Parties or the Prepetition Term Loan Adequate Protection granted to the Prepetition Term Loan Secured Parties (without the prior written consent of the Required Lenders), in each case, except as contemplated by the Interim DIP/Cash Collateral Order;

(13)    except for the Carve-Out or as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any Lien in Collateral that is pari passu with or senior to any Lien granted to the Secured Parties, or any Adequate Protection Lien granted to the Prepetition Term Loan Secured Parties (without the prior written consent of the Required Lenders), in each case, except as contemplated by the Interim DIP/Cash Collateral Order (other than the Carve Out);

(14)    except as provided in the DIP Orders, the making of any adequate protection payment or the granting of any adequate protection (including, without limitation, the granting of any Liens on the Collateral, superpriority claims, the right to receive cash payments or otherwise), without the prior written consent of the Required Lenders;

(15)    the Chapter 11 Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing and/or solicitation of a chapter 11 plan is terminated or shortened for any reason;

(16)    the payment of, or any Chapter 11 Debtors file a motion or application seeking authority to pay, any prepetition claim other than (A) as provided in any of the First Day Orders or the DIP Orders, or (B) with the prior written consent of the Required Lenders;

(17)    the entry of an order in any of the Chapter 11 Cases granting relief from or otherwise modifying any stay of proceeding (including the automatic stay) to allow a third party to execute upon or enforce a Lien against any assets of the Chapter 11 Debtors that have an aggregate value in excess of $50,000 or with respect to any Lien of or the granting of any Lien on any assets of the Chapter 11 Debtors to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Secured Parties, without the prior written consent of the Required Lenders;

(18)    except as expressly permitted by the DIP Orders,  (A) any Chapter 11 Debtor shall (i) challenge or contest the validity or enforceability of the DIP Orders or any Loan Document or deny that it has further liability thereunder, (ii) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the Obligations, Liens securing the Obligations, the DIP Superpriority Claims, Loan Documents, Prepetition Term Loan Adequate Protection Liens, Prepetition Term Loan Adequate Protection, the Prepetition Term Loans Obligations, the Liens securing the Prepetition Term Loan Obligations or the Prepetition Term Loan Documents, (iii) assert any claim,

defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset all or any portion of the Obligations, Liens securing the Obligations, the DIP Superpriority Claims, Loan Documents, Prepetition Term Loan Adequate Protection Liens, Prepetition Term Loan Adequate Protection, the Prepetition Term Loan Obligations, the Liens securing the Prepetition Term Loan Obligations and the Prepetition Term Loan Documents, (iv) investigate, join or file any motion, application or other pleading in support of, or publicly support any other Person that has asserted any of the claims, challenges or other requested relief contemplated in clauses (i) - (iii) above, or fails to timely contest such claims, challenges or other requested relief in good faith (provided, that responding to any investigation conducted by an Official Committee or other party with respect to the nature, extent, amount, enforceability, validity, priority or perfection of the Prepetition Term Loan Obligations, the Liens securing the Prepetition Term Loan Obligations and the Prepetition Term Loan Documents, subject in each case to the DIP Orders, shall not, in and of itself, constitute an Event of Default hereunder); or (B) subject in all respects to the Carve-Out and other exceptions set forth in the DIP Orders, the entry of a judgment or order in any of the Chapter 11 Cases sustaining any of the claims, challenges, causes of action or other relief contemplated in clauses (i) - (iv) above;

(19)    the entry of an order in any of the Chapter 11 Cases, avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Obligations owing under the DIP Orders, this Agreement, the other Loan Documents;

(20)    subject to entry of the DIP Orders and other with respect to the Carve-Out, the entry of any order in any of the Chapter 11 Cases (a) charging any of the Collateral with respect to the Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise or (b) charging any of the Prepetition Term Loan Collateral with respect to the Prepetition Term Loan Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(21)    [Reserved];

(22)    if any Chapter 11 Debtor is enjoined, restrained, or in any way prevented by court order or a Governmental Authority from continuing to conduct all or any material part of the business affairs of the Chapter 11 Debtors and their Subsidiaries;

(23)    any Chapter 11 Debtor initiates, commences, joins, publicly supports, pursues, files any motion, application or other pleading in support of, or fails to contest in good faith, the actions or relief described in clauses (8), (10) through (17), (21) and (22) of this Section 7.1(m);

(24)    any of the Chapter 11 Cases shall be removed to a different venue, or the Chapter 11 Cases shall be move to a different venue in any other manner, without the prior written consent of the Required Lenders; or

(25)    any adversarial action is commenced or threatened, including by the Loan Parties, ASC or any of their Affiliates, against any Lender, the Administrative Agent or any Prepetition Facility Secured Parties, other than as expressly permitted under Paragraph 5 of the DIP Orders, as such action relates to the Chapter 11 Cases, the DIP Facility, the Prepetition Term Loan Facility or any of the restructuring transactions.

**7.2**    **Action If Event of Default**.  Subject to the terms of the DIP Orders, if any Event of Default shall occur and be continuing, the Required Lenders, upon written notice to the Borrower (which shall be given by the Administrative Agent at the request of the Required Lenders), may terminate the Lenders' obligation to make additional Advances and may declare the outstanding principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder to be due and payable without other notice to the Borrower, presentment, protest or demand of any kind (all of which are hereby waived), whereupon the full unpaid amount of the Loans and any and all other Obligations, which shall be so declared due and payable shall bear interest at the Default Rate and shall be and become immediately due and payable.

**7.3**    **Remedies**.

(a)    Subject to the terms of the DIP Orders, upon acceleration of the Loans, as provided in Section 7.2, the Administrative Agent shall, at the request of the Required Lenders, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and/or under applicable law.

(b)    The Administrative Agent, personally or by attorney, shall, at the request of the Required Lenders, proceed to protect and enforce its rights and the rights of the Lenders by pursuing any available remedy, including a suit or suits in equity or at law, whether for damages or for the specific performance of any obligation, covenant or agreement contained in this Agreement or in the Notes, or in aid of the execution of any power herein or therein granted, or for the enforcement of any other appropriate legal or equitable remedy, as the Administrative Agent shall deem most effectual to collect the payments then due and thereafter to become due on the Notes or under this Agreement, to enforce performance and observance of any obligation, agreement or covenant of the Borrower hereunder or under the Notes or to protect and enforce any of the Administrative Agent's or any Lender's rights or duties hereunder.

(c)    Upon acceleration of the Loans, as provided in Section 7.2, to the extent permitted by law, the Administrative Agent shall, if so directed by the Required Lenders, have the right to the appointment of a receiver for the Collateral of the Loan Parties pledged to secure the Obligations, both to operate and to sell such Collateral, and the Borrower hereby consents to such right and such appointment and hereby waives, to the fullest extent permitted by applicable law, any objection the Borrower may have thereto or the right to have a bond or other security posted by the Administrative Agent on behalf of the Lenders in connection therewith.

(d)    No remedy herein conferred upon or reserved to the Administrative Agent or any Lender is intended to be exclusive of any other remedy or remedies, and each

and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or under any other Loan Document now or hereafter existing at law, in equity or by statute.

(e)      Each Lender agrees that it will not take any action, nor institute any actions or proceedings, against the Borrower hereunder or under any Loan Document, without the prior written consent of the Required Lenders or, as may be provided in this Agreement or the other Loan Documents, at the direction of the Administrative Agent with the consent of the Required Lenders.

**7.4    Bankruptcy Code and Other Remedies.**

(a)      Without in any way limiting the foregoing, during the continuance of an Event of Default, subject in all respects to the DIP Orders, the applicable Agent (acting at the direction of the Required Lenders) may exercise, in addition to all other rights and remedies granted to it in this Agreement (including, without limitation, Section 8.01) and in any other Security Document, all rights and remedies of a secured party under the Bankruptcy Code, the Uniform Commercial Code and any other applicable Law.

(b)      Disposition of Collateral.  Subject in all respects to the DIP Orders, without limiting the generality of the foregoing, the Administrative Agent (acting at the direction of the Required Lenders) may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the DIP Orders and any notice required by Law referred to below) to or upon any Loan Party (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the DIP Orders)), during the continuance of any Event of Default (directly or through its agents, designees or an acquisition vehicle), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self- help, without judicial process, without first obtaining a final judgment or giving any Loan Party notice or opportunity for a hearing on the Administrative Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) dispose of, sell, grant option or options to purchase and deliver any Collateral (enter into contractual obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk, (iv) withdraw all cash and Cash Equivalents in any deposit account or securities account of a Loan Party and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral in satisfaction of the Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any deposit account or securities account pursuant to any related control agreement.  Subject in all respects to the DIP Orders, the Administrative Agent (directly or via one or more acquisition vehicles), acting at the direction of the Required Lenders, shall have the right, upon any such public sale or sales and, to the extent permitted by the Bankruptcy Code and other applicable Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold (and, in lieu of actual payment of the purchase price, may "credit bid" or otherwise set off the amount of such price against all or any portion of the Obligations), free of any right or

equity of redemption of any Loan Party, which right or equity is hereby waived and released.

(c)    Management of the Collateral.  Subject in all respects to the DIP Orders, each Loan Party further agrees, that, during the continuance of any Event of Default, (i) at the Administrative Agent's request (acting at the direction of the Required Lenders), it shall assemble the Collateral and make it available to the Administrative Agent at places that the Administrative Agent shall reasonably select, whether at such Loan Party's premises or elsewhere, (ii) without limiting the foregoing, the Administrative Agent (acting at the direction of the Required Lenders and at their cost and expense) also has the right to require that each Loan Party store and keep any Collateral pending further action by the Administrative Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Administrative Agent is able to sell any Collateral, the Administrative Agent shall have the right to hold or use such Collateral for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent and (iv) the Administrative Agent may, at the direction of the Required Lenders, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.  Subject to the DIP Orders, the Administrative Agent shall not have any obligation to any Loan Party to maintain or preserve the rights of any Loan Party as against third parties with respect to any Collateral.

(d)    Direct Obligation.  Subject in all respects to the DIP Orders, neither the Administrative Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Loan Party or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Administrative Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any applicable Law and subject in all respects to the DIP Orders.  Subject in all respects to the DIP Orders, to the extent it may lawfully do so, each Loan Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Lender or other Secured Party, any valuation, stay, appraisal, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) calendar days before such sale or other disposition.

## ARTICLE VIII
## THE ADMINISTRATIVE AGENT

**8.1    Appointment and Authorization**.  Each Lender hereby irrevocably appoints the Administrative Agent as the Administrative Agent of such Lender and authorizes the

Administrative Agent to act on such Lender's behalf to the extent provided herein or under any of the other Loan Documents, and to take such other action and exercise such other powers as may be reasonably incidental thereto.  Each Lender hereby agrees that it will require any transferee of any of such Lender's interests in its Loans to irrevocably appoint and authorize the Administrative Agent as such transferee's Administrative Agent in accordance with the terms hereof. Notwithstanding the use of the term "agent," it is expressly understood and agreed that the Administrative Agent shall not have any fiduciary responsibilities to any Lender by reason of this Agreement and that the Administrative Agent is merely acting as the representative of the Lenders with only those duties as are expressly set forth in this Agreement and the other Loan Documents. In its capacity as the Lenders' contractual representative, the Administrative Agent (i) does not hereby assume any fiduciary duties to the Loan Parties, any of the Lenders or any other Person (and no such fiduciary duties shall be implied) and (ii) is acting as an independent contractor, the rights and duties of which are limited to those expressly set forth in this Agreement and the other Loan Documents.  The Borrower, on behalf of the Loan Parties, and each of the Lenders hereby agrees to assert no claim against the Administrative Agent on any agency theory or any other theory of liability for breach of fiduciary duty, all of which claims the Borrower and each Lender hereby waives.

8.2    **Power**.  The Administrative Agent shall have and may exercise such powers under this Agreement and any other Loan Documents as are specifically delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.   As to any matters not expressly provided for by the Loan Documents (including enforcement or collection of the Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and all holders of the Notes; provided, however, that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to any Loan Document or applicable law.  The Administrative Agent shall not have any implied duties or any obligation to take any action under this Agreement or any other Loan Document except such action as is specifically provided by this Agreement or any other Loan Document to be taken by the Administrative Agent.

8.3    **Interest Holders**.  The Administrative Agent may treat each Lender, or the Person designated in the last notice filed with the Administrative Agent, whether under Section 9.3 or 9.9, or otherwise hereunder, as the holder of all of the interests of such Lender in its Loans until written notice of transfer, signed by such Lender (or the Person designated in the last notice filed with the Administrative Agent) and by the Person designated in such written notice of transfer, in form and substance satisfactory to the Administrative Agent, shall have been filed with the Administrative Agent.

8.4    **Employment of Counsel; etc**.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document, and any instrument, agreement or document executed, issued or delivered pursuant or in connection herewith or therewith, by or through employees, agents and attorneys-in-fact and shall not be answerable for the default or misconduct of any such employee, agent or attorney-in-fact selected by it with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf

of the Administrative Agent).  The Administrative Agent shall be entitled to rely on advice of counsel (including counsel who are the employees of the Administrative Agent) selected by the Administrative Agent concerning all matters pertaining to the agency hereby created and its duties under any of the Loan Documents.

      **8.5**   <u>**Reliance**</u>.  The Administrative Agent shall be entitled to rely upon and shall not be under a duty to examine or pass upon the validity, effectiveness, genuineness of this Agreement, any other Loan Document or any notice, consent, waiver, amendment, certificate, affidavit, letter, telegram, statement, paper, document or writing furnished pursuant to this Agreement or any other Loan Document, and the Administrative Agent shall be entitled to assume (absent actual knowledge to the contrary) that the same are valid, effective and genuine, have been signed or sent by the proper Person(s) and are what they purport to be.  The Administrative Agent shall be entitled to assume that no Default has occurred and is continuing unless it has actual knowledge, or has been notified in writing by the Borrower, of such fact, or has been notified by a Lender in writing that such Lender considers that a Default has occurred and is continuing, and such Lender shall specify in detail the nature thereof in writing.  The Administrative Agent shall not be liable hereunder for any action taken or omitted to be taken except for its own gross negligence or willful misconduct.  The Administrative Agent shall provide promptly each Lender with copies of such documents received from the Borrower pursuant to the terms of this Agreement or any other Loan Document as such Lender may reasonably request.

      **8.6**   <u>**General Immunity**</u>.  Neither the Administrative Agent nor any of the Administrative Agent's directors, officers, agents, attorneys or employees shall be liable or responsible in any manner to the Borrower, any Lender or any other Person for any action taken or omitted to be taken by it or them under the Loan Documents or in connection therewith except for any liability imposed by law for its own willful misconduct or gross negligence.  Without limitation on the generality of the foregoing, the Administrative Agent: (a) shall not be responsible to any Lender for any recitals, statements, warranties, representations, or failure or delay of performance under the Loan Documents or any agreement or document related thereto or for the financial condition of the Borrower; (b) shall not be responsible for the authenticity, accuracy, completeness, value, validity, effectiveness, due execution, legality, genuineness, enforceability or sufficiency of any of the Loan Documents, any provisions thereof or any document contemplated thereby; (c) shall not be responsible for the validity, genuineness, creation, perfection or priority of any of the Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security; (d) shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, covenants or conditions of any of the Loan Documents on the part of the Borrower or of any of the terms of any such agreement by any party thereto and shall have no duty to inspect the property (including the books and records) of the Borrower; (e) shall incur no liability under or in respect of any of the Loan Documents or any other document or Collateral by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, cable or telex) furnished pursuant to this Agreement or any other Loan Document; (f) shall incur no liability to the Borrower or any other Person as a consequence of any failure or delay in performance by or any breach by, any Lender or Lenders of any of its or their obligations under this Agreement; and (g) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by the Administrative Agent.

**8.7**     **Credit Analysis**.  Each Lender has made, and shall continue to make, its own independent investigation or evaluation of the operations, business, property and condition, financial and otherwise, of the Borrower in connection with the making of its commitments hereunder and has made, and will continue to make, its own independent appraisal of the creditworthiness of the Borrower.  Without limiting the generality of the foregoing, each Lender acknowledges that prior to the execution of this Agreement, it had this Agreement and all other Loan Documents and such other documents or matters as it deemed appropriate relating thereto reviewed by its own legal counsel as it deemed appropriate, and it is satisfied with the form and substance of this Agreement and all other Loan Documents.   Each Lender agrees and acknowledges that neither the Administrative Agent nor any of its directors, officers, attorneys or employees makes any representation or warranties about the creditworthiness of the Borrower or with respect to the due execution, legality, validity, genuineness, effectiveness, sufficiency or enforceability of this Agreement or any other Loan Documents, or the validity, genuineness, execution, perfection or priority of Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security.  Each of the Lenders shall use its commercially reasonable efforts to provide the other Lenders with any credit or other material information which comes into the possession of such Lender on or before a Default or Event of Default or at any time thereafter with respect to the operations, business, property, condition or creditworthiness of the Borrower but no Lender shall have any liability to any other Lender for its inadvertent failure to do so.  Each Lender, upon the request of another Lender, shall deliver to such other Lender any financial statement, report, certificate or other document required to be delivered to the Lenders pursuant to Section 5.1 which the requesting Lender did not receive.   Except as explicitly provided herein, neither the Administrative Agent nor any Lender has any duty or responsibility, either initially or on a continuing basis, to provide any other Lender with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before a Default or an Event of Default or at any time thereafter.

**8.8**     **Administrative Agent and Affiliates**.  With respect to the Loans made by it and the Notes issued to it, the Administrative Agent, in its individual capacity, shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not an Administrative Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent in its individual capacity.  The Administrative Agent, in its individual capacity, and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, the Borrower, and any Person who may do business with or own securities of the Borrower, all as if it were not an Administrative Agent and without any duty to account therefor to the Lenders.

**8.9**     **Indemnification**.  The Lenders jointly and severally agree to indemnify and hold harmless the Administrative Agent and its officers, directors, employees and agents (to the extent not reimbursed by the Borrower), ratably according to their respective Commitments, from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent or any of its officers, directors, employees or agents, in any way relating to or arising out of any investigation, litigation or proceeding concerning or relating to the transaction contemplated by this Agreement or any of the other Loan Documents, or any of them, or any action taken or omitted by the Administrative Agent

or any of its officers, directors, employees or agents, under any of the Loan Documents; provided, however, that no Lender shall be liable for any portion of such claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of the Administrative Agent or any of its officers, directors, employees or agents. Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for such Lender's proportionate share of any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent or its officers, directors, employees or agents in connection with the preparation, execution, administration, or enforcement of, or legal advice in respect of rights or responsibilities under any of, the Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower.

8.10   **Security Documents**. The Administrative Agent, as collateral agent hereunder and under the Security Documents, is hereby authorized to act on behalf of the Secured Parties, in its own capacity and through other agents and sub-agents appointed by it in good faith, under the Security Documents, provided that the Administrative Agent shall not agree to the release of any Collateral, or any property encumbered by any mortgage, pledge or security interests except in compliance with Section 8.11. In connection with its role as secured party with respect to the Collateral hereunder, the Administrative Agent shall act as collateral agent, for itself and for the ratable benefit of the Lenders, and such role as Administrative Agent shall be disclosed on all appropriate accounts, filings, mortgages, and other Collateral documentation.

8.11   **Collateral Matters**. The Administrative Agent is authorized on behalf of all the Lenders without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to the Security Documents or any Collateral thereunder which may be necessary to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Security Documents. The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral (i) upon termination of the Commitments and payment in full of all Loans and all other Obligations of the Borrower known to the Administrative Agent and payable under this Agreement or any other Loan Document; (ii) constituting Property sold or to be sold or disposed of to a Person that is not a Loan Party as part of or in connection with any Disposition permitted hereunder; (iii) consisting of an instrument evidencing Indebtedness or other debt instrument, if the Indebtedness evidenced thereby has been paid in full; or (iv) if approved, authorized or ratified in writing by all the Lenders. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section 8.11, provided that the absence of any such confirmation for whatever reason shall not affect the Administrative Agent's rights under this Section 8.11. In the event that any landlord in favor of which the Borrower has granted a Permitted Lien on Excluded Assets requests an acknowledgement that the Collateral does not include any Excluded Assets secured by such Permitted Lien (a "Permitted Lien Acknowledgement"), the Administrative Agent shall deliver a Permitted Lien Acknowledgement to such landlord, on terms and conditions, and subject to documentation reasonably acceptable to the Administrative Agent and, if required by such landlord, shall amend any UCC-1 financing statements filed against a Loan Party in favor of the Administrative Agent to exclude the specific Excluded Assets that are the subject of such Permitted Lien Acknowledgement.

**8.12**     **Action by the Administrative Agent**.

(a)     The Administrative Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights with which it may be vested and with respect to taking or refraining from taking any action or actions which it may be able to take under or in respect of, this Agreement, unless the Administrative Agent shall have been instructed by the Required Lenders to exercise or refrain from exercising such rights or to take or refrain from taking such action; provided that the Administrative Agent shall not exercise any rights under Section 7.3 of this Agreement except upon the request of the Required Lenders or of all the Lenders, where expressly required by this Agreement. The Administrative Agent shall incur no liability under or in respect of this Agreement with respect to anything which it may do or refrain from doing in the exercise of its judgment or which may seem to it to be necessary or desirable in the circumstances, except for its gross negligence or willful misconduct as determined by a final, non-appealable order of a court having jurisdiction over the subject matter.

(b)     The Administrative Agent shall not be liable to the Lenders or to any Lender in acting or refraining from acting under this Agreement or any other Loan Document in accordance with the instructions of the Required Lenders or of all the Lenders, where expressly required by this Agreement, and any action taken or failure to act pursuant to such instructions shall be binding on all Lenders.

(c)     Notice of Default or Event of Default.  In the event that the Administrative Agent or any Lender shall acquire actual knowledge, or shall have been notified in writing, of any Default (other than through a notice by one party hereto to all other parties), such Lender shall promptly notify the Administrative Agent and the Administrative Agent shall promptly notify the Lenders, and the Administrative Agent shall take such action and assert such rights under this Agreement and the other Loan Documents as the Required Lenders (or all the Lenders, where expressly required by this Agreement) shall request in writing, and the Administrative Agent shall not be subject to any liability by reason of its acting pursuant to any such request.  If the Required Lenders shall fail to request the Administrative Agent to take action or to assert rights under this Agreement in respect of any Default within ten (10) days after their receipt of the notice of any Default from the Administrative Agent or any Lender, or shall request inconsistent action with respect to such Default, the Administrative Agent may, but shall not be required to, take such action and assert such rights as it deems in its discretion to be advisable for the protection of the Lenders, except that, if the Required Lenders have instructed the Administrative Agent not to take such action or assert such right, in no event shall the Administrative Agent act contrary to such instructions.

86

**8.13**    **Successor Administrative Agent**.

(a)    Reorganization.  The Administrative Agent may resign at any time as Administrative Agent under the Loan Documents by giving thirty (30) days' prior written notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), have the right to appoint a successor Administrative Agent hereunder that is organized under the laws of the United States of America or a political subdivision thereof.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any state thereof and having a combined capital and surplus of at least $250,000,000.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.  Upon the acceptance of any appointment as Administrative Agent under the Loan Documents by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After any retiring Administrative Agent's resignation as Administrative Agent under the Loan Documents, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under the Loan Documents.

**8.14**    **[Reserved]**.

**8.15**    **Erroneous Payments**.

(a)    If the Administrative Agent notifies a Term Loan Lender, or Secured Party, or any Person who has received funds on behalf of a Term Loan Lender or Secured Party, such Term Loan Lender (any such Term Loan Lender, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Term Loan Lender, Secured Party or other Payment Recipient on its behalf)  (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Term Loan Lender or Secured Party shall (or, with respect to any Payment Recipient who

received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding clause (a), each Term Loan Lender, or Secured Party, or any Person who has received funds on behalf of a Term Loan Lender or Secured Party hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Term Loan Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(1)     (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(2)     such Term Loan Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.15(b).

(c)     Each Term Loan Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Term Loan Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Term Loan Lender or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the

Administrative Agent in accordance with immediately preceding clause (a), from any Term Loan Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf)    (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Term Loan Lender at any time, (i) such Term Loan Lender shall be deemed to have assigned its Term Loans (but not its Term Loan Commitments) of the relevant class with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Term Loans (but not Term Loan Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption Agreement as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Term Loan Lender shall deliver any Notes evidencing such Term Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Term Loan Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Term Loan Lender shall become a Term Loan Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Term Loan Lender shall cease to be a Term Loan Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Term Loan Commitments which shall survive as to such assigning Term Loan Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Term Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Term Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Term Loan Lender shall be reduced by the net proceeds of the sale of such Term Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Term Loan Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Term Loan Commitments of any Term Loan Lender and such Term Loan Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Term Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Term Loan Lender or Secured Party under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)    The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely

with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)     Each party's obligations, agreements and waivers under this Section 8.15 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Term Loan Lender the termination of the Term Loan Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE IX
## MISCELLANEOUS

**9.1     Waivers, Amendments; etc**.  The provisions of this Agreement, including the closing conditions set forth herein, may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders; provided,

(a)     that no amendment, waiver or consent shall:

(1)     extend or increase the Commitment of any Lender or subject a Lender to any additional obligations, without the written consent of such Lender,

(2)     reduce the principal of, or interest on, the Notes or any fees or other amounts payable to any Lender hereunder without the written consent of such Lender,

(3)     postpone any date fixed for any payment of principal of, or interest on (including by extending the grace period applicable thereto), the Notes or any fees or other amounts payable to any Lender hereunder, or any scheduled reduction of Commitments, without the written consent of such Lender,

(4)     change the number of Lenders which shall be required for the Lenders or any of them to take any action hereunder, or the definition of "Required Lenders", unless in writing and signed by all the Lenders,

(5)     discharge the Borrower from its obligations under the Loan Documents, unless in writing and signed by all the Lenders,

(6)     amend Section 2.8 or this Section 9.1, or any other provision of this Agreement or any other Loan Document in a manner that would alter the pro rata

sharing or application of payments, or the pro rata treatment of the Lenders, or alter any payment waterfall or the priority or order of application of any proceeds or payments, in each case, including any amendment that would have the effect of any of the foregoing, unless in writing and signed by all Lenders,

(7)    except as specifically permitted hereby or thereby, release or impair the security interest in any of the Collateral granted to the Administrative Agent, for the benefit of the Secured Parties, under the Security Documents or discharge any Guarantor, or agree to subordinate (or enter into any amendment having the effect of subordinating) the priority of any of the Liens on the Collateral in favor of the Administrative Agent, for the benefit of the Secured Parties, in favor of any other creditor of the Loan Parties or class of Lenders hereunder, or agree to subordinate any of the Obligations in right of payment to any other indebtedness of the Loan Parties or indebtedness hereunder, unless in writing and signed by all the Lenders;

(8)    (i) amend this Agreement to permit non-pro rata open market purchases or other non-pro rata purchases by the Borrower, any other Loan Party or their respective Subsidiaries of the Loans or Commitments without the written consent of each Lender; or (ii) amend or waive any mandatory prepayment provisions under subsections 2.1(l)(2) through (7) without the consent of each affected Lender;

(b)    no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any Note;

(c)    any amendment, modification or consent expressly permitted by Section 2.12 shall be permitted to be made as referenced therein and shall not require the consent of the Required Lenders or any other Lender; and

(d)    that any amendment or waiver may be provided by the Lender Professionals (which may be via email).

No failure or delay on the part of the Administrative Agent, any Lender or the holder of any Note in exercising any power or right under this Agreement or any Note shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right. No notice to or demand on the Borrower in any case shall entitle it to any notice or demand in similar or other circumstances.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such

Defaulting Lender.

**9.2**     **Payment Dates**.  Except as expressly provided in this Agreement, whenever any payment to be made hereunder by or to the Lenders or to the holder of any Note shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be included in computing the fees or interest payable on such next succeeding Business Day.

**9.3**     **Notices**.  All communications and notices provided under this Agreement shall be in writing by writing (including email or facsimile transmission), telecopy or personal delivery and if to the Borrower addressed or delivered to the Borrower at its address shown on the signature page hereof or if to the Administrative Agent delivered to it at the address shown on **Schedule 9.3** attached hereto, or to any party at such other address as may be designated by such party in a notice to the other parties.  Any notice shall be deemed given when transmitted by email, telecopier or, when personally delivered, if mailed properly addressed, shall be deemed given upon the third Business Day after the placing thereof in the United States mail, postage prepaid.

**9.4**     **Costs and Expenses**.     The Borrower agrees to pay, or reimburse, the Administrative Agent and the Lenders for all expenses reasonably incurred for the preparation of this Agreement, including exhibits, and the Loan Documents and any amendments hereto or thereto or consents or waivers hereunder or thereunder as may from time to time hereafter be required thereby or by the transactions contemplated hereby, including, but not limited to, the fees and out-of-pocket expenses of the Administrative Agent, charges and disbursements of special counsel to the Administrative Agent from time to time incurred in connection with the preparation and execution of this Agreement and any document relevant to this Agreement, including the Loan Documents, any amendments hereto or thereto, or consents or waivers hereunder or thereunder, and the consideration of legal questions relevant hereto and thereto (but limited, in the case of attorneys' and financial advisors' fees, to the fees, costs and expenses of the Lender Professionals). The Borrower agrees to pay, or reimburse, the Administrative Agent and each Lender upon demand for all costs and expenses (including attorneys', auditors' and accountants' fees and expenses, but limited, in the case of attorneys' and financial advisors' fees, to the fees, costs and expenses of the Lender Professionals) reasonably incurred and arising out of the transactions contemplated by this Agreement and the Loan Documents, in connection with any work-out or restructuring of the transactions contemplated hereby and by the Loan Documents and any collection or enforcement of the obligations of the Borrower hereunder or thereunder, whether or not suit is commenced, including attorneys' fees and legal expenses (limited to the Lender Professionals) in connection with any appeal of a lower court's order or judgment.  The obligations of the Borrower under this Section 9.4 shall survive any termination of this Agreement.

**9.5**     **Indemnification**.  In consideration of the execution and delivery of this Agreement by the Administrative Agent and the Lenders, the Borrower agrees to indemnify and hold harmless the Administrative Agent, each Lender and their respective Affiliates, officers, directors, employees, shareholders, agents, successors and assigns (the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities and expenses (other than the expenses to be paid or reimbursed pursuant to Section 9.4 above), joint or several, to which any such Indemnified Party may become subject arising out of or in connection with this Agreement and the other transactions contemplated hereby, the Advances and the use of proceeds thereof in connection with

any claim, litigation, investigation or proceeding (any of the foregoing, a "Proceeding") relating to any of the foregoing, regardless of whether any such Indemnified Party is a party hereto or whether a Proceeding is brought by a third party or by you any Loan Party or Affiliate of a Loan Party, and to reimburse each such Indemnified Party within ten (10) days of receipt of an invoice for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; it being understood and agreed that no Loan Party shall be required to reimburse legal fees or expenses of more than one counsel to all Indemnified Parties, taken as a whole and in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel to each group of affected Indemnified Parties similarly situated taken as a whole (and, if reasonably necessary as determined by the Administrative Agent, a single local counsel for all Indemnified Parties taken as a whole in each relevant jurisdiction and, in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel in each relevant jurisdiction to each group of affected Indemnified Parties similarly situated taken as a whole); provided that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent (x) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Party or any Related Indemnified Party (as defined below), (y) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from a material breach of the material obligations of any Indemnified Party or any of its Related Indemnified Parties under this Agreement or any of the Loan Documents at a time when no Loan Party has breached its obligations hereunder in any material respect, or (z) they relate to any dispute solely among Indemnified Parties at a time when no Loan Party has breached its obligations hereunder or any other Loan Document in any material respect (other than any claims against the Administrative Agent in its capacity or in fulfilling its role as Administrative Agent, but not any other person or entity party to any such Proceeding).

Notwithstanding any other provision of this Agreement or any Loan Document, (i) no Indemnified Party or Related Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of any Indemnified Party and (ii) none Loan Parties, any of their Affiliates or any Indemnified Party or Related Indemnified Party shall be liable for any indirect, special, punitive or consequential damages incurred in connection with this Agreement or the transactions contemplated herein (provided that this provision shall not limit the Loan Parties' indemnification obligations set forth above). For purposes hereof, a "Related Indemnified Party" of an Indemnified Party means (1) any controlling person or controlled affiliate of such Indemnified Party, (2) the respective directors, trustees, officers, or employees of such Indemnified Party or any of its controlling persons or controlled Affiliates and (3) the respective agents or advisors of such Indemnified Party or any of its controlling persons or controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnified Party, controlling person or such controlled Affiliate; provided that each reference to a controlled Affiliate or controlling person in this paragraph pertains to a controlled Affiliate or controlling person involved in the negotiation of this Agreement and the other Loan Documents.

No Loan Party shall be liable for any settlement of any Proceedings effected without the Borrower's consent (which consent shall not be unreasonably conditioned, withheld or delayed), but if settled with the Borrower's written consent or if there is a final judgment for the plaintiff in any such Proceedings, the Borrower agrees to indemnify and hold harmless each Indemnified Party from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this Section 9.5. No Loan Party shall, without the prior written consent of an Indemnified Party, effect any settlement or consent to the entry of any judgment of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Party, unless (i) such settlement includes an unconditional release of such Indemnified Party in form and substance reasonably satisfactory to such Indemnified Party from all liability on claims that are the subject matter of such Proceedings, and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party.

The provisions of this Section 9.5 shall survive termination of this Agreement and payment in full of the Notes. This <u>Section 9.5</u> shall not apply with respect to Taxes, other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**9.6**  **Severability**.  Any provision of this Agreement, the Notes or any other Loan Document executed pursuant hereto which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, the Notes or any other Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

**9.7**  **Headings**.  The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions hereof.

**9.8**  **Governing Law**.  This Agreement and the Notes shall each be deemed to be a contract made under, governed by and interpreted pursuant to the internal laws (and not the law of conflicts) of the State of New York and, as may be applicable, the Bankruptcy Code, regardless of laws that might otherwise govern under applicable principles of conflicts of laws thereof.

**9.9**  **Successors and Assigns.**

(a)  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns except that: (i) the Borrower may not assign or transfer its rights hereunder without the prior written consent of all of the Lenders and the Administrative Agent; and (ii) any assignment by a Lender must be made in compliance with subsection (b) below and any participation by a Lender must be made in compliance with subsection (c) below. Notwithstanding clause (ii) of this subsection (a), any Lender may at any time, without the consent of Borrower or the Administrative Agent, assign all or any portion of its rights under this Agreement and its Notes to a Federal Reserve Bank. Except to the extent otherwise required by its context, the word "Lender" where used in this Agreement means and includes any such assignee and such assignee shall be bound by and have the benefits of this Agreement the same as if such holder had been a signatory hereto.

(b)      Any Lender may, in the ordinary course of its business and in accordance with applicable law, at any time assign to one or more banks or other entities that are Eligible Assignees all or a portion of its Commitments, Advances owing to it, and its rights and obligations under this Agreement in respect thereof in accordance with the provisions of this subsection (b).  Each assignment shall be of a constant, and not a varying, ratable percentage of the assigning Lender's rights and obligations under this Agreement and each Eligible Assignee shall assume a pro rata share of the assigning Lender's obligations determined by the percentage of the Commitments assigned for the period from the effective date of the assignment through the Maturity Date.  Such assignment shall be substantially in the form of the Assignment and Assumption Agreement attached as **Exhibit E** hereto (the "Assignment and Assumption Agreement") and shall not be permitted hereunder unless (i) such assignment is for all of such Lender's Commitment and the rights and obligations under this Agreement related thereto, (ii) the amount of the Commitment and/or Term Loans assigned by the assigning Lender pursuant to each assignment shall be at least $1,000,000, or (iii) such assignment is to another Lender or an Affiliate of a Lender, in which case no minimum amount shall apply.  The consent of the Administrative Agent and, provided no Default or Event of Default then exists, the Borrower (which consents shall not be unreasonably withheld or delayed) shall be required prior to an assignment becoming effective with respect to a transferee which is not a Lender, an Affiliate of a Lender, or an Approved Fund.  The Borrower's consent shall be deemed to have been given unless the Borrower objects within ten (10) Business Days after receipt of notice of such assignment. Upon (i) delivery to the Administrative Agent of an executed Assignment and Assumption Agreement, together with any required consents and (ii) payment of a $3,500 fee to the Administrative Agent for processing such assignment, such assignment shall become effective on the effective date specified in such Assignment and Assumption Agreement; provided, that (a) if an assignment by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such assignment and (b) if an assignment by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such assignment (unless waived or reduced by the Administrative Agent).  On and after the effective date of such assignment, such transferee, if not already a Lender, shall for all purposes be a Lender party to this Agreement and any other Loan Documents executed by the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party hereto, and no further consent or action by the Borrower, the Lenders or the Administrative Agent shall be required to release the transferor Lender with respect to the percentage of the Commitment and Advances assigned to such transferee Lender.  To the extent requested by the applicable Lenders, upon the consummation of any assignment pursuant to this Section 9.9, the Administrative Agent and the Borrower shall make appropriate arrangements so that replacement Notes are issued to such transferor Lender and new Notes or, as appropriate, replacement Notes, are issued to such transferee Lender, in each case in principal amounts reflecting their Commitment, as adjusted pursuant to such assignment.

(c)      Each Lender may, without the consent of the Borrower, sell participations to one or more banks or other entities that are Eligible Assignees in all or a

portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of, and obligations under, Section 10.1 and of the cost protection provisions contained in Section 10.4, as well as Sections 9.19 and 10.6 to the extent of the Lender selling such participation and the Borrower's aggregate obligations with respect to Section 10.1 and Section 10.4 shall not be increased by reason of such participation, provided that such participant shall not be entitled to the benefits of Sections 10.1 and 10.4 unless such participant complies with Section 10.1(e) as (and to the extent) applicable, as if such participant were a Lender (it being understood that the documentation required under Section 10.1(e) shall be delivered to the participating Lender) (iv) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right (and shall not limit its rights) to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers with respect to any fees payable hereunder (to the extent such participants are entitled to such fees) or the amount of principal of or the rate at which interest is payable on the Loans, or the dates fixed for payments of principal of or interest on the Loans). Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement.

(d)     The Administrative Agent shall maintain a copy of each Assignment and Assumption Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary. It is the intent of the parties that the Obligations shall be treated as issued in registered form under Section 5f. 103-1(c) of the United States Treasury Regulations. Upon the Administrative Agent's receipt of a duly completed Assignment and Assumption Agreement executed by an assigning Lender, an assignee Lender that is an Eligible Assignee and, to the extent required hereunder, the Borrower, such Eligible Assignee's completed Administrative Questionnaire (unless the assignee is already a Lender), the fee

referred to in Section 9.9(b) above, and any written consent to such assignment required by such subsection, the Administrative Agent shall accept such Assignment and Assumption Agreement and record the information contained therein in the Register. No assignment shall be effected for purposes of this Agreement unless it has been recorded in the Register as provided in this subsection.

(e)     Notwithstanding anything to the contrary contained in this Section 9.9, a Lender that is a fund that invests in bank loans may pledge all or a portion of its rights in connection with this Agreement to the trustee or other agent for holders of obligations owed, or securities issued, by such fund as security for such obligations or securities, provided that any foreclosure or other exercise of remedies by such trustee shall be subject, in all respects, to the provisions of this Section 9.9 regarding assignments. No pledge described in the immediately preceding sentence shall release any such Lender from its obligations hereunder.

(f)     Except as specifically set forth in this Section 9.9, nothing in this Agreement, expressed or implied, is intended to or shall confer on any Person other than the respective parties hereto and thereto and their successors and assignees permitted hereunder and thereunder any benefit or any legal or equitable right, remedy or other claim under this Agreement or any Notes.

(g)     The provisions of this Section 9.9 shall not apply to any purchase of participations among the Lenders pursuant to Section 2.5.

(h)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with, with respect to Term Loans, its Applicable Term Loan Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(i)     [Reserved].

(j)     [Reserved].

**9.10**   **Execution in Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**9.11**   **Several Liability**.  The Obligations of the Administrative Agent and each of the Lenders hereunder are several, not joint.

**9.12**   **Financial Information**.  The Borrower assumes responsibility for keeping itself informed of its own financial condition and the financial condition of any and all endorsers and/or other guarantors of all or any part of the Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Obligations, or any part thereof, that diligent inquiry would reveal, and the Borrower agrees that the Administrative Agent, the Lenders shall have no duty to advise the Borrower of information known to them regarding such condition or any such circumstances.

**9.13**   **Entire Agreement**.  Except as otherwise expressly provided herein, this Agreement and the other documents described or contemplated herein embody the entire agreement and understanding among the parties hereto and thereto and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

**9.14**   **Other Relationships**.  No relationship created hereunder or under any other Loan Document shall in any way affect the ability of the Administrative Agent or its Affiliates and each Lender or their respective Affiliates to enter into or maintain business relationships with the Borrower beyond the relationships specifically contemplated by this Agreement and the other Loan Documents.

**9.15**   **Consent to Jurisdiction**.  BORROWER HEREBY IRREVOCABLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION OVER ANY MATTER, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NOTES OR ANY OTHER LOAN DOCUMENT AND HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN BANKRUPTCY COURT AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION, SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.  EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING BY UNITED STATES CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OF COPIES OF SUCH PROCESS TO SUCH BORROWER'S ADDRESS REFERENCED IN

SECTION 9.3.   EACH PARTY AGREES THAT A JUDGMENT, FINAL BY APPEAL OR EXPIRATION OF TIME TO APPEAL WITHOUT AN APPEAL BEING TAKEN, IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS SECTION SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER TO BRING ANY ACTION OR PROCEEDING AGAINST SUCH BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

9.16   **Waiver of Jury Trial**.  THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY NOTE, OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

9.17   **USA Patriot Act**.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

9.18   **Confidentiality**.

(a)     Each of the Administrative Agent, each Lender agree to maintain the confidentiality of information obtained by it pursuant to any Loan Document, except that such information may be disclosed (i) with the Borrower's written consent, (ii) in any legal, judicial, administrative proceeding or compulsory process or otherwise as required by applicable law or regulations (in which case such Person agrees to promptly notify the Borrower to the extent practicable and permitted by applicable law); (iii) upon the request or demand of any Governmental Authority having jurisdiction over the Administrative Agent, such Lender or their respective Affiliates (in which case such Person agrees to, except with respect to any audit or examination conducted by bank accountants, any governmental bank or insurance regulatory authority exercising examination or regulatory authority, or any regulatory requests made by the National Association of Insurance Commissioners, promptly notify the Borrower to the extent lawfully permitted to do so); (iv) to officers, directors, trustees, agents, members, partners, equity holders, approved and managed funds, employees, attorneys, accountants and advisors of the Administrative Agent, any Lender who are informed of the confidential nature of such information and are or have been advised of their obligation to keep such information confidential solely on a need-to-know basis in connection with the transactions contemplated by this Agreement;

(v) to any Affiliates of the Administrative Agent, any Lender (<u>provided</u> that any such Affiliate is advised of its obligation to retain such information as confidential) on a need-to-know basis in connection with the transactions contemplated by this Agreement; (vi) to the extent any such information becomes publicly available other than by reason of disclosure in breach of this Agreement; and (vii) in connection with the exercise or enforcement of any right or remedy under any Loan Document.

**9.19    <u>Replacement of Lenders</u>**.  If the Borrower is entitled to replace a Lender pursuant to the provisions of <u>Section 10.6</u>, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 9.9</u>), all of its interests, rights (other than its existing rights to payments pursuant to <u>Sections 10.1</u> and <u>10.4</u> with respect to payments made prior to such assignment) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in <u>Section 9.9(b)</u>;

(b)    such Lender shall have received payment of an amount equal to 100% of the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 10.5</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under <u>Section 10.4</u> or payments required to be made pursuant to <u>Section 10.1</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    such assignment does not conflict with applicable Laws; and

(e)    in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**9.20    <u>Keepwell</u>**.  Each of Borrower, Affiliate of Borrower and Guarantor that is a Qualified ECP Guarantor at the time the Guarantee or the grant of a Lien under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only

up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this <u>Article IX</u> voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this <u>Section</u> shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full.  Borrower, each Affiliate of Borrower and Guarantor intends this <u>Section</u> to constitute, and this <u>Section</u> shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

      **9.21**   <u>**Electronic Execution of Assignments and Certain Other Documents**</u>.  The words "delivery," "execute," "execution," "signed," "signature," and words of like import in any Loan Document or any other document executed in connection herewith shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; <u>provided</u> that notwithstanding anything contained herein to the contrary neither the Administrative Agent nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent or such Lender pursuant to procedures approved by it and <u>provided</u> further without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

**ARTICLE X**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

      **10.1**   <u>**Taxes**</u>.

        (a)   <u>Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes</u>.

        (i)   Any and all payments by or on account of any obligation of any Borrower or Guarantor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws.  If any applicable Laws (as determined in the good faith discretion of the applicable withholding agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Borrower or Guarantor, then the Administrative Agent or such Borrower or Guarantor shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

        (ii)   If any Borrower or Guarantor or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment on account of any

obligation of the Borrower or Guarantor under any Loan Document, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code and provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower or Guarantor shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 10.1</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

        (iii)     If any Borrower or Guarantor or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment on account of any obligation of the Borrower or Guarantor under any Loan Document, then (A) such Borrower or Guarantor or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Borrower or Guarantor or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and, if paid by the Administrative Agent, the Administrative Agent shall provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower or Guarantor shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 10.1</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

        (b)     <u>Payment of Other Taxes by Borrower and/or Guarantor</u>.  Without limiting the provisions of subsection (a) above, Borrower and/or Guarantor shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

        (c)     <u>Tax Indemnifications</u>.

        (i)     Each Borrower and Guarantor shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 10.1</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a

Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii) Each Lender shall, and does hereby, severally indemnify and shall make payment in respect thereof within ten (10) days after demand therefor, (A) the Administrative Agent against any Indemnified Taxes attributable to such Lender (but only to the extent that any Borrower or Guarantor has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower and/or Guarantor to do so), and (B) the Administrative Agent and the Borrower and/or Guarantor, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.9(c) relating to the maintenance of a Participant Register, and (C) the Administrative Agent and the Borrower and/or Guarantor, as applicable, against any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent or a Borrower or Guarantor in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent, Borrower or Guarantor to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document or otherwise payable by the Administrative Agent, Borrower or Guarantor from any other source against any amount due to the Administrative Agent, Borrower or Guarantor under this clause (ii).

(d) Evidence of Payments. As soon as practicable after any payment of Taxes by any Borrower or Guarantor to a Governmental Authority, as provided in this Section 10.1, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e) Status of Lenders; Tax Documentation.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.1(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable

judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable)  establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed originals of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a

partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate satisfactory to the Administrative Agent on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies (or originals, as required) of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(E)     the Administrative Agent shall deliver to the Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that the Administrative Agent is a U.S. Person exempt from U.S. federal backup withholding tax.

(iii)     Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 10.1 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     Treatment of Certain Refunds. Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue

on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund (or credit in lieu of a cash refund) of any Taxes ("Refund") as to which it has been indemnified by any Borrower or Guarantor or with respect to which any Borrower or Guarantor has paid additional amounts pursuant to this Section 10.1, it shall pay to such Borrower or Guarantor an amount equal to such Refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower or Guarantor under this Section 10.1 with respect to the Taxes giving rise to such Refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such Refund), provided that each Borrower or Guarantor, upon the request of the Recipient, agrees to repay the amount paid over to such Borrower or Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such Refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to such Borrower or Guarantor pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such Refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Borrower or Guarantor or any other Person.

       (g)    Survival.  Each party's obligations under this Section 10.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**10.2**    **Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Term SOFR Reference Rate, or to determine or charge interest rates based upon the Term SOFR Reference Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market or the banking market generally, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (a) any obligation of such Lender to make or continue Term SOFR Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR Reference Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base

Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loans, and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Term SOFR Reference Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Term SOFR Reference Rate.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**10.3    Inability to Determine Rates**.

(a)    If in connection with any request for a Term SOFR Loan, or a continuation thereof, (i)  the Administrative Agent determines that (A)  Dollar deposits are not being offered to banks in the London interbank eurodollar market or, in the case of Term SOFR Loans, the banking market generally, for the applicable amount and Interest Period of such Term SOFR Loan, or (B) adequate and reasonable means do not exist for determining the Adjusted Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan or in connection with an existing or proposed Base Rate Loan (in each case with respect to clause (i), "Impacted Loans"), or (ii) the Administrative Agent or the Required Lenders determine that for any reason Adjusted Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Term SOFR Loans shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Adjusted Term SOFR component of the Base Rate, the utilization of the Adjusted Term SOFR component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for an Advance of or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for an Advance of Base Rate Loans in the amount specified therein.

(b)    Notwithstanding the foregoing, if the Administrative Agent has made the determination described in clause (a)(i) of this Section, the Administrative Agent in consultation with the Borrower and the Required Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (1) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under clause (a)(i) of this Section, (2) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (3) any Lender determines that any Law

107

has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof.

**10.4**   **Increased Costs**.

        (a)   <u>Increased Costs Generally</u>.  If any Change in Law shall:

        (i)   impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 10.4(e)</u>);

        (ii)   subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes) and (C) Connection Income Taxes on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

        (iii)   impose on any Lender or the banking market generally any other condition, cost or expense affecting this Agreement or Term SOFR Loans made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making, continuing or maintaining any Loan or Letter of Credit the interest on which is determined by reference to the Term SOFR Reference Rate (or of maintaining its obligation to make any such Loan or Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

        (b)   <u>Capital Requirements</u>.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

        (c)   <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or such Lender's

108

holding company, as the case may be, as specified in subsection (a) or (b) of this <u>Section</u> and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this <u>Section 10.4</u> shall not constitute a waiver of such Lender's right to demand such compensation, <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this <u>Section</u> for any increased costs or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

**10.5**    **<u>Funding Losses</u>**.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost, liability or expense (excluding loss of anticipated profits or margin) actually incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)    any assignment of a Term SOFR Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to <u>Section 9.19</u>; including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

**10.6**    **<u>Mitigation Obligations; Replacement of Lenders</u>**.

(a)    <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 10.4</u>, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 10.1</u>, or if any Lender gives a notice pursuant to <u>Section 10.2</u>, then at the request of the Borrower, such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans or Letters of Credit hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates,

if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 10.1 or 10.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 10.2, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 10.4, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 10.1 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 10.6(a) that eliminates the need to pay additional amounts for Indemnified Taxes under Section 10.1 or compensation under Section 10.4, the Borrower may replace such Lender in accordance with Section 9.19.

**10.7     Survival**.  All of the Borrower's obligations under this Sections 10.4 and 10.5 shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

[Signature pages follow]

## EXHIBIT B

## Initial Approved Budget

**Zips Car Wash**
*Approved Budget*
*$ in millions*

| Forecast / Actual | Fcst Week 1[1] | Fcst Week 2 | Fcst Week 3 | Fcst Week 4 | Fcst Week 5 | Fcst Week 6 | Fcst Week 7 | Fcst Week 8 | Fcst Week 9 | Fcst Week 10 | Fcst Week 11 | Fcst Week 12 | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | | | | | | | | | | | | | | |
| Week Ending | 16-Feb | 23-Feb | 2-Mar | 9-Mar | 16-Mar | 23-Mar | 30-Mar | 6-Apr | 13-Apr | 20-Apr | 27-Apr | 30-Apr | Exit | Total |
| **CASH COLLECTIONS** | 6.4 | 5.1 | 5.0 | 6.3 | 5.3 | 5.4 | 5.3 | 5.6 | 5.9 | 5.6 | 5.7 | 2.5 | 1.5 | **65.7** |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | |
| Payroll & Benefits | (0.2) | (2.5) | (0.1) | (2.3) | (0.2) | (2.6) | (0.0) | (2.4) | (0.0) | (2.7) | (0.0) | (2.4) | - | (15.5) |
| Rent and Real Estate Taxes | - | (0.7) | (0.0) | (7.9) | - | - | (0.4) | (6.2) | - | - | - | (0.3) | - | (15.5) |
| Other Operating Expenses | (2.7) | (2.3) | (1.9) | (2.1) | (2.6) | (1.8) | (1.5) | (1.8) | (1.7) | (2.5) | (1.5) | (1.2) | - | (23.7) |
| **Total Operating Disbursements** | **(3.0)** | **(5.5)** | **(2.0)** | **(12.3)** | **(2.9)** | **(4.3)** | **(1.9)** | **(10.4)** | **(1.8)** | **(5.1)** | **(1.5)** | **(3.9)** | **-** | **(54.6)** |
| **DEBT SERVICE** | | | | | | | | | | | | | | |
| Interest / Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Debt Service** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **OTHER NON-OPERATING** | | | | | | | | | | | | | | |
| Other Non-Operating | (2.7) | - | (0.1) | - | (0.0) | - | - | (0.1) | - | - | (0.1) | - | (5.9) | (8.9) |
| Restructuring Professional Fees | (1.3) | (1.5) | (1.5) | (1.8) | (2.4) | (1.3) | (1.6) | (1.2) | (2.1) | (1.0) | (1.0) | (1.0) | (5.9) | (23.8) |
| **Total Other Non-Operating** | **(4.0)** | **(1.5)** | **(1.6)** | **(1.8)** | **(2.4)** | **(1.3)** | **(1.6)** | **(1.2)** | **(2.1)** | **(1.0)** | **(1.1)** | **(1.0)** | **(11.8)** | **(32.6)** |
| **CAPEX** | | | | | | | | | | | | | | |
| Capex | (0.4) | (0.5) | (0.5) | (0.5) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.1) | - | (4.8) |
| **Total Capex** | **(0.4)** | **(0.5)** | **(0.5)** | **(0.5)** | **(0.4)** | **(0.4)** | **(0.4)** | **(0.4)** | **(0.4)** | **(0.4)** | **(0.4)** | **(0.1)** | **-** | **(4.8)** |
| **Net Cash Flow Before Financing** | **(0.9)** | **(2.3)** | **0.8** | **(8.4)** | **(0.4)** | **(0.6)** | **1.3** | **(6.3)** | **1.6** | **(0.9)** | **2.7** | **(2.5)** | **(10.4)** | **(26.4)** |
| DIP Draw / (Repayment) | 20.0 | - | - | - | 10.0 | - | - | - | - | - | - | - | - | 30.0 |
| **NET CASH FLOW** | **19.1** | **(2.3)** | **0.8** | **(8.4)** | **9.6** | **(0.6)** | **1.3** | **(6.3)** | **1.6** | **(0.9)** | **2.7** | **(2.5)** | **(10.4)** | **3.6** |
| **Total Cash Balance BoP** | **1.0** | **20.1** | **17.7** | **18.5** | **10.2** | **19.7** | **19.1** | **20.4** | **14.1** | **15.7** | **14.7** | **17.5** | **15.0** | **1.0** |
| Plus: Net Cash Flow | 19.1 | (2.3) | 0.8 | (8.4) | 9.6 | (0.6) | 1.3 | (6.3) | 1.6 | (0.9) | 2.7 | (2.5) | (10.4) | 3.6 |
| **Total Cash Balance EoP** | **20.1** | **17.7** | **18.5** | **10.2** | **19.7** | **19.1** | **20.4** | **14.1** | **15.7** | **14.7** | **17.5** | **15.0** | **4.6** | **4.6** |

(1) Week 1 covers the period from February 6, 2025 to February 16, 2025

## **EXHIBIT C**

## **DIP Default Termination Events**

**7.1     Events of Default**.  The term "Event of Default" means any of the following events occurring for whatever reason, whether voluntary or involuntary, effected by operation of law, judgment, order or otherwise:

        (a)     A failure to pay when and as due any principal amount of the Loans;

        (b)     A default in the payment when and as due of any interest on the Loans or of fees or other amounts payable to the Lenders pursuant to this Agreement and such failure continues for period of three (3) Business Days after delivery of written notice to Borrower;

        (c)     A default in the due performance and observance of any of the covenants or agreements contained in:

        (1)     Sections 5.1(e) (solely with respect to delivery of a notice of a Default), 5.2, 5.14, 5.16, 5.18, 5.19, 5.20 or Article VI,

        (2)     Sections 5.1, 5.17 or 5.21 and such failure continues for a period of three (3) Business Days; or

        (3)     of any of the other covenants contained in this Agreement or any other Loan Document and such failure continues for a period of five (5) Business Days;

        (d)     [reserved];

        (e)     So long as the enforcement of remedies is not subject to the automatic stay as a result of the Chapter 11 Cases (including for the avoidance of doubt, any Prepetition Term Loan Obligations), the Borrower or any Subsidiary thereof (i) fails to make any payment beyond the applicable grace period, if any, in respect of its Indebtedness (other than the Obligations) having an aggregate outstanding principal amount (individually or in the aggregate with all other such Indebtedness as to which such a failure shall exist) in excess of $1,000,000 or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that such failure is unremedied and is not waived by the holders of such Indebtedness prior to the termination of the Commitments and acceleration of the Loans pursuant to Section 7.2;

        (f)     [Reserved];

        (g)     [Reserved];

(h)     So long as the enforcement of remedies is not subject to the automatic stay as a result of the Chapter 11 Cases (including for the avoidance of doubt, any Prepetition Term Loan Obligations), one or more judgments (i) for the payment of money in an aggregate amount in excess of $1,000,000 (other than any such judgment covered by insurance (other than under a self-insurance program) to the extent a claim therefor has been made in writing and liability therefor has not been denied by the insurer), shall be rendered against any Loan Party and the same shall remain undischarged for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of a Loan Party to enforce any such judgment or (ii) in the case of non-monetary judgments, which would reasonably be expected to result in a Material Adverse Occurrence, and which, in any case, remains undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder);

(i)     Any Loan Document or any material provision of any Loan Document shall at any time and for any reason cease to be valid and binding on or enforceable against any Loan Party party thereto or any Loan Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any security interest and Lien on the Collateral purported to be granted to the Administrative Agent for the benefit of the Secured Parties by any Security Document shall for any reason (other than as expressly permitted hereunder or pursuant to the terms thereof) cease to be in full force and effect or create a valid security interest in any material portion of the Collateral or such security interest shall for any reason (other than the failure of the Administrative Agent to take any action within its control) cease to be a perfected security interest with the priority stated in the Security Documents, except (in each case) (x) to the extent that any such grant, perfection or priority is not required pursuant to the terms hereof or the Security Documents and (y) to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(j)     The occurrence of a Change of Control;

(k)     Any representation or warranty made or deemed made by any Loan Party in this Agreement or any other Loan Document shall be untrue, incorrect or misleading in any material respect when made or deemed made;

(l)     There shall be at any time any failure to satisfy the minimum funding standard as defined in ERISA or in Section 412 of the Code, whether or not waived, with respect to any Plan maintained by the Borrower, or to which the Borrower has any liabilities, or any trust created thereunder that would reasonably be expected to result in a Material Adverse Occurrence; or a trustee shall be appointed by PBGC or a federal district court to administer such Plan; or PBGC shall institute proceedings to terminate any such Plan; or the Borrower shall incur any liability to PBGC in connection with the termination of any such Plan; or any Plan or trust created under any Plan of the Borrower shall engage in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which would subject the Borrower to the tax or

penalty on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code that results in a Material Adverse Occurrence;

(m)   Chapter 11 Events of Default.   Unless otherwise waived or consented to, in each case, in writing by the Required Lenders, any of the following shall have occurred in the Chapter 11 Cases:

(1)   the Closing Date shall not have occurred within three (3) Business Days after the date of entry of the Interim DIP/Cash Collateral Order (or such later date as the Required Lenders may agree in their sole discretion);

(2)   [Reserved].

(3)   The Bankruptcy Court shall have failed to enter the Final DIP/Cash Collateral Order within thirty (30) days after the Petition Date and which shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders;

(4)   the filing by any Chapter 11 Debtor of any chapter 11 plan or any amendment thereof or supplement thereto (other than the Plan of Reorganization), that is inconsistent in any material respect with the Plan of Reorganization to which the Required Lenders do not consent in writing;

(5)   the Interim DIP/Cash Collateral Order (a) at any time ceases to be in full force and effect (other than through the entry of the Final DIP/Cash Collateral Order) or (b) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Required Lenders;

(6)   except with the prior written consent of the Required Lenders, the entry of an order in any of Chapter 11 Cases (a) staying, reversing, amending, supplementing, vacating or otherwise modifying any of the Loan Documents, the Interim DIP/Cash Collateral Order or the Final DIP/Cash Collateral Order (as applicable), or (b) impairing or modifying any of the liens, security interests, claims, rights, remedies, privileges, benefits or protections granted under the Loan Documents or under the DIP Orders to the Secured Parties or the Prepetition Term Loan Secured Parties;

(7)   the failure of any of the Chapter 11 Debtors to comply with any of the terms or conditions of the Interim DIP/Cash Collateral Order or the Final DIP/ Cash Collateral Order;

(8)   the dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a Chapter 7 case;

(9)   the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the

Bankruptcy Code) relating to the operation of the business of any Chapter 11 Debtor in the Chapter 11 Cases;

(10)    the entry of an order in any of the Chapter 11 Cases authorizing the Chapter 11 Debtors (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment in full in cash of all Obligations under this Agreement (without the prior written consent of the Required Lenders); or (ii) to grant any Lien, other than Liens expressly permitted under this Agreement and the DIP Orders, upon or affecting any Collateral, in each case, except as contemplated by the Interim DIP/Cash Collateral Order;

(11)    (a) the consensual use of prepetition cash collateral is terminated or modified, or (b) the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of cash collateral other than as provided in this Agreement and the DIP Orders, in each case, without the prior written consent of the Required Lenders;

(12)    except for the Carve-Out, and except as expressly permitted hereunder or in the DIP Orders, the entry of an order in any of the Chapter 11 Cases granting any claim against any Chapter 11 Debtor entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is pari passu with or senior to the claims of the Secured Parties or the Prepetition Term Loan Adequate Protection granted to the Prepetition Term Loan Secured Parties (without the prior written consent of the Required Lenders), in each case, except as contemplated by the Interim DIP/Cash Collateral Order;

(13)    except for the Carve-Out or as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any Lien in Collateral that is pari passu with or senior to any Lien granted to the Secured Parties, or any Adequate Protection Lien granted to the Prepetition Term Loan Secured Parties (without the prior written consent of the Required Lenders), in each case, except as contemplated by the Interim DIP/Cash Collateral Order (other than the Carve Out);

(14)    except as provided in the DIP Orders, the making of any adequate protection payment or the granting of any adequate protection (including, without limitation, the granting of any Liens on the Collateral, superpriority claims, the right to receive cash payments or otherwise), without the prior written consent of the Required Lenders;

(15)    the Chapter 11 Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing and/or solicitation of a chapter 11 plan is terminated or shortened for any reason;

(16)    the payment of, or any Chapter 11 Debtors file a motion or application seeking authority to pay, any prepetition claim other than (A) as provided in any of the First Day Orders or the DIP Orders, or (B) with the prior written consent of the Required Lenders;

(17)    the entry of an order in any of the Chapter 11 Cases granting relief from or otherwise modifying any stay of proceeding (including the automatic stay) to allow a third party to execute upon or enforce a Lien against any assets of the Chapter 11 Debtors that have an aggregate value in excess of $50,000 or with respect to any Lien of or the granting of any Lien on any assets of the Chapter 11 Debtors to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Secured Parties, without the prior written consent of the Required Lenders;

(18)    except as expressly permitted by the DIP Orders,  (A) any Chapter 11 Debtor shall (i) challenge or contest the validity or enforceability of the DIP Orders or any Loan Document or deny that it has further liability thereunder, (ii) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the Obligations, Liens securing the Obligations, the DIP Superpriority Claims, Loan Documents, Prepetition Term Loan Adequate Protection Liens, Prepetition Term Loan Adequate Protection, the Prepetition Term Loans Obligations, the Liens securing the Prepetition Term Loan Obligations or the Prepetition Term Loan Documents, (iii) assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset all or any portion of the Obligations, Liens securing the Obligations, the DIP Superpriority Claims, Loan Documents, Prepetition Term Loan Adequate Protection Liens, Prepetition Term Loan Adequate Protection, the Prepetition Term Loan Obligations, the Liens securing the Prepetition Term Loan Obligations and the Prepetition Term Loan Documents, (iv) investigate, join or file any motion, application or other pleading in support of, or publicly support any other Person that has asserted any of the claims, challenges or other requested relief contemplated in clauses (i) - (iii) above, or fails to timely contest such claims, challenges or other requested relief in good faith (provided, that responding to any investigation conducted by an Official Committee or other party with respect to the nature, extent, amount, enforceability, validity, priority or perfection of the Prepetition Term Loan Obligations, the Liens securing the Prepetition Term Loan Obligations and the Prepetition Term Loan Documents, subject in each case to the DIP Orders, shall not, in and of itself, constitute an Event of Default hereunder); or (B) subject in all respects to the Carve-Out and other exceptions set forth in the DIP Orders, the entry of a judgment or order in any of the Chapter 11 Cases sustaining any of the claims, challenges, causes of action or other relief contemplated in clauses (i) - (iv) above;

(19)    the entry of an order in any of the Chapter 11 Cases, avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Obligations owing under the DIP Orders, this Agreement, the other Loan Documents;

(20)    subject to entry of the DIP Orders and other with respect to the Carve-Out, the entry of any order in any of the Chapter 11 Cases (a) charging any of the Collateral with respect to the Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise or (b) charging any of the Prepetition Term Loan Collateral with respect to the Prepetition Term Loan Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(21)    [Reserved];

(22)    if any Chapter 11 Debtor is enjoined, restrained, or in any way prevented by court order or a Governmental Authority from continuing to conduct all or any material part of the business affairs of the Chapter 11 Debtors and their Subsidiaries;

(23)    any Chapter 11 Debtor initiates, commences, joins, publicly supports, pursues, files any motion, application or other pleading in support of, or fails to contest in good faith, the actions or relief described in clauses (8), (10) through (17), (21) and (22) of this Section 7.1(m);

(24)    any of the Chapter 11 Cases shall be removed to a different venue, or the Chapter 11 Cases shall be move to a different venue in any other manner, without the prior written consent of the Required Lenders; or

(25)    any adversarial action is commenced or threated, including by the Loan Parties, ASC or any of their Affiliates, against any Lender, the Administrative Agent or any Prepetition Facility Secured Parties, other than as expressly permitted under Paragraph 5 of the DIP Orders, as such action relates to the Chapter 11 Cases, the DIP Facility, the Prepetition Term Loan Facility or any of the restructuring transactions.

## **EXHIBIT D**

## **Milestones**

(i)      On the Petition Date, the Debtors shall file with the Bankruptcy Court: (a) a motion to approve the DIP Facility, (b) the Plan, (c) the Disclosure Statement, and (d) a motion approving the adequacy of the Disclosure Statement and solicitation of the Plan;

(ii)     Within thirty (30) days of the Petition Date, the Bankruptcy Court shall have entered the Final Order;

(iii)    Within thirty (30) days of the Petition Date, the Bankruptcy Court shall have entered an order approving the adequacy of the Disclosure Statement and the solicitation of the Plan (which order may be conditional approval of the Disclosure Statement), with the consent of the DIP Agent);

(iv)    Within sixty (70) days of the Petition Date, the Bankruptcy Court shall have entered an order confirming the Plan (which order may also be a final order approving the Disclosure Statement, with the consent of the DIP Agent); and

(v)     Within seventy (75) days of the Petition Date, the Effective Date of the Plan shall have occurred.

**<u>Exhibit B</u>**

**Redline of Proposed DIP Order**

**DALLAS DIVISION**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ZIPS CAR WASH, LLC, *et al.*,[1] | ) | Case No. 25-80069 (MVL) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**INTERIM ORDER
(I) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION FINANCING PURSUANT
TO SECTION 364 OF THE BANKRUPTCY CODE,
(II) AUTHORIZING THE USE OF CASH COLLATERAL
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE,
(III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION TERM
LOAN SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF
THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS,
(V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL
HEARING**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Zips Car Wash, LLC (3045); Express Car Wash Holdings, LLC (6223); Zips 2900 Wade Hampton, LLC (N/A); Zips 3107 N. Pleasantburg, LLC (N/A); Zips 6050 Wade Hampton, LLC (N/A); Zips Operating Holdings, LLC (2161); Zips Portfolio I, LLC (9999); Zips Portfolio II, LLC (1864); Zips Portfolio III, LLC (N/A) and Zips Portfolio IV, LLC (N/A).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 8400 Belleview Drive, Suite 210, Plano, Texas 75024.

Upon the *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Term Loan Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "<u>DIP Motion</u>") filed by the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Cases</u>"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rules 2002-1, 4001-1, and 5005-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "<u>Local Rules</u>") and the Procedures for Complex Cases in the Northern District of Texas (the "<u>Complex Case Procedures</u>"), seeking the entry of an interim order (this "<u>Interim Order</u>") and, following the Final Hearing, a final order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>"), which, among other things:

(i)      authorizes the Debtors to obtain senior secured priming and superpriority postpetition financing, in the form of a senior secured, super priority delayed draw term loan facility (the "<u>DIP Facility</u>"), pursuant to the terms of (x) the DIP Orders, (y) that certain *Senior Secured Super-Priority Priming Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "<u>DIP Credit Agreement</u>"),[2] by and among Zips Car Wash LLC, as Borrower, the other

---

[2]    Capitalized terms used but not yet defined herein shall have the meanings ascribed to them elsewhere in this Order or in the DIP Credit Agreement, as applicable.

Debtors party thereto, as Guarantors, Brightwood Loan Services LLC, as administrative agent and collateral agent (the "DIP Agent"), and the lenders party thereto from time to time (each, a "DIP Lender," and collectively, the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties"), substantially in the form attached hereto as **Exhibit A**, and (z) the other Loan Documents (collectively, together with the DIP Credit Agreement, the "DIP Loan Documents") in an aggregate principal amount of up to $82.5 million, consisting of (a) an aggregate principal amount of $30 million of new money loans to be provided under the DIP Credit Agreement, with (i) $20 million being made available to the Debtors following the entry of this Interim Order and (ii) the remaining $10 million being made available to the Debtors following the entry of the Final Order, in accordance with the Approved Budget (subject to Permitted Variances) and the DIP Orders) (the "New Money DIP Loans") and (b) subject to entry of the Final Order, a roll up of the outstanding term loans under the Prepetition Term Loan Credit Agreement (such loans, the "Prepetition Term Loans") in an aggregate principal amount of $52.5 million (the "Roll Up DIP Loans," and together with the New Money DIP Loans, the "DIP Loans," and any Claims arising out of the DIP Loans, the "DIP Claims") into DIP Obligations.

(ii)   approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents and authorizes and directs the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents and the DIP Orders;

(iii)   subject and subordinate to the Carve Out in all respects, grants adequate protection to the Prepetition Term Loan Secured Parties for any diminution in value of their respective

3

interests in the applicable Prepetition Term Loan Collateral, including[3] as a result from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Term Loan Collateral, including Cash Collateral, subject to the restrictions set forth in the DIP Loan Documents and the DIP Orders;

(iv)    subject and subordinate to the Carve Out in all respects, grants (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, automatically perfected, valid, enforceable, non-avoidable, and fully perfected Liens on all of the DIP Collateral and the proceeds thereof, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens and shall be junior solely to any valid, enforceable and non-avoidable Liens that are (A) in existence on the Petition Date, (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition Term Loan Liens after giving effect to any intercreditor or subordination agreement (all such Liens, collectively, the "Prepetition Prior Liens") and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including, upon entry of this Interim Order, any actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral, and upon entry of the Final Order, the proceeds of Avoidance Actions (but, for the avoidance of doubt, not the Avoidance Actions themselves);

---

[3]    As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

(v)   solely upon entry of the Final Order, authorizes the waiver of (x) the Debtors' right, pursuant to section 506(c) of the Bankruptcy Code, to surcharge the Prepetition Term Loan Collateral with respect to the Prepetition Term Loan Secured Parties and to surcharge the DIP Collateral with respect to the DIP Secured Parties, and (y) any rights of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(vi)   solely upon entry of the Final Order, finds that neither the DIP Lenders nor the Prepetition Term Loan Lenders, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Term Loan Collateral, as applicable;

(vii)   authorizes and directs the Debtors to make non-refundable, irrevocable, and final payments on account of any fees, expenses, and other amounts payable under, and in accordance with, the DIP Loan Documents as such become due and payable;

(viii)   authorizes the Debtors to use the proceeds of the DIP Facility and "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), in each case in accordance with the Approved Budget (subject to Permitted Variances), the DIP Loan Documents, and this Interim Order;

(ix)   subject to the terms and provisions of the DIP Orders, modifies the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and the DIP Loan Documents;

(x)   schedules a final hearing on the DIP Motion (the "Final Hearing") to be held no later than thirty (30) calendar days after the Petition Date to consider entry of the Final Order, which Final Order shall be in form and substance (including with respect to any subsequent modifications made in response to any objections of other parties in interest or as required by this

5

Court) acceptable to the DIP Agent (acting at the direction of the Required Lenders, under, and as defined in, the DIP Credit Agreement (the "Required DIP Lenders")); and

(xi)    provides for the immediate effectiveness of this Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the DIP Motion, the DIP Credit Agreement, the *Declaration of Daniel Aronson in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Term Loan Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*, the *Declaration of Kevin Nystrom in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Term Loan Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*, and the *Declaration of Kevin Nystrom, Chief Transformation Officer of Zips Car Wash, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14], and the evidence submitted or proffered at the hearing to consider this Interim Order (the "Interim Hearing"); and appropriate and sufficient notice of the DIP Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules, and no other further notice being necessary or required; and it appearing that approval of the relief requested in the DIP Motion is necessary on an interim basis to avoid immediate and irreparable harm to the Debtors and otherwise is fair and

reasonable under the circumstances and in the best interests of the Debtors, their creditors, their

estates, and all parties in interest, and is essential for the continued operation of the Debtors'

business and the preservation of the value of the Debtors' assets; and it appearing that the

Debtors' entry into the DIP Loan Documents is a sound and prudent exercise of the Debtors'

business judgment; and after due deliberation and consideration, and good and sufficient cause

appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A.      **Petition Date**.  On February 5, 2025 (the "Petition Date"), each of the

Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the

United States Bankruptcy Court for the Northern District of Texas (this "Court").  The Debtors

are continuing in the management and operation of their businesses and properties as debtors in

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee

of unsecured creditors (to the extent such committee is appointed, the "Committee"), trustee, or

examiner has been appointed in the Cases.

B.      **Jurisdiction and Venue**.  This Court has core jurisdiction over the Cases,

the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b)

and 1334.  Venue for the Cases and proceedings on the DIP Motion is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other predicates for the relief sought

herein are sections 105, 361, 362, 363, 364, 507, and 552 of the Bankruptcy Code, Bankruptcy

Rules 2002, 4001, 6004, and 9014, and the Local Rules.

C.      **Notice**.  Proper, timely, adequate and sufficient notice of the DIP Motion

---

[4]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

and the Interim Hearing has been provided under the circumstances in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the DIP Motion with respect to the relief requested at the Interim Hearing is or shall be required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, for purposes of Bankruptcy Rule 6003.

D.    **Debtors' Stipulations**.  Subject to the rights of all parties in interest, including those that are specifically set forth in Paragraph 5 of this Interim Order, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (this paragraph D shall be referred to herein as the "Debtors' Stipulations") as follows:

(i)    Prepetition Term Loan Credit Agreement and Prepetition Term Loan Documents. Pursuant to that certain Credit Agreement, dated as of August 30, 2016 (as amended by the First Amendment to Credit Agreement, dated as of March 10, 2017, the Second Amendment to Credit Agreement, dated as of September 27, 2017, the Third Amendment to Credit Agreement, dated as of January 16, 2019, the Fourth Amendment to Credit Agreement, dated as of March 13, 2019, the Fifth Amendment to Credit Agreement, dated as of May 29, 2019, the Sixth Amendment to Credit Agreement, dated as of January 16, 2020, the Seventh Amendment to Credit Agreement, dated as of May 4, 2020, the Eighth Amendment, dated as of December 21, 2020, the Ninth Amendment, dated as of May 26, 2021, the Tenth Amendment, dated as of July 13, 2021, the Eleventh Amendment, dated as of August 17, 2021, the Twelfth Amendment, dated as of October 18, 2021, the Thirteenth Amendment, dated as of October 20, 2021, the Fourteenth Amendment, dated as of December 21, 2021, the Fifteenth Amendment, dated as of February 11, 2022, the Sixteenth Amendment, dated as of May 10, 2022, the Seventeenth Amendment, dated as of July 13, 2022, the Eighteenth Amendment dated as of

August 24, 2022, the Nineteenth Amendment dated as of October 4, 2022, the Twentieth Amendment dated as of December 30, 2022, the Twenty-First Amendment dated as of May 15, 2023, the Twenty-Second Amendment dated September 26, 2023, the Twenty-Third Amendment dated November 17, 2023, the Waiver and Twenty-Fourth Amendment to Credit Agreement dated as of March 12, 2024, and Twenty-Fifth Amendment to Credit Agreement and Consent dated as of September 4, 2024, and as it may further be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Documents"), among (a) Zips Car Wash, LLC, as borrower, Zips Operating Holdings, LLC, Zips Portfolio I, LLC, Zips Portfolio II, LLC, Zips Portfolio III, LLC, Zips Portfolio IV, LLC, Zips 2900 Wade Hampton, LLC, Zips 6050 Wade Hampton, LLC, and Zips 3107 N. Pleasantburg, LLC, (b) the lenders party thereto from time to time (collectively, the "Prepetition Term Loan Lenders"), and (c) Brightwood Loan Services LLC, as administrative agent (in such capacity, the "Prepetition Term Loan Agent," and together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties"), the Prepetition Term Loan Lenders agreed to extend loans and other financial accommodations to the borrower pursuant to the Prepetition Term Loan Documents.  All obligations of the Debtors arising under the Prepetition Term Loan Credit Agreement (including all the "Obligations" as defined therein) or the other Prepetition Term Loan Documents shall collectively be referred to herein as the "Prepetition Term Loan Obligations."

   (ii)    Prepetition Term Loan Liens and Prepetition Term Loan Collateral.

Pursuant to the Security Documents (as defined in the Prepetition Term Loan Credit Agreement) (collectively, as such documents may have been amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Collateral Documents"), and to secure the Prepetition Term Loan Obligations, the Prepetition Term Loan Lenders were granted a security interest in and continuing Lien (the "Prepetition Term Loan Liens") on all present and future assets and properties of the Borrower and the Guarantors (as defined in the Prepetition Term Loan Credit Agreement) (which, for the avoidance of doubt, includes Cash Collateral and excludes Excluded Assets (as defined in the Prepetition Term Loan Credit Agreement)) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All "Collateral" as defined in the Prepetition Term Loan Credit Agreement granted or pledged pursuant to any Prepetition Term Loan Collateral Document or any other Prepetition Term Loan Document shall collectively be referred to herein as the "Prepetition Term Loan Collateral."  As of the Petition Date, (I) the Prepetition Term Loan Liens (a) are legal, valid, binding, enforceable, and perfected Liens, (b) were granted to, or for the benefit of, the Prepetition Term Loan Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and subordinate only to (A) the DIP Liens, (B) the Carve Out, and (C) the Prepetition Prior Liens, and (II) (w) the Prepetition Term Loan Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Term Loan Obligations exist, (y) no

10

portion of the Prepetition Term Loan Obligations or any payments made to any or all of the Prepetition Term Loan Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) each of the Guarantees (as defined in the Prepetition Term Loan Credit Agreement) shall continue in full force and effect to unconditionally guaranty the Prepetition Term Loan Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

(iii)         Amounts Owed under Prepetition Term Loan Documents.  As of the Petition Date, the applicable Debtors owed the Prepetition Term Loan Secured Parties, pursuant to the Prepetition Term Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made, letters of credit issued, and other financial accommodations made by the Prepetition Term Loan Secured Parties, (x) an aggregate principal amount of not less than $638,325,145.56[5] on account of the outstanding Prepetition Term Loans, *plus* (y) all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable attorneys', accountants', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Term Loan Documents), and other amounts now or hereafter due under the Prepetition Term Loan Documents.

(iv)         Release of Claims.  Subject to Paragraph 5 below and entry of this Interim Order, in exchange for good and valuable consideration, the adequacy of which is hereby

---

[5]    The aggregate principal amount of the outstanding Prepetition Term Loans excludes default interest, with respect to which the DIP Secured Parties and the Prepetition Term Loan Secured Parties have reserved all rights.

confirmed, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition Term Loan Secured Parties and their respective affiliates, assigns or successors and, with respect to each of the foregoing, their respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives (all of the foregoing, and in each case in their respective capacities as such, collectively, the "Prepetition Term Loan Secured Party Releasees") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition Term Loan Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition Term Loan Documents, the Prepetition Term Loan Obligations, the Prepetition Term Loan Liens, or the debtor-creditor relationship between any of the Prepetition Term Loan Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (I) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (II) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Term Loan Obligations or any payments or other transfers made on account of the Prepetition Term Loan Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Term Loan Liens securing the Prepetition Term Loan Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Term Loan Secured Party Releasees.

        E.        **Cash Collateral**.  All of the Debtors' cash, including any cash in deposit

accounts of the Debtors, wherever located, whether as original Prepetition Term Loan Collateral

or proceeds thereof, constitutes Cash Collateral of the Prepetition Term Loan Secured Parties.

F.      **No Control**.  None of the Prepetition Term Loan Secured Parties control

the Debtors or their properties or operations, have authority to determine the manner in which

any Debtors' operations are conducted, or are control persons or insiders of the Debtors or any of

their affiliates.

G.      **Findings Regarding the DIP Facility**.

(i)      Need for Postpetition Financing.  The Debtors have an immediate need to

obtain the DIP Facility and use Cash Collateral to, among other things, (a) permit the orderly

continuation of the operation of their businesses, (b) maintain business relationships with

vendors, suppliers, and customers, (c) make payroll, (d) make capital expenditures and satisfy

other working capital needs, and (e) pay the costs of administration and otherwise preserve the

value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity

through the use of Cash Collateral and borrowing under the DIP Facility is vital to preserve the

enterprise value of the Debtors' estates.  Immediate and irreparable harm will be caused to the

Debtors and their estates if immediate financing is not obtained and permission to use Cash

Collateral is not granted, in each case, in accordance with the terms of this Interim Order and the

DIP Loan Documents.

(ii)      No Credit Available on More Favorable Terms.  The Debtors have been

and continue to be unable to obtain financing on more favorable terms from sources other than

the DIP Secured Parties under the DIP Loan Documents and this Interim Order.  The Debtors are

unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as

an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2),

or 364(c)(3) of the Bankruptcy Code.  The Debtors are unable to obtain secured credit under

section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the

rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan

Documents, including the DIP Liens and the DIP Superpriority Claims, (b) allowing the DIP

Secured Parties to provide the loans and other financial accommodations under the DIP Facility

(including, subject to entry of the Final Order, the Roll Up DIP Loans) on the terms set forth

herein and in the DIP Loan Documents, and (c) granting to the Prepetition Term Loan Secured

Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP

Loan Documents, including the Prepetition Term Loan Adequate Protection and, subject to entry

of the Final Order, the conversion of certain Prepetition Term Loan Obligations into the Roll Up

DIP Loans (all of the foregoing described in clauses (a), (b), and (c) above, collectively, the "DIP

Protections").

        H.        **Interim Financing**.  During the Interim Period, the DIP Secured Parties

and the Prepetition Term Loan Secured Parties are willing to provide financing to the Debtors

and/or consent to the use of Cash Collateral by the Debtors, each as applicable, subject to (i) the

entry of this Interim Order, and (ii) the terms and conditions of this Interim Order and the DIP

Loan Documents.

        I.        **Adequate Protection for Prepetition Term Loan Secured Parties**.  The

Prepetition Term Loan Secured Parties have agreed to permit the Debtors to use the Prepetition

Term Loan Collateral, including the Cash Collateral, during the Interim Period, subject to the

terms and conditions set forth herein, including the protections afforded a party acting in "good

faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated

hereby provides for a priming of the Prepetition Term Loan Liens pursuant to section 364(d) of

the Bankruptcy Code.  Solely to the extent of any Diminution in Value, the Prepetition Term

Loan Secured Parties are entitled to the adequate protection as set forth herein, including, subject

to the entry of the Final Order with respect to any Roll Up DIP Loans until the conclusion of the

Challenge Period, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based

on the DIP Motion and on the record presented to this Court at the Interim Hearing, the terms of

the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility

contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business

judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and

fair consideration for the consent of the Prepetition Term Loan Secured Parties.  Prepetition

Term Loan Lenders holding 100% of the aggregate principal balance of the Prepetition Term

Loans (which Prepetition Term Loan Lenders accordingly constitute "Required Lenders," as

defined in the Prepetition Term Loan Credit Agreement) have expressly consented to the entry of

this Interim Order and the relief provided herein and pursuant to the terms of the Prepetition

Term Loan Credit Agreement, the consents of such Prepetition Term Loan Lenders are binding

on all Prepetition Term Loan Secured Parties.  Notwithstanding anything to the contrary herein,

the Prepetition Term Loan Secured Parties' consent to the DIP Facility and to the priming of the

Prepetition Term Loans by the DIP Liens is expressly limited to the present DIP Facility and the

DIP Liens securing the same and shall not be applicable to any other debtor-in-possession credit

facility, even if such contains substantially the same economic terms as the DIP Facility.

       J.       **Section 552**.  Subject to the entry of the Final Order, in light of the

subordination of their Liens and superpriority administrative claims to the Carve Out and the DIP

Liens, each of the Prepetition Term Loan Secured Parties is entitled to all of the rights and

benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall

not apply.

K.        **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)        The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Interim Order.

(ii)        The terms and conditions of the DIP Facility (including, subject to the entry of the Final Order, the Roll Up DIP Loans) as set forth in the DIP Loan Documents and this Interim Order, and the fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Loan Documents and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. Such terms and conditions are supported by reasonably equivalent value and fair consideration.

(iii)        The DIP Secured Parties, the Prepetition Term Loan Secured Parties, and the Debtors, with the assistance and counsel of their respective advisors, have acted in good faith and at arm's length in, as applicable, negotiating, consenting to, and/or agreeing to, the DIP Facility (including, subject to the entry of the Final Order, the Roll Up DIP Loans), the Debtors' use of the DIP Collateral and the Prepetition Term Loan Collateral (including Cash Collateral), the DIP Loan Documents and the DIP Protections (including the Prepetition Term Loan Adequate Protection). The DIP Obligations (including all advances that are made at any time to the Debtors under the DIP Loan Documents and including, subject to entry of the Final Order, the Roll Up DIP Loans) and the Debtors' use of the DIP Collateral and the Prepetition Term Loan Collateral (including Cash Collateral) shall be deemed to have been extended and/or

16

consented to by the DIP Secured Parties and the Prepetition Term Loan Secured Parties for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(e) of the Bankruptcy Code and this Interim Order, and, accordingly, the DIP Liens, the DIP Superpriority Claims, the Prepetition Term Loan Adequate Protection and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and this Interim Order in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

L.      **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates, their businesses and properties, and their ability to successfully sell their assets or otherwise preserve the enterprise value of the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.  Based on all of the foregoing, sufficient cause exists for immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition Term Loan Secured Parties, and the DIP Secured Parties to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

17

**IT IS ORDERED** that:

1. **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.  Any objections to the DIP Motion (and all reservation of rights included therein) with respect to the entry of this Interim Order that have not otherwise been withdrawn, waived, or settled, are hereby denied and overruled in all respects.

2. **DIP Loan Documents and DIP Protections**.

(i)      Approval of DIP Loan Documents.  The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Interim Order, to incur the DIP Obligations (including, subject to the entry of the Final Order, to convert $52.5 million of the outstanding amount of the Prepetition Term Loans  to DIP Loans), in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Interim Order and the DIP Loan Documents. The Debtors are hereby authorized and directed to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including, as applicable, all closing fees, administrative fees, commitment fees, and reasonable and documented out-of-pocket attorneys', financial advisors' fees, and disbursements arising under the DIP Loan Documents and this Interim Order (subject to the requirements of Paragraph 19 hereof), which amounts shall not be subject to further approval of this Court and shall be

non-refundable and not subject to challenge in any respect.  Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid, and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms.

(ii)     <u>DIP Obligations</u>.  For purposes of this Interim Order, the term "<u>DIP Obligations</u>" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and the other DIP Loan Documents (including all "<u>Obligations</u>" as defined in the DIP Credit Agreement, and subject to the entry of the Final Order, the Roll Up DIP Loans) and shall include the principal of, interest on, and fees, costs, expenses, and other charges owing in respect of, such amounts (including any reasonable and documented out-of-pocket attorneys', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents and/or this Interim Order), and any obligations in respect of indemnity claims, whether contingent or otherwise.  Notwithstanding anything to the contrary herein, the relative rights and priorities of the DIP Secured Parties in respect of the DIP Collateral shall be as provided in the DIP Loan Documents.

(iii)     <u>Authorization to Incur DIP Obligations and Use Cash Collateral</u>.  To prevent immediate and irreparable harm to the Debtors' estates and to enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, during the period from the entry of this Interim Order through and including the earliest to occur of (a) the entry of the Final Order, or (b) the Termination Declaration Date, in each case unless extended by written agreement of the DIP Agent and the Prepetition Term Loan Agent (the period from the entry of this Interim Order through and including such earliest date, the "<u>Interim Period</u>"), the Borrower is hereby authorized (x) to use Cash Collateral and (y) to borrow under the DIP Facility; *provided* that (i) the aggregate outstanding amount for all such New Money DIP Loan

borrowings shall not exceed $20 million during the Interim Period, with $10 million of such New Money DIP Loans available upon entry of the Final Order; and (ii) any proposed use of the proceeds of the DIP Loans or the use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget, subject to Permitted Variances and the Budget Covenants. Following the entry of the Final Order, the Borrower's authority to incur further DIP Obligations, if any, and use further Cash Collateral will be governed by the terms of such Final Order and the DIP Loan Documents. All DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the Guarantors under, and as defined in, the DIP Credit Agreement, as further provided in the DIP Loan Documents.

(iv)     Roll Up DIP Loans. Subject to the entry of the Final Order, and subject to Paragraph 5 of this Interim Order, $52.5 million of the Prepetition Term Loans shall immediately, automatically, and irrevocably be deemed to have been converted into DIP Obligations and, except as otherwise provided in the Final Order and the DIP Loan Documents, shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under the Final Order and the DIP Loan Documents. The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Term Loan Secured Parties as DIP Lenders to fund amounts and provide other consideration to the Debtors under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Term Loan Obligations. The Prepetition Term Loan Secured Parties would not otherwise consent to the use of their Cash Collateral, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without the inclusion of the Roll Up DIP

Loans in the DIP Obligations upon entry of the Final Order.   Moreover, the roll-up of the

Prepetition Term Loan Obligations in the amount of the Roll Up DIP Loans into DIP Obligations

will enable the Debtors to obtain urgently needed financing to administer these chapter 11 cases

to fund their operations.

(v)      Budget.   Attached hereto as **Exhibit B** is a rolling 13-week cash flow budget

(the "Initial Approved Budget"), that reflects on a line-item basis the Debtors' (a) weekly

projected cash receipts, (b) weekly projected disbursements (including a forecasted cash balance

as well as a line-item report setting forth the estimated fees and expenses to be incurred by each

of Kirkland & Ellis LLP, AlixPartners, LLP, and Evercore Group L.L.C. on a weekly basis), and

(c) the weekly outstanding principal balance of the loans made under the DIP Facility and all

unrestricted cash on hand.   Commencing on the first Thursday that is four weeks following the

Petition Date and continuing every other weekly anniversary thereafter (*i.e.*, biweekly), the

Debtors shall prepare and deliver to the DIP Agent, the United States Trustee, and counsel to the

Committee an updated "rolling" 13-week budget, which, once approved in writing (which may

be by email) by the DIP Agent (at the direction of the Required Lenders under the DIP Credit

Agreement) shall supplement and replace the Approved Budget or Supplemental Approved

Budget, as applicable, then in effect (each such updated budget that has been approved in writing

(which may be by email) by the DIP Agent (at the direction of the Required Lenders under the

DIP Credit Agreement), a "Supplemental Approved Budget") without further notice, motion, or

application to, order of, or hearing before, this Court; *provided*, *however*, that unless and until

the DIP Agent has approved such updated budget in writing (which may be by email), in

accordance with the foregoing, the Debtors shall still be subject to and be governed by the terms

of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect

as consented to in writing by the DIP Agent (at the direction of the Required Lenders under the

DIP Credit Agreement) in accordance with this Interim Order; *provided*, *further*, that within five

(5) Business Days after receipt by the DIP Agent of each updated Budget, the DIP Agent shall

deliver notice to the Debtors indicating whether such updated Budget is in form and substance

satisfactory to the DIP Agent.   The Initial Approved Budget, as modified by all Supplemental

Approved Budgets that are expressly consented to in writing in accordance with the foregoing,

shall constitute the "Approved Budget."   Commencing on the first Thursday that is two weeks

following the Petition Date and continuing on each weekly anniversary thereafter, the Debtors

shall prepare and deliver simultaneously to the DIP Agent and the Prepetition Term Loan Agent

a variance report/reconciliation report certified by an authorized representative of the Debtors, in

form and detail acceptable to the DIP Agent setting forth on a line-by-line basis (A) the actual

revenues received, and disbursements made, by the Debtors for such immediately preceding

week, (B) the variance in dollar amounts of such actual revenues and disbursements for each

weekly period from those reflected for the corresponding period in the Approved Budget

(inclusive of Allowed Professional Fees), (C) a description of the nature of any positive or

negative variance with respect to the revenue or disbursement and (D) whether the Debtors

complied with the budget covenant for the applicable testing period.   Notwithstanding anything

to the contrary in this Interim Order, the professional fees, costs and expenses of the DIP Secured

Parties' advisors and the Prepetition Term Loan Secured Parties' advisors, respectively, shall be

due, payable and paid in accordance with the terms of this Interim Order notwithstanding any

budgeted amounts for such fees, costs and expenses set forth in the Approved Budget, and the

Debtors shall not be deemed to have breached the terms of the Approved Budget or the Budget

Covenants to the extent the actual amount of such fees, costs and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.

(vi)    <u>Budget Covenants</u>.  The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget (subject to Permitted Variances) (and in the case of the costs and expenses of the DIP Secured Parties and Prepetition Term Loan Secured Parties, in accordance with the DIP Loan Documents and this Interim Order without being limited by the Approved Budget), subject to the following Permitted Variances, which shall be tested initially on the first Thursday following the first three full weeks following the Petition Date (the "<u>First Testing Date</u>") (testing the period from the Petition Date through and including the last Saturday just prior to the First Testing Date (such initial testing period, the "<u>First Testing Period</u>")) and continuing on each weekly anniversary thereafter (each, a "<u>Subsequent Testing Date</u>") (in each case, testing the trailing four-week period ending on the last Business Day before the applicable Subsequent Testing Date (each, a "<u>Testing Period</u>")):  (a) for the First Testing Date, actual disbursements of the Debtors (excluding any restructuring professional fees of the Debtors) shall not exceed 120% on a cumulative basis as set forth in the Approved Budget during the First Testing Period; (b) for each Subsequent Testing Date, actual disbursements of the Debtors (excluding any restructuring professional fees of the Debtors) shall not exceed 115% on a cumulative basis as set forth in the Approved Budget during each subsequent Testing Period, as applicable; (c) for the First Testing Date, actual receipts of the Debtors shall not be less than 80% on a cumulative basis as set forth in the Approved Budget during the First Testing Period; and (d) for each Subsequent Testing Date, actual receipts of the Debtors shall not be less than 85% on a cumulative basis as set forth in the Approved Budget

during each subsequent Testing Period, as applicable.  The foregoing budget-related covenants are collectively referred to herein as the "Budget Covenants."

(vii)    Interest, Fees, Costs, Indemnities, and Expenses.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  The Debtors shall pay all reasonable and documented fees, costs, indemnities, expenses (including reasonable and documented out-of-pocket legal and other professional fees and expenses of the DIP Agent), and other charges payable under the terms of the DIP Loan Documents as and when due thereunder.  Without limiting the scope in any way of the Carve Out, all such fees, costs, indemnities, expenses and disbursements, whether incurred, paid, or required to be paid prepetition or postpetition and whether or not budgeted in the Approved Budget, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Agent and/or its professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Loan Documents, and, subject to the provisions of Paragraph 19(ii) with respect to the fees and expenses of the Lender Professionals, shall be non-refundable and not subject to challenge in any respect.

(viii)    Use of DIP Facility and Proceeds of DIP Collateral.  The Borrower shall apply the proceeds of all DIP Collateral solely in accordance with this Interim Order, the DIP Loan Documents, and the Approved Budget (subject to Permitted Variances).  Without limiting the foregoing, and without limiting the scope and implementation of the Carve Out, the Debtors shall not be permitted to make any payments (from the DIP Collateral, the proceeds of DIP

Loans, or otherwise) on account of any prepetition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except (a) with respect to the Prepetition Term Loan Obligations as set forth in this Interim Order and a Final Order; (b) as provided in any order of the Court granting typical "first-day" relief in these Cases (collectively, the "First Day Orders"), which First Day Orders shall be in form and substance acceptable to the DIP Agent and the Prepetition Term Loan Agent; (c) as expressly provided in other motions, orders, and requests for relief, each in form and substance acceptable to the DIP Agent and the Prepetition Term Loan Agent with respect to any provisions that affect the rights or duties of the DIP Secured Parties or the Prepetition Term Loan Secured Parties; or (d) as otherwise contemplated by the *Joint Plan of Reorganization of Zips Car Wash, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (the "Plan") or the DIP Credit Agreement, without giving effect to any amendment or waiver thereof to which the Prepetition Term Loan Agent has not consented in writing.

(ix)     Conditions Precedent.  Neither the DIP Secured Parties nor the Prepetition Term Loan Secured Parties have an obligation to extend credit under the DIP Facility or permit use of any DIP Collateral or Prepetition Term Loan Collateral or any proceeds thereof, including Cash Collateral, as applicable, during the Interim Period unless and until all conditions precedent to the extension of credit and/or use of DIP Collateral, Prepetition Term Loan Collateral or proceeds thereof under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and the Prepetition Term Loan Agent in accordance with the DIP Loan Documents or Prepetition Term Loan Credit Agreement, as applicable, and this Interim Order.

(x)      DIP Liens.  As security for the DIP Obligations, effective as of the Petition Date, the following security interests and Liens, which shall immediately, upon entry of this Interim Order, and without any further action by any Person, be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable, are hereby granted by the Debtors to the DIP Agent, for itself and the other DIP Secured Parties (all such security interests and Liens granted to the DIP Agent for the benefit of all the DIP Secured Parties pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"), on all property of the Debtors (except, for the avoidance of doubt, Express Car Wash Holdings, LLC), now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, securities and other investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, proceeds of leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, permits, franchise rights, capital stock and other equity interests of subsidiaries and in other entities, tax and other refunds, insurance proceeds, commercial tort claims, causes of action, and proceeds relating thereto, rights under section 549 of the Bankruptcy Code (whether received by judgment, settlement or otherwise), all other Collateral (as defined in the DIP Loan Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and

non-cash proceeds of all of the foregoing, in each case wherever located, including Avoidance Actions (defined below) (all of the foregoing collateral collectively referred to as the "DIP Collateral"); *provided*, *however*, that (i) the DIP Liens on the proceeds of Avoidance Actions shall be subject to the entry of the Final Order and (ii) the DIP Secured Parties shall only avail themselves of Avoidance Action proceeds on a "last look" basis, and only if all other DIP Collateral is inadequate to indefeasibly repay the DIP Obligations in full; *provided*, *further*, that the DIP Collateral shall not include the Debtors' real property leases solely to the extent that the grant of a DIP Lien or a(i) leasehold interests of non-residential real property unless the applicable lease permits the granting of such liens (but shall include the proceeds of the sale or disposition of such leases) and (ii) any security deposits (in possession of the landlord) or the Debtors' interests, if any, in pre-paid rent, if such deposits are not property of the Debtors' estates unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; *provided*, *further*, that the DIP Liens and Prepetition Term Loan Adequate Protection Liens is prohibited or restricted byshall extend to any such security deposits or pre-paid rent upon reversion thereof to the Debtors, if at all; *provided*, *further*, any liens granted pursuant to the Orders relating to the Debtors' insurance policies or to any insurance proceeds therefrom shall, to the extent applicable and related to any leasehold interests of non-residential real property, be subject to the terms of such real property lease orthe applicable nonbankruptcy law to attach to any such real property lease (but shall include all proceeds of such real property leases):leases and applicable law, and shall not interfere with any rights held by a landlord under such policies to any such insurance proceeds for damage to landlord's property:

> (I)    subject only to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, perfected, binding, continuing, enforceable, and

non-avoidable first priority Lien on all unencumbered DIP Collateral, including, subject to the entry of the Final Order, the proceeds of each of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law (collectively, the "Avoidance Actions," which for avoidance of doubt, excludes the Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise;

(II)      pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable Lien upon all DIP Collateral that is subject solely to the Prepetition Prior Liens, which DIP Lien shall be junior only to such Prepetition Prior Liens and the Carve Out; and

(III)     subject to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming Lien on all other DIP Collateral (including Cash Collateral), which DIP Lien (x) shall be senior to the Prepetition Term Loan Adequate Protection Liens and senior and priming to (A) the Prepetition Term Loan Liens and (B) any Liens that are junior to the Prepetition Term Loan Liens or the Prepetition Term Loan Adequate Protection Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A) and (B), collectively, the "Primed Liens").

(xi)     DIP Lien Priority.  Notwithstanding anything to the contrary contained in this Interim Order or the DIP Loan Documents, but subject in all respects to the Carve Out, the DIP Liens granted to the DIP Agent for the benefit of the DIP Secured Parties shall in each and every case be first priority senior Liens that (a) are subject only to the Prepetition Prior Liens, and to the extent provided in this Interim Order and the DIP Loan Documents, shall also be subject to the Carve Out, and (b) except as provided in the immediately preceding sub-clause (a), are senior to all prepetition and postpetition Liens or other interests of any kind of any other person or entity whatsoever (including the Primed Liens and the Prepetition Term Loan Adequate Protection Liens), whether created voluntarily or involuntarily (including by order of a court).

(xii)     Enforceable Obligations.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be

enforceable against the Debtors, their estates and any successors thereto (including any trustee or other estate representative in any Successor Case, and their creditors and other parties in interest, in accordance with their terms. Subject to the provisions of Paragraph 2(iv) hereof with respect to the Roll Up DIP Loans, no obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, surcharge, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(xiii)   _Superpriority Administrative Claim Status_.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed superpriority administrative claims against each of the Debtors' estates pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject and subordinate to the Carve Out, over all claims against the Debtors or their estates of any kind or nature whatsoever (including the Prepetition Term Loan Adequate Protection Superpriority Claims), whether now existing or hereafter arising, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment (the "DIP Superpriority

Claims"). The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order and on a "last look" basis, any proceeds of or property recovered in connection with the pursuit of Avoidance Actions. Other than as expressly provided in the DIP Credit Agreement and/or this Interim Order with respect to the Carve Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or *pari passu* with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising under the DIP Loan Documents and/or this Interim Order.

(xiv)   <u>Priority of DIP Liens and DIP Superpriority Claims</u>. Subject to the Challenge Period described in Paragraph 5 of this Interim Order, the DIP Liens and the DIP Superpriority Claims: (a) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code and, subject to and upon the entry of the Final Order, shall not be subject to surcharge under section 506(c) of the Bankruptcy Code and the "equities of the case" exception of section 552 of the Bankruptcy Code, (b) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (c) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the

Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Cases, and (d) notwithstanding anything to the contrary in any orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such orders unless otherwise specifically set forth therein.

(xv)   Notwithstanding anything to the contrary herein, in the DIP Orders, or in the DIP Documents, Express Car Wash Holdings, LLC is not a guarantor or obligor under the DIP Credit Agreement, and no liens (including adequate protection liens), claims, or interests shall attach to, or be granted with respect to, Express Car Wash Holdings, LLC or any of its assets.

3.   **Adequate Protection for Prepetition Term Loan Secured Parties**. In consideration for the use of the Prepetition Term Loan Collateral (including Cash Collateral) and the priming of the Prepetition Term Loan Liens, the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Secured Parties, shall receive the following adequate protection (collectively referred to as the "Prepetition Term Loan Adequate Protection"):

(i)   Prepetition Term Loan Adequate Protection Liens. Solely to the extent there is a diminution in value of the interests of the Prepetition Term Loan Secured Parties in the Prepetition Term Loan Collateral (including Cash Collateral) from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Prepetition Term Loan Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition Term Loan Liens thereto and to the Carve Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("Diminution in Value"), the Prepetition Term Loan Agent, for the benefit of

31

all the Prepetition Term Loan Secured Parties (including on account of the Roll Up DIP Loans until the Challenge Period Termination Date), is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "Prepetition Term Loan Adequate Protection Liens"), which Prepetition Term Loan Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition Term Loan Liens and the Carve Out.

(ii)          Prepetition Term Loan Adequate Protection Superpriority Claims.  To the extent of Diminution in Value, the Prepetition Term Loan Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Prepetition Term Loan Adequate Protection Superpriority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 7), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and the Carve Out to the extent provided herein and in the DIP Loan Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, the proceeds of all Avoidance Actions); *provided*, *however*, that the Prepetition Term Loan Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Prepetition

Term Loan Adequate Protection Superpriority Claims unless and until all DIP Obligations (including, subject to entry of the Final Order, the Roll Up DIP Loans) have been Paid in Full. Subject to the relative priorities set forth above, the Prepetition Term Loan Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.  For purposes of this Interim Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations and/or Prepetition Term Loan Obligations, as applicable, (a) the indefeasible payment in full in cash of such obligations, (b) the termination or cash collateralization, in accordance with the DIP Loan Documents or Prepetition Term Loan Documents, as applicable, of all undrawn letters of credit outstanding thereunder,  and (c) the termination of all credit commitments under the DIP Loan Documents and/or Prepetition Term Loan Documents, as applicable.

(iii)    Priority of Prepetition Term Loan Adequate Protection Liens and Prepetition Term Loan Adequate Protection Superpriority Claims.  Subject to the Challenge Period provided herein, the Prepetition Term Loan Adequate Protection Liens and the Prepetition Term Loan Adequate Protection Superpriority Claims (a) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (b) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (c) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the

33

Cases or any Successor Cases, and/or upon the dismissal of any of the Cases, and (d) notwithstanding anything to the contrary in any orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such orders unless otherwise expressly set forth therein.

(iv)        <u>Professional Fees</u>.  Subject to Paragraph 19(ii) of this Interim Order, without limiting any rights of the Prepetition Term Loan Secured Parties under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement for obtaining the consent of the Prepetition Term Loan Secured Parties to entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall pay or reimburse in cash the Prepetition Term Loan Secured Parties for any and all reasonable and documented fees, costs, and out-of-pocket expenses and charges (including the reasonable and documented fees, costs and out-of-pocket expenses of one lead counsel, one local counsel, and one financial advisor), including any unpaid fees, costs and expenses accrued prior to the Petition Date, in each case without further action of any kind, including notice, hearing, motion, application or order of the Bankruptcy Court.

(v)        The Debtors shall deliver to the Prepetition Term Loan Secured Parties all information, reports, documents and other materials that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents.

(vi)        Notwithstanding the Payment in Full of the DIP Obligations and the termination of the DIP Loan Documents, the covenants set forth in the DIP Loan Documents and any order of this Court relating thereto shall continue in full force and effect for the benefit of the Prepetition Term Loan Secured Parties, and may be enforced by the Prepetition Term Loan Agent.  Unless otherwise expressly set forth herein, any consent or approval rights or similar

rights granted or referenced in this Interim Order in favor of any or all of the DIP Agent, the

other DIP Secured Parties, the Prepetition Term Loan Agent and the other Prepetition Term Loan

Secured Parties may be exercised (or not exercised) in the sole discretion of such party.

(vii)        Consent to Priming and Adequate Protection.  The Prepetition Term Loan

Agent, on behalf of the Prepetition Term Loan Secured Parties, consents to the Prepetition Term

Loan Adequate Protection and the priming provided for herein; *provided*, *however*, that such

consent of the Prepetition Term Loan Agent to the priming of the Prepetition Term Loan and the

use of Cash Collateral is expressly conditioned upon the entry of this Interim Order, and such

consent shall not be deemed to extend to any other Cash Collateral usage or other replacement

financing or debtor-in-possession financing other than the DIP Facility provided under the DIP

Loan Documents; *provided*, *further*, that such consent shall be of no force and effect in the event

this Interim Order is not entered or is entered and subsequently reversed, modified, stayed, or

amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition

Term Loan Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not

approved.

(viii)        Right to Seek Additional Adequate Protection.  Under the circumstances

and given that the above-described adequate protection is consistent with the Bankruptcy Code,

including section 506(b) thereof, this Court finds that the adequate protection provided herein is

reasonable to protect the interests of the Prepetition Term Loan Secured Parties.  However, the

Prepetition Term Loan Agent, on behalf of the Prepetition Term Loan Secured Parties, may

request Court approval for additional or alternative adequate protection, without prejudice to any

objection of the Debtors or any other party in interest to the grant of any additional or alternative

adequate protection; *provided* that any such additional or alternative adequate protection shall at

all times be subordinate and junior to the Carve Out and claims and Liens of the DIP Secured

Parties granted under this Interim Order and the DIP Loan Documents; *provided, further*, that

nothing in this paragraph shall authorize the Prepetition Term Loan Agent or Prepetition Term

Loan Secured Parties to deny the Debtors access to Cash Collateral or DIP Loans in accordance

with the Approved Budget, subject to any permitted variance, pursuant to the terms of this

Interim Order during the pendency of such request for additional or alternative adequate

protection.  The consent of the Prepetition Term Loan Secured Parties to the priming of the

Prepetition Term Loan Liens by the DIP Liens and the Debtors' use of Cash Collateral on the

terms set forth herein does not constitute, and shall not be construed as constituting, an

acknowledgment or stipulation by the Prepetition Term Loan Secured Parties that their

respective interests in the Prepetition Term Loan Collateral are adequately protected pursuant to

this Interim Order or otherwise.

      4.  **Automatic Postpetition Lien Perfection.**  This Interim Order shall be sufficient

and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP

Liens and the Prepetition Term Loan Adequate Protection Liens without the necessity of (a)

filing or recording any financing statement, deed of trust, mortgage, or other instrument or

document that may otherwise be required under the law of any jurisdiction, (b) obtaining

"control" (as defined in any applicable Uniform Commercial Code or other law) over any

DIP Collateral (and the DIP Agent and, after Payment in Full of the DIP Facility, the

Prepetition Term Loan Agent, shall be deemed, without any further action, to have control

over all the Debtors' deposit accounts, securities accounts and commodities accounts within

the meaning of such Uniform Commercial Code and other law) or (c) taking any other action

to validate or perfect the DIP Liens and the Prepetition Term Loan Adequate Protection

Liens or to entitle the DIP Liens and the Prepetition Term Loan Adequate Protection Liens to

the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the

Prepetition Term Loan Agent (in the latter case, solely with respect to the Prepetition Term

Loan Adequate Protection Liens) may, each in their sole discretion, enter into and file, as

applicable, financing statements, mortgages, security agreements, notices of Liens, and other

similar documents, and is hereby granted relief from the automatic stay of section 362 of the

Bankruptcy Code in order to do so, and all such financing statements, mortgages, security

agreements, notices, and other agreements or documents shall be deemed to have been

entered into, filed or recorded as of the Petition Date.  The applicable Debtors shall execute

and deliver to the DIP Agent and/or the Prepetition Term Loan Agent, as applicable, all such

financing statements, mortgages, notices, and other documents as such parties may

reasonably request to evidence and confirm the contemplated validity, perfection and priority

of the DIP Liens and the Prepetition Term Loan Adequate Protection Liens, as applicable,

granted pursuant hereto.  Without limiting the foregoing, each of the DIP Agent and the

Prepetition Term Loan Agent may, in its discretion, file a photocopy of this Interim Order as

a financing statement with any recording officer designated to file financing statements or

with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or

personal property, and in such event, the subject filing or recording officer shall be

authorized and hereby is directed to file or record such copy of this Interim Order.  To the

extent that the Prepetition Term Loan Agent is the secured party under any security

agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account

control agreements, listed as loss payee or additional insured under any of the Debtors'

insurance policies, or is the secured party under any of the Prepetition Term Loan

Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtors' insurance policies, and the secured party under each such Prepetition Term Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents and second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Prepetition Term Loan Secured Parties. The Prepetition Term Loan Agent shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

5. **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**. Except as otherwise set forth herein, the admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations, are and shall be binding upon the Debtors, their estates, and any of their respective successors and assigns, including, without limitation, any chapter 7 or chapter 11 trustee, responsible person, examiner with expanded powers, or other estate representative in all circumstances and for all purposes. The admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations, shall also be binding upon all creditors and other parties in interest and all of their respective successors and assigns, including, without limitation, any statutory or non-statutory committees appointed in the Cases, including the Committee (if appointed), and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes unless: (a) such party in

interest with the requisite standing commences an adversary proceeding or contested matter by the earlier of (i) seventy-five (75) calendar days after the entry of this Interim Order or, solely with respect to the Committee, if such Committee is appointed more than fifteen (15) calendar days after entry of this Interim Order, within sixty (60) calendar days after the appointment of the Committee, and (ii) the date that is established as the deadline for filing objections to confirmation of a chapter 11 plan in any of the Cases (the time period established by the foregoing clauses (i) and (ii), the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (A) no Challenge is properly raised during the Challenge Period or (B) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, the "Challenge Period Termination Date")), either (x) challenging or otherwise objecting to the admissions, stipulations, findings, or releases contained in this Interim Order, including the Debtors' Stipulations, or (y) against any or all of the Prepetition Term Loan Secured Parties in connection with or related to the Prepetition Term Loan Obligations, or the actions or inactions of any of the Prepetition Term Loan Secured Parties arising out of or related to the Prepetition Term Loan Obligations or the Prepetition Term Loan Documents, including any claim against any or all of the Prepetition Term Loan Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Term Loan Obligations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition Term Loan Secured Parties) (each such adversary proceeding or contested matter a "Challenge"); and (b) a final, non-appealable judgment is entered in favor of the plaintiff in any such timely filed Challenge sustaining such challenge (any such Challenge timely brought for which such a

final and non-appealable order is so obtained, a "Successful Challenge"); *provided* that any pleadings filed in any Challenge shall set forth with specificity the basis for such Challenge (and any such Challenge not so specified prior to the Challenge Period shall be deemed forever waived, released, and barred).

(i)      If any such Challenge is timely and properly filed prior to the Challenge Period by the Committee or any other statutory or non-statutory committee appointed or formed in the Cases or any other person or entity with requisite standing, the admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on each other statutory or non-statutory committee appointed or formed in the Cases or any other person or entity, except to the extent that such admissions, stipulations, findings, or releases contained in this Interim Order, including the Debtors' Stipulations, were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable judgment of a court of competent jurisdiction.

(ii)      If no such Challenge is timely and properly filed prior to the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then (a) the admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations (and the release provisions contained therein), shall remain binding and preclusive on the Debtors and all parties in interest in the Cases or any Successor Cases, including the Committee (if appointed), any chapter 11 or chapter 7 trustee, and any other person or entity; (b) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (c) all payments made to or for the benefit of the Prepetition Term Loan Secured Parties pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to

40

counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance; and (d) all of the Prepetition Term Loan Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code (which claims and Liens shall have been deemed satisfied to the extent the Prepetition Term Loan Obligations are converted into Roll Up DIP Loans as provided herein).  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (a) through (d) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (a) through (d) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.

(iii)    The Challenge Period may be extended (a) with the written consent of the Prepetition Term Loan Agent in its sole discretion or (b) pursuant to an order of the Court entered before the expiration of the applicable Challenge Period for good cause shown upon an application for extension filed and served by a party in interest; *provided* that an extension pursuant to the foregoing clause (b) shall only be applicable to such party in interest and the particular Challenge set forth in such application; *provided*, *further*, that the timely filing of a motion seeking standing to file a Challenge before the expiration of the Challenge Period, which attaches a draft complaint setting forth the legal and factual bases of the proposed Challenge, shall toll the Challenge Period only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by the Bankruptcy Court.

(iv)    Nothing in this Interim Order vests in or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if appointed) or any other statutory

or non-statutory committee appointed or formed in the Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the admissions, stipulations, findings, and releases contained in this Interim Order, including the Debtors' Stipulations, and the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing reserve all of their rights to contest on any grounds any Challenge.  The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 5 or to require or permit an extension of the Challenge Period Termination Date.

(v)        Any successor to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Cases or any Successor Cases) shall be bound by the terms of this Interim Order and the Final Order to the same extent as the Debtors, including with respect to the Debtors' Stipulations, to the extent and on the terms approved by this Interim Order and the Final Order.

6.  **Carve Out**.

(i)        Carve Out.  As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up

to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to

the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim

order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional

Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363

of the Bankruptcy Code (the "Debtor Professionals") and the Committee  pursuant to section 328

or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor

Professionals, the "Professional Persons") at any time before or on the first business day

following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether

allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed

Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000

incurred after the first business day following delivery by the DIP Agent of the Carve Out

Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or

otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice

Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice

delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead

restructuring counsel, the United States Trustee, and counsel to the Committee, which notice

may be delivered following the occurrence and during the continuation of an Event of Default

and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out

Trigger Notice Cap has been invoked.

(ii)         Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is

given by the DIP Agent to the Debtors with a copy to counsel to the Committee

(the "Termination Declaration Date"), the Carve Out Trigger Notice shall (a) be deemed a draw

request and notice of borrowing by the Debtors for New Money DIP Loans under the DIP

Facility (on a pro rata basis based on the then outstanding Term Loan Commitments (as defined in the DIP Credit Agreement), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute New Money DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at an institution acceptable to the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for New Money DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding Term Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute New Money DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at an institution acceptable to the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent gives such notice to such Term Loan Lenders (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the

failure of the Debtors to satisfy any or all of the conditions precedent for New Money DIP Loans under the DIP Facility, any termination of the Term Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding Term Loan Commitment (on a pro rata basis based on the then outstanding Term Loan Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Term Loan Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Term Loan Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Term Loan Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Term Loan Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 6, then, any excess funds in one of the Carve Out Reserves following the payment

45

of the Pre-Carve Out Amounts and Post Carve Out Amounts, respectively, shall be used to fund

the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph 6, prior to

making any payments to the DIP Agent or the Prepetition Term Loan Secured Parties, as

applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim

Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition

Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the

sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been

fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves,

with any excess paid to the DIP Agent for application in accordance with the DIP Loan

Documents. Further, notwithstanding anything to the contrary in this Interim Order,

(i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or

increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full

the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way

shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out

Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the

Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and

notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any

Prepetition Term Loan Documents, the Carve Out shall be senior to all liens and claims securing

the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other

forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition

Term Loan Obligations.

(iii) <u>Payment of Allowed Professional Fees Prior to the Termination
Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the

Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(iv)         <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Term Loan Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Term Loan Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(v)         <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(vi)         Notwithstanding anything to the contrary in this Interim Order, the Debtors' obligations to the DIP Secured Parties and Prepetition Term Loan Secured Parties and the liens, security interests, and superpriority claims granted herein, under the DIP Documents, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Prepetition Term Loan Adequate Protection Liens, the Primed Liens, the Prepetition Term Loan Adequate Protection Superpriority, and the Prepetition Term Loan Obligations, shall be subject in all respects and subordinate to the Carve Out.

7. **Waiver of 506(c) Claims**.  Except to the extent of Carve Out, and without limiting the scope of thereof, subject to the entry of the Final Order, and as a further condition of (i) the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Secured Parties and the Prepetition Term Loan Secured Parties to the payment of the Carve Out to the extent provided herein) and (ii) the Debtors' use of Cash Collateral pursuant to this Interim Order and the Final Order, (a) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition Term Loan Secured Parties, the Prepetition Term Loan Collateral, the DIP Collateral and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition Term Loan Agent, and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties.

8. **After-Acquired Property**.  Except as otherwise expressly provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date (or a valid, enforceable and unavoidable Lien that is perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code)

that is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

9. **Protection of DIP Secured Parties' and Prepetition Term Loan Secured Parties' Rights**.

(i)      Subject to and without limiting the scope of the Carve Out, unless the DIP Agent and the Prepetition Term Loan Agent shall have provided their prior written consent or all DIP Obligations and Prepetition Term Loan Obligations have been Paid in Full, there shall not be entered in any of these Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (a) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral or Prepetition Term Loan Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Term Loan Liens, the Prepetition Term Loan Adequate Protection Liens, the Prepetition Term Loan Adequate Protection Superpriority Claims and/or the other DIP Protections; (b) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations and the Prepetition Term Loan Obligations or as otherwise permitted in the DIP Loan Documents and this Interim Order, or (c) any modification of any of  the DIP Secured Parties' or the Prepetition Term Loan Secured Parties' rights under this Interim Order, the DIP Loan Documents or the Prepetition Term Loan Documents with respect to any DIP Obligations or Prepetition Term Loan Obligations.

(ii)      The Debtors (and/or their legal and financial advisors in the case of clauses (b) through (d) below) will, whether or not the DIP Obligations have been Paid in Full, (a) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents,

(b) reasonably cooperate with, consult with, and provide to the DIP Secured Parties and the Prepetition Term Loan Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon request by any of the DIP Secured Parties or the Prepetition Term Loan Secured Parties) to provide under the DIP Loan Documents, the Prepetition Term Loan Documents (in the absence of the pendency of these Cases) or the provisions of this Interim Order, (c) permit consultants, advisors and other representatives (including third party representatives) of each of the DIP Agent and the Prepetition Term Loan Agent to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, as and to the extent required by the DIP Loan Documents and/or the Prepetition Term Loan Documents, (d) permit the DIP Agent and the Prepetition Term Loan Agent and their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, and (e) permit the DIP Agent and the Prepetition Term Loan Agent to conduct, at their discretion and the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and the Prepetition Term Loan Collateral.  Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent, the Prepetition Term Loan Agent, or their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product, as determined by the Debtors in their sole discretion.  For the avoidance of doubt, the Prepetition Term Loan Agent shall have the same access and cooperation rights as the DIP Agent for purposes of this subparagraph (ii).

10. **Proceeds of Subsequent Financing**.   Without limiting the provisions and protections of the Carve Out and Paragraph 9 above, if at any time prior to the Payment in Full of all the DIP Obligations and the Prepetition Term Loan Obligations (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full and then to the Prepetition Term Loan Obligations until Paid in Full.

11. **Cash Collection**.   From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or Prepetition Term Loan Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same deposit accounts into which the collections and proceeds of the Prepetition Term Loan Collateral were deposited under the Prepetition Term Loan Documents (or in such other accounts as are designated by the DIP Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall be subject to the control of the DIP Agent and the Prepetition Term Loan Agent, and the funds in such accounts may be used by the Debtors in accordance at all times with the Budget and otherwise to the extent provided in this Interim Order and the DIP Loan Documents.  Subject to, and without limiting the scope of, the Carve Out, upon the direction

of the DIP Agent or, following Payment in Full of the DIP Obligations, the Prepetition Term

Loan Agent, at any time after the occurrence of a Termination Event and subject to the

provisions of Paragraph 6 hereof, all proceeds in the Cash Collection Accounts shall be

remitted to the DIP Agent for application to the DIP Obligations until Payment in Full and

then to the Prepetition Term Loan Agent for application to the Prepetition Term Loan

Obligations until Payment in Full, and the DIP Agent and the Prepetition Term Loan Agent

shall be entitled to take all action that is necessary or appropriate to effectuate the foregoing.

Unless otherwise agreed to in writing by the DIP Agent and the Prepetition Term Loan

Agent, the Debtors shall maintain no accounts except those identified in the *Debtors'*

*Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to*

*Continue to (A) Operate Their Cash Management System, (B) Honor Certain Prepetition*

*Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting*

*Related Relief* filed contemporaneously herewith (the "Cash Management Order").   The

Debtors and the financial institutions where the Debtors' Cash Collection Accounts are

maintained (including those accounts identified in any Cash Management Order), are

authorized and directed to remit, without offset or deduction, funds in such Cash Collection

Accounts upon receipt of any direction to that effect from the DIP Agent or, following

Payment in Full of the DIP Obligations, the Prepetition Term Loan Agent.

12. **Disposition of DIP Collateral; Credit Bid**.

(i)       Unless the DIP Obligations and the Prepetition Term Loan Obligations are Paid in

Full upon the closing of a sale or other disposition of the DIP Collateral or Prepetition Term

Loan Collateral, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any

portion of the DIP Collateral or any Prepetition Term Loan Collateral (or enter into any binding

52

agreement to do so) without the prior written consent of the DIP Agent and the Prepetition Term

Loan Agent (and no such consent shall be implied from any other action, inaction, or

acquiescence by any DIP Secured Party or Prepetition Term Loan Secured Party or any order of

this Court), except as permitted in the DIP Loan Documents and/or the Prepetition Term Loan

Documents, as applicable, and this Interim Order. Except to the extent otherwise expressly

provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance or

other disposition of any DIP Collateral outside the ordinary course of business shall be remitted

to the DIP Agent for application to the DIP Obligations and then to the Prepetition Term Loan

Obligations, in each case, in accordance with the terms of this Interim Order and the DIP Loan

Documents or the Prepetition Term Loan Documents, as the case may be.  In addition, the

Debtors are authorized and directed to enter into such blocked account agreements (with cash

dominion, if the DIP Agent so elects) with the DIP Agent and such financial institutions as the

DIP Agent may require, and, if it so elects, the DIP Agent shall be entitled to enjoy the benefit of

all control agreements to which the Prepetition Term Loan Agent is a party without the need to

enter into new blocked account agreements.

(ii)      Subject to Paragraph 5 of this Interim Order, (a) upon entry of this Interim Order,

the DIP Agent (at the direction of the Required DIP Lenders (as defined in the DIP Credit

Agreement)) shall have the right to credit bid, in accordance with the DIP Loan Documents, on a

dollar for dollar basis, up to the full amount of the DIP Obligations (including any accrued

interest and expenses and, subject to entry of the Final Order, the Roll Up DIP Loans) in any sale

of the DIP Collateral under or pursuant to (1) section 363 of the Bankruptcy Code, (2) any plan

of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code to the extent

any sale contemplated thereunder does not result in Payment in Full of all of the DIP Obligations

on the effective date of such plan, or (3) a sale or disposition by a chapter 7 trustee under section 725 of the Bankruptcy Code, and (b) subject to the preservation of rights provided in Paragraph 5 of this Interim Order, the Prepetition Term Loan Agent (acting at the direction of the applicable required lenders) shall have the right to credit bid up to the full amount of the Prepetition Term Loan Adequate Protection and the Prepetition Term Loan Obligations in the sale of any Prepetition Term Loan Collateral whether pursuant to (1) section 363 of the Bankruptcy Code, (2) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (3) a sale or disposition by a chapter 7 trustee for the Debtors under section 725 of the Bankruptcy Code and each of the DIP Agent and the Prepetition Term Loan Agent, in their respective capacities as such, shall be deemed a qualified bidder (or such analogous term or capacity) in connection with any such sale and any such credit bid shall be deemed to constitute a qualified bid, regardless of whether any qualified bid requirements are satisfied (such a credit bid described in this Paragraph 12, the "Credit Bid").

13. **Termination Events**.  The following shall constitute a termination event under this Interim Order and the DIP Loan Documents unless waived in writing by each of the DIP Agent and the Prepetition Term Loan Agent (each, a "Termination Event"):

(i)      The occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement, as set forth therein and as set forth in **Exhibit C** attached hereto (a "DIP Default Termination Event"), including, for avoidance of doubt, the failure to obtain entry of the Final Order, in form and substance acceptable to the DIP Agent and the Prepetition Term Loan Agent on or within thirty (30) calendar days of the Petition Date.

(ii)      Any other material breach or default by any of the Debtors of the terms and provisions of this Interim Order, which material breach or default or is not cured or waived

within five (5) calendar days of the Debtors having received actual notice of the occurrence thereof.

(iii)     The Debtors' failure to timely and strictly comply with any of the obligations and deadlines set forth in **Exhibit D** attached hereto (the "Milestones"), absent the written waiver or extension of any such Milestone by the DIP Agent (acting at the direction of the Required DIP Lenders), which may be by email.  The Debtors shall provide notice of any such waiver or extension (which may be by email) to the Court, the United States Trustee, and counsel to the Committee (if appointed) and shall file such notice on the docket of the Cases.

14. **Rights and Remedies Upon Termination Event**.

(i)     Upon the occurrence and during the continuance of a Termination Event, the DIP Agent may, by written notice to the Debtors, their counsel, counsel for the Committee, and the United States Trustee (which may be by email and shall be filed on the docket of these Cases): (a) declare all DIP Obligations to be immediately due and payable, (b) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains; or (c) declare a termination, reduction, or restriction of the ability of the Debtors to use any Cash Collateral (any such declaration, a "Termination Declaration," and the date of any such Termination Declaration, the "Termination Declaration Date").

(ii)     During the five (5) calendar day period after a Termination Declaration Date, the Debtors, the Committee, and any party in interest shall, upon request, be entitled to an emergency hearing before this Court solely for the purpose of (i) contesting whether a Termination Event has occurred and is continuing and/or (ii) solely with respect to the Debtors, seeking authorization for the non-consensual use of Cash Collateral, and the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall be deemed to have consented to any such

emergency hearing.  During such five (5) calendar day period, unless the Court has entered an order to the contrary or otherwise fashioned an appropriate remedy, including whether Termination Event has occurred and is continuing, the Debtors may not use Cash Collateral or any amounts previously or thereafter advanced under the DIP Credit Agreement (except with respect to the Carve Out) except to pay payroll and other expenses that are critical to keep the business of the Debtors operating, solely in accordance with the Approved  Budget.

(iii)    Five (5) calendar days following the Termination Declaration Date, unless prior to such time this Court determines that a Termination Event has not occurred and/or is not continuing or authorizes the Debtors to use Cash Collateral on a non-consensual basis, the DIP Agent is hereby granted relief from the automatic stay (other than with respect to the payment of the Carve Out as provided in this Interim Order), without further notice, hearing, motion, order, or other action of any kind, to the extent necessary to permit the DIP Secured Parties to exercise all rights and remedies under this Interim Order, the DIP Loan Documents and/or applicable non-bankruptcy law (other than those rights and remedies against the DIP Collateral and with respect to the Debtors' use of Cash Collateral, as provided in Paragraph 14(ii) above), including the right (in each case subject to the Carve Out) to (a) terminate the DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the other DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations, and/or (b) foreclose on, or otherwise enforce and realize on, its DIP Liens on all or any portion of the DIP Collateral, including, without limitation, by collecting accounts receivable and applying the proceeds thereof to the DIP Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral.  Notwithstanding anything to the contrary herein, upon the occurrence and continuation of a Termination Event, the DIP

Agent, the DIP Lenders, and the Prepetition Term Loan Secured Parties may enter upon the Debtors' leased premises only as provided by: (i) the applicable lease or a separate written agreement by and between the applicable landlord and the DIP Agent or the DIP Lenders; (ii) applicable non-bankruptcy law; or (iii) an order ~~from~~of the Court ~~on~~entered at a hearing upon no less than five (5) days' notice by the DIP Agent to the landlord for the affected leased premises.

(iv)     Other than with respect to the payment of the Carve Out as provided in this Interim Order, upon the effectiveness of any relief from the automatic stay with respect to the DIP Facility pursuant to Paragraph 14(iii) hereof, the Prepetition Term Loan Agent shall have relief from the automatic stay to the same extent as the DIP Agent, and without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on its Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens on, all or any portion of the DIP Collateral or Prepetition Term Loan Collateral (including by collecting accounts receivable and applying the proceeds thereof to the Prepetition Term Loan Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral or Prepetition Term Loan Collateral) or otherwise exercise remedies against the DIP Collateral or Prepetition Term Loan Collateral permitted by this Interim Order, the Prepetition Term Loan Documents and/or applicable non-bankruptcy law; *provided*, *however*, that any such foreclosure or other enforcement by the Prepetition Term Loan Agent of any Prepetition Term Loan Liens or any Adequate Protection Replacement Liens or any other such exercise of remedies by the Prepetition Term Loan Agent against the DIP Collateral or Prepetition Term Loan Collateral shall not interfere with or otherwise be inconsistent with any foreclosure or other enforcement by the DIP Agent of any DIP Liens or other DIP Protections or any other exercise of

remedies by the DIP Agent, and any proceeds received by the Prepetition Term Loan Agent in connection with such foreclosure, enforcement or other exercise of remedies shall be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full.

(v)     Subject to the provisions of Paragraph 5 hereof, and subject to, and without limiting the scope of, the Carve Out, all proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties or the Prepetition Term Loan Secured Parties, as applicable, shall be turned over <u>first</u> to the DIP Agent for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents and this Interim Order until Payment in Full of all of the DIP Obligations and <u>then</u> to the Prepetition Term Loan Agent for application to the Prepetition Term Loan Obligations under, and in accordance with the provisions of, the Prepetition Term Loan Documents and this Interim Order until Payment in full of the Prepetition Term Loan Obligations.

(vi)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (a) permit the Debtors to grant the Prepetition Term Loan Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Term Loan Secured Parties under the DIP Loan Documents, the DIP Facility, and this Interim Order, (b) authorize the DIP Secured Parties and the Prepetition Term Loan Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents, the Prepetition Term Loan Documents and/or this Interim Order, (c) to permit each of the DIP Agent, the other DIP Secured Parties, the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties to perform any act authorized under this Interim Order and the DIP

Loan Documents, and (d) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents.

15. **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary, no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition Term Loan Collateral, or any portion of the Carve Out may be used by (a) any Debtor, Committee, or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtors' Professionals, the Committee's Professionals or any committee member) to investigate or prosecute any Challenge (including any litigation or other action) in connection with the value of the Prepetition Term Loan Collateral or the DIP Collateral (or to pay any professional fees and disbursements incurred in connection therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtors' Professionals, the Committee's Professionals or any committee member) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Secured Parties, or to seek any modification to this Interim Order not approved by the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, to the extent such modification would affect the rights of any of the Prepetition Term Loan Secured Parties, the Prepetition Term Loan Agent; (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any

claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, any or all of the DIP Secured Parties, the Prepetition Term Loan Secured Parties, their respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including (A) any Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations and/or the Prepetition Term Loan Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Term Loan Liens, or the Prepetition Term Loan Adequate Protection Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition Term Loan Liens, the Prepetition Term Loan Adequate Protection Liens, or the other Prepetition Term Loan Adequate Protection; (D) except to contest in good faith the occurrence or continuance of any Termination Event as permitted in Paragraph 14 of this Interim Order or, with respect to the Debtors, seek authorization of the non-consensual use of Cash Collateral, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Secured Parties', and, after the Payment in Full of the DIP Obligations, the Prepetition Term Loan Secured Parties', assertion, enforcement, or realization on the Cash Collateral, the DIP Collateral or the Prepetition Term Loan Collateral in accordance with the DIP Loan Documents or the Prepetition Term Loan Documents, as applicable, or this Interim Order); and/or (E) any action seeking to modify any of the rights,

remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties hereunder or under the DIP Loan Documents or the Prepetition Term Loan Documents, as applicable, or any payments made thereunder or in respect thereof; *provided*, *however*, up to $75,000 in the aggregate of any DIP Collateral, any Prepetition Term Loan Collateral, any Cash Collateral and proceeds of the DIP Facility may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims and/or Liens of the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents (but not the claims and/or Liens of the DIP Agent and the other DIP Secured Parties) so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person (other than the Prepetition Term Loan Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Agent and the Prepetition Term Loan Agent; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral or Prepetition Term Loan Collateral, unless otherwise permitted hereby, without the prior written consent of the DIP Agent and the Prepetition Term Loan Agent.

16. **<u>Proofs of Claim</u>**.  The Prepetition Term Loan Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein. The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition Term Loan Secured Parties in respect of all Prepetition Term Loan Obligations. In addition, the Prepetition Term Loan Secured Parties and the DIP Secured Parties will not be required to file any request for allowance and/or payment of any administrative expenses, and this Interim Order is deemed to constitute a timely filed request for allowance and/or

payment of any Prepetition Term Loan Obligations constituting administrative expenses or any DIP Obligations, as applicable.   Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, the Prepetition Term Loan Agent, for the benefit of itself and the other Prepetition Term Loan Secured Parties, and the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby authorized and entitled, but not required, in its respective sole discretion to file (and amend and/or supplement, in its discretion) in each of the Cases or Successor Cases (a) in the case of the Prepetition Term Loan Agent, a proof of claim and/or aggregate proofs of claim in respect of any Prepetition Term Loan Obligations, and (b) in the case of each of the Prepetition Term Loan Agent and the DIP Agent, a request or aggregate requests for allowance and/or payment of any portion of the Prepetition Term Loan Obligations constituting administrative expenses or any DIP Obligations, as applicable.

17. **Preservation of Rights Granted Under the Interim Order**.

(i)      No Non-Consensual Modification or Extension of Interim Order.   Subject to Paragraph 14 of this Interim Order, the Debtors shall not seek to amend, modify, or extend this Interim Order (including through any chapter 11 plan of reorganization) without the prior written consent of the DIP Agent and the Prepetition Term Loan Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured Parties or any of the Prepetition Term Loan Secured Parties.   In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash authorized or made hereby or pursuant to the DIP Loan Documents, or Lien, claim, priority

or other DIP Protections authorized or created hereby or pursuant to the DIP Loan Documents. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or any DIP Protections (including the Prepetition Term Loan Adequate Protection) incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agent or the Prepetition Term Loan Agent, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the original provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order), and the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall be entitled to all of the DIP Protections (including the Prepetition Term Loan Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted pursuant to section 364(e) of the Bankruptcy Code, this Interim Order, or the DIP Loan Documents.

(ii)    Dismissal.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (a) the DIP Protections (including the Prepetition Term Loan Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties, respectively, shall remain in

full force and effect and be binding on all parties in interest and be governed in all respects by the provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order) until all DIP Obligations and all Prepetition Term Loan Obligations have been Paid in Full, and such order of dismissal shall so provide (in accordance with sections 105 and 349 of the Bankruptcy Code), and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections (including the Prepetition Term Loan Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties, respectively.

(iii)    <u>Survival of Interim Order</u>.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections (including the Prepetition Term Loan Adequate Protection), and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case or Successor Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases or any Successor Case in this Court, or terminating the joint administration of these Cases or any Successor Case or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections (including the Prepetition Term Loan Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Term Loan Secured Parties,

respectively, shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such DIP Protections (including the Prepetition Term Loan Adequate Protection), and such other rights, remedies, Liens priorities, privileges, protections and benefits, shall continue in full force and effect in these proceedings and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order.  Pursuant to any chapter 11 plan of reorganization with respect to any of the Debtors, the DIP Obligations shall not be discharged by the entry of an order confirming any such chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

18. **Insurance Policies**.  Until such time as all DIP Obligations are Paid in Full (or as otherwise agreed in writing by the DIP Agent, as applicable, in respect of the applicable obligations owed to them), the Debtors shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Loan Documents.  Upon entry of this Interim Order, to the fullest extent permitted by applicable law, the DIP Agent, the other DIP Secured Parties, the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, and the Debtors shall take such actions as are reasonably requested by the DIP Agent or the Prepetition Term Loan Agent from time to time to evidence or effectuate the foregoing.

19. **Other Rights and Obligations**.

(i)     Expenses.  As provided in the DIP Loan Documents (and without limiting the Debtors' respective obligations thereunder), the applicable Debtors will pay all reasonable and

documented expenses incurred by the DIP Secured Parties (including the reasonable and documented fees and out-of-pocket expenses of counsel for the DIP Secured Parties, including those of Paul Hastings LLP, as lead counsel, the "Lender Professionals"), in connection with these Cases, in accordance with the procedures set forth in Paragraph 19(ii) below, including the preparation, execution, delivery, and administration of the DIP Loan Documents, this Interim Order, the Final Order, and all other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with these Cases, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

(ii)    Notice of Professional Fees.   The Lender Professionals shall not be required to comply with the United States Trustee fee guidelines, submit invoices to this Court, or submit its time entries to any party in interest.   In accordance with the Complex Case Procedures, the Lender Professionals shall submit summary invoices to the Debtors, the United States Trustee, counsel for any Committee, and such other parties as this Court may direct not with not less than ten (10) days for recipients to object to payment of such invoices.   The summary invoices shall include (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested; *provided*, *however*, that such summary invoices shall not include any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.   If the Debtors, United States Trustee, or any Committee object to the reasonableness of the fees and expenses of any of the

66

Lender Professionals and cannot resolve such objection within ten (10) days of receipt of such invoices, then the Debtors, United States Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professionals an objection (the "Fee Objection") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice.  Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.  All such unpaid fees, costs, expenses, and charges of the DIP Agent that have not been disallowed by this Court on the basis of an objection filed by the Debtor, the United States Trustee, or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Interim Order. Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent or the other DIP Secured Parties in connection with or with respect to the DIP Facility, the DIP Credit Agreement, or the other DIP Loan Documents are hereby approved in full and are non-refundable and shall not otherwise be subject to any Challenge or contest whatsoever.

(iii)   <u>Binding Effect</u>.  Subject only to Paragraph 5 above, the provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases and any Successor Cases, including the DIP Secured Parties, the Prepetition Term Loan Secured Parties, any Committee, and the Debtors and their respective estates, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; *provided*, *however*, that the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(iv)   <u>No Waiver</u>.  The failure of the Prepetition Term Loan Secured Parties or the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Term Loan Documents, the DIP Loan Documents or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Interim Order (including the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition Term Loan Secured Party or any DIP Secured Party, including rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such

assertion). Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the Prepetition Term Loan Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (a) request conversion of the Cases or any Successor Cases to cases under chapter 7, dismissal of the Cases or any Successor Cases, or the appointment of a trustee or examiner in the Cases or any Successor Cases, or to oppose the use of Cash Collateral in any Successor Case or on terms other than those set forth in this Interim Order, (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (c) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition Term Loan Secured Parties, respectively, under the DIP Loan Documents or the Prepetition Term Loan Documents, the Bankruptcy Code or otherwise. Except to the extent otherwise expressly provided in this Interim Order or by law, neither the commencement of the Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents or with respect to any non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition Term Loan Documents, applicable law, or equity.

(v)      No Third-Party Rights. Except as explicitly provided for herein or in any DIP Loan Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary. In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash

Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Term Loan Secured Parties shall not (a) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(vi)    <u>No Marshaling</u>.  Upon entry of the Final Order, neither the DIP Secured Parties nor the Prepetition Term Loan Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Term Loan Collateral, as applicable; *provided* that the DIP Claims may be collected out of the proceeds of any Avoidance Actions only on a "last look" basis to the extent that all other DIP Collateral is inadequate to indefeasibly repay the DIP Obligations in full.

(vii)    <u>Amendments</u>.  The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver (a) increases the interest rate (other than as a result of the imposition of the default rate), (b) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facility, (c) shortens the Maturity Date (as defined in the DIP Credit Agreement), or (d) adds or amends (in any respect unfavorable to the Debtors) any Event of Default.  No such material amendment, modification, supplement, or waiver of any of the provisions of the DIP Loan Documents shall be effective unless set forth in writing, signed

70

by or on behalf of all the Debtors and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, except as provided herein, approved by this Court. Notwithstanding the foregoing, no amendment, modification, supplement, or waiver of any of the provisions of this Interim Order or the DIP Loan Documents that would directly and adversely affect the rights or interests of the Prepetition Term Loan Secured Parties, as applicable, shall be effective unless also consented to in writing by the Prepetition Term Loan Agent on behalf of the Prepetition Term Loan Secured Parties (after obtaining the approval of the requisite Prepetition Term Loan Secured Parties under the Prepetition Term Loan Credit Agreement).

(viii)   Inconsistency.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.  In the event of any inconsistency between the terms or conditions of this Interim Order and the terms or conditions of any other order entered by this Court in these Cases, including in the nature of a "first day order", the provisions of this Interim Order shall govern and control unless otherwise agreed in writing by the DIP Agent.

(ix)   Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(x)     <u>Reservation of Rights</u>.   Nothing in this Interim Order shall be deemed to constitute the consent of the DIP Secured Parties or the Prepetition Term Loan Secured Parties, and each of the foregoing expressly reserve the right to object to entry of any Order of the Bankruptcy Court that provides for the sale or other disposition of all or substantially all of the assets of the Debtors (or any other sale or other disposition of assets of any of the Debtors outside the ordinary course of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations, the Prepetition Term Loan Obligations, and the Prepetition Term Loan Adequate Protection and all of the foregoing are Paid in Full on the closing date of such sale.

(xi)    <u>Headings</u>.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

## 20. **<u>Final Hearing</u>**

(i)     The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [__], 2025, at [__:__ _.m.] (prevailing Central time) at the United States Bankruptcy Court for the Northern District of Texas.  The proposed Final Order shall be substantially the same as the Interim Order except that (a) those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (b) where appropriate, references to this Interim Order shall be changed to references to the Final Order.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(ii) <u>Final Hearing Notice</u>. As soon as reasonably practicable following entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (a) notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>") and (b) a copy of this Interim Order on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court by no later than [__:__ _.m.] (prevailing Central time) on [__], 2025, which objections shall be served, so that the same are received on or before such date by, (a) the Debtors, 8400 Belleview Drive, Suite 210, Plano, Texas 75024, Attn.: Kevin Nystrom (knystrom@alixpartners.com); (b) proposed co-counsel to the Debtors (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Joshua Sussberg, P.C. (jsussberg@kirkland.com), and Ross J. Fiedler (ross.fiedler@kirkland.com), (ii) Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.: Lindsey Blumenthal (lindsey.blumenthal@kirkland.com), and (iii) Gray Reed, 1601 Elm Street, Suite 4600, Dallas, Texas 75201 Attn.: Jason S. Brookner (jbrookner@grayreed.com), Amber M. Carson (acarson@grayreed.com),; (c) the Office of the United States Trustee for the Northern District of Texas, 1100 Commerce Street, Room 976, Dallas, Texas 75242, Attn.: Meredyth A. Kippes, Trial Attorney (meredyth.kippes@usdoj.gov); (d) counsel for the Prepetition Term Loan Secured Parties and the DIP Secured Parties, Paul Hastings LLP, 515 S. Flower Street, 25th Floor, Los Angeles, California 90071, Attn: Justin E. Rawlins (justinrawlins@paulhastings.com), 200 Park Ave, New York, New York

10166, Attn: Robert    Nussbaum    (robertnussbaum@paulhastings.com),    Matt    Friedrick (matthewfriedrick@paulhastings.com), and Paul Hastings LLP, 2001 Ross Ave., Suite 2700, Dallas, Texas 75201, Attn: Charles Persons (charlespersons@paulhastings.com); and (e) any statutory committee appointed in these Cases, and such objections shall be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Texas , in each case to allow actual receipt of the foregoing by no later than [__], 2025, at [__:__ _.m.] (prevailing Central time).

21. **<u>Retention of Jurisdiction</u>**.  This Court has and will retain exclusive jurisdiction to with respect to the interpretation, implementation, and enforcement this Interim Order according to its terms.

### # # # END OF ORDER # # #

Submitted by:

**GRAY REED**                                    **KIRKLAND & ELLIS LLP**
Jason S. Brookner (TX Bar No. 24033684)          **KIRKLAND & ELLIS INTERNATIONAL LLP**
Aaron M. Kaufman (TX Bar No. 24060067)           Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Amber M. Carson (TX Bar No. 24075610)            Ross J. Fiedler (*pro hac vice* pending)
1601 Elm Street, Suite 4600                      601 Lexington Avenue
Dallas, Texas 75201                              New York, New York 10022
Telephone:    (214) 954-4135                     Telephone:    (212) 446-4800
Facsimile:    (214) 953-1332                     Facsimile:    (212) 446-4900
Email:        jbrookner@grayreed.com             Email:        joshua.sussberg@kirkland.com
              akaufman@grayreed.com                            ross.fiedler@kirkland.com
              acarson@grayreed.com
                                                 -and-

                                                 Lindsey Blumenthal (*pro hac vice* pending)
                                                 333 West Wolf Point Plaza
                                                 Chicago, Illinois 60654
                                                 Telephone:    (312) 862-2000
                                                 Facsimile     (312) 862-2200
                                                 Email         lindsey.blumenthal@kirkland.com


*Proposed Co-Counsel for the Debtors*            *Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*                      *and Debtors in Possession*

**EXHIBIT D**

**Milestones**

(i) On the Petition Date, the Debtors shall file with the Bankruptcy Court: (a) a motion to approve the DIP Facility, (b) the Plan, (c) the Disclosure Statement, and (d) a motion approving the adequacy of the Disclosure Statement and solicitation of the Plan;

(ii) Within thirty (30) days of the Petition Date, the Bankruptcy Court shall have entered the Final Order;

(iii) Within thirty (30) days of the Petition Date, the Bankruptcy Court shall have entered an order approving the adequacy of the Disclosure Statement and the solicitation of the Plan (which order may be conditional approval of the Disclosure Statement), with the consent of the DIP Agent);

(iv) Within sixty (~~65~~70) days of the Petition Date, the Bankruptcy Court shall have entered an order confirming the Plan (which order may also be a final order approving the Disclosure Statement, with the consent of the DIP Agent); and

(v) Within seventy (7~~0~~5) days of the Petition Date, the Effective Date of the Plan shall have occurred.