Jason S. Brookner (TX Bar No. 24033684)
Aaron M. Kaufman (TX Bar No. 24060067)
Amber M. Carson (TX Bar No. 24075610)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:   (214) 953-1332
Email:        jbrookner@grayreed.com
                    akaufman@grayreed.com
                    acarson@grayreed.com

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900
Email:        joshua.sussberg@kirkland.com
                    ross.fiedler@kirkland.com

-and-

Lindsey Blumenthal (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200
Email:        lindsey.blumenthal@kirkland.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| ZIPS CAR WASH, LLC, *et al.*,[1] | ) Case No. 25-80069 (MVL) |
| Debtors. | ) (Jointly Administered) |

**DEBTORS' OBJECTION TO BVLY PARTNERS CLTZ TYVOLA, LLC AND**
**BVLY PARTNERS CLTZ WILKINSON, LLC'S MOTION FOR RELIEF FROM**
**THE AUTOMATIC STAY TO REMOVE THE DEBTOR FROM LEASED PREMISES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Zips Car Wash, LLC (3045); Express Car Wash Holdings, LLC (6223); Zips 2900 Wade Hampton, LLC (N/A); Zips 3107 N. Pleasantburg, LLC (N/A); Zips 6050 Wade Hampton, LLC (N/A); Zips Operating Holdings, LLC (2161); Zips Portfolio I, LLC (9999); Zips Portfolio II, LLC (1864); Zips Portfolio III, LLC (N/A) and Zips Portfolio IV, LLC (N/A).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 8400 Belleview Drive, Suite 210, Plano, Texas 75024.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this objection (this "Objection") to *BVLY Partners CLTZ Tyvola, LLC and BVLY Partners CLTZ Wilkinson, LLC's Motion for Relief from the Automatic Stay to Remove the Debtor from Leased Premises* [Docket No. 137] (the "Motion"):[2]

**Preliminary Statement**

1. BVLY Partners CLTZ Tyvola, LLC and BVLY Partners CLTZ Wilkinson, LLC (together, the "Movants"), landlords in the above-captioned chapter 11 cases, seek to lift the automatic stay to commence summary ejectment proceedings in North Carolina state court to remove the Debtors from two valuable premises. The central dispute is whether the leases at issue were validly terminated prepetition.

2. As an initial matter, the Debtors' chapter 11 case timeline and proximity to emergence largely render the concerns raised in the Motion moot. Under the final order approving the Debtors' DIP financing, the Debtors must obtain confirmation of a chapter 11 plan no later than April 21, 2025, and the plan must have an effective date of no later than April 30, 2025. By the time this Motion will be before the Court, the Debtors will be near emergence and the automatic stay will be lifted regardless. Nonetheless, the underlying issues are relevant with respect to the Debtors' ability to assume the Leases. By the time the Court hears this matter, the Debtors will have filed notices proposing to assume the Leases. In pursuit of a timely resolution of these issues and in support of the Debtors' goal to emerge as a stronger, reorganized Company, the Debtors seek to address both the Motion and the proposed assumption of the Leases

---

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Kevin Nystrom, Chief Transformation Officer of Zips Car Wash, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14] (the "First Day Declaration"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in either the Motion or the First Day Declaration, as applicable.

in this Objection by addressing the sole factual issue—whether the Leases were validly terminated prepetition.

3. The Debtors have been operating at the two locations subject to the Leases since 2019, and Movants have received every dime of rent they are due during that period. These locations are extremely valuable to the Debtors, on a stand-alone basis and from a strategic portfolio perspective. These locations are critical to the Debtors maintaining their footprint and presence in the Charlotte market, a region where the Debtors are planning to invest in moving forward as part of their growth strategy. Out of the ten locations in the Charlotte market, these locations are two of the higher performing locations and make up approximately thirty-six percent of the market's EBITDA (based on 2024 figures). These Leases are an important part of the Debtors' car wash portfolio and it would materially harm the Debtors' business if the Movants forced the Debtors from the locations.

4. The Movants, managed by Willow Oak Partners, LLC, which targets distressed properties, acquired the leased properties in July and August 2024, after news of the Debtors' financial struggles were made public, and have since sought every opportunity to call a technical default under the Leases to evict the Debtors from the leased properties. The current dispute is simply the latest aggressive attempt by the Movants to undercut the Debtors and snatch back valuable locations. Indeed, a few months ago, in the fall of 2024, the Movants sent the Debtors notice of default letters based on alleged failure to provide audited financials, despite the Movants' knowledge that the Debtors were in the process of obtaining signoff from their auditors to issue audited financial statements. At the same time, the Debtors cooperated with the Movants to provide unaudited financial statements while the audited statements were in process. The Movants capitalized on this technicality to tighten the screws on the Debtors by conditioning a waiver of

3

delivering the audited financial statements on increased rent payments. Nonetheless, the Debtors acquiesced given they had no other choice.

5. Movants' latest attempt, upon which the Motion is based, was a purported termination letter e-mailed to the Debtors on the day these chapter 11 cases were initiated, and which was not effective until after the Debtors filed. The Movants' actions do not comply with the letter or the spirit of the terms of the Leases. Moreover, as a Court of equity, and in recognition that equity abhors a forfeiture or windfall, this Court should deny the Movants' efforts to repossess valuable Leases for their own benefit and to the substantial detriment of the Debtors' estates and their reorganization efforts.

6. In their primary argument, the Movants assert that they provided, as required by the Leases, written notice of termination with such notice and termination being effective before the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Mot. ¶¶ 16–25. Alternatively, the Movants argue that if the automatic stay applies, the Leases were terminated prepetition and therefore may not be subject to assumption such that cause exists to lift the automatic stay. Mot. ¶¶ 26–28. The Movants fail to establish either point.

7. Under the terms of the Leases and the law, the Movant's purported termination could not have been effective until after the Debtors filed for bankruptcy, making that purported termination void. Regardless, lifting the stay would undoubtedly interfere with the Debtors' reorganization attempts by potentially evicting the Debtors from two very valuable sites. Lastly, in the absence of a negotiated resolution, the Movants have the ability to challenge the Debtors' assumption of the Leases through the chapter 11 process without the need for state court proceedings.

4

8. The Movants thus fail to establish that the automatic stay is inapplicable or meet the heavy burden required for the Court to lift the automatic stay for cause. Accordingly, and for the reasons set forth herein, the Motion should be denied.

9. In support of this Objection, the Debtors file contemporaneously herewith the *Declaration of Kevin Nystrom, Chief Transformation Officer of Zips Car Wash, LLC, In Support of Debtors' Objection to BVLY Partners CLTZ Tyvola, LLC and BVLY Partners CLTZ Wilkinson, LLC's Motion for Relief from the Automatic Stay to Remove the Debtor from Leased Premises* (the "Debtors' Declaration").

**Background**

10. The Movants are landlords to the Debtors for the premises located at 3401 Wilkinson Boulevard, Charlotte, NC 28208 and 1036 Tyvola Road, Charlotte, NC 28217 (together, the "Premises"). Since 2019, the Debtors have operated these locations under Leases that have been amended and supplemented over time.

11. On February 5, 2025, the Movants sent notices to the Debtors via e-mail purporting to terminate the Leases due to nonpayment of Base Monthly Rent, mere hours before the Debtors filed their petitions for relief under chapter 11 of the Bankruptcy Code. Decl. of David Head Supp. BVLY Partners CLTZ Tyvola, LLC and BVLY Partners CLTZ Wilkinson, LLC's Mot. for Relief from the Automatic Stay to Remove the Debtor from Leased Premises, ECF No. 137-1 (the "Movants' Declaration") Ex. 7. The Debtors disputed the notices, and, for the avoidance of doubt, wired payments for February Base Monthly Rent to the Movants that same evening. Movants' Decl. Ex. 11.

12. Starting at approximately 6:32 PM CT on February 5, 2025, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5

13. Movants' counsel followed up again on February 7, 2025, further arguing that they believed the Leases were terminated upon the Movants' sending of the February 5, 2025 e-mail at 12:26 PM CT. Movants' Decl. Ex. 12.

14. The Debtors responded on February 13, 2025, disputing that the Leases were validly terminated prepetition, including because the termination notices could not have resulted in a termination until 11:59 PM CT on February 5, 2025, at the earliest, even if they were otherwise valid and properly delivered, which the Debtors dispute. Movants' Decl. Ex. 13. As the Movants acknowledge, the Debtors filed for bankruptcy before 11:59 PM CT on February 5. Mot. ¶ 11. The Debtors also explained that the Leases remain an "unexpired lease of the debtor" as that term is used in section 365(a) of the Bankruptcy Code, and that the automatic stay set forth in section 362(a) of the Bankruptcy Code applies. Movants' Decl. Ex. 13.

15. Despite these correspondences, on February 27, 2025, the Movants filed the Motion seeking relief from the automatic stay to commence summary ejectment proceedings in North Carolina state court to remove the Debtors from the Premises.

16. On March 3, 2025, in continued compliance with the obligations of the Leases, the Debtors sent the Movants two payments for March Base Monthly Rent under the Leases. Debtors' Decl. Ex. 1. The Movants acknowledged receipt of these payments and have accepted both the February and March Base Monthly Rent payments, but have characterized those payments as "holdover rent." *Id*. Movants have received all rent payments due to them in full, for the entire period they have owned the leased Premises. Debtors' Decl. ¶ 15. The Debtors do not believe any amounts are currently owed under the Leases.

17. Following February 5, 2025 (the "Petition Date"), the Debtors have remained in possession of the Premises and have been operating their business there.

**Objection**

I. **The Automatic Stay Is a Fundamental Debtor Protection and Applies to the Leases.**

18. "The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs.), Ltd.*, 793 F.2d 1380, 1409 (5th Cir. 1986), *on reh'g*, 808 F.2d 363 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) (quoting H.R. Rep. 95-595, 340 (1977), U.S.C.C.A.N. 1978, p. 6296); *see also In re Halo Wireless, Inc.*, 684 F.3d 581, 586 (5th Cir. 2012) ("Congress considered the automatic stay one of the fundamental debtor protections provided by the bankruptcy laws when it was instituted." (internal citation omitted)). "The purposes of the bankruptcy stay under 11 U.S.C. § 362 'are to protect the debtor's assets, provide temporary relief from creditors, and further equity of distribution among the creditors by forestalling a race to the courthouse.'" *Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) (citing *GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir. 1985)); *see also In re Commonwealth Oil Refin. Co.*, 805 F.2d 1175, 1182 (5th Cir. 1986) ("The purpose of the automatic stay is to give the debtor a 'breathing spell' from his creditors, and also, to protect creditors by preventing a race for the debtor's assets." (citation omitted)). Or, as stated by the Fifth Circuit, the stay "prevent[s] a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *Hunt v. Bankers Tr. Co.*, 799 F.2d 1060, 1069 (5th Cir. 1986); *see also Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982) ("The purpose of the automatic stay is to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the

7

debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.").

19. "The stay insures that the debtor's affairs will be centralized, initially in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another." *In re Fowler*, 259 B.R. 856, 858 (Bankr. E.D. Tex. 2001) (quoting *Fid. Mortg. Inv'rs v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir. 1976)). In light of the purpose of the automatic stay, its scope is interpreted very broadly, and exceptions are interpreted narrowly. *In re Gasprom, Inc.*, 500 B.R. 598, 606 (B.A.P. 9th Cir. 2013). The automatic stay applies to an "action or proceeding against the debtor[.]" 11 U.S.C. § 362(a)(1).

20. It is undisputed that the automatic stay applies to property of the Debtors' estates; however, the Movants argue that the Leases are not property of the bankruptcy estate because they were allegedly terminated prepetition, therefore the automatic stay is inapplicable. Contrary to such arguments, any alleged termination of the Leases occurred postpetition and the Leases are property of the Debtors' estates. The Leases thus fall within the ambit of the Bankruptcy Code's automatic stay provision.

    **A.**    **The Movants Cannot Establish That Either Notice or Termination Occurred Prior to the Entrance of the Automatic Stay.**

21. Movants bear the burden on their Motion for relief from the automatic stay. *See In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990); *In re Tr.*, 526 B.R. 668, 673–74 (Bankr. N.D. Tex. 2015) (citing *Sonnax Indus.*, 907 F.2d at 1285).

22. It is undisputed that the Movants sent their e-mail purporting to terminate the Leases at 12:26 PM CT, February 5, 2025, and that the Debtor Zips Car Wash, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code at approximately 6:42 PM CT the same day. It is also undisputed that the Debtors received the required physical

8

copy of the purported termination by FedEx the next day, on February 6, 2025. In order to prevail on their argument, and strip the leased Premises from the Debtors' estates, the Movants must establish **both** that (a) the purported termination was effective the moment notice was effective; *and* (b) notice was effective under the Leases before 6:42 PM CT on February 5, 2025. The Movants cannot establish either required point.

23.    *First*, the Leases do not provide, as they must for the Movants to prevail, that termination occurs the moment notice is effective. To argue otherwise, the Movants cite to section 15.2.1 of the Leases, which provides that, after an uncured default landlord may "[t]erminate this Lease by giving written notice of termination to Tenant, in which event Tenant immediately shall surrender the Premises to Landlord." Leases § 15.2.1; Mot. ¶ 22. The Movants conflate the timing of surrender (relative to termination) and the timing of termination (relative to notice). Such timing is not the same. In fact, the Movants' own notices of default dated February 5, 2025 distinguished between the two. In the notices, the Movants purport to terminate the Leases "effective immediately," while demanding the Debtors surrender the Premises no later than February 19, 2025, a full two weeks later. Movants' Decl. Ex. 7. Section 15.2.1 of the Leases states that the landlord has the right to demand surrender "immediately" upon termination, but it does not state that termination occurs immediately upon notice. Instead, it says landlord may "[t]erminate this Lease by giving written notice." Leases § 15.2.1. If the parties had intended to say "terminate immediately upon notice," they would have. Instead, the Leases are silent as to the specific temporal relationship between notice and termination. As explained below, the *Restatement (Second) of Property: Landlord and Tenant* (the "<u>Restatement</u>") fills that silence: "[i]n the case where the event gives one party an option to terminate the lease, the termination

9

occurs one minute before midnight on the date the other party receives notice that the option has been exercised." *Restatement (Second) of Property, Land. & Ten.* § 1.7 (1977).

24. **Second**, the Movants cite to section 18 of the Leases in support of their argument that notice was effective the *moment* their e-mail was received. Mot. ¶ 22. Again, the Leases say no such thing. Section 18 of the Leases states:

### 18. NOTICES

All notices, requests, or demands herein provided to be given or made, or which may be given or made by either party to the other (excluding Emergencies), shall be given or made only in writing in the English language and shall be deemed to have been duly given:

> (i) upon delivery, or if delivery is rejected when delivery was attempted, of U.S. Certified Mail, properly addressed, postage prepaid with return receipt requested; or
>
> (ii) upon delivery, or if delivery is rejected when delivery was attempted, when sent via overnight or express mail courier, properly addressed and postage prepaid; or
>
> (iii) when delivered personally at the address set forth below, or to any agent of the party to whom notice is being given, or if delivery is rejected when delivery was attempted; or
>
> (iv) via facsimile transmission on a machine that prints the date and time of transmission on the notice or
>
> (v) by e-mail, and if so sent, (a) the subject line of the e-mail shall state "URGENT: NOTICE TO [LANDLORD] [TENANT]" (or substantially similar thereto) and (b) followed within one (1) business day by a copy sent by a method prescribed in (i), (ii) or (iv) above.

Notwithstanding the above-prescribed methods of delivery, actual receipt of written notice by a party designated below shall constitute notice given in accordance with this Lease on the date received, unless deemed earlier given pursuant to the foregoing methods of delivery.

25. Section 18(v) of the Leases provides that notice may be given by e-mail with the requirement that it be followed by a hard copy or fax. Leases § 18. Section 18(v) of the Leases, however, does not specify when notice via e-mail is "deemed to have been duly given." If the

10

parties intended to say that notice shall be deemed effective "upon delivery of an e-mail," they could have.  Instead, section 18(v) of the Leases states that notice "shall be deemed to have been duly given . . . ***by*** e-mail, ***and*** if so sent . . . ***followed within one (1) business day by*** a copy sent by a method prescribed in (i), (ii) or (iv) above." Leases § 18 (emphasis added).  Under the plain language of this provision, e-mail notice is not effective unless and until it is followed by one of the methods prescribed above.  The enumerated method Movants employed, overnight mail courier, is itself effective "upon delivery," which occurred ***after*** the automatic stay was in place, on February 6, 2025.  *Id.*; Movants' Decl. Ex. 8.  Thus, when the automatic stay became effective, proper and timely notice had not yet occurred under section 18(v) of the Leases.  Even if e-mail notice were to be retroactively "deemed to have been made" at the time the email was sent, this ***could not happen*** under the plain language of section 18(v) of the Leases ***until*** the hard-copy requirement in that section was completed.  Here, it is beyond dispute that the automatic stay was already in place when the hard-copy requirement in section 18(v) of the Leases was completed.  Thus, notice was not completed prepetition under section 18(v) of the Leases.  The stay exists to prevent a postpetition event, like delivery of the hard copy here, from causing the termination of the Debtor's property interests under the Leases.

26.     Movants alternatively argue that notice should be deemed effective when the Debtor actually received the e-mail.  However, section 18 of the Leases does not state that actual notice is effective "upon delivery," as it does for certified mail or express courier.  Instead, it says "actual receipt of written notice by a party designated below shall constitute notice given in accordance with this Lease ***on the date received***." Leases § 18 (emphasis added).  The decision to use this language in the same section of the Leases in which the parties specified that other forms of notice were effective "upon delivery" and "when delivered" supports the reading that actual

11

notice is deemed effective one minute before midnight ***on the date received***, consistent with the *Restatement*.

27. The Movants cannot establish that effective notice occurred earlier than "on the date received." Leases § 18. Nor can they establish that termination occurred earlier than "one minute before midnight on the date the [Debtor] receive[d] notice." *Restatement (Second) of Property, Land. & Ten.* § 1.7 (1977). On the other hand, it is clear that the automatic stay arises and becomes effective no later than the moment a debtor files for bankruptcy. In this case, that occurred at approximately 6:42 PM CT on February 5, 2025. The Movants cannot carry their burden to show that notice or termination occurred prepetition.

**B.  Because the Movants Cannot Establish That Notice or Termination Occurred Prepetition, the Court Should Follow the *Restatement*'s Approach.**

28. Since the Movants cannot establish, based on the language of the Leases, that either notice or termination occurred prepetition, the Movants cannot carry their initial burden, and the Court should deny the Motion. *See In re Sonnax*, 907 F.2d at 1285 ("If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."); *In re Boodrow*, 126 F.3d 43, 48 (2d Cir. 1997) ("[A] bankruptcy court should deny relief from the stay if the movant fails to make an initial showing of cause." (internal quotations omitted)); *In re Tr.*, 526 B.R. at 673–74 (citing *In re Sonnax*, 907 F.2d at 1285). However, should further analysis be necessary, the Court should adopt the approach set forth in the *Restatement*. According to the *Restatement*, "[i]n the case where the event gives one party an option to terminate the lease, the termination occurs one minute before midnight on the date the other party receives notice that the option has been exercised." *Restatement (Second) of Property, Land. & Ten.* § 1.7 (1977).

29. The Movants cite *Hedrick v. Rains*, 344 N.C. 729, 729 (N.C. 1996), a two sentence *per curiam* opinion, for the proposition that "[t]he North Carolina Supreme Court has held that Restatements of the Law are not determinative of North Carolina law unless that court has expressly adopted a provision therefrom." Mot. ¶ 20. While that proposition is true, it is far from a prohibition on the use of the *Restatement* as persuasive where North Carolina law is silent.

30. Indeed, North Carolina appellate courts, including the North Carolina Supreme Court, regularly follow the *Restatement*. *See e.g.*, *Kent v. Humphries*, 303 N.C. 675, 678 (N.C. 1981) (overruling existing North Carolina law to adopt a rule set forth in the *Restatement*); *Fairway Outdoor Ad. v. Edwards*, 678 S.E.2d 765, 769–70 (N.C. App. 2009) (citing the *Restatement* for an exception to a general rule under North Carolina law); *Boyer v. Agapion*, 264 S.E.2d 364, 367–68 (N.C. App. 1980) (adopting the rule in the *Restatement* to resolve a split in authority); *Rigsbee v. Special Flowers, Inc.*, 198 N.C. App. 703, at *5 (N.C. App. 2009) (citing *Boyer*'s agreement with the *Restatement*).

31. Here, neither party has been able to locate a case applying North Carolina law that determines the specific hour of the day a purported lease termination is deemed effective where, as here, the Leases provide no clear answer. *See generally* Mot. Section 1.7 of the *Restatement* is directly on point:

> In the case where the event gives one party an option to terminate the lease, the termination occurs one minute before midnight on the date the other party receives notice that the option has been exercised.

*Restatement (Second) of Property, Land. & Ten.* § 1.7 (1977).

32. Assuming the notices were otherwise valid and properly delivered on February 5, 2025, which the Debtor disputes, they would not have resulted in a termination until 11:59 PM CT

13

on February 5, 2025, at the earliest. As the Movants acknowledge, such time is after the Petition Time.

33. Because nothing in the Leases or existing North Carolina case law provides a more specific rule, the Court should look to the *Restatement*. This result is equitable and would further the public policy of avoiding a race by landlords to strip a debtor of its property rights in the hours before a filing. *In re Missionary Baptist Found. of Am., Inc.*, 796 F.2d 752, 764 (5th Cir. 1986) (characterizing attempts by creditors to terminate financial arrangements on the eve of a bankruptcy filing and apply certain assets as "a perfect example of the sort of 'last minute grab' that Congress attempted to prevent in the automatic stay provisions of 11 U.S.C. § 362." (citation omitted)).

34. Under the *Restatement* rule, any purported termination of the Leases occurred postpetition and the Leases remain property of the Debtors' estates. The Leases thus fall within the ambit of the Bankruptcy Code's automatic stay provision.

## II. The Movants Have Not Established Cause for Relief from the Automatic Stay.

35. Movant's entire alternative request for relief from the automatic stay is premised on the incorrect argument that the Leases were validly terminated prepetition. Because they were not, as demonstrated above, the Movants are in the same position as the Debtors' numerous other landlords, and no cause exists to lift the automatic stay. *See In re Comdisco*, 271 B.R. 273, 277 (Bankr. N.D. Ill. 2002) ("The automatic stay almost always delays litigants. That, after all, is its purpose, and the reason they call it a 'stay.'").

36. Section 362(d)(1) of the Bankruptcy Code provides that a court shall grant relief from the automatic stay "for cause." 11 U.S.C. § 362(d)(1). The Bankruptcy Code, however, does not define "cause." *See, e.g.*, *In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th Cir. 1998) ("Because

14

[Section] 362 does not offer guidance as to what constitutes 'cause,' reviewing courts must determine whether cause exist[s] on a case-by-case basis."); *In re Mendoza*, 111 F.3d 1264, 1271 (5th Cir. 1997) ("The Bankruptcy Act does not specify what constitutes cause to modify a stay, other than 'lack of adequate protection of an interest in property of such party in interest.'").

37. Courts in this jurisdiction apply relevant factors from various tests when determining whether cause exists to lift the stay. *See In re Choice ATM Enters., Inc.*, No. 14-44982, 2015 WL 1014617, at *4 (Bankr. N.D. Tex. Mar. 4, 2015) (explaining that "cases have relied on a mixture of factors" from at least two tests and that courts identify and use "the factors appropriate to the circumstances of the case"). One such test (the "Three Factor Test") considers "whether lifting the stay will result in any great prejudice to the debtor or the bankruptcy estate, whether any hardship to a nondebtor of continuation of the stay outweighs any hardship to [the] debtor, and whether the creditor has a probability of prevailing on the merits of the case." *In re Kao*, No. 15-31193, 2015 WL 9412744, at *2 (Bankr. S.D. Tex. Dec. 21, 2015) (citing *In re Namazi*, 106 B.R. 93, 94 (Bankr. E.D. Va. 1989)); *see also BDA Design Grp., Inc. v. Official Unsecured Creditors' Comm.*, No. 3:13-01568, 2013 WL 12100467, at *5 (N.D. Tex. Sept. 2, 2013) (citing the Three Factor Test to determine whether to lift the automatic stay); *In re Choice ATM Enters.*, No. 14-44982, 2015 WL 1014617, at *3 ("Before this court can lift the Automatic Stay, it must weigh the hardships to the parties and the goals of the Bankruptcy Code."); *Mooney v. Gill*, 310 B.R. 543, 546 (N.D. Tex. 2002) ("The bankruptcy court must balance the hardships of the parties and base a decision on whether to modify the automatic stay on the degree of hardship involved and the goals of the Bankruptcy Code.").

15

38. A second, prevalent test considers the twelve "*Sonnax* factors" that may be relevant when determining whether cause exists to lift the automatic stay to allow litigation to proceed in another forum, including:

    (1)    whether relief would result in a partial or complete resolution of the issues;

    (2)    the lack of any connection with or interference with the bankruptcy case;

    (3)    whether the other proceeding involves the debtor as a fiduciary;

    (4)    whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

    (5)    whether the debtor's insurer has assumed full responsibility for defending the action;

    (6)    whether the action primarily involves third parties;

    (7)    whether litigation in another forum would prejudice the interests of other creditors;

    (8)    whether the judgment claim arising from the other action is subject to equitable subordination;

    (9)    whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

    (10)    the interests of judicial economy and the expeditious and economical resolution of litigation;

    (11)    whether the parties are ready for trial in the other proceeding; and

    (12)    impact of the stay on the parties and the balance of harms.

*In re Sonnax*, 907 F.2d at 1286; *see also In re Choice ATM Enters.*, No. 14-44982, 2015 WL 1014617, at *3 ("Some courts begin with the widely-applied twelve factors" when deciding whether to lift the automatic stay to allow litigation against the debtor to proceed in another forum). The initial burden of proof to show cause is on the movant. *See In re Sonnax*, 907 F.2d at 1285.

39. While the Movants argue in the alternative that cause exists to lift the stay because "'[c]ause' includes the debtor's inability to assume the lease pursuant to § 365(a) of the Bankruptcy Code," this argument hinges on the incorrect allegation that the Leases were terminated

16

prepetition. Mot. ¶ 26. As previously discussed, the Movants *did not* accomplish a termination of the Leases prepetition. *See* supra at Section I.B. Accordingly, the Movants fail to analyze the relevant tests courts in this jurisdiction use when determining whether cause exists to lift the stay and therefore fail to present any argument to satisfy their initial burden of proof to show cause.

## Conclusion

40. Granting the Motion to lift the stay will consume significant time and resources and detract from the Debtors' complex restructuring efforts. This is contrary to the principles underlying the Bankruptcy Code. Because the Movants cannot establish that the stay does not apply to the Leases nor that cause exists to lift the stay, the Motion should be denied.

[*Remainder of page intentionally left blank*]

WHEREFORE, for the foregoing reasons, the Debtors respectfully request that the Court deny the Motion.

Dated: March 26, 2025
Dallas, Texas

*/s/ Jason S. Brookner*
**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Aaron M. Kaufman (TX Bar No. 24060067)
Amber M. Carson (TX Bar No. 24075610)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com
akaufman@grayreed.com
acarson@grayreed.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
ross.fiedler@kirkland.com

-and-

Lindsey Blumenthal (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile (312) 862-2200
Email lindsey.blumenthal@kirkland.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**Certificate of Service**

      I certify that on March 26, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

      */s/ Jason S. Brookner*
      Jason S. Brookner