Jason S. Brookner (TX Bar No. 24033684)
Aaron M. Kaufman (TX Bar No. 24060067)
Amber M. Carson (TX Bar No. 24075610)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:     (214) 954-4135
Facsimile:     (214) 953-1332
Email:       jbrookner@grayreed.com
          akaufman@grayreed.com
          acarson@grayreed.com

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:       joshua.sussberg@kirkland.com
          ross.fiedler@kirkland.com

-and-

Lindsey Blumenthal (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:       lindsey.blumenthal@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

*Co-Counsel for the Debtors*
*and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ZIPS CAR WASH, LLC, *et al.*,[1] | ) |
| | ) Case No. 25-80069 (MVL) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

**NOTICE OF FILING OF SECOND AMENDED PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE THAT** on April 18, 2025, the United States Bankruptcy Court for the Northern District of Texas (the "Court") entered an order [Docket No. 366]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Zips Car Wash, LLC (3045); Express Car Wash Holdings, LLC (6223); Zips 2900 Wade Hampton, LLC (N/A); Zips 3107 N. Pleasantburg, LLC (N/A); Zips 6050 Wade Hampton, LLC (N/A); Zips Operating Holdings, LLC (2161); Zips Portfolio I, LLC (9999); Zips Portfolio II, LLC (1864); Zips Portfolio III, LLC (N/A) and Zips Portfolio IV, LLC (N/A). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 8400 Belleview Drive, Suite 210, Plano, Texas 75024.

(the "Confirmation Order"):  (a)  approving the *Disclosure Statement for the Amended Joint Plan of Reorganization of Zips Car Wash, LLC, and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), and (b) confirming the *Third Amended Joint Plan of Reorganization of Zips Car Wash, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan").

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Confirmation Order, the Plan Supplement, as defined in the Plan, means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed with the Bankruptcy Court, and any additional documents Filed as amendments to the Plan Supplement, including the following, as applicable:  (a) the New Organizational Documents; (b) the Exit Facilities Documents; (c) to the extent known, the identities of the members of the New Board; (d) the Assumed Executory Contracts and Unexpired Leases Schedule; (e) the Rejected Executory Contracts and Unexpired Leases Schedule; (f) the Schedule of Retained Causes of Action; (g) the Restructuring Transactions Memorandum; and (h) the GUC Trust Agreement.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date or such other date as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Court's order authorizing and approving the Assumption and Rejection Procedures [Docket No. 192], Parties objecting to a proposed assumption or assumption and assignment (including as to the cure amount), as applicable, of an Agreement must file and serve a written objection[2] so that such objection is filed with the Court and actually received by the Objection Service Parties **no later than fourteen days after** the date the Debtors file and serve the relevant Assumption Notice and promptly serve such objection on the Objection Service Parties.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Confirmation Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, free of charge, you should contact Kroll Restructuring Administration LLC, the claims an noticing agent retained by the Debtors in these chapter 11 cases (the "Claims and Noticing Agent"), by:  (a) writing via (i) first class mail, to Zips Car Wash, LLC, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232 or (ii) electronic mail to ZipsCarWashInfo@ra.kroll.com (with "Zips Car Wash Solicitation Inquiry" in the subject line); or (b) calling the Debtors' restructuring hotline at (888) 343-1371 (U.S./Canada toll free) or +1 (646) 876-2491 (international toll).  You may also obtain copies of any pleadings filed in these chapter 11 cases (a) for a fee via PACER at: http://pacer.psc.uscourts.gov; or (b) at no charge from the Claims and Noticing Agent by accessing the Debtors' restructuring website at https://cases.ra.kroll.com/ZipsCarWash.

---

[2]   An objection to the assumption of any particular Agreement listed on an Assumption Notice shall not constitute an objection to the assumption of any other Agreement listed on such Assumption Notice.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AND NOTICING AGENT.**

Dated:  April 30, 2025
Dallas, Texas

*/s/ Jason S. Brookner*

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Aaron M. Kaufman (TX Bar No. 24060067)
Amber M. Carson (TX Bar No. 24075610)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:      (214) 954-4135
Facsimile:      (214) 953-1332
Email:          jbrookner@grayreed.com

                akaufman@grayreed.com
                acarson@grayreed.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ross J. Fiedler (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Email:          joshua.sussberg@kirkland.com
                ross.fiedler@kirkland.com

-and-

Lindsey Blumenthal (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile       (312) 862-2200
Email           lindsey.blumenthal@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

*Co-Counsel for the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on April 30, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Jason S. Brookner*

Jason S. Brookner

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ZIPS CAR WASH, LLC, *et al.*,[1] | ) | Case No. 25-80069 (MVL) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**SECOND AMENDED PLAN
SUPPLEMENT FOR THE DEBTORS' THIRD AMENDED
JOINT PLAN OF REORGANIZATION OF ZIPS CAR WASH, LLC AND ITS
DEBTOR AFFILIATES PUSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**Table of Contents**[2]

| Exhibit | Description |
|---------|-------------|
| A | New Organizational Documents |
| B | Exit Facilities Documents |
| C | Identities of Members of the New Board |
| D | Assumed Executory Contracts and Unexpired Leases Schedule |
| E | Rejected Executory Contracts and Unexpired Leases Schedule |
| F | Schedule of Retained Causes of Action |
| G | Restructuring Transactions Memorandum |
| H | GUC Trust Agreement |

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Zips Car Wash, LLC (3045); Express Car Wash Holdings, LLC (6223); Zips 2900 Wade Hampton, LLC (N/A); Zips 3107 N. Pleasantburg, LLC (N/A); Zips 6050 Wade Hampton, LLC (N/A); Zips Operating Holdings, LLC (2161); Zips Portfolio I, LLC (9999); Zips Portfolio II, LLC (1864); Zips Portfolio III, LLC (N/A); and Zips Portfolio IV, LLC (N/A).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 8400 Belleview Drive, Suite 210, Plano, Texas 75024.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Order (I) Approving the Debtors' Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Reorganization of Zips Car Wash, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Order").

## **Exhibit A**

### **New Organizational Documents**

This **Exhibit A** includes the following New Organizational Documents:

1. Amended and Restated Limited Liability Company Agreement of Zips Car Wash Holdings, LLC

The following New Organizational Documents were previously filed at Docket No. 360.

1. Limited Partnership Agreement of Wash & Wax Group LP
2. Amended and Restated Limited Partnership Agreement of Wash & Wax Group LP
3. Limited Liability Company Agreement of Wash & Wax Holdings LLC
4. Limited Liability Company Agreement of Wash & Wax Intermediate LLC
5. Limited Liability Company Agreement of Wash & Wax Systems LLC

## **Exhibit A**

**Amended and Restated Limited Liability Company Agreement of Zips Car Wash Holdings, LLC**

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
## ZIPS CAR WASH HOLDINGS, LLC

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") of ZIPS CAR WASH HOLDINGS, LLC, a Delaware limited liability company (the "**Company**"), effective as of April 30, 2025 (the "**Effective Date**"), is entered into by Wash & Wax Systems LLC, a Delaware limited liability company, as the sole member of the Company (the "**Member**").

## RECITALS

A.    WHEREAS, the Company was formed as a limited liability company on April 23, 2025, by the filing of a Certificate of Formation (the "**Certificate of Formation**") with the Secretary of State of the State of Delaware pursuant to and in accordance with the Delaware Limited Liability Company Act (as amended from time to time, the "**Act**");

B.    WHEREAS, Zips Car Wash, LLC, a Delaware limited liability company, the initial member of the Company (the "**Initial Member**") entered into that certain Limited Liability Company Agreement of the Company, dated April 23, 2025, which Limited Liability Company Agreement is amended and restated by the Member as set forth in this Agreement made effective as of the Effective Date;

C.    WHEREAS, pursuant to that certain Contribution and Exchange Agreement, by and between the Initial Member and the Member, dated on or about the date hereof, the Initial Member contributed all of the issued and outstanding equity interests of the Company to the Member; and

D.    WHEREAS, the Member agrees that the membership in and management of the Company shall be governed by the terms set forth herein.

E.    NOW, THEREFORE, in consideration of the agreements and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Member agrees as follows:

## AGREEMENT

**Section 1**    <u>Name</u>.  The name of the Company is Zips Car Wash Holdings, LLC.

**Section 2**    <u>Formation</u>.  The Company was formed as a limited liability company on April 23, 2025, by the filing of the Certificate of Formation with the Secretary of State of the State of Delaware pursuant to and in accordance with the Act.

**Section 3**    <u>Purpose</u>.  The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities necessary or incidental thereto.

**Section 4**  **Principal Office; Registered Agent and Office**.

(a) <u>Principal Office</u>.  The location of the principal office of the Company shall be such location as the Member may from time to time designate.

(b) <u>Registered Agent and Office</u>.  The registered agent of the Company for service of process in the State of Delaware and the registered office of the Company in the State of Delaware shall be as designated in the Certificate of Formation.

**Section 5**  **Term**.  The Company shall continue in existence unless and until the Company is dissolved and terminated in accordance with <u>Section 14</u>.

**Section 6**  **Certificates**.  The Member or the Officers (as defined below) of the Company shall have the authority to execute, deliver and file any certificates (and any amendments or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

**Section 7**  **Members**.

(a) <u>Member</u>.  The Member owns 100% of the membership interests in the Company.  The name and the business, residence or mailing address of the Member are as follows:

| Name | Address |
|------|---------|
| Wash & Wax Systems LLC | 810 Seventh Avenue, 26th Floor, New York, NY 10019 |

(b) <u>Additional Members</u>.  One or more additional members may be admitted to the Company with the prior written consent of the Member.  Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members.  Each additional member shall execute and deliver a joinder or counterpart to this Agreement, as necessary.

(c) <u>Membership Interests; Certificates</u>.  The Company will not issue any certificates to evidence ownership of the membership interests.

**Section 8**  **Management**.

(a) <u>Authority; Powers and Duties of the Member</u>.  The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company.  Any action taken by the Member shall constitute the act of and serve to bind the Company.  Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement.  The Member shall have all rights and powers of a manager under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement, including but not limited to executing, delivering and filing, or causing the execution,

2

delivery and filing of, all certificates (and any amendments or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware and all certificates (and any amendments or restatements thereof) necessary for the Company to qualify to do business in any other jurisdiction in which the Company may wish to conduct business. The Member is hereby designated as an "authorized person" within the meaning of the Act.

(b)     Election of Officers; Delegation of Authority. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "**Officer**"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member. An Officer may be so removed for any reason or no reason. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of any Officer set forth in this Agreement and any instrument designating such Officer and the authority delegated to him or her.

**Section 9     Limited Liability of Member**. Except as otherwise required in the Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being the Member or participating in the management of the Company.

**Section 10     Indemnification**. To the fullest extent permitted under the Act, the Member (irrespective of the capacity in which it acts) shall be entitled to indemnification and advancement of expenses from the Company for and against any loss, damage, claim or expense (including attorneys' fees) whatsoever incurred by such person relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence or gross negligence) performed or omitted by such person on behalf of the Company; provided, however, that any indemnity under this Section 10 shall be provided out of and to the extent of Company assets only, and neither the Member nor any other person shall have any personal liability on account thereof.

**Section 11     Capital Contributions**. The Member hereby agrees to contribute to the Company such cash, property or services as determined by the Member.

**Section 12     Tax Status**. The fiscal and taxable year of the Company will be the calendar year. The Company intends to be treated as a disregarded entity for U.S. federal income tax purposes and will not make an election to be treated as a corporation for U.S. federal income tax purposes.

**Section 13     Distributions**. Distributions shall be made to the Member at the times and in the amounts determined by the Member. Notwithstanding any provision in this Agreement to the contrary, the Company shall not, and shall not be permitted to, make any distribution to the Member on account of its interest in the Company if such distribution would violate Section 18-607 of the Act or other applicable law.

**Section 14**      **Dissolution; Liquidation**.

(a)      The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member or (ii) any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act.

(b)      Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs, and the Member shall promptly liquidate the business of the Company.  During the period of the winding up of the affairs of the Company, the rights and obligations of the Member under this Agreement shall continue.

(c)      In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied as follows:  (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and (ii) thereafter, to the Member.

(d)      Upon the completion of the winding up of the Company, the Member or duly authorized Officer shall file a Certificate of Cancellation in accordance with the Act.

**Section 15**      **Miscellaneous**.

(a)      Amendments.  Amendments and other modifications or supplements to this Agreement may be made only with the consent of the Member.

(b)      Creditors.  None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any creditors of the Company.

(c)      Governing Law.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied.

(d)      Severability.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable law, such provision shall survive to the extent it is not so held, and the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.

*[The remainder of this page is intentionally left blank.]*

4

IN WITNESS WHEREOF, the undersigned has executed this Agreement to be effective as of the date first above written.

**<u>MEMBER</u>:**

WASH & WAX SYSTEMS LLC


By: _____
Name: Peter Nani
Its:    Chief Executive Officer

*Being the sole Member of the Company*

## **Exhibit B**

**Exit Facilities Documents**

This **Exhibit B** includes the following Exit Facilities Document(s):

**Exhibit B(i)**:  New HoldCo Credit Agreement
**Exhibit B(ii)**:  New OpCo Credit Agreement

**<u>Exhibit B(i)</u>**

**New HoldCo Credit Agreement**

**AMENDED AND RESTATED HOLDCO CREDIT AGREEMENT**

**DATED APRIL 30, 2025 and**

**BY AND BETWEEN**

**WASH & WAX HOLDINGS LLC**
**as Borrower,**

**THE LENDERS WHICH ARE PARTY HERETO**

**AND**

**BRIGHTWOOD LOAN SERVICES LLC**
**as Administrative Agent**

## <u>TABLE OF CONTENTS</u>

**Page**

### ARTICLE I DEFINITIONS AND OTHER TERMS

| | | |
|---|---|---|
| 1.1 | Defined Terms | 2 |
| 1.2 | Other Interpretive Provisions | 28 |
| 1.3 | Accounting Terms; Payment Dates | 29 |
| 1.4 | References to Agreements, Laws, Etc | 29 |
| 1.5 | Times of Day | 29 |
| 1.6 | Interest Rates | 30 |

### ARTICLE II THE ADVANCES

| | | |
|---|---|---|
| 2.1 | The Advances | 30 |
| 2.2 | [Reserved] | 35 |
| 2.3 | Payments | 35 |
| 2.4 | Setoff; etc | 35 |
| 2.5 | Sharing | 36 |
| 2.6 | Fees | 36 |
| 2.7 | Lending Branch | 36 |
| 2.8 | Application of Payments and Collections | 36 |
| 2.9 | [Reserved] | 37 |
| 2.10 | Defaulting Lenders | 37 |

### ARTICLE III CONDITIONS PRECEDENT

| | | |
|---|---|---|
| 3.1 | Conditions Precedent to Effectiveness | 38 |
| 3.2 | Conditions Precedent to All Advances | 41 |

### ARTICLE IV REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 4.1 | Organization; etc | 41 |
| 4.2 | Due Authorization | 41 |
| 4.3 | Subsidiaries | 42 |
| 4.4 | Validity of the Agreement | 42 |
| 4.5 | Financial Statements | 42 |
| 4.6 | Litigation; etc | 43 |
| 4.7 | Compliance with Law | 43 |
| 4.8 | ERISA Compliance | 43 |
| 4.9 | Title to Assets | 43 |
| 4.10 | Use of Proceeds | 43 |
| 4.11 | Governmental Regulation | 44 |
| 4.12 | Margin Stock | 44 |
| 4.13 | Investment Company Act | 44 |
| 4.14 | Accuracy of Information | 44 |
| 4.15 | Tax Returns; Audits | 44 |
| 4.16 | Environmental and Safety Regulations | 44 |
| 4.17 | Payment of Wages; Labor Matters | 45 |
| 4.18 | Intellectual Property | 45 |

4.19    Projections ................................................................................................................... 45
4.20    Solvency ....................................................................................................................... 46
4.21    No Material Adverse Occurrence ................................................................................ 46
4.22    [Reserved] .................................................................................................................... 46
4.23    Deposit Accounts ......................................................................................................... 46
4.24    [Reserved] .................................................................................................................... 46
4.25    [Reserved] .................................................................................................................... 46
4.26    Valid Liens ................................................................................................................... 46
4.27    Foreign Assets Control Regulations and Anti-Money Laundering .............................. 46
4.28    Patriot Act .................................................................................................................... 47
4.29    Insurance ...................................................................................................................... 47
4.30    SBA Matters ................................................................................................................. 47

## ARTICLE V CERTAIN AFFIRMATIVE COVENANTS

5.1     Financial Information; etc ............................................................................................ 47
5.2     Maintenance of Existence; etc ..................................................................................... 50
5.3     Maintenance of Properties ........................................................................................... 50
5.4     Payment of Liabilities .................................................................................................. 50
5.5     Compliance with Laws ................................................................................................. 50
5.6     Books and Records; Inspection Rights; etc .................................................................. 51
5.7     Insurance ...................................................................................................................... 51
5.8     ERISA ........................................................................................................................... 51
5.9     Post-Closing Requirements .......................................................................................... 52
5.10    [Reserved] .................................................................................................................... 52
5.11    [Reserved] .................................................................................................................... 52
5.12    Further Assurances ....................................................................................................... 52
5.13    SBA Matters ................................................................................................................. 52
5.14    OFAC; Patriot Act ....................................................................................................... 53
5.15    Sale-Leaseback Accounting Treatment ........................................................................ 53
5.16    Quarterly Lender Calls ................................................................................................. 53

## ARTICLE VI NEGATIVE COVENANTS

6.1     [Reserved] .................................................................................................................... 53
6.2     Limitations on Indebtedness ........................................................................................ 53
6.3     Liens ............................................................................................................................. 56
6.4     Sales of Assets ............................................................................................................. 58
6.5     Liquidations, Mergers and Consolidations .................................................................. 59
6.6     Investments .................................................................................................................. 59
6.7     Transactions with Affiliates ......................................................................................... 59
6.8     [Reserved] .................................................................................................................... 60
6.9     Amendment and Waiver ............................................................................................... 60
6.10    Restricted Payments ..................................................................................................... 60
6.11    Payments in Respect of Certain Indebtedness ............................................................. 61
6.12    Change in Business ...................................................................................................... 62
6.13    Changes in Accounting, Name and Jurisdiction of Organization ................................ 62
6.14    No Negative Pledges .................................................................................................... 62
6.15    Borrower's Holding Company Status ........................................................................... 62
6.16    Use of Proceeds ........................................................................................................... 63

## ARTICLE VII EVENTS OF DEFAULT

7.1    Events of Default ......................................................................................................... 63
7.2    Action If Event of Default ............................................................................................ 65
7.3    Remedies ...................................................................................................................... 66

## ARTICLE VIII THE ADMINISTRATIVE AGENT

8.1    Appointment and Authorization .................................................................................. 66
8.2    Power ............................................................................................................................ 67
8.3    Interest Holders ............................................................................................................ 67
8.4    Employment of Counsel; etc ........................................................................................ 67
8.5    Reliance ........................................................................................................................ 67
8.6    General Immunity ........................................................................................................ 68
8.7    Credit Analysis ............................................................................................................ 68
8.8    Administrative Agent and Affiliates ............................................................................ 69
8.9    Indemnification ............................................................................................................ 69
8.10  Security Documents ...................................................................................................... 69
8.11  Collateral Matters ......................................................................................................... 69
8.12  Action by the Administrative Agent ............................................................................. 70
8.13  Successor Administrative Agent ................................................................................... 71
8.14  Authorization to Enter into Intercreditor Agreements. ................................................ 71
8.15  Erroneous Payments ..................................................................................................... 71

## ARTICLE IX MISCELLANEOUS

9.1    Waivers, Amendments; etc ........................................................................................... 73
9.2    Payment Dates .............................................................................................................. 76
9.3    Notices .......................................................................................................................... 76
9.4    Costs and Expenses ...................................................................................................... 76
9.5    Indemnification ............................................................................................................ 76
9.6    Severability .................................................................................................................. 78
9.7    Headings ....................................................................................................................... 78
9.8    Governing Law ............................................................................................................. 78
9.9    Successors and Assigns ................................................................................................ 78
9.10  Execution in Counterparts ............................................................................................ 82
9.11  Several Liability ........................................................................................................... 82
9.12  Financial Information ................................................................................................... 82
9.13  Entire Agreement ......................................................................................................... 82
9.14  Other Relationships ...................................................................................................... 82
9.15  Consent to Jurisdiction ................................................................................................ 82
9.16  Waiver of Jury Trial ..................................................................................................... 83
9.17  USA Patriot Act ........................................................................................................... 83
9.18  Confidentiality ............................................................................................................. 83
9.19  Replacement of Lenders ............................................................................................... 84
9.20  [Reserved] .................................................................................................................... 84
9.21  Electronic Execution of Assignments and Certain Other Documents .......................... 84
9.22  [Reserved]. ................................................................................................................... 85

## ARTICLE X TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    Taxes ........................................................................................................................... 85
10.2    [Reserved] .................................................................................................................... 89
10.3    [Reserved] .................................................................................................................... 89
10.4    Increased Costs ........................................................................................................... 89
10.5    [Reserved] .................................................................................................................... 90
10.6    Mitigation Obligations; Replacement of Lenders ...................................................... 90
10.7    Survival ....................................................................................................................... 90
10.8    Amendment and Restatement ..................................................................................... 90

SCHEDULE I            -    Lenders/Commitments
SCHEDULE I-A          -    Units
SCHEDULE II           -    Specified Units
SCHEDULE III          -    Sunset Units
SCHEDULE 4.17         -    Labor Matters
SCHEDULE 4.23         -    Deposit Accounts
SCHEDULE 6.2(a)       -    Existing Indebtedness
SCHEDULE 6.2(s)       -    Existing Letters of Credit
SCHEDULE 6.3          -    Existing Liens
SCHEDULE 6.6          -    Permitted Investments
SCHEDULE 6.7          -    Affiliate Transactions
SCHEDULE 9.3          -    Administrative Agent's Office; Certain Addresses for Notices
ANNEX I               -    List of Jurisdictions in which the Borrower is Qualified to Do Business
ANNEX II              -    List of Subsidiaries; Jurisdictions of Incorporation and Qualification to do Business
EXHIBIT A             -    Form of Term Note
EXHIBIT B             -    [Reserved]
EXHIBIT C             -    [Reserved]
EXHIBIT D             -    Form of Notice of Borrowing
EXHIBIT E             -    Form of Assignment and Assumption Agreement
EXHIBIT F             -    Compliance Certificate

## AMENDED AND RESTATED HOLDCO CREDIT AGREEMENT

This AMENDED AND RESTATED HOLDCO CREDIT AGREEMENT (this "Agreement") effective as of the 30th day of April, 2025, by and between **WASH & WAX HOLDINGS LLC** ("Borrower"), the Lenders now or hereafter parties hereto, and **BRIGHTWOOD LOAN SERVICES LLC**, in its capacity as Administrative Agent for the Lenders.

**WHEREAS**, on February 5, 2025 (the "Petition Date"), Zips and certain of its Affiliates and Subsidiaries (each, a "Debtor" and, collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court");

**WHEREAS**, on February 5, 2025, the Debtors filed the Joint Plan of Reorganization of Zips and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (as amended, supplemented or modified from time to time, the "Plan of Reorganization") and related disclosure statement with the Bankruptcy Court;

**WHEREAS**, on April 21, 2025, the Bankruptcy Court entered a confirmation order confirming the Plan of Reorganization (the "Confirmation Order") and on April 30, 2025, the Plan of Reorganization went effective (the "Plan Effective Date");

**WHERAS**, in connection with the Plan of Reorganization, on the Plan Effective Date, the Borrower acquired substantially all of the Debtors' assets (other than certain assets of the Debtors that were transferred to the Debtors' unsecured creditors), as set forth in the Plan of Reorganization, in exchange for, among other things, that certain note and security agreement issued by the Borrower, dated as of the Plan Effective Date (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Existing Holdco Note"), in the original principal amount of $150,000,000 (the "Existing Holdco Obligations");

**WHERAS**, pursuant to the Plan of Reorganization, the Lenders acquired all of the Debtors' right title and interest in and to the Existing Holdco Note;

**WHEREAS**, in connection with the Plan Effective Date, the Borrower has asked the Lenders to provide the Borrower with a term loan facility in an aggregate principal amount of $150,000,000, which will consist solely of the converted Existing Holdco Obligations;

**WHEREAS**, the Lenders are willing to make the foregoing term loan available to the Borrower, subject to the terms and conditions set forth in this Agreement and the Plan of Reorganization; and

**WHEREAS**, pursuant to and in accordance with the terms of the Plan of Reorganization, each Lender will exchange a portion of its Existing Holdco Obligations for Initial Term Loans on a pro-rata basis;

**NOW, THEREFORE**, in consideration of the terms and conditions contained herein, and of any loans or extensions of credit heretofore, now or hereafter made to or for the benefit of the Borrower by the Lenders and the Administrative Agent, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND OTHER TERMS

**1.1** <u>**Defined Terms.**</u> The following terms when used in this Agreement shall, except where the context otherwise requires, have the following meanings:

"<u>ABL Agent</u>" means the administrative agent and/or collateral agent for the ABL Lenders under the ABL Facility and any successor, refinancing or replacement thereof.

"<u>ABL Facility</u>" has the meaning given to such term the Opco Credit Agreement.

"<u>ABL Lenders</u>" means the lenders under the ABL Facility and any successor, refinancing or replacement thereof.

"<u>Acquisition</u>" means (whether by purchase, exchange, issuance of Equity Interests or Equity Interests Equivalents, merger, reorganization, joint venture or otherwise) any transaction, or any series of related transactions by which the Opco Borrower directly or indirectly (i) acquires any Person, which Person shall then become consolidated with the Opco Borrower in accordance with GAAP, (ii) acquires all or substantially all of the assets of any Person or any business, division or product line thereof or the acquisition of a portfolio of Real Property or leases of Real Property, (iii) acquires in excess of 50% of the Equity Interests or Equity Equivalents of any Person or otherwise causing such Person to become a Subsidiary of the Opco Borrower, or (iv) merges, consolidates or otherwise enters into any other business combination with any Person to effect any of the transactions referred to in clauses (i), (ii) or (iii) above.

"<u>Actual Tunnel Volume</u>" means, for any period, the aggregate volume of tunnel car washes at each Mature Unit for such period.

"<u>Administrative Agent</u>" means Brightwood Loan Services LLC, as Administrative Agent for the Lenders, or any successor Administrative Agent hereunder.

"<u>Administrative Questionnaire</u>" means an administrative questionnaire to be completed and provided to the Administrative Agent in form and substance as provided by the Administrative Agent.

"<u>Advance</u>" means one or more advances under the Term Loan Commitments.

"<u>Affiliate</u>" shall include, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with such Person. For purposes of this definition, a Person shall be deemed to control another Person if the controlling Person owns or controls directly or indirectly twenty percent (20%) or more of the shares of stock, other Equity Interests or Equity Interests Equivalents or voting powers of the controlled Person.

"<u>Aggregate Commitments</u>" means the Commitments of all Lenders.

"<u>Agreement</u>" means this Holdco Credit Agreement as originally executed and as amended, modified or supplemented from time to time.

"<u>Applicable Tax Rate</u>" means the highest combined individual federal, state and local tax rate for an individual living in New York City (taking into account the (a) effects of preferential rates on items of net taxable income that are taxed at long-term capital gain rates, (b) the assumed deductibility of state income tax from federal taxable income and (c) section 1411 of the Code).

"<u>Applicable Term Loan Percentage</u>" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the total Term Loan Commitments and the outstanding principal amount of the Term Loans represented by such Lender's Term Loan Commitment and outstanding principal

amount of the Term Loans owed to such Lender at such time.  If the Term Loan Commitments of each Lender have been terminated or if the Aggregate Commitments have expired, then the Applicable Term Loan Percentage of each Lender shall be determined based on the Applicable Term Loan Percentage of such Lender most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Term Loan Percentage of each Lender is set forth opposite the name of such Lender on **Schedule I** or in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 9.9(b).

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Borrower" has the meaning specified in the recitals hereto.

"Brightwood" means Brightwood Loan Services LLC and any Affiliate thereof.

"Business Day" means any day on which commercial banks and foreign exchange markets are open for business in New York, New York.

"Capital Expenditures" means, for any Person for any period for which the amount thereof is to be determined, without duplication, the aggregate amount of all expenditures, whether or not made with proceeds of Indebtedness, by such Person and its Subsidiaries during such period for any purchase or other acquisition of any asset which is required to be classified as a fixed or capital asset on the consolidated balance sheet of such Person prepared in accordance with GAAP, but excluding (a) expenditures that would otherwise qualify as Capital Expenditures made in connection with the replacement, substitution, restoration or repair of fixed or capital assets to the extent financed (i) from insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced, restored or repaired or (ii) with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (b) expenditures that would otherwise qualify as Capital Expenditures to the extent such expenditures constitute a reinvestment of Net Cash Proceeds (as defined in the Opco Credit Agreement) from Dispositions permitted pursuant to Section 6.4 and expenditures to the extent that such expenditure is substantially contemporaneously reimbursable (and in any event within 60 days after such expenditures) to the Opco Borrower or any of its Subsidiaries by a Person that is not a Opco Party or a Subsidiary thereof.

"Capital Lease" means, with respect to any Person, a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board) is required to be, classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligations" means, for any period for which the amount thereof is to be determined, any obligation of such Person to pay rent or other amounts under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Cash Rental Expense" means, for the relevant measurement period, all cash rental expense of the Opco Borrower and its Subsidiaries actually paid during such measurement period, determined on a consolidated and combined basis, incurred under any rental agreements or leases, other than obligations in

respect of any Capital Leases, calculated on a Pro Forma Basis; provided, that Cash Rental Expenses shall exclude (a) any common area maintenance expenses and (b) taxes; and provided, further, that for purposes of calculating Consolidated EBITDA such rental expenses paid in advance pursuant to clause (c) shall be deemed to be paid during the Test Period in which they would otherwise be due; and provided, further, rent that is deferred pursuant to an agreement shall be deemed paid on the date such rent arises or would be due and payable without giving effect to any agreement to defer such rent.

"Casualty Event" means any event that gives rise to the receipt by any Opco Party of any insurance proceeds (including business interruption insurance proceeds) or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Change in Law" means the occurrence, after the Closing Date, of any of the following:  (a) the adoption or taking effect of any law, order, policy, rule, regulation or treaty, (b) any change in any law, order, policy, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, regulations or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, regulations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the occurrence of any of the following: (i) any Person (together with its Affiliates), directly or indirectly, other than the Permitted Holders (and their respective Affiliates), owns more than greater than fifty percent (50%) of the Equity Interests and Equity Interests Equivalents of the Borrower, (ii) Borrower ceases to own and control, directly or indirectly, one hundred percent (100%) of the Equity Interests and Equity Interests Equivalents of Opco Holdings, (iii)  Opco Holdings ceases to own and control, directly or indirectly, one hundred percent (100%) of the Equity Interests and Equity Interests Equivalents of Opco Borrower or (iv) the occurrence of any "change of control" under the ABL Facility or the Opco Credit Agreement.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Closing Date" means April 30, 2025.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all present and future assets and properties of the Borrower, whether real or personal, tangible or intangible, in which Liens are granted or purported to be granted pursuant to the Security Documents; provided, that Collateral shall not include any Excluded Assets.

"Commitment" means, for each Lender, the aggregate amount of such Lender's commitment to fund Loans as set forth on **Schedule I**, as such amount may be modified from time to time pursuant to the terms hereof.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate in substantially the form set forth as **Exhibit F**, completed and signed by a Responsible Officer of the Borrower.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Amortization Expense" means the amount of amortization expense deducted in determining Consolidated Net Income.

"Consolidated Depreciation Expense" means the amount of depreciation expense deducted in determining Consolidated Net Income.

"Consolidated EBITDA" means, for any period for which the amount thereof is to be determined, an amount equal to Consolidated Net Income for such measurement period; plus (a) the following, without duplication, in each case the extent deducted in calculating such Consolidated Net Income:

(i) Consolidated Interest Expense during such period,

(ii) Consolidated Amortization Expense during such period,

(iii) Consolidated Depreciation Expense during such period,

(iv) Consolidated Tax Expenses paid or accrued during such period,

(v) [reserved],

(vi) (x) Transaction Expenses and (y)(a) costs, fees and expenses of the Borrower and its Subsidiaries associated with the ABL Facility, (b) any costs, fees, expenses and premiums paid to the ABL Agent and the ABL Lenders in connection with the ABL Facility and (c) any costs, fees and expenses paid to legal counsel or other consultants of or advisors to the ABL Agent or any ABL Lender in connection with the ABL Facility,

(vii) the aggregate amount of all costs, fees and expenses, during such period relating to, whether or not consummated, Equity Issuances, Debt Issuances, Permitted Acquisitions, Permitted Investments, or Dispositions,

(viii) [reserved];

(ix) the aggregate amount of all charges and losses during such period related to the early termination or extinguishment of any indebtedness,

(x) the aggregate amount of all net losses from discontinued operations (that are accounted for as such under GAAP) incurred during such period,

(xi) the aggregate amount of all net losses from Dispositions (other than Dispositions in the ordinary course of business) incurred during such period,

(xii) the aggregate amount of director fees, indemnities and reimbursements for expenses incurred in connection with attending board meetings that are paid to board members during such period,

(xiii) the aggregate amount of any non-cash charges, losses or expenses (including tax reclassification related to tax contingencies in a prior period and the excess of rent expense due to the use

5

of straight line rent for GAAP over Cash Rental Expense during such period) reducing Consolidated Net Income during such period, but excluding any non-cash charge relating to write-offs or write-downs of inventory or accounts receivable or representing amortization of a prepaid cash item that was paid but not expensed in a prior period,

(xiv) the aggregate amount of restructuring and similar charges or reserves, severance, recruiting, relocation costs or non-recurring integration costs; provided that (i) such costs are reasonably identifiable, factually supportable and, to the extent requested by the Administrative Agent, are disclosed in reasonable itemization and detail to the Administrative Agent and (ii) that the aggregate amount added pursuant to this clause (xiv), when combined with the amounts of adjustments made in such period pursuant to clauses (xv), (xviii) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period; provided, further, that the Transaction Expenses shall not be added back pursuant to this clause (xiv) and therefore shall not count against the maximum amount permitted to be added back hereunder,

(xv) the aggregate amount of other extraordinary, unusual and non-recurring cash losses and expenses; provided that the Borrower shall provide the Administrative Agent with notice and reasonable detail regarding the nature of such cash losses and expenses; provided further that the aggregate amount added pursuant to this clause (xv), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xviii) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xvi) any other non-cash charges, write-downs, expenses, losses or items for such period, including any impairment charges or any non-cash costs and/or expenses incurred pursuant to any management equity plan, stock option plan or any other stock subscription or shareholder agreement, or due to the application of FASB ASC No. 815-10 regarding hedging activity, FASB ASC No. 350 regarding impairment of goodwill, FASB ASC No. 480-10 regarding accounting for financial instruments with debt and equity characteristics, and non-cash foreign currency exchange losses,

(xvii) proceeds received from any business interruption insurance in an amount representing the earnings for the applicable period that such proceeds are intended to replace and to the extent not otherwise included in Consolidated Net Income,

(xviii) the aggregate amount of all costs, fees and expenses during such period relating to the pre-opening of New Units; provided that (i) the aggregate amount of any such costs, fees and expenses added pursuant to this clause (xviii) with respect to any single New Unit shall not exceed $200,000 and (ii) the aggregate amount added pursuant to this clause (xviii), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xv) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xix) integration and other business optimization expenses, charges and losses incurred in such period; provided that (i) such costs are reasonably identifiable, factually supportable and, to the extent requested by the Administrative Agent, are disclosed in reasonable itemization and detail to the Administrative Agent and (ii) the aggregate amount added pursuant to this clause (xix), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xv) and (xviii) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xx) [reserved],

(xxi) charges, losses or expenses to the extent indemnified, insured, reimbursed or reimbursable or otherwise covered by a third party (so long as the Borrower has made a determination that a reasonable

6

basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days),

(xxii) [reserved],

(xxiii) to the extent decreasing Consolidated Net Income, cash payments, costs, fees, expense and charges related to earnout obligations, performance fees and payouts, or other contingent obligations and amounts deducted in respect of purchasing accounting required or permitted by GAAP,

(xxiv) losses resulting from accruals and reserves that are established or adjusted as a result of any Permitted Acquisition in accordance with GAAP (including any adjustment of estimated payouts on earn-outs) or changes as a result of the adoption or modification of accounting policies during such period,

(xxv) [reserved], and

(xxvi) additional items as mutually agreed upon in writing by the Borrower and the Administrative Agent,

and minus (b) to the extent added in calculating such Consolidated Net Income, the aggregate amount of:

(i) all non-cash charges increasing Consolidated Net Income (other than with respect to payments actually received and the reversal of any accrual or reserve to the extent not previously added back in any prior period accrual of revenue or recording of receivables in the ordinary course of business) during such period,

(ii) all net gains from discontinued operations (that are accounted for as such under GAAP) incurred during such period,

(iii) all extraordinary gains during such period,

(iv) all gains resulting from the early termination or extinguishment of any Indebtedness,

(v) the aggregate amount of all net gains from Dispositions (other than Dispositions in the ordinary course of business) incurred during such period, and

(vi) the excess of Cash Rental Expense over rent expense due to the use of straight line rent for GAAP during such period.

Notwithstanding the foregoing, (i) the (positive or negative) 4-Wall EBITDA contribution of each Specified Unit with respect to any period occurring after February 28, 2025, shall be disregarded in the calculation of Consolidated EBITDA, (ii) the (positive or negative) 4-Wall EBITDA contribution of each Sunset Unit with respect to any period occurring after February 28, 2025, shall be disregarded in the calculation of Consolidated EBITDA; provided, that to the extent any Sunset Unit's lease terms are either extended to a date later than the Extension Date or its operations are not permanently discontinued on or prior to the Extension Date, in either case, (1) this clause (ii) shall not be applicable with respect to any such Sunset Unit and (2) to the extent applicable, the deemed historical Consolidated EBITDA numbers set forth in the table below shall be adjusted in a manner acceptable to the Administrative Agent to reflect the same and (iii) Consolidated EBITDA for each fiscal month set forth below shall be deemed to be the corresponding amount set forth opposite such fiscal month in the table below:

| Fiscal Month Ending | Consolidated EBITDA |
|---|---|
| March 31, 2024 | $5,497,738 |
| April 30, 2024 | $6,048,147 |
| May 31, 2024 | $3,615,979 |
| June 30, 2024 | $4,501,179 |
| July 31, 2024 | $3,684,457 |
| August 31, 2024 | $5,122,340 |
| September 30, 2024 | $3,404,351 |
| October 31, 2024 | $4,576,456 |
| November 30, 2024 | $1,765,565 |
| December 31, 2024 | $2,622,707 |
| January 31, 2025 | $4,752,906 |
| February 28, 2025 | $4,785,987 |

"Consolidated Interest Expense" means, for any period for which the amount thereof is to be determined, the consolidated interest expense of the Opco Borrower and its Subsidiaries (other than deferred financing costs and debt issuance costs), including (i) all interest on Indebtedness (including imputed interest related to Capital Leases), (ii) all amortization of debt discount and expense, (iii) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers' acceptances, and (iv) Swap Obligations of such Person and its Subsidiaries, to the extent required to be reflected on the income statement of such Person on a consolidated basis in accordance with GAAP.

"Consolidated Net Income" means, for any fiscal period, the consolidated net income (or loss) of the Opco Borrower and its Subsidiaries determined on a consolidated basis in accordance with Modified GAAP; provided that (i) revenues received during any such period from sales of unlimited car wash monthly memberships, whether or not such revenues are recognized in accordance with Modified GAAP, shall be included in such net income (to the extent not otherwise included therein), and (ii) there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

(a) the net income (or loss) of any Person (other than a Subsidiary of Opco Holdings) in which any Person other than Opco Holdings or any of its Subsidiaries has an ownership interest, except to the extent that cash in an amount equal to any such income has actually been received by Opco Holdings or any of its Subsidiaries from such Person during such period,

(b) the net income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Opco Holdings, Opco Borrower or is merged into or consolidated with Opco Holdings, Opco Borrower or any of its Subsidiaries or that Person's assets are acquired by Opco Holdings or any of its Subsidiaries,

(c) the net income of any Subsidiary of Opco Holdings during such period to the extent that the declaration and/or payment of dividends or similar distributions by such Subsidiary of that income is not permitted by operation of the terms of its Organizational Documents or any agreement, instrument, order or other legal requirement applicable to that Subsidiary or its equity holders during such period,

(d) the cumulative effect of a change in accounting principles, and

(e) any net extraordinary gains or net extraordinary losses.

"Consolidated Tax Expenses" means federal, state and local income tax expenses of Opco Borrower.

"control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "controlled" has the meaning correlative thereto.

"Declined Proceeds" has the meaning specified in Section 2.1(k).

"Debt Issuance" means the issuance by any Person of any Indebtedness.

"Debtor" or "Debtors" has the meaning specified in the recitals hereto.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Default" means any Event of Default and any event which with the giving of notice or lapse of time, or both, would become an Event of Default.

"Default Interest" shall have the meaning set forth in Section 2.1(h)(3).

"Default Rate" means a simple interest rate per annum equal to the sum of the otherwise then applicable interest rate plus (i) two percent (2%).

"Defaulting Lender" means, subject to Section 2.10(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the

Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.10(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each Lender promptly following such determination.

"Disclosure Limitations" shall have the meaning set forth in Section 5.6.

"Disposition" means any sale, transfer, lease, exclusive license or other disposition of any property by any Person (including by way of issuance of Equity Interests of any Person).  "Dispose" has the meaning correlative thereto.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any Equity Interests or Equity Interests Equivalent into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition,

(a)    matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments),

(b)    provides for the scheduled payments of dividends in cash,

(c)    is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests of the applicable Person and except as permitted by clause (a) above), in whole or in part, or

(d)    is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests or Equity Interests Equivalents that would constitute Disqualified Equity Interests, in the case of each of clauses (a), (b), (c) and (d) hereof, prior to the date that is ninety-one (91) days after the latest Maturity Date at the time of issuance;

provided that if such Equity Interests or Equity Interests Equivalents are issued pursuant to a plan for the benefit of future, current or former employees, directors, or officers of the Borrower, Opco Holdings, Opco Borrower or its Subsidiaries or by any such plan to such employees, directors or officers, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower, Opco Holdings, Opco Borrower or any Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's or officer's termination, death or disability.

"Dollars" or "$" means the basic unit of the lawful currency of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States of America.

"ECP Rules" means the final rules issued jointly by the Commodity Futures Trading Commission and the Securities and Exchange Commission as published in 77 FR 30596 (May 23, 2012), as may amended, modified or replaced from time to time.

"Effective Yield" has the meaning set forth in Section 2.1(b)(3).

"Eligible Assignee" means any Person (other than a natural person) that meets the requirements to be an assignee under Section 9.9 (subject to such consents, if any, as may be required under Section 9.9(b)); provided that, a Defaulting Lender shall not be an Eligible Assignee.

"Equipment" means all equipment, furniture and fixtures held or maintained at the Real Property or otherwise used in the ownership or operation of the Units, together with all additions and accessions thereto and replacements therefor.

"Equity Cure Contribution" has the meaning set forth in the Opco Credit Agreement.

"Equity Interests" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Equity Interests Equivalents" means all securities convertible into or exchangeable for Equity Interests and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Equity Interests, whether or not presently convertible, exchangeable or exercisable.

"Equity Issuance" means any sale or issuance of any Equity Interests or Equity Interests Equivalents of the Borrower or any direct or indirect parent of the Borrower or the contribution to the capital of the Borrower or any direct or indirect parent of the Borrower, in each case, the proceeds of which are contributed to the common equity of Opco Borrower or any of its Subsidiaries.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations promulgated and rulings issued thereunder and under the Code, in each case as in effect from time to time.  References to sections of ERISA shall be construed to also refer to any successor sections.

"ERISA Affiliate" means any Person, including Affiliates or Subsidiaries of the Borrower, that is a member of any group of organizations or a controlled group of trades or businesses, as described in Sections 414(b), 414(c), 414(m) or 414(o) of the Code or Section 4001 of ERISA, of which the Borrower is a member.

"Erroneous Payment" has the meaning assigned to it in Section 8.15(a).

"Erroneous Payment Deficiency Assignment" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Impacted Class" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Return Deficiency" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Subrogation Rights" has the meaning assigned to it in Section 8.15(d).

"Event of Default" means any Event of Default described in Article VII.

"Excess Cash Flow" means, for any Excess Cash Flow Period without duplication:

    (a). the sum, without duplication, of:

        i. Consolidated EBITDA for such Excess Cash Flow Period;

        ii. the decrease, if any, in the Net Working Capital from the beginning to the end of such Excess Cash Flow Period; and

        iii. to the extent received in cash, the deduction in clause (b)(iii) of the definition of Consolidated EBITDA;

    (b). *minus*, the sum, without duplication, of:

        i. the amount of any Consolidated Tax Expense paid or payable by Borrower and its Subsidiaries in cash with respect to such Excess Cash Flow Period and the amount of any Tax Distributions with respect to such Excess Cash Flow Period;

        ii. Consolidated Interest Expense for such Excess Cash Flow Period;

        iii. the increase, if any, in the Net Working Capital from the beginning to the end of such Excess Cash Flow Period;

        iv. cash used for Capital Expenditures and Permitted Acquisitions (including with respect to fees and expenses and, with respect to any Permitted Acquisition, cash consideration, that are payable upon the closing of any Permitted Acquisition pursuant to any letter of intent or definitive purchase agreement with respect to such Permitted Acquisition to which the Opco Borrower or any of its Affiliates is a party), in each case to the extent financed with Internally Generated Funds;

        v. the aggregate amount of all scheduled amortization payments of Indebtedness of the Opco Borrower and its Subsidiaries to the extent funded with Internally Generated Funds;

        vi. Restricted Payments pursuant to Section 6.10(e) paid in cash in accordance with the Loan Documents during such Excess Cash Flow Period;

        vii. to the extent paid in cash, the add-backs in clauses (a)(vi), (a)(vii), (a)(xii), (a)(xiv), (a)(xv), (a)(xvii), (a)(xviii) and (a)(xxii) of the definition of Consolidated EBITDA; and

        viii. the aggregate amount of add-backs in clause (a)(xix) of the definition of Consolidated EBITDA.

"Excess Cash Flow Period" means each fiscal year of the Borrower commencing with the fiscal year ending on December 31, 2026.

"Excluded Assets" means any of the following:

(a)  any lease, license, franchise, charter, authorization, contract or agreement to which the Borrower is a party, and any of its rights or interest thereunder, or any property subject to a purchase money security interest, capital lease obligation or other arrangement, if and to the extent that the pledge thereof or the grant of a security interest,

    (i)

        (A)  is prohibited by or in violation of any law (including financial assistance laws, corporate benefit laws or otherwise), rule or regulation applicable to the Borrower, except to the extent such prohibition is rendered ineffective under the Uniform Commercial Code,

        (B)  would be prohibited by the enforceable anti-assignment provisions of any contract (other than any such contract to which Holdings or any of its subsidiaries is the only counterparties) or law, rule or regulation applicable to the Borrower or with respect to any assets, to the extent such a grant or security interest would violate the terms of any contract with respect to such assets or would trigger termination of such contract (including any purchase money security interest, capital lease obligation or other arrangement) or any such material rights therein pursuant to any "change of control" or other provision or applicable law (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other applicable law), in each case, excluding any such contract or other agreement solely among the Borrower and the Opco Parties and any of their subsidiaries or controlled affiliates, or

        (C)  requires any governmental or third party (other than the Borrower or an Opco Party or any of its subsidiaries or controlled affiliates) consent, approval, license or authorization that has not been obtained, except to the extent such limitation is rendered ineffective under the Uniform Commercial Code or other applicable law,

    (ii)  is prohibited by or in violation of a term, provision or condition of any such lease, license, franchise, charter, authorization, contract or agreement; provided, however, that the Collateral shall include (and such security interest shall attach) at such time as the contractual or legal prohibition shall no longer be applicable and to the extent severable, shall attach to any portion of such lease, license, franchise, charter, authorization, contract or agreement not subject to the prohibitions specified in (i) or (ii) above (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other applicable Law in any relevant foreign jurisdiction); provided, further, that the exclusions referred to in this clause (a) shall not include any proceeds of any such lease, license, franchise, charter, authorization, contract or agreement;

(b)  margin stock,

(c)  any "intent-to-use" application for registration of a trademark filed pursuant to section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" or "Amendment to Allege Use" pursuant to section 1(d) of the Lanham Act, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law;

(d)    [reserved];

(e)    [reserved];

(f)    [reserved];

(g)    assets, if and to the extent that a security interest in such asset:

(i)    is prohibited by or in violation of any Law, rule or regulation applicable to the Borrower, or

(ii)    requires a consent (to the extent that the Borrower has sought such consent using its commercially reasonable efforts) of any Governmental Authority, the lessor of any leased property or any third party that has not been obtained, except, in the case of clauses (i) and (ii), to the extent such prohibition or consent is rendered ineffective under the Uniform Commercial Code;

(h)    [reserved];

(i)    [reserved]; and

(j)    assets in circumstances where the cost of obtaining a security interest in such assets, including the cost of title insurance, surveys or flood insurance (if necessary) would be excessive in light of the practical benefit to the Lenders afforded thereby as reasonably determined by the Borrower and the Administrative Agent.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 9.19), or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 10.1(a)(ii), (a)(iii) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 10.1(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Holdco Note" has the meaning specified in the recitals to this Agreement.

"Existing Holdco Obligations" has the meaning specified in the recitals to this Agreement.

"Extension Date" means (i) in the case of the Unit located at 9500 North Rodney Parham Road in Little Rock, Arkansas, May 31, 2025, (ii) in the case of the Unit located at 4311 North State Line Avenue in Texarkana, Texas, July 31, 2025, and (iii) in the case of any other Sunset Unit, April 30, 2026.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply

14

with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing reasonably selected by it.

"Fee Letter" means that certain holdco fee letter, dated as of the date hereof, by and between the Administrative Agent and the Borrower, providing for payment of the fees described therein, as amended, restated, supplemented or otherwise modified from time to time.

"Flood Insurance Laws" collectively, (i) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means, with respect to the Borrower (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time; provided, that no change in the accounting principles used in the preparation of any financial statement hereafter adopted by the Borrower or any other Opco Party shall be given effect for purposes of measuring compliance with any provision of this Agreement unless the Borrower, Administrative Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP; provided, further that no effect shall be given to any change in GAAP for purposes of measuring compliance with any provision of this Agreement that would require leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative,

judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee(s)" means all direct and indirect guarantees, sales with recourse, endorsements (other than for collection or deposit in the ordinary course of business) and other obligations (contingent or otherwise, including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) by any Person to pay, purchase, repurchase or otherwise acquire or become liable upon or in respect of any Indebtedness of any other Person, and, without limiting the generality of the foregoing, all obligations (contingent or otherwise) by any Person to purchase products, supplies or other tangible property or services for any Person under agreements requiring payment therefor regardless of the non-delivery or non-furnishing thereof, or to make investments in any other Person, or to maintain the capital, working capital, solvency or general financial conditions of any other Person, or to indemnify any other Person against and hold him harmless from damages, losses and liabilities, all under circumstances intended to enable such other Person or Persons to discharge any Indebtedness or to comply with agreements relating to such Indebtedness or otherwise to assure or protect creditors against loss in respect of such Indebtedness. The amount of any Guarantee shall be deemed to be the amount of the Indebtedness of, or damages, losses or liabilities of, the other Person or Persons in connection with which the Guarantee is made or to which it is related unless the obligations under the Guarantee are limited to a determinable amount, in which case the amount of such Guarantee shall be deemed to be such determinable amount. The term "Guarantee" as a verb has a corresponding meaning.

"Impacted Loans" has the meaning set forth in Section 10.3(b).

"Improvements" means the buildings, and other facilities, amenities and improvements to be erected on the Real Property.

"Incremental Effective Date" has the meaning set forth in Section 2.1(b)(1).

"Incremental Facility" has the meaning set forth in Section 2.1(b)(1).

"Incremental Facility Notice" has the meaning set forth in Section 2.1(b)(1).

"Incremental Term Loan" has the meaning set forth in Section 2.1(b)(1).

"Incremental Term Loan Commitment" has the meaning set forth in Section 2.1(b)(1).

"Indebtedness" means, as to any Person at a particular time, without duplication, the following: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) net obligations of such Person under any Swap Contract; (d) all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses payable in the ordinary course of business and (A) not overdue by more than 90 days or (B) to the extent overdue by more than 90 days, are being contested by such person by appropriate proceedings in good faith), (ii) any earn-out obligation to the extent such obligation is not required to be reflected on such Person's balance sheet in accordance with GAAP, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business); (e) indebtedness in respect of the foregoing (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title

retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (f) Capital Lease Obligations; (g) all obligations of such Person in respect of Disqualified Equity Interests; (h) the principal balance of synthetic leases or other off-balance sheet financing arrangements; and (i) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of consolidated Indebtedness. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) (to the extent that such Indebtedness is non-recourse to such Person for amounts in excess of the value of the property securing such Indebtedness) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Parties" has the meaning specified in Section 9.5.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Initial Term Loan" means Loans made pursuant to Section 2.1(a)(1).

"Initial Term Loan Commitment" means, for each Lender, the aggregate amount appearing opposite of such Lender's name under the heading "Initial Term Loan Commitments" as set forth on **Schedule I** or as set forth in an Assignment and Assumption Agreement delivered pursuant to Section 9.9(b), as such amount may be modified from time to time pursuant to the terms hereof, including as a result of any Incremental Term Loans; provided, that, it is understood and agreed that, as of the Closing Date, no Lender shall have any Initial Term Loan Commitment.

"Interest Payment Date" has the meaning set forth in Section 2.1(i)(4)(C).

"Internally Generated Funds" means funds not constituting the proceeds of any Indebtedness, Debt Issuance, Equity Issuance, Disposition or Casualty Event (in each case, without regard to the exclusions from the definitions thereof).

"Investment" means, with respect to any Person, any loan, advance or extension of credit (other than to customers in the ordinary course of business) by such Person to, or any Guarantee or other contingent liability with respect to the capital stock, Indebtedness or other obligations of, or any contributions to the capital of, any other Person, or any ownership, purchase or other acquisition by such Person of any interest in any capital stock, limited partnership interest, general partnership interest, or other securities of any such other Person, other than an Acquisition; and "Invest," "Investing" or "Invested" means the making of an Investment.

"Knowledge" of the Borrower or Opco Borrower means the actual knowledge of any Responsible Officer of the Borrower or Opco Borrower, as applicable.

"<u>Laws</u>" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"<u>Leases</u>" means each operating lease related to a Unit.

"<u>Lenders</u>" means each Lender that has a Term Loan Commitment or to which a Term Loan is owed.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"<u>Lien</u>" means, with respect to any interest in Property (whether real, personal or mixed and whether tangible or intangible) (a) any interest or right which secures the payment of Indebtedness or an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute or contract, and whether or not choate, vested or perfected, including any such interest or right arising from a mortgage, charge, pledge, negative pledge or other agreement not to lien or pledge, assignments, security interest, conditional sale, levy, execution, seizure, attachment, garnishment, conditional sale, Capital Lease or trust receipt, or arising from a lease, consignment or bailment given for security purposes, and (b) any exception to or defect in the title to or ownership interest in such Property, including, as applicable, reservations, rights of entry, possibilities of reverter, encroachments, easements, rights of way, restrictive covenants, leases and licenses.  For purposes of this Agreement, the Borrower or any Subsidiary shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, Capital Lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"<u>Liquidity</u>" means, as of any date of determination, (i) the Unrestricted Cash of the Opco Borrower and its Subsidiaries <u>plus</u> (ii) the Revolving Loan Unused Portion (as defined in the Opco Credit Agreement) as of such date <u>plus</u> (iii) excess availability (or any similar term) under and as defined in any ABL Facility of the Opco Borrower and its Subsidiaries as of such date.

"<u>Loan</u>" means, individually or collectively, as the case may be, each Term Loan.

"<u>Loan Document(s)</u>" means, individually or collectively, as the case may be, this Agreement (including, for the avoidance of doubt, any amendment of this Agreement), the Fee Letter, any Notes, each Security Document and all other documents, agreements and certificates executed or delivered in connection with or contemplated by this Agreement or any other document evidencing or securing a Loan or any other document that is mutually agreed by the Borrower and the Required Lenders to constitute a Loan Document, each as may be amended, modified or supplemented from time to time.

"<u>Master Agreement</u>" has the meaning set forth in the definition of Swap Contract.

"<u>Material Adverse Occurrence</u>" means any fact, circumstance or occurrence of any nature whatsoever (including any adverse determination in any litigation, arbitration, governmental investigation or proceeding) which taken alone or in combination with any other fact, circumstance or occurrence could reasonably be expected to have a material adverse effect on the (a) business, assets, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, (b) rights and remedies of the Administrative Agent, taken as a whole, under any Loan Documents or (c) ability of the Borrower to

18

perform its payment obligations under any Loan Documents; provided, that (i) the commencement of a proceeding under the Bankruptcy Code and the filing of the Chapter 11 Cases and (ii) the events and conditions related to or that led to the commencement of the Chapter 11 Cases, in each case, shall not constitute a Material Adverse Occurrence.

"Mature Unit" means, as of any date of determination, any Unit that has been owned and operated by any Opco Party for at least 12 months, other than (a) any Unit that is not in operation as of such date, (b) any Unit that, as of such date, has been designated (or the Opco Parties intend to designate) for Disposition or closure, and (c) any Unit that, as of such date, has been designated (or the Opco Parties intend to designate) as a discontinued operation.

"Maturity Date" means July 30, 2028, or with respect to any Incremental Term Loan, the date set forth as such in the agreement among the Borrower and the Lenders providing such Incremental Term Loan.

"Modified GAAP" means GAAP; provided that (a) sale-leaseback transactions in any financial statement shall be presented assuming that all consummated sale-leaseback transactions are successful sale-leaseback transactions for accounting purposes (i.e. consistent with the historical financial reporting practice of the Borrower prior to the Nineteenth Amendment Effective Date) and (b) no effect shall be given to any change in GAAP for purposes of financial reporting or measuring compliance with any provision of this Agreement resulting from the effectiveness of Accounting Standard Codification 842 (or any other accounting standards codification with substantially similar effect) that would (i) require the presentation of sale-leaseback transactions in a manner inconsistent with the presentation of sale-leaseback transactions described in clause (a) or (ii) otherwise cause leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"MFN Adjustment" has the meaning set forth in Section 2.1(b)(3).

"Moody's" means Moody's Investors Service, Inc., or any successor to the rating agency business thereof.

"Multiemployer Plan" means any multiemployer plan as defined in Sections 3(37) or 4001(a)(3) of ERISA of, or contributed to by, the Borrower, any of its Subsidiaries or any ERISA Affiliate.

"Net Working Capital" means the total current assets (excluding cash and cash equivalents) of the Borrower and its Subsidiaries minus the total current liabilities (excluding current portion of any Indebtedness under this Agreement and the current portion of any other long-term Indebtedness which would otherwise be included therein (including Capital Lease Obligations), current interest and current taxes) of the Borrower and its Subsidiaries, determined in accordance with Modified GAAP.

"New Unit" a carwash facility acquired, leased or constructed by the Borrower or any Affiliate thereof that is not a Unit on the Closing Date.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 9.1 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"<u>Note(s)</u>" means, individually or collectively, as the case may be, (a) the Term Notes (in form substantially as attached hereto as **Exhibit A**), and (b) such other promissory notes accepted by the Lenders in exchange for or in substitution of any such Notes.

"<u>Notice of Borrowing</u>" means the notice in the form of **Exhibit D** attached hereto to be delivered to the Administrative Agent pursuant to Section 2.1 or such other form as may be reasonably approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer of the Borrower.

"<u>Obligations</u>" means (i) all Loans, Advances, debts, liabilities, payment and performance obligations, covenants and duties of every kind, nature and description owing by the Borrower to the Administrative Agent, the Lenders or any Lender of any kind or nature, present or future, arising under this Agreement or any other Loan Document, whether direct or indirect (including those acquired by permitted assignment or participation), absolute or contingent, liquidated or unliquidated, due or to become due, now existing or hereafter arising and however acquired, (ii) [reserved], (iii) [reserved] and (iv) all Erroneous Payment Subrogation Rights. The term includes all principal, interest, fees, charges, expenses, reasonable attorneys' fees, and any other sum chargeable (including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) to the Borrower under this Agreement or any other Loan Document.

"<u>Opco Agent</u>" means Brightwood, as administrative agent and collateral agent with respect to the Opco Facility, together with its permitted successors and assigns.

"<u>Opco Borrower</u>" means Wash & Wax Systems LLC, a Delaware limited liability company.

"<u>Opco Credit Agreement</u>" means that certain Credit Agreement, dated as of the Closing Date, by and among Opco Borrower, as the borrower, the other obligors party thereto, Brightwood, as the administrative agent, and the lenders from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Opco Facility</u>" means the credit facility provided pursuant to the Opco Credit Agreement.

"<u>Opco Holdings</u>" means Wash & Wax Intermediate LLC, a Delaware limited liability company.

"<u>Opco Lenders</u>" means the Lenders under and as defined in the Opco Credit Agreement.

"<u>Opco Leverage Ratio</u>" means the First Lien Leverage Ratio (as defined in the Opco Credit Agreement).

"<u>Opco Party</u>" means Opco Holdings, Opco Borrower and each Subsidiary that is an obligor under the Opco Credit Agreement.

"<u>Organizational Documents</u>" means (a) with respect to any corporation or company, its certificate or articles of incorporation, organization or association and its bylaws, (b) with respect to any limited partnership, its certificate or declaration of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, and (d) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, and in the case of any Foreign Subsidiary, any analogous organizational documents. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a

20

secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, enforced any Loan Document.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.6).

"Payment Recipient" has the meaning assigned to it in Section 8.15(a).

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Permitted Acquisition" means any Acquisition, to the extent that each of the following conditions is satisfied:

(a)     no Default or Event of Default then exists or would result therefrom;

(b)     after giving effect to such transaction and/or series of related transactions on a Pro Forma Basis, the Borrower shall be in compliance with all of the Financial Covenants (as defined in the Opco Credit Agreement) for the most recently ended Test Period;

(c)     after giving effect to such transaction and/or series of related transactions on a Pro Forma Basis, (i) the Opco Leverage Ratio for the most recently ended Test Period shall not exceed 5.06 to 1.00 and (ii) Liquidity shall not be less than $10,000,000;

(d)     neither the Borrower nor any Opco Party shall, in connection with any such transaction and/or series of related transactions, assume or remain liable with respect to any Indebtedness of the related sellers or the business, person or properties acquired, except to the extent permitted herein;

(e)     the Persons or businesses to be acquired shall be, or shall be engaged in, a business of the type that Opco Parties and their Subsidiaries are permitted to be engaged in under the Loan Documents and, to the extent required by the Security Documents, the Collateral acquired in connection with any such transaction and/or series of related transactions shall be made subject to the Administrative Agent's security in accordance with the Security Documents and the Opco Parties shall otherwise comply with the terms of the Loan Documents relating to additional guarantees and further assurances;

(f)     the Acquisition has been approved by the board of directors (or other equivalent governing body) of the person to be acquired;

(g)     with respect to such Acquisition or any of the series of related transactions, the Borrower shall have provided the Administrative Agent with (i) in each case only if made available to the Borrower prior to the consummation of such transaction, historical financial statements for the last three fiscal years of the Person or business to be acquired and unaudited financial statements thereof for the most recent

interim period that is available and the comparable interim period for the prior year, (ii) a reasonably detailed description of all material information relating thereto and copies of all material documentation pertaining to such transaction, (iii) a Compliance Certificate after giving pro forma effect to such Permitted Acquisition on a Pro Forma Basis, and (iv) for Permitted Acquisitions with a purchase price in excess of $10,000,000, a quality of earnings report prepared for the Borrower by an independent certified accounting firm of nationally recognized standing;

(h)     at least three (3) Business Days prior to the proposed date of consummation of each such transaction, the Borrower shall have delivered to the Administrative Agent a certificate certifying that such transaction and related series of transactions complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance); and

(i)     the aggregate amount of consideration paid in respect of Permitted Acquisitions after the Closing Date shall not exceed $40,000,000.

"Permitted Holders" means (a) the direct and indirect holders of Equity Interests or Equity Interests Equivalents of the Borrower on the Closing Date, (b) the Qualified Owners, and (c) any "group" (within the meaning of Section 13(d) or Section 14(d) of the Securities Exchange Act of 1934, as amended) of which any of the foregoing are members; provided, that in the case of such "group" and without giving effect to the existence of such "group" or any other "group," such Persons specified in clauses (a) and/or (b) above, collectively, have beneficial ownership, directly or indirectly, of more than 50% of the aggregate ordinary voting power for election of directors represented by the issued and outstanding Equity Interests of the Borrower held, directly or indirectly, by such "group."

"Permitted Expense Reimbursement and Indemnity Payments" means any reasonable expense reimbursement and customary indemnities payable pursuant to the Permitted Holders for services provided to the Opco Parties, including the provision of directors and officers, if applicable.

"Permitted Indebtedness" has the meaning set forth in Section 6.2.

"Permitted Investment" means any of the following Investments made by the Borrower or any of its Subsidiaries in any Person:  (i) obligations, with a maturity of less than two years from the date of acquisition thereof, issued by or unconditionally guaranteed by the United States of America or an agency or instrumentality thereof backed by the full faith and credit of the United States of America; (ii) direct obligations of any state of the United States, any subdivision or agency thereof or any municipality therein which are rated by S&P or Moody's in one of the top two rating classifications and maturing within two years of the date of acquisition thereof; (iii) certificates of deposit or banker's acceptances, maturing within two years of the date of acquisition thereof, issued by commercial banks organized under the laws of the United States or any state thereof, having capital, surplus and undivided profits aggregating not less than $100,000,000 or such lesser amount approved by Lenders in their reasonable discretion so as to attempt to accommodate Investments made with minority owned commercial banks and whose unsecured long-term debt is rated in one of the top two rating classifications by S&P or Moody's; (iv) commercial paper of any corporation organized under the laws of the United States or any state thereof, rated in one of the top two rating classifications by S&P or Moody's and with a maturity of less than 270 days from the date of acquisition thereof; (v) Investments existing as of the date of this Agreement and set forth on Schedule 6.6; (vi) extensions of trade credit arising or acquired in the ordinary course of business, and Investments received in settlements in the ordinary course of business of such extensions of trade credit; (vii) Investments by any Opco Party in any other Opco Party; (viii) loans or advances to employees of the Borrower or any of its Subsidiaries to finance travel, entertainment and relocation expenses in the ordinary course of business as presently conducted in an aggregate amount not to exceed $250,000 at any one time outstanding; (ix) Permitted Acquisitions; (x) Investments of any Person existing at the time such Person

becomes a Subsidiary of the Borrower or merges with the Borrower or any of its Subsidiaries as permitted hereunder so long as such Investments were not made in contemplation of such Person becoming a Subsidiary of the Borrower; (xi) Investments received in connection with the bankruptcy or reorganization of suppliers and customers or in the settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment; (xii) advances of payroll payments to employees in the ordinary course of business not to exceed $250,000 in the aggregate amount outstanding at any time; (xiii) promissory notes and other non-cash consideration received in connection with Dispositions permitted under <u>Section 6.4</u>; (xiv) investments, including Acquisitions, financed with the proceeds of Equity Issuances; (xv) loans and advances to Opco Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Opco Holdings (or such direct or indirect parent) in accordance with <u>Section 6.10(f)</u> or <u>(g)</u>; (xvi) Guarantees by the Borrower or any of its Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; (xvii) Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests of Opco Holdings (or any direct or indirect parent thereof) or the proceeds from the issuance thereof; and (xviii) other Investments by the Borrower and its Subsidiaries in an aggregate amount not to exceed $5,000,000 at any one time outstanding.

"<u>Permitted Lien</u>" has the meaning set forth in <u>Section 6.3</u>.

"<u>Person</u>" means any natural person, corporation, firm, joint venture, partnership, limited partnership, limited liability company, association, trust or other entity or organization, whether acting in an individual, fiduciary or other capacity, or any government or political subdivision thereof or any agency, department or instrumentality thereof.

"<u>Petition Date</u>" has the meaning specified in the recitals hereto.

"<u>PIK Interest</u>" has the meaning set forth in <u>Section 2.1(j)</u>.

"<u>Plan</u>" means each employee benefit plan (as defined in Section 3(3) of ERISA) whether now in existence or hereafter instituted, of, or contributed to by, the Borrower or any ERISA Affiliate.

"<u>Plan Effective Date</u>" has the meaning specified in the recitals hereto.

"<u>Plan of Reorganization</u>" has the meaning specified in the recitals hereto.

"<u>Prime Rate</u>" means the rate of interest quoted in *The Wall Street Journal* (or another national publication reasonably selected by the Administrative Agent) as the U.S. "Prime Rate."

"<u>Pro Forma Basis</u>" means, with respect to compliance with any financial performance test hereunder for the applicable Test Period, in respect of any Specified Transaction, the making of such calculation after giving pro forma effect to:

(a)      the consummation of such Specified Transaction as of the first day of the applicable Test Period, as if such Specified Transaction had been consummated on the first day of such Test Period;

(b)      the assumption, incurrence or issuance of any Indebtedness by the Borrower or any of its Subsidiaries (including any person which becomes a Subsidiary pursuant to or in connection with such Specified Transaction) in connection with such Specified Transaction, as if such Indebtedness had been

assumed, incurred or issued (and the proceeds thereof applied) on the first day of such Test Period (with any such Indebtedness bearing interest during any portion of the applicable Test Period prior to the relevant acquisition at the weighted average of the interest rates applicable to such Indebtedness incurred during such Test Period);

(c)       the permanent repayment, retirement or redemption of any Indebtedness (other than revolving Indebtedness, except to the extent accompanied by a permanent commitment reduction) by the Borrower or any of its Subsidiaries (including any person which becomes a Subsidiary pursuant to or in connection with such Specified Transaction) in connection with such Specified Transaction, as if such Indebtedness had been repaid, retired or redeemed on the first day of such Test Period;

(d)       the Cash Rental Expense attributable to the target, Property or other assets subject to a Specified Transaction consummated or occurring, as applicable, during the applicable Test Period, in each case, as if such Specified Transaction had been consummated on the first day of such Test Period; and

(e)       in the case of the consummation of any Specified Transaction in the form of a sale-leaseback transaction, Consolidated Net Income shall be adjusted to give effect to any lease payments that would have been made on the lease established in connection with any sale-leaseback transaction during the relevant Test Period assuming such sale-leaseback transaction had been consummated on the first day of such Test Period; and

(f)       the costs and expenses of any target that have not been assumed by the Borrower or any of its Subsidiaries shall be disregarded to the extent such costs and expenses are reasonably identifiable, factually supportable and certified by a Responsible Officer, and any (i) cost and expenses of any such target that have been assumed in any Specified Transaction and (ii) incremental recurring costs and expenses incurred in connection with any Specified Transaction shall, in the case of each of (i) and (ii) be calculated as if such costs and expenses were assumed on the first day of such Test Period;

with clauses (a) through (f) calculated in a manner consistent with GAAP or Modified GAAP, as applicable, and the definition of Consolidated EBITDA and subject to, the limitations set forth in the definition of Consolidated EBITDA, including adjustments for restructuring charges or reserves and non-recurring integration costs.

"Proceeding" has the meaning ascribed to it in Section 9.5.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, and any right in respect of any of the foregoing.

"Purchasing Party" has the meaning specified in Section 9.9(i).

"Qualified Equity Interests" means any Equity Interests or Equity Interests Equivalents that are not Disqualified Equity Interests.

"Real Property" means all real property or interests therein wherever situated now, heretofore or hereafter owned or ground (or space) leased by the Borrower pledged to Administrative Agent for the benefit of the Secured Parties as Collateral under any of the Security Documents.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder.

"Register" has the meaning ascribed to it in Section 9.9(d).

"Regulation D," "Regulation T," "Regulation U" and "Regulation X" means Regulation D, Regulation T, Regulation U and Regulation X, respectively, of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Rejection Notice" has the meaning specified in Section 2.1(k).

"Related Indemnified Party" has the meaning ascribed to it in Section 9.5.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve Bank of New York, or any successor thereto.

"Required Lenders" means Lenders holding more than fifty percent (50%) of the sum of the Term Loan Commitments of all Lenders, plus the unpaid principal balance of the Term Loans; provided that (i) if there are at least two Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Required Lenders" must include at least two Lenders and (ii) the Commitments and Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Resignation Effective Date" has the meaning specified in Section 8.13(a).

"Responsible Officer" means the chief executive officer, president, senior vice president, senior vice president (finance), vice president, chief financial officer, treasurer, manager of treasury activities or assistant treasurer or other similar officer or Person performing similar functions of a Opco Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Opco Party. To the extent requested by the Administrative Agent, each "Responsible Officer" will provide an incumbency certificate and to the extent requested by the Administrative Agent, appropriate authorization documentation, in form and substance reasonably satisfactory to the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Opco Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Opco Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Opco Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"SBIA" means the Small Business Investment Act of 1958, as amended.

"S&P" means Standard & Poor's Ratings Services, a division of the McGraw Hill Companies, Inc., or any successor to the rating agency business thereof.

"SDN List" has the meaning set forth in Section 4.27.

"Secured Parties" means, collectively, with respect to each of the Security Documents, the Administrative Agent and the Lenders.

"Security Agreement" means the Security Agreement dated as of the Closing Date, entered into by the Borrower in favor of the Administrative Agent for the benefit of the Secured Parties, as it may be amended, modified, restated or replaced from time to time.

"Security Documents" means and refer to the Security Agreement and each other assignment, pledge or security agreement, instrument, certificate, financing statements, filings or document pursuant to

which the Borrower or any other Person shall grant or convey to the Administrative Agent or the Lenders a Lien in Collateral as security for all or any portion of the Obligations, whether now or hereafter in existence, as said agreements or documents may be amended, modified, restated or replaced from time to time, each in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Specified Real Estate</u>" means those certain real properties located at: (i) 7860 Mexico Road, St. Peters, MO 63375; (ii) 12 Junction Drive West, Glen Carbon, IL 62034; (iii) 6678 Mexico Road, St. Peters, MO 63376; and (iv) 994 Parkway, Sevierville, TN 37862, each of which are contemplated to be sold pursuant to the Plan of Reorganization.

"<u>Specified Transaction</u>" means any Investment (including any Acquisition), Disposition, incurrence or repayment of Indebtedness, Restricted Payment or Incremental Term Loan that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis".

"<u>Specified Unit</u>" means each Unit described on <u>Schedule II</u>.

"<u>Subsidiary</u>" of any Person means (i) any corporation of which more than 50% of the outstanding Equity Interests and Equity Interests Equivalents of any class or classes having ordinary voting power for the election of directors (irrespective of whether or not at the time Equity Interests or Equity Interests Equivalents of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is now or hereafter owned directly or indirectly by such Person, by such Person and one or more of its Subsidiaries, or by one or more of such Person's other Subsidiaries, (ii) any partnership, association, limited liability company, joint venture or other entity in which such Person, such Person and one or more of its Subsidiaries, or one or more of its Subsidiaries, is either a general partner or has an equity or voting interest of more than 50% at the time, and (iii) any other entity which is directly or indirectly controlled by such Person or one or more Subsidiaries of such Person or both; <u>provided</u> that, unless otherwise specified, any reference to "Subsidiary" means a Subsidiary of the Borrower.

"<u>Sunset Unit</u>" means each Unit described on <u>Schedule III</u>.

"<u>Supermajority Lenders</u>" means at any time Lenders holding at least seventy percent (70%) of the aggregate outstanding principal amount of the Loans; <u>provided</u> that (i) if there are (x) at least three Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this <u>proviso</u>), "Supermajority Lenders" must include at least three Lenders and (y) only two Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this <u>proviso</u>), "Supermajority Lenders" must include both Lenders and (ii) the Commitments and Loans of any Defaulting Lender shall be disregarded in determining Supermajority Lenders at any time.

"<u>Swap Contract</u>" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "<u>Master Agreement</u>"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligations" means with respect to the Borrower, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, as amended from time to time.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Tax Distributions" has the meaning set forth in Section 6.10.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" means, collectively, the Initial Term Loans and any Incremental Term Loan.

"Term Loan Commitment" means, for each Lender, such Lender's Initial Term Loan Commitment.

"Term Note" has the meaning set forth in Section 2.1(a)(4).

"Test Period" in effect at any time means the most recent period of four consecutive fiscal quarters of the Borrower ended on or prior to such time (taken as one accounting period) in respect of which financial statements have been or are required to be delivered pursuant to Section 5.1(a) or (b), as applicable.  A Test Period may be designated by reference to the last day thereof (e.g., the "March 31, 2026 Test Period" refers to the period of four consecutive fiscal quarters of the Borrower ended on March 31, 2026), and a Test Period shall be deemed to end on the last day thereof.

"Total Debt" means, as of any date of determination, (a) Indebtedness of the type described in clauses (a), (b), (e), (f), (h) and (i) of the definition of Indebtedness (but in the case of clause (i) solely to the extent Guaranteeing Indebtedness described in clauses (a), (b), (d), (f) (but, in the case of earn-out obligations, only to the extent not paid when due) and (h); provided that Total Debt shall not include Indebtedness in respect of letters of credit, except to the extent of drawn and unreimbursed amounts thereunder.

"Transactions" means the transactions contemplated under the Plan of Reorganization and the Confirmation Order to occur on the effective date of the Plan of Reorganization and the Confirmation Order, including the entry into this Agreement and the other Loan Documents.

"Transaction Expenses" means any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries in connection with the Transactions, including restructuring and legal fees and expenses incurred in connection with the events leading up to the filing of the petition for relief under the Bankruptcy Code.

"Unit" means, collectively, the property comprising the carwash locations described on **Schedule I-A** and the property comprising any New Unit.

"United States" and "U.S." mean the United States of America.

"<u>Unrestricted Cash</u>" shall mean unrestricted cash and cash equivalents of the Opco Borrower and its Subsidiaries to the extent such cash or cash equivalents are subject to a first priority perfected security interest in favor of the Opco Agent under the Opco Facility.

"<u>U.S. Government Securities Business Day</u>" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>U.S. Person</u>" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"<u>U.S. Tax Compliance Certificate</u>" has the meaning assigned thereto in <u>Section 10.1(e)(2)(B)(3)</u>.

"<u>4-Wall EBITDA</u>" means, with respect to each Unit for each period, the portion of Consolidated EBITDA attributable to such Unit during such period, excluding any allocations of corporate selling, general and administrative expenses allocated to that Unit.

"<u>Wash Club</u>" means any customer loyalty program maintained by a Mature Unit entitling members to unlimited car washes at such Mature Unit in exchange for a monthly fee.

"<u>Wash Club Membership</u>" means, for any period, the aggregate number of members of any Wash Club at each Mature Unit for the last calendar month of such period.

"<u>Zips</u>" means Zips Car Wash, LLC, an Arkansas limited liability company.

**1.2    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

        (a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

        (b)    All undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Uniform Commercial Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Uniform Commercial Code, the definition contained in Article or Division 9 shall control.

        (c)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

        (1)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

        (2)    References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

        (3)    The term "including" is by way of example and not a limitation.

(4)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(e)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(f)    For purposes of calculating Consolidated EBITDA and any financial ratios or tests, including the Opco Leverage Ratio and the Specified Transactions that have been made (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of Consolidated EBITDA or any such ratio is made shall be calculated on a Pro Forma Basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.

**1.3** **Accounting Terms; Payment Dates**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, Modified GAAP, except as otherwise specifically prescribed herein.  Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending December 31 or fiscal quarter ending March 31, June 30, September 30 or December 31 of the Borrower.  Unless the Borrower has requested an amendment pursuant to the process set out in the definition of "GAAP" with respect to the treatment of operating leases and Capitalized Lease Obligations under GAAP (or IFRS) and until such amendment has become effective, all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update (the "ASU") shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations, in each case, used for purposes of Article VII (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as Capitalized Lease Obligations in the financial statements to be delivered pursuant to Section 5.1.

**1.4** **References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document shall be construed as referring to such agreement, instrument or other document as may be from time to time amended, restated, amended and restated, supplemented or otherwise modified, extended, refinanced or replaced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications, extensions, refinancings or replacements set forth herein or in any Loan Document) and (b) any reference to any law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

**1.5** **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

**1.6** **Interest Rates**. The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability (other than arising from its or its Affiliates' gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable order) with respect to the administration, submission or any other matter related to the interest rates.

<div align="center">

**ARTICLE II**
**THE ADVANCES**

</div>

**2.1** **The Advances**.

      (a)    Initial Term Loans.

      (1)    Subject to the terms and conditions set forth herein and in the Plan of Reorganization, on the Closing Date, each Lender shall receive (and be deemed to have issued) the aggregate principal amount of Initial Term Loans set forth on Schedule I hereto opposite such Lender's name as a conversion of the Existing Holdco Obligations held by such Lender on the Closing Date. Once paid, the Initial Term Loans may not be re-borrowed.

      (2)    The Borrower's obligation to pay the principal of, and interest on, any Term Loan shall be evidenced by the records of the Lenders and, at the request of any applicable Lender, by a term loan promissory note(s) in form substantially as attached hereto as **Exhibit A** (the "Term Note").  The entries made in the Register shall (absent manifest error) be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that the failure or delay of the Lenders in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

      (b)    Incremental Facilities.

      (1)    Increase.  The Borrower may, by written notice to the Administrative Agent from time to time after the Closing Date (each, an "Incremental Facility Notice"), increase the Term Loan Commitments or obtain additional term loan facilities; provided such additional term loan facilities not increasing the Term Loan Commitments will rank junior in right of payment and security with the Term Loans or are unsecured (each, whether or not a separate class, an "Incremental Term Loan Commitment" and the term loans thereunder, an "Incremental Term Loan";  each Incremental Term Loan Commitment is sometimes referred to herein individually as an "Incremental Facility" and collectively as the "Incremental Facilities"), in Dollars in an aggregate principal amount not to exceed $40,000,000 for all such Incremental Facilities and subject to the conditions set forth in clause (3) below; provided that no commitment of any Lender shall be increased without the consent of such Lender.  Such notice shall set forth (A) the amount of the Incremental Term Loan Commitment being requested, (which shall be in a minimum amount of $5,000,000 and in increments of $250,000 in excess thereof) and (B) the date (an "Incremental Effective Date") on which such Incremental Facility is requested to become effective (which, unless otherwise agreed by the Administrative Agent, shall not be less than 10 Business Days nor more than 60 days after the date of such notice).

      (2)    Allocations.  Upon delivery of the applicable Incremental Facility Notice, the Administrative Agent will give notice thereof to each then-existing Lender of such Incremental Facility as an offer for all Lenders to provide such Incremental Facility pro rata according to the percentages of their respective Commitments.  If any Lender does not notify the

Administrative Agent in writing that such Lender accepts its pro rata share of such offer in its entirety within ten (10) Business Days of such offer, that portion of the Incremental Facility not accepted by the applicable Lenders shall be offered to the applicable accepting Lenders on a non-pro rata basis.  If the applicable accepting Lenders do not accept the applicable Incremental Facility in its entirety on a non-pro rata basis within five (5) Business Days after such offer, that portion of the Incremental Facility not accepted by the applicable accepting Lenders may be offered by the Borrower to any Persons that would constitute Eligible Assignees.

(3)      Conditions.  No Incremental Facility shall become effective under this Section 2.1(b) unless, after giving effect to such Incremental Facility, the Loans to be made thereunder, and the application of the proceeds therefrom, (A) no Default or Event of Default shall exist at the time of funding or would exist after giving effect thereto, except in connection with any Permitted Acquisition where the Lenders providing such Incremental Term Loans have agreed that no payment or bankruptcy Event of Default will be the standard and which shall be subject to customary "SunGard" limitations to the extent the proceeds of such Incremental Term Loans are used to fund such Permitted Acquisition; (B) the Incremental Term Loans will rank pari passu or junior in right of payment and security with the Term Loans (other than Incremental Term Loans) or may be unsecured, (C) any Incremental Term Loan will have a final maturity no earlier than the maturity of the Initial Term Loans, (D) the weighted average life to maturity of any Incremental Term Loan shall be no shorter than that of the Initial Term Loans, (E) subject to clause (D) above, the amortization schedule applicable to any Incremental Term Loan shall be determined by the Borrower and the Lenders thereunder, (F) the all-in yield (whether in the form of interest rate margins, original issue discount, upfront fees or reference rate floor greater than the floors applicable to the Initial Term Loans or similar yield related discounts, deductions or payments, with such increased amount being equated to interest margin on the basis of four year weighted average life to maturity for purposes of determining any increase to the applicable interest margin with respect to the Initial Term Loans) (the "Effective Yield") applicable to any Incremental Term Loan which is pari passu in right of payment and security with the Initial Term Loan will be determined by the Borrower and the Lenders providing such Incremental Term Loan, but will not be higher than the corresponding Effective Yield for the Initial Term Loans, unless the interest rate margins with respect to the then existing Term Loans are increased by an amount equal to the difference between the Effective Yield with respect to such Incremental Term Loans and the corresponding Effective Yield on such existing Term Loans (the "MFN Adjustment"), (G) any Incremental Term Loan shall be on terms and pursuant to documentation to be determined by the Borrower and the applicable Lenders providing such Incremental Term Loan; provided, that, to the extent that any financial maintenance covenant and/or call protection provision is added for the benefit of any such Incremental Term Loan, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant or call protection provision is either (i) also added for the benefit of any existing Term Loans or (ii) only applicable after the latest maturity of the existing Term Loans, and (H) no Incremental Term Loan will be secured by assets other than Collateral or guaranteed by any person.

(4)      Required Amendments.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Facility, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence of such Incremental Facility and the Loans evidenced thereby, and any joinder agreement or amendment may, without the consent of the other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effectuate the provisions of this Section 2.1(b), and, for the avoidance of doubt, this Section 2.1(b) shall supersede any provisions in Section 9.1.  From and after each Incremental Effective Date, the Loans and Commitments established pursuant to this Section 2.1(b) shall

31

constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and to the extent ranking *pari passu* with the Initial Term Loans shall, without limiting the foregoing, benefit equally and ratably from the guarantees and security interests created by the applicable Security Documents.  The Opco Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Liens and security interests granted by the applicable Security Documents continue to be perfected under the Uniform Commercial Code or otherwise after giving effect to the establishment of any such new Loans and Commitments.

(c)     [Reserved].

(d)     [Reserved].

(e)     [Reserved].

(f)     Notes.  If requested by any Lender, the Advances made by such Lender shall be evidenced by, and be payable in accordance with the terms of the Term Note issued to such Lender, as applicable, made by the Borrower payable to the order of such Lender in a principal amount equal to the Commitment of such Lender; subject, however, to the provisions of such Note to the effect that the principal amount payable thereunder at any time shall not exceed the then unpaid principal amount of the Advances made by such Lender.  The Borrower hereby irrevocably authorizes each Lender to make or cause to be made, at or about the time of each Advance made by such Lender, an appropriate notation on the records of such Lender, reflecting the principal amount of such Advance, and such Lender shall make or cause to be made, on or about the time of receipt of payment of any principal of any Advance, an appropriate notation on its records reflecting such payment and such Lender will, prior to any transfer of any of such Note, endorse on the reverse side thereof the outstanding principal amount of the Advances evidenced thereby.  Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances.  The aggregate amount of all Advances set forth on the Register shall be conclusive evidence of the principal amount owing and unpaid on such Lender's Note, absent manifest error.

(g)     Promise to Pay.  The Borrower hereby promises to pay in full to the Administrative Agent for the benefit of the Lenders the amount of all Obligations, including the principal amount of all Loans, together with accrued interest, fees and other amounts due thereon, all in accordance with the terms of this Agreement.  All outstanding Obligations, including the outstanding principal amount of all Loans, together with unpaid accrued interest, fees and other amounts due thereon, shall be due and payable in full on the applicable Maturity Date.  The Loans shall be payable as follows:

(1)     Term Loan.  The entire remaining unpaid principal balance of the Term Loan (including PIK Interest), together with accrued but unpaid interest, shall be due and payable in full on the Maturity Date.

(2)     [Reserved].

(3)     Incremental Term Loans.  The Borrower shall repay to the Administrative Agent, for the account of the Lenders who provided any Incremental Term Loans, on each date set forth in the amendment or other documentation relating to such Incremental Term Loan, such amount of such Incremental Term Loans as provided in such amendment or other documentation.

(h)    Interest on Advances.    The Borrower agrees to pay interest on the aggregate outstanding principal amount of the Advances until paid in full as follows:

(1)    Term Loan.    The Term Loan shall bear interest at a rate equal to 12.00% per annum.

(2)    [Reserved].

(3)    Default Interest.    While an Event of Default exists and is continuing or after acceleration, at the option of the Administrative Agent or the Required Lenders, the Borrower shall pay interest ("Default Interest") with respect to the principal of, or interest on, each Loan, any fee or any other amount payable by the Borrower hereunder that is not paid when due at the Default Rate.    All Default Interest under this clause (3) shall be payable in-kind and on demand.

(4)    Payment Dates. Interest accrued on each Loan shall be payable, without duplication:

(A)    on the Maturity Date;

(B)    in respect of any Loan, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan, on the principal amount so paid or prepaid; and

(C)    on the last Business Day of each fiscal quarter.

The Administrative Agent shall determine each interest rate applicable to the Loan in accordance with the terms hereof and, upon any rate change, shall promptly notify the Borrower of such rate in writing (or by telephone, promptly confirmed in writing).    Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(i)    Calculation of Interest.    All computations of interest and all other computations of fees shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).    Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.3, bear interest for one day.    Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(j)    PIK Interest. All interest of the Loans shall be payable solely in kind ("PIK Interest") (by adding such PIK Interest when paid to the principal amount of the outstanding Initial Term Loans on the applicable Interest Payment Date and such additional principal shall automatically constitute part of the principal amount of the Initial Term Loans for purposes hereunder, including the accrual of interest thereon at the interest rate applicable to such Initial Term Loans); provided, that any interest paid in connection with a prepayment of the Term Loans pursuant to Section 2.1(k), at maturity or otherwise, shall be payable all in cash.    Each Lender may determine in its sole discretion to record its PIK Interest as an increase in principal in the schedule annexed to its Notes or may request that such PIK Interest be evidenced by one or more additional Notes issued on the applicable Payment Date in the principal amount of such PIK Interest, provided, further, that the failure to request or obtain a promissory note to evidence the amount of such

33

outstanding PIK interest shall not impair in any manner the enforceability of the Obligation of the Borrower with respect to the payment thereof or the accrual of interest with respect thereto.

(k)     Prepayment. Prepayments of the Loans shall be (or in the case of Section 2.1(k)(1), may be) made as set forth below:

(1)     The Borrower shall have the right, by giving written notice to the Administrative Agent (which such written notice shall be in a form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer) by not later than 1:00 p.m. on the fifteenth (15th) day preceding the date of such prepayment, to prepay all or any portion of the aggregate principal amount of any Loan, without premium or penalty. Each partial prepayment shall be in an aggregate principal amount of not less than $500,000 and shall be accompanied by accrued interest to the date of prepayment on the amount prepaid. Borrower shall reimburse the Lenders and the Administrative Agent on demand for any amounts set forth in, and to the extent required by, Section 10.5. Except as provided in the immediately succeeding sentence, voluntary prepayments of Term Loans shall be applied to reduce the repayments required by Section 2.1(h) in the inverse order of maturity (including the payment owing on the Maturity Date).

(2)     No later than fifteen (15) days following the date of delivery of annual audited financial statements for the fiscal year ending December 31, 2026 pursuant to Section 5.1(a) and thereafter no later than the date fifteen (15) days following the date of delivery of annual audited financial statements for each subsequent fiscal year pursuant to Section 5.1(a), the Borrower shall make a mandatory prepayment of the Term Loans (other than an Incremental Term Loan to the extent otherwise provided in the documentation relating to such Incremental Term Loan) in an amount equal to 50.0% of Excess Cash Flow for such Excess Cash Flow Period; provided that at the option of the Borrower, any voluntary prepayments of the Term Loans, Term Loans (as defined in the Opco Credit Agreement), Revolving Loans (as defined in the Opco Credit Agreement) (to the extent accompanied by a permanent reduction of the corresponding Commitment; but excluding the repayment and termination of the Revolving Loan Commitments (as defined in the Opco Credit Agreement) to the extent such repayment is financed with loans under the ABL Facility) and revolving loans under the ABL Facility (to the extent accompanied by a permanent reduction of the corresponding commitments) made during such fiscal year prior to the applicable Excess Cash Flow prepayment date (and without duplication in the next fiscal year) will reduce the amount of Excess Cash Flow prepayments required for such fiscal year on a dollar-for-dollar basis (to the extent paid with Internally Generated Funds and not deducted in the calculation of Excess Cash Flow for such Excess Cash Flow Period) in each case made during such fiscal year and at the option of the Borrower, made prior to the date of such Excess Cash Flow prepayment.

(3)     To the extent applicable, the Borrower shall reimburse the Lenders and the Administrative Agent on demand for amounts set forth in and, to the extent required by, Section 10.5. Borrower shall give the Administrative Agent prior written notice of any event or circumstances reasonably likely to give rise to a mandatory prepayment obligation under this Section 2.1(k) (including the date and an estimate of the aggregate amount of such mandatory prepayment) at least five (5) Business Days prior thereto); provided that the failure to give such notice shall not constitute a Default or an Event of Default but shall not relieve the Borrower of its obligation to make such mandatory prepayments. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower.

(4)      Each Lender (or Required Lenders on behalf of all Lenders) may reject all or a portion of its pro rata share of any mandatory prepayment (such declined amounts, the "Declined Proceeds") of Term Loans required to be made pursuant to clause (2) of this Section 2.1(k) by providing written notice (each, a "Rejection Notice") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York time, two (2) Business Days prior to the prepayment date.

(A)      Each Rejection Notice shall specify the principal amount of the mandatory repayment of Term Loans to be rejected.  If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans.

(B)      Any Declined Proceeds remaining shall be applied in accordance with the terms of the Opco Credit Agreement.

**2.2      [Reserved]**.

**2.3      Payments**.  Any other provision of this Agreement to the contrary notwithstanding, the Borrower shall make each payment of interest in-kind.  Subject to Section 10.1 (Taxes) hereof, payments by the Borrower under this Agreement shall be made without offset, counterclaim or other deduction and in such amounts as may be necessary in order that all such payments shall not be less than the amounts otherwise specified to be paid under this Agreement and the Notes.  The Administrative Agent will promptly thereafter distribute like funds ratably to each Lender (unless such amount is not to be shared ratably in accordance with the terms hereof).

**2.4      Setoff; etc**.  Upon the occurrence and during the continuance of an Event of Default, each Lender and the Administrative Agent are hereby authorized at any time and from time to time, without prior notice to the Borrower (any such notice being expressly waived by the Borrower), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or Administrative Agent to or for the credit or the account of the Borrower or any of its Subsidiaries, including specifically any amounts held in any account maintained at such Lender or Administrative Agent, against any and all amounts which may be owed to the Administrative Agent or the Lenders, or any of them, by the Borrower, in connection with this Agreement or any Loan Document; provided that no Lender shall exercise any such right without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).  The rights of the Lenders and the Administrative Agent under this Section 2.4 are in addition to other rights and remedies (including other rights of set-off) which the Lenders and the Administrative Agent may have under applicable law.  Each Lender and the Administrative Agent agrees, severally and not jointly, to use reasonable efforts to notify the Borrower of any exercise of its rights pursuant to this Section 2.4, provided, however, that failure to provide such notice shall not affect any Lender's or the Administrative Agent's rights under this Section 2.4 or the effectiveness of any action taken pursuant hereto; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.10 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and

35

application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

**2.5**   **Sharing**.  If any Lender shall obtain any payment (whether voluntary, involuntary, by application of offset or otherwise) on account of the Loans made by it in excess of such Lender's ratable share of payments on account of the Loans obtained by all the Lenders, such Lender shall purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided that, (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this Section 2.5 shall not be construed to apply to (x) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to the Borrower or any Affiliate thereof (as to which the provisions of this Section 2.5 shall apply).  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 2.5 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right to setoff) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

**2.6**   **Fees**.

(a)   Fee Letter.  The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.7**   **Lending Branch**.  Subject to the provisions of Section 10.6(a), each Lender may, at its option, elect to make, fund or maintain its Loans hereunder at the branch or office specified on the signature pages hereto or such other of its branches or offices as such Lender may from time to time elect.

**2.8**   **Application of Payments and Collections**.

(a)   Order of Application of Payments.  Subject to the provisions of subsection (b) below, all payments and prepayments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied, first to pay principal of and interest on any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, second ratably to pay all other Obligations in respect of fees, expenses, reimbursements or indemnities then due and payable, third ratably to pay interest then due in respect of the Loans, and fourth to pay the principal of the Loans then due and payable, and in the case of any prepayment of Term Loans, in the inverse order of maturity (including the payment owing on the Maturity Date).

(b)   Application of Payments After an Event of Default.  After the occurrence of an Event of Default and while the same is continuing, the Administrative Agent shall, unless the Administrative Agent and the Lenders shall agree otherwise, apply all payments and prepayments in respect of any Obligations in the following order:

(1)   to pay interest on and then principal of any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

(2)      to pay Obligations in respect of any fees, expense reimbursements or indemnities then due to the Administrative Agent;

(3)      ratably to pay Obligations in respect of any fees, expenses, reimbursements or indemnities (other than principal and interest) payable to the Lenders;

(4)      to the payment of interest on all Loans and any amounts due pursuant to Sections 10.4 and 10.5, to be allocated among the Lenders pro rata based on the respective aggregate amounts of such accrued interest and amounts owed to them; and

(5)      to the payment of the outstanding principal amounts of all Loans to be allocated among the Lenders, pro rata based on the respective outstanding principal amounts described in this clause (5) payable to them;

(c)      Each of the Lenders hereby irrevocably designates the Administrative Agent its attorney in fact for the purpose of receiving any and all payments to be made to such Lender in respect of Obligations held by it, and hereby directs each payor of any such payment to make such payment to the Administrative Agent. Each of the Lenders hereby further agrees that if, notwithstanding the foregoing, it should receive any such payment (including by set-off), it shall hold such payment in trust for, and promptly deliver such payment to, the Administrative Agent.

(d)      The Administrative Agent shall promptly distribute to each Lender at its primary address set forth on the appropriate signature page hereof or at such other address as a Lender may notify the Administrative Agent in writing, such funds as such Lender may be entitled to receive.

**2.9      [Reserved]**.

**2.10      Defaulting Lenders**.

(a)      Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(1)      Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 9.1.

(2)      Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 2.4 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender

against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 3.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(3)    Certain Fees.  No Defaulting Lender shall be entitled to receive any fee payable under Section 2.6 for any period during which that Lender is a Defaulting Lender and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender.

(b)    [Reserved].

(c)    Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with, with respect to Term Loans, their Applicable Term Loan Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III
## CONDITIONS PRECEDENT

**3.1    Conditions Precedent to Effectiveness**.  The effectiveness of this Agreement and the obligation of the Lenders to make any Advance on the Closing Date, is subject to the following conditions precedent:

(a)    The Administrative Agent shall have received copies (in sufficient number for each of the Lenders to receive a copy) of all of the following, each in form and substance reasonably satisfactory to the Administrative Agent in all respects, and, if applicable, each dated the Closing Date or such earlier date as approved by the Administrative Agent:

(1)      This Agreement, appropriately completed and duly executed by the parties hereto;

(2)      The Notes, to the extent requested, appropriately completed and duly executed by the Borrower;

(3)      [reserved];

(4)      The Security Agreement, appropriately completed and duly executed by the parties thereto;

(5)      Uniform Commercial Code financing statements authorized by the applicable Opco Party as debtor, and naming the Administrative Agent as secured party with respect to the Collateral;

(6)      Favorable legal opinion of Kirkland & Ellis LLP, counsel to the Opco Parties, addressed to the Administrative Agent and each of the Lenders;

(7)      A certificate executed by a Responsible Officer or member of the Borrower, certifying in the name of and on behalf of the Borrower that (A) a true, correct and complete copy of its charter document, with all amendments thereto (as certified by the Secretary of State or similar state official), is attached to the certificate, (B) a true, correct and complete copy of its operating agreement or bylaws, with all amendments thereto, is attached to the certificate, (C) a correct and complete copy of the resolutions of its members or shareholders authorizing the execution, delivery and performance of the Loan Documents are attached to the certificate, and such resolutions have not been subsequently modified or repealed, (D) certificates of good standing dated within a reasonably close period of time prior to the Closing Date for the Borrower issued by the Secretary of State or similar state official for each state in which such Opco Party is required to be qualified to do business are attached to the certificate and (E) signature and incumbency certificates of its officers executing any of the Loan Documents, all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification;

(8)      A certificate of the duly signed by a Responsible Officer of Borrower, certifying as to the solvency on the Closing Date of the Borrower and its Subsidiaries in a manner consistent with Section 4.21;

(9)      A Notice of Borrowing appropriately completed and duly executed by the Borrower;

(10)     Payment by the Borrower of all fees due on or prior to the Closing Date in accordance with the provisions of Section 2.6 which payment shall be nonrefundable;

(11)     Payment by the Borrower or Opco Borrower of all reasonable costs and expenses of the Administrative Agent (including reasonable and documented legal fees and expenses) incurred in connection with the preparation and execution of the Loan Documents and incident to all proceedings in connection with, transactions contemplated by, and documents relating to this Agreement and the Loan Documents, which payment shall be nonrefundable to the extent required by Section 9.4;

(12)     [Reserved];

(13)    The conditions to the Opco Credit Agreement shall have been satisfied or validly waived thereunder;

(14)    A certified copy of the Confirmation Order as duly entered by the Bankruptcy Court and entered on the docket of the clerk of the Bankruptcy Court, following due notice to such creditors and other parties-in-interest as required by the Bankruptcy Court, provided that (x) no court of competent jurisdiction shall have issued any injunction, restraining order or other order with respect to the Confirmation Order which otherwise prohibits the consummation of the transactions described herein or the other transactions, or modifies such transactions, and no governmental or other action or proceeding shall have been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the transactions described herein or the other transactions, and (y) all conditions precedent to the effectiveness of the Plan of Reorganization (other than the occurrence of the Closing Date hereunder) shall have been satisfied;

(15)    Evidence as to the payment in full on the Closing Date of all material allowed administrative expense claims, priority claims and other claims under the Plan of Reorganization required to be paid on the Closing Date in a manner satisfactory to the Required Lenders;

(16)    Evidence that the form and substance of (i) a business plan and projections of the Opco Parties and (ii) the debt and equity capital structure of the Opco Parties and their parent entities (including Organizational Documents), in each case, after giving effect to the Transactions, are satisfactory to the Required Lenders;

(17)    Evidence that the Transactions will be consummated on the Plan Effective Date and that the Plan Effective Date will occur in accordance with the Plan of Reorganization;

(18)    Evidence that, other than as a result of the bankruptcy cases of the Opco Parties filed on the Petition Date and any successor cases (and the events resulting therefrom), since the Petition Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Occurrence;

(19)    Evidence that there is no threatened or pending litigation or other proceedings with respect to the Transactions;

(20)    The Opco Facility shall be issued in accordance with the Plan of Reorganization, on terms and pursuant to documentation acceptable to the Required Lenders, and the Administrative Agent shall have received copies of the executed documentation for the same; and

(21)    The Borrower shall have provided the documentation and other information to the Administrative Agent (to the extent reasonably requested by the Administrative Agent in writing at least five (5) Business Days prior to the Closing Date) that are required by regulatory authorities under the applicable "know-your-customer" rules and regulations, including the PATRIOT Act, in each case at least two (2) Business Days prior to the Closing Date.

The making of the Advance hereunder shall not constitute a waiver by the Administrative Agent or any Lender of any right which the Administrative Agent or such Lender may have in the event that any certificate, agreement, financial statement or other document delivered pursuant to

this <u>Section 3.1</u> or otherwise in connection with the transactions contemplated by this Agreement shall prove to have been false or misleading in any respect.

**3.2    <u>Conditions Precedent to All Advances</u>**.  The obligation of the Lenders to make any Advance hereunder, including the establishment of the Initial Term Loans on the Closing Date, shall be further subject to the satisfaction of each of the following conditions immediately prior to or contemporaneously with each such Advance, unless waived in writing by the Administrative Agent:

(a)    A Notice of Borrowing and appropriately completed and duly executed by the Borrower;

(b)    The representations and warranties set forth in <u>Article IV</u> and in each of the other Loan Documents are true and correct in all material respects on the date of and after giving effect to the making of the Advance (except, in the case of any representation and warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or period, as the case may be) and any representation and warranty that is qualified by references to materiality or Material Adverse Occurrence or similar term or qualification, shall be true and correct in all respects, except that the representations and warranties set forth in <u>Section 4.5</u> as to the financial statements of the Borrower shall be deemed to be updated to refer to the audited and unaudited financial statements of the Borrower, as the case may be, most recently delivered to the Administrative Agent pursuant to <u>Section 5.1</u>; and

(c)    No Default or Event of Default shall then have occurred and be continuing on the date of the making of the Advance.

The delivery of a Notice of Borrowing by the Borrower shall constitute a certification by the Borrower, binding upon the Borrower as to the matters set forth in subsections (b) and (c) above.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and each of the Lenders that as of the Closing Date and as of the date of each Advance,

**4.1    <u>Organization; etc</u>**.  The Borrower and each Opco Party is a limited liability company or corporation, as the case may be, validly organized and existing and in good standing under the laws of the state of its organization, has full power and authority to own its property and conduct its business as conducted by it and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence. A list of jurisdictions in which the Borrower and each Opco Party is qualified to do business is set forth in <u>Annex I</u>.  The Borrower has full power and authority to enter into and to perform its obligations under the Loan Documents and to request Advances under this Agreement.  The Borrower and each Opco Party has all licenses, permits and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its Property, except for permits, licenses, and rights the failure of which to have or obtain would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Occurrence.

**4.2    <u>Due Authorization</u>**.  The execution, delivery and performance by the Borrower of the Loan Documents to which it is a party (a) have been duly authorized by all necessary corporate or limited

liability company action, as the case may be, (b) do not and will not conflict with, result in any violation of or constitute any default under, (i) any provision of the organizational, constitutive or governing documents (including, as applicable, articles of organization and operating agreements) of the Borrower, (ii) any other material agreement binding on or applicable to the Borrower, or (iii) any of its Property, or any law or governmental regulation or court decree or order binding upon or applicable to the Borrower, or any of the Property and (c) will not result in the creation or imposition of any Lien on any of the Borrower's Property pursuant to the provisions of any agreement binding on or applicable to the Borrower, or such Property, except any such Liens created pursuant to the Security Documents in favor of the Administrative Agent, for the benefit of the Secured Parties and Permitted Liens, except with respect to any breach, contravention or violation referred to in clauses (b) (ii) and (b)(iii), to the extent that such breach, contravention or violation would not reasonably be expected to result in a Material Adverse Occurrence.

4.3 **Subsidiaries**. As of the Closing Date, none of the Borrower or any Opco Party has any Subsidiaries except those listed on <u>Annex II</u>, which correctly sets forth the name of each Subsidiary, the jurisdiction of its incorporation and the percentage ownership of each Subsidiary which is owned, of record or beneficially, by the Borrower and such Opco Party and/or one or more of its Subsidiaries. The Borrower and each Opco Party and each of their Subsidiaries has good and marketable title to all of the Equity Interests or Equity Interests Equivalents it owns in each of its Subsidiaries, free and clear of any Lien (other than any Liens in favor of the Administrative Agent for the benefit of the Secured Parties and inchoate Permitted Liens) and all such shares have been duly issued and are fully paid and non-assessable. The Borrower and each Opco Party has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and is duly licensed or qualified and in good standing in each other jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence. As of the Closing Date, a list of the jurisdictions in which each Opco Party is qualified to do business is set forth on the attached <u>Annex II</u>. The Borrower and each Opco Party has full power and authority to own and operate its properties, to carry on its business as now conducted and to enter into and perform the Loan Documents to which it is a party. The Borrower and each Opco Party has all licenses, permits, and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its properties, except for permits, licenses, and rights the failure of which to have or obtain, individually or in the aggregate, is not, and will not result in, a Material Adverse Occurrence.

4.4 **Validity of the Agreement**. Each Loan Document is the legal, valid and binding obligation of the Borrower and is enforceable in accordance with its terms except that, as to enforcement of remedies, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' and secured parties' rights generally or by equitable principles relating to enforceability, regardless of whether considered in equity or at law.

4.5 **Financial Statements**.

(a) The most recent financial statements furnished pursuant to <u>Section 5.1(a)</u> (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b) The most recent financial statements furnished pursuant to <u>Section 5.1(b)</u> (i) were prepared in accordance with Modified GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations

for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes.

**4.6** **Litigation; etc**. There is no action, suit, claim, demand, disputes, cause of action, proceeding, arbitration or investigation at law or equity, or before or by any federal, state, local or other governmental department, commission, court, tribunal, board, bureau, agency or instrumentality, domestic or foreign, pending, or to the Knowledge of the Borrower or the Opco Parties, threatened in writing, against or affecting any Opco Party or any of its Properties, which if determined adversely would reasonably be expected to result in a Material Adverse Occurrence.

**4.7** **Compliance with Law**. None of the Borrower or any Opco Party is (a) in default or breach with respect to any judgment, order, writ, injunction, rule, regulation or decree of any court, governmental authority, department, commission, agency or arbitration board or tribunal or (b) in violation of any law, rule, regulation, ordinance or order relating to its or their respective businesses, in each case of (a) and (b) above, the breach, default or violation of which would reasonably be expected to result in a Material Adverse Occurrence.

**4.8** **ERISA Compliance**. With respect to each Plan which is an employee pension benefit plan (as defined in Section 3(2) of ERISA) that is intended to be qualified under Section 401(a) of the Code, the Internal Revenue Service has issued a determination that each such Plan is qualified in form under Section 401(a) and related provisions of the Code, and that each related trust or custodial account is exempt from taxation under Section 501(a) of the Code, and nothing has occurred since the date of that determination that could reasonably be expected to adversely affect the qualified status of such Plan. All Plans comply with ERISA and other applicable laws, except as would not reasonably be expected to result in a Material Adverse Occurrence. There exist with respect to the Borrower and the Opco Parties no Multiemployer Plans, for which a material withdrawal or termination liability may be incurred. There exist with respect to all Plans or trusts: (a) no failure to satisfy the minimum funding standard within the meaning of ERISA, whether or not waived; (b) no termination of any Plan or trust which would result in any material liability to the PBGC or any "reportable event," as that term is defined in ERISA, which is likely to constitute grounds for termination of any Plan or trust by the PBGC; (c) no "prohibited transaction," as that term is defined in ERISA, which is likely to subject the Borrower to any material tax or penalty on prohibited transactions imposed by Section 4975 of the Code, and (d) no pending disputes, arbitrations, claims, suits, grievances or governmental audits involving any Plan (other than routine claims for benefits payable under any such Plan) that could reasonably be expected (individually or in the aggregate) to result in a Material Adverse Occurrence.

**4.9** **Title to Assets**. The Borrower holds or will hold title to the Collateral, including good, legal and marketable title to any Equipment, in each case and used in its business and pledged as Collateral for the Obligations, free and clear of all Liens except for Permitted Liens and other encumbrances permitted pursuant to Section 6.3, except where the failure to have such title would not reasonably be expected to result in a Material Adverse Occurrence. Except for Uniform Commercial Code financing statements evidencing Permitted Liens, or Uniform Commercial Code financing statements for which terminations will be tendered to the Administrative Agent prior to or contemporaneously with the first Advance for any Unit, no financing statement under the Uniform Commercial Code as in effect in any jurisdiction and no other filing which names the Borrower as debtor or which covers or purports to cover any of the Collateral, including Equipment pledged as Collateral for the Obligations, will be effective and on file in any state or other jurisdiction, and the Borrower shall not sign or authorize any such financing statement or filing or any security agreement authorizing any secured party thereunder to file any such financing statement or filing other than in favor of Administrative Agent.

**4.10** **Use of Proceeds**. Proceeds of the Loans shall be used to refinance certain Indebtedness of the Borrower and its Subsidiaries as contemplated by the Plan of Reorganization.

**4.11**     **Governmental Regulation**.  None of the Borrower or any Opco Party is required to obtain any material consent, approval, authorization, permit or license which has not already been obtained from, or effect any material filing or registration (other than the filing of the Uniform Commercial Code financing statements) which has not already been effected with, any federal, state or local regulatory authority in connection with the execution and delivery of this Agreement or the performance, in accordance with their respective terms, of this Agreement or any other Loan Document except for any consent, approval, authorization, permit or license, the failure of which to obtain or make would not reasonably be expected to result in a Material Adverse Occurrence.

**4.12**     **Margin Stock**.  No part of any Advance shall be used at any time by the Borrower or any Opco Party to purchase or carry margin stock (within the meaning of Regulations T, U and X) or to extend credit to others for the purpose of purchasing or carrying any margin stock.  None of the Borrower or nay Opco Party is engaged principally, or as one of its important activities, in the business of extending credit for the purposes of purchasing or carrying any such margin stock.  No part of the proceeds of any Advance will be used by the Borrower or any Opco Party for any purpose which violates, or which is inconsistent with, any regulations promulgated by the Board of Governors of the Federal Reserve System.

**4.13**     **Investment Company Act**.  None of the Borrower or any Opco Party is registered or required to be registered as an "investment company," or an "affiliated person" of, or a "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.  The making of the Advances, the application of the proceeds and repayment thereof by the Borrower and the performance by the Borrower of the transactions contemplated by this Agreement will not violate any provision of said Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.

**4.14**     **Accuracy of Information**.  All written information heretofore furnished by or on behalf of the Borrower or any Opco Party to the Administrative Agent or the Lenders for purposes of or in connection with this Agreement or any transaction contemplated by this Agreement is, and all other such information furnished by or on behalf of the Borrower or such Opco Party to the Administrative Agent is, when considered as a whole, complete and correct in all material respects and did not, when delivered, contain any untrue statement of material fact or omit to state a fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements have been made (after giving effect to all supplements thereto).

**4.15**     **Tax Returns; Audits**.  The Borrower and each Opco Party has filed all federal, and material state and local tax returns and other material reports which are required to be filed, and has paid all material taxes as shown on said returns and on all assessments received by any such Person (except for any assessments which are being contested in good faith by appropriate proceedings that will prevent a forfeiture or sale of any property and for which an adequate reserve has been provided on the books of such Opco Party in accordance with GAAP), to the extent that such taxes have become due or has obtained extensions with respect to the filing of such returns and has made provision in accordance with GAAP for the payment of taxes anticipated to be payable in connection with such returns.  The Borrower and each Opco Party has made all material required withholding deposits.

**4.16**     **Environmental and Safety Regulations**.  The Borrower and each Opco Party is in compliance with all requirements of applicable federal, state and local environmental, pollution control, health and safety statutes, laws and regulations except for any noncompliance which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Occurrence and is not, to the knowledge of the Borrower and each Opco Party, the subject of any federal or state investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, except for any investigation which, individually or in the aggregate, would not

reasonably be expected to result in a Material Adverse Occurrence. The Borrower further represents and warrants that the Real Property and its intended use complies with all applicable laws, governmental regulations and the terms of any enforcement action by any federal, state, regional or local governmental agency regarding all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus under such laws, except in each case for any noncompliance which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence. The Borrower and each Opco Party further represents and warrants that no written notice, demand, request for information, citation, summons or order has been issued, no complaint has been filed, no penalty has been assessed and, to the knowledge of each Opco Party, no investigation or review is pending or threatened by any governmental or other entity with respect to any alleged failure by the Borrower and each Opco Party to comply in any respect with any of such environmental laws, except in each case which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence (each of the foregoing, an "<u>Environmental Action</u>").

     **4.17**    <u>**Payment of Wages; Labor Matters**</u>. The Borrower and each Opco Party is in compliance with the Fair Labor Standards Act, as amended, in all material respects, and the Borrower has paid all minimum and overtime wages required by law to be paid to their respective employees. There are no strikes, work stoppages, slowdowns or lockouts existing, pending or, to the Knowledge of the Borrower and each Opco Party, threatened against or involving the Borrower or each Opco Party or any Subsidiary of any Opco Party, except for those that would reasonably be expected to result in a Material Adverse Occurrence. Except as set forth on <u>Schedule 4.17</u>, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of the Borrower or any Opco Party or any Subsidiary thereof, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of the Borrower or any Opco Party or any Subsidiary thereof and (c) to the knowledge of the Borrower and any Opco Party, no such representative has sought certification or recognition with respect to any employee of the Borrower or any Opco Party or any Subsidiary thereof.

     **4.18**    <u>**Intellectual Property**</u>. The Borrower and each Opco Party owns, possesses or has the right to use all material licenses and rights to all patents, trademarks, trademark rights, trade names, trade name rights, trade dress, service marks, domain marks and copyrights necessary to conduct their business in all material respects as now being conducted, to the Knowledge of the Borrower, without material conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, in each case of all of the foregoing, except where the failure to own, possess or have the right to use such intellectual property, or conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, would not reasonably be expected to result in a Material Adverse Occurrence. All such material licenses and rights with respect to patents, trademarks, trademark rights, trade names, trade name rights, service marks and copyrights are, to the Knowledge of the Borrower, in full force and effect in all material respects.

     **4.19**    <u>**Projections**</u>. The budget projections of the Borrower, furnished annually to the Administrative Agent, consisting of balance sheets, cash flow statements and income statements of the Borrower and its Subsidiaries after giving effect to the making of the Advances hereunder and the application of the proceeds thereof, together with supporting details and a statement of underlying assumptions, have been prepared in the light of the past business history of the Borrower and its Subsidiaries and on the basis of the assumptions set forth therein, which assumptions are in the opinion of the Borrower reasonable at the time such budget projections were prepared (it being recognized that budget projections

may differ from actual results and such differences may be material and such budget projections are subject to significant uncertainties and contingencies which are beyond the Borrower's control and no assurance can be given that any particular projection will be realized).

**4.20**   **Solvency**.  After giving effect to the transactions contemplated by this Agreement, as of the Closing Date, the Borrower and the Opco Parties and their Subsidiaries, on a consolidated and combined basis, have capital sufficient to carry on their business, are solvent and are able to pay their debts and obligations as they mature in the ordinary course.  After giving effect to the consummation of the transactions contemplated by this Agreement, as of the Closing Date, the Borrower and the Opco Parties and their Subsidiaries, on a consolidated and combined basis, now own Property having a value, both at fair valuation and at present fair saleable value, greater than the amount required to pay their debts, obligations and contingent liabilities as they mature in the ordinary course.

**4.21**   **No Material Adverse Occurrence**.  Since the date of the most recent audited financial statements submitted to the Administrative Agent and the Lenders as described in <u>Section 4.5</u>, there has occurred no event which is or which could reasonably be expected to result in a Material Adverse Occurrence.

**4.22**   **[Reserved].**

**4.23**   **Deposit Accounts**.  <u>Schedule 4.23</u> lists all banks and other financial institutions at which the Borrower or any Opco Party maintains deposit or other accounts as of the Closing Date, and such Schedule correctly identifies the name, address and any other relevant contact information reasonably requested by the Administrative Agent with respect to each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

**4.24**   **[Reserved].**

**4.25**   **[Reserved].**

**4.26**   **Valid Liens**.  The Security Agreement and each other Security Document delivered pursuant hereto will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties to the secure the Obligations, legal, valid and enforceable Liens on, and security interests in, the Borrower's right, title and interest in and to the Collateral thereunder, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Security Document), such Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Borrower in such Collateral, in each case subject to no Liens other than the applicable Permitted Liens.

**4.27**   **Foreign Assets Control Regulations and Anti-Money Laundering**.  The Borrower and each Opco Party is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("<u>OFAC</u>"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  The Borrower and each Opco Party (i) is not a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "<u>SDN List</u>") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is not a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is not

controlled by (including by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

**4.28**    **Patriot Act**.  The Borrower and each Opco Party, each of their Subsidiaries and, to their knowledge, each of their Affiliates, are in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations.  No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

**4.29**    **Insurance.**  The Borrower and its Subsidiaries maintain insurance policies with respect to their respective properties and business, in each case in compliance with Section 5.7.

**4.30**    **SBA Matters.**  The Borrower acknowledges that Brightwood Capital SBIC I, LP is, and certain other Lenders may from time to time be or become, a Small Business Investment Company (as defined in the SBIA), subject to the rules and regulations contained in and promulgated under the SBIA. As of the Closing Date, each of the Borrower, together with its "affiliates" (for purposes of this paragraph only, as that term is defined in Title 13, Code of Federal Regulations, §121.103), is a Small Business Concern (as defined in the SBIA). None of the Borrower nor any of its Subsidiaries presently engages in, and shall not hereafter engage in, any activities for which a Small Business Concern is prohibited from engaging in under the SBIA, nor shall any such Person use directly or indirectly the proceeds of the Loans for any purpose for which a Small Business Investment Company is prohibited from providing funds by the SBIA. The representations made by the Borrower in the SBA forms delivered on the Closing Date pursuant to <u>Section 5.13</u> (or such later date of delivery) shall be deemed to be representations made by the Borrower as of the Closing Date (or such later date) under this <u>Section 4.29</u>.

## ARTICLE V
## CERTAIN AFFIRMATIVE COVENANTS

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Loan shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**5.1**    **Financial Information; etc**.  The Borrower will furnish to the Administrative Agent copies of the following financial statements, reports and information:

(a)    (i) as soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year (or by May 31, 2026 in the case of the fiscal year ended December 31, 2025) of the Borrower (commencing with the fiscal year ended December 31, 2025), a copy of the consolidated and combined audited financial statements, including balance sheet, related statements of operations, and statements of cash flows, of the Borrower and its Subsidiaries for such fiscal year, with comparative figures for the preceding fiscal year, prepared in accordance with GAAP, certified without qualification or exception by Deloitte & Touche LLP, or such other nationally recognized auditor that is not subject to qualification as to "going concern" or the scope of such audit (other than an upcoming maturity date of any Indebtedness (including the termination of the commitments under any other revolving credit facility) occurring within one (1) year from

the time such opinion is delivered), accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with GAAP for such period, and a written management's discussion and analysis of the financial condition and results of operations for such fiscal year, as compared to the previous fiscal year and budgeted amounts, and (ii) as soon as available, and in any event within thirty (30) days after the delivery of audited financial statements pursuant to clause (a)(i) above for the applicable fiscal year, a reasonably detailed unaudited reconciliation (which shall not be required to be (x) attached or appended to the Borrower's audited financial statements or (y) audited or reviewed in any manner by the Borrower's auditor) reflecting the audited financial statements presented in accordance with GAAP for such fiscal year, on the one hand, and management-prepared unaudited financial statements presented in accordance with Modified GAAP for such fiscal year, on the other hand;

(b)      (i) as soon as available and in any event within sixty (60) days after the end of each fiscal quarterly period of each fiscal year of the Borrower, consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with Modified GAAP for such period, (subject to year-end adjustments and the lack of footnotes), and a written management's discussion and analysis of the financial condition and results of operations for such fiscal quarter and the then elapsed portion of the fiscal year, as compared to the comparable periods in the previous fiscal year and budgeted amounts, and (ii) as soon as available and in any event within seventy (70) days after the end of each fiscal quarterly period of each fiscal year of the Borrower and no later than ten (10) days after delivery of reports pursuant to clause (i), a site-level "databook" for the last month of such fiscal quarter (substantially in the same form as has been previously delivered to the Administrative Agent) detailing the following information by site: for each Unit and with respect to each such quarterly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (e) volume of retail traffic, (f) volume of total traffic, (g) chemical expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(c)      (i) as soon as available and in any event within forty-five (45) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower, consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year and (ii) as soon as available and in any event within fifty-five (55) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower and no later than ten (10) days after delivery of the reports and certificates pursuant to clause (i), a site-level "databook" for such fiscal month (substantially in the same form as has been previously delivered to the Administrative Agent) detailing the following information by site: for each Unit and with respect to each such monthly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (e) volume of retail traffic, (f) volume of total traffic, (g) chemical

48

expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(d)     with each financial statement required by Section 5.1(a) and Section 5.1(b) (other than the last fiscal quarter of such year) to be delivered to the Administrative Agent, a Compliance Certificate signed by a Responsible Officer of the Borrower;

(e)     promptly after the Borrower knows or has reason to know that any Default has occurred and is continuing or Material Adverse Occurrence has occurred, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice of such Default or Material Adverse Occurrence describing the same in reasonable detail and a description of the action that the Borrower has taken and proposes to take with respect thereto;

(f)     promptly after receipt thereof, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, all final letters and reports to management of the Borrower prepared by its independent certified public accountants and the responses of the management of the Borrower thereto;

(g)     promptly following the commencement of any litigation, suit, administrative proceeding or arbitration relating to the Borrower or any of its Properties which if adversely determined would reasonably be expected to result in a Material Adverse Occurrence or otherwise relating in any way to the transactions contemplated by this Agreement, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice thereof describing the allegations of such litigation, suit, administrative proceeding or arbitration and the Borrower's response thereto;

(h)     promptly following the commencement of any Environmental Action, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice describing the allegations of such Environmental Action;

(i)     promptly following the occurrence of, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, any "reportable event" or "prohibited transaction" or the imposition of a withdrawal or termination liability within the meaning of ERISA in connection with any Plan or Multiemployer Plan that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower, and, when known, any action taken by the Internal Revenue Service, Department of Labor or PBGC that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower with respect thereto;

(j)     within sixty (60) days of each fiscal year end thereafter, a copy of the updated annual budget and financing projections for the Opco Borrower for each fiscal quarter for such fiscal year, with discussion of principal assumptions upon which such budget is based;

(k)     [reserved];

(l)     promptly upon the delivery to or receipt from the ABL Agent, copies of (i) all amendments, waivers or other material modifications to any of the loan documents governing the ABL Facility; (ii) copies of all material notices, including notices of default or acceleration with respect to the ABL Facility and (iii) monthly borrowing base certificates and, upon request of the

Administrative Agent, any other material collateral reporting (including, without limitation, any other borrowing base certificates) required to be delivered to the ABL Lenders under the ABL Facility, if any; and

(m)     such other information with respect to the financial condition and operations of the Borrower and its Subsidiaries as the Administrative Agent or any Lender may reasonably request (subject to the Disclosure Limitations).

5.2     **Maintenance of Existence; etc**.  The Borrower and each Opco Party shall maintain and preserve its existence, and qualification and good standing in all states in which such qualification and good standing are required in order to conduct its business and own its property as conducted and owned in such states, except where the failure to do so would not reasonably be expected to result in a Material Adverse Occurrence.

5.3     **Maintenance of Properties**.  The Borrower and each Opco Party will maintain or cause to be maintained in the ordinary course of business in good repair, working order and condition (reasonable wear and tear excepted) all material Properties used in their respective businesses (whether owned or held under lease), and from time to time make or cause to be made all necessary repairs, renewals, replacements, additions, betterments and improvements thereto, except to the extent the failure to maintain such Properties would not reasonably be expected to result in a Material Adverse Occurrence.

5.4     **Payment of Liabilities**.  The Borrower and each Opco Party shall pay and discharge as the same may become due and payable, all material taxes, assessments and other governmental charges or levies against or on any of its Property, as well as all other lawful claims of any kind which, if unpaid, might become a Lien upon any of its Property; provided, however, that the foregoing shall not require the Borrower or any such Opco Party to pay any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested diligently in good faith by appropriate proceedings that will prevent a forfeiture or sale of such Property and an adequate book reserve in accordance with GAAP shall have been set aside with respect thereto, but (with respect to claims that are not Taxes, assessments and other governmental charges or levies) only so long as such claim does not become a Lien on any assets of such Opco Party.

5.5     **Compliance with Laws**.  The Borrower and each Opco Party shall carry on its business activities in substantial compliance with all applicable federal or state laws and all applicable rules, regulations and orders of all governmental bodies and offices having power to regulate or supervise its business activities, including all applicable environmental, pollution control, health and safety statutes, laws and regulations, except in each case where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence; provided that nothing in this Section 5.5 shall impair the obligations of the Borrower and the Opco Parties in Section 5.15.  The Borrower and each Opco Party shall maintain all material rights, liens, permits, certificates of compliance or grants of authority necessary for the conduct of its business, except where the failure to maintain would not reasonably be expected to result in a Material Adverse Occurrence.  The Borrower and each Opco Party agrees that the Real Property and its intended use will comply at all times with all applicable laws, governmental regulations and the terms of any enforcement action now or hereafter commenced by any federal, state, regional or local governmental agency, including all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended from time to time), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus, except where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence.

**5.6**    **Books and Records; Inspection Rights; etc**. The Borrower and each Opco Party shall keep (a) a system of accounting administered in accordance with GAAP and (b) books and records reflecting all of its business affairs and transactions in accordance with GAAP.  The Borrower and each Opco Party shall permit the Administrative Agent (accompanied by any Lender) or any representative thereof, at reasonable times and intervals, during normal business hours and upon reasonable notice to the Borrower, to visit the offices of the Borrower and such Opco Party, discuss financial matters with Responsible Officers of the Borrower and such Opco Party and with its independent public accountants (and by this provision the Borrower and each Opco Party authorizes its independent public accountants to participate in such discussions) and examine any of the Borrower's and such Opco Party's books and other company records in a non-disruptive manner; <u>provided</u>, that unless an Event of Default has occurred and is continuing there shall be no more than one such inspection or visit per year.  Notwithstanding anything to the contrary in this Section 5.6, none of the Borrower or any Opco Party will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information, that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) the disclosure of which is restricted by binding agreements with a third party that is not a controlled Affiliate of any Opco Party (collectively, the "Disclosure Limitations").

**5.7**    **Insurance**.  The Borrower and each Opco Party will:

(a)    Maintain insurance including, but not limited to, business interruption coverage, and public liability coverage insurance from responsible companies in such amounts and against such risks to the Borrower and such Opco Party as is prudent and reasonably satisfactory to the Administrative Agent; provided that the Administrative Agent acknowledges that the insurance maintained by the Borrower and the Opco Parties as of the Closing Date is satisfactory;

(b)    Keep its tangible assets insured by responsible companies against loss or damage by fire, theft, burglary, pilferage, loss in transit, explosions and hazards in amounts which are prudent for the carwash industry, in accordance with industry standards, all premiums thereon to be paid by the Borrower and the Opco Parties; and

(c)    With respect to each Unit, if at any time the area in which any Improvements located on such Unit is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), (i) obtain flood insurance in such total amount as required by Flood Insurance Laws, and otherwise comply with the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent, including a copy of the flood insurance policy and a declaration page relating to the insurance policies required by this Section 5.7 which shall (a) identify the addresses of each parcel of Real Property located in a special flood hazard area, (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (c) provide that the insurer will give the Administrative Agent thirty (30) days written notice of cancellation or non-renewal and shall include evidence of annual renewals of such insurance and (iii) shall be otherwise in form and substance satisfactory to the Administrative Agent.

**5.8**    **ERISA**.  The Borrower agrees that all assumptions and methods used to determine the actuarial valuation of employee benefits, both vested and unvested, under any Plan, and each such Plan, will comply in all material respects with ERISA and other applicable laws.

(a)    The Borrower will not at any time permit any Plan to:

51

(1)    engage in any "prohibited transaction" for which an exemption is not available as such term is defined in Section 4975 of the Code or in Section 406 of ERISA;

(2)    fail to satisfy the minimum funding standard as such term is defined in Section 302 of ERISA, whether or not waived;

(3)    be terminated under circumstances which are likely to result in the imposition of a lien on the property of the Borrower pursuant to Section 4068 of ERISA, if and to the extent such termination is within the control of the Borrower; or

(4)    be operated or administered in a manner which is not in compliance with ERISA or any applicable provisions of the Code;

if the event or condition described in (1), (2), (3) or (4) above would reasonably be expected to subject the Borrower to a Material Adverse Occurrence.

(b)    Upon the request of the Administrative Agent or any Lender, the Borrower will furnish a copy of the annual report of each Plan (Form 5500) required to be filed with the Internal Revenue Service.  Copies of such annual reports shall be delivered no later than thirty (30) days after the date the copy is requested.

**5.9    <u>Post-Closing Requirements</u>**.

(a)    The Borrower shall deliver to the Administrative Agent consolidated and combined audited financial statements, including balance sheet, related statements of operations, and statements of cash flows, of Zips and its Subsidiaries (i) for the fiscal year ended December 31, 2023 by July 31, 2025 (or such later date as agreed by the Administrative Agent in its discretion) and (ii) for the fiscal year ended December 31, 2024 by December 31, 2025 (or such later date as agreed by the Administrative Agent in its discretion).

**5.10    [Reserved]**.

**5.11    [Reserved]**.

**5.12    <u>Further Assurances</u>**.  Promptly upon reasonable request by the Administrative Agent, the Borrower shall (and, subject to the limitations hereinafter set forth, shall cause the other Opco Parties to) take such additional actions and execute such documents as the Administrative Agent may reasonably request from time to time in order (i) to carry out the purposes of this Agreement or any other Loan Documents; <u>provided</u>, that the Borrower and the other Opco Parties shall not be obligated to take any such actions or execute such documents to the extent that such actions or documents would impose any additional obligations not set forth herein on the Borrower or such Opco Party, (ii) to subject to the Liens in the Collateral granted by any of the Security Documents any of the Collateral and (iii) to perfect and maintain the validity, effectiveness and priority of the Liens granted by any of the Security Documents and the Liens intended to be created thereby.

**5.13    <u>SBA Matters</u>**.  The Borrower will, and will cause each of its Subsidiaries to: (a) upon the request of any Lender that is a Small Business Investment Company (as defined in the SBIA), repay such Lender's Loan in full (including the applicable prepayment fee), in immediately available funds, in the event that Borrower or any other Opco Party changes the nature of its business within one year after the Closing Date (or, if applicable, any later borrowing date hereunder) in a manner that would cause such Lender to have provided funds to Borrower or any other Opco Party pursuant to this Agreement or any

other Loan Document in violation of 13 C.F.R. §§ 107.700-107.760 (as amended from time to time); (b) upon the request of any Lender that is a Small Business Investment Company or the SBA, (i) submit to such Lender and/or the SBA timely and accurate compliance reports at such times and in such form and containing such information as the SBA may determine to be necessary to enable the SBA to ascertain whether Borrower and each other Opco Party have complied or are complying with 13 C.F.R. Part 112 ("Part 112"), (ii) submit to such Lender such information as may be necessary to enable such Lender to meet its reporting requirements under Part 112, and (iii) permit the SBA to have access with advance written notice and during normal business hours to such of its books, records, accounts and other sources of information, and its facilities as may be pertinent to ascertain compliance with Part 112. Where any information required of the Borrower or any other Opco Party is in the exclusive possession of any other agency, institution or Person and such agency, institution or Person shall fail or refuse to furnish this information, Borrower and each other Opco Party shall so certify in its report and shall set forth what efforts it has made to obtain this information; and (c) upon any Lender's request, take any and all actions required to permit any Lender to comply with SBIA and applicable law, in the event such Lender is restricted or prohibited from holding Loans or Qualified Equity Interests in any Opco Party or any Affiliate thereof as a result of any noncompliance thereunder.

**5.14    OFAC; Patriot Act**.    The Borrower and the Opco Parties shall, and shall cause their Subsidiaries to, comply with the laws, regulations and executive orders referred to in <u>Section 4.27</u> and <u>Section 4.28</u> (subject to any materiality qualifiers set forth in such <u>Section 4.27</u> and <u>Section 4.28</u>).

**5.15    Sale-Leaseback Accounting Treatment**. The Borrower and the Opco Parties shall, and shall cause their Subsidiaries to, employ best efforts to ensure that sale-leaseback transactions are treated as successful sale-leaseback transactions for GAAP accounting purposes. To the extent any sale-leaseback transactions are determined to be failed sale-leaseback(s) for accounting purposes under GAAP, Borrower shall promptly notify Administrative Agent (on behalf of itself and the Lenders).

**5.16    Quarterly Lender Calls**.    The Borrower and the Opco Parties shall, and shall cause their Subsidiaries to, participate in a meeting of the Lenders once during each fiscal quarter, to be held via teleconference, to discuss the financial performance of the Borrower and its Subsidiaries.  Each such meeting shall be held at a time reasonably agreed between the Borrower and the Administrative Agent.  For the avoidance of doubt, such quarterly lender call shall concurrently satisfy the obligations of this section and Section 5.16 of the OpCo Credit Agreement.

<div align="center">

**ARTICLE VI**
**NEGATIVE COVENANTS**

</div>

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Advance shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**6.1    [Reserved].**

**6.2    Limitations on Indebtedness**.  The Borrower shall not permit any of the Opco Parties or their Subsidiaries to, create, assume, incur, issue, guarantee or otherwise become or remain obligated in respect of, or permit to be outstanding, any Indebtedness, except the following (the "<u>Permitted Indebtedness</u>"):

(a)    Indebtedness outstanding on the date hereof and listed on **Schedule 6.2(a)** and any refinancings, refundings, renewals or extensions thereof; <u>provided</u> that the principal amount of such Indebtedness is not increased from the original principal balance except by an

<div align="center">53</div>

amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder;

(b)    (x) the Obligations (including Incremental Term Loans); and (y) (i) the Obligations under and as defined in the Opco Credit Agreement in an aggregate principal amount not to exceed an aggregate principal amount permitted to be incurred under the Opco Credit Agreement as in effect as of the Closing Date (including, for the avoidance of doubt, incremental term loans permitted thereunder as in effect as of the Closing Date), plus (ii) additional Indebtedness under the Opco Credit Agreement in an outstanding principal amount not to exceed (A) $45,000,000 plus (B) additional amounts such that after giving effect to such incurrence of Indebtedness on a Pro Forma Basis, the Opco Leverage Ratio for the most recently ended Test Period shall not exceed 4.56 to 1.00 plus (iii) other Obligations under the Opco Credit Agreement not constituting principal and, in each case, including any interest, fees or other amounts paid in-in kind and capitalized to principal in respect of any amounts otherwise described in this clause (y);

(c)    Indebtedness representing deferred compensation to employees incurred in the ordinary course of business or other similar arrangements incurred by such Person in connection with the any Permitted Acquisitions or any other Investment expressly permitted hereunder;

(d)    [reserved];

(e)    Indebtedness in the form of trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice, which Indebtedness shall not be secured by a Lien on any Property of the Borrower or its Subsidiaries;

(f)    Indebtedness owed in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business or consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(g)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, completion guaranties, surety bonds and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business, and any extension, renewal or refinancing thereof to the extent not provided to secure the repayment of other Indebtedness and to the extent that the amount of refinanced Indebtedness is not greater than the amount of Indebtedness being refinanced;

(h)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(i)    Indebtedness consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(j)    Indebtedness incurred in a Permitted Acquisition, any other Investment expressly permitted hereunder or any sale, in each case to the extent constituting indemnification

54

obligations or obligations in respect of purchase price adjustments (including earn-outs and other deferred purchase price obligations) or other similar adjustments;

(k)    Guarantee(s) incurred in the ordinary course of business in respect of obligations to suppliers, customers, franchisees, lessors and licensees;

(l)    obligations arising under any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantee(s) thereof;

(m)    Indebtedness of any Opco Party owing to another Opco Party;

(n)    Indebtedness (and Guarantees thereof) in respect of Swap Contracts designed to hedge against any Opco Party's or it Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks, in each case not for speculative purposes;

(o)    Indebtedness of assumed in connection with a Permitted Acquisition or Permitted Investment; provided that (i) such Indebtedness was not incurred or assumed in contemplation of such Permitted Acquisition or Permitted Investment, (ii) such Indebtedness is non-recourse to (and is not assumed by any of) the Opco Parties and their Subsidiaries (other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Subsidiary after the Closing Date), (iii) the aggregate outstanding principal amount of all such Indebtedness shall not exceed $5,000,000 at any time, and (iv) no Default or Event of Default then exists or would result therefrom;

(p)    Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Opco Borrower (or any direct or indirect parent thereof, including the Borrower) permitted by Section 6.10; provided, that such Indebtedness shall be subordinated to the Obligations, on terms and conditions reasonably satisfactory to the Administrative Agent;

(q)    Guarantees in respect of Indebtedness of any Opco Party otherwise permitted hereunder; provided that if such Indebtedness is subordinated to the Obligations, such Guarantee shall be subordinated to the same extent;

(r)    Indebtedness supported by a Letter of Credit (as defined in the Opco Credit Agreement), in a principal amount not to exceed the face amount of such Letter of Credit;

(s)    Indebtedness with respect to letters of credit listed on **Schedule 6.2(s)**;

(t)    Indebtedness for Real Property Taxes; provided the payment thereof is not required to be made pursuant to Section 5.4;

(u)    Indebtedness of any Opco Party under the ABL Facility to the extent permitted under the Opco Credit Agreement;

(v)    [Reserved];

55

(w)        Indebtedness with respect to Capital Leases and purchase money Indebtedness, in each case, incurred prior to or within one hundred and twenty (120) days after the acquisition, construction, lease or improvement of the applicable asset in an aggregate amount not to exceed $5,000,000 at any time;

(x)        to the extent that, as of any date of determination, there is no L/C Issuer under and as defined in the Opco Credit Agreement and the ABL Facility has not yet been established, Indebtedness under commercial, trade and standby letters of credit (including reimbursement obligations with respect thereto) in the ordinary course of business or incurred in order to support or backstop any performance or surety bonds permitted to be issued and/or incurred under clause (g) above; and

(y)        any other Indebtedness Party; provided that the aggregate outstanding principal amount of all such unsecured Indebtedness shall not exceed $5,000,000 at any time.

**6.3**    **Liens**.  The Borrower shall not permit any of the Opco Parties or their Subsidiaries to, create, incur, assume or permit to exist or to be created or assumed any Lien on any of its assets, whether now owned or hereafter acquired, except the following (the "Permitted Liens"):

(a)        Liens existing on the Closing Date and set forth on **Schedule 6.3**;

(b)        Liens arising by operation of law on the Real Property for real estate taxes and Liens securing Taxes, assessments or governmental charges or levies or the claims or demands of contractors, materialmen, mechanics, carriers, warehousemen, landlords and other like Persons; provided the payment thereof is not required to be made pursuant to Section 5.4 hereof;

(c)        Liens incurred or deposits made in the ordinary course of business (1) in connection with workmen's compensation, unemployment insurance, social security and other like laws or (2) to secure the performance of letters of credit, bids, tenders, sales contracts, leases, statutory obligations, surety, appeal and performance bonds and other similar obligations not incurred in connection with the borrowing of money, the obtaining of advances or the payment of the deferred purchase price of the Real Property or Equipment and, in the case of this clause (2) only, not in excess of 2,500,000 in the aggregate outstanding at any one time;

(d)        attachments, judgment and other similar Liens arising in connection with court proceedings, provided the execution or other enforcement of such Liens is stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings in such manner as not to have the Real Property or Equipment subject to such Liens forfeitable in accordance with Section 5.4;

(e)        easements, rights-of-ways, reservations, exceptions, minor encroachments, rights of entry, restrictive covenants, licenses, restrictions and similar charges created or incurred in the ordinary course of business and not in connection with Indebtedness, and which in the aggregate do not materially detract from the value of any Real Property or materially impair or interfere with its use in the business operations of the Borrower and its Subsidiaries; including any such items included as exceptions in the title policy obtained by Administrative Agent related to the Real Property;

(f)        Liens in favor of the Opco Borrower or its Subsidiaries;

(g)     (x) Liens in favor of the Administrative Agent for the benefit of the Secured Parties or otherwise to secure the Obligations; and (y) Liens securing the Opco Facility;

(h)     Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(i)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(j)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(k)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)     precautionary Uniform Commercial Code and similar filings;

(m)     Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted hereunder;

(n)     Liens on Property constituting Goods (as defined in the applicable Uniform Commercial Code), excluding inventory, but including Equipment and Fixtures (as defined in the applicable Uniform Commercial Code), securing obligations under leases of Units entered into in the ordinary course of business;

(o)     (i) Liens existing on property at the time of (and not in contemplation of) its acquisition or existing on the property of any Person at the time such Person becomes (and not in contemplation of such Person becoming) a Subsidiary, in each case after the Closing Date; provided that (A) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Person) and (B) the Indebtedness secured thereby is permitted under Section 6.2(o), and (ii) Liens incurred in connection with escrow arrangements or other agreements relating to a Permitted Acquisition or Permitted Investment permitted;

(p)     Liens in respect of the cash collateralization of Letters of Credit (as defined in the Opco Credit Agreement) and letters of credit permitted by Sections 6.2(s) or 6.2(x);

(q)     Liens (i) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial

institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(r)     Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 7.1(h);

(s)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and not securing Indebtedness prohibited by this Agreement;

(t)     Liens securing Indebtedness permitted pursuant to Section 6.2(w);

(u)     the modification, replacement, renewal or extension of any Lien permitted by this Section 6.3; provided that (i) such Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 6.2;

(v)     Liens securing Indebtedness permitted by Section 6.2(u) (to the extent permitted under the Opco Credit Agreement);

(w)     Liens securing Indebtedness or other obligations in an aggregate principal amount as of the date of initial attachment of such Lien not to exceed $5,000,000 and

(x)     Non-exclusive licenses or sublicenses of intellectual property granted in the ordinary course of business.

**6.4     Sales of Assets.**   The Borrower shall not permit any of the Opco Parties or their Subsidiaries, to, make any Dispositions, except for:

(a)     Dispositions of obsolete, damaged, worn out, used or surplus Property (including for purposes of recycling), whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of Property no longer used or useful in the conduct of the business of the Opco Parties or their Subsidiaries;

(b)     Dispositions of Property to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement Property; provided that to the extent the Property being transferred constitutes Collateral such replacement Property shall constitute Collateral;

(c)     Dispositions of Property among Opco Subsidiaries;

(d)     to the extent constituting a Disposition, any Opco Party and its Subsidiaries may enter into an consummation transactions expressly permitted by Section 6.3, Section 6.6 or Section 6.10;

(e)     Dispositions to the extent of any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by any Opco Party o its Subsidiaries to the extent allowable under Section 1031 of the Code (or comparable or successor provision);

58

(f)        Dispositions in connection with the unwinding of any Swap Contract;

(g)        the sale, license, sublicenses, transfer, lapse, abandonment, discontinuance or other Disposition of any Intellectual Property in the ordinary course of business or if determined by the Borrower or any Subsidiary in its reasonable business judgment that such Disposition is desirable in the conduct of its business;

(h)        Dispositions of any Property with a fair market value (as determined by the Borrower in its reasonable judgment) not to exceed $5,000,000 in the aggregate for all such Dispositions in any fiscal year;

(i)        Dispositions for a fair market value (as determined by the Borrower in its reasonable judgment), so long as, at the time of such Disposition, (i) no Event of Default has occurred and is continuing, and (ii) at least 75% of the consideration for such Disposition in excess of $2,500,000 consists of cash and cash equivalents (in each case free and clear of Liens at the time received); and

(j)        Dispositions of the Specified Real Estate for fair market value as reasonably determined by the Borrower; provided, that Dispositions of Specified Real Estate shall only be permitted pursuant to this clause (j) and not any other clause of this <u>Section 6.4</u>.

**6.5**      <u>**Liquidations, Mergers and Consolidations**</u>.  Except as permitted pursuant to <u>Sections 6.6</u> and <u>6.8</u> and except for the merger, consolidation or amalgamation of any Opco Party or any Subsidiary thereof into any other Opco Party or any Subsidiary thereof, the Borrower shall not, and will not permit any Opco Parties or any Subsidiary thereof to, liquidate or dissolve itself (or suffer any liquidation or dissolution) or otherwise wind up, or consolidate with or merge into any other Person; <u>provided</u> that any Subsidiary of the Borrower may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders so long as no Event of Default shall result therefrom.

**6.6**      <u>**Investments**</u>.  The Borrower will cause the Opco Parties and their Subsidiaries not to permit to exist any Investment, except that, so long as no Event of Default then exists or is caused thereby, the Opco Subsidiaries may make Permitted Investments.

**6.7**      <u>**Transactions with Affiliates**</u>. The Borrower shall not and will cause the Opco Parties and their Subsidiaries not to, enter into any material transaction (including the purchase, sale or exchange of Property, the rendering of any service, the making of any Investment in an Affiliate or the repayment of any Indebtedness owed to an Affiliate) with an Affiliate (other than any such transactions among the Opco Parties and their Subsidiaries), except for:

(a)        any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on <u>Schedule 6.7</u>, or any amendment thereto (so long as any such amendment is not adverse to the Lenders in any material respect as compared to the applicable agreement as in effect on the Closing Date);

(b)        any material transaction in the ordinary course of business and pursuant to the reasonable requirements of the Opco Parties and their Subsidiaries business, upon terms which are fair and reasonable to the Opco Parties and their Subsidiaries and which are not less favorable to the Opco Parties and their Subsidiaries than would be obtained in a comparable transaction with a Person not an Affiliate;

(c)      the Borrower may make Permitted Expense Reimbursement and Indemnity Payments; and

(d)      all transactions contemplated by the Plan of Reorganization, including the entry into the Loan Documents and the issuance of the Opco Facility and Equity Interests in any parent entity of the Borrower.

**6.8**     **[Reserved]**.

**6.9**     **Amendment and Waiver**.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, except in connection with a transaction otherwise permitted hereunder, enter into any material amendment of, or agree to or accept or consent to any material waiver of any of the material provisions of its Organizational Documents.

**6.10**     **Restricted Payments**.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, declare, pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests or Equity Interests Equivalents of any Opco Party or any direct or indirect parent thereof, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Opco Parties or any of their Subsidiaries (collectively, "Restricted Payments"), except that the Borrower, the Opco Parties and their Subsidiaries may:

(a)      make Restricted Payments to the Borrower, Opco Holdings, Opco Borrower or any of their Subsidiaries (on a pro rata basis to the holders of the equity thereof);

(b)      to the extent constituting Restricted Payments, make payments permitted by Section 6.7;

(c)      subject to the last paragraph in this Section 6.10, make Tax Distributions to the direct or indirect equity holders of the Borrower;

(d)      to the extent constituting Restricted Payments, any Opco Party and their Subsidiaries may enter into and consummate transactions expressly permitted by Sections 6.6 and 6.8;

(e)      pay (or make Restricted Payments to allow the Borrower, any Opco Party or any direct or indirect parent thereof to pay) for the repurchase, retirement or other acquisition or retirement for value of Equity Interests or Equity Interests Equivalents of the Borrower or any Opco Party (or of any direct or indirect parent thereof) held by any future, present or former employee, director, consultant or distributor (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Opco Borrower (or any direct or indirect parent of the Opco Borrower) or any of its Subsidiaries upon the death, disability, retirement or termination of employment of any such Person or otherwise pursuant to any employee or director equity plan, employee or director stock option or profits interest plan or any other employee or director benefit plan or any agreement (including any separation, stock subscription, shareholder or partnership agreement) with any employee, director, consultant or distributor of the Opco Borrower (or any direct or indirect parent of the Opco Borrower) or any of its Subsidiaries in an aggregate amount after the Closing Date not to exceed, together with any payments made under any other Indebtedness permitted under Section 6.2(p), $500,000 in any calendar year, in each case

60

so long as no Default or Event of Default has occurred and is continuing or would occur as a result thereof;

(f)    make any Restricted Payment the proceeds of which will be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) operating costs and expenses of the Borrower, any Opco Paty or their direct or indirect parents which do not own other Subsidiaries besides the Opco Parties and any other direct or indirect parents of the Borrower incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable solely to the ownership or operations of the Borrower and its Subsidiaries.

Notwithstanding anything to the contrary herein, for any taxable year in which the Borrower is a member of a group filing a consolidated, combined or similar income tax return ("Tax Group") of which any direct or indirect parent of Borrower is the common parent, Borrower may make tax distributions to such direct or indirect parent ("Tax Distributions"), the proceeds of which will be used by the parent of the Tax Group to pay consolidated or combined U.S. federal, state, and local income taxes imposed on such parent to the extent such income taxes are attributable to the income of such parent, Borrower and those Subsidiaries of Borrower that are members of such Tax Group (or any disregarded entity thereof); provided that the amount of such distributions in respect of any taxable period shall not, in the aggregate, exceed the amount that Borrower and those Subsidiaries of Borrower that are members of such Tax Group (including income of any disregarded entity thereof) would have been required to pay in respect of such U.S. federal, state, or local income taxes (as the case may be) in respect of such taxable period if Borrower and those Subsidiaries of Borrower paid such income taxes directly as a stand-alone consolidated or combined income tax group.  For the avoidance of doubt, Borrower shall be permitted to make such payments on a quarterly basis during such taxable year based on its best estimate of the amounts permitted to be distributions in accordance with the definition of Tax Distributions; provided, further that the total amount of such quarterly distributions for any taxable year shall not exceed the total amount otherwise distributable in accordance with the definition of Tax Distributions and, if the aggregate amount of estimated Tax Distributions paid to any such parent of the Tax Group for any taxable year exceeds the amount that would be calculated as of the end of such taxable year, the excess shall be deducted from the amount of the next Tax Distribution otherwise payable to such parent of the Tax Group.

**6.11    Payments in Respect of Certain Indebtedness**.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, (i) pay interest on any Indebtedness that (x) is subordinated in right of payment to the Obligations, or (y) secured by Liens on the Collateral on a junior basis to the Liens on the Collateral securing the Obligations (collectively, "Subordinated Indebtedness"), or (ii) prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Subordinated Indebtedness, except:

(a)    refinancings of such Subordinated Indebtedness pursuant to Section 6.2(a);

(b)    regularly scheduled interest and principal payments as and when due in respect of such Indebtedness, other than payments prohibited by the subordination provisions applicable thereto;

(c)    payments of or in respect of such Indebtedness made solely with Qualified Equity Interests (other than Equity Cure Contributions) in the Borrower or the conversion of such Indebtedness into Qualified Equity Interests of the Borrower; and

(d)      prepayments of intercompany Indebtedness permitted hereby owed by the Borrower or any Opco Paty to the Borrower or any Opco Paty, other than prepayments prohibited by the subordination provisions governing such Indebtedness.

**6.12    Change in Business**.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, engage in any line of business that is (i) substantially different from those lines of business carried on by it on the Closing Date (or any reasonable extension thereof) and (ii) not ancillary, corollary, complimentary or related thereto.

**6.13    Changes in Accounting, Name and Jurisdiction of Organization**.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, (i) change their fiscal year, (ii) change its name as it appears in official filings in its jurisdiction of organization or (iii) change its jurisdiction or form of organization, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, without at least ten (10) Business Days' prior written notice to the Administrative Agent and the acknowledgement of the Administrative Agent that all actions reasonably required by the Administrative Agent have been completed.

**6.14    No Negative Pledges**.  The Borrower shall not, and shall not permit any of the Opco Parties or their Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Subsidiary to pay dividends or make any other distribution on any of such Subsidiary's Equity Interests or Equity Interests Equivalents or to pay fees, including management fees, or make other payments and distributions to the Borrower or any Subsidiary, except pursuant to the terms of the Loan Documents or the terms of any other Indebtedness permitted hereby.  The Borrower shall not, and shall not permit any of the Opco Parties or their Subsidiaries to, directly or indirectly, enter into, assume or become subject to any contractual obligation prohibiting or otherwise restricting the existence of any Lien upon any Collateral in favor of the Administrative Agent to secure the Obligations, whether now owned or hereafter acquired except (i) in connection with any document or instrument governing Liens permitted herein, <u>provided</u> that any such restriction contained therein relates only to the Property subject to such Permitted Liens or (ii) with consent of the Administrative Agent.  Nothing in this <u>Section 6.14</u> shall prohibit (1) this Agreement or any of the other Loan Documents, (2) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted hereunder pending the consummation of such sale, (3) restrictions imposed by applicable law, (4) any agreement in effect at the time a Person first became a Subsidiary of any Opco Party, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary and such restrictions are limited to such Subsidiary and its Subsidiaries, (5) in the case of any Subsidiary that is not a wholly-owned Subsidiary of the Borrower, restrictions and conditions imposed by its Organizational Documents or any related joint venture, shareholder or similar agreements, or (6) contained in the Opco Credit Agreement or any financing documentation governing Indebtedness permitted to be incurred hereunder that are incurred by a Subsidiary, so long as such restrictions operate only upon the occurrence and during the continuance of an event of default under the documentation governing such Indebtedness and only impose restrictions on such Subsidiary and its Subsidiaries.

**6.15    Borrower's Holding Company Status**.  Notwithstanding anything contained in this Agreement or the other Loan Documents to the contrary, Borrower shall not:

(a)      form any new direct Subsidiaries, or own or acquire any assets other than the Equity Interests and Equity Interests Equivalents of Opco Holdings and, to the extent cash is temporarily transferred through the Borrower to effectuate a transaction expressly permitted by this Agreement, such cash during such transfer;

(b)      incur any liabilities other than (i) minimal liabilities necessary to maintain its separate organizational existence and to pay reasonable overhead expenses of Opco Parties and

their Subsidiaries and (ii) those incurred under or permitted by this Agreement and the other Loan Documents to which it is a party;

      (c)    incur any Indebtedness other than the Obligations and Guarantees of the other Opco Parties' obligations permitted by this Agreement;

      (d)    engage in any trade, business or operations (other than acting as a holding company for the equity of Opco Holdings and its Subsidiaries) and any administrative activities incidental or reasonably related thereto;

      (e)    merge, amalgamate or consolidate with any other Person;

      (f)    sell or otherwise transfer any of its assets;

      (g)    permit or suffer to exist any Lien on any of its assets other than Permitted Liens; provided, that no Lien securing borrowed money shall be permitted with respect to the Collateral; or

      (h)    accept or receive any Loans or Collateral (other than distributions that are expressly permitted by Section 6.12); provided that nothing herein shall prevent the Borrower from incurring liabilities with respect to Taxes as required by Law.

**6.16**    **Use of Proceeds**.  The Borrower shall not, nor shall it permit any of the Opco Parties or their Subsidiaries to, use the proceeds of the Advances other than for lawful purposes and in accordance with Sections 4.10 and 4.12.

### ARTICLE VII
### EVENTS OF DEFAULT

**7.1**    **Events of Default**.  The term "Event of Default" means any of the following events occurring for whatever reason, whether voluntary or involuntary, effected by operation of law, judgment, order or otherwise:

      (a)    A failure to pay when and as due any principal amount of the Loans;

      (b)    A default in the payment when and as due of any interest on the Loans or of fees or other amounts payable to the Lenders pursuant to this Agreement and such failure continues for period of three (3) Business Days after delivery of written notice to Borrower;

      (c)    A default in the due performance and observance of any of the covenants or agreements contained in (i) Sections 5.1(e) (solely with respect to delivery of a notice of a Default), 5.2, 5.14 or Article VI, or (ii) Sections 5.1(a), 5.1(b), 5.1(c) or 5.1(d), and, in any case of this clause (ii), such failure continues for a period of five (5) Business Days;

      (d)    A default (other than those defaults specifically described in other subsections of this Section 7.1) by the Borrower in the due performance and observance of any of the covenants contained in this Agreement or any other Loan Document and such failure continues for a period of thirty (30) days after the earlier to occur of (i) the date upon which a Responsible Officer of the Borrower becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by the Administrative Agent or Required Lenders;

(e)    The Borrower or any Subsidiary thereof (i) fails to make any payment beyond the applicable grace period, if any, in respect of (x) the ABL Facility or (y) its other Indebtedness (other than the Obligations) having an aggregate outstanding principal amount (individually or in the aggregate with all other such Indebtedness as to which such a failure shall exist) in excess of $2,500,000 or (ii) fails to observe or perform any other agreement or condition relating to the ABL Facility or any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the ABL Agent or ABL Lenders or the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, the obligations under the ABL Facility or such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem the obligations under the ABL Facility or such Indebtedness to be made, prior to its stated maturity; provided that such failure is unremedied and is not waived by the holders of such Indebtedness prior to the termination of the Commitments and acceleration of the Loans pursuant to Section 7.2;

(f)    An involuntary case under any applicable federal or state bankruptcy, insolvency or similar laws shall be commenced against any the Borrower or any obligor with respect other Opco Facility and the petition shall not be dismissed, stayed, bonded or discharged within ninety (90) days after the commencement of the case; the entry of a decree or order by a court having jurisdiction in the premises in respect of the Borrower or any Opco Party under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law; or the entry of a decree or order by a court having jurisdiction in the premises appointing a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Borrower or any Opco Party or of any substantial part of the property thereof, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days;

(g)    The commencement by the Borrower or any Opco Party of or consent to, a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law or the request or consent by it to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of either of the Borrower or any Opco Party or of any substantial part of the property thereof, or the making by it of a general assignment for the benefit of creditors, or the failure by the Borrower or any Opco Party to pay its debts generally as they become due, or the taking of any action by the Borrower or any Opco Party in furtherance thereof;

(h)    One or more judgments (i) for the payment of money in an aggregate amount in excess of $2,500,000 (other than any such judgment covered by insurance (other than under a self-insurance program) to the extent a claim therefor has been made in writing and liability therefor has not been denied by the insurer), shall be rendered against the Borrower or any Opco Party and the same shall remain undischarged for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Opco Party to enforce any such judgment or (ii) in the case of non-monetary judgments, which would reasonably be expected to result in a Material Adverse Occurrence, and which, in any case, remains undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder);

64

(i)      Any Loan Document or any material provision of any Loan Document shall at any time and for any reason cease to be valid and binding on or enforceable against any the Borrower shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any security interest and Lien on the Collateral purported to be granted to the Administrative Agent for the benefit of the Secured Parties by any Security Document shall for any reason (other than as expressly permitted hereunder or pursuant to the terms thereof) cease to be in full force and effect or create a valid security interest in any material portion of the Collateral or such security interest shall for any reason (other than the failure of the Administrative Agent to take any action within its control) cease to be a perfected security interest with the priority stated in the Security Documents, except (in each case) (x) to the extent that any such grant, perfection or priority is not required pursuant to the terms hereof or the Security Documents and (y) to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(j)      The occurrence of a Change of Control;

(k)      Any representation or warranty made or deemed made by the Borrower in this Agreement or any other Loan Document shall be untrue, incorrect or misleading in any material respect when made or deemed made;

(l)      The occurrence of an Event of Default (as defined in the Opco Credit Agreement); provided, that to the extent that such Event of Default (as defined in the Opco Credit Agreement) is waived pursuant to the terms of the Opco Credit Agreement prior to the acceleration thereof, the Event of Default contemplated by this clause (l) shall automatically be deemed to have been cured concurrently with such waiver; or

(m)      There shall be at any time any failure to satisfy the minimum funding standard as defined in ERISA or in Section 412 of the Code, whether or not waived, with respect to any Plan maintained by the Borrower, or to which the Borrower has any liabilities, or any trust created thereunder that would reasonably be expected to result in a Material Adverse Occurrence; or a trustee shall be appointed by PBGC or a federal district court to administer such Plan; or PBGC shall institute proceedings to terminate any such Plan; or the Borrower shall incur any liability to PBGC in connection with the termination of any such Plan; or any Plan or trust created under any Plan of the Borrower shall engage in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which would subject the Borrower to the tax or penalty on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code that results in a Material Adverse Occurrence.

**7.2**      __Action If Event of Default__.  If an Event of Default described in __Section 7.1(f)__ or __(g)__ shall occur, to the extent permitted by law, the full unpaid principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder shall automatically be due and payable without any declaration, notice, presentment, protest or demand of any kind (all of which are hereby waived) and the obligation of the Lenders to make additional Advances shall automatically terminate.  If any Event of Default other than pursuant to __Section 7.1(f)__ or __(g)__ shall occur and be continuing, the Required Lenders, upon written notice to the Borrower (which shall be given by the Administrative Agent at the request of the Required Lenders), may terminate the Lenders' obligation to make additional Advances and may declare the outstanding principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder to be due and payable without other notice to the Borrower, presentment, protest or demand of any kind (all of which are hereby waived), shall automatically terminate, whereupon the full unpaid amount of the Loans and any and all other Obligations, which shall be so declared due and payable shall bear interest at the Default Rate and shall be and become immediately due and payable.

65

**7.3**    **Remedies**.

(a)    Upon acceleration of the Loans, as provided in <u>Section 7.2</u>, the Administrative Agent shall, at the request of the Required Lenders, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and/or under applicable law.

(b)    The Administrative Agent, personally or by attorney, shall, at the request of the Required Lenders, proceed to protect and enforce its rights and the rights of the Lenders by pursuing any available remedy, including a suit or suits in equity or at law, whether for damages or for the specific performance of any obligation, covenant or agreement contained in this Agreement or in the Notes, or in aid of the execution of any power herein or therein granted, or for the enforcement of any other appropriate legal or equitable remedy, as the Administrative Agent shall deem most effectual to collect the payments then due and thereafter to become due on the Notes or under this Agreement, to enforce performance and observance of any obligation, agreement or covenant of the Borrower hereunder or under the Notes or to protect and enforce any of the Administrative Agent's or any Lender's rights or duties hereunder.

(c)    Upon acceleration of the Loans, as provided in <u>Section 7.2</u>, to the extent permitted by law, the Administrative Agent shall, if so directed by the Required Lenders, have the right to the appointment of a receiver for the Collateral of the Borrower pledged to secure the Obligations, both to operate and to sell such Collateral, and the Borrower hereby consents to such right and such appointment and hereby waives, to the fullest extent permitted by applicable law, any objection the Borrower may have thereto or the right to have a bond or other security posted by the Administrative Agent on behalf of the Lenders in connection therewith.

(d)    No remedy herein conferred upon or reserved to the Administrative Agent or any Lender is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or under any other Loan Document now or hereafter existing at law, in equity or by statute.

(e)    Each Lender agrees that it will not take any action, nor institute any actions or proceedings, against the Borrower hereunder or under any Loan Document, without the prior written consent of the Required Lenders or, as may be provided in this Agreement or the other Loan Documents, at the direction of the Administrative Agent with the consent of the Required Lenders.

## ARTICLE VIII
## THE ADMINISTRATIVE AGENT

**8.1**    **Appointment and Authorization**.    Each Lender hereby irrevocably appoints the Administrative Agent as the Administrative Agent of such Lender and authorizes the Administrative Agent to act on such Lender's behalf to the extent provided herein or under any of the other Loan Documents, and to take such other action and exercise such other powers as may be reasonably incidental thereto.  Each Lender hereby agrees that it will require any transferee of any of such Lender's interests in its Loans to irrevocably appoint and authorize the Administrative Agent as such transferee's Administrative Agent in accordance with the terms hereof.  Notwithstanding the use of the term "agent," it is expressly understood and agreed that the Administrative Agent shall not have any fiduciary responsibilities to any Lender by reason of this Agreement and that the Administrative Agent is merely acting as the representative of the Lenders with only those duties as are expressly set forth in this Agreement and the other Loan Documents. In its capacity as the Lenders' contractual representative, the Administrative Agent (i) does not hereby assume any fiduciary duties to the Borrower, any of the Lenders or any other Person (and no such fiduciary

duties shall be implied) and (ii) is acting as an independent contractor, the rights and duties of which are limited to those expressly set forth in this Agreement and the other Loan Documents.  The Borrower and each of the Lenders hereby agrees to assert no claim against the Administrative Agent on any agency theory or any other theory of liability for breach of fiduciary duty, all of which claims the Borrower and each Lender hereby waives.

     **8.2**     **Power**.  The Administrative Agent shall have and may exercise such powers under this Agreement and any other Loan Documents as are specifically delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including enforcement or collection of the Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and all holders of the Notes; provided, however, that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to any Loan Document or applicable law.  The Administrative Agent shall not have any implied duties or any obligation to take any action under this Agreement or any other Loan Document except such action as is specifically provided by this Agreement or any other Loan Document to be taken by the Administrative Agent.

     **8.3**     **Interest Holders**.  The Administrative Agent may treat each Lender, or the Person designated in the last notice filed with the Administrative Agent, whether under Section 9.3 or 9.9, or otherwise hereunder, as the holder of all of the interests of such Lender in its Loans until written notice of transfer, signed by such Lender (or the Person designated in the last notice filed with the Administrative Agent) and by the Person designated in such written notice of transfer, in form and substance satisfactory to the Administrative Agent, shall have been filed with the Administrative Agent.

     **8.4**     **Employment of Counsel; etc**.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document, and any instrument, agreement or document executed, issued or delivered pursuant or in connection herewith or therewith, by or through employees, agents and attorneys-in-fact and shall not be answerable for the default or misconduct of any such employee, agent or attorney-in-fact selected by it with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf of the Administrative Agent).  The Administrative Agent shall be entitled to rely on advice of counsel (including counsel who are the employees of the Administrative Agent) selected by the Administrative Agent concerning all matters pertaining to the agency hereby created and its duties under any of the Loan Documents.

     **8.5**     **Reliance**.  The Administrative Agent shall be entitled to rely upon and shall not be under a duty to examine or pass upon the validity, effectiveness, genuineness of this Agreement, any other Loan Document or any notice, consent, waiver, amendment, certificate, affidavit, letter, telegram, statement, paper, document or writing furnished pursuant to this Agreement or any other Loan Document, and the Administrative Agent shall be entitled to assume (absent actual knowledge to the contrary) that the same are valid, effective and genuine, have been signed or sent by the proper Person(s) and are what they purport to be.  The Administrative Agent shall be entitled to assume that no Default has occurred and is continuing unless it has actual knowledge, or has been notified in writing by the Borrower, of such fact, or has been notified by a Lender in writing that such Lender considers that a Default has occurred and is continuing, and such Lender shall specify in detail the nature thereof in writing.  The Administrative Agent shall not be liable hereunder for any action taken or omitted to be taken except for its own gross negligence or willful misconduct.  The Administrative Agent shall provide promptly each Lender with copies of such documents received from the Borrower pursuant to the terms of this Agreement or any other Loan Document as such Lender may reasonably request.

**8.6**     **General Immunity**.   Neither the Administrative Agent nor any of the Administrative Agent's directors, officers, agents, attorneys or employees shall be liable or responsible in any manner to the Borrower, any Lender or any other Person for any action taken or omitted to be taken by it or them under the Loan Documents or in connection therewith except for any liability imposed by law for its own willful misconduct or gross negligence.   Without limitation on the generality of the foregoing, the Administrative Agent:  (a) shall not be responsible to any Lender for any recitals, statements, warranties, representations, or failure or delay of performance under the Loan Documents or any agreement or document related thereto or for the financial condition of the Borrower; (b) shall not be responsible for the authenticity, accuracy, completeness, value, validity, effectiveness, due execution, legality, genuineness, enforceability or sufficiency of any of the Loan Documents, any provisions thereof or any document contemplated thereby; (c) shall not be responsible for the validity, genuineness, creation, perfection or priority of any of the Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security; (d) shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, covenants or conditions of any of the Loan Documents on the part of the Borrower or of any of the terms of any such agreement by any party thereto and shall have no duty to inspect the property (including the books and records) of the Borrower; (e) shall incur no liability under or in respect of any of the Loan Documents or any other document or Collateral by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, cable or telex) furnished pursuant to this Agreement or any other Loan Document; (f) shall incur no liability to the Borrower or any other Person as a consequence of any failure or delay in performance by or any breach by, any Lender or Lenders of any of its or their obligations under this Agreement; and (g) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by the Administrative Agent.

**8.7**     **Credit Analysis**.   Each Lender has made, and shall continue to make, its own independent investigation or evaluation of the operations, business, property and condition, financial and otherwise, of the Borrower in connection with the making of its commitments hereunder and has made, and will continue to make, its own independent appraisal of the creditworthiness of the Borrower.   Without limiting the generality of the foregoing, each Lender acknowledges that prior to the execution of this Agreement, it had this Agreement and all other Loan Documents and such other documents or matters as it deemed appropriate relating thereto reviewed by its own legal counsel as it deemed appropriate, and it is satisfied with the form and substance of this Agreement and all other Loan Documents.   Each Lender agrees and acknowledges that neither the Administrative Agent nor any of its directors, officers, attorneys or employees makes any representation or warranties about the creditworthiness of the Borrower or with respect to the due execution, legality, validity, genuineness, effectiveness, sufficiency or enforceability of this Agreement or any other Loan Documents, or the validity, genuineness, execution, perfection or priority of Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security.   Each of the Lenders shall use its commercially reasonable efforts to provide the other Lenders with any credit or other material information which comes into the possession of such Lender on or before a Default or Event of Default or at any time thereafter with respect to the operations, business, property, condition or creditworthiness of the Borrower but no Lender shall have any liability to any other Lender for its inadvertent failure to do so.   Each Lender, upon the request of another Lender, shall deliver to such other Lender any financial statement, report, certificate or other document required to be delivered to the Lenders pursuant to Section 5.1 which the requesting Lender did not receive.   Except as explicitly provided herein, neither the Administrative Agent nor any has any duty or responsibility, either initially or on a continuing basis, to provide any other Lender with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before a Default or an Event of Default or at any time thereafter.

**8.8**     **Administrative Agent and Affiliates**.  With respect to the Loans made by it and the Notes issued to it, the Administrative Agent, in its individual capacity, shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not an Administrative Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent in its individual capacity.  The Administrative Agent, in its individual capacity, and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, the Borrower, and any Person who may do business with or own securities of the Borrower, all as if it were not an Administrative Agent and without any duty to account therefor to the Lenders.

**8.9**     **Indemnification**.  The Lenders jointly and severally agree to indemnify and hold harmless the Administrative Agent and its officers, directors, employees and agents (to the extent not reimbursed by the Borrower), ratably according to their respective Commitments, from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent or any of its officers, directors, employees or agents, in any way relating to or arising out of any investigation, litigation or proceeding concerning or relating to the transaction contemplated by this Agreement or any of the other Loan Documents, or any of them, or any action taken or omitted by the Administrative Agent or any of its officers, directors, employees or agents, under any of the Loan Documents; provided, however, that no Lender shall be liable for any portion of such claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of the Administrative Agent or any of its officers, directors, employees or agents.  Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for such Lender's proportionate share of any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent or its officers, directors, employees or agents in connection with the preparation, execution, administration, or enforcement of, or legal advice in respect of rights or responsibilities under any of, the Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower.

**8.10**     **Security Documents**.  The Administrative Agent, as collateral agent hereunder and under the Security Documents, is hereby authorized to act on behalf of the Secured Parties, in its own capacity and through other agents and sub-agents appointed by it in good faith, under the Security Documents, provided that the Administrative Agent shall not agree to the release of any Collateral, or any property encumbered by any mortgage, pledge or security interests except in compliance with Section 8.11.  In connection with its role as secured party with respect to the Collateral hereunder, the Administrative Agent shall act as collateral agent, for itself and for the ratable benefit of the Lenders, and such role as Administrative Agent shall be disclosed on all appropriate accounts, filings, mortgages, and other Collateral documentation.

**8.11**     **Collateral Matters**.  The Administrative Agent is authorized on behalf of all the Lenders without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to the Security Documents or any Collateral thereunder which may be necessary to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Security Documents.  The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral (i) upon termination of the Commitments and payment in full of all Loans and all other Obligations of the Borrower known to the Administrative Agent and payable under this Agreement or any other Loan Document; (ii) [reserved]; (iii) [reserved]; or (iv) if approved, authorized or ratified in writing by all the Lenders.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section 8.11, provided

that the absence of any such confirmation for whatever reason shall not affect the Administrative Agent's rights under this <u>Section 8.11</u>.

**8.12**    <u>**Action by the Administrative Agent**</u>.

(a)    The Administrative Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights with which it may be vested and with respect to taking or refraining from taking any action or actions which it may be able to take under or in respect of, this Agreement, unless the Administrative Agent shall have been instructed by the Required Lenders to exercise or refrain from exercising such rights or to take or refrain from taking such action; <u>provided</u> that the Administrative Agent shall not exercise any rights under <u>Section 7.3</u> of this Agreement except upon the request of the Required Lenders or of all the Lenders, where expressly required by this Agreement. The Administrative Agent shall incur no liability under or in respect of this Agreement with respect to anything which it may do or refrain from doing in the exercise of its judgment or which may seem to it to be necessary or desirable in the circumstances, except for its gross negligence or willful misconduct as determined by a final, non-appealable order of a court having jurisdiction over the subject matter.

(b)    The Administrative Agent shall not be liable to the Lenders or to any Lender in acting or refraining from acting under this Agreement or any other Loan Document in accordance with the instructions of the Required Lenders or of all the Lenders, where expressly required by this Agreement, and any action taken or failure to act pursuant to such instructions shall be binding on all Lenders.

(c)    <u>Notice of Default or Event of Default</u>. In the event that the Administrative Agent or any Lender shall acquire actual knowledge, or shall have been notified in writing, of any Default (other than through a notice by one party hereto to all other parties), such Lender shall promptly notify the Administrative Agent and the Administrative Agent shall promptly notify the Lenders, and the Administrative Agent shall take such action and assert such rights under this Agreement and the other Loan Documents as the Required Lenders (or all the Lenders, where expressly required by this Agreement) shall request in writing, and the Administrative Agent shall not be subject to any liability by reason of its acting pursuant to any such request. If the Required Lenders shall fail to request the Administrative Agent to take action or to assert rights under this Agreement in respect of any Default within ten (10) days after their receipt of the notice of any Default from the Administrative Agent or any Lender, or shall request inconsistent action with respect to such Default, the Administrative Agent may, but shall not be required to, take such action and assert such rights as it deems in its discretion to be advisable for the protection of the Lenders, except that, if the Required Lenders have instructed the Administrative Agent not to take such action or assert such right, in no event shall the Administrative Agent act contrary to such instructions.

**8.13** **Successor Administrative Agent**.  The Administrative Agent may resign at any time as Administrative Agent under the Loan Documents by giving thirty (30) days' prior written notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), have the right to appoint a successor Administrative Agent hereunder that is organized under the laws of the United States of America or a political subdivision thereof.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any state thereof and having a combined capital and surplus of at least $250,000,000.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.  Upon the acceptance of any appointment as Administrative Agent under the Loan Documents by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.   After any retiring Administrative Agent's resignation as Administrative Agent under the Loan Documents, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under the Loan Documents.

**8.14** **Authorization to Enter into Intercreditor Agreements.**  Each Lender consents to and authorizes Administrative Agent's execution and delivery of any intercreditor or subordination agreements (including, without limitation any agreement among lenders) from time to time as contemplated by the terms hereof on behalf of such Lender and agrees to be bound by the terms and provisions thereof, including any purchase option contained therein.

**8.15** **Erroneous Payments**.

(a)     If the Administrative Agent notifies a Lender, or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party, such Lender (any such Lender, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf)  (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the

Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting immediately preceding clause (a), each Lender, or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(1)    (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(2)    such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.15(b).

(c)    Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)    In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf)  (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Term Loans (but not its Term Loan Commitments) of the relevant class with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Term Loans (but not Term Loan Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption Agreement as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Term Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment

72

Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Term Loan Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Term Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Term Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Term Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Term Loan Commitments of any Lender and such Term Loan Commitments shall remain available in accordance with the terms of this Agreement.   In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Term Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender or Secured Party under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)    The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making such Erroneous Payment.

(f)    To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)    Each party's obligations, agreements and waivers under this Section 8.15 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender the termination of the Term Loan Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE IX
## MISCELLANEOUS

**9.1    Waivers, Amendments; etc**.  The provisions of this Agreement, including the closing conditions set forth herein, may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders:

(a)    that no amendment, waiver or consent shall:

(1)      extend or increase the Commitment of any Lender or subject a Lender to any additional obligations, without the written consent of such Lender,

(2)      reduce the principal of, or interest on, the Loans or any fees or other amounts payable to any Lender hereunder without the written consent of such Lender; provided, that, notwithstanding the foregoing or anything else in this clause (a), any waiver or modification to the MFN Adjustment shall require the consent of each Lender adversely affected thereby except to the extent in connection with (A) a "first out" or "priming" Incremental Term Loan incurred in accordance with clause (6) below, (B) Senior Indebtedness incurred in accordance with clause (8) below, or (C) any other Incremental Term Loan with respect to which a ratable opportunity to participate is offered to all Lenders, in each of which such cases such MFN Adjustment may be waived or amended by the Supermajority Lenders;

(3)      postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable to any Lender hereunder, or any scheduled reduction of Commitments, without the written consent of such Lender,

(4)      reduce the percentage of Lenders which shall be required for the Lenders or any of them to take any action hereunder, or the definition of "Required Lenders" or "Supermajority Lenders", unless in writing and signed by all the Lenders,

(5)      discharge the Borrower from its obligations under the Loan Documents, unless in writing and signed by all the Lenders,

(6)      subject to clause (8) below with respect to Senior Priority Indebtedness, other than in connection with amendments to this Agreement to allow for a "first out" or "priming" Incremental Term Loan to the extent the opportunity to ratably participate in such Incremental Term Loan is offered to all Term Loan Lenders (in each case, which shall only require consent of the Supermajority Lenders), amend Section 2.8 or this Section 9.1, or any other provision of this Agreement or any other Loan Document in a manner that would alter the pro rata sharing or application of payments, or the pro rata treatment of the Lenders, or alter any payment waterfall or the priority or order of application of any proceeds or payments, unless in writing and signed by all Lenders (it being understood and agreed that any separate "agreement among lenders" executed and/or acknowledged by the Lenders shall not constitute a "Loan Document" for purposes of this subclause (6)),

(7)      release the security interest in all or substantially all of the Collateral granted to the Administrative Agent, for the benefit of the Secured Parties, under the Security Documents unless agreed in writing by all the Lenders or except as specifically permitted hereby or thereby as of the Closing Date,

(8)      unless agreed in writing by all the Lenders, (x) to subordinate the priority of any of the Liens on all or substantially all Collateral in favor of the Administrative Agent, for the benefit of the Secured Parties, in favor of any other creditor of the Borrower or class of Lenders hereunder, (y) subordinate any of the Obligations in right of payment to any other indebtedness of the Borrower or indebtedness hereunder  or (z) subordinate the payment priority of the Loans as set forth in a post-default waterfall or any similar provision providing for payment priority among the Loans hereunder (any such payment senior Class, "Senior Priority Indebtedness") (or agree to any amendment, waiver or modification that would facilitate any of the foregoing) (any such other indebtedness or other obligations, to which such liens securing any of the Obligations or such Obligations, as applicable, are subordinated, "Senior Indebtedness"), in

74

either case of subclause (x), (y) or (z), unless (A) Supermajority Lenders shall have agreed and (B) each directly adversely affected Lender has been offered a *bona fide* opportunity to fund or otherwise provide its *pro rata* share (based on the amount of Loans that are directly adversely affected thereby held by each Lender in respect of such Term Loans) of the Senior Indebtedness on the same terms (other than *bona fide* backstop fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction; such fees and expenses, "Ancillary Fees") as offered to all other providers (or their affiliates) of the Senior Indebtedness and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its *pro rata* share of the fees and any other similar benefit (other than Ancillary Fees) of the Senior Indebtedness afforded to the providers of the Senior Indebtedness (or any of their affiliates) in connection with providing the Senior Indebtedness pursuant to a written offer made to each such adversely affected Lender describing the material terms of the arrangements pursuant to which the Senior Indebtedness is to be provided, which offer shall remain open to each such adversely affected Lender for a period of not less than five (5) Business Days; provided that:

> (A)     any Lender may designate any of its Affiliates to provide such priming Indebtedness on its behalf with the existing Obligations of such Lender being treated, for purposes hereof, as though such Lender had provided such priming Indebtedness itself;

> (B)     any such offer may be made on a post-closing basis via syndication,

> (C)     subordination to any capital lease or similar acquisition financing shall not be subject to the foregoing, and

> (D)     for the avoidance of doubt, the foregoing shall not restrict the incurrence of any Indebtedness incurred by the Opco Parties;

(9)     permit or facilitate the purchase, repayment or retirement for value of any Loans on a non-*pro rata* basis with respect to the other Loans of the same Class, unless such purchase, repayment or retirement is offered to all such Lenders holding Loans of the same Class on the same terms or all Lenders agree in writing;

(b)     no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any Note;

(c)     [reserved]; and

(d)     any amendment, modification or consent expressly permitted by Section 2.12 shall be permitted to be made as referenced therein and shall not require the consent of the Required Lenders or any other Lender.

No failure or delay on the part of the Administrative Agent, any Lender or the holder of any Note in exercising any power or right under this Agreement or any Note shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on the Borrower in any case shall entitle it to any notice or demand in similar or other circumstances.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

**9.2** **Payment Dates**.  Except as expressly provided in this Agreement, whenever any payment to be made hereunder by or to the Lenders or to the holder of any Note shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be included in computing the fees or interest payable on such next succeeding Business Day.

**9.3** **Notices**.  All communications and notices provided under this Agreement shall be in writing by in writing (including email or facsimile transmission), telecopy or personal delivery and if to the Borrower addressed or delivered to the Borrower at its address shown on the signature page hereof or if to the Administrative Agent delivered to it at the address shown on **Schedule 9.3** attached hereto, or to any party at such other address as may be designated by such party in a notice to the other parties.  Any notice shall be deemed given when transmitted by email, telecopier or, when personally delivered, if mailed properly addressed, shall be deemed given upon the third Business Day after the placing thereof in the United States mail, postage prepaid.

**9.4** **Costs and Expenses**.  The Borrower agrees to pay, or reimburse, the Administrative Agent for all expenses reasonably incurred for the preparation of this Agreement, including exhibits, and the Loan Documents and any amendments hereto or thereto or consents or waivers hereunder or thereunder as may from time to time hereafter be required thereby or by the transactions contemplated hereby, including, but not limited to, the fees and out-of-pocket expenses of the Administrative Agent, charges and disbursements of special counsel to the Administrative Agent from time to time incurred in connection with the preparation and execution of this Agreement and any document relevant to this Agreement, including the Loan Documents, any amendments hereto or thereto, or consents or waivers hereunder or thereunder, and the consideration of legal questions relevant hereto and thereto.  The Borrower agrees to pay, or reimburse, the Administrative Agent and each Lender upon demand for all costs and expenses (including attorneys', auditors' and accountants' fees and expenses) reasonably incurred and arising out of the transactions contemplated by this Agreement and the Loan Documents, in connection with any work-out or restructuring of the transactions contemplated hereby and by the Loan Documents and any collection or enforcement of the obligations of the Borrower hereunder or thereunder, whether or not suit is commenced, including attorneys' fees and legal expenses (limited to one (1) primary counsel for the Administrative Agent and, if deemed appropriate by the Administrative Agent, one (1) counsel in each relevant jurisdiction and any special counsel (except in the case of actual or perceived conflict, in which case one (1) additional counsel for each Lender similarly situated in respect of such conflict) in connection with any appeal of a lower court's order or judgment.  The obligations of the Borrower under this Section 9.4 shall survive any termination of this Agreement.

**9.5** **Indemnification**.  In consideration of the execution and delivery of this Agreement by the Administrative Agent and the Lenders, the Borrower agrees to indemnify and hold harmless the Administrative Agent, each Lender and their respective Affiliates, officers, directors, employees, shareholders, agents, successors and assigns (the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities and expenses (other than the expenses to be paid or reimbursed pursuant to Section 9.4 above), joint or several, to which any such Indemnified Party may become subject arising out

of or in connection with this Agreement and the other transactions contemplated hereby, the Advances and the use of proceeds thereof in connection with any claim, litigation, investigation or proceeding (any of the foregoing, a "Proceeding") relating to any of the foregoing, regardless of whether any such Indemnified Party is a party hereto or whether a Proceeding is brought by a third party or by you, the Borrower or any Opco Party or Affiliate of a Opco Party, and to reimburse each such Indemnified Party within ten (10) days of receipt of an invoice for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; it being understood and agreed that the Borrower shall not be required to reimburse legal fees or expenses of more than one counsel to all Indemnified Parties, taken as a whole and in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel to each group of affected Indemnified Parties similarly situated taken as a whole (and, if reasonably necessary as determined by the Administrative Agent, a single local counsel for all Indemnified Parties taken as a whole in each relevant jurisdiction and, in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel in each relevant jurisdiction to each group of affected Indemnified Parties similarly situated taken as a whole); provided that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent (x) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Party or any Related Indemnified Party (as defined below), (y) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from a material breach of the material obligations of any Indemnified Party or any of its Related Indemnified Parties under this Agreement or any of the Loan Documents at a time when the Borrower has not breached its obligations hereunder in any material respect, or (z) they relate to any dispute solely among Indemnified Parties at a time when the Borrower has not breached its obligations hereunder or any other Loan Document in any material respect (other than any claims against the Administrative Agent in its capacity or in fulfilling its role as Administrative Agent, but not any other person or entity party to any such Proceeding).

Notwithstanding any other provision of this Agreement or any Loan Document, (i) no Indemnified Party or Related Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of any Indemnified Party and (ii) none of the Borrower, any of its Affiliates or any Indemnified Party or Related Indemnified Party shall be liable for any indirect, special, punitive or consequential damages incurred in connection with this Agreement or the transactions contemplated herein (provided that this provision shall not limit the Borrower's indemnification obligations set forth above).  For purposes hereof, a "Related Indemnified Party" of an Indemnified Party means (1) any controlling person or controlled affiliate of such Indemnified Party, (2) the respective directors, trustees, officers, or employees of such Indemnified Party or any of its controlling persons or controlled Affiliates and (3) the respective agents or advisors of such Indemnified Party or any of its controlling persons or controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnified Party, controlling person or such controlled Affiliate; provided that each reference to a controlled Affiliate or controlling person in this paragraph pertains to a controlled Affiliate or controlling person involved in the negotiation of this Agreement and the other Loan Documents.

The Borrower shall not be liable for any settlement of any Proceedings effected without the Borrower's consent (which consent shall not be unreasonably conditioned, withheld or delayed), but if settled with the Borrower's written consent or if there is a final judgment for the plaintiff in any such Proceedings, the Borrower agrees to indemnify and hold harmless each Indemnified Party from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in

accordance with this Section 9.5.  The Borrower shall not, without the prior written consent of an Indemnified Party, effect any settlement or consent to the entry of any judgment of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Party, unless (i) such settlement includes an unconditional release of such Indemnified Party in form and substance reasonably satisfactory to such Indemnified Party from all liability on claims that are the subject matter of such Proceedings, and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party.

The provisions of this Section 9.5 shall survive termination of this Agreement and payment in full of the Notes.  This Section 9.5 shall not apply with respect to Taxes, other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

9.6     **Severability**.  Any provision of this Agreement, the Notes or any other Loan Document executed pursuant hereto which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, the Notes or any other Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

9.7     **Headings**.  The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions hereof.

9.8     **Governing Law**.  This Agreement and the Notes shall each be deemed to be a contract made under, governed by and interpreted pursuant to the internal laws (and not the law of conflicts) of the State of New York.

9.9     **Successors and Assigns.**

(a)     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns except that:  (i) the Borrower may not assign or transfer its rights hereunder without the prior written consent of all of the Lenders and the Administrative Agent; and (ii) any assignment by a Lender must be made in compliance with subsection (b) below and any participation by a Lender must be made in compliance with subsection (c) below.  Notwithstanding clause (ii) of this subsection (a), any Lender may at any time, without the consent of Borrower or the Administrative Agent, assign all or any portion of its rights under this Agreement and its Notes to a Federal Reserve Bank.  Except to the extent otherwise required by its context, the word "Lender" where used in this Agreement means and includes any such assignee and such assignee shall be bound by and have the benefits of this Agreement the same as if such holder had been a signatory hereto.

(b)     (i) Any Lender may, in accordance with applicable law, at any time assign to one or more banks or other entities that are Eligible Assignees all or a portion of its Commitments, Advances owing to it, and its rights and obligations under this Agreement in respect thereof in accordance with the provisions of this subsection (b).  Each assignment shall be of a constant, and not a varying, ratable percentage of the assigning Lender's rights and obligations under this Agreement and each Eligible Assignee shall assume a pro rata share of the assigning Lender's obligations determined by the percentage of the Commitments assigned for the period from the effective date of the assignment through the Maturity Date.  Such assignment shall be substantially in the form of the Assignment and Assumption Agreement attached as **Exhibit E** hereto (the "Assignment and Assumption Agreement") and shall not be permitted hereunder unless:

(1)     the amount of the Loan or Commitment assigned by the assigning Lender pursuant to each assignment shall be at least $1,000,000 in the aggregate (or the entirety of such assigning Lender's Loan, if less), or

(2)     such assignment is to another Lender or an Affiliate of a Lender, in which case no minimum amount shall apply.

(ii) The consent of the Administrative Agent and, provided no Default or Event of Default then exists, the Borrower (which consents shall not be unreasonably withheld or delayed) shall be required prior to an assignment becoming effective with respect to a transferee which is not a Lender, an Affiliate of a Lender, or an Approved Fund.  The Borrower's consent shall be deemed to have been given unless the Borrower objects within ten (10) Business Days after receipt of notice of such assignment.  Notwithstanding anything herein to the contrary:

(1)     except to the extent otherwise agreed by the Required Lenders (and subject to a right of first offer to existing Lenders as described in clause (2) below), prior to the one-year anniversary of the Closing Date, no Lender may assign any portion of its Loans or Commitments hereunder other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund, and

(2)     from and after the one-year anniversary of the Closing Date, no Lender may assign any portion of its Loans or Commitments hereunder (other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund), unless the proposed assignor Lender notifies the Administrative Agent in writing of the proposed terms of such assignment and the Administrative Agent provides to each then-existing Lender an offer for all Lenders to purchase their pro rata portion of such Loans and Commitments being assigned, according to the percentages of their respective Loans and Commitments at the same terms agreed by the proposed assignee.

(A)     If any Lender does not notify the Administrative Agent in writing that such Lender agrees to purchase its pro rata share of such assigned Loans and Commitments at such proposed terms in its entirety within ten (10) Business Days of such offer, that portion of the assigned Loans and Commitments not accepted by the applicable Lenders shall be offered to the applicable accepting Lenders on a non-pro rata basis at the same proposed terms; and

(B)     If the applicable accepting Lenders do not accept the remainder of the proposed assigned Loans and Commitments at such proposed terms in its entirety on a non-pro rata basis within five (5) Business Days after such offer, that portion of the proposed assigned Loans and Commitments not accepted by the applicable accepting Lenders may be offered by the assigning Lender to any Persons that would constitute Eligible Assignees at such proposed terms.

(iii) Upon (i) delivery to the Administrative Agent of an executed Assignment and Assumption Agreement, together with any required consents and (ii) payment of a $3,500 fee to the Administrative Agent for processing such assignment, such assignment shall become effective on the effective date specified in such Assignment and Assumption Agreement; provided, that:

(1)     if an assignment by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such assignment and

(2)      if an assignment by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such assignment (unless waived or reduced by the Administrative Agent).

(iv) On and after the effective date of such assignment, such transferee, if not already a Lender, shall for all purposes be a Lender party to this Agreement and any other Loan Documents executed by the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party hereto, and no further consent or action by the Borrower, the Lenders or the Administrative Agent shall be required to release the transferor Lender with respect to the percentage of the  Commitment and Advances assigned to such transferee Lender.   To the extent requested by the applicable Lenders, upon the consummation of any assignment pursuant to this Section 9.9, the Administrative Agent and the Borrower shall make appropriate arrangements so that replacement Notes are issued to such transferor Lender and new Notes or, as appropriate, replacement Notes, are issued to such transferee Lender, in each case in principal amounts reflecting their Commitment, as adjusted pursuant to such assignment.

(c)

(1)      Prior to the one-year anniversary of the Closing Date, no Lender may sell participations in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder) other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund;

(2)      From and after the one-year anniversary of the Closing Date, each Lender may, without the consent of the Borrower, sell participations to one or more banks or other entities that are Eligible Assignees in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of, and obligations under, Section 10.1 and of the cost protection provisions contained in Section 10.4, as well as Sections 9.19 and 10.6 to the extent of the Lender selling such participation and the Borrower's aggregate obligations with respect to Section 10.1 and Section 10.4 shall not be increased by reason of such participation, provided that such participant shall not be entitled to the benefits of Sections 10.1 and 10.4 unless such participant complies with Section 10.1(e) as (and to the extent) applicable, as if such participant were a Lender (it being understood that the documentation required under Section 10.1(e) shall be delivered to the participating Lender) (iv) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right (and shall not limit its rights) to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers with respect to any fees payable hereunder (to the extent such participants are entitled to such fees) or the amount of principal of or the rate at which interest is payable on the Loans, or the dates fixed for payments of principal of or interest on the Loans). Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any person except to the extent that such disclosure is necessary to establish that such commitment,

loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement.

(d)    The Administrative Agent shall maintain a copy of each Assignment and Assumption Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary. It is the intent of the parties that the Obligations shall be treated as issued in registered form under Section 5f. 103-1(c) of the United States Treasury Regulations. Upon the Administrative Agent's receipt of a duly completed Assignment and Assumption Agreement executed by an assigning Lender, an assignee Lender that is an Eligible Assignee and, to the extent required hereunder, the Borrower, such Eligible Assignee's completed Administrative Questionnaire (unless the assignee is already a Lender), the fee referred to in Section 9.9(b) above, and any written consent to such assignment required by such subsection, the Administrative Agent shall accept such Assignment and Assumption Agreement and record the information contained therein in the Register. No assignment shall be effected for purposes of this Agreement unless it has been recorded in the Register as provided in this subsection.

(e)    Notwithstanding anything to the contrary contained in this Section 9.9, a Lender that is a fund that invests in bank loans may pledge all or a portion of its rights in connection with this Agreement to the trustee or other agent for holders of obligations owed, or securities issued, by such fund as security for such obligations or securities, provided that any foreclosure or other exercise of remedies by such trustee shall be subject, in all respects, to the provisions of this Section 9.9 regarding assignments. No pledge described in the immediately preceding sentence shall release any such Lender from its obligations hereunder.

(f)    Except as specifically set forth in this Section 9.9, nothing in this Agreement, expressed or implied, is intended to or shall confer on any Person other than the respective parties hereto and thereto and their successors and assignees permitted hereunder and thereunder any benefit or any legal or equitable right, remedy or other claim under this Agreement or any Notes.

(g)    The provisions of this Section 9.9 shall not apply to any purchase of participations among the Lenders pursuant to Section 2.5.

(h)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance

81

with, with respect to Term Loans and its Applicable Term Loan Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(i)      Any Lender may assign all or any portion of its Term Loans hereunder to the Borrower or Opco Party (any such Person, a "Purchasing Party"), but only if, (i) such assignment is made solely in exchange for cash consideration, pursuant to a process open to all Lenders holding Loans of the same Class pursuant to customary procedures to be agreed between the Borrower and the Administrative Agent at the time of any such auction (including pursuant to a "Dutch auction" or "reverse Dutch auction," and which shall include the ability of the Borrower to purchase Term Loans at a discount to par) offered on a *pro rata* basis among Lenders holding Loans of the same Class, (ii) any such purchased Term Loans shall be automatically and permanently cancelled immediately upon acquisition thereof by the Purchasing Party and no longer outstanding for any purpose hereunder, (iii) [reserved], and (iv) no Event of Default has occurred or is continuing, or would result therefrom.

**9.10**   **Execution in Counterparts**.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**9.11**   **Several Liability**.  The Obligations of the Administrative Agent and each of the Lenders hereunder are several, not joint.

**9.12**   **Financial Information**.  The Borrower assumes responsibility for keeping itself informed of its own financial condition and the financial condition of any and all endorsers and/or other guarantors of all or any part of the Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Obligations, or any part thereof, that diligent inquiry would reveal, and the Borrower agrees that the Administrative Agent and the Lenders shall have no duty to advise the Borrower of information known to them regarding such condition or any such circumstances.

**9.13**   **Entire Agreement**.  Except as otherwise expressly provided herein, this Agreement and the other documents described or contemplated herein embody the entire agreement and understanding among the parties hereto and thereto and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

**9.14**   **Other Relationships**.   No relationship created hereunder or under any other Loan Document shall in any way affect the ability of the Administrative Agent or its Affiliates and each Lender or their respective Affiliates to enter into or maintain business relationships with the Borrower beyond the relationships specifically contemplated by this Agreement and the other Loan Documents.

**9.15**   **Consent to Jurisdiction**.  BORROWER HEREBY IRREVOCABLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NOTES OR ANY OTHER LOAN DOCUMENT AND HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  BORROWER HEREBY

IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.  EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING BY UNITED STATES CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OF COPIES OF SUCH PROCESS TO THE BORROWER'S ADDRESS REFERENCED IN <u>SECTION 9.3</u>.  EACH PARTY AGREES THAT A JUDGMENT, FINAL BY APPEAL OR EXPIRATION OF TIME TO APPEAL WITHOUT AN APPEAL BEING TAKEN, IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS SECTION SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY LENDER TO BRING ANY ACTION OR PROCEEDING AGAINST THE BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

**9.16**   <u>**Waiver of Jury Trial**</u>.  THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY NOTE, OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

**9.17**   <u>**USA Patriot Act**</u>.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Act. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**9.18**   <u>**Confidentiality**</u>.

(a)    Each of the Administrative Agent, each Lender agree to maintain the confidentiality of information obtained by it pursuant to any Loan Document, except that such information may be disclosed (i) with the Borrower's written consent, (ii) in any legal, judicial, administrative proceeding or compulsory process or otherwise as required by applicable law or regulations (in which case such Person agrees to promptly notify the Borrower to the extent practicable and permitted by applicable law); (iii) upon the request or demand of any Governmental Authority having jurisdiction over the Administrative Agent, such Lender or their respective Affiliates (in which case such Person agrees to, except with respect to any audit or examination conducted by bank accountants, any governmental bank or insurance regulatory authority exercising examination or regulatory authority, or any regulatory requests made by the National Association of Insurance Commissioners, promptly notify the Borrower to the extent lawfully permitted to do so); (iv) to officers, directors, trustees, agents, members, partners, equity holders, approved and managed funds, employees, attorneys, prospective investors, accountants and advisors of the Administrative Agent or any Lender who are informed of the confidential nature of such information and are or have been advised of their obligation to keep such information confidential solely on a need-to-know basis in connection with the transactions contemplated by

this Agreement; (v) to any Affiliates of the Administrative Agent, any Lender (<u>provided</u> that any such Affiliate is advised of its obligation to retain such information as confidential) on a need-to-know basis in connection with the transactions contemplated by this Agreement; (vi) to the extent any such information becomes publicly available other than by reason of disclosure in breach of this Agreement; and (vii) in connection with the exercise or enforcement of any right or remedy under any Loan Document.

**9.19**   <u>**Replacement of Lenders**</u>.  If the Borrower is entitled to replace a Lender pursuant to the provisions of <u>Section 10.6</u>, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 9.9</u>), all of its interests, rights (other than its existing rights to payments pursuant to <u>Sections 10.1</u> and <u>10.4</u> with respect to payments made prior to such assignment) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)      the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in <u>Section 9.9(b)</u>;

(b)      such Lender shall have received payment of an amount equal to 100% of the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 10.5</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)      in the case of any such assignment resulting from a claim for compensation under <u>Section 10.4</u> or payments required to be made pursuant to <u>Section 10.1</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(d)      such assignment does not conflict with applicable Laws; and

(e)      in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**9.20**   <u>**[Reserved]**</u>.

**9.21**   <u>**Electronic Execution of Assignments and Certain Other Documents**</u>.  The words "delivery," "execute," "execution," "signed," "signature," and words of like import in any Loan Document or any other document executed in connection herewith shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the

84

Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary neither the Administrative Agent nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent or such Lender pursuant to procedures approved by it and provided further without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

**9.22    [Reserved]**.

<div align="center">

**ARTICLE X**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

</div>

**10.1    Taxes**.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)    Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws.  If any applicable Laws (as determined in the good faith discretion of the applicable withholding agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or the Borrower, then the Administrative Agent or the Borrower shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If the Borrower or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment on account of any obligation of the Borrower under any Loan Document, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code and provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 10.1) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)    If the Borrower or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment on account of any obligation of the Borrower under any Loan Document, then (A) the Borrower or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Borrower or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and, if paid by the Administrative Agent, the Administrative Agent shall provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this

<div align="center">85</div>

Section 10.1) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)      Payment of Other Taxes by Borrower.  Without limiting the provisions of subsection (a) above, Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)      Tax Indemnifications.

(i)      The Borrower shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 10.1) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)      Each Lender shall, and does hereby, severally indemnify and shall make payment in respect thereof within ten (10) days after demand therefor, (A) the Administrative Agent against any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), and (B) the Administrative Agent and the Borrower, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.9(c) relating to the maintenance of a Participant Register, and (C) the Administrative Agent and the Borrower, as applicable, against any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent or the Borrower in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent or the Borrower to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document or otherwise payable by the Administrative Agent or the Borrower from any other source against any amount due to the Administrative Agent or the Borrower under this clause (ii).

(d)      Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority, as provided in this Section 10.1, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)      Status of Lenders; Tax Documentation.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably

86

requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.1(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate, IRS

Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate satisfactory to the Administrative Agent on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies (or originals, as required) of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(E)    the Administrative Agent shall deliver to the Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that the Administrative Agent is a U.S. Person exempt from U.S. federal backup withholding tax.

(iii)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 10.1 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds. Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes ("Refund") as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 10.1, it shall pay to the Borrower an amount equal to such Refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower

under this Section 10.1 with respect to the Taxes giving rise to such Refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such Refund), provided that the Borrower, upon the request of the Recipient, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such Refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Borrower pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such Refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

(g)    Survival.  Each party's obligations under this Section 10.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**10.2    [Reserved].**

**10.3    [Reserved].**

**10.4    Increased Costs.**

(a)    [Reserved].

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender, or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or such Lender's holding company, as the case may be, as specified in subsection (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 10.4 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such

Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

**10.5**     **[Reserved]**.

**10.6**     **Mitigation Obligations; Replacement of Lenders**.

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 10.4, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 10.1, or if any Lender gives a notice pursuant to Section 10.2, then at the request of the Borrower, such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 10.1 or 10.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 10.2, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 10.4, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 10.1 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 10.6(a) that eliminates the need to pay additional amounts for Indemnified Taxes under Section 10.1 or compensation under Section 10.4, the Borrower may replace such Lender in accordance with Section 9.19.

**10.7**     **Survival**.  All of the Borrower's obligations under this Sections 10.4 and 10.5 shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

**10.8**     **Amendment and Restatement**.  The Borrower, the Administrative Agent and the Lenders hereby agree that upon the effectiveness of the amendment and restatement of the Existing Holdco Note by this Agreement, the terms and provisions of the Existing Holdco Note shall be and hereby are amended and restated in their entirety by the terms and provisions of this Agreement.  By execution of this Agreement each party hereto hereby agrees that (i) this Agreement is given as a substitution for, and not as a payment of, the obligations of the Borrower and the other obligors existing under the Existing Holdco Note prior to the effectiveness of this Agreement and (ii) this Agreement does not constitute a novation of the Existing Holdco Note.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**"BORROWER"**

**WASH & WAX HOLDINGS LLC**, a Delaware limited liability company

By: _____
  Name:
  Title:

**"ADMINISTRATIVE AGENT"**

**BRIGHTWOOD LOAN SERVICES LLC**, in its
capacity as Administrative Agent
By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


Address:  810 Seventh Avenue, 26th Floor
           New York, NY 10019
           Attention: Sam Sullivan, Mia Ellis and Brett
           Murray

**"LENDER"**

_____, in its capacity as a Lender

By: _____
    Name:
    Title:


Address: _____

[Signature Page to Holdco Credit Agreement]

[Signature Page to Holdco Credit Agreement]

**<u>Exhibit B(i)-1</u>**

**New HoldCo Credit Agreement Redline**

**AMENDED AND RESTATED HOLDCO CREDIT AGREEMENT**

**DATED APRIL ~~[_____]~~30, 2025 and**

**BY AND BETWEEN**

**~~[~~WASH & WAX HOLDINGS LLC~~]~~**
**as Borrower,**

**THE LENDERS WHICH ARE PARTY HERETO**

**AND**

**BRIGHTWOOD LOAN SERVICES LLC**
**as Administrative Agent**

**TABLE OF CONTENTS**

**Page**

**ARTICLE I DEFINITIONS AND OTHER TERMS**

| | | |
|---|---|---|
| 1.1 | Defined Terms | 1 |
| 1.2 | Other Interpretive Provisions | ~~29~~8 |
| 1.3 | Accounting Terms; Payment Dates | ~~30~~29 |
| 1.4 | References to Agreements, Laws, Etc | ~~30~~29 |
| 1.5 | Times of Day | ~~30~~29 |
| 1.6 | Interest Rates | 30 |

**ARTICLE II THE ADVANCES**

| | | |
|---|---|---|
| 2.1 | The Advances | 3~~1~~0 |
| 2.2 | [Reserved] | 3~~6~~5 |
| 2.3 | Payments | 3~~6~~5 |
| 2.4 | Setoff; etc | 3~~6~~5 |
| 2.5 | Sharing | 3~~7~~6 |
| 2.6 | Fees | 3~~7~~6 |
| 2.7 | Lending Branch | 3~~7~~6 |
| 2.8 | Application of Payments and Collections | 3~~7~~6 |
| 2.9 | [Reserved] | 3~~8~~7 |
| 2.10 | Defaulting Lenders | 3~~8~~7 |

**ARTICLE III CONDITIONS PRECEDENT**

| | | |
|---|---|---|
| 3.1 | Conditions Precedent to Effectiveness | 3~~9~~8 |
| 3.2 | Conditions Precedent to All Advances | 4~~2~~1 |

**ARTICLE IV REPRESENTATIONS AND WARRANTIES**

| | | |
|---|---|---|
| 4.1 | Organization; etc | 4~~2~~1 |
| 4.2 | Due Authorization | 4~~3~~1 |
| 4.3 | Subsidiaries | 4~~3~~2 |
| 4.4 | Validity of the Agreement | 4~~3~~2 |
| 4.5 | Financial Statements | 4~~3~~2 |
| 4.6 | Litigation; etc | 4~~4~~3 |
| 4.7 | Compliance with Law | 4~~4~~3 |
| 4.8 | ERISA Compliance | 4~~4~~3 |
| 4.9 | Title to Assets | 4~~4~~3 |
| 4.10 | Use of Proceeds | 4~~5~~3 |
| 4.11 | Governmental Regulation | 4~~5~~4 |
| 4.12 | Margin Stock | 4~~5~~4 |
| 4.13 | Investment Company Act | 4~~5~~4 |
| 4.14 | Accuracy of Information | 4~~5~~4 |
| 4.15 | Tax Returns; Audits | 4~~5~~4 |
| 4.16 | Environmental and Safety Regulations | 4~~5~~4 |
| 4.17 | Payment of Wages; Labor Matters | 4~~6~~5 |

4.18    Intellectual Property .......................................................................... 465
4.19    Projections ........................................................................................ 465
4.20    Solvency ............................................................................................ 476
4.21    No Material Adverse Occurrence ...................................................... 476
4.22    [Reserved]. ........................................................................................ 476
4.23    Deposit Accounts .............................................................................. 476
4.24    [Reserved]. ........................................................................................ 476
4.25    [Reserved]. ........................................................................................ 476
4.26    Valid Liens ........................................................................................ 476
4.27    Foreign Assets Control Regulations and Anti-Money Laundering .... 476
4.28    Patriot Act ......................................................................................... 487
4.29    Insurance ........................................................................................... 487
4.30    SBA Matters ...................................................................................... 487

## ARTICLE V CERTAIN AFFIRMATIVE COVENANTS

5.1    Financial Information; etc ................................................................ 487
5.2    Maintenance of Existence; etc .......................................................... 540
5.3    Maintenance of Properties ................................................................ 540
5.4    Payment of Liabilities ...................................................................... 540
5.5    Compliance with Laws ..................................................................... 540
5.6    Books and Records; Inspection Rights; etc ...................................... 521
5.7    Insurance ........................................................................................... 521
5.8    ERISA ............................................................................................... 531
5.9    Post-Closing Requirements .............................................................. 532
5.10    [Reserved] ........................................................................................ 532
5.11    [Reserved] ........................................................................................ 532
5.12    Further Assurances .......................................................................... 532
5.13    SBA Matters ...................................................................................... 542
5.14    OFAC; Patriot Act ........................................................................... 543
5.15    Sale-Leaseback Accounting Treatment ............................................ 543
5.16    Quarterly Lender Calls ..................................................................... 543

## ARTICLE VI NEGATIVE COVENANTS

6.1    [Reserved] ........................................................................................ 543
6.2    Limitations on Indebtedness ............................................................. 543
6.3    Liens ................................................................................................. 576
6.4    Sales of Assets .................................................................................. 598
6.5    Liquidations, Mergers and Consolidations ....................................... 6059
6.6    Investments ....................................................................................... 6059
6.7    Transactions with Affiliates ............................................................. 6059
6.8    [Reserved]. ........................................................................................ 60
6.9    Amendment and Waiver ................................................................... 60
6.10    Restricted Payments ......................................................................... 640
6.11    Payments in Respect of Certain Indebtedness .................................. 621
6.12    Change in Business ........................................................................... 62
6.13    Changes in Accounting, Name and Jurisdiction of Organization ...... 62
6.14    No Negative Pledges ........................................................................ 62
6.15    Borrower's Holding Company Status ............................................... 632
6.16    Use of Proceeds ................................................................................ 63

## ARTICLE VII EVENTS OF DEFAULT

| 7.1 | Events of Default | 63 |
| 7.2 | Action If Event of Default | 665 |
| 7.3 | Remedies | 66 |

## ARTICLE VIII THE ADMINISTRATIVE AGENT

| 8.1 | Appointment and Authorization | 676 |
| 8.2 | Power | 67 |
| 8.3 | Interest Holders | 67 |
| 8.4 | Employment of Counsel; etc | 67 |
| 8.5 | Reliance | 687 |
| 8.6 | General Immunity | 68 |
| 8.7 | Credit Analysis | 68 |
| 8.8 | Administrative Agent and Affiliates | 69 |
| 8.9 | Indemnification | 69 |
| 8.10 | Security Documents | 69 |
| 8.11 | Collateral Matters | 7069 |
| 8.12 | Action by the Administrative Agent | 70 |
| 8.13 | Successor Administrative Agent | 71 |
| 8.14 | Authorization to Enter into Intercreditor Agreements. | 71 |
| 8.15 | Erroneous Payments. | 71 |

## ARTICLE IX MISCELLANEOUS

| 9.1 | Waivers, Amendments; etc | 743 |
| 9.2 | Payment Dates | 76 |
| 9.3 | Notices | 76 |
| 9.4 | Costs and Expenses | 76 |
| 9.5 | Indemnification | 76 |
| 9.6 | Severability | 78 |
| 9.7 | Headings | 78 |
| 9.8 | Governing Law | 78 |
| 9.9 | Successors and Assigns | 78 |
| 9.10 | Execution in Counterparts | 812 |
| 9.11 | Several Liability | 812 |
| 9.12 | Financial Information | 812 |
| 9.13 | Entire Agreement | 82 |
| 9.14 | Other Relationships | 82 |
| 9.15 | Consent to Jurisdiction | 82 |
| 9.16 | Waiver of Jury Trial | 823 |
| 9.17 | USA Patriot Act | 823 |
| 9.18 | Confidentiality | 83 |
| 9.19 | Replacement of Lenders | 834 |
| 9.20 | [Reserved] | 84 |
| 9.21 | Electronic Execution of Assignments and Certain Other Documents | 84 |
| 9.22 | [Reserved]. | 845 |

## ARTICLE X TAXES, YIELD PROTECTION AND ILLEGALITY

| | | |
|---|---|---|
| 10.1 | Taxes | 845 |
| 10.2 | [Reserved] | 889 |
| 10.3 | [Reserved] | 889 |
| 10.4 | Increased Costs | 889 |
| 10.5 | [Reserved]. | 890 |
| 10.6 | Mitigation Obligations; Replacement of Lenders | 890 |
| 10.7 | Survival | 90 |
| 10.8 | Amendment and Restatement | 90 |

| | | |
|---|---|---|
| SCHEDULE I | - | Lenders/Commitments |
| SCHEDULE I-A | - | Units |
| SCHEDULE II | - | Specified Units |
| SCHEDULE III | - | Sunset Units |
| SCHEDULE 4.17 | - | Labor Matters |
| SCHEDULE 4.23 | - | Deposit Accounts |
| SCHEDULE 6.2(a) | - | Existing Indebtedness |
| SCHEDULE 6.2(s) | - | Existing Letters of Credit |
| SCHEDULE 6.3 | - | Existing Liens |
| SCHEDULE 6.6 | - | Permitted Investments |
| SCHEDULE 6.7 | - | Affiliate Transactions |
| SCHEDULE 9.3 | - | Administrative Agent's Office; Certain Addresses for Notices |
| ANNEX I | - | List of Jurisdictions in which the Borrower is Qualified to Do Business |
| ANNEX II | - | List of Subsidiaries; Jurisdictions of Incorporation and Qualification to do Business |
| EXHIBIT A | - | Form of Term Note |
| EXHIBIT B | - | [Reserved] |
| EXHIBIT C | - | [Reserved] |
| EXHIBIT D | - | Form of Notice of Borrowing |
| EXHIBIT E | - | Form of Assignment and Assumption Agreement |
| EXHIBIT F | - | Compliance Certificate |

## AMENDED AND RESTATED HOLDCO CREDIT AGREEMENT

This AMENDED AND RESTATED HOLDCO CREDIT AGREEMENT (this "Agreement") effective as of the [—]30th day of April, 2025, by and between |WASH & WAX HOLDINGS LLC| ("Borrower"), the Lenders now or hereafter parties hereto, and **BRIGHTWOOD LOAN SERVICES LLC**, in its capacity as Administrative Agent for the Lenders.

**WHEREAS**, on February 5, 2025 (the "Petition Date"), Zips and certain of its Affiliates and Subsidiaries (each, a "Debtor" and, collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court");

**WHEREAS**, on February 5, 2025, the Debtors filed the Joint Plan of Reorganization of Zips and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (as amended, supplemented or modified from time to time, the "Plan of Reorganization") and related disclosure statement with the Bankruptcy Court;

**WHEREAS**, on April [_____]21, 2025, the Bankruptcy Court entered a confirmation order confirming the Plan of Reorganization (the "Confirmation Order") and on April [_____]30, 2025, the Plan of Reorganization went effective (the "Plan Effective Date");

**WHERAS**, in connection with the Plan of Reorganization, on the Plan Effective Date, the Borrower acquired substantially all of the Debtors' assets (other than certain assets of the Debtors that were transferred to the Debtors' unsecured creditors), as set forth in the Plan of Reorganization, in exchange for, among other things, that certain note and security agreement issued by the Borrower, dated as of the Plan Effective Date (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Existing Holdco Note"), in the original principal amount of $150,000,000 (the "Existing Holdco Obligations");

**WHERAS**, pursuant to the Plan of Reorganization, the Lenders acquired all of the Debtors' right title and interest in and to the Existing Holdco Note;

**WHEREAS**, in connection with the Plan Effective Date, the Borrower has asked the Lenders to provide the Borrower with a term loan facility in an aggregate principal amount of $150,000,000, which will consist solely of the converted Existing Holdco Obligations;

**WHEREAS**, the Lenders are willing to make the foregoing term loan available to the Borrower, subject to the terms and conditions set forth in this Agreement and the Plan of Reorganization; and

**WHEREAS**, pursuant to and in accordance with the terms of the Plan of Reorganization, each Prepetition Term Loan Lender will exchange a portion of its Prepetition Term Loan ClaimsExisting Holdco Obligations for Initial Term Loans, in each case on a pro-rata basis;

**NOW, THEREFORE**, in consideration of the terms and conditions contained herein, and of any loans or extensions of credit heretofore, now or hereafter made to or for the benefit of the Borrower by the Lenders and the Administrative Agent, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND OTHER TERMS

1

**1.1    Defined Terms.** The following terms when used in this Agreement shall, except where the context otherwise requires, have the following meanings:

"ABL Agent" means the administrative agent and/or collateral agent for the ABL Lenders under the ABL Facility and any successor, refinancing or replacement thereof.

"ABL Facility" has the meaning given to such term the Opco Credit Agreement.

"ABL Lenders" means the lenders under the ABL Facility and any successor, refinancing or replacement thereof.

"Acquisition" means (whether by purchase, exchange, issuance of Equity Interests or Equity Interests Equivalents, merger, reorganization, joint venture or otherwise) any transaction, or any series of related transactions by which the Opco Borrower directly or indirectly (i) acquires any Person, which Person shall then become consolidated with the Opco Borrower in accordance with GAAP, (ii) acquires all or substantially all of the assets of any Person or any business, division or product line thereof or the acquisition of a portfolio of Real Property or leases of Real Property, (iii) acquires in excess of 50% of the Equity Interests or Equity Equivalents of any Person or otherwise causing such Person to become a Subsidiary of the Opco Borrower, or (iv) merges, consolidates or otherwise enters into any other business combination with any Person to effect any of the transactions referred to in clauses (i), (ii) or (iii) above.

"Actual Tunnel Volume" means, for any period, the aggregate volume of tunnel car washes at each Mature Unit for such period.

"Administrative Agent" means Brightwood Loan Services LLC, as Administrative Agent for the Lenders, or any successor Administrative Agent hereunder.

"Administrative Questionnaire" means an administrative questionnaire to be completed and provided to the Administrative Agent in form and substance as provided by the Administrative Agent.

"Advance" means one or more advances under the Term Loan Commitments.

"Affiliate" shall include, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with such Person. For purposes of this definition, a Person shall be deemed to control another Person if the controlling Person owns or controls directly or indirectly twenty percent (20%) or more of the shares of stock, other Equity Interests or Equity Interests Equivalents or voting powers of the controlled Person.

"Aggregate Commitments" means the Commitments of all Lenders.

"Agreement" means this Holdco Credit Agreement as originally executed and as amended, modified or supplemented from time to time.

"Applicable Tax Rate" means the highest combined individual federal, state and local tax rate for an individual living in New York City (taking into account the (a) effects of preferential rates on items of net taxable income that are taxed at long-term capital gain rates, (b) the assumed deductibility of state income tax from federal taxable income and (c) section 1411 of the Code).

"Applicable Term Loan Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the total Term Loan Commitments and the outstanding principal amount of the Term Loans represented by such Lender's Term Loan Commitment

and outstanding principal amount of the Term Loans owed to such Lender at such time.  If the Term Loan Commitments of each Lender have been terminated or if the Aggregate Commitments have expired, then the Applicable Term Loan Percentage of each Lender shall be determined based on the Applicable Term Loan Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Term Loan Percentage of each Lender is set forth opposite the name of such Lender on **Schedule I** or in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 9.9(b).

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Borrower" has the meaning specified in the recitals hereto.

"Brightwood" means Brightwood Loan Services LLC and any Affiliate thereof.

"Business Day" means any day on which commercial banks and foreign exchange markets are open for business in New York, New York.

"Capital Expenditures" means, for any Person for any period for which the amount thereof is to be determined, without duplication, the aggregate amount of all expenditures, whether or not made with proceeds of Indebtedness, by such Person and its Subsidiaries during such period for any purchase or other acquisition of any asset which is required to be classified as a fixed or capital asset on the consolidated balance sheet of such Person prepared in accordance with GAAP, but excluding (a) expenditures that would otherwise qualify as Capital Expenditures made in connection with the replacement, substitution, restoration or repair of fixed or capital assets to the extent financed (i) from insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced, restored or repaired or (ii) with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (b) expenditures that would otherwise qualify as Capital Expenditures to the extent such expenditures constitute a reinvestment of Net Cash Proceeds (as defined in the Opco Credit Agreement) from Dispositions permitted pursuant to Section 6.4 and expenditures to the extent that such expenditure is substantially contemporaneously reimbursable (and in any event within 60 days after such expenditures) to the Opco Borrower or any of its Subsidiaries by a Person that is not a Opco Party or a Subsidiary thereof.

"Capital Lease" means, with respect to any Person, a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board) is required to be, classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligations" means, for any period for which the amount thereof is to be determined, any obligation of such Person to pay rent or other amounts under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Cash Rental Expense" means, for the relevant measurement period, all cash rental expense of the Opco Borrower and its Subsidiaries actually paid during such measurement period, determined on a consolidated and combined basis, incurred under any rental agreements or leases, other than obligations

in respect of any Capital Leases, calculated on a Pro Forma Basis; <u>provided</u>, that Cash Rental Expenses shall exclude (a) any common area maintenance expenses and (b) taxes; and <u>provided</u>, <u>further</u>, that for purposes of calculating Consolidated EBITDA such rental expenses paid in advance pursuant to clause (c) shall be deemed to be paid during the Test Period in which they would otherwise be due; and <u>provided</u>, <u>further</u>, rent that is deferred pursuant to an agreement shall be deemed paid on the date such rent arises or would be due and payable without giving effect to any agreement to defer such rent.

"<u>Casualty Event</u>" means any event that gives rise to the receipt by any Opco Party of any insurance proceeds (including business interruption insurance proceeds) or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"<u>Change in Law</u>" means the occurrence, after the Closing Date, of any of the following:  (a) the adoption or taking effect of any law, order, policy, rule, regulation or treaty, (b) any change in any law, order, policy, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u> that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, regulations or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, regulations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"<u>Change of Control</u>" means the occurrence of any of the following: (i) any Person (together with its Affiliates), directly or indirectly, other than the Permitted Holders (and their respective Affiliates), owns more than greater than fifty percent (50%) of the Equity Interests and Equity Interests Equivalents of the Borrower, (ii) Borrower ceases to own and control, directly or indirectly, one hundred percent (100%) of the Equity Interests and Equity Interests Equivalents of Opco Holdings, (iii)  Opco Holdings ceases to own and control, directly or indirectly, one hundred percent (100%) of the Equity Interests and Equity Interests Equivalents of Opco Borrower or (iv) the occurrence of any "change of control" under the ABL Facility or the Opco Credit Agreement.

"<u>Chapter 11 Cases</u>" has the meaning specified in the recitals hereto.

"<u>Closing Date</u>" means April [————]30, 2025.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" means all present and future assets and properties of the Borrower, whether real or personal, tangible or intangible, in which Liens are granted or purported to be granted pursuant to the Security Documents; <u>provided</u>, that Collateral shall not include any Excluded Assets.

"<u>Commitment</u>" means, for each Lender, the aggregate amount of such Lender's commitment to fund Loans as set forth on **Schedule I**, as such amount may be modified from time to time pursuant to the terms hereof.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

4

"Compliance Certificate" means a certificate in substantially the form set forth as **Exhibit F**, completed and signed by a Responsible Officer of the Borrower.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Amortization Expense" means the amount of amortization expense deducted in determining Consolidated Net Income.

"Consolidated Depreciation Expense" means the amount of depreciation expense deducted in determining Consolidated Net Income.

"Consolidated EBITDA" means, for any period for which the amount thereof is to be determined, an amount equal to Consolidated Net Income for such measurement period; plus (a) the following, without duplication, in each case the extent deducted in calculating such Consolidated Net Income:

(i) Consolidated Interest Expense during such period,

(ii) Consolidated Amortization Expense during such period,

(iii) Consolidated Depreciation Expense during such period,

(iv) Consolidated Tax Expenses paid or accrued during such period,

(v) [reserved],

(vi) (x) Transaction Expenses and (y)(a) costs, fees and expenses of the Borrower and its Subsidiaries associated with the ABL Facility, (b) any costs, fees, expenses and premiums paid to the ABL Agent and the ABL Lenders in connection with the ABL Facility and (c) any costs, fees and expenses paid to legal counsel or other consultants of or advisors to the ABL Agent or any ABL Lender in connection with the ABL Facility,

(vii) the aggregate amount of all costs, fees and expenses, during such period relating to, whether or not consummated, Equity Issuances, Debt Issuances, Permitted Acquisitions, Permitted Investments, or Dispositions,

(viii) [reserved];

(ix) the aggregate amount of all charges and losses during such period related to the early termination or extinguishment of any indebtedness,

(x) the aggregate amount of all net losses from discontinued operations (that are accounted for as such under GAAP) incurred during such period,

(xi) the aggregate amount of all net losses from Dispositions (other than Dispositions in the ordinary course of business) incurred during such period,

(xii) the aggregate amount of director fees, indemnities and reimbursements for expenses incurred in connection with attending board meetings that are paid to board members during such period,

(xiii) the aggregate amount of any non-cash charges, losses or expenses (including tax reclassification related to tax contingencies in a prior period and the excess of rent expense due to the use

of straight line rent for GAAP over Cash Rental Expense during such period) reducing Consolidated Net Income during such period, but excluding any non-cash charge relating to write-offs or write-downs of inventory or accounts receivable or representing amortization of a prepaid cash item that was paid but not expensed in a prior period,

(xiv) the aggregate amount of restructuring and similar charges or reserves, severance, recruiting, relocation costs or non-recurring integration costs; provided that (i) such costs are reasonably identifiable, factually supportable and, to the extent requested by the Administrative Agent, are disclosed in reasonable itemization and detail to the Administrative Agent and (ii) that the aggregate amount added pursuant to this clause (xiv), when combined with the amounts of adjustments made in such period pursuant to clauses (xv), (xviii) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period; provided, further, that the Transaction Expenses shall not be added back pursuant to this clause (xiv) and therefore shall not count against the maximum amount permitted to be added back hereunder,

(xv) the aggregate amount of other extraordinary, unusual and non-recurring cash losses and expenses; provided that the Borrower shall provide the Administrative Agent with notice and reasonable detail regarding the nature of such cash losses and expenses; provided further that the aggregate amount added pursuant to this clause (xv), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xviii) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xvi) any other non-cash charges, write-downs, expenses, losses or items for such period, including any impairment charges or any non-cash costs and/or expenses incurred pursuant to any management equity plan, stock option plan or any other stock subscription or shareholder agreement, or due to the application of FASB ASC No. 815-10 regarding hedging activity, FASB ASC No. 350 regarding impairment of goodwill, FASB ASC No. 480-10 regarding accounting for financial instruments with debt and equity characteristics, and non-cash foreign currency exchange losses,

(xvii) proceeds received from any business interruption insurance in an amount representing the earnings for the applicable period that such proceeds are intended to replace and to the extent not otherwise included in Consolidated Net Income,

(xviii) the aggregate amount of all costs, fees and expenses during such period relating to the pre-opening of New Units; provided that (i) the aggregate amount of any such costs, fees and expenses added pursuant to this clause (xviii) with respect to any single New Unit shall not exceed $200,000 and (ii) the aggregate amount added pursuant to this clause (xviii), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xv) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xix) integration and other business optimization expenses, charges and losses incurred in such period; provided that (i) such costs are reasonably identifiable, factually supportable and, to the extent requested by the Administrative Agent, are disclosed in reasonable itemization and detail to the Administrative Agent and (ii) the aggregate amount added pursuant to this clause (xix), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xv) and (xviii) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xx) [reserved],

(xxi) charges, losses or expenses to the extent indemnified, insured, reimbursed or reimbursable or otherwise covered by a third party (so long as the Borrower has made a determination that a reasonable

basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days),

(xxii) [reserved],

(xxiii) to the extent decreasing Consolidated Net Income, cash payments, costs, fees, expense and charges related to earnout obligations, performance fees and payouts, or other contingent obligations and amounts deducted in respect of purchasing accounting required or permitted by GAAP,

(xxiv) losses resulting from accruals and reserves that are established or adjusted as a result of any Permitted Acquisition in accordance with GAAP (including any adjustment of estimated payouts on earn-outs) or changes as a result of the adoption or modification of accounting policies during such period,

(xxv) [reserved], and

(xxvi) additional items as mutually agreed upon in writing by the Borrower and the Administrative Agent,

and minus (b) to the extent added in calculating such Consolidated Net Income, the aggregate amount of:

(i) all non-cash charges increasing Consolidated Net Income (other than with respect to payments actually received and the reversal of any accrual or reserve to the extent not previously added back in any prior period accrual of revenue or recording of receivables in the ordinary course of business) during such period,

(ii) all net gains from discontinued operations (that are accounted for as such under GAAP) incurred during such period,

(iii) all extraordinary gains during such period,

(iv) all gains resulting from the early termination or extinguishment of any Indebtedness,

(v) the aggregate amount of all net gains from Dispositions (other than Dispositions in the ordinary course of business) incurred during such period, and

(vi) the excess of Cash Rental Expense over rent expense due to the use of straight line rent for GAAP during such period.

Notwithstanding the foregoing, (i) the (positive or negative) 4-Wall EBITDA contribution of each Specified Unit with respect to any period occurring after February 28, 2025, shall be disregarded in the calculation of Consolidated EBITDA, (ii) the (positive or negative) 4-Wall EBITDA contribution of each Sunset Unit with respect to any period occurring after February 28, 2025, shall be disregarded in the calculation of Consolidated EBITDA; provided, that to the extent any Sunset Unit's lease terms are either extended to a date later than the Extension Date or its operations are not permanently discontinued on or prior to the Extension Date, in either case, (1) this clause (ii) shall not be applicable with respect to any such Sunset Unit and (2) to the extent applicable, the deemed historical Consolidated EBITDA numbers set forth in the table below shall be adjusted in a manner acceptable to the Administrative Agent to reflect

the same and (iii) Consolidated EBITDA for each fiscal month set forth below shall be deemed to be the corresponding amount set forth opposite such fiscal month in the table below:

| Fiscal Month Ending | Consolidated EBITDA |
|---|---|
| February 28, 2024 | $[___] |
| March 31, 2024 | $[___]5,497,738 |
| April 30, 2024 | $[___]6,048,147 |
| May 31, 2024 | $[___]3,615,979 |
| June 30, 2024 | $[___]4,501,179 |
| July 31, 2024 | $[___]3,684,457 |
| August 31, 2024 | $[___]5,122,340 |
| September 30, 2024 | $[___]3,404,351 |
| October 31, 2024 | $[___]4,576,456 |
| November 30, 2024 | $[___]1,765,565 |
| December 31, 2024 | $[___]2,622,707 |
| January 31, 2025 | $[___]4,752,906 |
| February 28, 2025 | $[___]4,785,987 |

"Consolidated Interest Expense" means, for any period for which the amount thereof is to be determined, the consolidated interest expense of the Opco Borrower and its Subsidiaries (other than deferred financing costs and debt issuance costs), including (i) all interest on Indebtedness (including imputed interest related to Capital Leases), (ii) all amortization of debt discount and expense, (iii) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers' acceptances, and (iv) Swap Obligations of such Person and its Subsidiaries, to the extent required to be reflected on the income statement of such Person on a consolidated basis in accordance with GAAP.

"Consolidated Net Income" means, for any fiscal period, the consolidated net income (or loss) of the Opco Borrower and its Subsidiaries determined on a consolidated basis in accordance with Modified GAAP; provided that (i) revenues received during any such period from sales of unlimited car wash monthly memberships, whether or not such revenues are recognized in accordance with Modified GAAP, shall be included in such net income (to the extent not otherwise included therein), and (ii) there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

(a) the net income (or loss) of any Person (other than a Subsidiary of Opco Holdings) in which any Person other than Opco Holdings or any of its Subsidiaries has an ownership interest, except to the

extent that cash in an amount equal to any such income has actually been received by Opco Holdings or any of its Subsidiaries from such Person during such period,

(b) the net income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Opco Holdings, Opco Borrower or is merged into or consolidated with Opco Holdings, Opco Borrower or any of its Subsidiaries or that Person's assets are acquired by Opco Holdings or any of its Subsidiaries,

(c) the net income of any Subsidiary of Opco Holdings during such period to the extent that the declaration and/or payment of dividends or similar distributions by such Subsidiary of that income is not permitted by operation of the terms of its Organizational Documents or any agreement, instrument, order or other legal requirement applicable to that Subsidiary or its equity holders during such period,

(d) the cumulative effect of a change in accounting principles, and

(e) any net extraordinary gains or net extraordinary losses.

"Consolidated Tax Expenses" means federal, state and local income tax expenses of Opco Borrower.

"control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "controlled" has the meaning correlative thereto.

"Declined Proceeds" has the meaning specified in Section 2.1(k).

"Debt Issuance" means the issuance by any Person of any Indebtedness.

"Debtor" or "Debtors" has the meaning specified in the recitals hereto.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Default" means any Event of Default and any event which with the giving of notice or lapse of time, or both, would become an Event of Default.

"Default Interest" shall have the meaning set forth in Section 2.1(h)(3).

"Default Rate" means a simple interest rate per annum equal to the sum of the otherwise then applicable interest rate plus (i) two percent (2%).

"Defaulting Lender" means, subject to Section 2.10(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public

statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.10(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each Lender promptly following such determination.

"Disclosure Limitations" shall have the meaning set forth in Section 5.6.

"Disposition" means any sale, transfer, lease, exclusive license or other disposition of any property by any Person (including by way of issuance of Equity Interests of any Person). "Dispose" has the meaning correlative thereto.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any Equity Interests or Equity Interests Equivalent into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition,

(a)     matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments),

(b)     provides for the scheduled payments of dividends in cash,

(c)     is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests of the applicable Person and except as permitted by clause (a) above), in whole or in part, or

(d)     is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests or Equity Interests Equivalents that would constitute Disqualified Equity Interests, in the case of each of clauses (a), (b), (c) and (d) hereof, prior to the date that is ninety-one (91) days after the latest Maturity Date at the time of issuance;

provided that if such Equity Interests or Equity Interests Equivalents are issued pursuant to a plan for the benefit of future, current or former employees, directors, or officers of the Borrower, Opco Holdings, Opco Borrower or its Subsidiaries or by any such plan to such employees, directors or officers, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower, Opco Holdings, Opco Borrower or any Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's or officer's termination, death or disability.

 "Dollars" or "$" means the basic unit of the lawful currency of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States of America.

"ECP Rules" means the final rules issued jointly by the Commodity Futures Trading Commission and the Securities and Exchange Commission as published in 77 FR 30596 (May 23, 2012), as may amended, modified or replaced from time to time.

"Effective Yield" has the meaning set forth in Section 2.1(b)(3).

"Eligible Assignee" means any Person (other than a natural person) that meets the requirements to be an assignee under Section 9.9 (subject to such consents, if any, as may be required under Section 9.9(b)); provided that, a Defaulting Lender shall not be an Eligible Assignee.

"Equipment" means all equipment, furniture and fixtures held or maintained at the Real Property or otherwise used in the ownership or operation of the Units, together with all additions and accessions thereto and replacements therefor.

"Equity Cure Contribution" has the meaning set forth in the Opco Credit Agreement.

"Equity Interests" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Equity Interests Equivalents" means all securities convertible into or exchangeable for Equity Interests and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Equity Interests, whether or not presently convertible, exchangeable or exercisable.

"Equity Issuance" means any sale or issuance of any Equity Interests or Equity Interests Equivalents of the Borrower or any direct or indirect parent of the Borrower or the contribution to the capital of the Borrower or any direct or indirect parent of the Borrower, in each case, the proceeds of which are contributed to the common equity of Opco Borrower or any of its Subsidiaries.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations promulgated and rulings issued thereunder and under the Code, in each case as in effect from time to time.  References to sections of ERISA shall be construed to also refer to any successor sections.

"ERISA Affiliate" means any Person, including Affiliates or Subsidiaries of the Borrower, that is a member of any group of organizations or a controlled group of trades or businesses, as described in

11

Sections 414(b), 414(c), 414(m) or 414(o) of the Code or Section 4001 of ERISA, of which the Borrower is a member.

"Erroneous Payment" has the meaning assigned to it in Section 8.15(a).

"Erroneous Payment Deficiency Assignment" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Impacted Class" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Return Deficiency" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Subrogation Rights" has the meaning assigned to it in Section 8.15(d).

"Event of Default" means any Event of Default described in Article VII.

"Excess Cash Flow" means, for any Excess Cash Flow Period without duplication:

    (a). the sum, without duplication, of:

        i. Consolidated EBITDA for such Excess Cash Flow Period;

        ii. the decrease, if any, in the Net Working Capital from the beginning to the end of such Excess Cash Flow Period; and

        iii. to the extent received in cash, the deduction in clause (b)(iii) of the definition of Consolidated EBITDA;

    (b). *minus*, the sum, without duplication, of:

        i. the amount of any Consolidated Tax Expense paid or payable by Borrower and its Subsidiaries in cash with respect to such Excess Cash Flow Period and the amount of any Tax Distributions with respect to such Excess Cash Flow Period;

        ii. Consolidated Interest Expense for such Excess Cash Flow Period;

        iii. the increase, if any, in the Net Working Capital from the beginning to the end of such Excess Cash Flow Period;

        iv. cash used for Capital Expenditures and Permitted Acquisitions (including with respect to fees and expenses and, with respect to any Permitted Acquisition, cash consideration, that are payable upon the closing of any Permitted Acquisition pursuant to any letter of intent or definitive purchase agreement with respect to such Permitted Acquisition to which the Opco Borrower or any of its Affiliates is a party), in each case to the extent financed with Internally Generated Funds;

        v. the aggregate amount of all scheduled amortization payments of Indebtedness of the Opco Borrower and its Subsidiaries to the extent funded with Internally Generated Funds;

        vi. Restricted Payments pursuant to Section 6.10(e) paid in cash in accordance with the Loan Documents during such Excess Cash Flow Period;

12

vii.  to the extent paid in cash, the add-backs in clauses (a)(vi), (a)(vii), (a)(xii), (a)(xiv), (a)(xv), (a)(xvii), (a)(xviii) and (a)(xxii) of the definition of Consolidated EBITDA; and

viii.  the aggregate amount of add-backs in clause (a)(xix) of the definition of Consolidated EBITDA.

"Excess Cash Flow Period" means each fiscal year of the Borrower commencing with the fiscal year ending on December 31, 2026.

"Excluded Assets" means any of the following:

(a)  any lease, license, franchise, charter, authorization, contract or agreement to which the Borrower is a party, and any of its rights or interest thereunder, or any property subject to a purchase money security interest, capital lease obligation or other arrangement, if and to the extent that the pledge thereof or the grant of a security interest,

(i)

(A)  is prohibited by or in violation of any law (including financial assistance laws, corporate benefit laws or otherwise), rule or regulation applicable to the Borrower, except to the extent such prohibition is rendered ineffective under the Uniform Commercial Code,

(B)  would be prohibited by the enforceable anti-assignment provisions of any contract (other than any such contract to which Holdings or any of its subsidiaries is the only counterparties) or law, rule or regulation applicable to the Borrower or with respect to any assets, to the extent such a grant or security interest would violate the terms of any contract with respect to such assets or would trigger termination of such contract (including any purchase money security interest, capital lease obligation or other arrangement) or any such material rights therein pursuant to any "change of control" or other provision or applicable law (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other applicable law), in each case, excluding any such contract or other agreement solely among the Borrower and the Opco Parties and any of their subsidiaries or controlled affiliates, or

(C)  requires any governmental or third party (other than the Borrower or an Opco Party or any of its subsidiaries or controlled affiliates) consent, approval, license or authorization that has not been obtained, except to the extent such limitation is rendered ineffective under the Uniform Commercial Code or other applicable law,

(ii)  is prohibited by or in violation of a term, provision or condition of any such lease, license, franchise, charter, authorization, contract or agreement; provided, however, that the Collateral shall include (and such security interest shall attach) at such time as the contractual or legal prohibition shall no longer be applicable and to the extent severable, shall attach to any portion of such lease, license, franchise, charter, authorization, contract or agreement not subject to the prohibitions specified in (i) or (ii)

13

above (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other applicable Law in any relevant foreign jurisdiction); provided, further, that the exclusions referred to in this clause (a) shall not include any proceeds of any such lease, license, franchise, charter, authorization, contract or agreement;

(b)        margin stock,

(c)        any "intent-to-use" application for registration of a trademark filed pursuant to section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" or "Amendment to Allege Use" pursuant to section 1(d) of the Lanham Act, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law;

(d)        [reserved];

(e)        [reserved];

(f)        [reserved];

(g)        assets, if and to the extent that a security interest in such asset:

(i)        is prohibited by or in violation of any Law, rule or regulation applicable to the Borrower, or

(ii)        requires a consent (to the extent that the Borrower has sought such consent using its commercially reasonable efforts) of any Governmental Authority, the lessor of any leased property or any third party that has not been obtained, except, in the case of clauses (i) and (ii), to the extent such prohibition or consent is rendered ineffective under the Uniform Commercial Code;

(h)        [reserved];

(i)        [reserved]; and

(j)        assets in circumstances where the cost of obtaining a security interest in such assets, including the cost of title insurance, surveys or flood insurance (if necessary) would be excessive in light of the practical benefit to the Lenders afforded thereby as reasonably determined by the Borrower and the Administrative Agent.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 9.19), or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 10.1(a)(ii), (a)(iii) or (c), amounts with respect to such Taxes

were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 10.1(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Holdco Note" has the meaning specified in the recitals to this Agreement.

"Existing Holdco Obligations" has the meaning specified in the recitals to this Agreement.

"Extension Date" means (i) in the case of the Unit located at 9500 North Rodney Parham Road in Little Rock, Arkansas, May 31, 2025, (ii) in the case of the Unit located at 4311 North State Line Avenue in Texarkana, Texas, July 31, 2025, and (iii) in the case of any other Sunset Unit, April 30, 2026.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code.

"Federal Funds Effective Rate"  means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing reasonably selected by it.

"Fee Letter" means that certain holdco fee letter, dated as of the date hereof, by and between the Administrative Agent and the Borrower, providing for payment of the fees described therein, as amended, restated, supplemented or otherwise modified from time to time.

"Flood Insurance Laws" collectively, (i) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means, with respect to the Borrower (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.  For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time; provided, that no change in the accounting principles used in the preparation of any financial statement hereafter adopted by the Borrower or any other Opco Party shall be given effect for purposes of measuring compliance with any provision of this Agreement unless the Borrower, Administrative Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP; provided, further that no effect shall be given to any change in GAAP for purposes of measuring compliance with any provision of this Agreement that would require leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee(s)" means all direct and indirect guarantees, sales with recourse, endorsements (other than for collection or deposit in the ordinary course of business) and other obligations (contingent or otherwise, including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) by any Person to pay, purchase, repurchase or otherwise acquire or become liable upon or in respect of any Indebtedness of any other Person, and, without limiting the generality of the foregoing, all obligations (contingent or otherwise) by any Person to purchase products, supplies or other tangible property or services for any Person under agreements requiring payment therefor regardless of the non-delivery or non-furnishing thereof, or to make investments in any other Person, or to maintain the capital, working capital, solvency or general financial conditions of any other Person, or to indemnify any other Person against and hold him harmless from damages, losses and liabilities, all under circumstances intended to enable such other Person or Persons to discharge any Indebtedness or to comply with agreements relating to such Indebtedness or otherwise to assure or protect creditors against loss in respect of such Indebtedness. The amount of any Guarantee shall be deemed to be the amount of the Indebtedness of, or damages, losses or liabilities of, the other Person or Persons in connection with which the Guarantee is made or to which it is related unless the obligations under the Guarantee are limited to a determinable amount, in which case the amount of such Guarantee shall be deemed to be such determinable amount. The term "Guarantee" as a verb has a corresponding meaning.

"Impacted Loans" has the meaning set forth in Section 10.3(b).

"Improvements" means the buildings, and other facilities, amenities and improvements to be erected on the Real Property.

"Incremental Effective Date" has the meaning set forth in Section 2.1(b)(1).

"Incremental Facility" has the meaning set forth in Section 2.1(b)(1).

"Incremental Facility Notice" has the meaning set forth in Section 2.1(b)(1).

"Incremental Term Loan" has the meaning set forth in Section 2.1(b)(1).

"Incremental Term Loan Commitment" has the meaning set forth in Section 2.1(b)(1).

"Indebtedness" means, as to any Person at a particular time, without duplication, the following: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) net obligations of such Person under any Swap Contract; (d) all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses payable in the ordinary course of business and (A) not overdue by more than 90 days or (B) to the extent overdue by more than 90 days, are being contested by such person by appropriate proceedings in good faith), (ii) any earn-out obligation to the extent such obligation is not required to be reflected on such Person's balance sheet in accordance with GAAP, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business); (e) indebtedness in respect of the foregoing (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (f) all Capital Lease Obligations; (g) all obligations of such Person in respect of Disqualified Equity Interests; (h) the principal balance of synthetic leases or other off-balance sheet financing arrangements; and (i) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of consolidated Indebtedness. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) (to the extent that such Indebtedness is non-recourse to such Person for amounts in excess of the value of the property securing such Indebtedness) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Parties" has the meaning specified in Section 9.5.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Initial Term Loan" means Loans made pursuant to Section 2.1(a)(1).

"Initial Term Loan Commitment" means, for each Lender, the aggregate amount appearing opposite of such Lender's name under the heading "Initial Term Loan Commitments" as set forth on **Schedule I** or as set forth in an Assignment and Assumption Agreement delivered pursuant to Section 9.9(b), as such amount may be modified from time to time pursuant to the terms hereof, including as a result of any Incremental Term Loans; provided, that, it is understood and agreed that, as of the Closing Date, no Lender shall have any Initial Term Loan Commitment.

"<u>Interest Payment Date</u>" has the meaning set forth in <u>Section 2.1(i)(4)(C)</u>.

"<u>Internally Generated Funds</u>" means funds not constituting the proceeds of any Indebtedness, Debt Issuance, Equity Issuance, Disposition or Casualty Event (in each case, without regard to the exclusions from the definitions thereof).

"<u>Investment</u>" means, with respect to any Person, any loan, advance or extension of credit (other than to customers in the ordinary course of business) by such Person to, or any Guarantee or other contingent liability with respect to the capital stock, Indebtedness or other obligations of, or any contributions to the capital of, any other Person, or any ownership, purchase or other acquisition by such Person of any interest in any capital stock, limited partnership interest, general partnership interest, or other securities of any such other Person, other than an Acquisition; and "<u>Invest</u>," "<u>Investing</u>" or "<u>Invested</u>" means the making of an Investment.

"<u>Knowledge</u>" of the Borrower or Opco Borrower means the actual knowledge of any Responsible Officer of the Borrower or Opco Borrower, as applicable.

"<u>Laws</u>" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"<u>Leases</u>" means each operating lease related to a Unit.

"<u>Lenders</u>" means each Lender that has a Term Loan Commitment or to which a Term Loan is owed.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"<u>Lien</u>" means, with respect to any interest in Property (whether real, personal or mixed and whether tangible or intangible) (a) any interest or right which secures the payment of Indebtedness or an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute or contract, and whether or not choate, vested or perfected, including any such interest or right arising from a mortgage, charge, pledge, negative pledge or other agreement not to lien or pledge, assignments, security interest, conditional sale, levy, execution, seizure, attachment, garnishment, conditional sale, Capital Lease or trust receipt, or arising from a lease, consignment or bailment given for security purposes, and (b) any exception to or defect in the title to or ownership interest in such Property, including, as applicable, reservations, rights of entry, possibilities of reverter, encroachments, easements, rights of way, restrictive covenants, leases and licenses.  For purposes of this Agreement, the Borrower or any Subsidiary shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, Capital Lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"<u>Liquidity</u>" means, as of any date of determination, (i) the Unrestricted Cash of the Opco Borrower and its Subsidiaries <u>plus</u> (ii) the Revolving Loan Unused Portion (as defined in the Opco Credit

18

Agreement) as of such date plus (iii) excess availability (or any similar term) under and as defined in any ABL Facility of the Opco Borrower and its Subsidiaries as of such date.

"Loan" means, individually or collectively, as the case may be, each Term Loan.

"Loan Document(s)" means, individually or collectively, as the case may be, this Agreement (including, for the avoidance of doubt, any amendment of this Agreement), the Fee Letter, any Notes, each Security Document and all other documents, agreements and certificates executed or delivered in connection with or contemplated by this Agreement or any other document evidencing or securing a Loan or any other document that is mutually agreed by the Borrower and the Required Lenders to constitute a Loan Document, each as may be amended, modified or supplemented from time to time.

"Master Agreement" has the meaning set forth in the definition of Swap Contract.

"Material Adverse Occurrence" means any fact, circumstance or occurrence of any nature whatsoever (including any adverse determination in any litigation, arbitration, governmental investigation or proceeding) which taken alone or in combination with any other fact, circumstance or occurrence could reasonably be expected to have a material adverse effect on the (a) business, assets, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, (b) rights and remedies of the Administrative Agent, taken as a whole, under any Loan Documents or (c) ability of the Borrower to perform its payment obligations under any Loan Documents; provided, that (i) the commencement of a proceeding under the Bankruptcy Code and the filing of the Chapter 11 Cases and (ii) the events and conditions related to or that led to the commencement of the Chapter 11 Cases, in each case, shall not constitute a Material Adverse Occurrence.

"Mature Unit" means, as of any date of determination, any Unit that has been owned and operated by any Opco Party for at least 12 months, other than (a) any Unit that is not in operation as of such date, (b) any Unit that, as of such date, has been designated (or the Opco Parties intend to designate) for Disposition or closure, and (c) any Unit that, as of such date, has been designated (or the Opco Parties intend to designate) as a discontinued operation.

"Maturity Date" means July [~~____~~]30, 2028,[1] or with respect to any Incremental Term Loan, the date set forth as such in the agreement among the Borrower and the Lenders providing such Incremental Term Loan.

"Modified GAAP" means GAAP; provided that (a) sale-leaseback transactions in any financial statement shall be presented assuming that all consummated sale-leaseback transactions are successful sale-leaseback transactions for accounting purposes (i.e. consistent with the historical financial reporting practice of the Borrower prior to the Nineteenth Amendment Effective Date) and (b) no effect shall be given to any change in GAAP for purposes of financial reporting or measuring compliance with any provision of this Agreement resulting from the effectiveness of Accounting Standard Codification 842 (or any other accounting standards codification with substantially similar effect) that would (i) require the presentation of sale-leaseback transactions in a manner inconsistent with the presentation of sale-leaseback transactions described in clause (a) or (ii) otherwise cause leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

---

[1] ~~3 Years and three months after Closing Date.~~

"MFN Adjustment" has the meaning set forth in Section 2.1(b)(3).

"Moody's" means Moody's Investors Service, Inc., or any successor to the rating agency business thereof.

"Multiemployer Plan" means any multiemployer plan as defined in Sections 3(37) or 4001(a)(3) of ERISA of, or contributed to by, the Borrower, any of its Subsidiaries or any ERISA Affiliate.

"Net Working Capital" means the total current assets (excluding cash and cash equivalents) of the Borrower and its Subsidiaries minus the total current liabilities (excluding current portion of any Indebtedness under this Agreement and the current portion of any other long-term Indebtedness which would otherwise be included therein (including Capital Lease Obligations), current interest and current taxes) of the Borrower and its Subsidiaries, determined in accordance with Modified GAAP.

"New Unit" a carwash facility acquired, leased or constructed by the Borrower or any Affiliate thereof that is not a Unit on the Closing Date.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 9.1 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note(s)" means, individually or collectively, as the case may be, (a) the Term Notes (in form substantially as attached hereto as **Exhibit A**), and (b) such other promissory notes accepted by the Lenders in exchange for or in substitution of any such Notes.

"Notice of Borrowing" means the notice in the form of **Exhibit D** attached hereto to be delivered to the Administrative Agent pursuant to Section 2.1 or such other form as may be reasonably approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer of the Borrower.

"Obligations" means (i) all Loans, Advances, debts, liabilities, payment and performance obligations, covenants and duties of every kind, nature and description owing by the Borrower to the Administrative Agent, the Lenders or any Lender of any kind or nature, present or future, arising under this Agreement or any other Loan Document, whether direct or indirect (including those acquired by permitted assignment or participation), absolute or contingent, liquidated or unliquidated, due or to become due, now existing or hereafter arising and however acquired, (ii) [reserved], (iii) [reserved] and (iv) all Erroneous Payment Subrogation Rights.  The term includes all principal, interest, fees, charges, expenses, reasonable attorneys' fees, and any other sum chargeable (including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) to the Borrower under this Agreement or any other Loan Document.

"Opco Agent" means Brightwood, as administrative agent and collateral agent with respect to the Opco Facility, together with its permitted successors and assigns.

"Opco Borrower" means ~~Wax &~~ Wash & Wax Systems LLC, a Delaware limited liability company.

"Opco Credit Agreement" means that certain Credit Agreement, dated as of the Closing Date, by and among Opco Borrower, as the borrower, the other obligors party thereto, Brightwood, as the administrative agent, and the lenders from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time.

"Opco Facility" means the credit facility provided pursuant to the Opco Credit Agreement.

"Opco Holdings" means ~~Wax &~~ Wash & Wax Intermediate LLC, a Delaware limited liability company.

"Opco Lenders" means the Lenders under and as defined in the Opco Credit Agreement.

"Opco Leverage Ratio" means the First Lien Leverage Ratio (as defined in the Opco Credit Agreement).

"Opco Party" means Opco Holdings, Opco Borrower and each Subsidiary that is an obligor under the Opco Credit Agreement.

"Organizational Documents" means (a) with respect to any corporation or company, its certificate or articles of incorporation, organization or association and its bylaws, (b) with respect to any limited partnership, its certificate or declaration of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, and (d) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, and in the case of any Foreign Subsidiary, any analogous organizational documents. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, enforced any Loan Document.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.6).

"Payment Recipient" has the meaning assigned to it in Section 8.15(a).

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Permitted Acquisition" means any Acquisition, to the extent that each of the following conditions is satisfied:

(a)    no Default or Event of Default then exists or would result therefrom;

(b)      after giving effect to such transaction and/or series of related transactions on a Pro Forma Basis, the Borrower shall be in compliance with all of the Financial Covenants (as defined in the Opco Credit Agreement) for the most recently ended Test Period;

(c)      after giving effect to such transaction and/or series of related transactions on a Pro Forma Basis, (i) the Opco Leverage Ratio for the most recently ended Test Period shall not exceed [___:___]²5.06 to 1.00 and (ii) Liquidity shall not be less than $10,000,000;

(d)      neither the Borrower nor any Opco Party shall, in connection with any such transaction and/or series of related transactions, assume or remain liable with respect to any Indebtedness of the related sellers or the business, person or properties acquired, except to the extent permitted herein;

(e)      the Persons or businesses to be acquired shall be, or shall be engaged in, a business of the type that Opco Parties and their Subsidiaries are permitted to be engaged in under the Loan Documents and, to the extent required by the Security Documents, the Collateral acquired in connection with any such transaction and/or series of related transactions shall be made subject to the Administrative Agent's security in accordance with the Security Documents and the Opco Parties shall otherwise comply with the terms of the Loan Documents relating to additional guarantees and further assurances;

(f)      the Acquisition has been approved by the board of directors (or other equivalent governing body) of the person to be acquired;

(g)      with respect to such Acquisition or any of the series of related transactions, the Borrower shall have provided the Administrative Agent with (i) in each case only if made available to the Borrower prior to the consummation of such transaction, historical financial statements for the last three fiscal years of the Person or business to be acquired and unaudited financial statements thereof for the most recent interim period that is available and the comparable interim period for the prior year, (ii) a reasonably detailed description of all material information relating thereto and copies of all material documentation pertaining to such transaction, (iii) a Compliance Certificate after giving pro forma effect to such Permitted Acquisition on a Pro Forma Basis, and (iv) for Permitted Acquisitions with a purchase price in excess of $10,000,000, a quality of earnings report prepared for the Borrower by an independent certified accounting firm of nationally recognized standing;

(h)      at least three (3) Business Days prior to the proposed date of consummation of each such transaction, the Borrower shall have delivered to the Administrative Agent a certificate certifying that such transaction and related series of transactions complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance); and

(i)      the aggregate amount of consideration paid in respect of Permitted Acquisitions after the Closing Date shall not exceed $40,000,000.

"Permitted Holders" means (a) the direct and indirect holders of Equity Interests or Equity Interests Equivalents of the Borrower on the Closing Date, (b) the Qualified Owners, and (c) any "group" (within the meaning of Section 13(d) or Section 14(d) of the Securities Exchange Act of 1934, as amended) of which any of the foregoing are members; provided, that in the case of such "group" and without giving effect to the existence of such "group" or any other "group," such Persons specified in clauses (a) and/or (b) above, collectively, have beneficial ownership, directly or indirectly, of more than

---

² NTD - to be closing opco leverage.

50% of the aggregate ordinary voting power for election of directors represented by the issued and outstanding Equity Interests of the Borrower held, directly or indirectly, by such "group."

"Permitted Expense Reimbursement and Indemnity Payments" means any reasonable expense reimbursement and customary indemnities payable pursuant to the Permitted Holders for services provided to the Opco Parties, including the provision of directors and officers, if applicable.

"Permitted Indebtedness" has the meaning set forth in Section 6.2.

"Permitted Investment" means any of the following Investments made by the Borrower or any of its Subsidiaries in any Person: (i) obligations, with a maturity of less than two years from the date of acquisition thereof, issued by or unconditionally guaranteed by the United States of America or an agency or instrumentality thereof backed by the full faith and credit of the United States of America; (ii) direct obligations of any state of the United States, any subdivision or agency thereof or any municipality therein which are rated by S&P or Moody's in one of the top two rating classifications and maturing within two years of the date of acquisition thereof; (iii) certificates of deposit or banker's acceptances, maturing within two years of the date of acquisition thereof, issued by commercial banks organized under the laws of the United States or any state thereof, having capital, surplus and undivided profits aggregating not less than $100,000,000 or such lesser amount approved by Lenders in their reasonable discretion so as to attempt to accommodate Investments made with minority owned commercial banks and whose unsecured long-term debt is rated in one of the top two rating classifications by S&P or Moody's; (iv) commercial paper of any corporation organized under the laws of the United States or any state thereof, rated in one of the top two rating classifications by S&P or Moody's and with a maturity of less than 270 days from the date of acquisition thereof; (v) Investments existing as of the date of this Agreement and set forth on Schedule 6.6; (vi) extensions of trade credit arising or acquired in the ordinary course of business, and Investments received in settlements in the ordinary course of business of such extensions of trade credit; (vii) Investments by any Opco Party in any other Opco Party; (viii) loans or advances to employees of the Borrower or any of its Subsidiaries to finance travel, entertainment and relocation expenses in the ordinary course of business as presently conducted in an aggregate amount not to exceed $250,000 at any one time outstanding; (ix) Permitted Acquisitions; (x) Investments of any Person existing at the time such Person becomes a Subsidiary of the Borrower or merges with the Borrower or any of its Subsidiaries as permitted hereunder so long as such Investments were not made in contemplation of such Person becoming a Subsidiary of the Borrower; (xi) Investments received in connection with the bankruptcy or reorganization of suppliers and customers or in the settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment; (xii) advances of payroll payments to employees in the ordinary course of business not to exceed $250,000 in the aggregate amount outstanding at any time; (xiii) promissory notes and other non-cash consideration received in connection with Dispositions permitted under Section 6.4; (xiv) investments, including Acquisitions, financed with the proceeds of Equity Issuances; (xv) loans and advances to Opco Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Opco Holdings (or such direct or indirect parent) in accordance with Section 6.10(f) or (g); (xvi) Guarantees by the Borrower or any of its Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; (xvii) Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests of Opco Holdings (or any direct or indirect parent thereof) or the proceeds from the issuance thereof; and (xviii) other Investments by the Borrower and its Subsidiaries in an aggregate amount not to exceed $5,000,000 at any one time outstanding.

"Permitted Lien" has the meaning set forth in Section 6.3.

"Person" means any natural person, corporation, firm, joint venture, partnership, limited partnership, limited liability company, association, trust or other entity or organization, whether acting in an individual, fiduciary or other capacity, or any government or political subdivision thereof or any agency, department or instrumentality thereof.

"Petition Date" has the meaning specified in the recitals hereto.

"PIK Interest" has the meaning set forth in Section 2.1(j).

"Plan" means each employee benefit plan (as defined in Section 3(3) of ERISA) whether now in existence or hereafter instituted, of, or contributed to by, the Borrower or any ERISA Affiliate.

"Plan Effective Date" has the meaning specified in the recitals hereto.

"Plan of Reorganization" has the meaning specified in the recitals hereto.

~~"Prepetition Credit Agreement" means the Term Loan Credit Agreement (as defined in the Plan of Reorganization).~~

~~"Prepetition Term Loan Claim" means a Term Loan Claim (as defined in the Plan of Reorganization).~~

~~"Prepetition Term Loan Lender" means each lender under the Prepetition Credit Agreement.~~

"Prime Rate" means the rate of interest quoted in *The Wall Street Journal* (or another national publication reasonably selected by the Administrative Agent) as the U.S. "Prime Rate."

"Pro Forma Basis" means, with respect to compliance with any financial performance test hereunder for the applicable Test Period, in respect of any Specified Transaction, the making of such calculation after giving pro forma effect to:

(a)     the consummation of such Specified Transaction as of the first day of the applicable Test Period, as if such Specified Transaction had been consummated on the first day of such Test Period;

(b)     the assumption, incurrence or issuance of any Indebtedness by the Borrower or any of its Subsidiaries (including any person which becomes a Subsidiary pursuant to or in connection with such Specified Transaction) in connection with such Specified Transaction, as if such Indebtedness had been assumed, incurred or issued (and the proceeds thereof applied) on the first day of such Test Period (with any such Indebtedness bearing interest during any portion of the applicable Test Period prior to the relevant acquisition at the weighted average of the interest rates applicable to such Indebtedness incurred during such Test Period);

(c)     the permanent repayment, retirement or redemption of any Indebtedness (other than revolving Indebtedness, except to the extent accompanied by a permanent commitment reduction) by the Borrower or any of its Subsidiaries (including any person which becomes a Subsidiary pursuant to or in connection with such Specified Transaction) in connection with such Specified Transaction, as if such Indebtedness had been repaid, retired or redeemed on the first day of such Test Period;

(d)    the Cash Rental Expense attributable to the target, Property or other assets subject to a Specified Transaction consummated or occurring, as applicable, during the applicable Test Period, in each case, as if such Specified Transaction had been consummated on the first day of such Test Period; and

(e)    in the case of the consummation of any Specified Transaction in the form of a sale-leaseback transaction, Consolidated Net Income shall be adjusted to give effect to any lease payments that would have been made on the lease established in connection with any sale-leaseback transaction during the relevant Test Period assuming such sale-leaseback transaction had been consummated on the first day of such Test Period; and

(f)    the costs and expenses of any target that have not been assumed by the Borrower or any of its Subsidiaries shall be disregarded to the extent such costs and expenses are reasonably identifiable, factually supportable and certified by a Responsible Officer, and any (i) cost and expenses of any such target that have been assumed in any Specified Transaction and (ii) incremental recurring costs and expenses incurred in connection with any Specified Transaction shall, in the case of each of (i) and (ii) be calculated as if such costs and expenses were assumed on the first day of such Test Period;

with clauses (a) through (f) calculated in a manner consistent with GAAP or Modified GAAP, as applicable, and the definition of Consolidated EBITDA and subject to, the limitations set forth in the definition of Consolidated EBITDA, including adjustments for restructuring charges or reserves and non-recurring integration costs.

"Proceeding" has the meaning ascribed to it in Section 9.5.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, and any right in respect of any of the foregoing.

"Purchasing Party" has the meaning specified in Section 9.9(i).

"Qualified Equity Interests" means any Equity Interests or Equity Interests Equivalents that are not Disqualified Equity Interests.

"Real Property" means all real property or interests therein wherever situated now, heretofore or hereafter owned or ground (or space) leased by the Borrower pledged to Administrative Agent for the benefit of the Secured Parties as Collateral under any of the Security Documents.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder.

"Register" has the meaning ascribed to it in Section 9.9(d).

"Regulation D," "Regulation T," "Regulation U" and "Regulation X" means Regulation D, Regulation T, Regulation U and Regulation X, respectively, of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Rejection Notice" has the meaning specified in Section 2.1(k).

"Related Indemnified Party" has the meaning ascribed to it in Section 9.5.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve Bank of New York, or any successor thereto.

"Required Lenders" means Lenders holding more than fifty percent (50%) of the sum of the Term Loan Commitments of all Lenders, plus the unpaid principal balance of the Term Loans; provided that (i) if there are at least two Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Required Lenders" must include at least two Lenders and (ii) the Commitments and Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Resignation Effective Date" has the meaning specified in Section 8.13(a).

"Responsible Officer" means the chief executive officer, president, senior vice president, senior vice president (finance), vice president, chief financial officer, treasurer, manager of treasury activities or assistant treasurer or other similar officer or Person performing similar functions of a Opco Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Opco Party.  To the extent requested by the Administrative Agent, each "Responsible Officer" will provide an incumbency certificate and to the extent requested by the Administrative Agent, appropriate authorization documentation, in form and substance reasonably satisfactory to the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Opco Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Opco Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Opco Party.  Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"SBIA" means the Small Business Investment Act of 1958, as amended.

"S&P" means Standard & Poor's Ratings Services, a division of the McGraw Hill Companies, Inc., or any successor to the rating agency business thereof.

"SDN List" has the meaning set forth in Section 4.27.

"Secured Parties" means, collectively, with respect to each of the Security Documents, the Administrative Agent and the Lenders.

"Security Agreement" means the Security Agreement dated as of the Closing Date, entered into by the Borrower in favor of the Administrative Agent for the benefit of the Secured Parties, as it may be amended, modified, restated or replaced from time to time.

"Security Documents" means and refer to the Security Agreement and each other assignment, pledge or security agreement, instrument, certificate, financing statements, filings or document pursuant to which the Borrower or any other Person shall grant or convey to the Administrative Agent or the Lenders a Lien in Collateral as security for all or any portion of the Obligations, whether now or hereafter in existence, as said agreements or documents may be amended, modified, restated or replaced from time to time, each in form and substance reasonably satisfactory to the Administrative Agent.

"Specified Real Estate" means those certain real properties located at: (i) 7860 Mexico Road, St. Peters, MO 63375; (ii) 12 Junction Drive West, Glen Carbon, IL 62034; (iii) 6678 Mexico Road, St.

Peters, MO 63376; and (iv) 994 Parkway, Sevierville, TN 37862, each of which are contemplated to be sold pursuant to the Plan of Reorganization.

"Specified Transaction" means any Investment (including any Acquisition), Disposition, incurrence or repayment of Indebtedness, Restricted Payment or Incremental Term Loan that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis".

"Specified Unit" means each Unit described on Schedule II.

"Subsidiary" of any Person means (i) any corporation of which more than 50% of the outstanding Equity Interests and Equity Interests Equivalents of any class or classes having ordinary voting power for the election of directors (irrespective of whether or not at the time Equity Interests or Equity Interests Equivalents of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is now or hereafter owned directly or indirectly by such Person, by such Person and one or more of its Subsidiaries, or by one or more of such Person's other Subsidiaries, (ii) any partnership, association, limited liability company, joint venture or other entity in which such Person, such Person and one or more of its Subsidiaries, or one or more of its Subsidiaries, is either a general partner or has an equity or voting interest of more than 50% at the time, and (iii) any other entity which is directly or indirectly controlled by such Person or one or more Subsidiaries of such Person or both; provided that, unless otherwise specified, any reference to "Subsidiary" means a Subsidiary of the Borrower.

"Sunset Unit" means each Unit described on Schedule III.

"Supermajority Lenders" means at any time Lenders holding at least seventy percent (70%) of the aggregate outstanding principal amount of the Loans; provided that (i) if there are (x) at least three Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Supermajority Lenders" must include at least three Lenders and (y) only two Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Supermajority Lenders" must include both Lenders and (ii) the Commitments and Loans of any Defaulting Lender shall be disregarded in determining Supermajority Lenders at any time.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligations" means with respect to the Borrower, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, as amended from time to time.

27

"<u>Swap Termination Value</u>" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"<u>Tax Distributions</u>" has the meaning set forth in Section 6.<u>10</u>.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Loan</u>" means, collectively, the Initial Term Loans and any Incremental Term Loan.

"<u>Term Loan Commitment</u>" means, for each Lender, such Lender's Initial Term Loan Commitment.

"<u>Term Note</u>" has the meaning set forth in <u>Section 2.1(a)(4)</u>.

"<u>Test Period</u>" in effect at any time means the most recent period of four consecutive fiscal quarters of the Borrower ended on or prior to such time (taken as one accounting period) in respect of which financial statements have been or are required to be delivered pursuant to <u>Section 5.1(a)</u> or <u>(b)</u>, as applicable. A Test Period may be designated by reference to the last day thereof (*e.g.*, the "March 31, 2026 Test Period" refers to the period of four consecutive fiscal quarters of the Borrower ended on March 31, 2026), and a Test Period shall be deemed to end on the last day thereof.

"<u>Total Debt</u>" means, as of any date of determination, (a) Indebtedness of the type described in clauses (a), (b), (e), (f), (h) and (i) of the definition of Indebtedness (but in the case of clause (i) solely to the extent Guaranteeing Indebtedness described in clauses (a), (b), (d), (f) (but, in the case of earn-out obligations, only to the extent not paid when due) and (h); <u>provided</u> that Total Debt shall not include Indebtedness in respect of letters of credit, except to the extent of drawn and unreimbursed amounts thereunder.

"<u>Transactions</u>" means the transactions contemplated under the Plan of Reorganization and the Confirmation Order to occur on the effective date of the Plan of Reorganization and the Confirmation Order, including the entry into this Agreement and the other Loan Documents.

"<u>Transaction Expenses</u>" means any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries in connection with the Transactions, including restructuring and legal fees and expenses incurred in connection with the events leading up to the filing of the petition for relief under the Bankruptcy Code.

"<u>Unit</u>" means, collectively, the property comprising the carwash locations described on **Schedule I-A** and the property comprising any New Unit.

"<u>United States</u>" and "<u>U.S.</u>" mean the United States of America.

"Unrestricted Cash" shall mean unrestricted cash and cash equivalents of the Opco Borrower and its Subsidiaries to the extent such cash or cash equivalents are subject to a first priority perfected security interest in favor of the Opco Agent under the Opco Facility.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned thereto in Section 10.1(e)(2)(B)(3).

"4-Wall EBITDA" means, with respect to each Unit for each period, the portion of Consolidated EBITDA attributable to such Unit during such period, excluding any allocations of corporate selling, general and administrative expenses allocated to that Unit.

"Wash Club" means any customer loyalty program maintained by a Mature Unit entitling members to unlimited car washes at such Mature Unit in exchange for a monthly fee.

"Wash Club Membership" means, for any period, the aggregate number of members of any Wash Club at each Mature Unit for the last calendar month of such period.

"Zips" means Zips Car Wash, LLC, an Arkansas limited liability company.

**1.2      Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)      All undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Uniform Commercial Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Uniform Commercial Code, the definition contained in Article or Division 9 shall control.

(c)      The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(1)      The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(2)      References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

29

(3)      The term "including" is by way of example and not a limitation.

(4)      The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(e)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(f)      For purposes of calculating Consolidated EBITDA and any financial ratios or tests, including the Opco Leverage Ratio and the Specified Transactions that have been made (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of Consolidated EBITDA or any such ratio is made shall be calculated on a Pro Forma Basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.

**1.3      Accounting Terms; Payment Dates**.    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, Modified GAAP, except as otherwise specifically prescribed herein. Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending December 31 or fiscal quarter ending March 31, June 30, September 30 or December 31 of the Borrower.  Unless the Borrower has requested an amendment pursuant to the process set out in the definition of "GAAP" with respect to the treatment of operating leases and Capitalized Lease Obligations under GAAP (or IFRS) and until such amendment has become effective, all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update (the "ASU") shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations, in each case, used for purposes of Article VII (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as Capitalized Lease Obligations in the financial statements to be delivered pursuant to Section 5.1.

**1.4      References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document shall be construed as referring to such agreement, instrument or other document as may be from time to time amended, restated, amended and restated, supplemented or otherwise modified, extended, refinanced or replaced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications, extensions, refinancings or replacements set forth herein or in any Loan Document) and (b) any reference to any law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

30

**1.5**    **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

**1.6**    **Interest Rates**.  The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability (other than arising from its or its Affiliates' gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable order) with respect to the administration, submission or any other matter related to the interest rates.

## ARTICLE II
## THE ADVANCES

**2.1**    **The Advances**.

(a)    Initial Term Loans.

(1)    Subject to the terms and conditions set forth herein and in the Plan of Reorganization, ~~in satisfaction of a portion of each Prepetition Term Loan Lender's Prepetition Term Loan Claim, each Prepetition Term Loan~~ on the Closing Date, each Lender shall receive (and be deemed to have issued) ~~on the Closing Date~~ the aggregate principal amount of Initial Term Loans set forth on Schedule I hereto ~~and, each Prepetition Term Loan Lender shall receive (and be deemed to have issued)~~ opposite such Lender's name as a conversion of the Existing Holdco Obligations held by such Lender on the Closing Date ~~the aggregate principal amount of Initial Term Loans set forth on Schedule I hereto~~. Once paid, the Initial Term Loans may not be re-borrowed.

(2)    The Borrower's obligation to pay the principal of, and interest on, any Term Loan shall be evidenced by the records of the Lenders and, at the request of any applicable Lender, by a term loan promissory note(s) in form substantially as attached hereto as **Exhibit A** (the "Term Note").  The entries made in the Register shall (absent manifest error) be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that the failure or delay of the Lenders in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

(b)    Incremental Facilities.

(1)    Increase.    The Borrower may, by written notice to the Administrative Agent from time to time after the Closing Date (each, an "Incremental Facility Notice"), increase the Term Loan Commitments or obtain additional term loan facilities; provided such additional term loan facilities not increasing the Term Loan Commitments will rank junior in right of payment and security with the Term Loans or are unsecured (each, whether or not a separate class, an "Incremental Term Loan Commitment" and the term loans thereunder, an "Incremental Term Loan"; each Incremental Term Loan Commitment is sometimes referred to herein individually as an "Incremental Facility" and collectively as the "Incremental Facilities"), in Dollars in an aggregate principal amount not to exceed $40,000,000 for all such Incremental Facilities and subject to the conditions set forth in clause (3) below; provided that no commitment of any Lender shall be increased without the consent of such Lender.  Such notice shall set forth (A) the amount of the Incremental Term Loan Commitment being requested, (which shall be in a minimum amount of $5,000,000 and in increments of $250,000 in excess thereof) and (B) the date (an "Incremental Effective Date") on which such Incremental Facility is requested to become

effective (which, unless otherwise agreed by the Administrative Agent, shall not be less than 10 Business Days nor more than 60 days after the date of such notice).

(2)     <u>Allocations</u>.   Upon delivery of the applicable Incremental Facility Notice, the Administrative Agent will give notice thereof to each then-existing Lender of such Incremental Facility as an offer for all Lenders to provide such Incremental Facility pro rata according to the percentages of their respective Commitments.  If any Lender does not notify the Administrative Agent in writing that such Lender accepts its pro rata share of such offer in its entirety within ten (10) Business Days of such offer, that portion of the Incremental Facility not accepted by the applicable Lenders shall be offered to the applicable accepting Lenders on a non-pro rata basis.  If the applicable accepting Lenders do not accept the applicable Incremental Facility in its entirety on a non-pro rata basis within five (5) Business Days after such offer, that portion of the Incremental Facility not accepted by the applicable accepting Lenders may be offered by the Borrower to any Persons that would constitute Eligible Assignees.

(3)     <u>Conditions</u>.   No Incremental Facility shall become effective under this <u>Section 2.1(b)</u> unless, after giving effect to such Incremental Facility, the Loans to be made thereunder, and the application of the proceeds therefrom, (A) no Default or Event of Default shall exist at the time of funding or would exist after giving effect thereto, except in connection with any Permitted Acquisition where the Lenders providing such Incremental Term Loans have agreed that no payment or bankruptcy Event of Default will be the standard and which shall be subject to customary "SunGard" limitations to the extent the proceeds of such Incremental Term Loans are used to fund such Permitted Acquisition; (B) the Incremental Term Loans will rank pari passu or junior in right of payment and security with the Term Loans (other than Incremental Term Loans) or may be unsecured, (C) any Incremental Term Loan will have a final maturity no earlier than the maturity of the Initial Term Loans, (D) the weighted average life to maturity of any Incremental Term Loan shall be no shorter than that of the Initial Term Loans, (E) subject to clause (D) above, the amortization schedule applicable to any Incremental Term Loan shall be determined by the Borrower and the Lenders thereunder, (F) the all-in yield (whether in the form of interest rate margins, original issue discount, upfront fees or reference rate floor greater than the floors applicable to the Initial Term Loans or similar yield related discounts, deductions or payments, with such increased amount being equated to interest margin on the basis of four year weighted average life to maturity for purposes of determining any increase to the applicable interest margin with respect to the Initial Term Loans) (the "<u>Effective Yield</u>") applicable to any Incremental Term Loan which is pari passu in right of payment and security with the Initial Term Loan will be determined by the Borrower and the Lenders providing such Incremental Term Loan, but will not be higher than the corresponding Effective Yield for the Initial Term Loans, unless the interest rate margins with respect to the then existing Term Loans are increased by an amount equal to the difference between the Effective Yield with respect to such Incremental Term Loans and the corresponding Effective Yield on such existing Term Loans (the "<u>MFN Adjustment</u>"), (G) any Incremental Term Loan shall be on terms and pursuant to documentation to be determined by the Borrower and the applicable Lenders providing such Incremental Term Loan; <u>provided</u>, that, to the extent that any financial maintenance covenant and/or call protection provision is added for the benefit of any such Incremental Term Loan, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant or call protection provision is either (i) also added for the benefit of any existing Term Loans or (ii) only applicable after the latest maturity of the existing Term Loans, and (H) no Incremental Term Loan will be secured by assets other than Collateral or guaranteed by any person.

(4)     Required Amendments.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Facility, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence of such Incremental Facility and the Loans evidenced thereby, and any joinder agreement or amendment may, without the consent of the other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effectuate the provisions of this Section 2.1(b), and, for the avoidance of doubt, this Section 2.1(b) shall supersede any provisions in Section 9.1.  From and after each Incremental Effective Date, the Loans and Commitments established pursuant to this Section 2.1(b) shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and to the extent ranking *pari passu* with the Initial Term Loans shall, without limiting the foregoing, benefit equally and ratably from the guarantees and security interests created by the applicable Security Documents.  The Opco Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Liens and security interests granted by the applicable Security Documents continue to be perfected under the Uniform Commercial Code or otherwise after giving effect to the establishment of any such new Loans and Commitments.

(c)     [Reserved].

(d)     [Reserved].

(e)     [Reserved].

(f)     Notes.  If requested by any Lender, the Advances made by such Lender shall be evidenced by, and be payable in accordance with the terms of the Term Note issued to such Lender, as applicable, made by the Borrower payable to the order of such Lender in a principal amount equal to the Commitment of such Lender; subject, however, to the provisions of such Note to the effect that the principal amount payable thereunder at any time shall not exceed the then unpaid principal amount of the Advances made by such Lender.  The Borrower hereby irrevocably authorizes each Lender to make or cause to be made, at or about the time of each Advance made by such Lender, an appropriate notation on the records of such Lender, reflecting the principal amount of such Advance, and such Lender shall make or cause to be made, on or about the time of receipt of payment of any principal of any Advance, an appropriate notation on its records reflecting such payment and such Lender will, prior to any transfer of any of such Note, endorse on the reverse side thereof the outstanding principal amount of the Advances evidenced thereby.  Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances.  The aggregate amount of all Advances set forth on the Register shall be conclusive evidence of the principal amount owing and unpaid on such Lender's Note, absent manifest error.

(g)     Promise to Pay.  The Borrower hereby promises to pay in full to the Administrative Agent for the benefit of the Lenders the amount of all Obligations, including the principal amount of all Loans, together with accrued interest, fees and other amounts due thereon, all in accordance with the terms of this Agreement.  All outstanding Obligations, including the outstanding principal amount of all Loans, together with unpaid accrued interest, fees and other amounts due thereon, shall be due and payable in full on the applicable Maturity Date.  The Loans shall be payable as follows:

33

(1)    Term Loan.  The entire remaining unpaid principal balance of the Term Loan (including PIK Interest), together with accrued but unpaid interest, shall be due and payable in full on the Maturity Date.

(2)    [Reserved].

(3)    Incremental Term Loans.  The Borrower shall repay to the Administrative Agent, for the account of the Lenders who provided any Incremental Term Loans, on each date set forth in the amendment or other documentation relating to such Incremental Term Loan, such amount of such Incremental Term Loans as provided in such amendment or other documentation.

(h)    Interest on Advances.  The Borrower agrees to pay interest on the aggregate outstanding principal amount of the Advances until paid in full as follows:

(1)    Term Loan.  The Term Loan shall bear interest at a rate equal to 12.00% per annum.

(2)    [Reserved].

(3)    Default Interest.  While an Event of Default exists and is continuing or after acceleration, at the option of the Administrative Agent or the Required Lenders, the Borrower shall pay interest ("Default Interest") with respect to the principal of, or interest on, each Loan, any fee or any other amount payable by the Borrower hereunder that is not paid when due at the Default Rate.  All Default Interest under this clause (3) shall be payable in-kind and on demand.

(4)    Payment Dates.  Interest accrued on each Loan shall be payable, without duplication:

(A)    on the Maturity Date;

(B)    in respect of any Loan, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan, on the principal amount so paid or prepaid; and

(C)    on the last Business Day of each fiscal quarter.

The Administrative Agent shall determine each interest rate applicable to the Loan in accordance with the terms hereof and, upon any rate change, shall promptly notify the Borrower of such rate in writing (or by telephone, promptly confirmed in writing).  Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(i)    Calculation of Interest.  All computations of interest and all other computations of fees shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.3, bear interest for one day.  Each determination by the Administrative Agent of an

34

interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(j)    <u>PIK Interest</u>. All interest of the Loans shall be payable solely in kind ("<u>PIK Interest</u>") (by adding such PIK Interest when paid to the principal amount of the outstanding Initial Term Loans on the applicable Interest Payment Date and such additional principal shall automatically constitute part of the principal amount of the Initial Term Loans for purposes hereunder, including the accrual of interest thereon at the interest rate applicable to such Initial Term Loans); <u>provided</u>, that any interest paid in connection with a prepayment of the Term Loans pursuant to Section 2.1(k), at maturity or otherwise, shall be payable all in cash.  Each Lender may determine in its sole discretion to record its PIK Interest as an increase in principal in the schedule annexed to its Notes or may request that such PIK Interest be evidenced by one or more additional Notes issued on the applicable Payment Date in the principal amount of such PIK Interest, <u>provided</u>, <u>further</u>, that the failure to request or obtain a promissory note to evidence the amount of such outstanding PIK interest shall not impair in any manner the enforceability of the Obligation of the Borrower with respect to the payment thereof or the accrual of interest with respect thereto.

(k)    <u>Prepayment</u>. Prepayments of the Loans shall be (or in the case of <u>Section 2.1(k)(1)</u>, may be) made as set forth below:

(1)    The Borrower shall have the right, by giving written notice to the Administrative Agent (which such written notice shall be in a form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer) by not later than 1:00 p.m. on the fifteenth (15th) day preceding the date of such prepayment, to prepay all or any portion of the aggregate principal amount of any Loan, without premium or penalty. Each partial prepayment shall be in an aggregate principal amount of not less than $500,000 and shall be accompanied by accrued interest to the date of prepayment on the amount prepaid. Borrower shall reimburse the Lenders and the Administrative Agent on demand for any amounts set forth in, and to the extent required by, <u>Section 10.5</u>.  Except as provided in the immediately succeeding sentence, voluntary prepayments of Term Loans shall be applied to reduce the repayments required by <u>Section 2.1(h)</u> in the inverse order of maturity (including the payment owing on the Maturity Date).

(2)    No later than fifteen (15) days following the date of delivery of annual audited financial statements for the fiscal year ending December 31, 2026 pursuant to <u>Section 5.1(a)</u> and thereafter no later than the date fifteen (15) days following the date of delivery of annual audited financial statements for each subsequent fiscal year pursuant to <u>Section 5.1(a)</u>, the Borrower shall make a mandatory prepayment of the Term Loans (other than an Incremental Term Loan to the extent otherwise provided in the documentation relating to such Incremental Term Loan) in an amount equal to 50.0% of Excess Cash Flow for such Excess Cash Flow Period; <u>provided</u> that at the option of the Borrower, any voluntary prepayments of the Term Loans, Term Loans (as defined in the Opco Credit Agreement), Revolving Loans (as defined in the Opco Credit Agreement) (to the extent accompanied by a permanent reduction of the corresponding Commitment; but excluding the repayment and termination of the Revolving Loan Commitments (as defined in the Opco Credit Agreement) to the extent such repayment is financed with loans under the ABL Facility) and revolving loans under the ABL Facility (to the extent accompanied by a permanent reduction of the corresponding commitments) made during such fiscal year prior to the applicable Excess Cash Flow prepayment date (and without duplication in the next fiscal year) will reduce the amount of Excess Cash Flow prepayments

35

required for such fiscal year on a dollar-for-dollar basis (to the extent paid with Internally Generated Funds and not deducted in the calculation of Excess Cash Flow for such Excess Cash Flow Period) in each case made during such fiscal year and at the option of the Borrower, made prior to the date of such Excess Cash Flow prepayment.

(3)     To the extent applicable, the Borrower shall reimburse the Lenders and the Administrative Agent on demand for amounts set forth in and, to the extent required by, <u>Section 10.5</u>. Borrower shall give the Administrative Agent prior written notice of any event or circumstances reasonably likely to give rise to a mandatory prepayment obligation under this <u>Section 2.1(k)</u> (including the date and an estimate of the aggregate amount of such mandatory prepayment) at least five (5) Business Days prior thereto); <u>provided</u> that the failure to give such notice shall not constitute a Default or an Event of Default but shall not relieve the Borrower of its obligation to make such mandatory prepayments. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower.

(4)     Each Lender (or Required Lenders on behalf of all Lenders) may reject all or a portion of its pro rata share of any mandatory prepayment (such declined amounts, the "<u>Declined Proceeds</u>") of Term Loans required to be made pursuant to clause (2) of this Section 2.1(k) by providing written notice (each, a "<u>Rejection Notice</u>") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York time, two (2) Business Days prior to the prepayment date.

(A)     Each Rejection Notice shall specify the principal amount of the mandatory repayment of Term Loans to be rejected.  If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans.

(B)     Any Declined Proceeds remaining shall be applied in accordance with the terms of the Opco Credit Agreement.

**2.2     [Reserved]**.

**2.3     Payments**.  Any other provision of this Agreement to the contrary notwithstanding, the Borrower shall make each payment of interest in-kind.  Subject to <u>Section 10.1</u> (Taxes) hereof, payments by the Borrower under this Agreement shall be made without offset, counterclaim or other deduction and in such amounts as may be necessary in order that all such payments shall not be less than the amounts otherwise specified to be paid under this Agreement and the Notes.  The Administrative Agent will promptly thereafter distribute like funds ratably to each Lender (unless such amount is not to be shared ratably in accordance with the terms hereof).

**2.4     Setoff; etc**.  Upon the occurrence and during the continuance of an Event of Default, each Lender and the Administrative Agent are hereby authorized at any time and from time to time, without prior notice to the Borrower (any such notice being expressly waived by the Borrower), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or Administrative Agent to or for the credit or the account of the Borrower or any of its Subsidiaries, including specifically any amounts held in any account maintained at such Lender or Administrative Agent, against any and all amounts which may be owed to the Administrative Agent or the Lenders, or any of them, by the Borrower, in connection with

this Agreement or any Loan Document; provided that no Lender shall exercise any such right without the prior written consent of the Administrative Agent (at the direction of the Required Lenders). The rights of the Lenders and the Administrative Agent under this Section 2.4 are in addition to other rights and remedies (including other rights of set-off) which the Lenders and the Administrative Agent may have under applicable law. Each Lender and the Administrative Agent agrees, severally and not jointly, to use reasonable efforts to notify the Borrower of any exercise of its rights pursuant to this Section 2.4, provided, however, that failure to provide such notice shall not affect any Lender's or the Administrative Agent's rights under this Section 2.4 or the effectiveness of any action taken pursuant hereto; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.10 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

**2.5**  **Sharing**.  If any Lender shall obtain any payment (whether voluntary, involuntary, by application of offset or otherwise) on account of the Loans made by it in excess of such Lender's ratable share of payments on account of the Loans obtained by all the Lenders, such Lender shall purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided that, (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this Section 2.5 shall not be construed to apply to (x) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to the Borrower or any Affiliate thereof (as to which the provisions of this Section 2.5 shall apply). The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 2.5 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right to setoff) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

**2.6**  **Fees**.

(a)  **Fee Letter**.  The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.7**  **Lending Branch**.  Subject to the provisions of Section 10.6(a), each Lender may, at its option, elect to make, fund or maintain its Loans hereunder at the branch or office specified on the signature pages hereto or such other of its branches or offices as such Lender may from time to time elect.

**2.8**  **Application of Payments and Collections**.

(a)  **Order of Application of Payments**.  Subject to the provisions of subsection (b) below, all payments and prepayments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied, first to pay

37

principal of and interest on any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, <u>second</u> ratably to pay all other Obligations in respect of fees, expenses, reimbursements or indemnities then due and payable, <u>third</u> ratably to pay interest then due in respect of the Loans, and <u>fourth</u> to pay the principal of the Loans then due and payable, and in the case of any prepayment of Term Loans, in the inverse order of maturity (including the payment owing on the Maturity Date).

(b)    <u>Application of Payments After an Event of Default</u>.  After the occurrence of an Event of Default and while the same is continuing, the Administrative Agent shall, unless the Administrative Agent and the Lenders shall agree otherwise, apply all payments and prepayments in respect of any Obligations in the following order:

(1)    to pay interest on and then principal of any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

(2)    to pay Obligations in respect of any fees, expense reimbursements or indemnities then due to the Administrative Agent;

(3)    ratably to pay Obligations in respect of any fees, expenses, reimbursements or indemnities (other than principal and interest) payable to the Lenders;

(4)    to the payment of interest on all Loans and any amounts due pursuant to <u>Sections 10.4</u> and <u>10.5</u>, to be allocated among the Lenders pro rata based on the respective aggregate amounts of such accrued interest and amounts owed to them; and

(5)    to the payment of the outstanding principal amounts of all Loans to be allocated among the Lenders, pro rata based on the respective outstanding principal amounts described in this clause (5) payable to them;

(c)    Each of the Lenders hereby irrevocably designates the Administrative Agent its attorney in fact for the purpose of receiving any and all payments to be made to such Lender in respect of Obligations held by it, and hereby directs each payor of any such payment to make such payment to the Administrative Agent.  Each of the Lenders hereby further agrees that if, notwithstanding the foregoing, it should receive any such payment (including by set-off), it shall hold such payment in trust for, and promptly deliver such payment to, the Administrative Agent.

(d)    The Administrative Agent shall promptly distribute to each Lender at its primary address set forth on the appropriate signature page hereof or at such other address as a Lender may notify the Administrative Agent in writing, such funds as such Lender may be entitled to receive.

**2.9    [Reserved]**.

**2.10    Defaulting Lenders**.

(a) <u>Adjustments</u>. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(1) <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and <u>Section 9.1</u>.

(2) <u>Defaulting Lender Waterfall</u>. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VII</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 2.4</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows: <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; <u>third</u>, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; <u>fourth</u>, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>fifth</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and <u>sixth</u>, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; <u>provided</u> that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in <u>Section 3.2</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(3) <u>Certain Fees</u>. No Defaulting Lender shall be entitled to receive any fee payable under <u>Section 2.6</u> for any period during which that Lender is a Defaulting Lender and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender.

(b) [Reserved].

(c) <u>Defaulting Lender Cure</u>. If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the

Lenders in accordance with, with respect to Term Loans, their Applicable Term Loan Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III
## CONDITIONS PRECEDENT

**3.1** **Conditions Precedent to Effectiveness**. The effectiveness of this Agreement and the obligation of the Lenders to make any Advance on the Closing Date, is subject to the following conditions precedent:

(a) The Administrative Agent shall have received copies (in sufficient number for each of the Lenders to receive a copy) of all of the following, each in form and substance reasonably satisfactory to the Administrative Agent in all respects, and, if applicable, each dated the Closing Date or such earlier date as approved by the Administrative Agent:

(1) This Agreement, appropriately completed and duly executed by the parties hereto;

(2) The Notes, to the extent requested, appropriately completed and duly executed by the Borrower;

(3) [reserved];

(4) The Security Agreement, appropriately completed and duly executed by the parties thereto;

(5) Uniform Commercial Code financing statements authorized by the applicable Opco Party as debtor, and naming the Administrative Agent as secured party with respect to the Collateral;

(6) Favorable legal opinion of Kirkland & Ellis LLP, counsel to the Opco Parties, addressed to the Administrative Agent and each of the Lenders;

(7) A certificate executed by a Responsible Officer or member of the Borrower, certifying in the name of and on behalf of the Borrower that (A) a true, correct and complete copy of its charter document, with all amendments thereto (as certified by the Secretary of State or similar state official), is attached to the certificate, (B) a true, correct and complete copy of its operating agreement or bylaws, with all amendments thereto, is attached to the certificate, (C) a correct and complete copy of the resolutions of its members or shareholders authorizing the execution, delivery and performance of the Loan Documents are attached to the certificate, and such resolutions have not been subsequently modified or repealed, (D) certificates of good standing dated within a reasonably close period of time prior to the Closing Date for the Borrower issued by the Secretary of State or similar state official for each state in which such Opco Party is required to be qualified to do business are attached to the certificate and (E) signature and incumbency certificates of its officers executing any of the Loan Documents, all

certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification;

(8)    A certificate of the duly signed by a Responsible Officer of Borrower, certifying as to the solvency on the Closing Date of the Borrower and its Subsidiaries in a manner consistent with Section 4.21;

(9)    A Notice of Borrowing appropriately completed and duly executed by the Borrower;

(10)    Payment by the Borrower of all fees due on or prior to the Closing Date in accordance with the provisions of Section 2.6 which payment shall be nonrefundable;

(11)    Payment by the Borrower or Opco Borrower of all reasonable costs and expenses of the Administrative Agent (including reasonable and documented legal fees and expenses) incurred in connection with the preparation and execution of the Loan Documents and incident to all proceedings in connection with, transactions contemplated by, and documents relating to this Agreement and the Loan Documents, which payment shall be nonrefundable to the extent required by Section 9.4;

(12)    [Reserved];

(13)    The conditions to the Opco Credit Agreement shall have been satisfied or validly waived thereunder;

(14)    A certified copy of the Confirmation Order as duly entered by the Bankruptcy Court and entered on the docket of the clerk of the Bankruptcy Court, following due notice to such creditors and other parties-in-interest as required by the Bankruptcy Court, provided that (x) no court of competent jurisdiction shall have issued any injunction, restraining order or other order with respect to the Confirmation Order which otherwise prohibits the consummation of the transactions described herein or the other transactions, or modifies such transactions, and no governmental or other action or proceeding shall have been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the transactions described herein or the other transactions, and (y) all conditions precedent to the effectiveness of the Plan of Reorganization (other than the occurrence of the Closing Date hereunder) shall have been satisfied;

(15)    Evidence as to the payment in full on the Closing Date of all material allowed administrative expense claims, priority claims and other claims under the Plan of Reorganization required to be paid on the Closing Date in a manner satisfactory to the Required Lenders;

(16)    Evidence that the form and substance of (i) a business plan and projections of the Opco Parties and (ii) the debt and equity capital structure of the Opco Parties and their parent entities (including Organizational Documents), in each case, after giving effect to the Transactions, are satisfactory to the Required Lenders;

41

(17)     Evidence that the Transactions will be consummated on the Plan Effective Date and that the Plan Effective Date will occur in accordance with the Plan of Reorganization;

(18)     Evidence that, other than as a result of the bankruptcy cases of the Opco Parties filed on the Petition Date and any successor cases (and the events resulting therefrom), since the Petition Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Occurrence;

(19)     Evidence that there is no threatened or pending litigation or other proceedings with respect to the Transactions;

(20)     The Opco Facility shall be issued in accordance with the Plan of Reorganization, on terms and pursuant to documentation acceptable to the Required Lenders, and the Administrative Agent shall have received copies of the executed documentation for the same; and

(21)     The Borrower shall have provided the documentation and other information to the Administrative Agent (to the extent reasonably requested by the Administrative Agent in writing at least five (5) Business Days prior to the Closing Date) that are required by regulatory authorities under the applicable "know-your-customer" rules and regulations, including the PATRIOT Act, in each case at least two (2) Business Days prior to the Closing Date.

The making of the Advance hereunder shall not constitute a waiver by the Administrative Agent or any Lender of any right which the Administrative Agent or such Lender may have in the event that any certificate, agreement, financial statement or other document delivered pursuant to this Section 3.1 or otherwise in connection with the transactions contemplated by this Agreement shall prove to have been false or misleading in any respect.

**3.2     Conditions Precedent to All Advances**.  The obligation of the Lenders to make any Advance hereunder, including the establishment of the Initial Term Loans on the Closing Date, shall be further subject to the satisfaction of each of the following conditions immediately prior to or contemporaneously with each such Advance, unless waived in writing by the Administrative Agent:

(a)     A Notice of Borrowing and appropriately completed and duly executed by the Borrower;

(b)     The representations and warranties set forth in Article IV and in each of the other Loan Documents are true and correct in all material respects on the date of and after giving effect to the making of the Advance (except, in the case of any representation and warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or period, as the case may be) and any representation and warranty that is qualified by references to materiality or Material Adverse Occurrence or similar term or qualification, shall be true and correct in all respects, except that the representations and warranties set forth in Section 4.5 as to the financial statements of the Borrower shall be deemed to be updated to refer to the audited and unaudited financial statements of the Borrower, as the case may be, most recently delivered to the Administrative Agent pursuant to Section 5.1; and

(c)      No Default or Event of Default shall then have occurred and be continuing on the date of the making of the Advance.

The delivery of a Notice of Borrowing by the Borrower shall constitute a certification by the Borrower, binding upon the Borrower as to the matters set forth in subsections (b) and (c) above.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and each of the Lenders that as of the Closing Date and as of the date of each Advance,

**4.1**     **Organization; etc**.  The Borrower and each Opco Party is a limited liability company or corporation, as the case may be, validly organized and existing and in good standing under the laws of the state of its organization, has full power and authority to own its property and conduct its business as conducted by it and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence.  A list of jurisdictions in which the Borrower and each Opco Party is qualified to do business is set forth in Annex I.  The Borrower has full power and authority to enter into and to perform its obligations under the Loan Documents and to request Advances under this Agreement.  The Borrower and each Opco Party has all licenses, permits and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its Property, except for permits, licenses, and rights the failure of which to have or obtain would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Occurrence.

**4.2**     **Due Authorization**.  The execution, delivery and performance by the Borrower of the Loan Documents to which it is a party (a) have been duly authorized by all necessary corporate or limited liability company action, as the case may be, (b)  do not and will not conflict with, result in any violation of or constitute any default under, (i) any provision of the organizational, constitutive or governing documents (including, as applicable, articles of organization and operating agreements) of the Borrower, (ii) any other material agreement binding on or applicable to the Borrower, or (iii) any of its Property, or any law or governmental regulation or court decree or order binding upon or applicable to the Borrower, or any of the Property and (c) will not result in the creation or imposition of any Lien on any of the Borrower's Property pursuant to the provisions of any agreement binding on or applicable to the Borrower, or such Property, except any such Liens created pursuant to the Security Documents in favor of the Administrative Agent, for the benefit of the Secured Parties and Permitted Liens, except with respect to any breach, contravention or violation referred to in clauses (b) (ii) and (b)(iii), to the extent that such breach, contravention or violation would not reasonably be expected to result in a Material Adverse Occurrence.

**4.3**     **Subsidiaries**.  As of the Closing Date, none of the Borrower or any Opco Party has any Subsidiaries except those listed on Annex II, which correctly sets forth the name of each Subsidiary, the jurisdiction of its incorporation and the percentage ownership of each Subsidiary which is owned, of record or beneficially, by the Borrower and such Opco Party and/or one or more of its Subsidiaries.  The Borrower and each Opco Party and each of their Subsidiaries has good and marketable title to all of the Equity Interests or Equity Interests Equivalents it owns in each of its Subsidiaries, free and clear of any Lien (other than any Liens in favor of the Administrative Agent for the benefit of the Secured Parties and inchoate Permitted Liens) and all such shares have been duly issued and are fully paid and non-assessable.  The Borrower and each Opco Party has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and is duly licensed or

qualified and in good standing in each other jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence.  As of the Closing Date, a list of the jurisdictions in which each Opco Party is qualified to do business is set forth on the attached Annex II.  The Borrower and each Opco Party has full power and authority to own and operate its properties, to carry on its business as now conducted and to enter into and perform the Loan Documents to which it is a party.  The Borrower and each Opco Party has all licenses, permits, and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its properties, except for permits, licenses, and rights the failure of which to have or obtain, individually or in the aggregate, is not, and will not result in, a Material Adverse Occurrence.

4.4     **Validity of the Agreement**.  Each Loan Document is the legal, valid and binding obligation of the Borrower and is enforceable in accordance with its terms except that, as to enforcement of remedies, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' and secured parties' rights generally or by equitable principles relating to enforceability, regardless of whether considered in equity or at law.

4.5     **Financial Statements**.

(a)     The most recent financial statements furnished pursuant to Section 5.1(a) (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b)     The most recent financial statements furnished pursuant to Section 5.1(b) (i) were prepared in accordance with Modified GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes.

4.6     **Litigation; etc**.  There is no action, suit, claim, demand, disputes, cause of action, proceeding, arbitration or investigation at law or equity, or before or by any federal, state, local or other governmental department, commission, court, tribunal, board, bureau, agency or instrumentality, domestic or foreign, pending, or to the Knowledge of the Borrower or the Opco Parties, threatened in writing, against or affecting any Opco Party or any of its Properties, which if determined adversely would reasonably be expected to result in a Material Adverse Occurrence.

4.7     **Compliance with Law**.  None of the Borrower or any Opco Party is (a) in default or breach with respect to any judgment, order, writ, injunction, rule, regulation or decree of any court, governmental authority, department, commission, agency or arbitration board or tribunal or (b) in violation of any law, rule, regulation, ordinance or order relating to its or their respective businesses, in each case of (a) and (b) above, the breach, default or violation of which would reasonably be expected to result in a Material Adverse Occurrence.

4.8     **ERISA Compliance**.  With respect to each Plan which is an employee pension benefit plan (as defined in Section 3(2) of ERISA) that is intended to be qualified under Section 401(a) of the Code, the Internal Revenue Service has issued a determination that each such Plan is qualified in form

44

under Section 401(a) and related provisions of the Code, and that each related trust or custodial account is exempt from taxation under Section 501(a) of the Code, and nothing has occurred since the date of that determination that could reasonably be expected to adversely affect the qualified status of such Plan.  All Plans comply with ERISA and other applicable laws, except as would not reasonably be expected to result in a Material Adverse Occurrence.  There exist with respect to the Borrower and the Opco Parties no Multiemployer Plans, for which a material withdrawal or termination liability may be incurred.  There exist with respect to all Plans or trusts:  (a) no failure to satisfy the minimum funding standard within the meaning of ERISA, whether or not waived; (b) no termination of any Plan or trust which would result in any material liability to the PBGC or any "reportable event," as that term is defined in ERISA, which is likely to constitute grounds for termination of any Plan or trust by the PBGC; (c) no "prohibited transaction," as that term is defined in ERISA, which is likely to subject the Borrower to any material tax or penalty on prohibited transactions imposed by Section 4975 of the Code, and (d) no pending disputes, arbitrations, claims, suits, grievances or governmental audits involving any Plan (other than routine claims for benefits payable under any such Plan) that could reasonably be expected (individually or in the aggregate) to result in a Material Adverse Occurrence.

4.9 **Title to Assets**.  The Borrower holds or will hold title to the Collateral, including good, legal and marketable title to any Equipment, in each case and used in its business and pledged as Collateral for the Obligations, free and clear of all Liens except for Permitted Liens and other encumbrances permitted pursuant to <u>Section 6.3</u>, except where the failure to have such title would not reasonably be expected to result in a Material Adverse Occurrence.  Except for Uniform Commercial Code financing statements evidencing Permitted Liens, or Uniform Commercial Code financing statements for which terminations will be tendered to the Administrative Agent prior to or contemporaneously with the first Advance for any Unit, no financing statement under the Uniform Commercial Code as in effect in any jurisdiction and no other filing which names the Borrower as debtor or which covers or purports to cover any of the Collateral, including Equipment pledged as Collateral for the Obligations, will be effective and on file in any state or other jurisdiction, and the Borrower shall not sign or authorize any such financing statement or filing or any security agreement authorizing any secured party thereunder to file any such financing statement or filing other than in favor of Administrative Agent.

4.10 **Use of Proceeds**.  Proceeds of the Loans shall be used to refinance certain Indebtedness of the Borrower and its Subsidiaries as contemplated by the Plan of Reorganization.

4.11 **Governmental Regulation**.  None of the Borrower or any Opco Party is required to obtain any material consent, approval, authorization, permit or license which has not already been obtained from, or effect any material filing or registration (other than the filing of the Uniform Commercial Code financing statements) which has not already been effected with, any federal, state or local regulatory authority in connection with the execution and delivery of this Agreement or the performance, in accordance with their respective terms, of this Agreement or any other Loan Document except for any consent, approval, authorization, permit or license, the failure of which to obtain or make would not reasonably be expected to result in a Material Adverse Occurrence.

4.12 **Margin Stock**.  No part of any Advance shall be used at any time by the Borrower or any Opco Party to purchase or carry margin stock (within the meaning of Regulations T, U and X) or to extend credit to others for the purpose of purchasing or carrying any margin stock.  None of the Borrower or nay Opco Party is engaged principally, or as one of its important activities, in the business of extending credit for the purposes of purchasing or carrying any such margin stock.  No part of the proceeds of any Advance will be used by the Borrower or any Opco Party for any purpose which violates, or which is inconsistent with, any regulations promulgated by the Board of Governors of the Federal Reserve System.

**4.13** <u>**Investment Company Act**</u>.  None of the Borrower or any Opco Party is registered or required to be registered as an "investment company," or an "affiliated person" of, or a "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.  The making of the Advances, the application of the proceeds and repayment thereof by the Borrower and the performance by the Borrower of the transactions contemplated by this Agreement will not violate any provision of said Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.

**4.14** <u>**Accuracy of Information**</u>.  All written information heretofore furnished by or on behalf of the Borrower or any Opco Party to the Administrative Agent or the Lenders for purposes of or in connection with this Agreement or any transaction contemplated by this Agreement is, and all other such information furnished by or on behalf of the Borrower or such Opco Party to the Administrative Agent is, when considered as a whole, complete and correct in all material respects and did not, when delivered, contain any untrue statement of material fact or omit to state a fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements have been made (after giving effect to all supplements thereto).

**4.15** <u>**Tax Returns; Audits**</u>.  The Borrower and each Opco Party has filed all federal, and material state and local tax returns and other material reports which are required to be filed, and has paid all material taxes as shown on said returns and on all assessments received by any such Person (except for any assessments which are being contested in good faith by appropriate proceedings that will prevent a forfeiture or sale of any property and for which an adequate reserve has been provided on the books of such Opco Party in accordance with GAAP), to the extent that such taxes have become due or has obtained extensions with respect to the filing of such returns and has made provision in accordance with GAAP for the payment of taxes anticipated to be payable in connection with such returns.  The Borrower and each Opco Party has made all material required withholding deposits.

**4.16** <u>**Environmental and Safety Regulations**</u>.  The Borrower and each Opco Party is in compliance with all requirements of applicable federal, state and local environmental, pollution control, health and safety statutes, laws and regulations except for any noncompliance which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Occurrence and is not, to the knowledge of the Borrower and each Opco Party, the subject of any federal or state investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, except for any investigation which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence.  The Borrower further represents and warrants that the Real Property and its intended use complies with all applicable laws, governmental regulations and the terms of any enforcement action by any federal, state, regional or local governmental agency regarding all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus under such laws, except in each case for any noncompliance which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence.  The Borrower and each Opco Party further represents and warrants that no written notice, demand, request for information, citation, summons or order has been issued, no complaint has been filed, no penalty has been assessed and, to the knowledge of each Opco Party, no investigation or review is pending or threatened by any governmental or other entity with respect to any alleged failure by the Borrower and each Opco Party to comply in any respect with any of such environmental laws, except in

each case which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence (each of the foregoing, an "<u>Environmental Action</u>").

**4.17** **Payment of Wages; Labor Matters**.  The Borrower and each Opco Party is in compliance with the Fair Labor Standards Act, as amended, in all material respects, and the Borrower has paid all minimum and overtime wages required by law to be paid to their respective employees. There are no strikes, work stoppages, slowdowns or lockouts existing, pending or, to the Knowledge of the Borrower and each Opco Party, threatened against or involving the Borrower or each Opco Party or any Subsidiary of any Opco Party, except for those that would reasonably be expected to result in a Material Adverse Occurrence.  Except as set forth on <u>Schedule 4.17</u>, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of the Borrower or any Opco Party or any Subsidiary thereof, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of the Borrower or any Opco Party or any Subsidiary thereof and (c) to the knowledge of the Borrower and any Opco Party, no such representative has sought certification or recognition with respect to any employee of the Borrower or any Opco Party or any Subsidiary thereof.

**4.18** **Intellectual Property**.  The Borrower and each Opco Party owns, possesses or has the right to use all material licenses and rights to all patents, trademarks, trademark rights, trade names, trade name rights, trade dress, service marks, domain marks and copyrights necessary to conduct their business in all material respects as now being conducted, to the Knowledge of the Borrower, without material conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, in each case of all of the foregoing, except where the failure to own, possess or have the right to use such intellectual property, or conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, would not reasonably be expected to result in a Material Adverse Occurrence.  All such material licenses and rights with respect to patents, trademarks, trademark rights, trade names, trade name rights, service marks and copyrights are, to the Knowledge of the Borrower, in full force and effect in all material respects.

**4.19** **Projections**.  The budget projections of the Borrower, furnished annually to the Administrative Agent, consisting of balance sheets, cash flow statements and income statements of the Borrower and its Subsidiaries after giving effect to the making of the Advances hereunder and the application of the proceeds thereof, together with supporting details and a statement of underlying assumptions, have been prepared in the light of the past business history of the Borrower and its Subsidiaries and on the basis of the assumptions set forth therein, which assumptions are in the opinion of the Borrower reasonable at the time such budget projections were prepared (it being recognized that budget projections may differ from actual results and such differences may be material and such budget projections are subject to significant uncertainties and contingencies which are beyond the Borrower's control and no assurance can be given that any particular projection will be realized).

**4.20** **Solvency**.  After giving effect to the transactions contemplated by this Agreement, as of the Closing Date, the Borrower and the Opco Parties and their Subsidiaries, on a consolidated and combined basis, have capital sufficient to carry on their business, are solvent and are able to pay their debts and obligations as they mature in the ordinary course. After giving effect to the consummation of the transactions contemplated by this Agreement, as of the Closing Date, the Borrower and the Opco Parties and their Subsidiaries, on a consolidated and combined basis, now own Property having a value, both at fair valuation and at present fair saleable value, greater than the amount required to pay their debts, obligations and contingent liabilities as they mature in the ordinary course.

**4.21** **No Material Adverse Occurrence**.  Since the date of the most recent audited financial statements submitted to the Administrative Agent and the Lenders as described in <u>Section 4.5</u>, there has

occurred no event which is or which could reasonably be expected to result in a Material Adverse Occurrence.

**4.22     [Reserved].**

**4.23     Deposit Accounts**.  Schedule 4.23 lists all banks and other financial institutions at which the Borrower or any Opco Party maintains deposit or other accounts as of the Closing Date, and such Schedule correctly identifies the name, address and any other relevant contact information reasonably requested by the Administrative Agent with respect to each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

**4.24     [Reserved].**

**4.25     [Reserved].**

**4.26     Valid Liens**.  The Security Agreement and each other Security Document delivered pursuant hereto will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties to the secure the Obligations, legal, valid and enforceable Liens on, and security interests in, the Borrower's right, title and interest in and to the Collateral thereunder, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Security Document), such Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Borrower in such Collateral, in each case subject to no Liens other than the applicable Permitted Liens.

**4.27     Foreign Assets Control Regulations and Anti-Money Laundering**.  The Borrower and each Opco Party is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. The Borrower and each Opco Party (i) is not a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is not a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is not controlled by (including by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

**4.28     Patriot Act**.  The Borrower and each Opco Party, each of their Subsidiaries and, to their knowledge, each of their Affiliates, are in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations. No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office,

or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

**4.29    Insurance.**  The Borrower and its Subsidiaries maintain insurance policies with respect to their respective properties and business, in each case in compliance with Section 5.7.

**4.30    SBA Matters.**  The Borrower acknowledges that Brightwood Capital SBIC I, LP is, and certain other Lenders may from time to time be or become, a Small Business Investment Company (as defined in the SBIA), subject to the rules and regulations contained in and promulgated under the SBIA. As of the Closing Date, each of the Borrower, together with its "affiliates" (for purposes of this paragraph only, as that term is defined in Title 13, Code of Federal Regulations, §121.103), is a Small Business Concern (as defined in the SBIA). None of the Borrower nor any of its Subsidiaries presently engages in, and shall not hereafter engage in, any activities for which a Small Business Concern is prohibited from engaging in under the SBIA, nor shall any such Person use directly or indirectly the proceeds of the Loans for any purpose for which a Small Business Investment Company is prohibited from providing funds by the SBIA. The representations made by the Borrower in the SBA forms delivered on the Closing Date pursuant to Section 5.13 (or such later date of delivery) shall be deemed to be representations made by the Borrower as of the Closing Date (or such later date) under this Section 4.29.

<div align="center">

**ARTICLE V**
**CERTAIN AFFIRMATIVE COVENANTS**

</div>

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Loan shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**5.1    Financial Information; etc.**  The Borrower will furnish to the Administrative Agent copies of the following financial statements, reports and information:

(a)    (i) as soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year (or by May 31, 2026 in the case of the fiscal year ended December 31, 2025) of the Borrower (commencing with the fiscal year ended December 31, 2025), a copy of the consolidated and combined audited financial statements, including balance sheet, related statements of operations, and statements of cash flows, of the Borrower and its Subsidiaries for such fiscal year, with comparative figures for the preceding fiscal year, prepared in accordance with GAAP, certified without qualification or exception by Deloitte & Touche LLP, or such other nationally recognized auditor that is not subject to qualification as to "going concern" or the scope of such audit (other than an upcoming maturity date of any Indebtedness (including the termination of the commitments under any other revolving credit facility) occurring within one (1) year from the time such opinion is delivered), accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with GAAP for such period, and a written management's discussion and analysis of the financial condition and results of operations for such fiscal year, as compared to the previous fiscal year and budgeted amounts, and (ii) as soon as available, and in any event within thirty (30) days after the delivery of audited financial statements pursuant to clause (a)(i) above for the applicable fiscal year, a reasonably detailed unaudited reconciliation (which shall not be required to be (x) attached or appended to the Borrower's audited financial statements or (y) audited or reviewed in any manner by the Borrower's auditor) reflecting the audited financial statements presented in accordance with GAAP for such fiscal year, on the one hand, and

<div align="center">49</div>

management-prepared unaudited financial statements presented in accordance with Modified GAAP for such fiscal year, on the other hand;

(b)    (i) as soon as available and in any event within sixty (60) days after the end of each fiscal quarterly period of each fiscal year of the Borrower, consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with Modified GAAP for such period, (subject to year-end adjustments and the lack of footnotes), and a written management's discussion and analysis of the financial condition and results of operations for such fiscal quarter and the then elapsed portion of the fiscal year, as compared to the comparable periods in the previous fiscal year and budgeted amounts, and (ii) as soon as available and in any event within seventy (70) days after the end of each fiscal quarterly period of each fiscal year of the Borrower and no later than ten (10) days after delivery of reports pursuant to clause (i), a site-level "databook" for the last month of such fiscal quarter (substantially in the same form as has been previously delivered to the Administrative Agent) detailing the following information by site: for each Unit and with respect to each such quarterly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (e) volume of retail traffic, (f) volume of total traffic, (g) chemical expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(c)    (i) as soon as available and in any event within forty-five (45) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower, consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year and (ii) as soon as available and in any event within fifty-five (55) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower and no later than ten (10) days after delivery of the reports and certificates pursuant to clause (i), a site-level "databook" for such fiscal month (substantially in the same form as has been previously delivered to the Administrative Agent) detailing the following information by site: for each Unit and with respect to each such monthly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (e) volume of retail traffic, (f) volume of total traffic, (g) chemical expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(d)    with each financial statement required by Section 5.1(a) and Section 5.1(b) (other than the last fiscal quarter of such year) to be delivered to the Administrative Agent, a Compliance Certificate signed by a Responsible Officer of the Borrower;

(e)    promptly after the Borrower knows or has reason to know that any Default has occurred and is continuing or Material Adverse Occurrence has occurred, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower

becomes aware thereof, a notice of such Default or Material Adverse Occurrence describing the same in reasonable detail and a description of the action that the Borrower has taken and proposes to take with respect thereto;

(f)        promptly after receipt thereof, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, all final letters and reports to management of the Borrower prepared by its independent certified public accountants and the responses of the management of the Borrower thereto;

(g)        promptly following the commencement of any litigation, suit, administrative proceeding or arbitration relating to the Borrower or any of its Properties which if adversely determined would reasonably be expected to result in a Material Adverse Occurrence or otherwise relating in any way to the transactions contemplated by this Agreement, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice thereof describing the allegations of such litigation, suit, administrative proceeding or arbitration and the Borrower's response thereto;

(h)        promptly following the commencement of any Environmental Action, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice describing the allegations of such Environmental Action;

(i)        promptly following the occurrence of, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, any "reportable event" or "prohibited transaction" or the imposition of a withdrawal or termination liability within the meaning of ERISA in connection with any Plan or Multiemployer Plan that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower, and, when known, any action taken by the Internal Revenue Service, Department of Labor or PBGC that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower with respect thereto;

(j)        within sixty (60) days of each fiscal year end thereafter, a copy of the updated annual budget and financing projections for the Opco Borrower for each fiscal quarter for such fiscal year, with discussion of principal assumptions upon which such budget is based;

(k)        [reserved];

(l)        promptly upon the delivery to or receipt from the ABL Agent, copies of (i) all amendments, waivers or other material modifications to any of the loan documents governing the ABL Facility; (ii) copies of all material notices, including notices of default or acceleration with respect to the ABL Facility and (iii) monthly borrowing base certificates and, upon request of the Administrative Agent, any other material collateral reporting (including, without limitation, any other borrowing base certificates) required to be delivered to the ABL Lenders under the ABL Facility, if any; and

(m)        such other information with respect to the financial condition and operations of the Borrower and its Subsidiaries as the Administrative Agent or any Lender may reasonably request (subject to the Disclosure Limitations).

**5.2**      **Maintenance of Existence; etc**.  The Borrower and each Opco Party shall maintain and preserve its existence, and qualification and good standing in all states in which such qualification and good standing are required in order to conduct its business and own its property as conducted and owned

in such states, except where the failure to do so would not reasonably be expected to result in a Material Adverse Occurrence.

**5.3**     **Maintenance of Properties**.  The Borrower and each Opco Party will maintain or cause to be maintained in the ordinary course of business in good repair, working order and condition (reasonable wear and tear excepted) all material Properties used in their respective businesses (whether owned or held under lease), and from time to time make or cause to be made all necessary repairs, renewals, replacements, additions, betterments and improvements thereto, except to the extent the failure to maintain such Properties would not reasonably be expected to result in a Material Adverse Occurrence.

**5.4**     **Payment of Liabilities**.  The Borrower and each Opco Party shall pay and discharge as the same may become due and payable, all material taxes, assessments and other governmental charges or levies against or on any of its Property, as well as all other lawful claims of any kind which, if unpaid, might become a Lien upon any of its Property; provided, however, that the foregoing shall not require the Borrower or any such Opco Party to pay any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested diligently in good faith by appropriate proceedings that will prevent a forfeiture or sale of such Property and an adequate book reserve in accordance with GAAP shall have been set aside with respect thereto, but (with respect to claims that are not Taxes, assessments and other governmental charges or levies) only so long as such claim does not become a Lien on any assets of such Opco Party.

**5.5**     **Compliance with Laws**.  The Borrower and each Opco Party shall carry on its business activities in substantial compliance with all applicable federal or state laws and all applicable rules, regulations and orders of all governmental bodies and offices having power to regulate or supervise its business activities, including all applicable environmental, pollution control, health and safety statutes, laws and regulations, except in each case where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence; provided that nothing in this Section 5.5 shall impair the obligations of the Borrower and the Opco Parties in Section 5.15.  The Borrower and each Opco Party shall maintain all material rights, liens, permits, certificates of compliance or grants of authority necessary for the conduct of its business, except where the failure to maintain would not reasonably be expected to result in a Material Adverse Occurrence.  The Borrower and each Opco Party agrees that the Real Property and its intended use will comply at all times with all applicable laws, governmental regulations and the terms of any enforcement action now or hereafter commenced by any federal, state, regional or local governmental agency, including all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended from time to time), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus, except where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence.

**5.6**     **Books and Records; Inspection Rights; etc**. The Borrower and each Opco Party shall keep (a) a system of accounting administered in accordance with GAAP and (b) books and records reflecting all of its business affairs and transactions in accordance with GAAP.  The Borrower and each Opco Party shall permit the Administrative Agent (accompanied by any Lender) or any representative thereof, at reasonable times and intervals, during normal business hours and upon reasonable notice to the Borrower, to visit the offices of the Borrower and such Opco Party, discuss financial matters with Responsible Officers of the Borrower and such Opco Party and with its independent public accountants (and by this provision the Borrower and each Opco Party authorizes its independent public accountants to participate in such discussions) and examine any of the Borrower's and such Opco Party's books and other company records in a non-disruptive manner; provided, that unless an Event of Default has occurred

and is continuing there shall be no more than one such inspection or visit per year. Notwithstanding anything to the contrary in this Section 5.6, none of the Borrower or any Opco Party will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information, that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) the disclosure of which is restricted by binding agreements with a third party that is not a controlled Affiliate of any Opco Party (collectively, the "Disclosure Limitations").

5.7    **Insurance**.  The Borrower and each Opco Party will:

(a)    Maintain insurance including, but not limited to, business interruption coverage, and public liability coverage insurance from responsible companies in such amounts and against such risks to the Borrower and such Opco Party as is prudent and reasonably satisfactory to the Administrative Agent; provided that the Administrative Agent acknowledges that the insurance maintained by the Borrower and the Opco Parties as of the Closing Date is satisfactory;

(b)    Keep its tangible assets insured by responsible companies against loss or damage by fire, theft, burglary, pilferage, loss in transit, explosions and hazards in amounts which are prudent for the carwash industry, in accordance with industry standards, all premiums thereon to be paid by the Borrower and the Opco Parties; and

(c)    With respect to each Unit, if at any time the area in which any Improvements located on such Unit is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), (i) obtain flood insurance in such total amount as required by Flood Insurance Laws, and otherwise comply with the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent, including a copy of the flood insurance policy and a declaration page relating to the insurance policies required by this Section 5.7 which shall (a) identify the addresses of each parcel of Real Property located in a special flood hazard area, (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (c) provide that the insurer will give the Administrative Agent thirty (30) days written notice of cancellation or non-renewal and shall include evidence of annual renewals of such insurance and (iii) shall be otherwise in form and substance satisfactory to the Administrative Agent.

5.8    **ERISA**.  The Borrower agrees that all assumptions and methods used to determine the actuarial valuation of employee benefits, both vested and unvested, under any Plan, and each such Plan, will comply in all material respects with ERISA and other applicable laws.

(a)    The Borrower will not at any time permit any Plan to:

(1)    engage in any "prohibited transaction" for which an exemption is not available as such term is defined in Section 4975 of the Code or in Section 406 of ERISA;

(2)    fail to satisfy the minimum funding standard as such term is defined in Section 302 of ERISA, whether or not waived;

(3)    be terminated under circumstances which are likely to result in the imposition of a lien on the property of the Borrower pursuant to Section 4068 of ERISA, if and to the extent such termination is within the control of the Borrower; or

(4)    be operated or administered in a manner which is not in compliance with ERISA or any applicable provisions of the Code;

if the event or condition described in (1), (2), (3) or (4) above would reasonably be expected to subject the Borrower to a Material Adverse Occurrence.

(b)    Upon the request of the Administrative Agent or any Lender, the Borrower will furnish a copy of the annual report of each Plan (Form 5500) required to be filed with the Internal Revenue Service. Copies of such annual reports shall be delivered no later than thirty (30) days after the date the copy is requested.

**5.9    Post-Closing Requirements.**

(a) [TBD if any]

(a)    The Borrower shall deliver to the Administrative Agent consolidated and combined audited financial statements, including balance sheet, related statements of operations, and statements of cash flows, of Zips and its Subsidiaries (i) for the fiscal year ended December 31, 2023 by July 31, 2025 (or such later date as agreed by the Administrative Agent in its discretion) and (ii) for the fiscal year ended December 31, 2024 by December 31, 2025 (or such later date as agreed by the Administrative Agent in its discretion).

**5.10    [Reserved].**

**5.11    [Reserved].**

**5.12    Further Assurances.** Promptly upon reasonable request by the Administrative Agent, the Borrower shall (and, subject to the limitations hereinafter set forth, shall cause the other Opco Parties to) take such additional actions and execute such documents as the Administrative Agent may reasonably request from time to time in order (i) to carry out the purposes of this Agreement or any other Loan Documents; provided, that the Borrower and the other Opco Parties shall not be obligated to take any such actions or execute such documents to the extent that such actions or documents would impose any additional obligations not set forth herein on the Borrower or such Opco Party, (ii) to subject to the Liens in the Collateral granted by any of the Security Documents any of the Collateral and (iii) to perfect and maintain the validity, effectiveness and priority of the Liens granted by any of the Security Documents and the Liens intended to be created thereby.

**5.13    SBA Matters.** The Borrower will, and will cause each of its Subsidiaries to: (a) upon the request of any Lender that is a Small Business Investment Company (as defined in the SBIA), repay such Lender's Loan in full (including the applicable prepayment fee), in immediately available funds, in the event that Borrower or any other Opco Party changes the nature of its business within one year after the Closing Date (or, if applicable, any later borrowing date hereunder) in a manner that would cause such Lender to have provided funds to Borrower or any other Opco Party pursuant to this Agreement or any other Loan Document in violation of 13 C.F.R. §§ 107.700-107.760 (as amended from time to time); (b) upon the request of any Lender that is a Small Business Investment Company or the SBA, (i) submit to such Lender and/or the SBA timely and accurate compliance reports at such times and in such form and containing such information as the SBA may determine to be necessary to enable the SBA to ascertain

whether Borrower and each other Opco Party have complied or are complying with 13 C.F.R. Part 112 ("Part 112"), (ii) submit to such Lender such information as may be necessary to enable such Lender to meet its reporting requirements under Part 112, and (iii) permit the SBA to have access with advance written notice and during normal business hours to such of its books, records, accounts and other sources of information, and its facilities as may be pertinent to ascertain compliance with Part 112. Where any information required of the Borrower or any other Opco Party is in the exclusive possession of any other agency, institution or Person and such agency, institution or Person shall fail or refuse to furnish this information, Borrower and each other Opco Party shall so certify in its report and shall set forth what efforts it has made to obtain this information; and (c) upon any Lender's request, take any and all actions required to permit any Lender to comply with SBIA and applicable law, in the event such Lender is restricted or prohibited from holding Loans or Qualified Equity Interests in any Opco Party or any Affiliate thereof as a result of any noncompliance thereunder.

5.14    **OFAC; Patriot Act**.  The Borrower and the Opco Parties shall, and shall cause their Subsidiaries to, comply with the laws, regulations and executive orders referred to in Section 4.27 and Section 4.28 (subject to any materiality qualifiers set forth in such Section 4.27 and Section 4.28).

5.15    **Sale-Leaseback Accounting Treatment**. The Borrower and the Opco Parties shall, and shall cause their Subsidiaries to, employ best efforts to ensure that sale-leaseback transactions are treated as successful sale-leaseback transactions for GAAP accounting purposes. To the extent any sale-leaseback transactions are determined to be failed sale-leaseback(s) for accounting purposes under GAAP, Borrower shall promptly notify Administrative Agent (on behalf of itself and the Lenders).

5.16    **Quarterly Lender Calls**.  The Borrower and the Opco Parties shall, and shall cause their Subsidiaries to, participate in a meeting of the Lenders once during each fiscal quarter, to be held via teleconference, to discuss the financial performance of the Borrower and its Subsidiaries.  Each such meeting shall be held at a time reasonably agreed between the Borrower and the Administrative Agent. For the avoidance of doubt, such quarterly lender call shall concurrently satisfy the obligations of this section and Section 5.16 of the OpCo Credit Agreement.

**ARTICLE VI**
**NEGATIVE COVENANTS**

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Advance shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

6.1    **[Reserved].**

6.2    **Limitations on Indebtedness**.  The Borrower shall not permit any of the Opco Parties or their Subsidiaries to, create, assume, incur, issue, guarantee or otherwise become or remain obligated in respect of, or permit to be outstanding, any Indebtedness, except the following (the "Permitted Indebtedness"):

(a)    Indebtedness outstanding on the date hereof and listed on **Schedule 6.2(a)** and any refinancings, refundings, renewals or extensions thereof; provided that the principal amount of such Indebtedness is not increased from the original principal balance except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder;

(b)        (x) the Obligations (including Incremental Term Loans); and (y) (i) the Obligations under and as defined in the Opco Credit Agreement in an aggregate principal amount not to exceed an aggregate principal amount permitted to be incurred under the Opco Credit Agreement as in effect as of the Closing Date (including, for the avoidance of doubt, incremental term loans permitted thereunder as in effect as of the Closing Date), plus (ii) additional Indebtedness under the Opco Credit Agreement in an outstanding principal amount not to exceed (A) $45,000,000 plus (B) additional amounts such that after giving effect to such incurrence of Indebtedness on a Pro Forma Basis, the Opco Leverage Ratio for the most recently ended Test Period shall not exceed [___:___]³4.56 to 1.00 plus (iii) other Obligations under the Opco Credit Agreement not constituting principal and, in each case, including any interest, fees or other amounts paid in-in kind and capitalized to principal in respect of any amounts otherwise described in this clause (y);

(c)        Indebtedness representing deferred compensation to employees incurred in the ordinary course of business or other similar arrangements incurred by such Person in connection with the any Permitted Acquisitions or any other Investment expressly permitted hereunder;

(d)        [reserved];

(e)        Indebtedness in the form of trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice, which Indebtedness shall not be secured by a Lien on any Property of the Borrower or its Subsidiaries;

(f)        Indebtedness owed in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business or consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(g)        Indebtedness in respect of performance bonds, bid bonds, appeal bonds, completion guaranties, surety bonds and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business, and any extension, renewal or refinancing thereof to the extent not provided to secure the repayment of other Indebtedness and to the extent that the amount of refinanced Indebtedness is not greater than the amount of Indebtedness being refinanced;

(h)        Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(i)        Indebtedness consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

---

³ NTD – to be closing opco leverage.

(j)      Indebtedness incurred in a Permitted Acquisition, any other Investment expressly permitted hereunder or any sale, in each case to the extent constituting indemnification obligations or obligations in respect of purchase price adjustments (including earn-outs and other deferred purchase price obligations) or other similar adjustments;

(k)      Guarantee(s) incurred in the ordinary course of business in respect of obligations to suppliers, customers, franchisees, lessors and licensees;

(l)      obligations arising under any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantee(s) thereof;

(m)      Indebtedness of any Opco Party owing to another Opco Party;

(n)      Indebtedness (and Guarantees thereof) in respect of Swap Contracts designed to hedge against any Opco Party's or it Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks, in each case not for speculative purposes;

(o)      Indebtedness of assumed in connection with a Permitted Acquisition or Permitted Investment; provided that (i) such Indebtedness was not incurred or assumed in contemplation of such Permitted Acquisition or Permitted Investment, (ii) such Indebtedness is non-recourse to (and is not assumed by any of) the Opco Parties and their Subsidiaries (other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Subsidiary after the Closing Date), (iii) the aggregate outstanding principal amount of all such Indebtedness shall not exceed $5,000,000 at any time, and (iv) no Default or Event of Default then exists or would result therefrom;

(p)      Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Opco Borrower (or any direct or indirect parent thereof, including the Borrower) permitted by Section 6.10; provided, that such Indebtedness shall be subordinated to the Obligations, on terms and conditions reasonably satisfactory to the Administrative Agent;

(q)      Guarantees in respect of Indebtedness of any Opco Party otherwise permitted hereunder; provided that if such Indebtedness is subordinated to the Obligations, such Guarantee shall be subordinated to the same extent;

(r)      Indebtedness supported by a Letter of Credit (as defined in the Opco Credit Agreement), in a principal amount not to exceed the face amount of such Letter of Credit;

(s)      Indebtedness with respect to letters of credit listed on **Schedule 6.2(s)**;

(t)      Indebtedness for Real Property Taxes; provided the payment thereof is not required to be made pursuant to Section 5.4;

(u)     Indebtedness of any Opco Party under the ABL Facility to the extent permitted under the Opco Credit Agreement;

(v)     [Reserved];

(w)     Indebtedness with respect to Capital Leases and purchase money Indebtedness, in each case, incurred prior to or within one hundred and twenty (120) days after the acquisition, construction, lease or improvement of the applicable asset in an aggregate amount not to exceed $5,000,000 at any time;

(x)     to the extent that, as of any date of determination, there is no L/C Issuer under and as defined in the Opco Credit Agreement and the ABL Facility has not yet been established, Indebtedness under commercial, trade and standby letters of credit (including reimbursement obligations with respect thereto) in the ordinary course of business or incurred in order to support or backstop any performance or surety bonds permitted to be issued and/or incurred under clause (g) above; and

(y)     any other Indebtedness Party; provided that the aggregate outstanding principal amount of all such unsecured Indebtedness shall not exceed $5,000,000 at any time.

**6.3    Liens**.  The Borrower shall not permit any of the Opco Parties or their Subsidiaries to, create, incur, assume or permit to exist or to be created or assumed any Lien on any of its assets, whether now owned or hereafter acquired, except the following (the "Permitted Liens"):

(a)     Liens existing on the Closing Date and set forth on **Schedule 6.3**;

(b)     Liens arising by operation of law on the Real Property for real estate taxes and Liens securing Taxes, assessments or governmental charges or levies or the claims or demands of contractors, materialmen, mechanics, carriers, warehousemen, landlords and other like Persons; provided the payment thereof is not required to be made pursuant to Section 5.4 hereof;

(c)     Liens incurred or deposits made in the ordinary course of business (1) in connection with workmen's compensation, unemployment insurance, social security and other like laws or (2) to secure the performance of letters of credit, bids, tenders, sales contracts, leases, statutory obligations, surety, appeal and performance bonds and other similar obligations not incurred in connection with the borrowing of money, the obtaining of advances or the payment of the deferred purchase price of the Real Property or Equipment and, in the case of this clause (2) only, not in excess of 2,500,000 in the aggregate outstanding at any one time;

(d)     attachments, judgment and other similar Liens arising in connection with court proceedings, provided the execution or other enforcement of such Liens is stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings in such manner as not to have the Real Property or Equipment subject to such Liens forfeitable in accordance with Section 5.4;

(e)     easements, rights-of-ways, reservations, exceptions, minor encroachments, rights of entry, restrictive covenants, licenses, restrictions and similar charges created or incurred in the ordinary course of business and not in connection with Indebtedness, and which in the aggregate do not materially detract from the value of any Real Property or materially impair or interfere with its use in the business operations of the Borrower and its

Subsidiaries; including any such items included as exceptions in the title policy obtained by Administrative Agent related to the Real Property;

(f)      Liens in favor of the Opco Borrower or its Subsidiaries;

(g)      (x) Liens in favor of the Administrative Agent for the benefit of the Secured Parties or otherwise to secure the Obligations; and (y) Liens securing the Opco Facility;

(h)      Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(i)      Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(j)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(k)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)      precautionary Uniform Commercial Code and similar filings;

(m)      Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted hereunder;

(n)      Liens on Property constituting Goods (as defined in the applicable Uniform Commercial Code), excluding inventory, but including Equipment and Fixtures (as defined in the applicable Uniform Commercial Code), securing obligations under leases of Units entered into in the ordinary course of business;

(o)      (i) Liens existing on property at the time of (and not in contemplation of) its acquisition or existing on the property of any Person at the time such Person becomes (and not in contemplation of such Person becoming) a Subsidiary, in each case after the Closing Date; provided that (A) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Person) and (B) the Indebtedness secured thereby is permitted under Section 6.2(o), and (ii) Liens incurred in connection with escrow arrangements or other agreements relating to a Permitted Acquisition or Permitted Investment permitted;

(p)      Liens in respect of the cash collateralization of Letters of Credit (as defined in the Opco Credit Agreement) and letters of credit permitted by Sections 6.2(s) or 6.2(x);

(q)      Liens (i) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(r)      Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 7.1(h);

(s)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and not securing Indebtedness prohibited by this Agreement;

(t)      Liens securing Indebtedness permitted pursuant to Section 6.2(w);

(u)      the modification, replacement, renewal or extension of any Lien permitted by this Section 6.3; provided that (i) such Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 6.2;

(v)      Liens securing Indebtedness permitted by Section 6.2(u) (to the extent permitted under the Opco Credit Agreement);

(w)      Liens securing Indebtedness or other obligations in an aggregate principal amount as of the date of initial attachment of such Lien not to exceed $5,000,000 and

(x)      Non-exclusive licenses or sublicenses of intellectual property granted in the ordinary course of business.

6.4      **Sales of Assets**.  The Borrower shall not permit any of the Opco Parties or their Subsidiaries, to, make any Dispositions, except for:

(a)      Dispositions of obsolete, damaged, worn out, used or surplus Property (including for purposes of recycling), whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of Property no longer used or useful in the conduct of the business of the Opco Parties or their Subsidiaries;

(b)      Dispositions of Property to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement Property; provided that to the extent the Property being transferred constitutes Collateral such replacement Property shall constitute Collateral;

(c)      Dispositions of Property among Opco Subsidiaries;

(d)    to the extent constituting a Disposition, any Opco Party and its Subsidiaries may enter into an consummation transactions expressly permitted by Section 6.3, Section 6.6 or Section 6.10;

(e)    Dispositions to the extent of any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by any Opco Party o its Subsidiaries to the extent allowable under Section 1031 of the Code (or comparable or successor provision);

(f)    Dispositions in connection with the unwinding of any Swap Contract;

(g)    the sale, license, sublicenses, transfer, lapse, abandonment, discontinuance or other Disposition of any Intellectual Property in the ordinary course of business or if determined by the Borrower or any Subsidiary in its reasonable business judgment that such Disposition is desirable in the conduct of its business;

(h)    Dispositions of any Property with a fair market value (as determined by the Borrower in its reasonable judgment) not to exceed $5,000,000 in the aggregate for all such Dispositions in any fiscal year;

(i)    Dispositions for a fair market value (as determined by the Borrower in its reasonable judgment), so long as, at the time of such Disposition, (i) no Event of Default has occurred and is continuing, and (ii) at least 75% of the consideration for such Disposition in excess of $2,500,000 consists of cash and cash equivalents (in each case free and clear of Liens at the time received); and

(j)    Dispositions of the Specified Real Estate for fair market value as reasonably determined by the Borrower; provided, that Dispositions of Specified Real Estate shall only be permitted pursuant to this clause (j) and not any other clause of this Section 6.4.

**6.5    Liquidations, Mergers and Consolidations**.  Except as permitted pursuant to Sections 6.6 and 6.8 and except for the merger, consolidation or amalgamation of any Opco Party or any Subsidiary thereof into any other Opco Party or any Subsidiary thereof, the Borrower shall not, and will not permit any Opco Parties or any Subsidiary thereof to, liquidate or dissolve itself (or suffer any liquidation or dissolution) or otherwise wind up, or consolidate with or merge into any other Person; provided that any Subsidiary of the Borrower may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders so long as no Event of Default shall result therefrom.

**6.6    Investments**.  The Borrower will cause the Opco Parties and their Subsidiaries not to permit to exist any Investment, except that, so long as no Event of Default then exists or is caused thereby, the Opco Subsidiaries may make Permitted Investments.

**6.7    Transactions with Affiliates**. The Borrower shall not and will cause the Opco Parties and their Subsidiaries not to, enter into any material transaction (including the purchase, sale or exchange of Property, the rendering of any service, the making of any Investment in an Affiliate or the repayment of any Indebtedness owed to an Affiliate) with an Affiliate (other than any such transactions among the Opco Parties and their Subsidiaries), except for:

61

(a)      any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on <u>Schedule 6.7</u>, or any amendment thereto (so long as any such amendment is not adverse to the Lenders in any material respect as compared to the applicable agreement as in effect on the Closing Date);

(b)      any material transaction in the ordinary course of business and pursuant to the reasonable requirements of the Opco Parties and their Subsidiaries business, upon terms which are fair and reasonable to the Opco Parties and their Subsidiaries and which are not less favorable to the Opco Parties and their Subsidiaries than would be obtained in a comparable transaction with a Person not an Affiliate;

(c)      the Borrower may make Permitted Expense Reimbursement and Indemnity Payments; and

(d)      all transactions contemplated by the Plan of Reorganization, including the entry into the Loan Documents and the issuance of the Opco Facility and Equity Interests in any parent entity of the Borrower.

**6.8**      **[Reserved]**.

**6.9**      <u>**Amendment and Waiver**</u>.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, except in connection with a transaction otherwise permitted hereunder, enter into any material amendment of, or agree to or accept or consent to any material waiver of any of the material provisions of its Organizational Documents.

**6.10**      <u>**Restricted Payments**</u>.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, declare, pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests or Equity Interests Equivalents of any Opco Party or any direct or indirect parent thereof, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Opco Parties or any of their Subsidiaries (collectively, "<u>Restricted Payments</u>"), except that the Borrower, the Opco Parties and their Subsidiaries may:

(a)      make Restricted Payments to the Borrower, Opco Holdings, Opco Borrower or any of their Subsidiaries (on a pro rata basis to the holders of the equity thereof);

(b)      to the extent constituting Restricted Payments, make payments permitted by <u>Section 6.7</u>;

(c)      subject to the last paragraph in this <u>Section 6.10</u>, make Tax Distributions to the direct or indirect equity holders of the Borrower;

(d)      to the extent constituting Restricted Payments, any Opco Party and their Subsidiaries may enter into and consummate transactions expressly permitted by <u>Sections 6.6</u> and <u>6.8</u>;

(e)      pay (or make Restricted Payments to allow the Borrower, any Opco Party or any direct or indirect parent thereof to pay) for the repurchase, retirement or other acquisition or retirement for value of Equity Interests or Equity Interests Equivalents of the Borrower or any Opco Party (of of any direct or indirect parent thereof) held by any future,

62

present or former employee, director, consultant or distributor (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Opco Borrower (or any direct or indirect parent of the Opco Borrower) or any of its Subsidiaries upon the death, disability, retirement or termination of employment of any such Person or otherwise pursuant to any employee or director equity plan, employee or director stock option or profits interest plan or any other employee or director benefit plan or any agreement (including any separation, stock subscription, shareholder or partnership agreement) with any employee, director, consultant or distributor of the Opco Borrower (or any direct or indirect parent of the Opco Borrower) or any of its Subsidiaries in an aggregate amount after the Closing Date not to exceed, together with any payments made under any other Indebtedness permitted under Section 6.2(p), $500,000 in any calendar year, in each case so long as no Default or Event of Default has occurred and is continuing or would occur as a result thereof;

(f)     make any Restricted Payment the proceeds of which will be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) operating costs and expenses of the Borrower, any Opco Paty or their direct or indirect parents which do not own other Subsidiaries besides the Opco Parties and any other direct or indirect parents of the Borrower incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable solely to the ownership or operations of the Borrower and its Subsidiaries.

Notwithstanding anything to the contrary herein, for any taxable year in which the Borrower is a member of a group filing a consolidated, combined or similar income tax return ("Tax Group") of which any direct or indirect parent of Borrower is the common parent, Borrower may make tax distributions to such direct or indirect parent ("Tax Distributions"), the proceeds of which will be used by the parent of the Tax Group to pay consolidated or combined U.S. federal, state, and local income taxes imposed on such parent to the extent such income taxes are attributable to the income of such parent, Borrower and those Subsidiaries of Borrower that are members of such Tax Group (or any disregarded entity thereof); provided that the amount of such distributions in respect of any taxable period shall not, in the aggregate, exceed the amount that Borrower and those Subsidiaries of Borrower that are members of such Tax Group (including income of any disregarded entity thereof) would have been required to pay in respect of such U.S. federal, state, or local income taxes (as the case may be) in respect of such taxable period if Borrower and those Subsidiaries of Borrower paid such income taxes directly as a stand-alone consolidated or combined income tax group. For the avoidance

of doubt, Borrower shall be permitted to make such payments on a quarterly basis during such taxable year based on its best estimate of the amounts permitted to be distributions in accordance with the definition of Tax Distributions; provided, further that the total amount of such quarterly distributions for any taxable year shall not exceed the total amount otherwise distributable in accordance with the definition of Tax Distributions and, if the aggregate amount of estimated Tax Distributions paid to any such parent of the Tax Group for any taxable year exceeds the amount that would be calculated as of the end of such taxable year, the excess shall be deducted from the amount of the next Tax Distribution otherwise payable to such parent of the Tax Group.

**6.11    Payments in Respect of Certain Indebtedness**.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, (i) pay interest on any Indebtedness that (x) is subordinated in right of payment to the Obligations, or (y) secured by Liens on the Collateral on a junior basis to the Liens on the Collateral securing the Obligations (collectively, "Subordinated Indebtedness"), or (ii) prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Subordinated Indebtedness, except:

(a)    refinancings of such Subordinated Indebtedness pursuant to Section 6.2(a);

(b)    regularly scheduled interest and principal payments as and when due in respect of such Indebtedness, other than payments prohibited by the subordination provisions applicable thereto;

(c)    payments of or in respect of such Indebtedness made solely with Qualified Equity Interests (other than Equity Cure Contributions) in the Borrower or the conversion of such Indebtedness into Qualified Equity Interests of the Borrower; and

(d)    prepayments of intercompany Indebtedness permitted hereby owed by the Borrower or any Opco Paty to the Borrower or any Opco Paty, other than prepayments prohibited by the subordination provisions governing such Indebtedness.

**6.12    Change in Business**.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, engage in any line of business that is (i) substantially different from those lines of business carried on by it on the Closing Date (or any reasonable extension thereof) and (ii) not ancillary, corollary, complimentary or related thereto.

**6.13    Changes in Accounting, Name and Jurisdiction of Organization**.  The Borrower shall not, and will cause the Opco Parties and their Subsidiaries not to, (i) change their fiscal year, (ii) change its name as it appears in official filings in its jurisdiction of organization or (iii) change its jurisdiction or form of organization, in the case of clauses (ii) and (iii), without at least ten (10) Business Days' prior

written notice to the Administrative Agent and the acknowledgement of the Administrative Agent that all actions reasonably required by the Administrative Agent have been completed.

**6.14**   **No Negative Pledges**.   The Borrower shall not, and shall not permit any of the Opco Parties or their Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Subsidiary to pay dividends or make any other distribution on any of such Subsidiary's Equity Interests or Equity Interests Equivalents or to pay fees, including management fees, or make other payments and distributions to the Borrower or any Subsidiary, except pursuant to the terms of the Loan Documents or the terms of any other Indebtedness permitted hereby.   The Borrower shall not, and shall not permit any of the Opco Parties or their Subsidiaries to, directly or indirectly, enter into, assume or become subject to any contractual obligation prohibiting or otherwise restricting the existence of any Lien upon any Collateral in favor of the Administrative Agent to secure the Obligations, whether now owned or hereafter acquired except (i) in connection with any document or instrument governing Liens permitted herein, <u>provided</u> that any such restriction contained therein relates only to the Property subject to such Permitted Liens or (ii) with consent of the Administrative Agent.   Nothing in this <u>Section 6.14</u> shall prohibit (1) this Agreement or any of the other Loan Documents, (2) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted hereunder pending the consummation of such sale, (3) restrictions imposed by applicable law, (4) any agreement in effect at the time a Person first became a Subsidiary of any Opco Party, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary and such restrictions are limited to such Subsidiary and its Subsidiaries, (5) in the case of any Subsidiary that is not a wholly-owned Subsidiary of the Borrower, restrictions and conditions imposed by its Organizational Documents or any related joint venture, shareholder or similar agreements, or (6) contained in the Opco Credit Agreement or any financing documentation governing Indebtedness permitted to be incurred hereunder that are incurred by a Subsidiary, so long as such restrictions operate only upon the occurrence and during the continuance of an event of default under the documentation governing such Indebtedness and only impose restrictions on such Subsidiary and its Subsidiaries.

**6.15**   **Borrower's Holding Company Status**.   Notwithstanding anything contained in this Agreement or the other Loan Documents to the contrary, Borrower shall not:

(a)     form any new direct Subsidiaries, or own or acquire any assets other than the Equity Interests and Equity Interests Equivalents of Opco Holdings and, to the extent cash is temporarily transferred through the Borrower to effectuate a transaction expressly permitted by this Agreement, such cash during such transfer;

(b)     incur any liabilities other than (i) minimal liabilities necessary to maintain its separate organizational existence and to pay reasonable overhead expenses of Opco Parties and their Subsidiaries and (ii) those incurred under or permitted by this Agreement and the other Loan Documents to which it is a party;

(c)     incur any Indebtedness other than the Obligations and Guarantees of the other Opco Parties' obligations permitted by this Agreement;

(d)     engage in any trade, business or operations (other than acting as a holding company for the equity of Opco Holdings and its Subsidiaries) and any administrative activities incidental or reasonably related thereto;

(e)     merge, amalgamate or consolidate with any other Person;

65

(f)      sell or otherwise transfer any of its assets;

(g)      permit or suffer to exist any Lien on any of its assets other than Permitted Liens; provided, that no Lien securing borrowed money shall be permitted with respect to the Collateral; or

(h)      accept or receive any Loans or Collateral (other than distributions that are expressly permitted by Section 6.12); provided that nothing herein shall prevent the Borrower from incurring liabilities with respect to Taxes as required by Law.

**6.16   Use of Proceeds**.  The Borrower shall not, nor shall it permit any of the Opco Parties or their Subsidiaries to, use the proceeds of the Advances other than for lawful purposes and in accordance with Sections 4.10 and 4.12.

**ARTICLE VII
EVENTS OF DEFAULT**

**7.1   Events of Default**.  The term "Event of Default" means any of the following events occurring for whatever reason, whether voluntary or involuntary, effected by operation of law, judgment, order or otherwise:

(a)      A failure to pay when and as due any principal amount of the Loans;

(b)      A default in the payment when and as due of any interest on the Loans or of fees or other amounts payable to the Lenders pursuant to this Agreement and such failure continues for period of three (3) Business Days after delivery of written notice to Borrower;

(c)      A default in the due performance and observance of any of the covenants or agreements contained in (i) Sections 5.1(e) (solely with respect to delivery of a notice of a Default), 5.2, 5.14 or Article VI, or (ii) Sections 5.1(a), 5.1(b), 5.1(c) or 5.1(d), and, in any case of this clause (ii), such failure continues for a period of five (5) Business Days;

(d)      A default (other than those defaults specifically described in other subsections of this Section 7.1) by the Borrower in the due performance and observance of any of the covenants contained in this Agreement or any other Loan Document and such failure continues for a period of thirty (30) days after the earlier to occur of (i) the date upon which a Responsible Officer of the Borrower becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by the Administrative Agent or Required Lenders;

(e)      The Borrower or any Subsidiary thereof (i) fails to make any payment beyond the applicable grace period, if any, in respect of (x) the ABL Facility or (y) its other Indebtedness (other than the Obligations) having an aggregate outstanding principal amount (individually or in the aggregate with all other such Indebtedness as to which such a failure shall exist) in excess of $2,500,000 or (ii) fails to observe or perform any other agreement or condition relating to the ABL Facility or any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the ABL Agent or ABL Lenders or the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, the obligations under the ABL Facility or such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise),

or an offer to repurchase, prepay, defease or redeem the obligations under the ABL Facility or such Indebtedness to be made, prior to its stated maturity; provided that such failure is unremedied and is not waived by the holders of such Indebtedness prior to the termination of the Commitments and acceleration of the Loans pursuant to Section 7.2;

(f)     An involuntary case under any applicable federal or state bankruptcy, insolvency or similar laws shall be commenced against any the Borrower or any obligor with respect other Opco Facility and the petition shall not be dismissed, stayed, bonded or discharged within ninety (90) days after the commencement of the case; the entry of a decree or order by a court having jurisdiction in the premises in respect of the Borrower or any Opco Party under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law; or the entry of a decree or order by a court having jurisdiction in the premises appointing a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Borrower or any Opco Party or of any substantial part of the property thereof, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days;

(g)     The commencement by the Borrower or any Opco Party of or consent to, a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law or the request or consent by it to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of either of the Borrower or any Opco Party or of any substantial part of the property thereof, or the making by it of a general assignment for the benefit of creditors, or the failure by the Borrower or any Opco Party to pay its debts generally as they become due, or the taking of any action by the Borrower or any Opco Party in furtherance thereof;

(h)     One or more judgments (i) for the payment of money in an aggregate amount in excess of $2,500,000 (other than any such judgment covered by insurance (other than under a self-insurance program) to the extent a claim therefor has been made in writing and liability therefor has not been denied by the insurer), shall be rendered against the Borrower or any Opco Party and the same shall remain undischarged for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Opco Party to enforce any such judgment or (ii) in the case of non-monetary judgments, which would reasonably be expected to result in a Material Adverse Occurrence, and which, in any case, remains undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder);

(i)     Any Loan Document or any material provision of any Loan Document shall at any time and for any reason cease to be valid and binding on or enforceable against any the Borrower shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any security interest and Lien on the Collateral purported to be granted to the Administrative Agent for the benefit of the Secured Parties by any Security Document shall for any reason (other than as expressly permitted hereunder or pursuant to the terms thereof) cease to be in full force and effect or create a valid security interest in any material portion of the Collateral or such security interest shall for any reason (other than the failure of the Administrative Agent to take any action within its control) cease to be a perfected security interest with the priority stated in the Security Documents, except (in each case) (x) to the extent that any such grant, perfection or priority is not required pursuant to the terms hereof or the

Security Documents and (y) to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(j)      The occurrence of a Change of Control;

(k)      Any representation or warranty made or deemed made by the Borrower in this Agreement or any other Loan Document shall be untrue, incorrect or misleading in any material respect when made or deemed made;

(l)      The occurrence of an Event of Default (as defined in the Opco Credit Agreement); <u>provided</u>, that to the extent that such Event of Default (as defined in the Opco Credit Agreement) is waived pursuant to the terms of the Opco Credit Agreement prior to the acceleration thereof, the Event of Default contemplated by this clause (l) shall automatically be deemed to have been cured concurrently with such waiver; or

(m)      There shall be at any time any failure to satisfy the minimum funding standard as defined in ERISA or in Section 412 of the Code, whether or not waived, with respect to any Plan maintained by the Borrower, or to which the Borrower has any liabilities, or any trust created thereunder that would reasonably be expected to result in a Material Adverse Occurrence; or a trustee shall be appointed by PBGC or a federal district court to administer such Plan; or PBGC shall institute proceedings to terminate any such Plan; or the Borrower shall incur any liability to PBGC in connection with the termination of any such Plan; or any Plan or trust created under any Plan of the Borrower shall engage in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which would subject the Borrower to the tax or penalty on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code that results in a Material Adverse Occurrence.

**7.2      Action If Event of Default**.  If an Event of Default described in Section 7.1(f) or (g) shall occur, to the extent permitted by law, the full unpaid principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder shall automatically be due and payable without any declaration, notice, presentment, protest or demand of any kind (all of which are hereby waived) and the obligation of the Lenders to make additional Advances shall automatically terminate.  If any Event of Default other than pursuant to Section 7.1(f) or (g) shall occur and be continuing, the Required Lenders, upon written notice to the Borrower (which shall be given by the Administrative Agent at the request of the Required Lenders), may terminate the Lenders' obligation to make additional Advances and may declare the outstanding principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder to be due and payable without other notice to the Borrower, presentment, protest or demand of any kind (all of which are hereby waived), shall automatically terminate, whereupon the full unpaid amount of the Loans and any and all other Obligations, which shall be so declared due and payable shall bear interest at the Default Rate and shall be and become immediately due and payable.

**7.3      Remedies**.

(a)      Upon acceleration of the Loans, as provided in Section 7.2, the Administrative Agent shall, at the request of the Required Lenders, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and/or under applicable law.

(b)      The Administrative Agent, personally or by attorney, shall, at the request of the Required Lenders, proceed to protect and enforce its rights and the rights of the Lenders by

pursuing any available remedy, including a suit or suits in equity or at law, whether for damages or for the specific performance of any obligation, covenant or agreement contained in this Agreement or in the Notes, or in aid of the execution of any power herein or therein granted, or for the enforcement of any other appropriate legal or equitable remedy, as the Administrative Agent shall deem most effectual to collect the payments then due and thereafter to become due on the Notes or under this Agreement, to enforce performance and observance of any obligation, agreement or covenant of the Borrower hereunder or under the Notes or to protect and enforce any of the Administrative Agent's or any Lender's rights or duties hereunder.

(c)     Upon acceleration of the Loans, as provided in <u>Section 7.2</u>, to the extent permitted by law, the Administrative Agent shall, if so directed by the Required Lenders, have the right to the appointment of a receiver for the Collateral of the Borrower pledged to secure the Obligations, both to operate and to sell such Collateral, and the Borrower hereby consents to such right and such appointment and hereby waives, to the fullest extent permitted by applicable law, any objection the Borrower may have thereto or the right to have a bond or other security posted by the Administrative Agent on behalf of the Lenders in connection therewith.

(d)     No remedy herein conferred upon or reserved to the Administrative Agent or any Lender is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or under any other Loan Document now or hereafter existing at law, in equity or by statute.

(e)     Each Lender agrees that it will not take any action, nor institute any actions or proceedings, against the Borrower hereunder or under any Loan Document, without the prior written consent of the Required Lenders or, as may be provided in this Agreement or the other Loan Documents, at the direction of the Administrative Agent with the consent of the Required Lenders.

## ARTICLE VIII
## THE ADMINISTRATIVE AGENT

**8.1     <u>Appointment and Authorization</u>.**   Each Lender hereby irrevocably appoints the Administrative Agent as the Administrative Agent of such Lender and authorizes the Administrative Agent to act on such Lender's behalf to the extent provided herein or under any of the other Loan Documents, and to take such other action and exercise such other powers as may be reasonably incidental thereto.  Each Lender hereby agrees that it will require any transferee of any of such Lender's interests in its Loans to irrevocably appoint and authorize the Administrative Agent as such transferee's Administrative Agent in accordance with the terms hereof.  Notwithstanding the use of the term "agent," it is expressly understood and agreed that the Administrative Agent shall not have any fiduciary responsibilities to any Lender by reason of this Agreement and that the Administrative Agent is merely acting as the representative of the Lenders with only those duties as are expressly set forth in this Agreement and the other Loan Documents.  In its capacity as the Lenders' contractual representative, the Administrative Agent (i) does not hereby assume any fiduciary duties to the Borrower, any of the Lenders or any other Person (and no such fiduciary duties shall be implied) and (ii) is acting as an independent contractor, the rights and duties of which are limited to those expressly set forth in this Agreement and the other Loan Documents.  The Borrower and each of the Lenders hereby agrees to assert no claim against the Administrative Agent on any agency theory or any other theory of liability for breach of fiduciary duty, all of which claims the Borrower and each Lender hereby waives.

69

**8.2** **Power**. The Administrative Agent shall have and may exercise such powers under this Agreement and any other Loan Documents as are specifically delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto. As to any matters not expressly provided for by the Loan Documents (including enforcement or collection of the Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and all holders of the Notes; provided, however, that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to any Loan Document or applicable law. The Administrative Agent shall not have any implied duties or any obligation to take any action under this Agreement or any other Loan Document except such action as is specifically provided by this Agreement or any other Loan Document to be taken by the Administrative Agent.

**8.3** **Interest Holders**. The Administrative Agent may treat each Lender, or the Person designated in the last notice filed with the Administrative Agent, whether under Section 9.3 or 9.9, or otherwise hereunder, as the holder of all of the interests of such Lender in its Loans until written notice of transfer, signed by such Lender (or the Person designated in the last notice filed with the Administrative Agent) and by the Person designated in such written notice of transfer, in form and substance satisfactory to the Administrative Agent, shall have been filed with the Administrative Agent.

**8.4** **Employment of Counsel; etc**. The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document, and any instrument, agreement or document executed, issued or delivered pursuant or in connection herewith or therewith, by or through employees, agents and attorneys-in-fact and shall not be answerable for the default or misconduct of any such employee, agent or attorney-in-fact selected by it with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf of the Administrative Agent). The Administrative Agent shall be entitled to rely on advice of counsel (including counsel who are the employees of the Administrative Agent) selected by the Administrative Agent concerning all matters pertaining to the agency hereby created and its duties under any of the Loan Documents.

**8.5** **Reliance**. The Administrative Agent shall be entitled to rely upon and shall not be under a duty to examine or pass upon the validity, effectiveness, genuineness of this Agreement, any other Loan Document or any notice, consent, waiver, amendment, certificate, affidavit, letter, telegram, statement, paper, document or writing furnished pursuant to this Agreement or any other Loan Document, and the Administrative Agent shall be entitled to assume (absent actual knowledge to the contrary) that the same are valid, effective and genuine, have been signed or sent by the proper Person(s) and are what they purport to be. The Administrative Agent shall be entitled to assume that no Default has occurred and is continuing unless it has actual knowledge, or has been notified in writing by the Borrower, of such fact, or has been notified by a Lender in writing that such Lender considers that a Default has occurred and is continuing, and such Lender shall specify in detail the nature thereof in writing. The Administrative Agent shall not be liable hereunder for any action taken or omitted to be taken except for its own gross negligence or willful misconduct. The Administrative Agent shall provide promptly each Lender with copies of such documents received from the Borrower pursuant to the terms of this Agreement or any other Loan Document as such Lender may reasonably request.

**8.6** **General Immunity**. Neither the Administrative Agent nor any of the Administrative Agent's directors, officers, agents, attorneys or employees shall be liable or responsible in any manner to the Borrower, any Lender or any other Person for any action taken or omitted to be taken by it or them under the Loan Documents or in connection therewith except for any liability imposed by law for its own willful misconduct or gross negligence. Without limitation on the generality of the foregoing, the

70

Administrative Agent:  (a) shall not be responsible to any Lender for any recitals, statements, warranties, representations, or failure or delay of performance under the Loan Documents or any agreement or document related thereto or for the financial condition of the Borrower; (b) shall not be responsible for the authenticity, accuracy, completeness, value, validity, effectiveness, due execution, legality, genuineness, enforceability or sufficiency of any of the Loan Documents, any provisions thereof or any document contemplated thereby; (c) shall not be responsible for the validity, genuineness, creation, perfection or priority of any of the Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security; (d) shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, covenants or conditions of any of the Loan Documents on the part of the Borrower or of any of the terms of any such agreement by any party thereto and shall have no duty to inspect the property (including the books and records) of the Borrower; (e) shall incur no liability under or in respect of any of the Loan Documents or any other document or Collateral by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, cable or telex) furnished pursuant to this Agreement or any other Loan Document; (f) shall incur no liability to the Borrower or any other Person as a consequence of any failure or delay in performance by or any breach by, any Lender or Lenders of any of its or their obligations under this Agreement; and (g) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by the Administrative Agent.

      **8.7**    **Credit Analysis**.  Each Lender has made, and shall continue to make, its own independent investigation or evaluation of the operations, business, property and condition, financial and otherwise, of the Borrower in connection with the making of its commitments hereunder and has made, and will continue to make, its own independent appraisal of the creditworthiness of the Borrower. Without limiting the generality of the foregoing, each Lender acknowledges that prior to the execution of this Agreement, it had this Agreement and all other Loan Documents and such other documents or matters as it deemed appropriate relating thereto reviewed by its own legal counsel as it deemed appropriate, and it is satisfied with the form and substance of this Agreement and all other Loan Documents. Each Lender agrees and acknowledges that neither the Administrative Agent nor any of its directors, officers, attorneys or employees makes any representation or warranties about the creditworthiness of the Borrower or with respect to the due execution, legality, validity, genuineness, effectiveness, sufficiency or enforceability of this Agreement or any other Loan Documents, or the validity, genuineness, execution, perfection or priority of Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security.  Each of the Lenders shall use its commercially reasonable efforts to provide the other Lenders with any credit or other material information which comes into the possession of such Lender on or before a Default or Event of Default or at any time thereafter with respect to the operations, business, property, condition or creditworthiness of the Borrower but no Lender shall have any liability to any other Lender for its inadvertent failure to do so.  Each Lender, upon the request of another Lender, shall deliver to such other Lender any financial statement, report, certificate or other document required to be delivered to the Lenders pursuant to Section 5.1 which the requesting Lender did not receive.  Except as explicitly provided herein, neither the Administrative Agent nor any has any duty or responsibility, either initially or on a continuing basis, to provide any other Lender with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before a Default or an Event of Default or at any time thereafter.

      **8.8**    **Administrative Agent and Affiliates**.  With respect to the Loans made by it and the Notes issued to it, the Administrative Agent, in its individual capacity, shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not an Administrative Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent in its individual capacity.  The Administrative Agent, in its individual

71

capacity, and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, the Borrower, and any Person who may do business with or own securities of the Borrower, all as if it were not an Administrative Agent and without any duty to account therefor to the Lenders.

8.9    **Indemnification**.  The Lenders jointly and severally agree to indemnify and hold harmless the Administrative Agent and its officers, directors, employees and agents (to the extent not reimbursed by the Borrower), ratably according to their respective Commitments, from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent or any of its officers, directors, employees or agents, in any way relating to or arising out of any investigation, litigation or proceeding concerning or relating to the transaction contemplated by this Agreement or any of the other Loan Documents, or any of them, or any action taken or omitted by the Administrative Agent or any of its officers, directors, employees or agents, under any of the Loan Documents; provided, however, that no Lender shall be liable for any portion of such claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of the Administrative Agent or any of its officers, directors, employees or agents.  Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for such Lender's proportionate share of any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent or its officers, directors, employees or agents in connection with the preparation, execution, administration, or enforcement of, or legal advice in respect of rights or responsibilities under any of, the Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower.

8.10    **Security Documents**.  The Administrative Agent, as collateral agent hereunder and under the Security Documents, is hereby authorized to act on behalf of the Secured Parties, in its own capacity and through other agents and sub-agents appointed by it in good faith, under the Security Documents, provided that the Administrative Agent shall not agree to the release of any Collateral, or any property encumbered by any mortgage, pledge or security interests except in compliance with Section 8.11.  In connection with its role as secured party with respect to the Collateral hereunder, the Administrative Agent shall act as collateral agent, for itself and for the ratable benefit of the Lenders, and such role as Administrative Agent shall be disclosed on all appropriate accounts, filings, mortgages, and other Collateral documentation.

8.11    **Collateral Matters**.  The Administrative Agent is authorized on behalf of all the Lenders without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to the Security Documents or any Collateral thereunder which may be necessary to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Security Documents.  The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral (i) upon termination of the Commitments and payment in full of all Loans and all other Obligations of the Borrower known to the Administrative Agent and payable under this Agreement or any other Loan Document; (ii) [reserved]; (iii) [reserved]; or (iv) if approved, authorized or ratified in writing by all the Lenders.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section 8.11, provided that the absence of any such confirmation for whatever reason shall not affect the Administrative Agent's rights under this Section 8.11.

8.12    **Action by the Administrative Agent**.

(a)    The Administrative Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights with which it may be vested and with respect to taking or refraining from taking any action or actions which it may be able to take under or in respect of, this Agreement, unless the Administrative Agent shall have been instructed by the Required Lenders to exercise or refrain from exercising such rights or to take or refrain from taking such action; provided that the Administrative Agent shall not exercise any rights under Section 7.3 of this Agreement except upon the request of the Required Lenders or of all the Lenders, where expressly required by this Agreement.  The Administrative Agent shall incur no liability under or in respect of this Agreement with respect to anything which it may do or refrain from doing in the exercise of its judgment or which may seem to it to be necessary or desirable in the circumstances, except for its gross negligence or willful misconduct as determined by a final, non-appealable order of a court having jurisdiction over the subject matter.

(b)    The Administrative Agent shall not be liable to the Lenders or to any Lender in acting or refraining from acting under this Agreement or any other Loan Document in accordance with the instructions of the Required Lenders or of all the Lenders, where expressly required by this Agreement, and any action taken or failure to act pursuant to such instructions shall be binding on all Lenders.

(c)    Notice of Default or Event of Default.   In the event that the Administrative Agent or any Lender shall acquire actual knowledge, or shall have been notified in writing, of any Default (other than through a notice by one party hereto to all other parties), such Lender shall promptly notify the Administrative Agent and the Administrative Agent shall promptly notify the Lenders, and the Administrative Agent shall take such action and assert such rights under this Agreement and the other Loan Documents as the Required Lenders (or all the Lenders, where expressly required by this Agreement) shall request in writing, and the Administrative Agent shall not be subject to any liability by reason of its acting pursuant to any such request.  If the Required Lenders shall fail to request the Administrative Agent to take action or to assert rights under this Agreement in respect of any Default within ten (10) days after their receipt of the notice of any Default from the Administrative Agent or any Lender, or shall request inconsistent action with respect to such Default, the Administrative Agent may, but shall not be required to, take such action and assert such rights as it deems in its discretion to be advisable for the protection of the Lenders, except that, if the Required Lenders have instructed the Administrative Agent not to take such action or assert such right, in no event shall the Administrative Agent act contrary to such instructions.

**8.13** **Successor Administrative Agent**.  The Administrative Agent may resign at any time as Administrative Agent under the Loan Documents by giving thirty (30) days' prior written notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), have the right to appoint a successor Administrative Agent hereunder that is organized under the laws of the United States of America or a political subdivision thereof.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any state thereof and having a combined capital and surplus of at least $250,000,000.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.  Upon the acceptance of any appointment as Administrative Agent under the Loan Documents by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After any retiring Administrative Agent's resignation as Administrative Agent under the Loan Documents, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under the Loan Documents.

**8.14** **Authorization to Enter into Intercreditor Agreements.**  Each Lender consents to and authorizes Administrative Agent's execution and delivery of any intercreditor or subordination agreements (including, without limitation any agreement among lenders) from time to time as contemplated by the terms hereof on behalf of such Lender and agrees to be bound by the terms and provisions thereof, including any purchase option contained therein.

**8.15** **Erroneous Payments**.

(a)     If the Administrative Agent notifies a Lender, or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party, such Lender (any such Lender, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf)  (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds

Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)　　Without limiting immediately preceding <u>clause (a)</u>, each Lender, or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(1)　　(A) in the case of immediately preceding <u>clauses (x)</u> or <u>(y)</u>, an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding <u>clause (z)</u>), in each case, with respect to such payment, prepayment or repayment; and

(2)　　such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this <u>Section 8.15(b)</u>.

(c)　　Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding <u>clause (a)</u> or under the indemnification provisions of this Agreement.

(d)　　In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding <u>clause (a)</u>, from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf)  (such unrecovered amount, an "<u>Erroneous Payment Return Deficiency</u>"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Term Loans (but not its Term Loan Commitments) of the relevant class with respect to which such Erroneous Payment was made (the "<u>Erroneous Payment Impacted Class</u>") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Term Loans (but not Term Loan Commitments) of the Erroneous Payment Impacted Class, the "<u>Erroneous Payment Deficiency Assignment</u>") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption Agreement as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment,

and such Lender shall deliver any Notes evidencing such Term Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Term Loan Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Term Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Term Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Term Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Term Loan Commitments of any Lender and such Term Loan Commitments shall remain available in accordance with the terms of this Agreement. In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Term Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender or Secured Party under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)    The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making such Erroneous Payment.

(f)    To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)    Each party's obligations, agreements and waivers under this Section 8.15 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender the termination of the Term Loan Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE IX
## MISCELLANEOUS

**9.1    Waivers, Amendments; etc**. The provisions of this Agreement, including the closing conditions set forth herein, may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders:

(a)        that no amendment, waiver or consent shall:

(1)        extend or increase the Commitment of any Lender or subject a Lender to any additional obligations, without the written consent of such Lender,

(2)        reduce the principal of, or interest on, the Loans or any fees or other amounts payable to any Lender hereunder without the written consent of such Lender; <u>provided</u>, that, notwithstanding the foregoing or anything else in this clause (a), any waiver or modification to the MFN Adjustment shall require the consent of each Lender adversely affected thereby except to the extent in connection with (A) a "first out" or "priming" Incremental Term Loan incurred in accordance with clause (6) below, (B) Senior Indebtedness incurred in accordance with clause (8) below, or (C) any other Incremental Term Loan with respect to which a ratable opportunity to participate is offered to all Lenders, in each of which such cases such MFN Adjustment may be waived or amended by the Supermajority Lenders;

(3)        postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable to any Lender hereunder, or any scheduled reduction of Commitments, without the written consent of such Lender,

(4)        reduce the percentage of Lenders which shall be required for the Lenders or any of them to take any action hereunder, or the definition of "Required Lenders" or "Supermajority Lenders", unless in writing and signed by all the Lenders,

(5)        discharge the Borrower from its obligations under the Loan Documents, unless in writing and signed by all the Lenders,

(6)        subject to clause (8) below with respect to Senior Priority Indebtedness, other than in connection with amendments to this Agreement to allow for a "first out" or "priming" Incremental Term Loan to the extent the opportunity to ratably participate in such Incremental Term Loan is offered to all Term Loan Lenders (in each case, which shall only require consent of the Supermajority Lenders), amend <u>Section 2.8</u> or this <u>Section 9.1</u>, or any other provision of this Agreement or any other Loan Document in a manner that would alter the pro rata sharing or application of payments, or the pro rata treatment of the Lenders, or alter any payment waterfall or the priority or order of application of any proceeds or payments, unless in writing and signed by all Lenders (it being understood and agreed that any separate "agreement among lenders" executed and/or acknowledged by the Lenders shall not constitute a "Loan Document" for purposes of this subclause (6)),

(7)        release the security interest in all or substantially all of the Collateral granted to the Administrative Agent, for the benefit of the Secured Parties, under the Security Documents unless agreed in writing by all the Lenders or except as specifically permitted hereby or thereby as of the Closing Date,

(8)        unless agreed in writing by all the Lenders, (x) to subordinate the priority of any of the Liens on all or substantially all Collateral in favor of the Administrative Agent, for the benefit of the Secured Parties, in favor of any other creditor of the Borrower or class of Lenders hereunder, (y) subordinate any of the Obligations in right of payment to any other indebtedness of the Borrower or indebtedness hereunder  or (z) subordinate the payment priority of the Loans as set forth in a post-default waterfall or any similar provision providing for payment priority among the Loans hereunder (any such payment senior Class, "<u>Senior Priority Indebtedness</u>") (or agree to any amendment, waiver or modification that would facilitate any of

the foregoing) (any such other indebtedness or other obligations, to which such liens securing any of the Obligations or such Obligations, as applicable, are subordinated, "Senior Indebtedness"), in either case of subclause (x), (y) or (z), unless (A) Supermajority Lenders shall have agreed and (B) each directly adversely affected Lender has been offered a *bona fide* opportunity to fund or otherwise provide its *pro rata* share (based on the amount of Loans that are directly adversely affected thereby held by each Lender in respect of such Term Loans) of the Senior Indebtedness on the same terms (other than *bona fide* backstop fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction; such fees and expenses, "Ancillary Fees") as offered to all other providers (or their affiliates) of the Senior Indebtedness and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its *pro rata* share of the fees and any other similar benefit (other than Ancillary Fees) of the Senior Indebtedness afforded to the providers of the Senior Indebtedness (or any of their affiliates) in connection with providing the Senior Indebtedness pursuant to a written offer made to each such adversely affected Lender describing the material terms of the arrangements pursuant to which the Senior Indebtedness is to be provided, which offer shall remain open to each such adversely affected Lender for a period of not less than five (5) Business Days; provided that:

      (A)    any Lender may designate any of its Affiliates to provide such priming Indebtedness on its behalf with the existing Obligations of such Lender being treated, for purposes hereof, as though such Lender had provided such priming Indebtedness itself;

      (B)    (A) any such offer may be made on a post-closing basis via syndication,

      (C)    (B) subordination to any capital lease or similar acquisition financing shall not be subject to the foregoing, and

      (D)    (C) for the avoidance of doubt, the foregoing shall not restrict the incurrence of any Indebtedness incurred by the Opco Parties;

      (9)    permit or facilitate the purchase, repayment or retirement for value of any Loans on a non-*pro rata* basis with respect to the other Loans of the same Class, unless such purchase, repayment or retirement is offered to all such Lenders holding Loans of the same Class on the same terms or all Lenders agree in writing;

      (b)    no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any Note;

      (c)    [reserved]; and

      (d)    any amendment, modification or consent expressly permitted by Section 2.12 shall be permitted to be made as referenced therein and shall not require the consent of the Required Lenders or any other Lender.

No failure or delay on the part of the Administrative Agent, any Lender or the holder of any Note in exercising any power or right under this Agreement or any Note shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise

thereof or the exercise of any other power or right. No notice to or demand on the Borrower in any case shall entitle it to any notice or demand in similar or other circumstances.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

**9.2    Payment Dates**.  Except as expressly provided in this Agreement, whenever any payment to be made hereunder by or to the Lenders or to the holder of any Note shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be included in computing the fees or interest payable on such next succeeding Business Day.

**9.3    Notices**.  All communications and notices provided under this Agreement shall be in writing by in writing (including email or facsimile transmission), telecopy or personal delivery and if to the Borrower addressed or delivered to the Borrower at its address shown on the signature page hereof or if to the Administrative Agent delivered to it at the address shown on **Schedule 9.3** attached hereto, or to any party at such other address as may be designated by such party in a notice to the other parties. Any notice shall be deemed given when transmitted by email, telecopier or, when personally delivered, if mailed properly addressed, shall be deemed given upon the third Business Day after the placing thereof in the United States mail, postage prepaid.

**9.4    Costs and Expenses**.  The Borrower agrees to pay, or reimburse, the Administrative Agent for all expenses reasonably incurred for the preparation of this Agreement, including exhibits, and the Loan Documents and any amendments hereto or thereto or consents or waivers hereunder or thereunder as may from time to time hereafter be required thereby or by the transactions contemplated hereby, including, but not limited to, the fees and out-of-pocket expenses of the Administrative Agent, charges and disbursements of special counsel to the Administrative Agent from time to time incurred in connection with the preparation and execution of this Agreement and any document relevant to this Agreement, including the Loan Documents, any amendments hereto or thereto, or consents or waivers hereunder or thereunder, and the consideration of legal questions relevant hereto and thereto. The Borrower agrees to pay, or reimburse, the Administrative Agent and each Lender upon demand for all costs and expenses (including attorneys', auditors' and accountants' fees and expenses) reasonably incurred and arising out of the transactions contemplated by this Agreement and the Loan Documents, in connection with any work-out or restructuring of the transactions contemplated hereby and by the Loan Documents and any collection or enforcement of the obligations of the Borrower hereunder or thereunder, whether or not suit is commenced, including attorneys' fees and legal expenses (limited to one (1) primary counsel for the Administrative Agent and, if deemed appropriate by the Administrative Agent, one (1) counsel in each relevant jurisdiction and any special counsel (except in the case of actual or perceived conflict, in which case one (1) additional counsel for each Lender similarly situated in respect of such conflict)) in connection with any appeal of a lower court's order or judgment. The obligations of the Borrower under this Section 9.4 shall survive any termination of this Agreement.

**9.5    Indemnification**.  In consideration of the execution and delivery of this Agreement by the Administrative Agent and the Lenders, the Borrower agrees to indemnify and hold harmless the Administrative Agent, each Lender and their respective Affiliates, officers, directors, employees,

shareholders, agents, successors and assigns (the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities and expenses (other than the expenses to be paid or reimbursed pursuant to Section 9.4 above), joint or several, to which any such Indemnified Party may become subject arising out of or in connection with this Agreement and the other transactions contemplated hereby, the Advances and the use of proceeds thereof in connection with any claim, litigation, investigation or proceeding (any of the foregoing, a "Proceeding") relating to any of the foregoing, regardless of whether any such Indemnified Party is a party hereto or whether a Proceeding is brought by a third party or by you, the Borrower or any Opco Party or Affiliate of a Opco Party, and to reimburse each such Indemnified Party within ten (10) days of receipt of an invoice for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; it being understood and agreed that the Borrower shall not be required to reimburse legal fees or expenses of more than one counsel to all Indemnified Parties, taken as a whole and in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel to each group of affected Indemnified Parties similarly situated taken as a whole (and, if reasonably necessary as determined by the Administrative Agent, a single local counsel for all Indemnified Parties taken as a whole in each relevant jurisdiction and, in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel in each relevant jurisdiction to each group of affected Indemnified Parties similarly situated taken as a whole); provided that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent (x) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Party or any Related Indemnified Party (as defined below), (y) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from a material breach of the material obligations of any Indemnified Party or any of its Related Indemnified Parties under this Agreement or any of the Loan Documents at a time when the Borrower has not breached its obligations hereunder in any material respect, or (z) they relate to any dispute solely among Indemnified Parties at a time when the Borrower has not breached its obligations hereunder or any other Loan Document in any material respect (other than any claims against the Administrative Agent in its capacity or in fulfilling its role as Administrative Agent, but not any other person or entity party to any such Proceeding).

Notwithstanding any other provision of this Agreement or any Loan Document, (i) no Indemnified Party or Related Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of any Indemnified Party and (ii) none of the Borrower, any of its Affiliates or any Indemnified Party or Related Indemnified Party shall be liable for any indirect, special, punitive or consequential damages incurred in connection with this Agreement or the transactions contemplated herein (provided that this provision shall not limit the Borrower's indemnification obligations set forth above). For purposes hereof, a "Related Indemnified Party" of an Indemnified Party means (1) any controlling person or controlled affiliate of such Indemnified Party, (2) the respective directors, trustees, officers, or employees of such Indemnified Party or any of its controlling persons or controlled Affiliates and (3) the respective agents or advisors of such Indemnified Party or any of its controlling persons or controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnified Party, controlling person or such controlled Affiliate; provided that each reference to a controlled Affiliate or controlling person in this paragraph pertains to a controlled Affiliate or controlling person involved in the negotiation of this Agreement and the other Loan Documents.

The Borrower shall not be liable for any settlement of any Proceedings effected without the Borrower's consent (which consent shall not be unreasonably conditioned, withheld or delayed), but if settled with the Borrower's written consent or if there is a final judgment for the plaintiff in any such Proceedings, the Borrower agrees to indemnify and hold harmless each Indemnified Party from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this Section 9.5.  The Borrower shall not, without the prior written consent of an Indemnified Party, effect any settlement or consent to the entry of any judgment of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Party, unless (i) such settlement includes an unconditional release of such Indemnified Party in form and substance reasonably satisfactory to such Indemnified Party from all liability on claims that are the subject matter of such Proceedings, and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party.

The provisions of this Section 9.5 shall survive termination of this Agreement and payment in full of the Notes.  This <u>Section 9.5</u> shall not apply with respect to Taxes, other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**9.6**     <u>**Severability**</u>.  Any provision of this Agreement, the Notes or any other Loan Document executed pursuant hereto which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, the Notes or any other Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

**9.7**     <u>**Headings**</u>.  The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions hereof.

**9.8**     <u>**Governing Law**</u>.  This Agreement and the Notes shall each be deemed to be a contract made under, governed by and interpreted pursuant to the internal laws (and not the law of conflicts) of the State of New York.

**9.9**     <u>**Successors and Assigns.**</u>

(a)     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns except that:  (i) the Borrower may not assign or transfer its rights hereunder without the prior written consent of all of the Lenders and the Administrative Agent; and (ii) any assignment by a Lender must be made in compliance with subsection (b) below and any participation by a Lender must be made in compliance with subsection (c) below.  Notwithstanding clause (ii) of this subsection (a), any Lender may at any time, without the consent of Borrower or the Administrative Agent, assign all or any portion of its rights under this Agreement and its Notes to a Federal Reserve Bank.  Except to the extent otherwise required by its context, the word "Lender" where used in this Agreement means and includes any such assignee and such assignee shall be bound by and have the benefits of this Agreement the same as if such holder had been a signatory hereto.

(b)     (i) Any Lender may, in accordance with applicable law, at any time assign to one or more banks or other entities that are Eligible Assignees all or a portion of its Commitments, Advances owing to it, and its rights and obligations under this Agreement in respect thereof in accordance with the provisions of this subsection (b).  Each assignment shall be of a constant, and not a varying, ratable percentage of the assigning Lender's rights and obligations under this Agreement and each Eligible Assignee shall assume a pro rata share of the assigning Lender's obligations determined by the percentage of the Commitments assigned for

the period from the effective date of the assignment through the Maturity Date.  Such assignment shall be substantially in the form of the Assignment and Assumption Agreement attached as **Exhibit E** hereto (the "Assignment and Assumption Agreement") and shall not be permitted hereunder unless:

(1)    the amount of the Loan or Commitment assigned by the assigning Lender pursuant to each assignment shall be at least $1,000,000 in the aggregate (or the entirety of such assigning Lender's Loan, if less), or

(2)    such assignment is to another Lender or an Affiliate of a Lender, in which case no minimum amount shall apply.

(ii) The consent of the Administrative Agent and, provided no Default or Event of Default then exists, the Borrower (which consents shall not be unreasonably withheld or delayed) shall be required prior to an assignment becoming effective with respect to a transferee which is not a Lender, an Affiliate of a Lender, or an Approved Fund.  The Borrower's consent shall be deemed to have been given unless the Borrower objects within ten (10) Business Days after receipt of notice of such assignment.  Notwithstanding anything herein to the contrary:

(1)    except to the extent otherwise agreed by the Required Lenders (and subject to a right of first offer to existing Lenders as described in clause (2) below), prior to the one-year anniversary of the Closing Date, no Lender may assign any portion of its Loans or Commitments hereunder other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund, and

(2)    from and after the one-year anniversary of the Closing Date, no Lender may assign any portion of its Loans or Commitments hereunder (other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund), unless the proposed assignor Lender notifies the Administrative Agent in writing of the proposed terms of such assignment and the Administrative Agent provides to each then-existing Lender an offer for all Lenders to purchase their pro rata portion of such Loans and Commitments being assigned, according to the percentages of their respective Loans and Commitments at the same terms agreed by the proposed assignee.

(A)    If any Lender does not notify the Administrative Agent in writing that such Lender agrees to purchase its pro rata share of such assigned Loans and Commitments at such proposed terms in its entirety within ten (10) Business Days of such offer, that portion of the assigned Loans and Commitments not accepted by the applicable Lenders shall be offered to the applicable accepting Lenders on a non-pro rata basis at the same proposed terms; and

(B)    If the applicable accepting Lenders do not accept the remainder of the proposed assigned Loans and Commitments at such proposed terms in its entirety on a non-pro rata basis within five (5) Business Days after such offer, that portion of the proposed assigned Loans and Commitments not accepted by the applicable accepting Lenders may be offered by the assigning Lender to any Persons that would constitute Eligible Assignees at such proposed terms.

(iii) Upon (i) delivery to the Administrative Agent of an executed Assignment and Assumption Agreement, together with any required consents and (ii) payment of a $3,500 fee to

the Administrative Agent for processing such assignment, such assignment shall become effective on the effective date specified in such Assignment and Assumption Agreement; provided, that:

(1)    if an assignment by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such assignment and

(2)    if an assignment by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such assignment (unless waived or reduced by the Administrative Agent).

(iv) On and after the effective date of such assignment, such transferee, if not already a Lender, shall for all purposes be a Lender party to this Agreement and any other Loan Documents executed by the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party hereto, and no further consent or action by the Borrower, the Lenders or the Administrative Agent shall be required to release the transferor Lender with respect to the percentage of the  Commitment and Advances assigned to such transferee Lender.    To the extent requested by the applicable Lenders, upon the consummation of any assignment pursuant to this Section 9.9, the Administrative Agent and the Borrower shall make appropriate arrangements so that replacement Notes are issued to such transferor Lender and new Notes or, as appropriate, replacement Notes, are issued to such transferee Lender, in each case in principal amounts reflecting their Commitment, as adjusted pursuant to such assignment.

(c)

(1)    Prior to the one-year anniversary of the Closing Date, no Lender may sell participations in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder) other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund;

(2)    From and after the one-year anniversary of the Closing Date, each Lender may, without the consent of the Borrower, sell participations to one or more banks or other entities that are Eligible Assignees in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of, and obligations under, Section 10.1 and of the cost protection provisions contained in Section 10.4, as well as Sections 9.19 and 10.6 to the extent of the Lender selling such participation and the Borrower's aggregate obligations with respect to Section 10.1 and Section 10.4 shall not be increased by reason of such participation, provided that such participant shall not be entitled to the benefits of Sections 10.1 and 10.4 unless such participant complies with Section 10.1(e) as (and to the extent) applicable, as if such participant were a Lender (it being understood that the documentation required under Section 10.1(e) shall be delivered to the participating Lender) (iv) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right (and shall not limit its rights) to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments,

modifications or waivers with respect to any fees payable hereunder (to the extent such participants are entitled to such fees) or the amount of principal of or the rate at which interest is payable on the Loans, or the dates fixed for payments of principal of or interest on the Loans). Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement.

(d)     The Administrative Agent shall maintain a copy of each Assignment and Assumption Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary.  It is the intent of the parties that the Obligations shall be treated as issued in registered form under Section 5f. 103-1(c) of the United States Treasury Regulations.  Upon the Administrative Agent's receipt of a duly completed Assignment and Assumption Agreement executed by an assigning Lender, an assignee Lender that is an Eligible Assignee and, to the extent required hereunder, the Borrower, such Eligible Assignee's completed Administrative Questionnaire (unless the assignee is already a Lender), the fee referred to in Section 9.9(b) above, and any written consent to such assignment required by such subsection, the Administrative Agent shall accept such Assignment and Assumption Agreement and record the information contained therein in the Register.  No assignment shall be effected for purposes of this Agreement unless it has been recorded in the Register as provided in this subsection.

(e)     Notwithstanding anything to the contrary contained in this Section 9.9, a Lender that is a fund that invests in bank loans may pledge all or a portion of its rights in connection with this Agreement to the trustee or other agent for holders of obligations owed, or securities issued, by such fund as security for such obligations or securities, provided that any foreclosure or other exercise of remedies by such trustee shall be subject, in all respects, to the provisions of this Section 9.9 regarding assignments.  No pledge described in the immediately preceding sentence shall release any such Lender from its obligations hereunder.

(f)     Except as specifically set forth in this Section 9.9, nothing in this Agreement, expressed or implied, is intended to or shall confer on any Person other than the respective parties hereto and thereto and their successors and assignees permitted hereunder and thereunder any benefit or any legal or equitable right, remedy or other claim under this Agreement or any Notes.

(g)     The provisions of this Section 9.9 shall not apply to any purchase of participations among the Lenders pursuant to Section 2.5.

(h)      In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with, with respect to Term Loans and its Applicable Term Loan Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(i)      Any Lender may assign all or any portion of its Term Loans hereunder to the Borrower or Opco Party (any such Person, a "Purchasing Party"), but only if, (i) such assignment is made solely in exchange for cash consideration, pursuant to a process open to all Lenders holding Loans of the same Class pursuant to customary procedures to be agreed between the Borrower and the Administrative Agent at the time of any such auction (including pursuant to a "Dutch auction" or "reverse Dutch auction," and which shall include the ability of the Borrower to purchase Term Loans at a discount to par) offered on a *pro rata* basis among Lenders holding Loans of the same Class, (ii) any such purchased Term Loans shall be automatically and permanently cancelled immediately upon acquisition thereof by the Purchasing Party and no longer outstanding for any purpose hereunder, (iii) [reserved], and (iv) no Event of Default has occurred or is continuing, or would result therefrom.

**9.10**    **Execution in Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**9.11**    **Several Liability**.  The Obligations of the Administrative Agent and each of the Lenders hereunder are several, not joint.

**9.12**    **Financial Information**.   The Borrower assumes responsibility for keeping itself informed of its own financial condition and the financial condition of any and all endorsers and/or other guarantors of all or any part of the Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Obligations, or any part thereof, that diligent inquiry would reveal, and the Borrower agrees that the Administrative Agent and the Lenders shall have no duty to advise the Borrower of information known to them regarding such condition or any such circumstances.

**9.13**    **Entire Agreement**.  Except as otherwise expressly provided herein, this Agreement and the other documents described or contemplated herein embody the entire agreement and understanding among the parties hereto and thereto and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

9.14     **Other Relationships**.   No relationship created hereunder or under any other Loan Document shall in any way affect the ability of the Administrative Agent or its Affiliates and each Lender or their respective Affiliates to enter into or maintain business relationships with the Borrower beyond the relationships specifically contemplated by this Agreement and the other Loan Documents.

9.15     **Consent to Jurisdiction**.   BORROWER HEREBY IRREVOCABLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NOTES OR ANY OTHER LOAN DOCUMENT AND HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.   EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING BY UNITED STATES CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OF COPIES OF SUCH PROCESS TO THE BORROWER'S ADDRESS REFERENCED IN <u>SECTION 9.3</u>. EACH PARTY AGREES THAT A JUDGMENT, FINAL BY APPEAL OR EXPIRATION OF TIME TO APPEAL WITHOUT AN APPEAL BEING TAKEN, IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.   NOTHING IN THIS SECTION SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY LENDER TO BRING ANY ACTION OR PROCEEDING AGAINST THE BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

9.16     **Waiver of Jury Trial**.   THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY NOTE, OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

9.17     **USA Patriot Act**.   Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Act.   The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

9.18     **Confidentiality**.

(a)     Each of the Administrative Agent, each Lender agree to maintain the confidentiality of information obtained by it pursuant to any Loan Document, except that such

information may be disclosed (i) with the Borrower's written consent, (ii) in any legal, judicial, administrative proceeding or compulsory process or otherwise as required by applicable law or regulations (in which case such Person agrees to promptly notify the Borrower to the extent practicable and permitted by applicable law); (iii) upon the request or demand of any Governmental Authority having jurisdiction over the Administrative Agent, such Lender or their respective Affiliates (in which case such Person agrees to, except with respect to any audit or examination conducted by bank accountants, any governmental bank or insurance regulatory authority exercising examination or regulatory authority, or any regulatory requests made by the National Association of Insurance Commissioners, promptly notify the Borrower to the extent lawfully permitted to do so); (iv) to officers, directors, trustees, agents, members, partners, equity holders, approved and managed funds, employees, attorneys, prospective investors, accountants and advisors of the Administrative Agent or any Lender who are informed of the confidential nature of such information and are or have been advised of their obligation to keep such information confidential solely on a need-to-know basis in connection with the transactions contemplated by this Agreement; (v) to any Affiliates of the Administrative Agent, any Lender (provided that any such Affiliate is advised of its obligation to retain such information as confidential) on a need-to-know basis in connection with the transactions contemplated by this Agreement; (vi) to the extent any such information becomes publicly available other than by reason of disclosure in breach of this Agreement; and (vii) in connection with the exercise or enforcement of any right or remedy under any Loan Document.

     **9.19**    **Replacement of Lenders**.  If the Borrower is entitled to replace a Lender pursuant to the provisions of Section 10.6, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.9), all of its interests, rights (other than its existing rights to payments pursuant to Sections 10.1 and 10.4 with respect to payments made prior to such assignment) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

        (a)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 9.9(b);

        (b)    such Lender shall have received payment of an amount equal to 100% of the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 10.5) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

        (c)    in the case of any such assignment resulting from a claim for compensation under Section 10.4 or payments required to be made pursuant to Section 10.1, such assignment will result in a reduction in such compensation or payments thereafter;

        (d)    such assignment does not conflict with applicable Laws; and

        (e)    in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**9.20**    [Reserved].

**9.21**    **Electronic Execution of Assignments and Certain Other Documents**.  The words "delivery," "execute," "execution," "signed," "signature," and words of like import in any Loan Document or any other document executed in connection herewith shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary neither the Administrative Agent nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent or such Lender pursuant to procedures approved by it and provided further without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

**9.22**    [Reserved].

## ARTICLE X
## TAXES, YIELD PROTECTION AND ILLEGALITY

**10.1**    **Taxes**.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)    Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws.  If any applicable Laws (as determined in the good faith discretion of the applicable withholding agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or the Borrower, then the Administrative Agent or the Borrower shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If the Borrower or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment on account of any obligation of the Borrower under any Loan Document, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code and provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after

any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 10.1</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)    If the Borrower or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment on account of any obligation of the Borrower under any Loan Document, then (A) the Borrower or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Borrower or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and, if paid by the Administrative Agent, the Administrative Agent shall provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 10.1</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    <u>Payment of Other Taxes by Borrower</u>.  Without limiting the provisions of subsection (a) above, Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    <u>Tax Indemnifications</u>.

(i)    The Borrower shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 10.1</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)    Each Lender shall, and does hereby, severally indemnify and shall make payment in respect thereof within ten (10) days after demand therefor, (A) the Administrative Agent against any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), and (B) the Administrative Agent and the Borrower, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 9.9(c)</u> relating to the maintenance of a Participant Register, and (C) the Administrative Agent and the Borrower, as applicable, against any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent or the Borrower in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as

to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent or the Borrower to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document or otherwise payable by the Administrative Agent or the Borrower from any other source against any amount due to the Administrative Agent or the Borrower under this clause (ii).

(d)    Evidence of Payments. As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority, as provided in this Section 10.1, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders; Tax Documentation.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.1(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable)  establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed originals of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate satisfactory to the Administrative Agent on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies (or originals, as required) of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their

obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(E)     the Administrative Agent shall deliver to the Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that the Administrative Agent is a U.S. Person exempt from U.S. federal backup withholding tax.

(iii)     Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 10.1 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     Treatment of Certain Refunds.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes ("Refund") as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 10.1, it shall pay to the Borrower an amount equal to such Refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 10.1 with respect to the Taxes giving rise to such Refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such Refund), provided that the Borrower, upon the request of the Recipient, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such Refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Borrower pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such Refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

(g)     Survival.  Each party's obligations under this Section 10.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**10.2    [Reserved]**.

**10.3    [Reserved]**.

**10.4    Increased Costs**.

(a)        [Reserved].

(b)        Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender, or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)        Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or such Lender's holding company, as the case may be, as specified in subsection (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)        Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 10.4 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

**10.5    [Reserved].**

**10.6    Mitigation Obligations; Replacement of Lenders.**

(a)        Designation of a Different Lending Office.  If any Lender requests compensation under Section 10.4, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 10.1, or if any Lender gives a notice pursuant to Section 10.2, then at the request of the Borrower, such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 10.1 or 10.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 10.2, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)        Replacement of Lenders.  If any Lender requests compensation under Section 10.4, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section

10.1 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 10.6(a) that eliminates the need to pay additional amounts for Indemnified Taxes under Section 10.1 or compensation under Section 10.4, the Borrower may replace such Lender in accordance with Section 9.19.

**10.7**    **Survival**.  All of the Borrower's obligations under this Sections 10.4 and 10.5 shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

**10.8**    **Amendment and Restatement**.    The Borrower, the Administrative Agent and the Lenders hereby agree that upon the effectiveness of the amendment and restatement of the Existing Holdco Note by this Agreement, the terms and provisions of the Existing Holdco Note shall be and hereby are amended and restated in their entirety by the terms and provisions of this Agreement.  By execution of this Agreement each party hereto hereby agrees that (i) this Agreement is given as a substitution for, and not as a payment of, the obligations of the Borrower and the other obligors existing under the Existing Holdco Note prior to the effectiveness of this Agreement and (ii) this Agreement does not constitute a novation of the Existing Holdco Note.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**"BORROWER"**

**WASH & WAX HOLDINGS LLC**, a Delaware limited liability company

By:_____

    Name:

    Title:

**"ADMINISTRATIVE AGENT"**

**BRIGHTWOOD LOAN SERVICES LLC**, in its
capacity as Administrative Agent

By:_____

    Name:

    Title:


By:_____

    Name:_

    Title:


Address:  810 Seventh Avenue, 26th Floor

          New York, NY 10019

          Attention: _____

**"LENDER"**

**BRIGHTWOOD LOAN SERVICES LLC**, in its capacity as a Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Address:  810 Seventh Avenue, 26th Floor
    New York, NY 10019
    Attention: Sam Sullivan, Mia Ellis and Brett Murray

**"LENDER"**[4]

_____, in its capacity as a Lender

By:_____
    Name:
    Title:

Address: _____

---

[4] NTD: Lender sig pages and allocations to be confirmed.

*[Different first page link-to-previous setting changed from off in original to on in modified.].*

**"LENDER"**

_____, in its capacity as a Lender

By: _____

    Name:

    Title:

Address: _____

**<u>Exhibit B(ii)</u>**

**New OpCo Credit Agreement**

**AMENDED AND RESTATED OPCO CREDIT AGREEMENT**

**DATED APRIL 30, 2025 and**

**BY AND BETWEEN**

**WASH & WAX SYSTEMS LLC**
**as Borrower,**

**WASH & WAX INTERMEDIATE LLC**
**as Holdings,**

**THE OTHER LOAN PARTIES WHICH ARE PARTY HERETO,**

**THE LENDERS AND L/C ISSUERS WHICH ARE PARTY HERETO**

**AND**

**BRIGHTWOOD LOAN SERVICES LLC**
**as Administrative Agent**

## TABLE OF CONTENTS

**Page**

### ARTICLE I DEFINITIONS AND OTHER TERMS

| | | |
|---|---|---|
| 1.1 | Defined Terms | 2 |
| 1.2 | Other Interpretive Provisions | 39 |
| 1.3 | Accounting Terms; Payment Dates | 40 |
| 1.4 | References to Agreements, Laws, Etc | 40 |
| 1.5 | Times of Day | 40 |
| 1.6 | Interest Rates | 41 |

### ARTICLE II THE ADVANCES

| | | |
|---|---|---|
| 2.1 | The Advances | 41 |
| 2.2 | Election by Borrower | 52 |
| 2.3 | Payments | 53 |
| 2.4 | Setoff; etc | 53 |
| 2.5 | Sharing | 53 |
| 2.6 | Fees | 54 |
| 2.7 | Lending Branch | 54 |
| 2.8 | Application of Payments and Collections | 54 |
| 2.9 | [Reserved] | 55 |
| 2.10 | Defaulting Lenders | 55 |
| 2.11 | Rates | 57 |
| 2.12 | Benchmark Replacement Setting for Term Loans | 57 |

### ARTICLE III CONDITIONS PRECEDENT

| | | |
|---|---|---|
| 3.1 | Conditions Precedent to Effectiveness | 59 |
| 3.2 | Conditions Precedent to All Advances | 62 |

### ARTICLE IV REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 4.1 | Organization; etc | 62 |
| 4.2 | Due Authorization | 62 |
| 4.3 | Subsidiaries | 63 |
| 4.4 | Validity of the Agreement | 63 |
| 4.5 | Financial Statements | 63 |
| 4.6 | Litigation; etc | 64 |
| 4.7 | Compliance with Law | 64 |
| 4.8 | ERISA Compliance | 64 |
| 4.9 | Title to Assets | 64 |
| 4.10 | Use of Proceeds | 64 |
| 4.11 | Governmental Regulation | 65 |
| 4.12 | Margin Stock | 65 |
| 4.13 | Investment Company Act | 65 |
| 4.14 | Accuracy of Information | 65 |

4.15   Tax Returns; Audits .................................................................................. 65
4.16   Environmental and Safety Regulations ....................................................... 65
4.17   Payment of Wages; Labor Matters .............................................................. 66
4.18   Intellectual Property ................................................................................... 66
4.19   Projections .................................................................................................. 66
4.20   Solvency ..................................................................................................... 67
4.21   No Material Adverse Occurrence ............................................................... 67
4.22   [Reserved] .................................................................................................. 67
4.23   Deposit Accounts ....................................................................................... 67
4.24   [Reserved]. ................................................................................................. 67
4.25   [Reserved]. ................................................................................................. 67
4.26   Valid Liens ................................................................................................. 67
4.27   Foreign Assets Control Regulations and Anti-Money Laundering ............. 67
4.28   Patriot Act .................................................................................................. 68
4.29   Insurance .................................................................................................... 68
4.30   SBA Matters ............................................................................................... 68

## ARTICLE V CERTAIN AFFIRMATIVE COVENANTS

5.1    Financial Information; etc ........................................................................... 68
5.2    Maintenance of Existence; etc .................................................................... 71
5.3    Maintenance of Properties .......................................................................... 71
5.4    Payment of Liabilities ................................................................................ 71
5.5    Compliance with Laws ............................................................................... 71
5.6    Books and Records; Inspection Rights; etc ................................................. 72
5.7    Insurance .................................................................................................... 72
5.8    ERISA ........................................................................................................ 73
5.9    Additional Subsidiary Guarantors; Post-Closing Requirements ................. 73
5.10   [Reserved] .................................................................................................. 74
5.11   Cash Management Systems ......................................................................... 74
5.12   Further Assurances ..................................................................................... 75
5.13   SBA Matters ............................................................................................... 75
5.14   OFAC; Patriot Act ...................................................................................... 75
5.15   Sale-Leaseback Accounting Treatment ....................................................... 75
5.16   Quarterly Lender Calls ............................................................................... 75

## ARTICLE VI FINANCIAL COVENANTS AND NEGATIVE COVENANTS

6.1    Financial Covenants .................................................................................... 76
6.2    Limitations on Indebtedness ....................................................................... 77
6.3    Liens ........................................................................................................... 79
6.4    Sales of Assets ........................................................................................... 81
6.5    Liquidations, Mergers and Consolidations ................................................. 82
6.6    Investments ................................................................................................ 82
6.7    Transactions with Affiliates ....................................................................... 82
6.8    [Reserved]. ................................................................................................. 83
6.9    Amendment and Waiver .............................................................................. 83
6.10   Restricted Payments ................................................................................... 83
6.11   Payments in Respect of Certain Indebtedness ............................................ 84
6.12   Change in Business ..................................................................................... 85
6.13   Changes in Accounting, Name and Jurisdiction of Organization ............... 85

6.14    No Negative Pledges..................................................................................................85
6.15    Holding Company Status...........................................................................................86
6.16    Use of Proceeds .........................................................................................................86

## ARTICLE VII EVENTS OF DEFAULT

7.1    Events of Default .......................................................................................................86
7.2    Action If Event of Default .........................................................................................89
7.3    Remedies.....................................................................................................................89
7.4    Cash Collateral for Letters of Credit.........................................................................90

## ARTICLE VIII THE ADMINISTRATIVE AGENT

8.1    Appointment and Authorization .................................................................................90
8.2    Power ..........................................................................................................................90
8.3    Interest Holders ..........................................................................................................91
8.4    Employment of Counsel; etc......................................................................................91
8.5    Reliance ......................................................................................................................91
8.6    General Immunity .......................................................................................................91
8.7    Credit Analysis ...........................................................................................................92
8.8    Administrative Agent and Affiliates ..........................................................................92
8.9    Indemnification ..........................................................................................................92
8.10    Security Documents ...................................................................................................93
8.11    Collateral Matters.......................................................................................................93
8.12    Action by the Administrative Agent ..........................................................................93
8.13    Successor Administrative Agent .................................................................................95
8.14    Authorization to Enter into Intercreditor Agreements. ..............................................95
8.15    Erroneous Payments....................................................................................................95

## ARTICLE IX MISCELLANEOUS

9.1    Waivers, Amendments; etc .........................................................................................98
9.2    Payment Dates ..........................................................................................................100
9.3    Notices ......................................................................................................................100
9.4    Costs and Expenses...................................................................................................101
9.5    Indemnification ........................................................................................................101
9.6    Severability ...............................................................................................................102
9.7    Headings ...................................................................................................................102
9.8    Governing Law .........................................................................................................102
9.9    Successors and Assigns.............................................................................................103
9.10    Execution in Counterparts........................................................................................106
9.11    Several Liability .......................................................................................................107
9.12    Financial Information................................................................................................107
9.13    Entire Agreement......................................................................................................107
9.14    Other Relationships...................................................................................................107
9.15    Consent to Jurisdiction.............................................................................................107
9.16    Waiver of Jury Trial.................................................................................................107
9.17    USA Patriot Act .......................................................................................................108
9.18    Confidentiality ..........................................................................................................108
9.19    Replacement of Lenders ...........................................................................................108
9.20    Keepwell ...................................................................................................................109

9.21 Electronic Execution of Assignments and Certain Other Documents ........................................ 109
9.22 ABL/Term Intercreditor Agreement ........................................................................................... 109

## ARTICLE X TAXES, YIELD PROTECTION AND ILLEGALITY

10.1 Taxes ......................................................................................................................................... 110
10.2 Illegality .................................................................................................................................... 114
10.3 Inability to Determine Rates ..................................................................................................... 115
10.4 Increased Costs .......................................................................................................................... 115
10.5 Funding Losses .......................................................................................................................... 116
10.6 Mitigation Obligations; Replacement of Lenders ..................................................................... 117
10.7 Survival ..................................................................................................................................... 117
10.8 Amendment and Restatement .................................................................................................... 117

| | | |
|---|---|---|
| SCHEDULE I | - | Lenders/Commitments |
| SCHEDULE I-A | - | Units |
| SCHEDULE II | - | Specified Units |
| SCHEDULE III | - | Sunset Units |
| SCHEDULE 4.17 | - | Labor Matters |
| SCHEDULE 4.23 | - | Deposit Accounts |
| SCHEDULE 6.2(a) | - | Existing Indebtedness |
| SCHEDULE 6.2(s) | - | Existing Letters of Credit |
| SCHEDULE 6.3 | - | Existing Liens |
| SCHEDULE 6.6 | - | Permitted Investments |
| SCHEDULE 6.7 | - | Affiliate Transactions |
| SCHEDULE 9.3 | - | Administrative Agent's Office; Certain Addresses for Notices |
| ANNEX I | - | List of Jurisdictions in which the Borrower is Qualified to Do Business |
| ANNEX II | - | List of Subsidiaries; Jurisdictions of Incorporation and Qualification to do Business |
| EXHIBIT A | - | Form of Opco Term Note |
| EXHIBIT B | - | Form of Opco Revolving Loan Note |
| EXHIBIT C | - | Form of Opco Guaranty |
| EXHIBIT D | - | Form of Notice of Borrowing |
| EXHIBIT E | - | Form of Assignment and Assumption Agreement |
| EXHIBIT F | - | Compliance Certificate |

## AMENDED AND RESTATED OPCO CREDIT AGREEMENT

This AMENDED AND RESTATED OPCO CREDIT AGREEMENT (this "Agreement") effective as of the 30th day of April, 2025, by and between **WASH & WAX SYSTEMS LLC** ("Borrower"), **WASH & WAX INTERMEDIATE LLC** ("Holdings"), the other Loan Parties party hereto, the Lenders and L/C Issuers now or hereafter parties hereto, and **BRIGHTWOOD LOAN SERVICES LLC**, in its capacity as Administrative Agent for the Lenders.

**WHEREAS**, on February 5, 2025 (the "Petition Date"), Zips and certain of its Affiliates and Subsidiaries (each, a "Debtor" and, collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court");

**WHEREAS**, following the Petition Date, pursuant to an interim order entered by the Bankruptcy Court (the "Interim DIP Order") the Debtors entered into that certain Senior Secured Super-Priority Priming Debtor-In-Possession Credit Agreement, dated as of February 10, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the Debtors, certain lenders party thereto (the "DIP Lenders") and Brightwood Loan Services LLC, as administrative agent (the "DIP Administrative Agent"), consisting of (a) "new money" term loans in an aggregate principal amount of $30,000,000 and (b) subject to the entry of a final order by the Bankruptcy Court (the "Final DIP Order"), "roll up" term loans in an aggregate principal amount of $52,500,000;

**WHEREAS**, on February 5, 2025, the Debtors filed the Joint Plan of Reorganization of Zips Car Wash, LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (as amended, supplemented or modified from time to time, the "Plan of Reorganization") and related disclosure statement with the Bankruptcy Court;

**WHEREAS**, on February 21, 2025, an Official Committee of Unsecured Creditors was appointed in the Chapter 11 Cases (the "Official Committee");

**WHEREAS**, on March 17, 2025, the Debtors, the DIP Lenders, and the Official Committee entered into a global settlement with respect to certain outstanding issues and claims in the Chapter 11 Cases (the "Bankruptcy Settlement");

**WHEREAS**, the terms of the Bankruptcy Settlement were set forth in an amended Final DIP Order and an amended Plan of Reorganization, each of which were filed with the Bankruptcy Court on March 17, 2025;

**WHEREAS**, on March 18, 2025, the Bankruptcy Court entered the Final DIP Order and approved entry into the DIP Credit Agreement, and all actions contemplated thereby, on a final basis;

**WHEREAS**, on April 21, 2025, the Bankruptcy Court entered a confirmation order confirming the Plan of Reorganization (the "Confirmation Order") and on April 30, 2025, the Plan of Reorganization went effective (the "Plan Effective Date");

**WHERAS**, in connection with the Plan of Reorganization, on the Plan Effective Date, the Borrower acquired substantially all of the Debtors' assets (other than certain assets of the Debtors that were transferred to the Debtors' unsecured creditors), as set forth in the Plan of Reorganization, in exchange for, among other things, the issuance by the Borrower to Zips of that certain note and security agreement, dated as of the Plan Effective Date (as amended, restated, amended and restated, supplemented, or otherwise

1

modified from time to time prior to the date hereof, the "Existing Opco Note"), in the original principal amount of $225,000,000 (the "Existing Opco Obligations");

WHERAS, pursuant to the Plan of Reorganization, the Lenders acquired all of the Debtors' right title and interest in and to the Existing Opco Note;

WHEREAS, in connection with the Plan Effective Date, the Borrower has asked the Lenders to provide the Borrower with (a) a revolving credit facility in an aggregate principal amount of $15,000,000 and (b) a term loan facility in an aggregate principal amount of $225,000,000, which will consist solely of the converted Existing Opco Obligations;

WHEREAS, the Lenders are willing to make the foregoing revolving credit facility and term loan available to the Borrower, subject to the terms and conditions set forth in this Agreement and the Plan of Reorganization; and

WHEREAS, pursuant to and in accordance with the terms of the Plan of Reorganization, each Initial Term Loan Lender will exchange a portion of its Existing Opco Obligations for Initial Term Loans on a pro-rata basis;

NOW, THEREFORE, in consideration of the terms and conditions contained herein, and of any loans or extensions of credit heretofore, now or hereafter made to or for the benefit of the Borrower by the Lenders and the Administrative Agent, the parties hereto agree as follows:

<div align="center">

ARTICLE I
DEFINITIONS AND OTHER TERMS

</div>

1.1    **Defined Terms.**  The following terms when used in this Agreement shall, except where the context otherwise requires, have the following meanings:

"ABL Agent" means the administrative agent and/or collateral agent for the ABL Lenders under the ABL Facility and any successor, refinancing or replacement thereof.

"ABL Facility" means an asset-based lending facility with a borrowing base tied to accounts receivable and/or inventory or any other assets approved by Supermajority Lenders to be entered into by the Loan Parties, the ABL Agent and the ABL Lenders after the Closing Date on terms and pursuant to documentation reasonably satisfactory to the Supermajority Lenders.

"ABL Lenders" means the lenders under the ABL Facility and any successor, refinancing or replacement thereof.

"ABL/Term Intercreditor Agreement" means an intercreditor agreement executed in connection with an ABL Facility, to be entered into by and among the Administrative Agent and the ABL Agent, and acknowledged by the Loan Parties, in form and substance reasonably satisfactory to the Supermajority Lenders and the Borrower, as amended, restated, amended and restated, supplemented or otherwise modified or replaced from time to time.

"Acquisition" means (whether by purchase, exchange, issuance of Equity Interests or Equity Interests Equivalents, merger, reorganization, joint venture or otherwise) any transaction, or any series of related transactions by which the Borrower directly or indirectly (i) acquires any Person, which Person shall then become consolidated with the Borrower in accordance with GAAP, (ii) acquires all or substantially all of the assets of any Person or any business, division or product line thereof or the acquisition of a portfolio

of Real Property or leases of Real Property, (iii) acquires in excess of 50% of the Equity Interests or Equity Equivalents of any Person or otherwise causing such Person to become a Subsidiary of the Borrower, or (iv) merges, consolidates or otherwise enters into any other business combination with any Person to effect any of the transactions referred to in clauses (i), (ii) or (iii) above.

"<u>Actual Tunnel Volume</u>" means, for any period, the aggregate volume of tunnel car washes at each Mature Unit for such period.

"<u>Adjusted Term SOFR</u>" means, for purposes of any calculation, the rate per annum equal to Term SOFR for such calculation; <u>provided</u> that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"<u>Administrative Agent</u>" means Brightwood Loan Services LLC, as Administrative Agent for the Lenders, or any successor Administrative Agent hereunder.

"<u>Administrative Questionnaire</u>" means an administrative questionnaire to be completed and provided to the Administrative Agent in form and substance as provided by the Administrative Agent.

"<u>Advance</u>" means one or more advances under the Term Loan Commitments and/or Revolving Loan Commitments, as applicable.

"<u>Affiliate</u>" shall include, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with such Person.  For purposes of this definition, a Person shall be deemed to control another Person if the controlling Person owns or controls directly or indirectly twenty percent (20%) or more of the shares of stock, other Equity Interests or Equity Interests Equivalents or voting powers of the controlled Person.

"<u>Aggregate Commitments</u>" means the Commitments of all Lenders.

"<u>Agreement</u>" means this Opco Credit Agreement as originally executed and as amended, modified or supplemented from time to time.

"<u>Applicable Margin</u>" means, (i) for Term SOFR Loans, 5.50% per annum, and (ii) for Base Rate Loans, 4.50% per annum.

"<u>Applicable Revolving Loan Percentage</u>" means with respect to any Revolving Loan Lender at any time, the percentage (carried out to the ninth decimal place) of the total Revolving Loan Commitments represented by such Revolving Loan Lender's Revolving Loan Commitment at such time.  If the Revolving Loan Commitments of each Revolving Loan Lender have been terminated or if the Aggregate Commitments have expired, then the Applicable Revolving Loan Percentage of each Revolving Loan Lender shall be determined based on the Applicable Revolving Loan Percentage of such Revolving Loan Lender most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Revolving Loan Percentage of each Lender is set forth opposite the name of such Lender on **<u>Schedule I</u>** or in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable.

"<u>Applicable Term Loan Percentage</u>" means with respect to any Term Loan Lender at any time, the percentage (carried out to the ninth decimal place) of the total Term Loan Commitments and the outstanding principal amount of the Term Loans represented by such Term Loan Lender's Term Loan Commitment and outstanding principal amount of the Term Loans owed to such Lender at such time.  If the Term Loan Commitments of each Term Loan Lender have been terminated or if the Aggregate Commitments have

expired, then the Applicable Term Loan Percentage of each Term Loan Lender shall be determined based on the Applicable Term Loan Percentage of such Term Loan Lender most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Term Loan Percentage of each Lender is set forth opposite the name of such Lender on **Schedule I** or in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Unused Margin" means 0.50% per annum.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 9.9(b).

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.12(d).

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Bankruptcy Settlement" has the meaning specified in the recitals hereto.

"Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the sum of (x) the Adjusted Term SOFR calculated for each such day based on an Interest Period of three months determined two (2) Business Days prior to such day (but for the avoidance of doubt, not less than one percent (1.0%) per annum), plus (y) one percent (1.0%), in each instance, as of such day. For the avoidance of doubt, the Base Rate shall not at any time be less than 2.00% per annum. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate, the Adjusted Term SOFR shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR, as the case may be.

"Base Rate Loan" means any Advance accruing interest by reference to the Base Rate.

"Base Rate Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Benchmark" means, with respect to Term Loans, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.12.

"<u>Benchmark Replacement</u>" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)    Daily Simple SOFR for an interest period of one month or three months, as applicable; or

(b)    the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Adjustment</u>" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"<u>Benchmark Replacement Date</u>" means a date and time determined by the Administrative Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; <u>provided</u> that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

5

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12.

"Borrower" has the meaning specified in the recitals hereto.

"Brightwood" means Brightwood Loan Services LLC and any Affiliate thereof.

"Business Day" means any day on which commercial banks and foreign exchange markets are open for business in New York, New York.

"Capital Expenditures" means, for any Person for any period for which the amount thereof is to be determined, without duplication, the aggregate amount of all expenditures, whether or not made with proceeds of Indebtedness, by such Person and its Subsidiaries during such period for any purchase or other acquisition of any asset which is required to be classified as a fixed or capital asset on the consolidated balance sheet of such Person prepared in accordance with GAAP, but excluding (a) expenditures that would otherwise qualify as Capital Expenditures made in connection with the replacement, substitution, restoration or repair of fixed or capital assets to the extent financed (i) from insurance proceeds (or other

similar recoveries) paid on account of the loss of or damage to the assets being replaced, restored or repaired or (ii) with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (b) expenditures that would otherwise qualify as Capital Expenditures to the extent such expenditures constitute a reinvestment of Net Cash Proceeds from Dispositions permitted pursuant to Section 6.4 and expenditures to the extent that such expenditure is substantially contemporaneously reimbursable (and in any event within 60 days after such expenditures) to the Borrower or any of its Subsidiaries by a Person that is not a Loan Party or a Subsidiary thereof.

"Capital Lease" means, with respect to any Person, a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board) is required to be, classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligations" means, for any period for which the amount thereof is to be determined, any obligation of such Person to pay rent or other amounts under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Cash Rental Expense" means, for the relevant measurement period, all cash rental expense of the Borrower and its Subsidiaries actually paid during such measurement period, determined on a consolidated and combined basis, incurred under any rental agreements or leases, other than obligations in respect of any Capital Leases, calculated on a Pro Forma Basis; provided, that Cash Rental Expenses shall exclude (a) any common area maintenance expenses and (b) taxes; and provided, further, that for purposes of calculating Consolidated EBITDA such rental expenses paid in advance pursuant to clause (c) shall be deemed to be paid during the Test Period in which they would otherwise be due; and provided, further, rent that is deferred pursuant to an agreement shall be deemed paid on the date such rent arises or would be due and payable without giving effect to any agreement to defer such rent.

"Casualty Event" means any event that gives rise to the receipt by any Loan Party of any insurance proceeds (including business interruption insurance proceeds) or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, order, policy, rule, regulation or treaty, (b) any change in any law, order, policy, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, regulations or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, regulations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the occurrence of any of the following: (i) any Person (together with its Affiliates), directly or indirectly, other than the Permitted Holders (and their respective Affiliates), owns more than greater than fifty percent (50%) of the Equity Interests and Equity Interests Equivalents of the Parent, (ii) Holdings ceases to own and control, directly or indirectly, one hundred percent (100%) of the Equity Interests and Equity Interests Equivalents of the Borrower, or (iii) the occurrence of any "change of control" under the ABL Facility.

7

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Closing Date" means April 30, 2025.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all present and future assets and properties of the Borrower and the Guarantors, whether real or personal, tangible or intangible, in which Liens are granted or purported to be granted pursuant to the Security Documents; provided, that Collateral shall not include any Excluded Assets.

"Commitment" means, for each Lender, the aggregate amount of such Lender's commitment to fund Loans as set forth on **Schedule I**, as such amount may be modified from time to time pursuant to the terms hereof.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate in substantially the form set forth as **Exhibit F**, completed and signed by a Responsible Officer of the Borrower.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 10.5 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Amortization Expense" means the amount of amortization expense deducted in determining Consolidated Net Income.

"Consolidated Depreciation Expense" means the amount of depreciation expense deducted in determining Consolidated Net Income.

"Consolidated EBITDA" means, for any period for which the amount thereof is to be determined, an amount equal to Consolidated Net Income for such measurement period; plus (a) the following, without duplication, in each case the extent deducted in calculating such Consolidated Net Income:

(i) Consolidated Interest Expense during such period,

8

(ii) Consolidated Amortization Expense during such period,

(iii) Consolidated Depreciation Expense during such period,

(iv) Consolidated Tax Expenses paid or accrued during such period,

(v) [reserved],

(vi) (x) Transaction Expenses and (y)(a) costs, fees and expenses of the Loan Parties associated with the ABL Facility, (b) any costs, fees, expenses and premiums paid to the ABL Agent and the ABL Lenders in connection with the ABL Facility and (c) any costs, fees and expenses paid to legal counsel or other consultants of or advisors to the ABL Agent or any ABL Lender in connection with the ABL Facility,

(vii) the aggregate amount of all costs, fees and expenses, during such period relating to, whether or not consummated, Equity Issuances, Debt Issuances, Permitted Acquisitions, Permitted Investments, or Dispositions,

(viii) [reserved];

(ix) the aggregate amount of all charges and losses during such period related to the early termination or extinguishment of any indebtedness,

(x) the aggregate amount of all net losses from discontinued operations (that are accounted for as such under GAAP) incurred during such period,

(xi) the aggregate amount of all net losses from Dispositions (other than Dispositions in the ordinary course of business) incurred during such period,

(xii) the aggregate amount of director fees, indemnities and reimbursements for expenses incurred in connection with attending board meetings that are paid to board members during such period,

(xiii) the aggregate amount of any non-cash charges, losses or expenses (including tax reclassification related to tax contingencies in a prior period and the excess of rent expense due to the use of straight line rent for GAAP over Cash Rental Expense during such period) reducing Consolidated Net Income during such period, but excluding any non-cash charge relating to write-offs or write-downs of inventory or accounts receivable or representing amortization of a prepaid cash item that was paid but not expensed in a prior period,

(xiv) the aggregate amount of restructuring and similar charges or reserves, severance, recruiting, relocation costs or non-recurring integration costs; provided that (i) such costs are reasonably identifiable, factually supportable and, to the extent requested by the Administrative Agent, are disclosed in reasonable itemization and detail to the Administrative Agent and (ii) that the aggregate amount added pursuant to this clause (xiv), when combined with the amounts of adjustments made in such period pursuant to clauses (xv), (xviii) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period; provided, further, that the Transaction Expenses shall not be added back pursuant to this clause (xiv) and therefore shall not count against the maximum amount permitted to be added back hereunder,

(xv) the aggregate amount of other extraordinary, unusual and non-recurring cash losses and expenses; provided that the Borrower shall provide the Administrative Agent with notice and reasonable detail regarding the nature of such cash losses and expenses; provided further that the aggregate amount

added pursuant to this clause (xv), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xviii) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xvi) any other non-cash charges, write-downs, expenses, losses or items for such period, including any impairment charges or any non-cash costs and/or expenses incurred pursuant to any management equity plan, stock option plan or any other stock subscription or shareholder agreement, or due to the application of FASB ASC No. 815-10 regarding hedging activity, FASB ASC No. 350 regarding impairment of goodwill, FASB ASC No. 480-10 regarding accounting for financial instruments with debt and equity characteristics, and non-cash foreign currency exchange losses,

(xvii) proceeds received from any business interruption insurance in an amount representing the earnings for the applicable period that such proceeds are intended to replace and to the extent not otherwise included in Consolidated Net Income,

(xviii) the aggregate amount of all costs, fees and expenses during such period relating to the pre-opening of New Units; provided that (i) the aggregate amount of any such costs, fees and expenses added pursuant to this clause (xviii) with respect to any single New Unit shall not exceed $200,000 and (ii) the aggregate amount added pursuant to this clause (xviii), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xv) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xix) integration and other business optimization expenses, charges and losses incurred in such period; provided that (i) such costs are reasonably identifiable, factually supportable and, to the extent requested by the Administrative Agent, are disclosed in reasonable itemization and detail to the Administrative Agent and (ii) the aggregate amount added pursuant to this clause (xix), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xv) and (xviii) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xx) [reserved],

(xxi) charges, losses or expenses to the extent indemnified, insured, reimbursed or reimbursable or otherwise covered by a third party (so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within 365 days),

(xxii) [reserved],

(xxiii) to the extent decreasing Consolidated Net Income, cash payments, costs, fees, expense and charges related to earnout obligations, performance fees and payouts, or other contingent obligations and amounts deducted in respect of purchasing accounting required or permitted by GAAP,

(xxiv) losses resulting from accruals and reserves that are established or adjusted as a result of any Permitted Acquisition in accordance with GAAP (including any adjustment of estimated payouts on earn-outs) or changes as a result of the adoption or modification of accounting policies during such period,

(xxv) without duplication of Section 6.1(c), proceeds received of any Equity Cure Contribution; provided that amounts added back pursuant to this clause (xxv) shall only be included in Consolidated EBITDA for the purposes set forth in Section 6.1(c) and shall not be included in Consolidated EBITDA for any other purpose, and

(xxvi) additional items as mutually agreed upon in writing by the Borrower and the Administrative Agent,

and minus (b) to the extent added in calculating such Consolidated Net Income, the aggregate amount of:

(i) all non-cash charges increasing Consolidated Net Income (other than with respect to payments actually received and the reversal of any accrual or reserve to the extent not previously added back in any prior period accrual of revenue or recording of receivables in the ordinary course of business) during such period,

(ii) all net gains from discontinued operations (that are accounted for as such under GAAP) incurred during such period,

(iii) all extraordinary gains during such period,

(iv) all gains resulting from the early termination or extinguishment of any Indebtedness,

(v) the aggregate amount of all net gains from Dispositions (other than Dispositions in the ordinary course of business) incurred during such period, and

(vi) the excess of Cash Rental Expense over rent expense due to the use of straight line rent for GAAP during such period.

Notwithstanding the foregoing, (i) the (positive or negative) 4-Wall EBITDA contribution of each Specified Unit with respect to any period occurring after February 28, 2025, shall be disregarded in the calculation of Consolidated EBITDA, (ii) the (positive or negative) 4-Wall EBITDA contribution of each Sunset Unit with respect to any period occurring after February 28, 2025, shall be disregarded in the calculation of Consolidated EBITDA; provided, that to the extent any Sunset Unit's lease terms are either extended to a date later than the Extension Date or its operations are not permanently discontinued on or prior to the Extension Date, in either case, (1) this clause (ii) shall not be applicable with respect to any such Sunset Unit and (2) to the extent applicable, the deemed historical Consolidated EBITDA numbers set forth in the table below shall be adjusted in a manner acceptable to the Administrative Agent to reflect the same and (iii) Consolidated EBITDA for each fiscal month set forth below shall be deemed to be the corresponding amount set forth opposite such fiscal month in the table below:

| Fiscal Month Ending | Consolidated EBITDA |
|---|---|
| March 31, 2024 | $5,497,738 |
| April 30, 2024 | $6,048,147 |
| May 31, 2024 | $3,615,979 |
| June 30, 2024 | $4,501,179 |
| July 31, 2024 | $3,684,457 |
| August 31, 2024 | $5,122,340 |

| | |
|---|---|
| September 30, 2024 | $3,404,351 |
| October 31, 2024 | $4,576,456 |
| November 30, 2024 | $1,765,565 |
| December 31, 2024 | $2,622,707 |
| January 31, 2025 | $4,752,906 |
| February 28, 2025 | $4,785,987 |

"Consolidated Fixed Charges" means, for any period for which the amount thereof is to be determined, the sum, without duplication of (a) Consolidated Interest Expense to the extent paid or payable in cash for such period, and (b) the principal amount of all scheduled amortization payments on all Indebtedness of the Borrower and its Subsidiaries consisting of Indebtedness for borrowed money (including debt obligations evidenced by promissory notes and other instruments), the principal portion of capital lease obligations and purchase money indebtedness of the Borrower and its Subsidiaries paid or payable for such period; provided, that for the purposes of calculating Consolidated Fixed Charges for any date of measurement from and after the Closing Date until the first anniversary of the Closing Date, each of the amounts set forth in clause (a) and (b) above shall equal the product of (1) such amounts paid or payable during the period from Closing Date through the date of measurement, multiplied by (2) the amount equal to (i) 365, divided by (ii) the number of days during the period from the Closing Date through the date of measurement.

"Consolidated Interest Expense" means, for any period for which the amount thereof is to be determined, the consolidated interest expense of the Borrower and its Subsidiaries (other than deferred financing costs and debt issuance costs), including (i) all interest on Indebtedness (including imputed interest related to Capital Leases), (ii) all amortization of debt discount and expense, (iii) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers' acceptances, and (iv) Swap Obligations of such Person and its Subsidiaries, to the extent required to be reflected on the income statement of such Person on a consolidated basis in accordance with GAAP.

"Consolidated Net Income" means, for any fiscal period, the consolidated net income (or loss) of the Borrower and its Subsidiaries determined on a consolidated basis in accordance with Modified GAAP; provided that (i) revenues received during any such period from sales of unlimited car wash monthly memberships, whether or not such revenues are recognized in accordance with Modified GAAP, shall be included in such net income (to the extent not otherwise included therein), and (ii) there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

(a) the net income (or loss) of any Person (other than a Subsidiary of Holdings) in which any Person other than Holdings, Borrower or any of its Subsidiaries has an ownership interest, except to the extent that cash in an amount equal to any such income has actually been received by Holdings, Borrower or any of its Subsidiaries from such Person during such period,

(b) the net income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings, the Borrower or any of its Subsidiaries or that Person's assets are acquired by Holdings, the Borrower or any of its Subsidiaries,

(c) the net income of any Subsidiary of Holdings during such period to the extent that the declaration and/or payment of dividends or similar distributions by such Subsidiary of that income is not permitted by operation of the terms of its Organizational Documents or any agreement, instrument, order or other legal requirement applicable to that Subsidiary or its equity holders during such period,

(d) the cumulative effect of a change in accounting principles, and

(e) any net extraordinary gains or net extraordinary losses.

"Consolidated Tax Expenses" means federal, state and local income tax expenses of the Borrower.

"control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "controlled" has the meaning correlative thereto.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Declined Proceeds" has the meaning specified in Section 2.1(k)(9).

"Debt Issuance" means the issuance by any Person of any Indebtedness.

"Debtor" or "Debtors" has the meaning specified in the recitals hereto.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Default" means any Event of Default and any event which with the giving of notice or lapse of time, or both, would become an Event of Default.

"Default Interest" shall have the meaning set forth in Section 2.1(h)(3).

"Default Rate" means a simple interest rate per annum equal to the sum of the otherwise then applicable interest rate plus (i) two percent (2%). With respect to amounts bearing interest at the Default Rate, for purposes of the foregoing sentence, the words "otherwise then applicable interest rate" shall be deemed to mean the Base Rate plus the Applicable Margin with respect to Base Rate Loans and the Adjusted Term SOFR plus the Applicable Margin with respect to Term SOFR Loans, as applicable.

"Defaulting Lender" means, subject to Section 2.10(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans, including participations in respect of Letters of Credit, within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the L/C Issuers or any other Lender any other amount required to

13

be paid by it hereunder (including in respect of its participation in Letters of Credit) within two (2) Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent or the L/C Issuers in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (<u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity; underline{provided} that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.10(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each Lender promptly following such determination.

"DIP Credit Agreement" as defined in the preamble hereto.

"DIP Administrative Agent" has the meaning specified in the recitals hereto.

"DIP Lender" has the meaning specified in the recitals hereto.

"Disclosure Limitations" shall have the meaning set forth in Section 5.6.

"Disposition" means any sale, transfer, lease, exclusive license or other disposition of any property by any Person (including by way of issuance of Equity Interests of any Person).  "Dispose" has the meaning correlative thereto.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any Equity Interests or Equity Interests Equivalent into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition,

(a)       matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments),

(b)       provides for the scheduled payments of dividends in cash,

(c)      is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests of the applicable Person and except as permitted by clause (a) above), in whole or in part, or

(d)      is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests or Equity Interests Equivalents that would constitute Disqualified Equity Interests, in the case of each of clauses (a), (b), (c) and (d) hereof, prior to the date that is ninety-one (91) days after the latest Maturity Date at the time of issuance;

provided that if such Equity Interests or Equity Interests Equivalents are issued pursuant to a plan for the benefit of future, current or former employees, directors, or officers of Holdings, the Borrower or its Subsidiaries or by any such plan to such employees, directors or officers, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Holdings, the Borrower or any Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's or officer's termination, death or disability.

"Dollars" or "$" means the basic unit of the lawful currency of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States of America.

"ECP Rules" means the final rules issued jointly by the Commodity Futures Trading Commission and the Securities and Exchange Commission as published in 77 FR 30596 (May 23, 2012), as may amended, modified or replaced from time to time.

"Effective Yield" has the meaning set forth in Section 2.1(b)(3).

"Eligible Assignee" means any Person (other than a natural person) that meets the requirements to be an assignee under Section 9.9 (subject to such consents, if any, as may be required under Section 9.9(b)); provided that, a Defaulting Lender shall not be an Eligible Assignee.

"Equipment" means all equipment, furniture and fixtures held or maintained at the Real Property or otherwise used in the ownership or operation of the Units, together with all additions and accessions thereto and replacements therefor.

"Equity Cure Contribution" has the meaning set forth in Section 6.1(c).

"Equity Interests" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Equity Interests Equivalents" means all securities convertible into or exchangeable for Equity Interests and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Equity Interests, whether or not presently convertible, exchangeable or exercisable.

"Equity Issuance" means any sale or issuance of any Equity Interests or Equity Interests Equivalents of the Borrower or any direct or indirect parent of the Borrower or the contribution to the capital of the Borrower or any direct or indirect parent of the Borrower, in each case, the proceeds of which are contributed to the common equity of the Borrower or any of its Subsidiaries.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations promulgated and rulings issued thereunder and under the Code, in each case as in effect from time to time. References to sections of ERISA shall be construed to also refer to any successor sections.

"ERISA Affiliate" means any Person, including Affiliates or Subsidiaries of the Borrower, that is a member of any group of organizations or a controlled group of trades or businesses, as described in Sections 414(b), 414(c), 414(m) or 414(o) of the Code or Section 4001 of ERISA, of which the Borrower is a member.

"Erroneous Payment" has the meaning assigned to it in Section 8.15(a).

"Erroneous Payment Deficiency Assignment" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Impacted Class" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Return Deficiency" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Subrogation Rights" has the meaning assigned to it in Section 8.15(d).

"Event of Default" means any Event of Default described in Article VII.

"Excess Cash Flow" means, for any Excess Cash Flow Period without duplication:

    (a). the sum, without duplication, of:

        i. Consolidated EBITDA for such Excess Cash Flow Period;

        ii. the decrease, if any, in the Net Working Capital from the beginning to the end of such Excess Cash Flow Period; and

        iii. to the extent received in cash, the deduction in clause (b)(iii) of the definition of Consolidated EBITDA;

    (b). *minus*, the sum, without duplication, of:

        i. the amount of any Consolidated Tax Expense paid or payable by Borrower and its Subsidiaries in cash with respect to such Excess Cash Flow Period and the amount of any Tax Distributions with respect to such Excess Cash Flow Period;

        ii. Consolidated Interest Expense for such Excess Cash Flow Period;

        iii. the increase, if any, in the Net Working Capital from the beginning to the end of such Excess Cash Flow Period;

        iv. cash used for Capital Expenditures and Permitted Acquisitions (including with respect to fees and expenses and, with respect to any Permitted Acquisition, cash consideration, that are payable upon the closing of any Permitted Acquisition pursuant to any letter of intent or definitive purchase agreement with respect to such Permitted Acquisition to which the Borrower or any of its affiliates is a party), in each case to the extent financed with Internally Generated Funds;

     v.    the aggregate amount of all scheduled amortization payments of Indebtedness of the Borrower and its Subsidiaries to the extent funded with Internally Generated Funds;

    vi.    Restricted Payments pursuant to Section 6.10(e) paid in cash in accordance with the Loan Documents during such Excess Cash Flow Period;

    vii.    to the extent paid in cash, the add-backs in clauses (a)(vi), (a)(vii), (a)(xii), (a)(xiv), (a)(xv), (a)(xvii), (a)(xviii) and (a)(xxii) of the definition of Consolidated EBITDA; and

    viii.    the aggregate amount of add-backs in clause (a)(xix) of the definition of Consolidated EBITDA.

"Excess Cash Flow Period" means each fiscal year of the Borrower commencing with the fiscal year ending on December 31, 2026.

"Excluded Assets" means any of the following:

(a)    any lease, license, franchise, charter, authorization, contract or agreement to which any Loan Party is a party, and any of its rights or interest thereunder, or any property subject to a purchase money security interest, capital lease obligation or other arrangement, if and to the extent that the pledge thereof or the grant of a security interest,

    (i)

        (A)    is prohibited by or in violation of any law (including financial assistance laws, corporate benefit laws or otherwise), rule or regulation applicable to any Loan Party, except to the extent such prohibition is rendered ineffective under the Uniform Commercial Code,

        (B)    would be prohibited by the enforceable anti-assignment provisions of any contract (other than any such contract to which Holdings or any of its subsidiaries is the only counterparties) or law, rule or regulation applicable to any Loan Party or with respect to any assets, to the extent such a grant or security interest would violate the terms of any contract with respect to such assets or would trigger termination of such contract (including any purchase money security interest, capital lease obligation or other arrangement) or any such material rights therein pursuant to any "change of control" or other provision or applicable law (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other applicable law), in each case, excluding any such contract or other agreement solely among the Loan Parties and any of their subsidiaries or controlled affiliates, or

        (C)    requires any governmental or third party (other than a Loan Party or any of its subsidiaries or controlled affiliates) consent, approval, license or authorization that has not been obtained, except to the extent such limitation is rendered ineffective under the Uniform Commercial Code or other applicable law,

    (ii)    is prohibited by or in violation of a term, provision or condition of any such lease, license, franchise, charter, authorization, contract or agreement; provided,

however, that the Collateral shall include (and such security interest shall attach) at such time as the contractual or legal prohibition shall no longer be applicable and to the extent severable, shall attach to any portion of such lease, license, franchise, charter, authorization, contract or agreement not subject to the prohibitions specified in (i) or (ii) above (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other applicable Law in any relevant foreign jurisdiction); provided, further, that the exclusions referred to in this clause (a) shall not include any proceeds of any such lease, license, franchise, charter, authorization, contract or agreement;

(b)

(i)    Equity Interests or Equity Interests Equivalents that consist of the outstanding voting ownership interest of an Excluded Foreign Subsidiary,

(ii)    Equity Interests or Equity Interests Equivalents in joint ventures or any non-wholly owned subsidiaries, but only to the extent that (x) the Organizational Documents or other agreements with other equity holders of such joint ventures or non-wholly owned subsidiaries do not permit or restrict the pledge of such Equity Interests or Equity Interests Equivalents, or (y) the pledge of such Equity Interests or Equity Interests Equivalents (including any exercise of remedies) would result in a change of control, repurchase obligation or other adverse consequence to any of the Loan Parties or such subsidiary,

(iii)    Equity Interests or Equity Interests Equivalents of any Subsidiary that is a Subsidiary of a controlled foreign corporation as defined in the Code,

(iv)    margin stock,

(v)    any property or assets for which the creation or perfection of pledges of, or security interests in, would result in material adverse tax consequences to the Borrower or any of its subsidiaries as reasonably determined by the Borrower and the Administrative Agent; and

(c)    any "intent-to-use" application for registration of a trademark filed pursuant to section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" or "Amendment to Allege Use" pursuant to section 1(d) of the Lanham Act, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law;

(d)

(i)    [reserved],

(ii)    any fee interest in owned real property that is not Material Real Property, and

(iii)    any fixtures affixed to any real property to the extent a security interest in such fixtures may not be perfected by a UCC-1 financing statement or a similar filing in any relevant foreign jurisdiction in the jurisdiction of organization of the applicable Loan Party, or, solely in the case of fixtures affixed to any Material Real Property, to the extent a security interest in such fixtures may not be perfected by the recording of a mortgage or

18

UCC-1 financing statement in the jurisdiction where such Material Real Property is located;

(e)      motor vehicles, aircraft and other assets subject to certificates of title, except to the extent a security interest therein can be perfected by the filing of a UCC-1 financing statement;

(f)      letter of credit rights, except to the extent constituting supporting obligations in respect of other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a Uniform Commercial Code financing statement or a similar filing in any relevant foreign jurisdiction (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC-1 financing statement);

(g)      assets, if and to the extent that a security interest in such asset:

(i)      is prohibited by or in violation of any Law, rule or regulation applicable to any Loan Party or

(ii)      requires a consent (to the extent that any Loan Party has sought such consent using its commercially reasonable efforts) of any Governmental Authority, the lessor of any leased property or any third party that has not been obtained, except, in the case of clauses (i) and (ii), to the extent such prohibition or consent is rendered ineffective under the Uniform Commercial Code;

(h)      commercial tort claims that, in the reasonable determination of the Borrower, are not expected to result in a judgment in excess of $500,000;

(i)      (v) accounts holding cash collateral in respect of letters of credit permitted to be incurred pursuant to Sections 6.2(s) or 6.2(x), (w) payroll and other employee wage and benefit accounts, (x) tax accounts (including sales tax accounts), and (y) fiduciary or trust accounts, in each case of clauses (w) through (y), the funds or other property held in or maintained in any such account (as long as the accounts described in such clauses (w) through (y) are used solely for such purposes), and (z) any other accounts so long as, with respect to this clause (z), the aggregate amount on deposit in each such account does not exceed $150,000 at the end of any business day and the aggregate amount on deposit in all such accounts does not exceed $500,000 at the end of any business day; and

(j)      assets in circumstances where the cost of obtaining a security interest in such assets, including the cost of title insurance, surveys or flood insurance (if necessary) would be excessive in light of the practical benefit to the Lenders afforded thereby as reasonably determined by the Borrower and the Administrative Agent.

"Excluded Foreign Subsidiary" means any direct or indirect Subsidiary of a Loan Party (i) that is a "controlled foreign corporation" as defined in the Code, (ii) all or substantially all of the assets of which consist of stock of one or more subsidiaries described in clause (i) above, or (iii) that is owned, directly or indirectly, by one or more Subsidiaries described in clause (i) above, in each case that has not previously guaranteed or pledged any of its assets or suffered a pledge of more than 65% of its voting stock, to secure, directly or indirectly, any indebtedness of the Borrower or any Guarantor that is a U.S. Person.

"Excluded Swap Obligation" means, with respect to Borrower, any Affiliate of Borrower or Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Borrower, such Affiliate or such Guarantor of, or the grant by such Borrower, such Affiliate or such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the

Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Borrower's, such Affiliate's or such Guarantor's failure for any reason not to constitute an "Eligible Contract Participant" as defined in Section 1a(18) of the Commodity Exchange Act (and the regulations thereunder), as further defined and modified by the ECP Rules (determined after giving effect to Section 9.20 and any other keepwell, support or other agreement for the benefit of such Borrower, such Affiliate or such Guarantor and any and all Guarantees of such Borrower's, such Affiliate's or such Guarantor's Swap Obligations by any other Borrower, Affiliate or the Guarantor), at the time the applicable Swap Obligation was entered into and at such other relevant time as provided in the ECP Rules or any other applicable law and to the extent that the providing of such Guarantee or the granting of such security interest by such Borrower, such Affiliate or such Guarantor would violate the ECP Rules or any other applicable law.  If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such Guarantee or Lien is or becomes excluded in accordance with the first sentence of this definition.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender or L/C Issuer, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender or L/C Issuer, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender or L/C Issuer with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender or L/C Issuer acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 9.19), or (ii) such Lender or L/C Issuer changes its lending office, except in each case to the extent that, pursuant to Section 10.1(a)(ii), (a)(iii) or (c), amounts with respect to such Taxes were payable either to such Lender's or L/C Issuer's assignor immediately before such Lender or L/C Issuer became a party hereto or to such Lender or L/C Issuer immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 10.1(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Opco Note" has the meaning specified in the recitals to this Agreement.

"Existing Opco Obligations" has the meaning specified in the recitals to this Agreement.

"Extension Date" means (i) in the case of the Unit located at 9500 North Rodney Parham Road in Little Rock, Arkansas, May 31, 2025, (ii) in the case of the Unit located at 4311 North State Line Avenue in Texarkana, Texas, July 31, 2025, and (iii) in the case of any other Sunset Unit, April 30, 2026.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for

such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing reasonably selected by it.

"Fee Letter" means that certain opco fee letter, dated as of the date hereof, by and between the Administrative Agent and the Borrower, providing for payment of the fees described therein, as amended, restated, supplemented or otherwise modified from time to time.

"Final DIP Order" has the meaning specified in the recitals hereto.

"Financial Covenants" the covenants, agreements and obligations set forth in Sections 6.1(a) and 6.1(b).

"First Lien Debt" means, as of any date of determination, Indebtedness of the type described in clauses (a), (b), (e), (f), (h) and (i) of the definition of Indebtedness (but in the case of clause (i) solely to the extent Guaranteeing Indebtedness described in clauses (a), (b), (d), (f) (but, in the case of earn-out obligations, only to the extent not paid when due) and (h)) that is secured by a first priority Lien on any assets of the Borrower, Holdings or any other Loan Party (and which Lien is not expressly subordinated or junior to the Liens securing the Obligations); provided that First Lien Debt shall not include Indebtedness in respect of letters of credit, except to the extent of drawn and unreimbursed amounts thereunder.

"First Lien Leverage Ratio" means, as of any date of determination, on a consolidated basis, the ratio of (a) First Lien Debt of the Borrower and its Subsidiaries as of such date to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for the Test Period ending on the last day of such fiscal quarter.

"Fixed Charge Coverage Ratio" means, as of any date of determination, the ratio of: (a) Consolidated EBITDA for the then most recently ended Test Period *minus* (i) the aggregate amount of Capital Expenditures made by Borrower and its Subsidiaries for such period to the extent funded with Internally Generated Funds, *minus* (ii) all cash payments in respect of Consolidated Tax Expenses and, without duplication, Tax Distributions, made by the Borrower and its Subsidiaries during such period; to (b) Consolidated Fixed Charges for such period.

"Flood Insurance Laws" collectively, (i) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" means a rate of interest equal to 1.00% per annum.

"Foreign Lender" means, with respect to any Borrower (a) if such Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

21

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time; provided, that no change in the accounting principles used in the preparation of any financial statement hereafter adopted by the Borrower or any other Loan Party shall be given effect for purposes of measuring compliance with any provision of this Agreement unless the Borrower, Administrative Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP; provided, further that no effect shall be given to any change in GAAP for purposes of measuring compliance with any provision of this Agreement that would require leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee(s)" means all direct and indirect guarantees, sales with recourse, endorsements (other than for collection or deposit in the ordinary course of business) and other obligations (contingent or otherwise, including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) by any Person to pay, purchase, repurchase or otherwise acquire or become liable upon or in respect of any Indebtedness of any other Person, and, without limiting the generality of the foregoing, all obligations (contingent or otherwise) by any Person to purchase products, supplies or other tangible property or services for any Person under agreements requiring payment therefor regardless of the non-delivery or non-furnishing thereof, or to make investments in any other Person, or to maintain the capital, working capital, solvency or general financial conditions of any other Person, or to indemnify any other Person against and hold him harmless from damages, losses and liabilities, all under circumstances intended to enable such other Person or Persons to discharge any Indebtedness or to comply with agreements relating to such Indebtedness or otherwise to assure or protect creditors against loss in respect of such Indebtedness.  The amount of any Guarantee shall be deemed to be the amount of the Indebtedness of, or damages, losses or liabilities of, the other Person or Persons in connection with which the Guarantee is made or to which it is related unless the obligations under the Guarantee are limited to a determinable amount, in which case the amount of such Guarantee shall be deemed to be such determinable amount.  The term "Guarantee" as a verb has a corresponding meaning. For the avoidance of doubt, the keepwell provided by Borrower, any Affiliate of Borrower or any Guarantor in Section 9.20 shall constitute a Guarantee.

"Guarantor(s)" means, collectively, (i) Holdings, (ii) any Domestic Subsidiary that becomes a Guarantor in accordance with Section 5.9, and (iii) any other Person who executes and delivers a Guaranty of the Obligations, jointly and severally.

"Guaranty" means, individually or collectively, as the case may be, the Opco Guaranty made by the Guarantors in favor of Administrative Agent for the benefit of the Secured Parties in form substantially as attached hereto as **Exhibit C**.

"Holdco Credit Agreement" means that certain Credit Agreement, dated as of the Closing Date, by and among Parent, as the borrower, Brightwood, as the administrative agent, and the lenders from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time.

"Holdco Facility" means the credit facility provided pursuant to the Holdco Credit Agreement.

"Holdings" has the meaning specified in the recitals hereto.

"Impacted Loans" has the meaning set forth in Section 10.3(b).

"Improvements" means the buildings, and other facilities, amenities and improvements to be erected on the Real Property.

"Incremental Effective Date" has the meaning set forth in Section 2.1(b)(1).

"Incremental Facility" has the meaning set forth in Section 2.1(b)(1).

"Incremental Facility Notice" has the meaning set forth in Section 2.1(b)(1).

"Incremental Term Loan" has the meaning set forth in Section 2.1(b)(1).

"Incremental Term Loan Commitment" has the meaning set forth in Section 2.1(b)(1).

"Indebtedness" means, as to any Person at a particular time, without duplication, the following: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) net obligations of such Person under any Swap Contract; (d) all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses payable in the ordinary course of business and (A) not overdue by more than 90 days or (B) to the extent overdue by more than 90 days, are being contested by such person by appropriate proceedings in good faith), (ii) any earn-out obligation to the extent such obligation is not required to be reflected on such Person's balance sheet in accordance with GAAP, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business); (e) indebtedness in respect of the foregoing (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (f) all Capital Lease Obligations; (g) all obligations of such Person in respect of Disqualified Equity Interests; (h) the principal balance of synthetic leases or other off-balance sheet financing arrangements; and (i) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of consolidated Indebtedness. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) (to the extent that such Indebtedness is non-recourse to such Person for amounts in excess of the value of the property securing such Indebtedness) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Parties" has the meaning specified in Section 9.5.

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower or Guarantor under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"<u>Initial Term Loan</u>" means Loans made pursuant to <u>Section 2.1(a)(1)</u>.

"<u>Initial Term Loan Commitment</u>" means, for each Lender, the aggregate amount appearing opposite of such Lender's name under the heading "Initial Term Loan Commitments" as set forth on **Schedule I** or as set forth in an Assignment and Assumption Agreement delivered pursuant to <u>Section 9.9(b)</u>, as such amount may be modified from time to time pursuant to the terms hereof, including as a result of any Incremental Term Loans; <u>provided</u>, <u>that</u>, it is understood and agreed that, as of the Closing Date, no Lender shall have any Initial Term Loan Commitment.

"<u>Initial Term Loan Lender</u>" means each Lender that has an Initial Term Loan Commitment or to which an Initial Term Loan is owed.

"<u>Interest Payment Date</u>" has the meaning set forth in <u>Section 2.1(i)(4)(C)</u>.

"<u>Interest Period</u>" means with respect to any Term SOFR Loan, the period commencing on the date the relevant Advance is made and ending on the date which is one (1), three (3) or six (6) months thereafter, as selected by the Borrower by irrevocable written notice to the Administrative Agent not less than three (3) Business Days prior to the date the relevant Advance is made and each subsequent one (1), three (3) or six (6) month period thereafter, as selected by the Borrower by irrevocable written notice to the Administrative Agent not less than three (3) Business Days prior to the last day of the then-current Interest Period with respect thereto. For purposes of determining an Interest Period, a month means a period starting on one day in a calendar month and ending on a numerically corresponding date in the next calendar month. Notwithstanding the foregoing, however, (i) any applicable Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any applicable Interest Period which begins on a day for which there is no numerically corresponding day in the calendar month during which such Interest Period is to end shall (subject to clause (i) above) end on the last day of such calendar month, (iii) no Interest Period shall extend beyond the Revolver Maturity Date or Term Loan Maturity Date, as applicable, or such earlier date as would interfere with the Borrower's repayment obligations hereunder, (iv) [reserved] or (v) no tenor that has been removed from this definition pursuant to <u>Section 2.12(d)</u> shall be available for specification by the Borrower in such written notice to the Administrative Agent. For the avoidance of doubt, notwithstanding any selection by Borrower of an Interest Period of longer than one (1) month, interest shall be payable on each Loan in accordance with <u>Section 2.1(i)(4)(C)</u>.

"<u>Interim DIP Order</u>" has the meaning specified in the recitals hereto.

"<u>Internally Generated Funds</u>" means funds not constituting the proceeds of any Indebtedness, Debt Issuance, Equity Issuance, Disposition or Casualty Event (in each case, without regard to the exclusions from the definitions thereof).

"<u>Investment</u>" means, with respect to any Person, any loan, advance or extension of credit (other than to customers in the ordinary course of business) by such Person to, or any Guarantee or other contingent liability with respect to the capital stock, Indebtedness or other obligations of, or any contributions to the capital of, any other Person, or any ownership, purchase or other acquisition by such Person of any interest in any capital stock, limited partnership interest, general partnership interest, or other

securities of any such other Person, other than an Acquisition; and "<u>Invest</u>," "<u>Investing</u>" or "<u>Invested</u>" means the making of an Investment.

"<u>Issue</u>" means, with respect to any Letter of Credit, to issue, extend the expiration date of, renew (including by failure to object to any automatic renewal on the last day such objection is permitted), increase the face amount of, or reduce or eliminate any scheduled decrease in the face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing.  The terms "<u>Issued</u>", "<u>Issuance</u>" and "<u>Issuer</u>" have correlative meanings.

"<u>Knowledge</u>" of the Borrower or Holdings means the actual knowledge of any Responsible Officer of the Borrower or Holdings, as applicable.

"<u>L/C Issuer</u>" means any Lender or an Affiliate thereof or a bank or other legally authorized Person, in each case, reasonably acceptable to the Administrative Agent and the Borrower, in such Person's capacity as an issuer of Letters of Credit hereunder; <u>provided</u>, <u>that</u>, the Borrower acknowledges and agrees that, as of the Closing Date, there is no L/C Issuer hereunder.

"<u>L/C Reimbursement Agreement</u>" has the meaning set forth in <u>Section 2.1(d)(1)(C)</u>.

"<u>L/C Reimbursement Date</u>" has the meaning set forth in <u>Section 2.1(d)(5)</u>.

"<u>L/C Reimbursement Obligation</u>" means, for any Letter of Credit, the obligation of the Borrower to the L/C Issuer thereof or to the Administrative Agent, as and when matured, to pay all amounts drawn under such Letter of Credit.

"<u>L/C Request</u>" has the meaning set forth in <u>Section 2.1(d)(2)</u>.

"<u>L/C Sublimit</u>" means $3,000,000; <u>provided</u>, that to the extent that, as of any date of determination, there is then no L/C Issuer under this Agreement, the L/C Sublimit shall be $0.00 as of such date.

"<u>Laws</u>" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"<u>Leases</u>" means each operating lease related to a Unit.

"<u>Lenders</u>" means (i) each Term Loan Lender and (ii) each Revolving Loan Lender, as the context may require.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"<u>Letter of Credit</u>" means documentary or standby letters of credit Issued for the account of the Borrower by L/C Issuers, and bankers' acceptances issued by the Borrower, for which the Administrative Agent and Lenders have incurred Letter of Credit Obligations.

25

"Letter of Credit Obligations" means all outstanding obligations incurred by the Administrative Agent and Lenders at the request of the Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the Issuance of Letters of Credit by L/C Issuers or the purchase of a participation as set forth in Section 2.1(e) with respect to any Letter of Credit.  The amount of such Letter of Credit Obligations shall equal the maximum amount that may be payable by the Administrative Agent and Lenders thereupon or pursuant thereto.

"Lien" means, with respect to any interest in Property (whether real, personal or mixed and whether tangible or intangible) (a) any interest or right which secures the payment of Indebtedness or an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute or contract, and whether or not choate, vested or perfected, including any such interest or right arising from a mortgage, charge, pledge, negative pledge or other agreement not to lien or pledge, assignments, security interest, conditional sale, levy, execution, seizure, attachment, garnishment, conditional sale, Capital Lease or trust receipt, or arising from a lease, consignment or bailment given for security purposes, and (b) any exception to or defect in the title to or ownership interest in such Property, including, as applicable, reservations, rights of entry, possibilities of reverter, encroachments, easements, rights of way, restrictive covenants, leases and licenses.  For purposes of this Agreement, the Borrower or any Subsidiary shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, Capital Lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"Liquidity" means, as of any date of determination, (i) the Unrestricted Cash of the Borrower and its Subsidiaries plus (ii) the Revolving Loan Unused Portion as of such date plus (iii) excess availability (or any similar term) under and as defined in the ABL Facility as of such date.

"Loan" means, individually or collectively, as the case may be, each Term Loan and each Revolving Loan.

"Loan Document(s)" means, individually or collectively, as the case may be, this Agreement (including, for the avoidance of doubt, any amendment of this Agreement), the Fee Letter, any Notes, the Guaranty, each Security Document, any ABL/Term Intercreditor Agreement, and all other documents, agreements and certificates executed or delivered in connection with or contemplated by this Agreement or any other document evidencing or securing a Loan or any other document that is mutually agreed by the Loan Parties and the Required Lenders to constitute a Loan Document, each as may be amended, modified or supplemented from time to time.

"Loan Party" means the Borrower and the Guarantors.

"Master Agreement" has the meaning set forth in the definition of Swap Contract.

"Material Adverse Occurrence" means any fact, circumstance or occurrence of any nature whatsoever (including any adverse determination in any litigation, arbitration, governmental investigation or proceeding) which taken alone or in combination with any other fact, circumstance or occurrence could reasonably be expected to have a material adverse effect on the (a) business, assets, financial condition or results of operations of Holdings, the Borrower and its Subsidiaries, taken as a whole, (b) rights and remedies of the Administrative Agent, taken as a whole, under any Loan Documents or (c) ability of the Loan Parties, taken as a whole, to perform their payment obligations under any Loan Documents; provided, that (i) the commencement of a proceeding under the Bankruptcy Code and the filing of the Chapter 11 Cases and (ii) the events and conditions related to or that led to the commencement of the Chapter 11 Cases, in each case, shall not constitute a Material Adverse Occurrence.

"Material Real Property" means any fee-owned Real Property having a fair market value, as reasonably determined by the Borrower in good faith, in excess of $1,000,000 as of the date the acquisition thereof (it being agreed that in no event shall an appraisal or other third-party valuation be required unless required by an applicable requirement of Law or requested by the Administrative Agent); *provided, however, that,* Material Real Property shall not include any fee-owned Real Property that constitutes Specified Real Estate.

"Mature Unit" means, as of any date of determination, any Unit that has been owned and operated by any Loan Party for at least 12 months, other than (a) any Unit that is not in operation as of such date, (b) any Unit that, as of such date, has been designated (or the Loan Parties intend to designate) for Disposition or closure, and (c) any Unit that, as of such date, has been designated (or the Loan Parties intend to designate) as a discontinued operation.

"Maturity Date" means the Revolver Maturity Date or the Term Loan Maturity Date, as applicable.

"Modified GAAP" means GAAP; provided that (a) sale-leaseback transactions in any financial statement shall be presented assuming that all consummated sale-leaseback transactions are successful sale-leaseback transactions for accounting purposes (i.e. consistent with the historical financial reporting practice of the Borrower prior to the Nineteenth Amendment Effective Date) and (b) no effect shall be given to any change in GAAP for purposes of financial reporting or measuring compliance with any provision of this Agreement resulting from the effectiveness of Accounting Standard Codification 842 (or any other accounting standards codification with substantially similar effect) that would (i) require the presentation of sale-leaseback transactions in a manner inconsistent with the presentation of sale-leaseback transactions described in clause (a) or (ii) otherwise cause leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"MFN Adjustment" has the meaning set forth in Section 2.1(b)(3).

"Moody's" means Moody's Investors Service, Inc., or any successor to the rating agency business thereof.

"Multiemployer Plan" means any multiemployer plan as defined in Sections 3(37) or 4001(a)(3) of ERISA of, or contributed to by, the Borrower, any of its Subsidiaries or any ERISA Affiliate.

"Net Cash Proceeds" means:

(a)      with respect to any Disposition by the Borrower or any Subsidiary or any Casualty Event, the aggregate cash or cash equivalents proceeds (including cash or cash equivalents proceeds received pursuant to policies of insurance (including business interruption insurance) and by way of deferred payment of principal pursuant to a note, installment receivable or otherwise, but only as and when received) received by any Loan Party pursuant to such Disposition or Casualty Event net of (i) the reasonable direct costs relating to such Disposition or Casualty Event actually incurred by the Borrower or any Subsidiary (including sales commissions and legal, accounting and investment banking fees, commissions and expenses), (ii) any portion of such proceeds deposited in an escrow account pursuant to the documentation relating to such Disposition or Casualty Event (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to the applicable Loan Party), (iii) taxes paid or reasonably estimated by any Loan Party to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), (iv) amounts necessary to make Tax Distributions in order to pay federal, state and local income taxes (if any) imposed on such Disposition or Casualty Event; provided that to the extent any such amounts are not in fact made as a permitted Tax Distribution, any amount so deducted shall be included as Net Cash Proceeds and be subject to Section

2.1(k)(4), and (v) amounts required to be applied to the repayment of any principal amounts of Indebtedness (other than the Obligations) secured by a Lien on the asset subject to such Disposition or Casualty Event; and

(b)      with respect to any issuance of debt securities or other incurrence of Indebtedness (other than Indebtedness incurred in accordance with Section 6.2), the aggregate cash proceeds received by Holdings, the Borrower or any Subsidiary pursuant to such issuance or receipt, net of the reasonable direct costs paid or reasonably estimated by any Loan Party to be payable as a result thereof relating to such issuance (including reasonable sales and underwriter's commission).

"Net Working Capital" means the total current assets (excluding cash and cash equivalents) of the Borrower and its Subsidiaries minus the total current liabilities (excluding current portion of any Indebtedness under this Agreement and the current portion of any other long-term Indebtedness which would otherwise be included therein (including Capital Lease Obligations), current interest and current taxes) of the Borrower and its Subsidiaries, determined in accordance with Modified GAAP.

"New Unit" a carwash facility acquired, leased or constructed by the Borrower or any Affiliate thereof that is not a Unit on the Closing Date.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 9.1 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note(s)" means, individually or collectively, as the case may be, (a) the Term Notes (b) the Revolving Loan Note(s) (in form substantially as attached hereto as **Exhibit A** and **B**, respectively), and (c) such other promissory notes accepted by the Lenders in exchange for or in substitution of any such Notes.

"Notice of Borrowing" means the notice in the form of **Exhibit D** attached hereto to be delivered to the Administrative Agent pursuant to Section 2.1 or such other form as may be reasonably approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer of the Borrower.

"Obligations" means (i) all Loans, Advances, Letter of Credit Obligations, L/C Reimbursement Obligations, debts, liabilities, payment and performance obligations, covenants and duties of every kind, nature and description owing by the Borrower or the Guarantors to the Administrative Agent, the Lenders, any Lender or any L/C Issuer of any kind or nature, present or future, arising under this Agreement and any other Loan Document, whether direct or indirect (including those acquired by permitted assignment or participation), absolute or contingent, liquidated or unliquidated, due or to become due, now existing or hereafter arising and however acquired, (ii) all Rate Hedging Obligations owing at any time or from time to time by the Borrower or the Guarantors, or any of them, to the Lenders, any Lender or any Affiliate of any Lender (excluding, as to any Borrower or Guarantor, any Excluded Swap Obligations) (iii) all obligations of the Borrower or any Guarantor under any Related Treasury Management Arrangement and (iv) all Erroneous Payment Subrogation Rights. The term includes all principal, interest, fees, charges, expenses, reasonable attorneys' fees, and any other sum chargeable (including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) to the Borrower or the Guarantors under this Agreement or any other Loan

Document or in connection with any Rate Hedging Obligation or Related Treasury Management Arrangement.

"Organizational Documents" means (a) with respect to any corporation or company, its certificate or articles of incorporation, organization or association and its bylaws, (b) with respect to any limited partnership, its certificate or declaration of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, and (d) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, and in the case of any Foreign Subsidiary, any analogous organizational documents. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, enforced any Loan Document.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.6).

"Parent" means Wash & Wax Holdings LLC, a Delaware limited liability company.

"Payment Recipient" has the meaning assigned to it in Section 8.15(a).

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Periodic Term SOFR Determination Day" has the meaning set forth in the definition of "Term SOFR".

"Permitted Acquisition" means any Acquisition, to the extent that each of the following conditions is satisfied:

(a)     no Default or Event of Default then exists or would result therefrom;

(b)     after giving effect to such transaction and/or series of related transactions on a Pro Forma Basis, the Borrower shall be in compliance with all of the Financial Covenants for the most recently ended Test Period;

(c)     after giving effect to such transaction and/or series of related transactions on a Pro Forma Basis, (i) the First Lien Leverage Ratio for the most recently ended Test Period shall not exceed (x) prior to the date that the Compliance Certificate for the fiscal quarter ended September 30, 2026, with a First Lien Leverage Ratio not to exceed 5.06 and (y) thereafter, with the Financial Covenants as of the last day of the most recently ended Test Period ending on or prior to such date and (ii) Liquidity shall not be less than $10,000,000;

29

(d)    neither the Borrower nor Holdings shall, in connection with any such transaction and/or series of related transactions, assume or remain liable with respect to any Indebtedness of the related sellers or the business, person or properties acquired, except to the extent permitted herein;

(e)    the Persons or businesses to be acquired shall be, or shall be engaged in, a business of the type that Borrower and its Subsidiaries are permitted to be engaged in under the Loan Documents and, to the extent required by the Security Documents, the Collateral acquired in connection with any such transaction and/or series of related transactions shall be made subject to the Administrative Agent's security in accordance with the Security Documents and the Loan Parties shall otherwise comply with the terms of the Loan Documents relating to additional guarantees and further assurances;

(f)    the Acquisition has been approved by the board of directors (or other equivalent governing body) of the person to be acquired;

(g)    with respect to such Acquisition or any of the series of related transactions, the Borrower shall have provided the Administrative Agent with (i) in each case only if made available to the Borrower prior to the consummation of such transaction, historical financial statements for the last three fiscal years of the Person to be acquired and unaudited financial statements thereof for the most recent interim period that is available and the comparable interim period for the prior year, (ii) a reasonably detailed description of all material information relating thereto and copies of all material documentation pertaining to such transaction, (iii) a Compliance Certificate after giving pro forma effect to such Permitted Acquisition on a Pro Forma Basis, and (iv) for Permitted Acquisitions with a purchase price in excess of $10,000,000, a quality of earnings report prepared for the Borrower by an independent certified accounting firm of nationally recognized standing;

(h)    at least three (3) Business Days prior to the proposed date of consummation of each such transaction, the Borrower shall have delivered to the Administrative Agent a certificate certifying that such transaction and related series of transactions complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance); and

(i)    the aggregate amount of consideration paid in respect of Permitted Acquisitions after the Closing Date shall not exceed $40,000,000.

"Permitted Holders" means (a) the direct and indirect holders of Equity Interests or Equity Interests Equivalents of Holdings on the Closing Date, (b) the Qualified Owners, and (c) any "group" (within the meaning of Section 13(d) or Section 14(d) of the Securities Exchange Act of 1934, as amended) of which any of the foregoing are members; provided, that in the case of such "group" and without giving effect to the existence of such "group" or any other "group," such Persons specified in clauses (a) and/or (b) above, collectively, have beneficial ownership, directly or indirectly, of more than 50% of the aggregate ordinary voting power for election of directors represented by the issued and outstanding Equity Interests of Holdings held, directly or indirectly, by such "group."

"Permitted Expense Reimbursement and Indemnity Payments" means any reasonable expense reimbursement and customary indemnities payable pursuant to the Permitted Holders for services provided to the Loan Parties, including the provision of directors and officers, if applicable.

"Permitted Indebtedness" has the meaning set forth in Section 6.2.

"Permitted Investment" means any of the following Investments made by the Borrower or any of its Subsidiaries in any Person:  (i) obligations, with a maturity of less than two years from the date of acquisition thereof, issued by or unconditionally guaranteed by the United States of America or an agency

or instrumentality thereof backed by the full faith and credit of the United States of America; (ii) direct obligations of any state of the United States, any subdivision or agency thereof or any municipality therein which are rated by S&P or Moody's in one of the top two rating classifications and maturing within two years of the date of acquisition thereof; (iii) certificates of deposit or banker's acceptances, maturing within two years of the date of acquisition thereof, issued by commercial banks organized under the laws of the United States or any state thereof, having capital, surplus and undivided profits aggregating not less than $100,000,000 or such lesser amount approved by Lenders in their reasonable discretion so as to attempt to accommodate Investments made with minority owned commercial banks and whose unsecured long-term debt is rated in one of the top two rating classifications by S&P or Moody's; (iv) commercial paper of any corporation organized under the laws of the United States or any state thereof, rated in one of the top two rating classifications by S&P or Moody's and with a maturity of less than 270 days from the date of acquisition thereof; (v) Investments existing as of the date of this Agreement and set forth on Schedule 6.6; (vi) extensions of trade credit arising or acquired in the ordinary course of business, and Investments received in settlements in the ordinary course of business of such extensions of trade credit; (vii) Investments by any Loan Party in any other Loan Party; (viii) loans or advances to employees of the Borrower or any of its Subsidiaries to finance travel, entertainment and relocation expenses in the ordinary course of business as presently conducted in an aggregate amount not to exceed $250,000 at any one time outstanding; (ix) Permitted Acquisitions; (x) Investments of any Person existing at the time such Person becomes a Subsidiary of the Borrower or merges with the Borrower or any of its Subsidiaries as permitted hereunder so long as such Investments were not made in contemplation of such Person becoming a Subsidiary of the Borrower; (xi) Investments received in connection with the bankruptcy or reorganization of suppliers and customers or in the settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment; (xii) advances of payroll payments to employees in the ordinary course of business not to exceed $250,000 in the aggregate amount outstanding at any time; (xiii) promissory notes and other non-cash consideration received in connection with Dispositions permitted under Section 6.4; (xiv) investments, including Acquisitions, financed with the proceeds of Equity Issuances; (xv) loans and advances to Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such direct or indirect parent) in accordance with Section 6.10(f) or (g); (xvi) Guarantees by the Borrower or any of its Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; (xvii) Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests of Holdings (or any direct or indirect parent thereof) or the proceeds from the issuance thereof; and (xviii) other Investments by the Borrower and its Subsidiaries in an aggregate amount not to exceed $5,000,000 at any one time outstanding.

"Permitted Lien" has the meaning set forth in Section 6.3.

"Person" means any natural person, corporation, firm, joint venture, partnership, limited partnership, limited liability company, association, trust or other entity or organization, whether acting in an individual, fiduciary or other capacity, or any government or political subdivision thereof or any agency, department or instrumentality thereof.

"Petition Date" has the meaning specified in the recitals hereto.

"PIK Interest" has the meaning set forth in Section 2.1(j).

"Plan" means each employee benefit plan (as defined in Section 3(3) of ERISA) whether now in existence or hereafter instituted, of, or contributed to by, the Borrower or any ERISA Affiliate.

"<u>Plan Effective Date</u>" has the meaning specified in the recitals hereto.

"<u>Plan of Reorganization</u>" has the meaning specified in the recitals hereto.

"<u>Prepetition Term Loan Claim</u>" means a Term Loan Claim (as defined in the Plan of Reorganization).

"<u>Prime Rate</u>" means the rate of interest quoted in *The Wall Street Journal* (or another national publication reasonably selected by the Administrative Agent) as the U.S. "Prime Rate."

"<u>Pro Forma Basis</u>" means, with respect to compliance with any Financial Covenant or financial performance test hereunder for the applicable Test Period, in respect of any Specified Transaction, the making of such calculation after giving pro forma effect to:

(a)    the consummation of such Specified Transaction as of the first day of the applicable Test Period, as if such Specified Transaction had been consummated on the first day of such Test Period;

(b)    the assumption, incurrence or issuance of any Indebtedness by Holdings or any of its Subsidiaries (including any person which becomes a Subsidiary pursuant to or in connection with such Specified Transaction) in connection with such Specified Transaction, as if such Indebtedness had been assumed, incurred or issued (and the proceeds thereof applied) on the first day of such Test Period (with any such Indebtedness bearing interest during any portion of the applicable Test Period prior to the relevant acquisition at the weighted average of the interest rates applicable to such Indebtedness incurred during such Test Period);

(c)    the permanent repayment, retirement or redemption of any Indebtedness (other than revolving Indebtedness, except to the extent accompanied by a permanent commitment reduction) by Holdings or any of its Subsidiaries (including any person which becomes a Subsidiary pursuant to or in connection with such Specified Transaction) in connection with such Specified Transaction, as if such Indebtedness had been repaid, retired or redeemed on the first day of such Test Period;

(d)    the Cash Rental Expense attributable to the target, Property or other assets subject to a Specified Transaction consummated or occurring, as applicable, during the applicable Test Period, in each case, as if such Specified Transaction had been consummated on the first day of such Test Period; and

(e)    in the case of the consummation of any Specified Transaction in the form of a sale-leaseback transaction, Consolidated Net Income shall be adjusted to give effect to any lease payments that would have been made on the lease established in connection with any sale-leaseback transaction during the relevant Test Period assuming such sale-leaseback transaction had been consummated on the first day of such Test Period; and

(f)    the costs and expenses of any target that have not been assumed by Holdings or any of its Subsidiaries shall be disregarded to the extent such costs and expenses are reasonably identifiable, factually supportable and certified by a Responsible Officer, and any (i) cost and expenses of any such target that have been assumed in any Specified Transaction and (ii) incremental recurring costs and expenses incurred in connection with any Specified Transaction shall, in the case of each of (i) and (ii) be calculated as if such costs and expenses were assumed on the first day of such Test Period;

with clauses (a) through (f) calculated in a manner consistent with GAAP or Modified GAAP, as applicable, and the definition of Consolidated EBITDA and subject to, the limitations set forth in the definition of Consolidated EBITDA, including adjustments for restructuring charges or reserves and

non-recurring integration costs.

"<u>Proceeding</u>" has the meaning ascribed to it in <u>Section 9.5</u>.

"<u>Property</u>" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, and any right in respect of any of the foregoing.

"<u>Purchasing Loan Party</u>" has the meaning specified in <u>Section 9.9(i)</u>.

"<u>Qualified ECP Guarantor</u>" means, at any time, each Borrower, Affiliate of Borrower or Guarantor with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"<u>Qualified Equity Interests</u>" means any Equity Interests or Equity Interests Equivalents that are not Disqualified Equity Interests.

"<u>Rate Hedging Obligations</u>" means any and all obligations of Borrower, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) under Swap Contracts which are entered into or maintained by any Borrower, Guarantor or any of their Affiliates with the Administrative Agent or a Lender or an Affiliate of the Administrative Agent or a Lender and which are not prohibited by the express terms of the Loan Documents.

"<u>Real Property</u>" means all real property or interests therein wherever situated now, heretofore or hereafter owned or ground (or space) leased by the Borrower pledged to Administrative Agent for the benefit of the Secured Parties as Collateral under any of the Security Documents.

"<u>Recipient</u>" means the Administrative Agent, any Lender or L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of any Borrower or Guarantor hereunder.

"<u>Register</u>" has the meaning ascribed to it in <u>Section 9.9(d)</u>.

"<u>Regulation D</u>," "<u>Regulation T</u>," "<u>Regulation U</u>" and "<u>Regulation X</u>" means Regulation D, Regulation T, Regulation U and Regulation X, respectively, of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"<u>Rejection Notice</u>" has the meaning specified in <u>Section 2.1(k)(9)</u>.

"<u>Related Indemnified Party</u>" has the meaning ascribed to it in <u>Section 9.5</u>.

"<u>Related Treasury Management Arrangement</u>" means all arrangements for the delivery of cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements, to or for the benefit of any Borrower, Guarantor or any of their Affiliates which are now or hereafter entered into or maintained with a Lender, the Administrative Agent or an Affiliate of a Lender or the Administrative Agent.

"<u>Relevant Governmental Body</u>" means the Board of Governors of the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve Bank of New York, or any successor thereto.

"Required Lenders" means Lenders holding (a) more than fifty percent (50%) of the sum of the Revolving Loan Commitments of all Lenders plus the Term Loan Commitments of all Lenders, plus the unpaid principal balance of the Term Loans, or (b) if the Commitments have been terminated, more than fifty percent (50%) of the aggregate outstanding principal amount of the Loans, plus Letter of Credit Obligations; provided that (i) if there are at least two Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Required Lenders" must include at least two Lenders and (ii) the Commitments and Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Required Revolving Lenders" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of the Revolving Loan Commitments then in effect, or (b) if the Revolving Loan Commitments have terminated, Lenders then holding more than fifty percent (50%) of the sum of the aggregate outstanding amount of Revolving Loans and outstanding Letter of Credit Obligations; provided that (i) if there are at least two Lenders holding Revolving Loan Commitments (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Required Revolving Lenders" must include at least two Lenders holding Revolving Loan Commitments and (ii) the Revolving Loan Commitments of any Defaulting Lender shall be disregarded in determining Required Revolving Lenders at any time.

"Required Term Loan Lenders" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of the Term Loan Commitments then in effect, or (b) if the Term Loan Commitments have terminated, Lenders then holding more than fifty percent (50%) of the sum of the aggregate outstanding amount of Term Loans; provided that (i) if there are at least two Lenders holding Term Loans or Term Loan Commitments (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Required Term Loan Lenders" must include at least two Lenders holding Term Loans or Term Loan Commitments and (ii) the Term Loan Commitments and Term Loans of any Defaulting Lender shall be disregarded in determining Required Term Loan Lenders at any time.

"Resignation Effective Date" has the meaning specified in Section 8.13(a).

"Responsible Officer" means the chief executive officer, president, senior vice president, senior vice president (finance), vice president, chief financial officer, treasurer, manager of treasury activities or assistant treasurer or other similar officer or Person performing similar functions of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party. To the extent requested by the Administrative Agent, each "Responsible Officer" will provide an incumbency certificate and to the extent requested by the Administrative Agent, appropriate authorization documentation, in form and substance reasonably satisfactory to the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"Revolver Maturity Date" means (a) April 30, 2028; or (b) such earlier date on which (1) payment in full of all outstanding Revolving Loans shall be due (whether by acceleration or otherwise) and (2) all obligations of the Revolving Loan Lenders to make Advances is terminated.

"Revolving Loan" means an Advance or Advances pursuant to the Revolving Loan Commitments.

"Revolving Loan Commitment" means, for each Lender, its obligation to fund its portion of the Revolving Loan in the aggregate amount appearing opposite of such Lender's name under the heading

"Revolving Loan Commitments" as set forth on **Schedule I** or as set forth in an Assignment and Assumption Agreement delivered pursuant to <u>Section 9.9(b)</u>, as such amount may be modified from time to time pursuant to the terms hereof.

"<u>Revolving Loan Lender</u>" means, at any time, (a) so long as any Revolving Loan Commitment is in effect, any Lender that has a Revolving Loan Commitment at such time or (b) if the Revolving Loan Commitments have terminated or expired, any Lender to which a Revolving Loan is owed or that hold Letter of Credit Obligations at such time.

"<u>Revolving Loan Note</u>" has the meaning set forth in <u>Section 2.1(c)(3)</u>.

"<u>Revolving Loan Unused Fee</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Revolving Loan Unused Portion</u>" means the excess of the Revolving Loan Commitment on such date over the Total Revolving Outstandings on such date.

"<u>SBIA</u>" means the Small Business Investment Act of 1958, as amended.

"<u>S&P</u>" means Standard & Poor's Ratings Services, a division of the McGraw Hill Companies, Inc., or any successor to the rating agency business thereof.

"<u>SDN List</u>" has the meaning set forth in <u>Section 4.27</u>.

"<u>Secured Parties</u>" means, collectively, with respect to each of the Security Documents, the Administrative Agent, the Lenders, the L/C Issuers, and each Affiliate of the Administrative Agent or any Lender, which Affiliate is party to any Rate Hedging Obligations or any Related Treasury Management Arrangement and each agent or sub-agent appointed by the Administrative Agent from time to time pursuant to <u>Section 8.10</u>.

"<u>Security Agreement</u>" means the Security Agreement dated as of the Closing Date, entered into by the Borrower and the Guarantors in favor of the Administrative Agent for the benefit of the Secured Parties, as it may be amended, modified, restated or replaced from time to time.

"<u>Security Documents</u>" means and refer to the Security Agreement, the Perfection Certificate (as defined in the Security Agreement), the Guarantees and each other assignment, pledge or security agreement, instrument, certificate, financing statements, filings or document pursuant to which the Borrower, any Guarantor or any other Person shall grant or convey to the Administrative Agent or the Lenders a Lien in Collateral as security for all or any portion of the Obligations, whether now or hereafter in existence, as said agreements or documents may be amended, modified, restated or replaced from time to time, each in form and substance reasonably satisfactory to the Administrative Agent.

"<u>SOFR</u>" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"<u>Specified Loan Party</u>" means any Borrower, Affiliate of Borrower or Guarantor that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to <u>Section 9.20</u>).

"Specified Real Estate" means those certain real properties located at: (i) 7860 Mexico Road, St. Peters, MO 63375; (ii) 12 Junction Drive West, Glen Carbon, IL 62034; (iii) 6678 Mexico Road, St. Peters, MO 63376; and (iv) 994 Parkway, Sevierville, TN 37862, each of which are contemplated to be sold pursuant to the Plan of Reorganization.

"Specified Transaction" means any Investment (including any Acquisition), Disposition, incurrence or repayment of Indebtedness, Restricted Payment or Incremental Term Loan that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis".

"Specified Unit" means each Unit described on Schedule II.

"Subsidiary" of any Person means (i) any corporation of which more than 50% of the outstanding Equity Interests and Equity Interests Equivalents of any class or classes having ordinary voting power for the election of directors (irrespective of whether or not at the time Equity Interests or Equity Interests Equivalents of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is now or hereafter owned directly or indirectly by such Person, by such Person and one or more of its Subsidiaries, or by one or more of such Person's other Subsidiaries, (ii) any partnership, association, limited liability company, joint venture or other entity in which such Person, such Person and one or more of its Subsidiaries, or one or more of its Subsidiaries, is either a general partner or has an equity or voting interest of more than 50% at the time, and (iii) any other entity which is directly or indirectly controlled by such Person or one or more Subsidiaries of such Person or both; provided that, unless otherwise specified, any reference to "Subsidiary" means a Subsidiary of the Borrower.

"Sunset Unit" means each Unit described on Schedule III.

"Supermajority Lenders" means at any time  Lenders holding (a) at least seventy percent (70%) of the sum of the Revolving Loan Commitments of all Lenders plus the Term Loan Commitments of all Lenders, plus the unpaid principal balance of the Term Loans, or (b) if the Commitments have been terminated, at least seventy percent (70%) of the aggregate outstanding principal amount of the Loans, plus Letter of Credit Obligations; provided that (i) if there are (x) at least three Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Supermajority Lenders" must include at least three Lenders and (y) only two Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Supermajority Lenders" must include both Lenders and (ii) the Commitments and Loans of any Defaulting Lender shall be disregarded in determining Supermajority Lenders at any time.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"<u>Swap Obligations</u>" means with respect to any Borrower or Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, as amended from time to time.

"<u>Swap Termination Value</u>" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"<u>Tax Distributions</u>" has the meaning set forth in <u>Section 6.10</u>.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Loan</u>" means, collectively, the Initial Term Loans and any Incremental Term Loan.

"<u>Term Loan Collateral Account</u>" means a segregated deposit account which shall hold proceeds of Term Loan Priority Collateral and shall be subject to a Control Agreement in favor of the Administrative Agent and shall not be subject to a Control Agreement in favor of the ABL Lenders.

"<u>Term Loan Commitment</u>" means, for each Lender, such Lender's Initial Term Loan Commitment.

"<u>Term Loan Lender</u>" means each Lender that has a Term Loan Commitment or to which a Term Loan is owed.

"<u>Term Loan Maturity Date</u>" means April 30, 2028, or with respect to any Incremental Term Loan, the date set forth as such in the agreement among the Borrower and the Lenders providing such Incremental Term Loan.

"<u>Term Loan Priority Collateral</u>" means all "Term Loan Priority Collateral" as defined in the ABL/Term Intercreditor Agreement, or similar analogous term describing Collateral on which the Obligations have Lien priority over the ABL Facility.

"<u>Term Note</u>" has the meaning set forth in <u>Section 2.1(a)(4)</u>.

"<u>Term SOFR</u>" means,

(a)    for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "<u>Periodic Term SOFR Determination Day</u>") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; <u>provided</u>, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S.

Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR (other than pursuant to clause (ii)(c) of the definition of "Base Rate").

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Test Period" in effect at any time means the most recent period of four consecutive fiscal quarters of the Borrower ended on or prior to such time (taken as one accounting period) in respect of which financial statements have been or are required to be delivered pursuant to Section 5.1(a) or (b), as applicable. A Test Period may be designated by reference to the last day thereof (e.g., the "March 31, 2026 Test Period" refers to the period of four consecutive fiscal quarters of the Borrower ended on March 31, 2026), and a Test Period shall be deemed to end on the last day thereof.

"Total Revolving Outstandings" means, as of any date of determination, the aggregate outstanding principal amount of all Revolving Loans (excluding any PIK Interest that has been capitalized in respect of the Revolving Loans) and the Letter of Credit Obligations on such date.

"Transactions" means the transactions contemplated under the Plan of Reorganization and the Confirmation Order to occur on the effective date of the Plan of Reorganization and the Confirmation Order, including the entry into this Agreement and the other Loan Documents.

"Transaction Expenses" means any fees or expenses incurred or paid by Holdings, the Borrower or any of its (or their) Subsidiaries in connection with the Transactions, including restructuring and legal fees and expenses incurred in connection with the events leading up to the filing of the petition for relief under the Bankruptcy Code.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unit" means, collectively, the property comprising the carwash locations described on **Schedule I-A** and the property comprising any New Unit.

"United States" and "U.S." mean the United States of America.

"Unrestricted Cash" shall mean unrestricted cash and cash equivalents of the Borrower and its Subsidiaries to the extent such cash or cash equivalents are subject to a first priority perfected security interest in favor of the Administrative Agent through control agreements.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned thereto in Section 10.1(e)(2)(B)(3).

"4-Wall EBITDA" means, with respect to each Unit for each period, the portion of Consolidated EBITDA attributable to such Unit during such period, excluding any allocations of corporate selling, general and administrative expenses allocated to that Unit.

"Wash Club" means any customer loyalty program maintained by a Mature Unit entitling members to unlimited car washes at such Mature Unit in exchange for a monthly fee.

"Wash Club Membership" means, for any period, the aggregate number of members of any Wash Club at each Mature Unit for the last calendar month of such period.

"Zips" means Zips Car Wash, LLC, an Arkansas limited liability company.

**1.2     Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     All undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Uniform Commercial Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Uniform Commercial Code, the definition contained in Article or Division 9 shall control.

(c)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(1)     The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(2)     References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(3)     The term "including" is by way of example and not a limitation.

(4)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(e)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(f)    For purposes of calculating Consolidated EBITDA and any financial ratios or tests, including the First Lien Leverage Ratio and the Fixed Charge Coverage Ratio, Specified Transactions that have been made (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of Consolidated EBITDA or any such ratio is made shall be calculated on a Pro Forma Basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.

1.3    **Accounting Terms; Payment Dates**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, Modified GAAP, except as otherwise specifically prescribed herein.  Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending December 31 or fiscal quarter ending March 31, June 30, September 30 or December 31 of the Borrower.  Unless the Borrower has requested an amendment pursuant to the process set out in the definition of "GAAP" with respect to the treatment of operating leases and Capitalized Lease Obligations under GAAP (or IFRS) and until such amendment has become effective, all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update (the "ASU") shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations, in each case, used for purposes of Article VII (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as Capitalized Lease Obligations in the financial statements to be delivered pursuant to Section 5.1.

1.4    **References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document shall be construed as referring to such agreement, instrument or other document as may be from time to time amended, restated, amended and restated, supplemented or otherwise modified, extended, refinanced or replaced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications, extensions, refinancings or replacements set forth herein or in any Loan Document) and (b) any reference to any law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

1.5    **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

40

**1.6**    **Interest Rates**. The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability (other than arising from its or its Affiliates' gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable order) with respect to the administration, submission or any other matter related to the rates in the definition of "Term SOFR Reference Rate", "Adjusted Term SOFR" or "Term SOFR", or any component of such definitions or rates referred to in such definitions or with respect to any rate that is an alternative or replacement for or successor to any of such rate (including, without limitation, any Benchmark Replacement) or the effect of any of the foregoing.

## ARTICLE II
## THE ADVANCES

**2.1**    **The Advances**.

    (a)    <u>Initial Term Loans</u>.

    (1)    Subject to the terms and conditions set forth herein and in the Plan of Reorganization, on the Closing Date, each Initial Term Loan Lender shall receive (and be deemed to have issued) the aggregate principal amount of Initial Term Loans set forth on <u>Schedule I</u> hereto set forth opposite such Initial Term Loan Lender's name, as a conversion of the Existing Opco Obligations held by such Initial Term Loan Lender on the Closing Date. The Initial Term Loans may be converted to and continued as Term SOFR Loans and/or Base Rate Loans. Once paid, the Initial Term Loans may not be re-borrowed.

    (2)    The Borrower's obligation to pay the principal of, and interest on, any Term Loan shall be evidenced by the records of the Term Loan Lenders and, at the request of any applicable Term Loan Lender, by a term loan promissory note(s) in form substantially as attached hereto as **Exhibit A** (the "Term Note"). The entries made in the Register shall (absent manifest error) be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; <u>provided</u>, that the failure or delay of the Term Loan Lenders in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

    (b)    <u>Incremental Facilities</u>.

    (1)    <u>Increase</u>.    The Borrower may, by written notice to the Administrative Agent from time to time after the Closing Date (each, an "Incremental Facility Notice"), increase the Term Loan Commitments or obtain additional term loan facilities; <u>provided</u> such additional term loan facilities not increasing the Term Loan Commitments will rank junior in right of payment and security with the Term Loans or are unsecured (each, whether or not a separate class, an "Incremental Term Loan Commitment" and the term loans thereunder, an "Incremental Term Loan"; each Incremental Term Loan Commitment is sometimes referred to herein individually as an "Incremental Facility" and collectively as the "Incremental Facilities"), in Dollars in an aggregate principal amount not to exceed $40,000,000 for all such Incremental Facilities and subject to the conditions set forth in clause (3) below; <u>provided</u> that no commitment of any Lender shall be increased without the consent of such Lender. Such notice shall set forth (A) the amount of the Incremental Term Loan Commitment being requested, (which shall be in a minimum amount of $5,000,000 and in increments of $250,000 in excess thereof), (B) the date (an "Incremental Effective Date") on which such Incremental Facility is requested to become effective (which, unless otherwise agreed by the Administrative Agent, shall be not less than 10 Business Days nor more than 60 days after the date of such notice), and (C) whether the related Incremental

Term Loan is to initially be a Term SOFR Loan or a Base Rate Loan (and, if a Term SOFR Loan, the Interest Period therefor).

(2)     Allocations.  Upon delivery of the applicable Incremental Facility Notice, the Administrative Agent will give notice thereof to each then-existing Lender of such Incremental Facility as an offer for all Lenders to provide such Incremental Facility pro rata according to the percentages of their respective Commitments.  If any Lender does not notify the Administrative Agent in writing that such Lender accepts its pro rata share of such offer in its entirety within ten (10) Business Days of such offer, that portion of the Incremental Facility not accepted by the applicable Lenders shall be offered to the applicable accepting Lenders on a non-pro rata basis.  If the applicable accepting Lenders do not accept the applicable Incremental Facility in its entirety on a non-pro rata basis within five (5) Business Days after such offer, that portion of the Incremental Facility not accepted by the applicable accepting Lenders may be offered by the Borrower to any Persons that would constitute Eligible Assignees.

(3)     Conditions.  No Incremental Facility shall become effective under this Section 2.1(b) unless, after giving effect to such Incremental Facility, the Loans to be made thereunder, and the application of the proceeds therefrom, (A) no Default or Event of Default shall exist at the time of funding or would exist after giving effect thereto, except in connection with any Permitted Acquisition where the Lenders providing such Incremental Term Loans have agreed that no payment or bankruptcy Event of Default will be the standard and which shall be subject to customary "SunGard" limitations to the extent the proceeds of such Incremental Term Loans are used to fund such Permitted Acquisition, (B) the Incremental Term Loans will rank pari passu or junior in right of payment and security with the Term Loans (other than Incremental Term Loans) and Revolving Loans or may be unsecured, (C) any Incremental Term Loan will have a final maturity no earlier than the maturity of the Initial Term Loans, (D) the weighted average life to maturity of any Incremental Term Loan shall be no shorter than that of the Initial Term Loans, (E) subject to clause (D) above, the amortization schedule applicable to any Incremental Term Loan shall be determined by the Borrower and the Lenders thereunder, (F) the all-in yield (whether in the form of interest rate margins, original issue discount, upfront fees or Adjusted Term SOFR or Base Rate floor greater than the floors applicable to the Initial Term Loans or similar yield related discounts, deductions or payments, with such increased amount being equated to interest margin on the basis of four year weighted average life to maturity for purposes of determining any increase to the applicable interest margin with respect to the Initial Term Loans) (the "Effective Yield") applicable to any Incremental Term Loan which is pari passu in right of payment and security with the Initial Term Loan will be determined by the Borrower and the Lenders providing such Incremental Term Loan, but will not be higher than the corresponding Effective Yield for the Initial Term Loans, unless the interest rate margins with respect to the then existing Term Loans are increased by an amount equal to the difference between the Effective Yield with respect to such Incremental Term Loans and the corresponding Effective Yield on such existing Term Loans (the "MFN Adjustment"), (G) any Incremental Term Loan shall be on terms and pursuant to documentation to be determined by the Borrower and the applicable Lenders providing such Incremental Term Loan; provided, that, to the extent that any financial maintenance covenant and/or call protection provision is added for the benefit of any such Incremental Term Loan, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant or call protection provision is either (i) also added for the benefit of any existing Term Loans or (ii) only applicable after the latest maturity of the existing Term Loans, and (H) no Incremental Term Loan will be secured by assets other than Collateral or guaranteed by any person other than the Guarantors.

42

(4)  <u>Required Amendments</u>.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Facility, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence of such Incremental Facility and the Loans evidenced thereby, and any joinder agreement or amendment may, without the consent of the other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effectuate the provisions of this <u>Section 2.1(b)</u>, and, for the avoidance of doubt, this <u>Section 2.1(b)</u> shall supersede any provisions in <u>Section 9.1</u>.  From and after each Incremental Effective Date, the Loans and Commitments established pursuant to this <u>Section 2.1(b)</u> shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and to the extent ranking *pari passu* with the Initial Term Loans shall, without limiting the foregoing, benefit equally and ratably from the guarantees and security interests created by the applicable Security Documents.  The Loan Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Liens and security interests granted by the applicable Security Documents continue to be perfected under the Uniform Commercial Code or otherwise after giving effect to the establishment of any such new Loans and Commitments.

(c)  <u>Revolving Loan</u>.

(1)  Subject to the terms and conditions set forth herein, the Revolving Loan Lenders severally agree to make Revolving Loan(s) to the Borrower, from time to time from the Closing Date to the Revolver Maturity Date, in an aggregate principal amount not to exceed the Revolving Loan Commitment.  The Revolving Loan is a revolving line of credit and amounts paid and prepaid on the Revolving Loan may be reborrowed hereunder.  The Revolving Loan Commitment shall terminate on the Revolver Maturity Date.

(2)  <u>Procedure for Revolving Loan Borrowing</u>.  Each Advance of a Revolving Loan shall be made upon the Borrower's irrevocable written notice delivered to the Administrative Agent substantially in the form of a Notice of Borrowing or in a writing in any other form acceptable to the Administrative Agent, which notice must be received by the Administrative Agent prior to 12:00 p.m. on the requested date of the Advance.  Such Notice of Borrowing shall specify:

(A)  the amount of the Advance (which shall be in an aggregate minimum principal amount of $500,000); and

(B)  the requested Advance date, which shall be a Business Day.

Upon receipt of a Notice of Borrowing with respect to a Revolving Loan, the Administrative Agent will promptly notify each Revolving Loan Lender of such Notice of Borrowing and of the amount of such Lender's percentage of the Commitment with respect to such Advance.  Unless the Administrative Agent is otherwise directed in writing by the Borrower, the proceeds of each requested Advance after the Closing Date will be made available to the Borrower by the Administrative Agent by wire transfer of such amount to the Borrower pursuant to the wire transfer instructions provided to the Administrative Agent in writing.

(3)  The Borrower's obligation to pay the principal of, and interest on, the Revolving Loan shall be evidenced by the records of the Revolving Loan Lender and, at the request of any applicable Revolving Loan Lender, by a promissory note or notes in form

43

substantially as attached hereto as **Exhibit B** (the "Revolving Loan Note").  The entries made in such records and/or on the schedule annexed to the Revolving Loan Note shall (absent manifest error) be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that the failure or delay of the Revolving Loan Lender in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Revolving Loan (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

(4)    Advances under the Revolving Loan shall be used by the Borrower for working capital and general corporate purposes of the Borrower and its Subsidiaries, including funding Capital Expenditures and Permitted Acquisitions.

(d)    Letters of Credit.

(1)    Conditions.  On the terms and subject to the conditions contained herein, the Borrower may request that one or more L/C Issuers Issue and one or more of the L/C Issuers will issue, in accordance with such L/C Issuers' usual and customary business practices, and for the account of the Loan Parties, Letters of Credit (denominated in Dollars) from time to time on any Business Day during the period from the Closing Date through the Revolver Maturity Date; provided, however, that no L/C Issuer shall Issue any Letter of Credit upon the occurrence of any of the following or, if after giving effect to such Issuance:

(A)    (i) the Revolving Loan Unused Portion would be less than zero or (ii) the Letter of Credit Obligations for all Letters of Credit would exceed the L/C Sublimit;

(B)    the expiration date of such Letter of Credit (i) is not a Business Day, (ii) is more than one year after the date of Issuance thereof or (iii) is later than seven (7) days prior to the Revolver Maturity Date; provided, however, that any Letter of Credit with a term not exceeding one year may provide for its renewal for additional periods not exceeding one year as long as (x) the Borrower and such L/C Issuer have the option to prevent such renewal before the expiration of such term or any such period and (y) neither such L/C Issuer nor the Borrower shall permit any such renewal to extend such expiration date beyond the date set forth in clause (iii) above; or

(C)    (i) any fee due in connection with, and on or prior to, such Issuance has not been paid, (ii) such Letter of Credit is requested to be Issued in a form that is not acceptable to such L/C Issuer or (iii) such L/C Issuer shall not have received, each in form and substance reasonably acceptable to it and duly executed by the Borrower on behalf of the Loan Parties, the documents that such L/C Issuer generally uses in the ordinary course of business for the Issuance of letters of credit of the type of such Letter of Credit (collectively, the "L/C Reimbursement Agreement").

Furthermore, each L/C Issuer may elect only to Issue Letters of Credit in its own name and may only Issue Letters of Credit to the extent permitted by Law, and such Letters of Credit may not be accepted by certain beneficiaries such as insurance companies.  For each Issuance, the applicable L/C Issuer may, but shall not be required to, determine that, or take notice whether, the conditions precedent set forth in Section 3.2 have been satisfied or waived in connection with the Issuance of any Letter of Credit; provided, however, that no Letters of Credit shall be Issued during the period starting on the first Business Day after the receipt by such L/C Issuer of notice from the Administrative Agent at the written direction of the Required Lenders that any condition precedent

44

contained in <u>Section 3.2</u> is not satisfied and ending on the date all such conditions are satisfied or duly waived.

Notwithstanding anything else to the contrary herein, if any Lender is a Defaulting Lender, no L/C Issuer shall be obligated to Issue any Letter of Credit unless (w) the Defaulting Lender has been replaced in accordance with <u>Section 9.19</u> and <u>Section 9.19</u>, (x) the Letter of Credit Obligations of such Defaulting Lender have been cash collateralized, (y) the Revolving Loan Commitments of the other Lenders have been increased by an amount sufficient to satisfy the Administrative Agent that all future Letter of Credit Obligations will be covered by all Revolving Loan Lenders that are not Defaulting Lenders, or (z) the Letter of Credit Obligations of such Defaulting Lender have been reallocated to other Revolving Loan Lenders in a manner consistent with <u>Section 2.10(b)</u>.

(2)    <u>Notice of Issuance</u>.  The Borrower shall give the relevant L/C Issuer and the Administrative Agent a notice of any requested Issuance of any Letter of Credit, which shall be effective only if received by such L/C Issuer and the Administrative Agent not later than 12:00 p.m. on the third Business Day prior to the date of such requested Issuance.  Such notice shall be made in a writing or electronic transmission in any written form reasonably acceptable to such L/C Issuer (each, an "<u>L/C Request</u>").

(3)    <u>Reporting Obligations of L/C Issuers</u>.  Each L/C Issuer agrees to provide the Administrative Agent, in form and substance satisfactory to the Administrative Agent, each of the following on the following dates: (A) (i) on or prior to any Issuance of any Letter of Credit by such L/C Issuer, (ii) immediately after any drawing under any such Letter of Credit or (iii) immediately after any payment (or failure to pay when due) by the Borrower of any related L/C Reimbursement Obligation, notice thereof, which shall contain a reasonably detailed description of such Issuance, drawing or payment and the Administrative Agent shall provide copies of such notices to each Revolving Loan Lender reasonably promptly after receipt thereof; (B) upon the request of the Administrative Agent (or any Revolving Loan Lender through the Administrative Agent), copies of any Letter of Credit Issued by such L/C Issuer and any related L/C Reimbursement Agreement and such other documents and information as may reasonably be requested by Agent; and (C) on the first Business Day of each calendar week, a schedule of the Letters of Credit Issued by such L/C Issuer, in form and substance reasonably satisfactory to Agent, setting forth the Letter of Credit Obligations for such Letters of Credit outstanding on the last Business Day of the previous calendar week.

(4)    <u>Acquisition of Participations</u>.  Upon any Issuance of a Letter of Credit in accordance with the terms of this Agreement resulting in any increase in the Letter of Credit Obligations, each Revolving Loan Lender shall be deemed to have acquired, without recourse or warranty, an undivided interest and participation in such Letter of Credit and the related Letter of Credit Obligations in an amount equal to its Applicable Revolving Loan Percentage of such Letter of Credit Obligations.

(5)    <u>Reimbursement Obligations of the Borrower</u>.  The Borrower agrees to pay to the L/C Issuer of any Letter of Credit, or to the Administrative Agent for the benefit of such L/C Issuer, each L/C Reimbursement Obligation owing with respect to such Letter of Credit no later than the first Business Day after the Borrower receives notice from such L/C Issuer or from the Administrative Agent that payment has been made under such Letter of Credit or that such L/C Reimbursement Obligation is otherwise due (the "<u>L/C Reimbursement Date</u>") with interest thereon computed as set forth in <u>clause (A)</u> below.  In the event that any L/C Reimbursement Obligation is not repaid by the Borrower as provided in this <u>clause (5)</u> (or any such payment by the Borrower is rescinded or set aside for any reason), such L/C Issuer shall promptly notify the Administrative

Agent of such failure (and, upon receipt of such notice, the Administrative Agent shall notify each Revolving Loan Lender) and, irrespective of whether such notice is given, such L/C Reimbursement Obligation shall be payable on demand by the Borrower with interest thereon computed (A) from the date on which such L/C Reimbursement Obligation arose to the L/C Reimbursement Date, at the interest rate applicable during such period to Revolving Loans that are Base Rate Loans and (B) thereafter until payment in full, at the interest rate specified in Section 2.1(i)(3) to past due Revolving Loans that are Base Rate Loans (regardless of whether or not an election is made under such Section).

(6)    Reimbursement Obligations of the Revolving Loan Lenders.

(A)    Upon receipt of the notice described in clause (5) above from the Administrative Agent, each Revolving Loan Lender shall pay to the Administrative Agent for the account of such L/C Issuer its percentage of the Commitment of such Letter of Credit Obligations (as such amount may be increased pursuant to Section 2.10(b)).

(B)    By making any payment described in clause (A) above (other than during the continuation of an Event of Default under Section 7.1(f) or 7.1(g)), such Lender shall be deemed to have made a Revolving Loan to the Borrower, which, upon receipt thereof by the Administrative Agent for the benefit of such L/C Issuer, the Borrower shall be deemed to have used in whole to repay such L/C Reimbursement Obligation. Any such payment that is not deemed a Revolving Loan shall be deemed a funding by such Lender of its participation in the applicable Letter of Credit and the Letter of Credit Obligation in respect of the related L/C Reimbursement Obligations. Such participation shall not otherwise be required to be funded. Following receipt by any L/C Issuer of any payment from any Lender pursuant to this clause (6) with respect to any portion of any L/C Reimbursement Obligation, such L/C Issuer shall promptly pay to the Administrative Agent, for the benefit of such Lender, all amounts received by such L/C Issuer (or to the extent such amounts shall have been received by Agent for the benefit of such L/C Issuer, the Administrative Agent shall promptly pay to such Lender all amounts received by the Administrative Agent for the benefit of such L/C Issuer) with respect to such portion.

(7)    Obligations Absolute. The obligations of the Borrower and the Revolving Loan Lenders pursuant to clauses (4), (5) and (6) above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Agreement irrespective of (A) (i) the invalidity or unenforceability of any term or provision in any Letter of Credit, any document transferring or purporting to transfer a Letter of Credit, any Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (ii) any document presented under a Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or failing to comply with the terms of such Letter of Credit or (iii) any loss or delay, including in the transmission of any document, (B) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Loan Party) may have against the beneficiary of any Letter of Credit or any other Person, whether in connection with any Loan Document or any other Contractual Obligation or transaction, or the existence of any other withholding, abatement or reduction, (C) in the case of the obligations of any Revolving Loan Lender, (i) the failure of any condition precedent set forth in Section 3.2 to be satisfied (each of which conditions precedent the Revolving Loan Lenders hereby irrevocably waive) or (ii) any adverse change in the condition (financial or otherwise) of any Loan Party and (D) any other act or omission to act or delay of any kind of the Administrative Agent, any Lender or any other Person or any other event or circumstance whatsoever, whether or not similar to any

46

of the foregoing, that might, but for the provisions of this clause (vii), constitute a legal or equitable discharge of any obligation of the Borrower or any Revolving Loan Lender hereunder.   No provision hereof shall be deemed to waive or limit the Borrower's right to seek repayment of any payment of any L/C Reimbursement Obligations from the L/C Issuer under the terms of the applicable L/C Reimbursement Agreement or applicable law.

(e)      Termination or Reduction of Commitments. The Borrower may, upon written notice to the Administrative Agent, terminate, or from time to time permanently reduce the unused Revolving Loan Commitments; provided that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $250,000 or any whole multiple of $50,000 in excess thereof, and (iii) any such partial reduction shall reduce the Revolving Loan Commitments of each Lender ratably based on such Applicable Revolving Loan Percentage. The Revolving Loan Commitments shall automatically be reduced to $0 and terminated immediately upon the closing of the loan documentation establishing an ABL Facility (it being understood and agreed that all outstanding Revolving Loans, together with all accrued but unpaid interest owing thereon and all other amounts owing in respect of the Revolving Loans shall be due and payable immediately upon such date in accordance with Section 2.1(k)(2)).  The Administrative Agent shall promptly notify the Lenders of any termination or reduction of unused Commitments under this Section 2.1(f). Any Revolving Loan Unused Fee accrued until the effective date of any termination or reduction of Commitments under this Section 2.1(f) shall be paid on the effective date of such termination or reduction.

(f)      Notes.  If requested by any Lender, the Advances made by such Lender shall be evidenced by, and be payable in accordance with the terms of the Term Note and Revolving Loan Note issued to such Lender, as applicable, made by the Borrower payable to the order of such Lender in a principal amount equal to the Commitment of such Lender; subject, however, to the provisions of such Note to the effect that the principal amount payable thereunder at any time shall not exceed the then unpaid principal amount of the Advances made by such Lender.  The Borrower hereby irrevocably authorizes each Lender to make or cause to be made, at or about the time of each Advance made by such Lender, an appropriate notation on the records of such Lender, reflecting the principal amount of such Advance, and such Lender shall make or cause to be made, on or about the time of receipt of payment of any principal of any Advance, an appropriate notation on its records reflecting such payment and such Lender will, prior to any transfer of any of such Note, endorse on the reverse side thereof the outstanding principal amount of the Advances evidenced thereby.  Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances.  The aggregate amount of all Advances set forth on the Register shall be conclusive evidence of the principal amount owing and unpaid on such Lender's Note, absent manifest error.

(g)      Promise to Pay.  The Borrower hereby promises to pay in full to the Administrative Agent for the benefit of the Lenders the amount of all Obligations, including the principal amount of all Loans, together with accrued interest, fees and other amounts due thereon, all in accordance with the terms of this Agreement.   All outstanding Obligations, including the outstanding principal amount of all Loans, together with unpaid accrued interest, fees and other amounts due thereon, shall be due and payable in full on the applicable Maturity Date.   The Loans shall be payable as follows:

(1)      Term Loan.  Commencing September 30, 2025, and continuing on the last day of each fiscal quarter of the Borrower thereafter, the Borrower shall make quarterly repayments of the principal amount of the Initial Term Loans established on the Closing Date in

the aggregate principal amount equal to 0.25% of the principal amount of the Initial Term Loans established on the Closing Date; provided that, the principal amount of any Term Loan that constitutes PIK Interest shall not share in any repayment made or required to be made pursuant to this Section 2.1(g)(1). The entire remaining unpaid principal balance of the Term Loan (including PIK Interest), together with accrued but unpaid interest, shall be due and payable in full on the Term Loan Maturity Date.

(2)    <u>Revolving Loans</u>. The Borrower shall repay to the Administrative Agent, for the account of the Revolving Loan Lenders on the Revolver Maturity Date the aggregate unpaid principal amount of the Revolving Loans outstanding on such date, together with accrued but unpaid interest thereon.

(3)    <u>Incremental Term Loans</u>. The Borrower shall repay to the Administrative Agent, for the account of the Lenders who provided any Incremental Term Loans, on each date set forth in the amendment or other documentation relating to such Incremental Term Loan, such amount of such Incremental Term Loans as provided in such amendment or other documentation.

(h)    <u>Interest on Advances</u>.   The Borrower agrees to pay interest on the aggregate outstanding principal amount of the Advances until paid in full as follows:

(1)    <u>Term Loan</u>.  The Term Loan shall bear interest at the rates of, at Borrower's election pursuant to an appropriately delivered Notice of Borrowing, (I) with respect to Term SOFR Loans, the Adjusted Term SOFR plus the Applicable Margin, and (II) with respect to Base Rate Loans, the Base Rate plus the Applicable Margin.

(2)    <u>Revolving Loan</u>.

(A)    The Revolving Loan shall bear interest at the rates of, at Borrower's election pursuant to an appropriately delivered Notice of Borrowing, (I) with respect to Term SOFR Loans, the Adjusted Term SOFR plus the Applicable Margin, and (II) with respect to Base Rate Loans, the Base Rate plus the Applicable Margin.

(3)    <u>Default Interest</u>. While an Event of Default exists and is continuing or after acceleration, at the option of the Administrative Agent or the Required Lenders, the Borrower shall pay interest ("<u>Default Interest</u>") with respect to the principal of, or interest on, each Loan, any fee or any other amount payable by the Borrower hereunder that is not paid when due at the Default Rate.  All Default Interest under this clause (3) shall be payable in cash and on demand.

(4)    <u>Payment Dates</u>. Interest accrued on each Loan shall be payable, without duplication:

(A)    on the Revolver Maturity Date or Term Loan Maturity Date, as applicable;

(B)    in respect of any Loan, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan, on the principal amount so paid or prepaid; and

(C)     in respect of (i) any Base Rate Loan, on the last Business day of each month occurring after the Closing Date and (ii) any Term SOFR Loan, at the end of each Interest Period and, in addition, at the end of 90 days in the case of a six-month Interest Period (together with the applicable Maturity Date, each an "Interest Payment Date").

The Administrative Agent shall determine each interest rate applicable to the Loan in accordance with the terms hereof and, upon any rate change, shall promptly notify the Borrower of such rate in writing (or by telephone, promptly confirmed in writing).  Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(i)     Calculation of Interest.  All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Adjusted Term SOFR) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.3, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(j)     PIK Interest.

(1)     With respect to any and all interest that has accrued in respect of the Initial Term Loans during the period from and after the Closing Date and prior to the three-month anniversary of the Closing Date, 100% of such interest that has accrued and is payable shall be capitalized ("PIK Interest") (by adding such PIK Interest when paid to the principal amount of the outstanding Initial Term Loans on the applicable Interest Payment Date and such additional principal shall automatically constitute part of the principal amount of the Initial Term Loans for purposes hereunder, including the accrual of interest thereon at the interest rate applicable to such Initial Term Loans);

(2)     With respect to any and all interest that has accrued in respect of the Initial Term Loans during the period on or after the three-month anniversary of the Closing Date and prior to the six-month anniversary of the Closing Date (the "Second PIK Period Interest"), (x) the portion of such Second PIK Period Interest that has accrued at a rate equal to Adjusted Term SOFR plus 2.50% shall be paid in cash and (y) the remainder of such Second PIK Period Interest shall also be paid in cash or, at the election of the Borrower (by delivery of written notice to the Administrative Agent at least one (1) Business Day prior to the applicable Interest Payment Date), if after giving pro forma effect to the payment of all (or such portion as, after giving effect to the cash-pay portion would allow the Borrower to satisfy the pro forma Liquidity requirement of this clause (y)) of such Second PIK Period Interest in cash, the Borrower's pro forma Liquidity will be less than $15,000,000, such portion of the remainder may instead be paid as PIK Interest;

(3)     With respect to any and all interest that has accrued in respect of the Initial Term Loans during the period on or after the six-month anniversary of the Closing Date and prior to the one-year anniversary of the Closing Date (the "Third PIK Period Interest"), (x) the portion of the Third PIK Period Interest that has accrued at a rate equal to Adjusted Term SOFR plus 2.50% shall be paid in cash and (y) the remainder of the Third PIK Period Interest shall also be paid in cash or, at the election of the Borrower (by delivery of written notice to the Administrative Agent

49

at least one (1) Business Day prior to the applicable Interest Payment Date), if after giving pro forma effect to payment of all (or such portion as, after giving effect to the cash-pay portion would allow the Borrower to satisfy the pro forma Liquidity requirement of this clause (y)) of the Third PIK Period Interest in cash, the Borrower's pro forma Liquidity will be less than $10,000,000, such portion of the remainder may instead be paid as PIK Interest; and

(4)     With respect to any and all interest that has accrued in respect of the Initial Term Loans on or after the one-year anniversary of the Closing Date at the cash rate shall be paid in cash on each such Interest Payment Date; provided, that, any interest paid in connection with a prepayment of the Term Loans pursuant to Section 2.1(k), shall be payable all in cash, at the Adjusted Term SOFR or the Base Rate, as applicable.

(5)     Each Lender may determine in its sole discretion to record its PIK Interest as an increase in principal in the schedule annexed to its Notes or may request that such PIK Interest be evidenced by one or more additional Notes issued on the applicable Payment Date in the principal amount of such PIK Interest, provided, further, that the failure to request or obtain a promissory note to evidence the amount of such outstanding PIK interest shall not impair in any manner the enforceability of the Obligation of the Borrower with respect to the payment thereof or the accrual of interest with respect thereto.

(k)     Prepayment. Prepayments of the Loans shall be (or in the case of Section 2.1(k)(1), may be) made as set forth below:

(1)     The Borrower shall have the right, by giving written notice to the Administrative Agent (which such written notice shall be in a form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer) by not later than 1:00 p.m. on the fifteenth (15th) day preceding the date of such prepayment, to prepay all or any portion of the aggregate principal amount of any Loan, without premium or penalty. Each partial prepayment shall be in an aggregate principal amount of not less than $500,000 and shall be accompanied by accrued interest to the date of prepayment on the amount prepaid. Borrower shall reimburse the Lenders and the Administrative Agent on demand for any amounts set forth in, and to the extent required by, Section 10.5. Except as provided in the immediately succeeding sentence, voluntary prepayments of Term Loans shall be applied to reduce the repayments required by Section 2.1(h) in the inverse order of maturity (including the payment owing on the Maturity Date).

(2)     At any time that the sum of the Total Revolving Outstandings exceeds the aggregate Revolving Loan Commitments, including in connection with the reduction of the Revolving Loan Commitments concurrently with the closing of the loan documentation establishing the ABL Facility, the Borrower shall immediately prepay outstanding principal amount of the Revolving Loans in an amount equal to such excess (including the repayment in full in connection with the establishment of an ABL Facility).

(3)     Solely to the extent that any portion of such amount has been declined as a mandatory prepayment under the Holdco Credit Agreement by the applicable lenders thereunder, no later than fifteen (15) days following the date of delivery of annual audited financial statements for the fiscal year ending December 31, 2026 pursuant to Section 5.1(a) and thereafter no later than the date fifteen (15) days following the date of delivery of annual audited financial statements for each subsequent fiscal year pursuant to Section 5.1(a), the Borrower shall make a mandatory prepayment of the Term Loans (other than an Incremental Term Loan to the extent

50

otherwise provided in the documentation relating to such Incremental Term Loan) in an amount equal to 50.0% of Excess Cash Flow for such Excess Cash Flow Period; provided that at the option of the Borrower, any voluntary prepayments of the Term Loans, Revolving Loans (to the extent accompanied by a permanent reduction of the corresponding Commitment; but excluding the repayment and termination of the Revolving Loan Commitments to the extent such repayment is financed with loans under the ABL Facility) and revolving loans under the ABL Facility (to the extent accompanied by a permanent reduction of the corresponding commitments) made during such fiscal year prior to the applicable Excess Cash Flow prepayment date (and without duplication in the next fiscal year) will reduce the amount of Excess Cash Flow prepayments required for such fiscal year on a dollar-for-dollar basis (to the extent paid with Internally Generated Funds and not deducted in the calculation of Excess Cash Flow for such Excess Cash Flow Period) in each case made during such fiscal year and at the option of the Borrower, made prior to the date of such Excess Cash Flow prepayment.

(4)     No later than five (5) Business Days following the receipt by Holdings or any of its Subsidiaries of Net Cash Proceeds from (a) any Casualty Event or any Disposition pursuant to Section 6.4(h) or Section 6.4(i), the Borrower shall make a mandatory prepayment of the Term Loans in an amount equal to 100.0% of such Net Cash Proceeds; provided that (A) the foregoing prepayment obligation shall not apply to the extent such Net Cash Proceeds, are reinvested or committed to be reinvested in other assets or property useful in the business of the Borrower and its Subsidiaries within 12 months, and if so committed to be reinvested, reinvested no later than one hundred (180) days after the end of such 12-month period and (B) any such amounts to be reinvested shall be, immediately upon receipt thereof, placed into a Term Loan Collateral Account and held therein until such amounts are actually reinvested in accordance with this clause (4) and (b) any Disposition pursuant to Section 6.4(j), the Borrower shall make a mandatory prepayment of the Term Loans in an amount equal to 75.0% of such Net Cash Proceeds (the "Company Share"), with the remaining 25.0% of such Net Cash Proceeds distributed in accordance with the Plan of Reorganization and the Bankruptcy Settlement; provided that (x) the foregoing prepayment obligation with respect to the Company Share shall not apply to the extent such Net Cash Proceeds, are reinvested or committed to be reinvested in other assets or property useful in the business of the Borrower and its Subsidiaries within 12 months, and if so committed to be reinvested, reinvested no later than one hundred (180) days after the end of such 12-month period and (y) any such amounts to be reinvested shall be, immediately upon receipt thereof, placed into a Term Loan Collateral Account and held therein until such amounts are actually reinvested in accordance with this clause (4);

(5)     No later than five (5) Business Days following the receipt by Holdings or any of its Subsidiaries of Net Cash Proceeds of any Indebtedness (except for Permitted Indebtedness (other than Permitted Indebtedness pursuant to Section 6.2(d)) by Holdings or any of its Subsidiaries, the Borrower shall make a mandatory prepayment of the Term Loans in an amount equal to 100.0% of such Net Cash Proceeds.

(6)     [Reserved].

(7)     [Reserved].

(8)     To the extent applicable, the Borrower shall reimburse the Lenders and the Administrative Agent on demand for amounts set forth in and, to the extent required by, Section 10.5. Borrower shall give the Administrative Agent prior written notice of any event or circumstances reasonably likely to give rise to a mandatory prepayment obligation under this Section 2.1(k) (including the date and an estimate of the aggregate amount of such mandatory

prepayment) at least five (5) Business Days prior thereto); <u>provided</u> that the failure to give such notice shall not constitute a Default or an Event of Default but shall not relieve the Borrower of its obligation to make such mandatory prepayments. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower.

(9)    Each Term Loan Lender (or Required Term Loan Lenders on behalf of all Term Loan Lenders, to the extent that Required Term Loan Lenders determine that such cash should remain with the Borrower for liquidity purposes) may reject all or a portion of its pro rata share of any mandatory prepayment (such declined amounts, the "<u>Declined Proceeds</u>") of Term Loans required to be made pursuant to clauses (3), (4) or (5) of this Section 2.1(k) by providing written notice (each, a "<u>Rejection Notice</u>") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York time, two (2) Business Days prior to the prepayment date.

(A)    Each Rejection Notice shall specify the principal amount of the mandatory repayment of Term Loans to be rejected. If a Term Loan Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans.

(B)    Any Declined Proceeds remaining shall be retained by the Borrower (or the applicable Subsidiary) and may be applied by the Borrower or such Subsidiary in any manner not prohibited by this Agreement.

(l)    In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

## 2.2    <u>Election by Borrower</u>.

(a)    <u>Interest Rate for Advances</u>. The Borrower may, upon irrevocable written notice to the Administrative Agent, elect (i) as of any Business Day, to convert any Term Loans or Revolving Loans (or any part thereof in an aggregate amount of not less than $100,000 or a higher integral multiple of $50,000) that (1) are Base Rate Loans into Term SOFR Loans or (2) are Term SOFR Loans into Base Rate Loans, or (ii) as of the last day of the applicable Interest Period, to continue any Term Loans or Revolving Loans that are Term SOFR Loans having Interest Periods expiring on such day (or any part thereof in an aggregate amount not less than $100,000 or a higher integral multiple of $50,000) as Term SOFR Loans with a new Interest Period; <u>provided</u> that any conversion of a Term SOFR Loan on a day other than the last day of an Interest Period therefor shall be subject to <u>Section 10.5</u>.

(b)    <u>Lenders' Records</u>. The Borrower hereby irrevocably authorizes the Administrative Agent to make, or cause to be made, an appropriate notation on the Register, reflecting the date and original principal amount of each Advance made by any Lender, the dates for each period when such Advance is being maintained as a Term SOFR Loan, the interest rate for each such period and the dates of principal and interest payments on such Advance. The Register

shall be conclusive evidence of the status of such Lender's Advances, absent manifest error. Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances.

2.3 **Payments**. Any other provision of this Agreement to the contrary notwithstanding, the Borrower shall make each payment of interest (other than (i) PIK Interest, which shall be paid-in-kind in accordance with Section 2.1(j) on and principal of the Notes, and fees and other payments due under this Agreement (except as otherwise expressly provided herein), in immediately available funds to the Administrative Agent at its office referred to in Section 9.3 not later than 2:00 p.m. on the date when due. Subject to Section 10.1 (Taxes) hereof, payments by the Borrower under this Agreement shall be made without offset, counterclaim or other deduction and in such amounts as may be necessary in order that all such payments shall not be less than the amounts otherwise specified to be paid under this Agreement and the Notes. The Administrative Agent will promptly thereafter distribute like funds ratably to each Lender and each L/C Issuer (unless such amount is not to be shared ratably in accordance with the terms hereof).

2.4 **Setoff; etc**. Upon the occurrence and during the continuance of an Event of Default, each Lender and each L/C Issuer and the Administrative Agent are hereby authorized at any time and from time to time, without prior notice to the Borrower (any such notice being expressly waived by the Borrower), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or Administrative Agent to or for the credit or the account of the Borrower or any of its Subsidiaries, including specifically any amounts held in any account maintained at such Lender, L/C Issuer or Administrative Agent, against any and all amounts which may be owed to the Administrative Agent or the Lenders, or any of them, by the Borrower, in connection with this Agreement or any Loan Document; provided that no Lender shall exercise any such right without the prior written consent of the Administrative Agent (at the direction of the Required Lenders). The rights of the Lenders, the L/C Issuers and the Administrative Agent under this Section 2.4 are in addition to other rights and remedies (including other rights of set-off) which the Lenders and the Administrative Agent may have under applicable law. Each Lender and each L/C Issuer and the Administrative Agent agrees, severally and not jointly, to use reasonable efforts to notify the Borrower of any exercise of its rights pursuant to this Section 2.4, provided, however, that failure to provide such notice shall not affect any Lender's or the Administrative Agent's rights under this Section 2.4 or the effectiveness of any action taken pursuant hereto; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.10 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Lenders and the L/C Issuers, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender and each L/C Issuer agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

2.5 **Sharing**. If any Lender shall obtain any payment (whether voluntary, involuntary, by application of offset or otherwise) on account of the Loans made by it in excess of such Lender's ratable share of payments on account of the Loans obtained by all the Lenders, such Lender shall purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided that, (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this Section 2.5 shall not be construed to apply to (x) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to

53

any assignee or participant, other than an assignment to any Borrower or any Guarantor or any Affiliate thereof (as to which the provisions of this <u>Section 2.5</u> shall apply). The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this <u>Section 2.5</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including the right to setoff) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

**2.6**    **<u>Fees</u>**.

(a)    <u>Fee Letter</u>. The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(b)    <u>Revolving Loan Unused Fee</u>. Borrower shall pay to Administrative Agent for the account of each Revolving Loan Lender in accordance with its Applicable Revolving Loan Percentage, an unused fee (the "<u>Revolving Loan Unused Fee</u>") equal to the Applicable Unused Margin times the Revolving Loan Unused Portion for the period (including any portion thereof when Revolving Loan Lenders' obligations to lend shall be suspended by reason of the Borrower's inability to satisfy the conditions of <u>Article IV</u>) commencing on the Closing Date and continuing through the Revolver Maturity Date, computed on the actual daily amount of the Revolving Loan Unused Portion during the period for which payment is made. Such Revolving Loan Unused Fee shall be payable to Administrative Agent for the ratable benefit of Revolving Loan Lenders in arrears on the first day of each calendar quarter.

(c)    <u>Letter of Credit Fee</u>. The Borrower agrees to pay to the Administrative Agent for the ratable benefit of the Revolving Loan Lenders, as compensation to such Lenders for Letter of Credit Obligations incurred hereunder, for each calendar quarter during which any Letter of Credit Obligation shall remain outstanding, a fee (the "<u>Letter of Credit Fee</u>") in an amount equal to the product of the daily undrawn face amount of all Letters of Credit Issued, guarantied or supported by risk participation agreements multiplied by a per annum rate to be agreed by the Borrower and the L/C Issuer.

(d)    <u>Upfront Fees</u>. On the Closing Date the Borrower shall be deemed to have (i) paid to the Administrative Agent, for the ratable benefit Term Loan Lender, an upfront fee in an amount equal to two percent (2.00%) of the aggregate principal amount of the Term Loans deemed funded to the Borrower by such Term Loan Lender on the Closing Date, which upfront fee will be capitalized to the principal amount of the Term Loan on the Closing Date and (ii) borrowed, and each Revolving Loan Lender shall be deemed to have advanced, a Revolving Loan (on a cashless basis without the need for any Revolving Loan Lender to actually advance funds) in an amount equal to two percent (2.00%) of its Revolving Loan Commitment. For the avoidance of doubt, the new Term Loans represented by the capitalization of the upfront fee contemplated by clause (i) above shall be in addition to each Term Loan Lender's Term Loans reflected on <u>Schedule I</u>.

**2.7**    **<u>Lending Branch</u>**. Subject to the provisions of <u>Section 10.6(a)</u>, each Lender may, at its option, elect to make, fund or maintain its Loans hereunder at the branch or office specified on the signature pages hereto or such other of its branches or offices as such Lender may from time to time elect.

**2.8**    **<u>Application of Payments and Collections</u>**.

(a)    <u>Order of Application of Payments</u>. Subject to the provisions of subsection (b) below, all payments and prepayments and any other amounts received by the

Administrative Agent from or for the benefit of the Borrower shall be applied, <u>first</u> to pay principal of and interest on any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, <u>second</u> ratably to pay all other Obligations in respect of fees, expenses, reimbursements or indemnities then due and payable, <u>third</u> ratably to pay interest then due in respect of the Loans, and <u>fourth</u> to pay the principal of the Loans then due and payable, and in the case of any prepayment of Term Loans, in the inverse order of maturity (including the payment owing on the Maturity Date).

(b)      <u>Application of Payments After an Event of Default</u>.  After the occurrence of an Event of Default and while the same is continuing, the Administrative Agent shall, unless the Administrative Agent and the Lenders and the L/C Issuers shall agree otherwise, apply all payments and prepayments in respect of any Obligations in the following order:

(1)      to pay interest on and then principal of any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

(2)      to pay Obligations in respect of any fees, expense reimbursements or indemnities then due to the Administrative Agent;

(3)      ratably to pay Obligations in respect of any fees, expenses, reimbursements or indemnities (other than principal and interest) payable to the Lenders and the L/C Issuers;

(4)      to the payment of interest on all Loans and any amounts due pursuant to <u>Sections 10.4</u> and <u>10.5</u>, to be allocated among the Lenders and the L/C Issuers pro rata based on the respective aggregate amounts of such accrued interest and amounts owed to them; and

(5)      to the payment of the outstanding principal amounts of all Loans and Obligations under Rate Hedging Obligations and Related Treasury Management Arrangements to be allocated among the Lenders, pro rata based on the respective outstanding principal amounts described in this clause (5) payable to them;

(c)      Each of the Lenders hereby irrevocably designates the Administrative Agent its attorney in fact for the purpose of receiving any and all payments to be made to such Lender in respect of Obligations held by it, and hereby directs each payor of any such payment to make such payment to the Administrative Agent.  Each of the Lenders hereby further agrees that if, notwithstanding the foregoing, it should receive any such payment (including by set-off), it shall hold such payment in trust for, and promptly deliver such payment to, the Administrative Agent.

(d)      The Administrative Agent shall promptly distribute to each Lender and each L/C Issuer at its primary address set forth on the appropriate signature page hereof or at such other address as a Lender may notify the Administrative Agent in writing, such funds as such Lender and each L/C Issuer may be entitled to receive.

**2.9**      **[Reserved]**.

**2.10**      **Defaulting Lenders**.

(a)     Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(1)     Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 9.1.

(2)     Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 2.4 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 3.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender and each L/C Issuer irrevocably consents hereto.

(3)     Certain Fees.  No Defaulting Lender shall be entitled to receive any fee payable under Section 2.6 for any period during which that Lender is a Defaulting Lender and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender. In the event that any reallocation of Letter of Credit Obligations occurs pursuant to Section 2.10(c), during the period of time that such reallocation remains in effect, the Letter of Credit Fee payable with respect to such reallocated portion shall be payable to (A) all Revolving Loan Lenders based on their pro rata share of such reallocation or (B) to the L/C Issuer for any remaining portion not reallocated to any other Revolving Loan Lenders. So long as a Lender is a Defaulting Lender, the Letter of Credit Fee payable with respect to any Letter of Credit Obligations of such Defaulting Lender that has not been reallocated pursuant to Section 2.10(c) shall be payable to the L/C Issuer.

(b)      Reallocation.  If any Revolving Loan Lender is a Defaulting Lender, all or a portion of such Defaulting Lender's Letter of Credit Obligations (unless such Lender is the L/C Issuer that Issued such Letter of Credit) shall, at the Administrative Agent's election at any time or upon any L/C Issuer's written request delivered to the Administrative Agent (whether before or after the occurrence of any Default or Event of Default), be reallocated to and assumed by the Revolving Loan Lenders that are not Defaulting Lenders in accordance with their pro rata Revolving Loan Commitments (calculated as if the Defaulting Lender's Revolving Loan Commitment was reduced to zero and each other Revolving Loan Lender's Revolving Loan Commitment had been increased proportionately), provided that no Revolving Loan Lender shall be reallocated any such amounts or be required to fund any amounts that would cause the sum of its outstanding Revolving Loans and outstanding Letter of Credit Obligations to exceed its Revolving Loan Commitment.

(c)      Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with, with respect to Term Loans, their Applicable Term Loan Percentages, and with respect to Revolving Loans, their Applicable Revolving Loan Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

2.11    Rates.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

2.12    **Benchmark Replacement Setting for Term Loans**.

(a)    <u>Benchmark Replacement</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Term Loan Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Term Loan Lenders comprising the Required Term Loan Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable, at the option of the Borrower, on a monthly or quarterly basis.

(b)    <u>Benchmark Replacement Conforming Changes</u>.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    <u>Notices; Standards for Decisions and Determinations</u>.  The Administrative Agent will promptly notify the Borrower and the Term Loan Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to paragraph (d) below and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Term Loan Lender (or group of Term Loan Lenders) pursuant to this <u>Section 2.12</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 2.12</u>.

(d)    <u>Unavailability of Tenor of Benchmark</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (x) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable

or non-representative tenor and (y) if a tenor that was removed pursuant to clause (x) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)  <u>Benchmark Unavailability Period</u>.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a Term SOFR Loan of, conversion to or continuation of Term SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

## ARTICLE III
## CONDITIONS PRECEDENT

**3.1**  <u>**Conditions Precedent to Effectiveness**</u>.  The effectiveness of this Agreement and the obligation of the Lenders to make any Advance on the Closing Date, is subject to the following conditions precedent:

(a)  The Administrative Agent shall have received copies (in sufficient number for each of the Lenders to receive a copy) of all of the following, each in form and substance reasonably satisfactory to the Administrative Agent in all respects, and, if applicable, each dated the Closing Date or such earlier date as approved by the Administrative Agent:

(1)  This Agreement, appropriately completed and duly executed by the parties hereto;

(2)  The Notes, to the extent requested, appropriately completed and duly executed by the Borrower;

(3)  The Guaranty, appropriately completed and duly executed and delivered by each of the Guarantors;

(4)  The Security Agreement, appropriately completed and duly executed by the parties thereto;

(5)  Uniform Commercial Code financing statements authorized by the applicable Loan Party as debtor, and naming the Administrative Agent as secured party with respect to the Collateral;

(6)  Favorable legal opinions of Kirkland & Ellis LLP, counsel to the Loan Parties, and Gordon Rees Scully Mansukhani, LLP, special Arkansas counsel to the Loan Parties, each addressed to the Administrative Agent and each of the Lenders;

(7)     A certificate executed by a Responsible Officer or member of each Loan Party, certifying in the name of and on behalf of such Loan Party that (A) a true, correct and complete copy of its charter document, with all amendments thereto (as certified by the Secretary of State or similar state official), is attached to the certificate, (B) a true, correct and complete copy of its operating agreement or bylaws, with all amendments thereto, is attached to the certificate, (C) a correct and complete copy of the resolutions of its members or shareholders authorizing the execution, delivery and performance of the Loan Documents to which it is a party are attached to the certificate, and such resolutions have not been subsequently modified or repealed, (D) certificates of good standing dated within a reasonably close period of time prior to the Closing Date for such Loan Party issued by the Secretary of State or similar state official for each state in which such Loan Party is required to be qualified to do business are attached to the certificate and (E) signature and incumbency certificates of its officers executing any of the Loan Documents, all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification;

(8)     A certificate of the duly signed by a Responsible Officer of Borrower, certifying as to the solvency on the Closing Date of the Borrower and its Subsidiaries in a manner consistent with Section 4.21;

(9)     A Notice of Borrowing appropriately completed and duly executed by the Borrower;

(10)     Payment by the Borrower of all fees due on or prior to the Closing Date in accordance with the provisions of Section 2.6 which payment shall be nonrefundable;

(11)     Payment by the Borrower of all reasonable costs and expenses of the Administrative Agent (including reasonable and documented legal fees and expenses) incurred in connection with the preparation and execution of the Loan Documents and incident to all proceedings in connection with, transactions contemplated by, and documents relating to this Agreement and the Loan Documents, which payment shall be nonrefundable to the extent required by Section 9.4;

(12)     The Loan Parties shall have executed and delivered a payoff letter, confirming that all obligations and Liens under the DIP Credit Agreement will be defeased in full on or prior to the Closing Date;

(13)     Duly executed payoff letters and UCC-3 termination statements with respect to any Liens which are not Permitted Liens upon the Collateral, including for the avoidance of doubt all payoff letters and UCC-3 termination statements with respect to the Liens securing the Prepetition Term Loan Claims;

(14)     Each Credit Party shall have obtained all governmental authorizations and all consents of other Persons, in each case that are necessary or advisable in connection with the transactions contemplated by the Loan Documents and each of the foregoing shall be in full force and effect. All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Loan Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired;

(15)     A certified copy of the Confirmation Order as duly entered by the Bankruptcy Court and entered on the docket of the clerk of the Bankruptcy Court, following due notice to such creditors and other parties-in-interest as required by the Bankruptcy Court, provided that (x) no court of competent jurisdiction shall have issued any injunction, restraining order or other order with respect to the Confirmation Order which otherwise prohibits the consummation of the transactions described herein or the other transactions, or modifies such transactions, and no governmental or other action or proceeding shall have been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the transactions described herein or the other transactions, and (y) all conditions precedent to the effectiveness of the Plan of Reorganization (other than the occurrence of the Closing Date hereunder) shall have been satisfied;

(16)     Evidence as to the payment in full on the Closing Date of all material allowed administrative expense claims, priority claims and other claims under the Plan of Reorganization required to be paid on the Closing Date in a manner satisfactory to the Required Lenders;

(17)     Evidence that the form and substance of (i) a business plan and projections of the Loan Parties and (ii) the debt and equity capital structure of the Loan Parties and their parent entities (including Organizational Documents), in each case, after giving effect to the Transactions, are satisfactory to the Required Lenders;

(18)     Evidence that the Transactions will be consummated on the Plan Effective Date and that the Plan Effective Date will occur in accordance with the Plan of Reorganization;

(19)     Evidence that, other than as a result of the bankruptcy cases of the Loan Parties filed on the Petition Date and any successor cases (and the events resulting therefrom), since the Petition Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Occurrence;

(20)     Evidence that there is no threatened or pending litigation or other proceedings with respect to the Transactions;

(21)     The Holdco Facility shall be issued in accordance with the Plan of Reorganization, on terms and pursuant to documentation acceptable to the Required Lenders, and the Administrative Agent shall have received copies of the executed documentation for the same; and

(22)     The Borrower and each of the Guarantors shall have provided the documentation and other information to the Administrative Agent (to the extent reasonably requested by the Administrative Agent in writing at least five (5) Business Days prior to the Closing Date) that are required by regulatory authorities under the applicable "know-your-customer" rules and regulations, including the PATRIOT Act, in each case at least two (2) Business Days prior to the Closing Date.

The making of the Advance hereunder shall not constitute a waiver by the Administrative Agent or any Lender of any right which the Administrative Agent or such Lender may have in the event that any certificate, agreement, financial statement or other document delivered pursuant to this Section 3.1 or otherwise in connection with the transactions contemplated by this Agreement shall prove to have been false or misleading in any respect.

61

**3.2**    **Conditions Precedent to All Advances**.  The obligation of the Lenders to make any Advance and the L/C Issuer to Issue Letters of Credit hereunder, including the establishment of the Initial Term Loans on the Closing Date, shall be further subject to the satisfaction of each of the following conditions immediately prior to or contemporaneously with each such Advance, unless waived in writing by the Administrative Agent:

(a)    A Notice of Borrowing and/or L/C Request appropriately completed and duly executed by the Borrower;

(b)    The representations and warranties set forth in <u>Article IV</u> and in each of the other Loan Documents are true and correct in all material respects on the date of and after giving effect to the making of the Advance or incurrence of Letter of Credit Obligations (except, in the case of any representation and warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or period, as the case may be) and any representation and warranty that is qualified by references to materiality or Material Adverse Occurrence or similar term or qualification, shall be true and correct in all respects, except that the representations and warranties set forth in <u>Section 4.5</u> as to the financial statements of the Borrower shall be deemed to be updated to refer to the audited and unaudited financial statements of the Borrower, as the case may be, most recently delivered to the Administrative Agent pursuant to <u>Section 5.1</u>; and

(c)    No Default or Event of Default shall then have occurred and be continuing on the date of the making of the Advance or incurrence of Letter of Credit Obligations.

The delivery of a Notice of Borrowing or L/C Request by the Borrower shall constitute a certification by the Borrower, binding upon the Borrower as to the matters set forth in subsections (b) and (c) above.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and each of the Lenders that as of the Closing Date and as of the date of each Advance,

**4.1**    **Organization; etc**.  Each Loan Party is a limited liability company or corporation, as the case may be, validly organized and existing and in good standing under the laws of the state of its organization, has full power and authority to own its property and conduct its business as conducted by it and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence.  A list of jurisdictions in which such Loan Party is qualified to do business is set forth in <u>Annex I</u>.  Each Loan Party has full power and authority to enter into and to perform its obligations under the Loan Documents to which it is a party and, in the case of the Borrower only, to request Advances under this Agreement.  Each Loan Party has all licenses, permits and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its Property, except for permits, licenses, and rights the failure of which to have or obtain would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Occurrence.

**4.2**    **Due Authorization**.  The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party (a) have been duly authorized by all necessary corporate or limited liability company action, as the case may be, (b)  do not and will not conflict with, result in any violation

of or constitute any default under, (i) any provision of the organizational, constitutive or governing documents (including, as applicable, articles of organization and operating agreements) of such Loan Party, (ii) any other material agreement binding on or applicable to such Loan Party, or (iii) any of their respective Property, or any law or governmental regulation or court decree or order binding upon or applicable to such Loan Party, or any of the Property and (c) will not result in the creation or imposition of any Lien on any of such Loan Party's Property pursuant to the provisions of any agreement binding on or applicable to such Loan Party, or such Property, except any such Liens created pursuant to the Security Documents in favor of the Administrative Agent, for the benefit of the Secured Parties and Permitted Liens, except with respect to any breach, contravention or violation referred to in clauses (b) (ii) and (b)(iii), to the extent that such breach, contravention or violation would not reasonably be expected to result in a Material Adverse Occurrence.

4.3 **Subsidiaries**. As of the Closing Date, no Loan Party has any Subsidiaries except those listed on Annex II, which correctly sets forth the name of each Subsidiary, the jurisdiction of its incorporation and the percentage ownership of each Subsidiary which is owned, of record or beneficially, by such Loan Party and/or one or more of its Subsidiaries. Each Loan Party and its Subsidiaries has good and marketable title to all of the Equity Interests or Equity Interests Equivalents it owns in each of its Subsidiaries, free and clear of any Lien (other than any Liens in favor of the Administrative Agent for the benefit of the Secured Parties and inchoate Permitted Liens) and all such shares have been duly issued and are fully paid and non-assessable. Each Loan Party has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and is duly licensed or qualified and in good standing in each other jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence. As of the Closing Date, a list of the jurisdictions in which each Loan Party is qualified to do business is set forth on the attached Annex II. Each Loan Party has full power and authority to own and operate its properties, to carry on its business as now conducted and to enter into and perform the Loan Documents to which it is a party. Each Loan Party has all licenses, permits, and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its properties, except for permits, licenses, and rights the failure of which to have or obtain, individually or in the aggregate, is not, and will not result in, a Material Adverse Occurrence.

4.4 **Validity of the Agreement**. Each Loan Document is the legal, valid and binding obligation of each Loan Party and is enforceable in accordance with its terms except that, as to enforcement of remedies, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' and secured parties' rights generally or by equitable principles relating to enforceability, regardless of whether considered in equity or at law.

4.5 **Financial Statements**.

(a) The most recent financial statements furnished pursuant to Section 5.1(a) (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b) The most recent financial statements furnished pursuant to Section 5.1(b) (i) were prepared in accordance with Modified GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes.

**4.6** **Litigation; etc**. There is no action, suit, claim, demand, disputes, cause of action, proceeding, arbitration or investigation at law or equity, or before or by any federal, state, local or other governmental department, commission, court, tribunal, board, bureau, agency or instrumentality, domestic or foreign, pending, or to the Knowledge of the Loan Parties, threatened in writing, against or affecting any Loan Party or any of its Properties, which if determined adversely would reasonably be expected to result in a Material Adverse Occurrence.

**4.7** **Compliance with Law**. No Loan Party is (a) in default or breach with respect to any judgment, order, writ, injunction, rule, regulation or decree of any court, governmental authority, department, commission, agency or arbitration board or tribunal or (b) in violation of any law, rule, regulation, ordinance or order relating to its or their respective businesses, in each case of (a) and (b) above, the breach, default or violation of which would reasonably be expected to result in a Material Adverse Occurrence.

**4.8** **ERISA Compliance**. With respect to each Plan which is an employee pension benefit plan (as defined in Section 3(2) of ERISA) that is intended to be qualified under Section 401(a) of the Code, the Internal Revenue Service has issued a determination that each such Plan is qualified in form under Section 401(a) and related provisions of the Code, and that each related trust or custodial account is exempt from taxation under Section 501(a) of the Code, and nothing has occurred since the date of that determination that could reasonably be expected to adversely affect the qualified status of such Plan. All Plans comply with ERISA and other applicable laws, except as would not reasonably be expected to result in a Material Adverse Occurrence. There exist with respect to the Loan Parties no Multiemployer Plans, for which a material withdrawal or termination liability may be incurred. There exist with respect to all Plans or trusts: (a) no failure to satisfy the minimum funding standard within the meaning of ERISA, whether or not waived; (b) no termination of any Plan or trust which would result in any material liability to the PBGC or any "reportable event," as that term is defined in ERISA, which is likely to constitute grounds for termination of any Plan or trust by the PBGC; (c) no "prohibited transaction," as that term is defined in ERISA, which is likely to subject the Borrower to any material tax or penalty on prohibited transactions imposed by Section 4975 of the Code, and (d) no pending disputes, arbitrations, claims, suits, grievances or governmental audits involving any Plan (other than routine claims for benefits payable under any such Plan) that could reasonably be expected (individually or in the aggregate) to result in a Material Adverse Occurrence.

**4.9** **Title to Assets**. Each Loan Party holds or will hold title to the Collateral, including any owned Real Property in fee simple and good, legal and marketable title to any Equipment, in each case and used in its business and pledged as Collateral for the Obligations, free and clear of all Liens except for Permitted Liens and other encumbrances permitted pursuant to Section 6.3, except where the failure to have such title would not reasonably be expected to result in a Material Adverse Occurrence. Except for Uniform Commercial Code financing statements evidencing Permitted Liens, or Uniform Commercial Code financing statements for which terminations will be tendered to the Administrative Agent prior to or contemporaneously with the first Advance for any Unit, no financing statement under the Uniform Commercial Code as in effect in any jurisdiction and no other filing which names any Loan Party as debtor or which covers or purports to cover any of the Collateral, including Real Property or Equipment pledged as Collateral for the Obligations, will be effective and on file in any state or other jurisdiction, and no Loan Party will sign or authorize any such financing statement or filing or any security agreement authorizing any secured party thereunder to file any such financing statement or filing other than in favor of Administrative Agent.

**4.10** **Use of Proceeds**. Proceeds of the Loans shall be used (i) to pay certain fees, costs and expenses incurred in connection with the other transactions contemplated by this Agreement, and (ii) to

refine certain Indebtedness of the Borrower and its Subsidiaries as contemplated by the Plan of Reorganization and (iii) to fund working capital and general corporate purposes.

**4.11    Governmental Regulation**.  No Loan Party is required to obtain any material consent, approval, authorization, permit or license which has not already been obtained from, or effect any material filing or registration (other than the filing of the Uniform Commercial Code financing statements) which has not already been effected with, any federal, state or local regulatory authority in connection with the execution and delivery of this Agreement or the performance, in accordance with their respective terms, of this Agreement or any other Loan Document except for any consent, approval, authorization, permit or license, the failure of which to obtain or make would not reasonably be expected to result in a Material Adverse Occurrence.

**4.12    Margin Stock**.  No part of any Advance shall be used at any time by any Loan Party to purchase or carry margin stock (within the meaning of Regulations T, U and X) or to extend credit to others for the purpose of purchasing or carrying any margin stock.  No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purposes of purchasing or carrying any such margin stock.  No part of the proceeds of any Advance will be used by any Loan Party for any purpose which violates, or which is inconsistent with, any regulations promulgated by the Board of Governors of the Federal Reserve System.

**4.13    Investment Company Act**.  No Loan Party is registered or required to be registered as an "investment company," or an "affiliated person" of, or a "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended. The making of the Advances, the application of the proceeds and repayment thereof by the Borrower and the performance by each Loan Party of the transactions contemplated by this Agreement will not violate any provision of said Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.

**4.14    Accuracy of Information**.  All written information heretofore furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders for purposes of or in connection with this Agreement or any transaction contemplated by this Agreement is, and all other such information furnished by or on behalf of such Loan Party to the Administrative Agent is, when considered as a whole, complete and correct in all material respects and did not, when delivered, contain any untrue statement of material fact or omit to state a fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements have been made (after giving effect to all supplements thereto).

**4.15    Tax Returns; Audits**.  Each Loan Party has filed all federal, and material state and local tax returns and other material reports which are required to be filed, and has paid all material taxes as shown on said returns and on all assessments received by any such Person (except for any assessments which are being contested in good faith by appropriate proceedings that will prevent a forfeiture or sale of any property and for which an adequate reserve has been provided on the books of such Loan Party in accordance with GAAP), to the extent that such taxes have become due or has obtained extensions with respect to the filing of such returns and has made provision in accordance with GAAP for the payment of taxes anticipated to be payable in connection with such returns.  Each Loan Party has made all material required withholding deposits.

**4.16    Environmental and Safety Regulations**.  Each Loan Party is in compliance with all requirements of applicable federal, state and local environmental, pollution control, health and safety statutes, laws and regulations except for any noncompliance which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Occurrence and is not, to the knowledge of each

65

Loan Party, the subject of any federal or state investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, except for any investigation which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence. The Borrower further represents and warrants that the Real Property and its intended use complies with all applicable laws, governmental regulations and the terms of any enforcement action by any federal, state, regional or local governmental agency regarding all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus under such laws, except in each case for any noncompliance which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence. Each Loan Party further represents and warrants that no written notice, demand, request for information, citation, summons or order has been issued, no complaint has been filed, no penalty has been assessed and, to the knowledge of each Loan Party, no investigation or review is pending or threatened by any governmental or other entity with respect to any alleged failure by such Loan Party to comply in any respect with any of such environmental laws, except in each case which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence (each of the foregoing, an "Environmental Action").

      **4.17**    **Payment of Wages; Labor Matters**.  The Borrower is in compliance with the Fair Labor Standards Act, as amended, in all material respects, and the Borrower has paid all minimum and overtime wages required by law to be paid to their respective employees. There are no strikes, work stoppages, slowdowns or lockouts existing, pending or, to the Knowledge of the Loan Parties, threatened against or involving any Loan Party or any Subsidiary of any Loan Party, except for those that would reasonably be expected to result in a Material Adverse Occurrence.  Except as set forth on Schedule 4.17, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Loan Party or any Subsidiary of any Loan Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Loan Party or any Subsidiary of any Loan Party and (c) to the knowledge of any Loan Party, no such representative has sought certification or recognition with respect to any employee of any Loan Party or any Subsidiary of any Loan Party.

      **4.18**    **Intellectual Property**.  Each Loan Party owns, possesses or has the right to use all material licenses and rights to all patents, trademarks, trademark rights, trade names, trade name rights, trade dress, service marks, domain marks and copyrights necessary to conduct their business in all material respects as now being conducted, to the Knowledge of the Loan Parties, without material conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, in each case of all of the foregoing, except where the failure to own, possess or have the right to use such intellectual property, or conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, would not reasonably be expected to result in a Material Adverse Occurrence.  All such material licenses and rights with respect to patents, trademarks, trademark rights, trade names, trade name rights, service marks and copyrights are, to the Knowledge of the Loan Parties, in full force and effect in all material respects.

      **4.19**    **Projections**.  The budget projections of the Borrower, furnished annually to the Administrative Agent, consisting of balance sheets, cash flow statements and income statements of the Borrower and its Subsidiaries after giving effect to the making of the Advances hereunder and the application of the proceeds thereof, together with supporting details and a statement of underlying assumptions, have been prepared in the light of the past business history of the Borrower and its Subsidiaries and on the basis of the assumptions set forth therein, which assumptions are in the opinion of the Borrower

reasonable at the time such budget projections were prepared (it being recognized that budget projections may differ from actual results and such differences may be material and such budget projections are subject to significant uncertainties and contingencies which are beyond the Borrower's control and no assurance can be given that any particular projection will be realized).

**4.20    Solvency**.  After giving effect to the transactions contemplated by this Agreement, as of the Closing Date, the Loan Parties and their Subsidiaries, on a consolidated and combined basis, have capital sufficient to carry on their business, are solvent and are able to pay their debts and obligations as they mature in the ordinary course.  After giving effect to the consummation of the transactions contemplated by this Agreement, as of the Closing Date, the Loan Parties and their Subsidiaries, on a consolidated and combined basis, now own Property having a value, both at fair valuation and at present fair saleable value, greater than the amount required to pay their debts, obligations and contingent liabilities as they mature in the ordinary course.

**4.21    No Material Adverse Occurrence**.  Since the date of the most recent audited financial statements submitted to the Administrative Agent and the Lenders as described in Section 4.5, there has occurred no event which is or which could reasonably be expected to result in a Material Adverse Occurrence.

**4.22    [Reserved]**.

**4.23    Deposit Accounts**.  Schedule 4.23 lists all banks and other financial institutions at which any Loan Party maintains deposit or other accounts as of the Closing Date, and such Schedule correctly identifies the name, address and any other relevant contact information reasonably requested by the Administrative Agent with respect to each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

**4.24    [Reserved]**.

**4.25    [Reserved].**

**4.26    Valid Liens**.  The Security Agreement and each other Security Document delivered pursuant hereto will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties to the secure the Obligations, legal, valid and enforceable Liens on, and security interests in, each Loan Party's right, title and interest in and to the Collateral thereunder, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Security Document), such Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of each Loan Party in such Collateral, in each case subject to no Liens other than the applicable Permitted Liens.

**4.27    Foreign Assets Control Regulations and Anti-Money Laundering**.  The Borrower is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  The Borrower (i) is not a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is not a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or

otherwise engage in business transactions with such Person or (iii) is not controlled by (including by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

**4.28**    **Patriot Act**.  The Loan Parties, each of their Subsidiaries and, to their knowledge, each of their Affiliates, are in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations.  No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

**4.29**    **Insurance.**  The Borrower and its Subsidiaries maintain insurance policies with respect to their respective properties and business, in each case in compliance with Section 5.7.

**4.30**    **SBA Matters.**  Each of Holdings and the Borrower acknowledges that Brightwood Capital SBIC I, LP is, and certain other Lenders may from time to time be or become, a Small Business Investment Company (as defined in the SBIA), subject to the rules and regulations contained in and promulgated under the SBIA. As of the Closing Date, each of Holdings and the Borrower, together with its "affiliates" (for purposes of this paragraph only, as that term is defined in Title 13, Code of Federal Regulations, §121.103), is a Small Business Concern (as defined in the SBIA). Neither Holdings nor any of its Subsidiaries presently engages in, and shall not hereafter engage in, any activities for which a Small Business Concern is prohibited from engaging in under the SBIA, nor shall any such Person use directly or indirectly the proceeds of the Loans for any purpose for which a Small Business Investment Company is prohibited from providing funds by the SBIA. The representations made by Holdings and Borrower in the SBA forms delivered on the Closing Date pursuant to Section 5.13 (or such later date of delivery) shall be deemed to be representations made by Holdings and Borrower as of the Closing Date (or such later date) under this Section 4.29.

<div align="center">

**ARTICLE V**
**CERTAIN AFFIRMATIVE COVENANTS**

</div>

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Loan shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**5.1**    **Financial Information; etc**.  The Borrower will furnish to the Administrative Agent copies of the following financial statements, reports and information:

(a)       (i) as soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year (or by May 31, 2026 in the case of the fiscal year ended December 31, 2025) of the Borrower (commencing with the fiscal year ended December 31, 2025), a copy of the consolidated and combined audited financial statements, including balance sheet, related statements of operations, and statements of cash flows, of the Borrower and its Subsidiaries for such fiscal year, with comparative figures for the preceding fiscal year, prepared in accordance with GAAP, certified without qualification or exception by Deloitte & Touche LLP, or such other nationally recognized auditor that is not subject to qualification as to "going concern" or the scope

of such audit (other than an upcoming maturity date of any Indebtedness (including the termination of the Revolving Loan Commitments or the commitments under any other revolving credit facility) occurring within one (1) year from the time such opinion is delivered), accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with GAAP for such period, and a written management's discussion and analysis of the financial condition and results of operations for such fiscal year, as compared to the previous fiscal year and budgeted amounts, and (ii) as soon as available, and in any event within thirty (30) days after the delivery of audited financial statements pursuant to clause (a)(i) above for the applicable fiscal year, a reasonably detailed unaudited reconciliation (which shall not be required to be (x) attached or appended to the Borrower's audited financial statements or (y) audited or reviewed in any manner by the Borrower's auditor) reflecting the audited financial statements presented in accordance with GAAP for such fiscal year, on the one hand, and management-prepared unaudited financial statements presented in accordance with Modified GAAP for such fiscal year, on the other hand;

(b)    (i) as soon as available and in any event within sixty (60) days after the end of each fiscal quarterly period of each fiscal year of the Borrower, consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with Modified GAAP for such period, (subject to year-end adjustments and the lack of footnotes), and a written management's discussion and analysis of the financial condition and results of operations for such fiscal quarter and the then elapsed portion of the fiscal year, as compared to the comparable periods in the previous fiscal year and budgeted amounts, and (ii) as soon as available and in any event within seventy (70) days after the end of each fiscal quarterly period of each fiscal year of the Borrower and no later than ten (10) days after delivery of reports pursuant to clause (i), a site-level "databook" for the last month of such fiscal quarter (substantially in the same form as has been previously delivered to the Administrative Agent) detailing the following information by site: for each Unit and with respect to each such quarterly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (c) volume of retail traffic, (f) volume of total traffic, (g) chemical expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(c)    (i) as soon as available and in any event within forty-five (45) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year and (ii) as soon as available and in any event within fifty-five (55) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower and no later than ten (10) days after delivery of the reports and certificates pursuant to clause (i), a site-level "databook" for such fiscal month (substantially in the same form as has been previously delivered to the Administrative Agent)

69

detailing the following information by site: for each Unit and with respect to each such monthly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (c) volume of retail traffic, (f) volume of total traffic, (g) chemical expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(d)      with each financial statement required by <u>Section 5.1(a)</u> and <u>Section 5.1(b)</u> (other than the last fiscal quarter of such year) to be delivered to the Administrative Agent, a Compliance Certificate signed by a Responsible Officer of the Borrower;

(e)      promptly after the Borrower knows or has reason to know that any Default has occurred and is continuing or Material Adverse Occurrence has occurred, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice of such Default or Material Adverse Occurrence describing the same in reasonable detail and a description of the action that the Borrower has taken and proposes to take with respect thereto;

(f)      promptly after receipt thereof, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, all final letters and reports to management of the Borrower prepared by its independent certified public accountants and the responses of the management of the Borrower thereto;

(g)      promptly following the commencement of any litigation, suit, administrative proceeding or arbitration relating to the Borrower or any of its Properties which if adversely determined would reasonably be expected to result in a Material Adverse Occurrence or otherwise relating in any way to the transactions contemplated by this Agreement, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice thereof describing the allegations of such litigation, suit, administrative proceeding or arbitration and the Borrower's response thereto;

(h)      promptly following the commencement of any Environmental Action, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice describing the allegations of such Environmental Action;

(i)      promptly following the occurrence of, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, any "reportable event" or "prohibited transaction" or the imposition of a withdrawal or termination liability within the meaning of ERISA in connection with any Plan or Multiemployer Plan that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower, and, when known, any action taken by the Internal Revenue Service, Department of Labor or PBGC that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower with respect thereto;

(j)      within sixty (60) days of each fiscal year end thereafter, a copy of the updated annual budget and financing projections for the Borrower for each fiscal quarter for such fiscal year, with discussion of principal assumptions upon which such budget is based;

(k)      [reserved];

70

(l)        promptly upon the delivery to or receipt from the ABL Agent, copies of (i) all amendments, waivers or other material modifications to any of the loan documents governing the ABL Facility; (ii) copies of all material notices, including notices of default or acceleration with respect to the ABL Facility and (iii) monthly borrowing base certificates and, upon request of the Administrative Agent, any other material collateral reporting (including, without limitation, any other borrowing base certificates) required to be delivered to the ABL Lenders under the ABL Facility, if any; and

(m)        such other information with respect to the financial condition and operations of the Borrower as the Administrative Agent or any Lender may reasonably request (subject to the Disclosure Limitations).

Notwithstanding the foregoing, the obligations in paragraphs (a), (b), (c) and (j) of this Section 5.1 may be satisfied by furnishing the applicable financial statements or other information required by such paragraphs of Holdings, Parent (or any other parent company), in each case, within the time periods specified in such paragraphs; provided, that (i) to the extent such financial statements, reports or other information relate to Holdings, Parent (or any other parent company), such financial statements, reports and information shall be accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Holdings, Parent (or any other parent company), on the one hand, and the information relating to the Borrower on a standalone basis, on the other hand, which consolidating information shall be certified by a Responsible Officer of the Borrower as having been fairly presented in all materials respects.

**5.2        Maintenance of Existence; etc**. Each Loan Party shall maintain and preserve its existence, and qualification and good standing in all states in which such qualification and good standing are required in order to conduct its business and own its property as conducted and owned in such states, except where the failure to do so would not reasonably be expected to result in a Material Adverse Occurrence.

**5.3        Maintenance of Properties**. Each Loan Party will maintain or cause to be maintained in the ordinary course of business in good repair, working order and condition (reasonable wear and tear excepted) all material Properties used in their respective businesses (whether owned or held under lease), and from time to time make or cause to be made all necessary repairs, renewals, replacements, additions, betterments and improvements thereto, except to the extent the failure to maintain such Properties would not reasonably be expected to result in a Material Adverse Occurrence.

**5.4        Payment of Liabilities**. Each Loan Party shall pay and discharge as the same may become due and payable, all material taxes, assessments and other governmental charges or levies against or on any of its Property, as well as all other lawful claims of any kind which, if unpaid, might become a Lien upon any of its Property; provided, however, that the foregoing shall not require such Loan Party to pay any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested diligently in good faith by appropriate proceedings that will prevent a forfeiture or sale of any Property and an adequate book reserve in accordance with GAAP shall have been set aside with respect thereto, but (with respect to claims that are not Taxes, assessments and other governmental charges or levies) only so long as such claim does not become a Lien on any assets of such Loan Party.

**5.5        Compliance with Laws**. Each Loan Party shall carry on its business activities in substantial compliance with all applicable federal or state laws and all applicable rules, regulations and orders of all governmental bodies and offices having power to regulate or supervise its business activities, including all applicable environmental, pollution control, health and safety statutes, laws and regulations, except in each case where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence; provided that nothing in this Section 5.5 shall impair the obligations of the Loan

Parties in <u>Section 5.15</u>.  Each Loan Party shall maintain all material rights, liens, permits, certificates of compliance or grants of authority necessary for the conduct of its business, except where the failure to maintain would not reasonably be expected to result in a Material Adverse Occurrence.  Each Loan Party agrees that the Real Property and its intended use will comply at all times with all applicable laws, governmental regulations and the terms of any enforcement action now or hereafter commenced by any federal, state, regional or local governmental agency, including all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended from time to time), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus, except where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence.

5.6     <u>**Books and Records; Inspection Rights; etc**</u>.  Each Loan Party shall keep (a) a system of accounting administered in accordance with GAAP and (b) books and records reflecting all of its business affairs and transactions in accordance with GAAP.  Each Loan Party shall permit the Administrative Agent (accompanied by any Lender) or any representative thereof, at reasonable times and intervals, during normal business hours and upon reasonable notice to the Borrower, to visit the offices of such Loan Party, discuss financial matters with Responsible Officers of such Loan Party and with its independent public accountants (and by this provision each Loan Party authorizes its independent public accountants to participate in such discussions) and examine any of the such Loan Party's books and other company records in a non-disruptive manner; <u>provided</u>, that unless an Event of Default has occurred and is continuing there shall be no more than one such inspection or visit per year.  Notwithstanding anything to the contrary in this <u>Section 5.6</u>, no Loan Party will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information, that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) the disclosure of which is restricted by binding agreements with a third party that is not a controlled Affiliate of any Loan Party (collectively, the "<u>Disclosure Limitations</u>").

5.7     <u>**Insurance**</u>.  Each Loan Party will:

(a)     Maintain insurance including, but not limited to, business interruption coverage, and public liability coverage insurance from responsible companies in such amounts and against such risks to such Loan Party as is prudent and reasonably satisfactory to the Administrative Agent; <u>provided</u> that the Administrative Agent acknowledges that the insurance maintained by the Loan Parties as of the Closing Date is satisfactory;

(b)     Keep its tangible assets insured by responsible companies against loss or damage by fire, theft, burglary, pilferage, loss in transit, explosions and hazards in amounts which are prudent for the carwash industry, in accordance with industry standards, all premiums thereon to be paid by the Loan Parties;

(c)     With respect to each Unit, if at any time the area in which any Improvements located on such Unit is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), (i) obtain flood insurance in such total amount as required by Flood Insurance Laws, and otherwise comply with the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent, including a copy of the flood insurance policy and a declaration page relating to the insurance policies required by this <u>Section 5.7</u> which shall (a) identify the addresses of each parcel of Real

Property located in a special flood hazard area, (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (c) provide that the insurer will give the Administrative Agent thirty (30) days written notice of cancellation or non-renewal and shall include evidence of annual renewals of such insurance and (iii) shall be otherwise in form and substance satisfactory to the Administrative Agent;

(d)    Require that each insurance policy for the Collateral provide for at least thirty (30) days' prior written notice to the Administrative Agent of any termination of or proposed cancellation or non-renewal of such policy, or material reduction in coverage, and name the Administrative Agent for the Secured Parties as additional named loss payee or additional named insured, as applicable;

**5.8    ERISA**.  The Borrower agrees that all assumptions and methods used to determine the actuarial valuation of employee benefits, both vested and unvested, under any Plan, and each such Plan, will comply in all material respects with ERISA and other applicable laws.

(a)    The Borrower will not at any time permit any Plan to:

(1)    engage in any "prohibited transaction" for which an exemption is not available as such term is defined in Section 4975 of the Code or in Section 406 of ERISA;

(2)    fail to satisfy the minimum funding standard as such term is defined in Section 302 of ERISA, whether or not waived;

(3)    be terminated under circumstances which are likely to result in the imposition of a lien on the property of the Borrower pursuant to Section 4068 of ERISA, if and to the extent such termination is within the control of the Borrower; or

(4)    be operated or administered in a manner which is not in compliance with ERISA or any applicable provisions of the Code;

if the event or condition described in (1), (2), (3) or (4) above would reasonably be expected to subject the Borrower to a Material Adverse Occurrence.

(b)    Upon the request of the Administrative Agent or any Lender, the Borrower will furnish a copy of the annual report of each Plan (Form 5500) required to be filed with the Internal Revenue Service.  Copies of such annual reports shall be delivered no later than thirty (30) days after the date the copy is requested.

**5.9    Additional Subsidiary Guarantors; Post-Closing Requirements**.

(a)    Within thirty (30) days (or such longer period as agreed by the Administrative Agent in its discretion) after the Borrower or any of its Subsidiaries creates or acquires an entity which is or becomes a Subsidiary, cause such Person (other than an Excluded Foreign Subsidiary) to (i) become a Guarantor by executing and delivering to the Administrative Agent a counterpart of the Guaranty or such other document as the Administrative Agent shall reasonably deem appropriate for such purpose, (ii) take all such action and execute such agreements, documents and instruments, including execution and delivery of a counterpart signature page to the Security Agreement and execution and delivery of such other Security Documents, that may be necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a first priority perfected security interest and Lien in any Collateral owned by such

73

new Subsidiary and (iii) deliver to the Administrative Agent documents of the types referred to in <u>Section 3.1(a)(7)</u> and, if reasonably requested by the Administrative Agent, favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clauses (i) and (ii) of this subsection), all in form, content and scope reasonably satisfactory to the Administrative Agent.

(b)      The Borrower shall or shall cause the applicable Loan Parties to deliver to the Administrative Agent within sixty (60) days after the Closing Date (or such longer period as agreed by the Administrative Agent in its discretion), customary insurance endorsements naming the Administrative Agent, for the benefit of the Secured Parties, as lender loss payee/additional insured, as applicable, on behalf of the Secured Parties pursuant to the requirements of <u>Section 5.7</u>.

(c)      The Borrower shall or shall cause the applicable Loan Parties to deliver to the Administrative Agent within sixty (60) days after the Closing Date (or such longer period as agreed by the Administrative Agent in its discretion), control agreements with respect to bank accounts of the Borrower and its Subsidiaries to the extent required by <u>Section 5.11</u>.

(d)      To the extent requested by the Administrative Agent, with respect to any such Material Real Property owned by the Borrower and its Subsidiaries as of the Closing Date, within ninety (90) days after the Closing Date, or with respect to any Material Real Property acquired after the Closing Date, within ninety (90) days after the applicable date of acquisition thereof (or, in either case, such longer period as agreed by the Administrative Agent in its discretion), as applicable, deliver mortgages or deeds of trust (together with customary supporting documentation reasonably required by Administrative Agent, including title insurance), with respect to all Material Real Property owned by the Borrower and its Subsidiaries, in each case, in customary form and in form and substance reasonably satisfactory to the Administrative Agent; <u>provided</u>, that in no event shall any mortgages or supporting documentation be required with respect to the Specified Real Estate.

(e)      The Borrower shall deliver to the Administrative Agent consolidated and combined audited financial statements, including balance sheet, related statements of operations, and statements of cash flows, of Zips and its Subsidiaries (i) for the fiscal year ended December 31, 2023 by July 31, 2025 (or such later date as agreed by the Administrative Agent in its discretion) and (ii) for the fiscal year ended December 31, 2024 by December 31, 2025 (or such later date as agreed by the Administrative Agent in its discretion).

(f)      The Borrower shall, or shall cause the applicable Loan Parties to, deliver to the Administrative Agent within thirty (30) days after the Closing Date (or such longer period as agreed by the Administrative Agent in its discretion) a certificate from the applicable Loan Party's insurance broker, or other evidence satisfactory to the Administrative Agent, that all insurance required to be maintained pursuant to Section 5.7 is in full force and effect, together with endorsements naming the Administrative Agent, for the benefit of the Secured Parties, as additional insured and loss payee thereunder.

**5.10**    **[Reserved]**.

**5.11**    **Cash Management Systems**.  Within sixty (60) days after the Closing Date, unless waived or extended by the Administrative Agent in its sole discretion, the Borrower shall enter into, and cause each

depository, securities intermediary or commodities intermediary to enter into, control agreements subject to the provisions in the Security Agreement.

**5.12**   **Further Assurances**.  Promptly upon reasonable request by the Administrative Agent, the Borrower shall (and, subject to the limitations hereinafter set forth, shall cause the other Loan Parties to) take such additional actions and execute such documents as the Administrative Agent may reasonably request from time to time in order (i) to carry out the purposes of this Agreement or any other Loan Documents; provided, that the Borrower and the other Loan Parties shall not be obligated to take any such actions or execute such documents to the extent that such actions or documents would impose any additional obligations not set forth herein on such Loan Party, (ii) to subject to the Liens in the Collateral granted by any of the Security Documents any of the Collateral and (iii) to perfect and maintain the validity, effectiveness and priority of the Liens granted by any of the Security Documents and the Liens intended to be created thereby.

**5.13**   **SBA Matters**.  Each of Holdings and Borrower will, and will cause each of its Subsidiaries to: (a) upon the request of any Lender that is a Small Business Investment Company (as defined in the SBIA), repay such Lender's Loan in full (including the applicable prepayment fee), in immediately available funds, in the event that Borrower or any other Loan Party changes the nature of its business within one year after the Closing Date (or, if applicable, any later borrowing date hereunder) in a manner that would cause such Lender to have provided funds to Borrower or any other Loan Party pursuant to this Agreement or any other Loan Document in violation of 13 C.F.R. §§ 107.700-107.760 (as amended from time to time); (b) upon the request of any Lender that is a Small Business Investment Company or the SBA, (i) submit to such Lender and/or the SBA timely and accurate compliance reports at such times and in such form and containing such information as the SBA may determine to be necessary to enable the SBA to ascertain whether Borrower and each other Loan Party have complied or are complying with 13 C.F.R. Part 112 ("Part 112"), (ii) submit to such Lender such information as may be necessary to enable such Lender to meet its reporting requirements under Part 112, and (iii) permit the SBA to have access with advance written notice and during normal business hours to such of its books, records, accounts and other sources of information, and its facilities as may be pertinent to ascertain compliance with Part 112. Where any information required of the Borrower or any other Loan Party is in the exclusive possession of any other agency, institution or Person and such agency, institution or Person shall fail or refuse to furnish this information, Borrower and each other Loan Party shall so certify in its report and shall set forth what efforts it has made to obtain this information; and (c) upon any Lender's request, take any and all actions required to permit any Lender to comply with SBIA and applicable law, in the event such Lender is restricted or prohibited from holding Loans or Qualified Equity Interests in any Loan Party or any Affiliate thereof as a result of any noncompliance thereunder.

**5.14**   **OFAC; Patriot Act**.  The Loan Parties shall, and shall cause their Subsidiaries to, comply with the laws, regulations and executive orders referred to in Section 4.27 and Section 4.28 (subject to any materiality qualifiers set forth in such Section 4.27 and Section 4.28).

**5.15**   **Sale-Leaseback Accounting Treatment**.  The Loan Parties shall, and shall cause their Subsidiaries to, employ best efforts to ensure that sale-leaseback transactions are treated as successful sale-leaseback transactions for GAAP accounting purposes. To the extent any sale-leaseback transactions are determined to be failed sale-leaseback(s) for accounting purposes under GAAP, Borrower shall promptly notify Administrative Agent (on behalf of itself and the Lenders).

**5.16**   **Quarterly Lender Calls**.  The Loan Parties shall, and shall cause their Subsidiaries to, participate in a meeting of the Lenders once during each fiscal quarter, to be held via teleconference, to discuss the financial performance of the Borrower and its Subsidiaries. Each such meeting shall be held at a time reasonably agreed between the Borrower and the Administrative Agent.

## ARTICLE VI
## FINANCIAL COVENANTS AND NEGATIVE COVENANTS

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Advance shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**6.1** **Financial Covenants.**

(a)    Fixed Charge Coverage Ratio. Commencing with the Test Period ending September 30, 2026, the Borrower shall not permit the Fixed Charge Coverage Ratio as of the last day of any Test Period to be less than 1.20 to 1.00.

(b)    First Lien Leverage Ratio. Commencing with the Test Period ending September 30, 2026, the Borrower shall not permit the First Lien Leverage Ratio as of the date set forth in the table below for the Test Period ending on such date to be greater than the maximum ratio set forth in the table below opposite such date:

| Test Period | Maximum First Lien Leverage Ratio |
|---|---|
| Fiscal quarters ended September 30, 2026 and December 31, 2026 | 5.00:1.00 |
| Fiscal quarters ended March 31, 2027 and June 30, 2027 | 4.50:1.00 |
| Fiscal quarter ended September 30, 2027 and each fiscal quarter ended thereafter | 4.00:1.00 |

(c)    Equity Cure Contributions. In the event the Borrower fails to comply with the Financial Covenants as oof any applicable Test Period, for purposes of determining compliance with the Financial Covenants, any cash equity contribution to the Borrower after the last day of the applicable fiscal quarter and on or prior to the day that is fifteen (15) Business Days after the day on which financial statements are required to be delivered for such fiscal quarter (each such contribution, an "Equity Cure Contribution") will, at the request of the Borrower, be included in the calculation of Consolidated EBITDA for purposes of determining compliance with the Financial Covenants for the applicable fiscal quarter and applicable subsequent periods; provided, that, in each case:

(1)    (x) in any four fiscal quarter period, there shall be a period of at least two fiscal quarters in which no Equity Cure Contribution was made, and (y) only two Equity Cure Contributions may be made during the term of this Agreement,

(2)    the amount of any Equity Cure Contributions shall not exceed the amount required to cause the Borrower to be in compliance with the Financial Covenants,

(3)    all Equity Cure Contributions will be used solely for curing the Financial Covenants and will be disregarded for purposes of determining the availability of any baskets, pricing or step-downs with respect to other provisions contained in the Loan Documents and

(4)     there shall be no pro forma or other reduction of First Lien Debt (including by way of cash netting) using the proceeds of any Equity Cure Contribution for purposes of determining compliance for the fiscal quarter (and subsequent quarters in the applicable Test Period) in respect of which such Equity Cure Contribution was made.

For the avoidance of doubt, compliance with the then-applicable Financial Covenants set forth in this Section 6.1 with respect to (x) the fourth fiscal quarter of any fiscal year, shall be tested only based upon the Compliance Certificate delivered with respect to the annual financial statements referred to in Section 5.1(a) and (y) any other fiscal quarter shall be tested only based upon the Compliance Certificate delivered with respect to the quarterly financial statements referred to in Section 5.1(b).

**6.2     Limitations on Indebtedness**.  The Loan Parties shall not, and shall not permit any of their Subsidiaries to, create, assume, incur, issue, guarantee or otherwise become or remain obligated in respect of, or permit to be outstanding, any Indebtedness, except the following (the "Permitted Indebtedness"):

(a)     Indebtedness outstanding on the date hereof and listed on **Schedule 6.2(a)** and any refinancings, refundings, renewals or extensions thereof; provided that the principal amount of such Indebtedness is not increased from the original principal balance except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder;

(b)     the Obligations (including Incremental Term Loans);

(c)     Indebtedness representing deferred compensation to employees of any Loan Party incurred in the ordinary course of business or other similar arrangements incurred by such Person in connection with the any Permitted Acquisitions or any other Investment expressly permitted hereunder;

(d)     [reserved];

(e)     Indebtedness in the form of trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice, which Indebtedness shall not be secured by a Lien on any Property of the Borrower or its Subsidiaries;

(f)     Indebtedness of any Loan Party owed in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business or consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(g)     Indebtedness of a Loan Party in respect of performance bonds, bid bonds, appeal bonds, completion guaranties, surety bonds and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business, and any extension, renewal or refinancing thereof to the extent not provided to secure the repayment of other Indebtedness and to the extent that the amount of refinanced Indebtedness is not greater than the amount of Indebtedness being refinanced;

77

(h)    Indebtedness of a Loan Party arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(i)    Indebtedness consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(j)    Indebtedness incurred by a Loan Party in a Permitted Acquisition, any other Investment expressly permitted hereunder or any sale, in each case to the extent constituting indemnification obligations or obligations in respect of purchase price adjustments (including earn-outs and other deferred purchase price adjustments) or other similar adjustments;

(k)    Guarantee(s) of any Loan Party incurred in the ordinary course of business in respect of obligations to suppliers, customers, franchisees, lessors and licensees;

(l)    obligations arising under any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantee(s) thereof;

(m)    Indebtedness of any Loan Party owing to another Loan Party;

(n)    Indebtedness (and Guarantees thereof) in respect of Swap Contracts designed to hedge against Holdings', the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks, in each case not for speculative purposes;

(o)    Indebtedness of any Loan Party assumed in connection with a Permitted Acquisition or Permitted Investment; provided that (i) such Indebtedness was not incurred or assumed in contemplation of such Permitted Acquisition or Permitted Investment, (ii) such Indebtedness is non-recourse to (and is not assumed by any of) the Borrower, Holdings or any Subsidiary (other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Guarantor after the Closing Date), (iii) the aggregate outstanding principal amount of all such Indebtedness shall not exceed $5,000,000 at any time, and (iv) no Default or Event of Default then exists or would result therefrom;

(p)    Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of Holdings (or any direct or indirect parent thereof) permitted by Section 6.10; provided, that such Indebtedness shall be subordinated to the Obligations, on terms and conditions reasonably satisfactory to the Administrative Agent;

(q)    Guarantees by any Loan Party in respect of Indebtedness of any Loan Party otherwise permitted hereunder; provided that if such Indebtedness is subordinated to the Obligations, such Guarantee shall be subordinated to the same extent;

(r)    Indebtedness supported by a Letter of Credit, in a principal amount not to exceed the face amount of such Letter of Credit;

(s)        Indebtedness with respect to letters of credit listed on **Schedule 6.2(s)**;

(t)        Indebtedness for Real Property Taxes; <u>provided</u> the payment thereof is not required to be made pursuant to <u>Section 5.4</u>;

(u)        solely to the extent that the Supermajority Lenders have consented to the establishment of the ABL Facility, Indebtedness of any Loan Party under the ABL Facility in an aggregate principal amount not to exceed the amount permitted under the ABL/Term Intercreditor Agreement;

(v)        [Reserved];

(w)        Indebtedness with respect to Capital Leases and purchase money Indebtedness, in each case, incurred prior to or within one hundred and twenty (120) days after the acquisition, construction, lease or improvement of the applicable asset in an aggregate amount not to exceed $5,000,000 at any time;

(x)        to the extent that, as of any date of determination, there is no L/C Issuer hereunder and the ABL Facility has not yet been established, Indebtedness under commercial, trade and standby letters of credit (including reimbursement obligations with respect thereto) in the ordinary course of business or incurred in order to support or backstop any performance or surety bonds permitted to be issued and/or incurred under clause (g) above; and

(y)        any other Indebtedness of any Loan Party; <u>provided</u> that the aggregate outstanding principal amount of all such unsecured Indebtedness shall not exceed $5,000,000 at any time.

**6.3**     <u>Liens</u>.  The Loan Parties shall not, and will cause their Subsidiaries not to, create, incur, assume or permit to exist or to be created or assumed any Lien on any of its assets, whether now owned or hereafter acquired, except the following (the "<u>Permitted Liens</u>"):

(a)        Liens existing on the Closing Date and set forth on **Schedule 6.3**;

(b)        Liens arising by operation of law on the Real Property for real estate taxes and Liens securing Taxes, assessments or governmental charges or levies or the claims or demands of contractors, materialmen, mechanics, carriers, warehousemen, landlords and other like Persons; <u>provided</u> the payment thereof is not required to be made pursuant to <u>Section 5.4</u> hereof;

(c)        Liens incurred or deposits made in the ordinary course of business (1) in connection with workmen's compensation, unemployment insurance, social security and other like laws or (2) to secure the performance of letters of credit, bids, tenders, sales contracts, leases, statutory obligations, surety, appeal and performance bonds and other similar obligations not incurred in connection with the borrowing of money, the obtaining of advances or the payment of the deferred purchase price of the Real Property or Equipment and, in the case of this clause (2) only, not in excess of 2,500,000 in the aggregate outstanding at any one time;

(d)        attachments, judgment and other similar Liens arising in connection with court proceedings, provided the execution or other enforcement of such Liens is stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings in such manner as not to have the Real Property or Equipment subject to such Liens forfeitable in accordance with <u>Section 5.4</u>;

79

(e) easements, rights-of-ways, reservations, exceptions, minor encroachments, rights of entry, restrictive covenants, licenses, restrictions and similar charges created or incurred in the ordinary course of business and not in connection with Indebtedness, and which in the aggregate do not materially detract from the value of any Real Property or materially impair with its use in the business operations of the Borrower and its Subsidiaries; including any such items included as exceptions in the title policy obtained by Administrative Agent related to the Real Property;

(f) Liens in favor of the Borrower or any Guarantor;

(g) Liens in favor of the Administrative Agent for the benefit of the Secured Parties or otherwise to secure the Obligations;

(h) Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(i) Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(j) Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(k) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l) precautionary Uniform Commercial Code and similar filings;

(m) Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted hereunder;

(n) Liens on Property constituting Goods (as defined in the applicable Uniform Commercial Code), excluding inventory, but including Equipment and Fixtures (as defined in the applicable Uniform Commercial Code), securing obligations under leases of Units entered into in the ordinary course of business;

(o) (i) Liens existing on property at the time of (and not in contemplation of) its acquisition or existing on the property of any Person at the time such Person becomes (and not in contemplation of such Person becoming) a Guarantor, in each case after the Closing Date; provided that (A) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Guarantor) and (B) the Indebtedness secured thereby is permitted under Section 6.2(o), and (ii) Liens incurred in connection with escrow arrangements or other agreements relating to a Permitted Acquisition or Permitted Investment permitted;

80

(p)      Liens in respect of the cash collateralization of Letters of Credit and letters of credit permitted by Sections 6.2(s) or 6.2(x);

(q)      Liens (i) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(r)      Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 7.1(h);

(s)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and not securing Indebtedness prohibited by this Agreement;

(t)      Liens securing Indebtedness permitted pursuant to Section 6.2(w);

(u)      the modification, replacement, renewal or extension of any Lien permitted by this Section 6.3; provided that (i) such Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 6.2;

(v)      Liens securing Indebtedness permitted by Section 6.2(u) (subject to the ABL/Term Intercreditor Agreement);

(w)      Liens securing Indebtedness or other obligations in an aggregate principal amount as of the date of initial attachment of such Lien not to exceed $5,000,000; and

(x)      Non-exclusive licenses or sublicenses of intellectual property granted in the ordinary course of business.

**6.4      Sales of Assets**.  The Loan Parties shall not, and will cause their Subsidiaries not to, make any Dispositions, except for:

(a)      Dispositions of obsolete, damaged, worn out, used or surplus Property (including for purposes of recycling), whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of Property no longer used or useful in the conduct of the business of the Borrower and the Subsidiaries;

(b)      Dispositions of Property to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement Property; provided that to the extent the Property being transferred constitutes Collateral such replacement Property shall constitute Collateral;

(c)      Dispositions of Property to the Borrower or any Subsidiary;

(d)       to the extent constituting a Disposition, any Loan Party and its Subsidiaries may enter into an consummation transactions expressly permitted by <u>Section 6.3</u>, <u>Section 6.6</u> or <u>Section 6.10</u>;

(e)       Dispositions to the extent of any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by any Loan Party or its Subsidiaries to the extent allowable under Section 1031 of the Code (or comparable or successor provision);

(f)       Dispositions in connection with the unwinding of any Swap Contract;

(g)       the sale, license, sublicenses, transfer, lapse, abandonment, discontinuance or other Disposition of any Intellectual Property in the ordinary course of business or if determined by the Borrower or any Subsidiary in its reasonable business judgment that such Disposition is desirable in the conduct of its business;

(h)       Dispositions of any Property with a fair market value (as determined by the Borrower in its reasonable judgment) not to exceed $5,000,000 in the aggregate for all such Dispositions in any fiscal year;

(i)       Dispositions for a fair market value (as determined by the Borrower in its reasonable judgment), so long as, at the time of such Disposition, (i) no Event of Default has occurred and is continuing, and (ii) at least 75% of the consideration for such Disposition in excess of $2,500,000 consists of cash and cash equivalents (in each case free and clear of Liens at the time received); and

(j)       Dispositions of the Specified Real Estate for fair market value as reasonably determined by the Borrower; provided, that Dispositions of Specified Real Estate shall only be permitted pursuant to this clause (j) and not any other clause of this <u>Section 6.4</u>.

**6.5** **<u>Liquidations, Mergers and Consolidations</u>**.  Except as permitted pursuant to <u>Sections 6.6</u> and <u>6.8</u> and except for the merger, consolidation or amalgamation of any Loan Party or any Subsidiary of any Loan Party into any other Loan Party, the Loan Parties shall not, and will cause their Subsidiaries not to, liquidate or dissolve itself (or suffer any liquidation or dissolution) or otherwise wind up, or consolidate with or merge into any other Person; <u>provided</u> that any Subsidiary of the Borrower may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders so long as (A) no Event of Default shall result therefrom and (B) the surviving Person or the Person who receives the assets of such dissolving or liquidated Subsidiary that is Loan Party shall be a Loan Party.

**6.6** **<u>Investments</u>**.  The Loan Parties shall not, and will cause their Subsidiaries not to, permit to exist any Investment, except that, so long as no Event of Default then exists or is caused thereby, the Borrower and its Subsidiaries may make Permitted Investments.

**6.7** **<u>Transactions with Affiliates</u>**.  The Loan Parties shall not, and will cause their Subsidiaries not to, enter into any material transaction (including the purchase, sale or exchange of Property, the rendering of any service, the making of any Investment in an Affiliate or the repayment of any Indebtedness owed to an Affiliate) with an Affiliate (other than any such transactions among the Loan Parties and their Subsidiaries), except for:

(a)     any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on Schedule 6.7, or any amendment thereto (so long as any such amendment is not adverse to the Lenders in any material respect as compared to the applicable agreement as in effect on the Closing Date);

(b)     any material transaction in the ordinary course of business and pursuant to the reasonable requirements of the Loan Parties and their Subsidiaries business, upon terms which are fair and reasonable to the Loan Parties and their Subsidiaries and which are not less favorable to the Loan Parties and their Subsidiaries than would be obtained in a comparable transaction with a Person not an Affiliate;

(c)     the Borrower may make Permitted Expense Reimbursement and Indemnity Payments; and

(d)     all transactions contemplated by the Plan of Reorganization, including the entry into the Loan Documents and the issuance of the Holdco Facility and Equity Interests in any parent entity of the Borrower.

**6.8     [Reserved]**.

**6.9     Amendment and Waiver**.  The Loan Parties shall not, and will cause their Subsidiaries not to, (a) except in connection with a transaction otherwise permitted hereunder, enter into any material amendment of, or agree to or accept or consent to any material waiver of any of the material provisions of its Organizational Documents or (b) except to the extent permitted by the ABL/Term Intercreditor Agreement, amend, modify or change in any manner any term or condition of any of the loan documents governing the ABL Facility.

**6.10     Restricted Payments**.  The Loan Parties shall not, and will cause their Subsidiaries not to, declare, pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests or Equity Interests Equivalents of any Loan Party or any direct or indirect parent thereof, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Loan Parties or any of their Subsidiaries (collectively, "Restricted Payments"), except that the Loan Parties and their Subsidiaries may:

(a)     Restricted Payments to allow for the distribution of "Excess Cash Flow" (as defined in the Holdco Credit Agreement as in effect on the Closing Date) to make mandatory prepayments required under the Holdco Credit Agreement in respect thereof, if any;

(b)     to the extent constituting Restricted Payments, make payments permitted by Section 6.7;

(c)     subject to the last paragraph in this Section 6.10, make Tax Distributions to the direct or indirect equity holders of Holdings;

(d)     to the extent constituting Restricted Payments, any Loan Party and their Subsidiaries may enter into and consummate transactions expressly permitted by Sections 6.6 and 6.8;

(e)     pay (or make Restricted Payments to allow Holdings or any direct or indirect parent thereof to pay) for the repurchase, retirement or other acquisition or retirement for

value of Equity Interests or Equity Interests Equivalents of Holdings (or of any direct or indirect parent thereof) held by any future, present or former employee, director, consultant or distributor (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Borrower (or any direct or indirect parent of the Borrower) or any of its Subsidiaries upon the death, disability, retirement or termination of employment of any such Person or otherwise pursuant to any employee or director equity plan, employee or director stock option or profits interest plan or any other employee or director benefit plan or any agreement (including any separation, stock subscription, shareholder or partnership agreement) with any employee, director, consultant or distributor of the Borrower (or any direct or indirect parent of the Borrower) or any of its Subsidiaries in an aggregate amount after the Closing Date not to exceed, together with any payments made under any other Indebtedness permitted under Section 6.2(p), $500,000 in any calendar year, in each case so long as no Default or Event of Default has occurred and is continuing or would occur as a result thereof;

(f)    make any Restricted Payment the proceeds of which will be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) operating costs and expenses of Holdings or its direct or indirect parents which do not own other Subsidiaries besides Holdings, its Subsidiaries and any other direct or indirect parents of Holdings incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable solely to the ownership or operations of the Borrower and its Subsidiaries.

Notwithstanding anything to the contrary herein, for any taxable year in which the Borrower or Holdings are members of a group filing a consolidated, combined or similar income tax return ("Tax Group") of which any direct or indirect parent of Borrower or Holdings is the common parent, Borrower and Holdings may make tax distributions to Parent (and Parent may make further distributions to the parent of the Tax Group, if Parent is not the parent of the Tax Group) ("Tax Distributions"), the proceeds of which will be used by the parent of the Tax Group to pay consolidated or combined U.S. federal, state, and local income taxes imposed on such parent to the extent such income taxes are attributable to the income of such parent, Holdings, Borrower and those Subsidiaries of Borrower that are members of such Tax Group (or any disregarded entity thereof); provided that the amount of such distributions in respect of any taxable period shall not, in the aggregate, exceed the amount that Holdings, Borrower and those Subsidiaries of Borrower that are members of such Tax Group (including income of any disregarded entity thereof) would have been required to pay in respect of such U.S. federal, state, or local income taxes (as the case may be) in respect of such taxable period if Holdings, Borrower and those Subsidiaries of Borrower paid such income taxes directly as a stand-alone consolidated or combined income tax group. For the avoidance of doubt, Holdings and Borrower shall be permitted to make such payments on a quarterly basis during such taxable year based on its best estimate of the amounts permitted to be distributions in accordance with the definition of Tax Distributions; provided, further that the total amount of such quarterly distributions for any taxable year shall not exceed the total amount otherwise distributable in accordance with the definition of Tax Distributions and, if the aggregate amount of estimated Tax Distributions paid to any such parent of the Tax Group for any taxable year exceeds the amount that would be calculated as of the end of such taxable year, the excess shall be deducted from the amount of the next Tax Distribution otherwise payable to such parent of the Tax Group.

**6.11    Payments in Respect of Certain Indebtedness**. The Loan Parties shall not, and will cause their Subsidiaries not to, (i) pay interest on any Indebtedness that (x) is subordinated in right of payment to the Obligations, or (y) secured by Liens on the Collateral on a junior basis to the Liens on the Collateral securing the Obligations (collectively, "Subordinated Indebtedness"), or (ii) prepay, redeem, purchase,

defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Subordinated Indebtedness, except:

(a)     refinancings of such Subordinated Indebtedness pursuant to <u>Section 6.2(a)</u>;

(b)     regularly scheduled interest and principal payments as and when due in respect of such Indebtedness, other than payments prohibited by the subordination provisions applicable thereto;

(c)     payments of or in respect of such Indebtedness made solely with Qualified Equity Interests (other than Equity Cure Contributions) in Holdings or the Borrower or the conversion of such Indebtedness into Qualified Equity Interests of Holdings or the Borrower; and

(d)     prepayments of intercompany Indebtedness permitted hereby owed by Holdings or any Subsidiary thereof to Holdings or any Subsidiary thereof, other than prepayments prohibited by the subordination provisions governing such Indebtedness.

**6.12     Change in Business**.  The Loan Parties shall not, and will cause their Subsidiaries not to, engage in any line of business that is (i) substantially different from those lines of business carried on by it on the Closing Date (or any reasonable extension thereof) and (ii) not ancillary, corollary, complimentary or related thereto.

**6.13     Changes in Accounting, Name and Jurisdiction of Organization**.  The Loan Parties shall not, and will cause their Subsidiaries not to, (i) change their fiscal year, (ii) change its name as it appears in official filings in its jurisdiction of organization or (iii) change its jurisdiction or form of organization, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, without at least ten (10) Business Days' prior written notice to the Administrative Agent and the acknowledgement of the Administrative Agent that all actions reasonably required by the Administrative Agent have been completed.

**6.14     No Negative Pledges**.  No Loan Party shall, and shall not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Subsidiary to pay dividends or make any other distribution on any of such Subsidiary's Equity Interests or Equity Interests Equivalents or to pay fees, including management fees, or make other payments and distributions to the Borrower or any Subsidiary, except pursuant to the terms of the Loan Documents.  No Loan Party shall, and shall not permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any contractual obligation prohibiting or otherwise restricting the existence of any Lien upon any Collateral in favor of the Administrative Agent to secure the Obligations, whether now owned or hereafter acquired except (i) in connection with any document or instrument governing Liens permitted herein, <u>provided</u> that any such restriction contained therein relates only to the Property subject to such Permitted Liens or (ii) with consent of the Administrative Agent.  Nothing in this <u>Section 6.14</u> shall prohibit (1) this Agreement or any of the other Loan Documents, (2) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted hereunder pending the consummation of such sale, (3) restrictions imposed by applicable law, (4) any agreement in effect at the time a Person first became a Subsidiary of any Loan Party, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary and such restrictions are limited to such Subsidiary and its Subsidiaries, (5) in the case of any Subsidiary that is not a wholly-owned Subsidiary of Holdings, restrictions and conditions imposed by its Organizational Documents or any related joint venture, shareholder or similar agreements, or (6) contained in the Holdco Credit Agreement or any financing documentation governing Indebtedness permitted to be incurred hereunder that are incurred by a Subsidiary that is not required to be a Guarantor,

so long as such restrictions operate only upon the occurrence and during the continuance of an event of default under the documentation governing such Indebtedness and only impose restrictions on such Subsidiary and its Subsidiaries.

6.15    **Holding Company Status**.  Notwithstanding anything contained in this Agreement or the other Loan Documents to the contrary, Holdings shall not (a)

(a)       own or acquire any assets other than the Equity Interests and Equity Interests Equivalents of its Subsidiaries that are Loan Parties or become Loan Parties in accordance with the terms hereof and its own Equity Interests or Equity Interests Equivalents, and, to the extent cash is temporarily transferred through Holdings to effectuate a transaction expressly permitted by this Agreement, such cash during such transfer,

(b)       incur any liabilities other than (i) minimal liabilities necessary to maintain its separate organizational existence and to pay reasonable overhead expenses of Loan Parties and their Subsidiaries and (ii) those incurred under or permitted by this Agreement and the other Loan Documents to which it is a party,

(c)       incur any Indebtedness other than the Obligations and Guarantees of the other Loan Parties' obligations permitted by this Agreement,

(d)       engage in any trade, business or operations (other than acting as a holding company for the equity of its Subsidiaries) and any administrative activities incidental or reasonably related thereto,

(e)       merge, amalgamate or consolidate with any other Person,

(f)        sell or otherwise transfer any of its assets,

(g)       permit or suffer to exist any Lien on any of its assets other than Permitted Liens, or

(h)       accept or receive any Loans or Collateral (other than distributions that are expressly permitted by Section 6.12); provided that nothing herein shall prevent Holdings from incurring liabilities with respect to Taxes as required by Law.

6.16    **Use of Proceeds**.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, use the proceeds of the Advances other than for lawful purposes and in accordance with Sections 4.10 and 4.12.

## ARTICLE VII
## EVENTS OF DEFAULT

7.1    **Events of Default**.  The term "Event of Default" means any of the following events occurring for whatever reason, whether voluntary or involuntary, effected by operation of law, judgment, order or otherwise:

(a)       A failure to pay when and as due any principal amount of the Loans or to pay any L/C Reimbursement Obligation;

(b)    A default in the payment when and as due of any interest on the Loans or of fees or other amounts payable to the Lenders pursuant to this Agreement and such failure continues for period of three (3) Business Days after delivery of written notice to Borrower;

(c)    A default in the due performance and observance of any of the covenants or agreements contained in (i) Sections 5.1(e) (solely with respect to delivery of a notice of a Default), 5.2, 5.14 or Article VI, or (ii) Sections 5.1(a), 5.1(b), 5.1(c) or 5.1(d), and, in any case of this clause (ii), such failure continues for a period of five (5) Business Days;

(d)    A default (other than those defaults specifically described in other subsections of this Section 7.1) by any Loan Party in the due performance and observance of any of the covenants contained in this Agreement or any other Loan Document and such failure continues for a period of thirty (30) days after the earlier to occur of (i) the date upon which a Responsible Officer of the Borrower becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by the Administrative Agent or Required Lenders;

(e)    The Borrower or any Subsidiary thereof (i) fails to make any payment beyond the applicable grace period, if any, in respect of (x) the ABL Facility or (y) its other Indebtedness (other than the Obligations) having an aggregate outstanding principal amount (individually or in the aggregate with all other such Indebtedness as to which such a failure shall exist) in excess of $2,500,000 or (ii) fails to observe or perform any other agreement or condition relating to the ABL Facility or any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the ABL Agent or ABL Lenders or the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, the obligations under the ABL Facility or such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem the obligations under the ABL Facility or such Indebtedness to be made, prior to its stated maturity; provided that such failure is unremedied and is not waived by the holders of such Indebtedness prior to the termination of the Commitments and acceleration of the Loans pursuant to Section 7.2;

(f)    An involuntary case under any applicable federal or state bankruptcy, insolvency or similar laws shall be commenced against any Loan Party and the petition shall not be dismissed, stayed, bonded or discharged within ninety (90) days after the commencement of the case; the entry of a decree or order by a court having jurisdiction in the premises in respect of any Loan Party under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law; or the entry of a decree or order by a court having jurisdiction in the premises appointing a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the any Loan Party or of any substantial part of the property of any Loan Party, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days;

(g)    The commencement by any Loan Party of or consent to, a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law or the request or consent by it to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of either of any Loan Party or of any substantial part of the property of any Loan Party, or the making by it of a general assignment for the benefit of creditors, or the failure by the Borrower to pay its

debts generally as they become due, or the taking of any action by the Borrower in furtherance thereof;

(h)    One or more judgments (i) for the payment of money in an aggregate amount in excess of $2,500,000 (other than any such judgment covered by insurance (other than under a self-insurance program) to the extent a claim therefor has been made in writing and liability therefor has not been denied by the insurer), shall be rendered against any Loan Party and the same shall remain undischarged for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of a Loan Party to enforce any such judgment or (ii) in the case of non-monetary judgments, which would reasonably be expected to result in a Material Adverse Occurrence, and which, in any case, remains undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder);

(i)    Any Loan Document or any material provision of any Loan Document shall at any time and for any reason cease to be valid and binding on or enforceable against any Loan Party party thereto or any Loan Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any security interest and Lien on the Collateral purported to be granted to the Administrative Agent for the benefit of the Secured Parties by any Security Document shall for any reason (other than as expressly permitted hereunder or pursuant to the terms thereof) cease to be in full force and effect or create a valid security interest in any material portion of the Collateral or such security interest shall for any reason (other than the failure of the Administrative Agent to take any action within its control) cease to be a perfected security interest with the priority stated in the Security Documents, except (in each case) (x) to the extent that any such grant, perfection or priority is not required pursuant to the terms hereof or the Security Documents and (y) to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(j)    The occurrence of a Change of Control;

(k)    Any representation or warranty made or deemed made by any Loan Party in this Agreement or any other Loan Document shall be untrue, incorrect or misleading in any material respect when made or deemed made;

(l)    The occurrence of an Event of Default (as defined in the Holdco Credit Agreement); provided, that to the extent that such Event of Default (as defined in the Holdco Credit Agreement) is waived pursuant to the terms of the Holdco Credit Agreement prior to the acceleration thereof, the Event of Default contemplated by this clause (l) shall automatically be deemed to have been cured concurrently with such waiver; or

(m)    There shall be at any time any failure to satisfy the minimum funding standard as defined in ERISA or in Section 412 of the Code, whether or not waived, with respect to any Plan maintained by the Borrower, or to which the Borrower has any liabilities, or any trust created thereunder that would reasonably be expected to result in a Material Adverse Occurrence; or a trustee shall be appointed by PBGC or a federal district court to administer such Plan; or PBGC shall institute proceedings to terminate any such Plan; or the Borrower shall incur any liability to PBGC in connection with the termination of any such Plan; or any Plan or trust created under any Plan of the Borrower shall engage in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which would subject the Borrower to the tax

or penalty on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code that results in a Material Adverse Occurrence.

**7.2**   <u>**Action If Event of Default**</u>.  If an Event of Default described in <u>Section 7.1(f)</u> or <u>(g)</u> shall occur, to the extent permitted by law, the full unpaid principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder shall automatically be due and payable without any declaration, notice, presentment, protest or demand of any kind (all of which are hereby waived) and the obligation of the Lenders and the L/C Issuers to make additional Advances shall automatically terminate.  If any Event of Default other than pursuant to <u>Section 7.1(f)</u> or <u>(g)</u> shall occur and be continuing, the Required Lenders, upon written notice to the Borrower (which shall be given by the Administrative Agent at the request of the Required Lenders), may terminate the Lenders' obligation to make additional Advances and may declare the outstanding principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder to be due and payable without other notice to the Borrower, presentment, protest or demand of any kind (all of which are hereby waived), and the obligation of the L/C Issuer to Issue Letters of Credit shall automatically terminate, whereupon the full unpaid amount of the Loans and any and all other Obligations, which shall be so declared due and payable shall bear interest at the Default Rate and shall be and become immediately due and payable.

**7.3**   <u>**Remedies**</u>.

(a)   Upon acceleration of the Loans, as provided in <u>Section 7.2</u>, the Administrative Agent shall, at the request of the Required Lenders, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and/or under applicable law.

(b)   The Administrative Agent, personally or by attorney, shall, at the request of the Required Lenders, proceed to protect and enforce its rights and the rights of the Lenders by pursuing any available remedy, including a suit or suits in equity or at law, whether for damages or for the specific performance of any obligation, covenant or agreement contained in this Agreement or in the Notes, or in aid of the execution of any power herein or therein granted, or for the enforcement of any other appropriate legal or equitable remedy, as the Administrative Agent shall deem most effectual to collect the payments then due and thereafter to become due on the Notes or under this Agreement, to enforce performance and observance of any obligation, agreement or covenant of the Borrower hereunder or under the Notes or to protect and enforce any of the Administrative Agent's or any Lender's rights or duties hereunder.

(c)   Upon acceleration of the Loans, as provided in <u>Section 7.2</u>, to the extent permitted by law, the Administrative Agent shall, if so directed by the Required Lenders, have the right to the appointment of a receiver for the Collateral of the Loan Parties pledged to secure the Obligations, both to operate and to sell such Collateral, and the Borrower hereby consents to such right and such appointment and hereby waives, to the fullest extent permitted by applicable law, any objection the Borrower may have thereto or the right to have a bond or other security posted by the Administrative Agent on behalf of the Lenders in connection therewith.

(d)   No remedy herein conferred upon or reserved to the Administrative Agent or any Lender is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or under any other Loan Document now or hereafter existing at law, in equity or by statute.

(e)   Each Lender agrees that it will not take any action, nor institute any actions or proceedings, against the Borrower hereunder or under any Loan Document, without the prior

written consent of the Required Lenders or, as may be provided in this Agreement or the other Loan Documents, at the direction of the Administrative Agent with the consent of the Required Lenders.

**7.4**    **Cash Collateral for Letters of Credit**.    If an Event of Default has occurred and is continuing, this Agreement (or the Revolving Loan Commitment) shall be terminated for any reason or if otherwise required by the terms hereof, the Administrative Agent shall, upon request of Required Revolving Loan Lenders, demand (which demand shall be deemed to have been delivered automatically upon any acceleration of the Loans and other obligations hereunder pursuant to Section 7.3), and the Borrower shall thereupon deliver to Agent, to be held for the benefit of the L/C Issuer, the Administrative Agent and the Lenders entitled thereto, an amount of cash equal to 105% of the amount of Letter of Credit Obligations as additional collateral security for Obligations in respect of any outstanding Letter of Credit.    The Administrative Agent may at any time apply any or all of such cash and cash collateral to the payment of any or all of the Loan Parties' Obligations in respect of any Letters of Credit.  Pending such application, the Administrative Agent may (but shall not be obligated to) invest the same in an interest bearing account in the Administrative Agent's name, for the benefit of the L/C Issuer, the Administrative Agent and the Lenders entitled thereto, under which deposits are available for immediate withdrawal, at such bank or financial institution as the L/C Issuer and the Administrative Agent may, in their discretion, select.

# ARTICLE VIII
# THE ADMINISTRATIVE AGENT

**8.1**    **Appointment and Authorization**.    Each Lender and each L/C Issuer hereby irrevocably appoints the Administrative Agent as the Administrative Agent of such Lender and authorizes the Administrative Agent to act on such Lender's behalf to the extent provided herein or under any of the other Loan Documents, and to take such other action and exercise such other powers as may be reasonably incidental thereto.  Each Lender and each L/C Issuer hereby agrees that it will require any transferee of any of such Lender's interests in its Loans to irrevocably appoint and authorize the Administrative Agent as such transferee's Administrative Agent in accordance with the terms hereof.  Notwithstanding the use of the term "agent," it is expressly understood and agreed that the Administrative Agent shall not have any fiduciary responsibilities to any Lender by reason of this Agreement and that the Administrative Agent is merely acting as the representative of the Lenders with only those duties as are expressly set forth in this Agreement and the other Loan Documents.  In its capacity as the Lenders' contractual representative, the Administrative Agent (i) does not hereby assume any fiduciary duties to the Loan Parties, any of the Lenders or any other Person (and no such fiduciary duties shall be implied) and (ii) is acting as an independent contractor, the rights and duties of which are limited to those expressly set forth in this Agreement and the other Loan Documents.  The Borrower, on behalf of the Loan Parties, and each of the Lenders hereby agrees to assert no claim against the Administrative Agent on any agency theory or any other theory of liability for breach of fiduciary duty, all of which claims the Borrower and each Lender and each L/C Issuer hereby waives.

**8.2**    **Power**.    The Administrative Agent shall have and may exercise such powers under this Agreement and any other Loan Documents as are specifically delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including enforcement or collection of the Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and all holders of the Notes; provided, however, that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to any Loan Document or applicable law.  The Administrative Agent shall not have any implied duties or any obligation

to take any action under this Agreement or any other Loan Document except such action as is specifically provided by this Agreement or any other Loan Document to be taken by the Administrative Agent.

**8.3**     **Interest Holders**.  The Administrative Agent may treat each Lender and each L/C Issuer, or the Person designated in the last notice filed with the Administrative Agent, whether under Section 9.3 or 9.9, or otherwise hereunder, as the holder of all of the interests of such Lender in its Loans until written notice of transfer, signed by such Lender or such L/C Issuer (or the Person designated in the last notice filed with the Administrative Agent) and by the Person designated in such written notice of transfer, in form and substance satisfactory to the Administrative Agent, shall have been filed with the Administrative Agent.

**8.4**     **Employment of Counsel; etc**.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document, and any instrument, agreement or document executed, issued or delivered pursuant or in connection herewith or therewith, by or through employees, agents and attorneys-in-fact and shall not be answerable for the default or misconduct of any such employee, agent or attorney-in-fact selected by it with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf of the Administrative Agent).  The Administrative Agent shall be entitled to rely on advice of counsel (including counsel who are the employees of the Administrative Agent) selected by the Administrative Agent concerning all matters pertaining to the agency hereby created and its duties under any of the Loan Documents.

**8.5**     **Reliance**.  The Administrative Agent shall be entitled to rely upon and shall not be under a duty to examine or pass upon the validity, effectiveness, genuineness of this Agreement, any other Loan Document or any notice, consent, waiver, amendment, certificate, affidavit, letter, telegram, statement, paper, document or writing furnished pursuant to this Agreement or any other Loan Document, and the Administrative Agent shall be entitled to assume (absent actual knowledge to the contrary) that the same are valid, effective and genuine, have been signed or sent by the proper Person(s) and are what they purport to be.  The Administrative Agent shall be entitled to assume that no Default has occurred and is continuing unless it has actual knowledge, or has been notified in writing by the Borrower, of such fact, or has been notified by a Lender in writing that such Lender considers that a Default has occurred and is continuing, and such Lender shall specify in detail the nature thereof in writing.  The Administrative Agent shall not be liable hereunder for any action taken or omitted to be taken except for its own gross negligence or willful misconduct.  The Administrative Agent shall provide promptly each Lender and each L/C Issuer with copies of such documents received from the Borrower pursuant to the terms of this Agreement or any other Loan Document as such Lender may reasonably request.

**8.6**     **General Immunity**.  Neither the Administrative Agent nor any of the Administrative Agent's directors, officers, agents, attorneys or employees shall be liable or responsible in any manner to the Borrower, any Lender, any L/C Issuer or any other Person for any action taken or omitted to be taken by it or them under the Loan Documents or in connection therewith except for any liability imposed by law for its own willful misconduct or gross negligence.  Without limitation on the generality of the foregoing, the Administrative Agent:  (a) shall not be responsible to any Lender or any L/C Issuer for any recitals, statements, warranties, representations, or failure or delay of performance under the Loan Documents or any agreement or document related thereto or for the financial condition of the Borrower; (b) shall not be responsible for the authenticity, accuracy, completeness, value, validity, effectiveness, due execution, legality, genuineness, enforceability or sufficiency of any of the Loan Documents, any provisions thereof or any document contemplated thereby; (c) shall not be responsible for the validity, genuineness, creation, perfection or priority of any of the Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security; (d) shall not be bound to ascertain or inquire as to the performance or observance of any of the terms, covenants or conditions of any of the Loan Documents on the part of the Borrower or of any of the terms of any such agreement by any party thereto and shall have no duty to inspect the property (including the

books and records) of the Borrower; (e) shall incur no liability under or in respect of any of the Loan Documents or any other document or Collateral by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, cable or telex) furnished pursuant to this Agreement or any other Loan Document; (f) shall incur no liability to the Borrower or any other Person as a consequence of any failure or delay in performance by or any breach by, any Lender or Lenders or any L/C Issuer of any of its or their obligations under this Agreement; and (g) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by the Administrative Agent.

8.7    **Credit Analysis**.  Each Lender and each L/C Issuer has made, and shall continue to make, its own independent investigation or evaluation of the operations, business, property and condition, financial and otherwise, of the Borrower in connection with the making of its commitments hereunder and has made, and will continue to make, its own independent appraisal of the creditworthiness of the Borrower. Without limiting the generality of the foregoing, each Lender and each L/C Issuer acknowledges that prior to the execution of this Agreement, it had this Agreement and all other Loan Documents and such other documents or matters as it deemed appropriate relating thereto reviewed by its own legal counsel as it deemed appropriate, and it is satisfied with the form and substance of this Agreement and all other Loan Documents.  Each Lender and each L/C Issuer agrees and acknowledges that neither the Administrative Agent nor any of its directors, officers, attorneys or employees makes any representation or warranties about the creditworthiness of the Borrower or with respect to the due execution, legality, validity, genuineness, effectiveness, sufficiency or enforceability of this Agreement or any other Loan Documents, or the validity, genuineness, execution, perfection or priority of Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security.  Each of the Lenders and L/C Issuers shall use its commercially reasonable efforts to provide the other Lenders and L/C Issuers with any credit or other material information which comes into the possession of such Lender or L/C Issuer on or before a Default or Event of Default or at any time thereafter with respect to the operations, business, property, condition or creditworthiness of the Borrower but no Lender or L/C Issuer shall have any liability to any other Lender or L/C Issuer for its inadvertent failure to do so.  Each Lender or L/C Issuer, upon the request of another Lender or L/C Issuer, shall deliver to such other Lender or L/C Issuer any financial statement, report, certificate or other document required to be delivered to the Lenders pursuant to Section 5.1 which the requesting Lender did not receive. Except as explicitly provided herein, neither the Administrative Agent nor any Lender or L/C Issuer has any duty or responsibility, either initially or on a continuing basis, to provide any other Lender or L/C Issuer with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before a Default or an Event of Default or at any time thereafter.

8.8    **Administrative Agent and Affiliates**.  With respect to the Loans made by it and the Notes issued to it, the Administrative Agent, in its individual capacity, shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not an Administrative Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent in its individual capacity.  The Administrative Agent, in its individual capacity, and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, the Borrower, and any Person who may do business with or own securities of the Borrower, all as if it were not an Administrative Agent and without any duty to account therefor to the Lenders.

8.9    **Indemnification**.  The Lenders jointly and severally agree to indemnify and hold harmless the Administrative Agent and its officers, directors, employees and agents (to the extent not reimbursed by the Borrower), ratably according to their respective Commitments, from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against

the Administrative Agent or any of its officers, directors, employees or agents, in any way relating to or arising out of any investigation, litigation or proceeding concerning or relating to the transaction contemplated by this Agreement or any of the other Loan Documents, or any of them, or any action taken or omitted by the Administrative Agent or any of its officers, directors, employees or agents, under any of the Loan Documents; provided, however, that no Lender shall be liable for any portion of such claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of the Administrative Agent or any of its officers, directors, employees or agents. Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for such Lender's proportionate share of any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent or its officers, directors, employees or agents in connection with the preparation, execution, administration, or enforcement of, or legal advice in respect of rights or responsibilities under any of, the Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower.

      **8.10**    **Security Documents**. The Administrative Agent, as collateral agent hereunder and under the Security Documents, is hereby authorized to act on behalf of the Secured Parties, in its own capacity and through other agents and sub-agents appointed by it in good faith, under the Security Documents, provided that the Administrative Agent shall not agree to the release of any Collateral, or any property encumbered by any mortgage, pledge or security interests except in compliance with Section 8.11. In connection with its role as secured party with respect to the Collateral hereunder, the Administrative Agent shall act as collateral agent, for itself and for the ratable benefit of the Lenders, and such role as Administrative Agent shall be disclosed on all appropriate accounts, filings, mortgages, and other Collateral documentation.

      **8.11**    **Collateral Matters**. The Administrative Agent is authorized on behalf of all the Lenders without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to the Security Documents or any Collateral thereunder which may be necessary to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Security Documents. The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral (i) upon termination of the Commitments and payment in full of all Loans and all other Obligations of the Borrower known to the Administrative Agent and payable under this Agreement or any other Loan Document; (ii) constituting Property sold or to be sold or disposed of to a Person that is not a Loan Party as part of or in connection with any Disposition permitted hereunder; (iii) consisting of an instrument evidencing Indebtedness or other debt instrument, if the Indebtedness evidenced thereby has been paid in full; or (iv) if approved, authorized or ratified in writing by all the Lenders. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section 8.11, provided that the absence of any such confirmation for whatever reason shall not affect the Administrative Agent's rights under this Section 8.11. In the event that any landlord in favor of which the Borrower has granted a Permitted Lien on Excluded Assets requests an acknowledgement that the Collateral does not include any Excluded Assets secured by such Permitted Lien (a "Permitted Lien Acknowledgement"), the Administrative Agent shall deliver a Permitted Lien Acknowledgement to such landlord, on terms and conditions, and subject to documentation reasonably acceptable to the Administrative Agent and, if required by such landlord, shall amend any UCC-1 financing statements filed against a Loan Party in favor of the Administrative Agent to exclude the specific Excluded Assets that are the subject of such Permitted Lien Acknowledgement.

      **8.12**    **Action by the Administrative Agent**.

          (a)    The Administrative Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights with which it may be vested and with

respect to taking or refraining from taking any action or actions which it may be able to take under or in respect of, this Agreement, unless the Administrative Agent shall have been instructed by the Required Lenders to exercise or refrain from exercising such rights or to take or refrain from taking such action; provided that the Administrative Agent shall not exercise any rights under Section 7.3 of this Agreement except upon the request of the Required Lenders or of all the Lenders, where expressly required by this Agreement.  The Administrative Agent shall incur no liability under or in respect of this Agreement with respect to anything which it may do or refrain from doing in the exercise of its judgment or which may seem to it to be necessary or desirable in the circumstances, except for its gross negligence or willful misconduct as determined by a final, non-appealable order of a court having jurisdiction over the subject matter.

(b)      The Administrative Agent shall not be liable to the Lenders or to any Lender in acting or refraining from acting under this Agreement or any other Loan Document in accordance with the instructions of the Required Lenders or of all the Lenders, where expressly required by this Agreement, and any action taken or failure to act pursuant to such instructions shall be binding on all Lenders.

(c)      Notice of Default or Event of Default.  In the event that the Administrative Agent or any Lender shall acquire actual knowledge, or shall have been notified in writing, of any Default (other than through a notice by one party hereto to all other parties), such Lender shall promptly notify the Administrative Agent and the Administrative Agent shall promptly notify the Lenders, and the Administrative Agent shall take such action and assert such rights under this Agreement and the other Loan Documents as the Required Lenders (or all the Lenders, where expressly required by this Agreement) shall request in writing, and the Administrative Agent shall not be subject to any liability by reason of its acting pursuant to any such request.  If the Required Lenders shall fail to request the Administrative Agent to take action or to assert rights under this Agreement in respect of any Default within ten (10) days after their receipt of the notice of any Default from the Administrative Agent or any Lender, or shall request inconsistent action with respect to such Default, the Administrative Agent may, but shall not be required to, take such action and assert such rights as it deems in its discretion to be advisable for the protection of the Lenders, except that, if the Required Lenders have instructed the Administrative Agent not to take such action or assert such right, in no event shall the Administrative Agent act contrary to such instructions.

94

**8.13**   **Successor Administrative Agent**.  The Administrative Agent may resign at any time as Administrative Agent under the Loan Documents by giving thirty (30) days' prior written notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), have the right to appoint a successor Administrative Agent hereunder that is organized under the laws of the United States of America or a political subdivision thereof.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any state thereof and having a combined capital and surplus of at least $250,000,000.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.  Upon the acceptance of any appointment as Administrative Agent under the Loan Documents by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.   After any retiring Administrative Agent's resignation as Administrative Agent under the Loan Documents, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under the Loan Documents.

**8.14**   **Authorization to Enter into Intercreditor Agreements.**  Each Lender consents to and authorizes Administrative Agent's execution and delivery of any intercreditor or subordination agreements (including, without limitation, any ABL/Term Intercreditor Agreement and any agreement among lenders) from time to time as contemplated by the terms hereof on behalf of such Lender and agrees to be bound by the terms and provisions thereof, including any purchase option contained therein.

**8.15**   **Erroneous Payments**.

(a)    If the Administrative Agent notifies a Term Loan Lender, or Secured Party, or any Person who has received funds on behalf of a Term Loan Lender or Secured Party, such Term Loan Lender (any such Term Loan Lender, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Term Loan Lender, Secured Party or other Payment Recipient on its behalf)  (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Term Loan Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the

Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding <u>clause (a)</u>, each Term Loan Lender, or Secured Party, or any Person who has received funds on behalf of a Term Loan Lender or Secured Party hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Term Loan Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(1)     (A) in the case of immediately preceding <u>clauses (x)</u> or <u>(y)</u>, an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding <u>clause (z)</u>), in each case, with respect to such payment, prepayment or repayment; and

(2)     such Term Loan Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this <u>Section 8.15(b)</u>.

(c)     Each Term Loan Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Term Loan Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Term Loan Lender or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding <u>clause (a)</u> or under the indemnification provisions of this Agreement.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding <u>clause (a)</u>, from any Term Loan Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf)  (such unrecovered amount, an "<u>Erroneous Payment Return Deficiency</u>"), upon the Administrative Agent's notice to such Term Loan Lender at any time, (i) such Term Loan Lender shall be deemed to have assigned its Term Loans (but not its Term Loan Commitments) of the relevant class with respect to which such Erroneous Payment was made (the "<u>Erroneous Payment Impacted Class</u>") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Term Loans (but not Term Loan Commitments) of the Erroneous Payment  Impacted Class, the "<u>Erroneous Payment Deficiency Assignment</u>") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption Agreement as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Term Loan

Lender shall deliver any Notes evidencing such Term Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Term Loan Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Term Loan Lender shall become a Term Loan Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Term Loan Lender shall cease to be a Term Loan Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Term Loan Commitments which shall survive as to such assigning Term Loan Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Term Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Term Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Term Loan Lender shall be reduced by the net proceeds of the sale of such Term Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Term Loan Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Term Loan Commitments of any Term Loan Lender and such Term Loan Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Term Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Term Loan Lender or Secured Party under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)  The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(f)  To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)  Each party's obligations, agreements and waivers under this Section 8.15 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Term Loan Lender the termination of the Term Loan Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

Notwithstanding anything else to the contrary herein, this Section 8.15 shall not apply to any funds received by any L/C Issuer or any Revolving Loan Lender, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise. For the purpose of this Section 8.15 only, the term "Secured Party" shall not include any L/C Issuer or any Revolving Loan Lender.

**ARTICLE IX**
**MISCELLANEOUS**

**9.1**    __Waivers, Amendments; etc__.  The provisions of this Agreement, including the closing conditions set forth herein, may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders:

(a)    that no amendment, waiver or consent shall:

(1)    extend or increase the Commitment of any Lender or subject a Lender to any additional obligations, without the written consent of such Lender,

(2)    reduce the principal of, or interest on, the Loans or any fees or other amounts payable to any Lender or any L/C Issuer (including L/C Reimbursement Obligations and PIK Interest payable pursuant to Section 2.1(j)) hereunder without the written consent of such Lender or L/C Issuer; provided, that, notwithstanding the foregoing or anything else in this clause (a), any waiver or modification to the MFN Adjustment shall require the consent of each Lender adversely affected thereby except to the extent in connection with (A) a "first out" or "priming" Incremental Term Loan incurred in accordance with clause (6) below, (B) Senior Indebtedness incurred in accordance with clause (8) below, or (C) any other Incremental Term Loan with respect to which a ratable opportunity to participate is offered to all Term Loan Lenders, in each of which such cases such MFN Adjustment may be waived or amended by the Supermajority Lenders;

(3)    postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable to any Lender or any L/C Issuer hereunder, or any scheduled reduction of Commitments, without the written consent of such Lender or L/C Issuer,

(4)    reduce the percentage of Lenders which shall be required for the Lenders or any of them to take any action hereunder, or the definition of "Required Lenders", "Supermajority Lenders", "Required Revolving Lenders" or "Required Term Loan Lenders" unless in writing and signed by all the Lenders (with respect to "Required Lenders" or "Supermajority Lenders"), all of the Revolving Loan Lenders (with respect to "Required Revolving Lenders") or all of the Term Loan Lenders (with respect to "Required Term Loan Lenders"), as applicable,

(5)    discharge the Borrower from its obligations under the Loan Documents, unless in writing and signed by all the Lenders and the L/C Issuers,

(6)    subject to clause (8) below with respect to Senior Priority Indebtedness, other than in connection with amendments to this Agreement to (x) change the payment priorities with respect to the Loans under this Agreement in order to reflect a "first-out" structure with respect to the Revolving Loan or (y) allow for a "first out" or "priming" Incremental Term Loan to the extent the opportunity to ratably participate in such Incremental Term Loan is offered to all Term Loan Lenders (in each case, which shall only require consent of the Supermajority Lenders), amend Section 2.8 or this Section 9.1, or any other provision of this Agreement or any other Loan Document in a manner that would alter the pro rata sharing or application of payments, or the pro rata treatment of the Lenders, or alter any payment waterfall or the priority or order of application of any proceeds or payments, unless in writing and signed by all Lenders and the L/C Issuers (it being understood and agreed that any separate "agreement among lenders" executed and/or acknowledged by the Lenders shall not constitute a "Loan Document" for purposes of this subclause (6)),

98

(7)      (x) release the security interest in all or substantially all of the Collateral granted to the Administrative Agent, for the benefit of the Secured Parties, under the Security Documents or (y) discharge Guarantors representing all or substantially all of the value of the Guarantors, in each case, unless agreed in writing by all the Lenders and the L/C Issuers or except as specifically permitted hereby or thereby as of the Closing Date,

(8)      unless agreed in writing by all the Lenders and the L/C Issuers, (x) to subordinate the priority of any of the Liens on all or substantially all Collateral in favor of the Administrative Agent, for the benefit of the Secured Parties, in favor of any other creditor of the Loan Parties or class of Lenders hereunder, (y) subordinate any of the Obligations in right of payment to any other indebtedness of the Loan Parties or indebtedness hereunder or (z) subordinate the payment priority of the Loans (including the Term Loans and the Revolving Loans, which shall maintain the same relative priority among them) as set forth in a post-default waterfall or any similar provision providing for payment priority among the Loans hereunder (any such payment senior Class, "Senior Priority Indebtedness") (or agree to any amendment, waiver or modification that would facilitate any of the foregoing) (any such other indebtedness or other obligations, to which such liens securing any of the Obligations or such Obligations, as applicable, are subordinated, "Senior Indebtedness"), in either case of subclause (x), (y) or (z), unless (A) Supermajority Lenders shall have agreed and (B) each directly adversely affected Term Loan Lender and Revolving Loan Lender has been offered a *bona fide* opportunity to fund or otherwise provide its *pro rata* share (based on the amount of Loans or Revolving Loan Commitments that are directly adversely affected thereby held by each Lender in respect of such Term Loans and/or Revolving Loans) of the Senior Indebtedness on the same terms (other than *bona fide* backstop fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction; such fees and expenses, "Ancillary Fees") as offered to all other providers (or their affiliates) of the Senior Indebtedness and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its *pro rata* share of the fees and any other similar benefit (other than Ancillary Fees) of the Senior Indebtedness afforded to the providers of the Senior Indebtedness (or any of their affiliates) in connection with providing the Senior Indebtedness pursuant to a written offer made to each such adversely affected Lender describing the material terms of the arrangements pursuant to which the Senior Indebtedness is to be provided, which offer shall remain open to each such adversely affected Lender for a period of not less than five (5) Business Days; provided that:

(A)      any Lender may designate any of its Affiliates to provide such priming Indebtedness on its behalf with the existing Obligations of such Lender being treated, for purposes hereof, as though such Lender had provided such priming Indebtedness itself;

(B)      any such offer may be made on a post-closing basis via syndication,

(C)      any ABL Facility permitted by clause (10) below shall not be subject to the foregoing; and

(D)      subordination to any capital lease or similar acquisition financing shall not be subject to the foregoing.

(9)      permit or facilitate the purchase, repayment or retirement for value of any Loans on a non-*pro rata* basis with respect to the other Loans of the same Class, unless such

99

purchase, repayment or retirement is offered to all such Lenders holding Loans of the same Class on the same terms or all Lenders agree in writing; and

(10)    permit the incurrence of an ABL Facility (i) having a commitment in excess of $50,000,000 or (ii) which is being provided by any existing Lender (or its Affiliates) holding greater than 15% of the outstanding Term Loans as of the date of incurrence of such ABL Facility, except to the extent that each Lender is given the opportunity to ratably participate in such ABL Facility, in either case, without the written consent of each Lender;

(b)    no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any Note;

(c)    the consent of the Borrower shall not be required in connection with amendments to this Agreement to change the payment priorities with respect to the Loans under this Agreement in order to reflect a "first-out" structure with respect to the Revolving Loan, so long as such amendments are not adverse to the Borrower and the other Loan Parties; and

(d)    any amendment, modification or consent expressly permitted by <u>Section 2.12</u> shall be permitted to be made as referenced therein and shall not require the consent of the Required Lenders or any other Lender.

No failure or delay on the part of the Administrative Agent, any Lender or the holder of any Note in exercising any power or right under this Agreement or any Note shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on the Borrower in any case shall entitle it to any notice or demand in similar or other circumstances.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

**9.2**    **Payment Dates**.  Except as expressly provided in this Agreement, whenever any payment to be made hereunder by or to the Lenders or to the holder of any Note shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be included in computing the fees or interest payable on such next succeeding Business Day.

**9.3**    **Notices**.  All communications and notices provided under this Agreement shall be in writing by in writing (including email or facsimile transmission), telecopy or personal delivery and if to the Borrower addressed or delivered to the Borrower at its address shown on the signature page hereof or if to the Administrative Agent delivered to it at the address shown on **Schedule 9.3** attached hereto, or to any party at such other address as may be designated by such party in a notice to the other parties.  Any notice shall be deemed given when transmitted by email, telecopier or, when personally delivered, if mailed properly addressed, shall be deemed given upon the third Business Day after the placing thereof in the United States mail, postage prepaid.

100

**9.4**   **Costs and Expenses**.  The Borrower agrees to pay, or reimburse, the Administrative Agent for all expenses reasonably incurred for the preparation of this Agreement, including exhibits, and the Loan Documents and any amendments hereto or thereto or consents or waivers hereunder or thereunder as may from time to time hereafter be required thereby or by the transactions contemplated hereby, including, but not limited to, the fees and out-of-pocket expenses of the Administrative Agent, charges and disbursements of special counsel to the Administrative Agent from time to time incurred in connection with the preparation and execution of this Agreement and any document relevant to this Agreement, including the Loan Documents, any amendments hereto or thereto, or consents or waivers hereunder or thereunder, and the consideration of legal questions relevant hereto and thereto.  The Borrower agrees to pay, or reimburse, the Administrative Agent and each Lender and each L/C Issuer upon demand for all costs and expenses (including attorneys', auditors' and accountants' fees and expenses) reasonably incurred and arising out of the transactions contemplated by this Agreement and the Loan Documents, in connection with any work-out or restructuring of the transactions contemplated hereby and by the Loan Documents and any collection or enforcement of the obligations of the Borrower hereunder or thereunder, whether or not suit is commenced, including attorneys' fees and legal expenses (limited to one (1) primary counsel for the Administrative Agent and, if deemed appropriate by the Administrative Agent, one (1) counsel in each relevant jurisdiction and any special counsel (except in the case of actual or perceived conflict, in which case one (1) additional counsel for each Lender and each L/C Issuer similarly situated in respect of such conflict)) in connection with any appeal of a lower court's order or judgment.  The obligations of the Borrower under this Section 9.4 shall survive any termination of this Agreement.

**9.5**   **Indemnification**.  In consideration of the execution and delivery of this Agreement by the Administrative Agent and the Lenders, the Borrower agrees to indemnify and hold harmless the Administrative Agent, each Lender and each L/C Issuer and their respective Affiliates, officers, directors, employees, shareholders, agents, successors and assigns (the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities and expenses (other than the expenses to be paid or reimbursed pursuant to Section 9.4 above), joint or several, to which any such Indemnified Party may become subject arising out of or in connection with this Agreement and the other transactions contemplated hereby, the Advances and the use of proceeds thereof in connection with any claim, litigation, investigation or proceeding (any of the foregoing, a "Proceeding") relating to any of the foregoing, regardless of whether any such Indemnified Party is a party hereto or whether a Proceeding is brought by a third party or by you any Loan Party or Affiliate of a Loan Party, and to reimburse each such Indemnified Party within ten (10) days of receipt of an invoice for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; it being understood and agreed that no Loan Party shall be required to reimburse legal fees or expenses of more than one counsel to all Indemnified Parties, taken as a whole and in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel to each group of affected Indemnified Parties similarly situated taken as a whole (and, if reasonably necessary as determined by the Administrative Agent, a single local counsel for all Indemnified Parties taken as a whole in each relevant jurisdiction and, in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel in each relevant jurisdiction to each group of affected Indemnified Parties similarly situated taken as a whole); provided that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent (x) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Party or any Related Indemnified Party (as defined below), (y) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from a material breach of the material obligations of any Indemnified Party or any of its Related Indemnified Parties under this Agreement or any of the Loan Documents at a time when no Loan Party has breached its obligations hereunder in any material respect, or (z) they relate to any dispute solely among Indemnified Parties at a time when no Loan Party has breached

its obligations hereunder or any other Loan Document in any material respect (other than any claims against the Administrative Agent in its capacity or in fulfilling its role as Administrative Agent, but not any other person or entity party to any such Proceeding).

Notwithstanding any other provision of this Agreement or any Loan Document, (i) no Indemnified Party or Related Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of any Indemnified Party and (ii) none Loan Parties, any of their Affiliates or any Indemnified Party or Related Indemnified Party shall be liable for any indirect, special, punitive or consequential damages incurred in connection with this Agreement or the transactions contemplated herein (provided that this provision shall not limit the Loan Parties' indemnification obligations set forth above). For purposes hereof, a "Related Indemnified Party" of an Indemnified Party means (1) any controlling person or controlled affiliate of such Indemnified Party, (2) the respective directors, trustees, officers, or employees of such Indemnified Party or any of its controlling persons or controlled Affiliates and (3) the respective agents or advisors of such Indemnified Party or any of its controlling persons or controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnified Party, controlling person or such controlled Affiliate; provided that each reference to a controlled Affiliate or controlling person in this paragraph pertains to a controlled Affiliate or controlling person involved in the negotiation of this Agreement and the other Loan Documents.

No Loan Party shall be liable for any settlement of any Proceedings effected without the Borrower's consent (which consent shall not be unreasonably conditioned, withheld or delayed), but if settled with the Borrower's written consent or if there is a final judgment for the plaintiff in any such Proceedings, the Borrower agrees to indemnify and hold harmless each Indemnified Party from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this Section 9.5. No Loan Party shall, without the prior written consent of an Indemnified Party, effect any settlement or consent to the entry of any judgment of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Party, unless (i) such settlement includes an unconditional release of such Indemnified Party in form and substance reasonably satisfactory to such Indemnified Party from all liability on claims that are the subject matter of such Proceedings, and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party.

The provisions of this Section 9.5 shall survive termination of this Agreement and payment in full of the Notes. This <u>Section 9.5</u> shall not apply with respect to Taxes, other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**9.6** **Severability**. Any provision of this Agreement, the Notes or any other Loan Document executed pursuant hereto which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, the Notes or any other Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

**9.7** **Headings**. The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions hereof.

**9.8** **Governing Law**. This Agreement and the Notes shall each be deemed to be a contract made under, governed by and interpreted pursuant to the internal laws (and not the law of conflicts) of the State of New York.

**9.9**    **Successors and Assigns**.

(a)    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns except that: (i) the Borrower may not assign or transfer its rights hereunder without the prior written consent of all of the Lenders and the Administrative Agent; and (ii) any assignment by a Lender must be made in compliance with subsection (b) below and any participation by a Lender must be made in compliance with subsection (c) below. Notwithstanding clause (ii) of this subsection (a), any Lender may at any time, without the consent of Borrower or the Administrative Agent, assign all or any portion of its rights under this Agreement and its Notes to a Federal Reserve Bank. Except to the extent otherwise required by its context, the word "Lender" and "L/C Issuer" where used in this Agreement means and includes any such assignee and such assignee shall be bound by and have the benefits of this Agreement the same as if such holder had been a signatory hereto.

(b)    (i) Any Lender may, in the ordinary course of its business and in accordance with applicable law, at any time assign to one or more banks or other entities that are Eligible Assignees all or a portion of its Commitments, Advances owing to it, and its rights and obligations under this Agreement in respect thereof in accordance with the provisions of this subsection (b). Each assignment shall be of a constant, and not a varying, ratable percentage of the assigning Lender's rights and obligations under this Agreement and each Eligible Assignee shall assume a pro rata share of the assigning Lender's obligations determined by the percentage of the Commitments assigned for the period from the effective date of the assignment through the Revolver Maturity Date or Term Loan Maturity Date, as applicable. Such assignment shall be substantially in the form of the Assignment and Assumption Agreement attached as **Exhibit E** hereto (the "Assignment and Assumption Agreement") and shall not be permitted hereunder unless:

(1)    the amount of the Loans, Commitment and/or Letter of Credit Obligations assigned by the assigning Lender pursuant to each assignment shall be at least $1,000,000 in the aggregate (or the entirety of such assigning Lender's Loans, Commitment and/or Letter of Credit Obligations, as applicable, if less), or

(2)    such assignment is to another Lender or an Affiliate of a Lender, in which case no minimum amount shall apply.

(ii) The consent of the Administrative Agent and, provided no Default or Event of Default then exists, the Borrower (which consents shall not be unreasonably withheld or delayed) shall be required prior to an assignment becoming effective with respect to a transferee which is not a Lender, an Affiliate of a Lender, or an Approved Fund. The Borrower's consent shall be deemed to have been given unless the Borrower objects within ten (10) Business Days after receipt of notice of such assignment. Notwithstanding anything herein to the contrary:

(1)    except to the extent otherwise agreed by the Required Lenders (and subject to a right of first offer to existing Lenders as described in clause (2) below), prior to the one-year anniversary of the Closing Date, no Lender may assign any portion of its Loans or Commitments hereunder other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund;

(2)    from and after the one-year anniversary of the Closing Date, no Lender may assign any portion of its Loans or Commitments hereunder (other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund), unless the proposed assignor Lender notifies the Administrative Agent in writing of the proposed terms of such

103

assignment and the Administrative Agent provides to each then-existing Lender an offer for all Lenders to purchase their pro rata portion of such Loans and Commitments being assigned, according to the percentages of their respective Loans and Commitments at the same terms agreed by the proposed assignee.

(A)    If any Lender does not notify the Administrative Agent in writing that such Lender agrees to purchase its pro rata share of such assigned Loans and Commitments at such proposed terms in its entirety within ten (10) Business Days of such offer, that portion of the assigned Loans and Commitments not accepted by the applicable Lenders shall be offered to the applicable accepting Lenders on a non-pro rata basis at the same proposed terms; and

(B)    If the applicable accepting Lenders do not accept the remainder of the proposed assigned Loans and Commitments at such proposed terms in its entirety on a non-pro rata basis within five (5) Business Days after such offer, that portion of the proposed assigned Loans and Commitments not accepted by the applicable accepting Lenders may be offered by the assigning Lender to any Persons that would constitute Eligible Assignees.

(iii) Upon (i) delivery to the Administrative Agent of an executed Assignment and Assumption Agreement, together with any required consents and (ii) payment of a $3,500 fee to the Administrative Agent for processing such assignment, such assignment shall become effective on the effective date specified in such Assignment and Assumption Agreement; provided, that:

(1)    if an assignment by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such assignment and

(2)    if an assignment by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such assignment (unless waived or reduced by the Administrative Agent).

(iv) On and after the effective date of such assignment, such transferee, if not already a Lender, shall for all purposes be a Lender party to this Agreement and any other Loan Documents executed by the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party hereto, and no further consent or action by the Borrower, the Lenders or the Administrative Agent shall be required to release the transferor Lender with respect to the percentage of the Commitment and Advances assigned to such transferee Lender. To the extent requested by the applicable Lenders, upon the consummation of any assignment pursuant to this Section 9.9, the Administrative Agent and the Borrower shall make appropriate arrangements so that replacement Notes are issued to such transferor Lender and new Notes or, as appropriate, replacement Notes, are issued to such transferee Lender, in each case in principal amounts reflecting their Commitment, as adjusted pursuant to such assignment.

(c)

(1)    Prior to the one-year anniversary of the Closing Date, no Lender may sell participations in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder) other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund;

(2)      From and after the one-year anniversary of the Closing Date, each Lender and each L/C Issuer may, without the consent of the Borrower, sell participations to one or more banks or other entities that are Eligible Assignees in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of, and obligations under, Section 10.1 and of the cost protection provisions contained in Section 10.4, as well as Sections 9.19 and 10.6 to the extent of the Lender selling such participation and the Borrower's aggregate obligations with respect to Section 10.1 and Section 10.4 shall not be increased by reason of such participation, provided that such participant shall not be entitled to the benefits of Sections 10.1 and 10.4 unless such participant complies with Section 10.1(e) as (and to the extent) applicable, as if such participant were a Lender (it being understood that the documentation required under Section 10.1(e) shall be delivered to the participating Lender) (iv) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right (and shall not limit its rights) to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers with respect to any fees payable hereunder (to the extent such participants are entitled to such fees) or the amount of principal of or the rate at which interest is payable on the Loans, or the dates fixed for payments of principal of or interest on the Loans). Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement.

(d)      The Administrative Agent shall maintain a copy of each Assignment and Assumption Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and the principal amount of the Loans owing to, each Lender and each L/C Issuer pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary. It is the intent of the parties that the Obligations shall be treated as issued in registered form under Section 5f. 103-1(c) of the United States Treasury Regulations. Upon the Administrative Agent's receipt of a duly completed Assignment and Assumption Agreement executed by an assigning Lender, an assignee Lender that is an Eligible Assignee and, to the extent required hereunder, the Borrower, such Eligible Assignee's completed Administrative Questionnaire (unless the assignee is already a Lender), the fee referred to in Section 9.9(b) above, and any written consent to such assignment required by such subsection, the Administrative Agent shall accept such Assignment and Assumption Agreement and record the information contained therein in the Register. No assignment shall be effected for purposes of this Agreement unless it has been recorded in the Register as provided in this subsection.

(e)    Notwithstanding anything to the contrary contained in this Section 9.9, a Lender that is a fund that invests in bank loans may pledge all or a portion of its rights in connection with this Agreement to the trustee or other agent for holders of obligations owed, or securities issued, by such fund as security for such obligations or securities, provided that any foreclosure or other exercise of remedies by such trustee shall be subject, in all respects, to the provisions of this Section 9.9 regarding assignments.  No pledge described in the immediately preceding sentence shall release any such Lender from its obligations hereunder.

(f)    Except as specifically set forth in this Section 9.9, nothing in this Agreement, expressed or implied, is intended to or shall confer on any Person other than the respective parties hereto and thereto and their successors and assignees permitted hereunder and thereunder any benefit or any legal or equitable right, remedy or other claim under this Agreement or any Notes.

(g)    The provisions of this Section 9.9 shall not apply to any purchase of participations among the Lenders pursuant to Section 2.5.

(h)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with, with respect to Term Loans, its Applicable Term Loan Percentage, and with respect to Revolving Loans, its Applicable Revolving Loan Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(i)    Any Lender may assign all or any portion of its Term Loans hereunder to any Loan Party (any such Person, a "Purchasing Loan Party"), but only if, (i) such assignment is made solely in exchange for cash consideration, pursuant to a process open to all Lenders holding Loans of the same Class pursuant to customary procedures to be agreed between the Borrower and the Administrative Agent at the time of any such auction (including pursuant to a "Dutch auction" or "reverse Dutch auction," and which shall include the ability of the Borrower to purchase Term Loans at a discount to par) offered on a pro rata basis among Lenders holding Loans of the same Class, (ii) any such purchased Term Loans shall be automatically and permanently cancelled immediately upon acquisition thereof by the Purchasing Loan Party and no longer outstanding for any purpose hereunder, (iii) no such assignment shall be made with the proceeds of any Revolving Loans, and (iv) no Event of Default has occurred or is continuing, or would result therefrom.

**9.10    Execution in Counterparts**.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**9.11** **Several Liability**.  The Obligations of the Administrative Agent and each of the Lenders hereunder are several, not joint.

**9.12** **Financial Information**.  The Borrower assumes responsibility for keeping itself informed of its own financial condition and the financial condition of any and all endorsers and/or other guarantors of all or any part of the Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Obligations, or any part thereof, that diligent inquiry would reveal, and the Borrower agrees that the Administrative Agent, the Lenders and the L/C Issuers shall have no duty to advise the Borrower of information known to them regarding such condition or any such circumstances.

**9.13** **Entire Agreement**.  Except as otherwise expressly provided herein, this Agreement and the other documents described or contemplated herein embody the entire agreement and understanding among the parties hereto and thereto and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

**9.14** **Other Relationships**.  No relationship created hereunder or under any other Loan Document shall in any way affect the ability of the Administrative Agent or its Affiliates and each Lender and each L/C Issuer or their respective Affiliates to enter into or maintain business relationships with the Borrower beyond the relationships specifically contemplated by this Agreement and the other Loan Documents.

**9.15** **Consent to Jurisdiction**.  BORROWER HEREBY IRREVOCABLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NOTES OR ANY OTHER LOAN DOCUMENT AND HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING. EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING BY UNITED STATES CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OF COPIES OF SUCH PROCESS TO SUCH BORROWER'S ADDRESS REFERENCED IN SECTION 9.3.  EACH PARTY AGREES THAT A JUDGMENT, FINAL BY APPEAL OR EXPIRATION OF TIME TO APPEAL WITHOUT AN APPEAL BEING TAKEN, IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECTION SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR L/C ISSUER TO BRING ANY ACTION OR PROCEEDING AGAINST SUCH BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

**9.16** **Waiver of Jury Trial**.  THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY NOTE, OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

**9.17**    **USA Patriot Act**.  Each Lender and each L/C Issuer that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**9.18**    **Confidentiality**.

(a)    Each of the Administrative Agent, each Lender and each L/C Issuer agree to maintain the confidentiality of information obtained by it pursuant to any Loan Document, except that such information may be disclosed (i) with the Borrower's written consent, (ii) in any legal, judicial, administrative proceeding or compulsory process or otherwise as required by applicable law or regulations (in which case such Person agrees to promptly notify the Borrower to the extent practicable and permitted by applicable law); (iii) upon the request or demand of any Governmental Authority having jurisdiction over the Administrative Agent, such Lender, such L/C Issuer or their respective Affiliates (in which case such Person agrees to, except with respect to any audit or examination conducted by bank accountants, any governmental bank or insurance regulatory authority exercising examination or regulatory authority, or any regulatory requests made by the National Association of Insurance Commissioners, promptly notify the Borrower to the extent lawfully permitted to do so); (iv) to officers, directors, trustees, agents, members, partners, equity holders, approved and managed funds, employees, attorneys, prospective investors, accountants and advisors of the Administrative Agent, any Lender or any L/C Issuer who are informed of the confidential nature of such information and are or have been advised of their obligation to keep such information confidential solely on a need-to-know basis in connection with the transactions contemplated by this Agreement; (v) to any Affiliates of the Administrative Agent, any Lender or any L/C Issuer (provided that any such Affiliate is advised of its obligation to retain such information as confidential) on a need-to-know basis in connection with the transactions contemplated by this Agreement; (vi) to the extent any such information becomes publicly available other than by reason of disclosure in breach of this Agreement; and (vii) in connection with the exercise or enforcement of any right or remedy under any Loan Document.

**9.19**    **Replacement of Lenders**.  If the Borrower is entitled to replace a Lender or L/C Issuer pursuant to the provisions of Section 10.6, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender or L/C Issuer and the Administrative Agent, require such Lender or L/C Issuer to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.9), all of its interests, rights (other than its existing rights to payments pursuant to Sections 10.1 and 10.4 with respect to payments made prior to such assignment) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender or L/C Issuer, if a Lender or L/C Issuer accepts such assignment), provided that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 9.9(b);

(b)    such Lender or L/C Issuer shall have received payment of an amount equal to 100% of the outstanding principal of its Loans, accrued interest thereon, accrued fees and all

other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 10.5) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 10.4 or payments required to be made pursuant to Section 10.1, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    such assignment does not conflict with applicable Laws; and

(e)    in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender or L/C Issuer shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or L/C Issuer or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**9.20    Keepwell**.  Each of Borrower, Affiliate of Borrower and Guarantor that is a Qualified ECP Guarantor at the time the Guarantee or the grant of a Lien under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this Article IX voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full. Borrower, each Affiliate of Borrower and Guarantor intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

**9.21    Electronic Execution of Assignments and Certain Other Documents**.  The words "delivery," "execute," "execution," "signed," "signature," and words of like import in any Loan Document or any other document executed in connection herewith shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary neither the Administrative Agent nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent or such Lender pursuant to procedures approved by it and provided further without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

**9.22    ABL/Term Intercreditor Agreement**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, in the event of a conflict or inconsistency between the

terms of this Agreement and the terms of the ABL/Term Intercreditor Agreement, if any, the terms of the ABL/Term Intercreditor Agreement shall prevail.

<div align="center">

**ARTICLE X**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

</div>

**10.1**    **Taxes**.

(a)    <u>Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes</u>.

(i)    Any and all payments by or on account of any obligation of any Borrower or Guarantor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws.  If any applicable Laws (as determined in the good faith discretion of the applicable withholding agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Borrower or Guarantor, then the Administrative Agent or such Borrower or Guarantor shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If any Borrower or Guarantor or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment on account of any obligation of the Borrower or Guarantor under any Loan Document, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code and provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower or Guarantor shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 10.1</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)    If any Borrower or Guarantor or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment on account of any obligation of the Borrower or Guarantor under any Loan Document, then (A) such Borrower or Guarantor or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Borrower or Guarantor or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and, if paid by the Administrative Agent, the Administrative Agent shall provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower or Guarantor shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 10.1</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

<div align="center">110</div>

(b)    <u>Payment of Other Taxes by Borrower and/or Guarantor</u>.  Without limiting the provisions of subsection (a) above, Borrower and/or Guarantor shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    <u>Tax Indemnifications</u>.

(i)    Each Borrower and Guarantor shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 10.1</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)    Each Lender and each L/C Issuer shall, and does hereby, severally indemnify and shall make payment in respect thereof within ten (10) days after demand therefor, (A) the Administrative Agent against any Indemnified Taxes attributable to such Lender or L/C Issuer (but only to the extent that any Borrower or Guarantor has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower and/or Guarantor to do so), and (B) the Administrative Agent and the Borrower and/or Guarantor, as applicable, against any Taxes attributable to such Lender's or L/C Issuer's failure to comply with the provisions of <u>Section 9.9(c)</u> relating to the maintenance of a Participant Register, and (C) the Administrative Agent and the Borrower and/or Guarantor, as applicable, against any Excluded Taxes attributable to such Lender or L/C Issuer, in each case, that are payable or paid by the Administrative Agent or a Borrower or Guarantor in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender and each L/C Issuer hereby authorizes the Administrative Agent, Borrower or Guarantor to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document or otherwise payable by the Administrative Agent, Borrower or Guarantor from any other source against any amount due to the Administrative Agent, Borrower or Guarantor under this clause (ii).

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Borrower or Guarantor to a Governmental Authority, as provided in this <u>Section 10.1</u>, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    <u>Status of Lenders; Tax Documentation</u>.

(i)    Any Lender or L/C Issuer that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by

the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender or L/C Issuer, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender or L/C Issuer is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.1(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's or L/C Issuer's reasonable judgment such completion, execution or submission would subject such Lender or L/C Issuer to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    any Lender or L/C Issuer that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender or L/C Issuer becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender or L/C Issuer is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender or L/C Issuer shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender or L/C Issuer becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender or L/C Issuer claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender or L/C Issuer claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

112

(4)      to the extent a Foreign Lender or L/C Issuer is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender or L/C Issuer is a partnership and one or more direct or indirect partners of such Foreign Lender or L/C Issuer are claiming the portfolio interest exemption, such Foreign Lender or L/C Issuer may provide a U.S. Tax Compliance Certificate satisfactory to the Administrative Agent on behalf of each such direct and indirect partner;

(C)      any Foreign Lender or L/C Issuer shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender or L/C Issuer becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies (or originals, as required) of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)      if a payment made to a Lender or L/C Issuer under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or L/C Issuer were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or L/C Issuer shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender or L/C Issuer has complied with such Lender's or L/C Issuer's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(E)      the Administrative Agent shall deliver to the Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that the Administrative Agent is a U.S. Person exempt from U.S. federal backup withholding tax.

(iii)      Each Lender and L/C Issuer agrees that if any form or certification it previously delivered pursuant to this Section 10.1 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)      Treatment of Certain Refunds.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or L/C Issuer, or have any obligation to pay to any Lender or L/C Issuer, any refund of

Taxes withheld or deducted from funds paid for the account of such Lender or L/C Issuer.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes ("Refund") as to which it has been indemnified by any Borrower or Guarantor or with respect to which any Borrower or Guarantor has paid additional amounts pursuant to this <u>Section 10.1</u>, it shall pay to such Borrower or Guarantor an amount equal to such Refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower or Guarantor under this <u>Section 10.1</u> with respect to the Taxes giving rise to such Refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such Refund), <u>provided</u> that each Borrower or Guarantor, upon the request of the Recipient, agrees to repay the amount paid over to such Borrower or Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such Refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to such Borrower or Guarantor pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such Refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Borrower or Guarantor or any other Person.

(g)    <u>Survival</u>.  Each party's obligations under this <u>Section 10.1</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or L/C Issuer, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**10.2    Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Term SOFR Reference Rate, or to determine or charge interest rates based upon the Term SOFR Reference Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market or the banking market generally, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (a) any obligation of such Lender to make or continue Term SOFR Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR Reference Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loans, and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Term SOFR Reference Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest

114

rates based upon the Term SOFR Reference Rate.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**10.3**    **Inability to Determine Rates**.

(a)    If in connection with any request for a Term SOFR Loan, or a continuation thereof, (i)  the Administrative Agent determines that (A)  Dollar deposits are not being offered to banks in the London interbank eurodollar market or, in the case of Term SOFR Loans, the banking market generally, for the applicable amount and Interest Period of such Term SOFR Loan, or (B) adequate and reasonable means do not exist for determining the Adjusted Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan or in connection with an existing or proposed Base Rate Loan (in each case with respect to clause (i), "Impacted Loans"), or (ii) the Administrative Agent or the Required Lenders determine that for any reason Adjusted Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Term SOFR Loans shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Adjusted Term SOFR component of the Base Rate, the utilization of the Adjusted Term SOFR component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for an Advance of or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for an Advance of Base Rate Loans in the amount specified therein.

(b)    Notwithstanding the foregoing, if the Administrative Agent has made the determination described in clause (a)(i) of this Section, the Administrative Agent in consultation with the Borrower and the Required Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (1) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under clause (a)(i) of this Section, (2) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (3) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof.

**10.4**    **Increased Costs**.

(a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 10.4(e)</u>) or L/C Issuer;

115

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes) and (C) Connection Income Taxes on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or L/C Issuer, the London interbank market or the banking market generally any other condition, cost or expense affecting this Agreement or Term SOFR Loans made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making, continuing or maintaining any Loan or Letter of Credit the interest on which is determined by reference to the Term SOFR Reference Rate (or of maintaining its obligation to make any such Loan or Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or L/C Issuer (whether of principal, interest or any other amount) then, upon request of such Lender or L/C Issuer, the Borrower will pay to such Lender or L/C Issuer such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>.  If any Lender or L/C Issuer determines that any Change in Law affecting such Lender or any Lending Office of such Lender, or L/C Issuer or such Lender's or L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, or Letter of Credit Obligations held by such L/C Issuer, to a level below that which such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or L/C issuer's policies and the policies of such Lender's or L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company for any such reduction suffered.

(c)    <u>Certificates for Reimbursement</u>.  A certificate of a Lender or L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company, as the case may be, as specified in subsection (a) or (b) of this <u>Section</u> and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender or L/C Issuer the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Lender or L/C Issuer to demand compensation pursuant to the foregoing provisions of this <u>Section 10.4</u> shall not constitute a waiver of such Lender's or L/C Issuer's right to demand such compensation, <u>provided</u> that the Borrower shall not be required to compensate a Lender or L/C Issuer pursuant to the foregoing provisions of this <u>Section</u> for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or L/C Issuer notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

**10.5    <u>Funding Losses</u>**.  Upon written demand of any Lender or L/C Issuer (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender

116

harmless from any loss, cost, liability or expense (excluding loss of anticipated profits or margin) actually incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)    any assignment of a Term SOFR Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 9.19; including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender or L/C Issuer in connection with the foregoing.

**10.6    Mitigation Obligations; Replacement of Lenders**.

(a)    Designation of a Different Lending Office.  If any Lender or L/C Issuer requests compensation under Section 10.4, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or L/C Issuer or any Governmental Authority for the account of any Lender or L/C Issuer pursuant to Section 10.1, or if any Lender gives a notice pursuant to Section 10.2, then at the request of the Borrower, such Lender or L/C Issuer shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans or Letters of Credit hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 10.1 or 10.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 10.2, as applicable, and (ii) in each case, would not subject such Lender or L/C Issuer to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or L/C Issuer.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or L/C Issuer in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender or L/C Issuer requests compensation under Section 10.4, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or L/C Issuer or any Governmental Authority for the account of any Lender or L/C Issuer pursuant to Section 10.1 and, in each case, such Lender or L/C Issuer has declined or is unable to designate a different lending office in accordance with Section 10.6(a) that eliminates the need to pay additional amounts for Indemnified Taxes under Section 10.1 or compensation under Section 10.4, the Borrower may replace such Lender or L/C Issuer in accordance with Section 9.19.

**10.7    Survival**.  All of the Borrower's obligations under this Sections 10.4 and 10.5 shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

**10.8    Amendment and Restatement**.  The Borrower, Holdings, the Administrative Agent and the Lenders hereby agree that upon the effectiveness of the amendment and restatement of the Existing

Opco Note by this Agreement, the terms and provisions of the Existing Opco Note shall be and hereby are amended and restated in their entirety by the terms and provisions of this Agreement.  By execution of this Agreement each party hereto hereby agrees that (i) this Agreement is given as a substitution for, and not as a payment of, the obligations of the Borrower and the other obligors existing under the Existing Opco Note prior to the effectiveness of this Agreement and (ii) this Agreement does not constitute a novation of the Existing Opco Note.

[Signature pages follow]

118

      IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**"BORROWER"**

**WASH & WAX SYSTEMS LLC**, a Delaware limited liability company

By: _____
   Name:
   Title:

**"HOLDINGS"**

**WASH & WAX INTERMEDIATE LLC**, a Delaware limited liability company

By: _____
   Name:
   Title:

[Signature Page to Opco Credit Agreement]

**"ADMINISTRATIVE AGENT"**

**BRIGHTWOOD LOAN SERVICES LLC**, in its
capacity as Administrative Agent
By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


Address:  810 Seventh Avenue, 26th Floor
         New York, NY 10019
         Attention: Sam Sullivan, Mia Ellis and Brett
         Murray

**"LENDER"**

_____, in its capacity as a Lender

By: _____
    Name:
    Title:

Address: _____

[Signature Page to Opco Credit Agreement]

**"LENDER"**

_____, in its capacity as a Lender

By: _____
    Name:
    Title:

Address: _____

[Signature Page to Opco Credit Agreement]

## Exhibit B(ii)-1

**New OpCo Credit Agreement Redline**

**AMENDED AND RESTATED OPCO CREDIT AGREEMENT**

**DATED APRIL 30, 2025 and**

**BY AND BETWEEN**

**WASH & WAX SYSTEMS LLC**
**as Borrower,**

**WASH & WAX INTERMEDIATE LLC**
**as Holdings,**

**THE OTHER LOAN PARTIES WHICH ARE PARTY HERETO,**

**THE LENDERS AND L/C ISSUERS WHICH ARE PARTY HERETO**

**AND**

**BRIGHTWOOD LOAN SERVICES LLC**
**as Administrative Agent**

**TABLE OF CONTENTS**

**Page**

**ARTICLE I DEFINITIONS AND OTHER TERMS**

| | | |
|---|---|---|
| 1.1 | Defined Terms | 2 |
| 1.2 | Other Interpretive Provisions | 39 |
| 1.3 | Accounting Terms; Payment Dates | 40 |
| 1.4 | References to Agreements, Laws, Etc | 40 |
| 1.5 | Times of Day | 40 |
| 1.6 | Interest Rates | 4041 |

**ARTICLE II THE ADVANCES**

| | | |
|---|---|---|
| 2.1 | The Advances | 41 |
| 2.2 | Election by Borrower | 52 |
| 2.3 | Payments | 5223 |
| 2.4 | Setoff; etc | 53 |
| 2.5 | Sharing | 53 |
| 2.6 | Fees | 5334 |
| 2.7 | Lending Branch | 54 |
| 2.8 | Application of Payments and Collections | 54 |
| 2.9 | [Reserved] | 55 |
| 2.10 | Defaulting Lenders | 55 |
| 2.11 | Rates | 57 |
| 2.12 | Benchmark Replacement Setting for Term Loans | 57 |

**ARTICLE III CONDITIONS PRECEDENT**

| | | |
|---|---|---|
| 3.1 | Conditions Precedent to Effectiveness | 5889 |
| 3.2 | Conditions Precedent to All Advances | 6412 |

**ARTICLE IV REPRESENTATIONS AND WARRANTIES**

| | | |
|---|---|---|
| 4.1 | Organization; etc | 62 |
| 4.2 | Due Authorization | 6223 |
| 4.3 | Subsidiaries | 6223 |
| 4.4 | Validity of the Agreement | 63 |
| 4.5 | Financial Statements | 63 |
| 4.6 | Litigation; etc | 6334 |
| 4.7 | Compliance with Law | 6334 |
| 4.8 | ERISA Compliance | 6334 |
| 4.9 | Title to Assets | 64 |
| 4.10 | Use of Proceeds | 6445 |
| 4.11 | Governmental Regulation | 6445 |
| 4.12 | Margin Stock | 6445 |
| 4.13 | Investment Company Act | 65 |
| 4.14 | Accuracy of Information | 65 |

4.15    Tax Returns; Audits .................................................................................................... 65
4.16    Environmental and Safety Regulations ....................................................................... 65 6
4.17    Payment of Wages; Labor Matters .............................................................................. 66
4.18    Intellectual Property .................................................................................................... 66
4.19    Projections ................................................................................................................... 66
4.20    Solvency ...................................................................................................................... 66 7
4.21    No Material Adverse Occurrence ................................................................................ 66 7
4.22    [Reserved]. .................................................................................................................. 66 7
4.23    Deposit Accounts ........................................................................................................ 67
4.24    [Reserved]. .................................................................................................................. 67
4.25    [Reserved]. .................................................................................................................. 67
4.26    Valid Liens .................................................................................................................. 67
4.27    Foreign Assets Control Regulations and Anti-Money Laundering ............................ 67
4.28    Patriot Act ................................................................................................................... 67 8
4.29    Insurance ..................................................................................................................... 67 8
4.30    SBA Matters ................................................................................................................ 67 8

**ARTICLE V CERTAIN AFFIRMATIVE COVENANTS**

5.1    Financial Information; etc ........................................................................................... 68
5.2    Maintenance of Existence; etc .................................................................................... 71
5.3    Maintenance of Properties ........................................................................................... 71
5.4    Payment of Liabilities .................................................................................................. 71
5.5    Compliance with Laws ................................................................................................ 71
5.6    Books and Records; Inspection Rights; etc ................................................................ 71 2
5.7    Insurance ..................................................................................................................... 72
5.8    ERISA .......................................................................................................................... 72 3
5.9    Additional Subsidiary Guarantors; Post-Closing Requirements ................................ 73
5.10    [Reserved] ................................................................................................................... 74
5.11    Cash Management Systems .......................................................................................... 74
5.12    Further Assurances ...................................................................................................... 74
5.13    SBA Matters ................................................................................................................ 74 5
5.14    OFAC; Patriot Act ....................................................................................................... 75
5.15    Sale-Leaseback Accounting Treatment ....................................................................... 75
5.16    Quarterly Lender Calls ................................................................................................ 75

**ARTICLE VI FINANCIAL COVENANTS AND NEGATIVE COVENANTS**

6.1    Financial Covenants ..................................................................................................... 75
6.2    Limitations on Indebtedness ........................................................................................ 76 7
6.3    Liens ............................................................................................................................ 78 9
6.4    Sales of Assets ............................................................................................................. 81
6.5    Liquidations, Mergers and Consolidations ................................................................. 81 2
6.6    Investments .................................................................................................................. 82
6.7    Transactions with Affiliates ........................................................................................ 82
6.8    [Reserved]. .................................................................................................................. 82 3
6.9    Amendment and Waiver ............................................................................................... 82 3
6.10    Restricted Payments ..................................................................................................... 82 3
6.11    Payments in Respect of Certain Indebtedness ............................................................ 84
6.12    Change in Business ...................................................................................................... 84 5
6.13    Changes in Accounting, Name and Jurisdiction of Organization ............................... 84 5

6.14    No Negative Pledges ................................................................. 845
6.15    Holding Company Status ............................................................ 85
6.16    Use of Proceeds ......................................................................... 86

## ARTICLE VII EVENTS OF DEFAULT

7.1    Events of Default ....................................................................... 86
7.2    Action If Event of Default ......................................................... 88
7.3    Remedies ................................................................................... 889
7.4    Cash Collateral for Letters of Credit ......................................... 89

## ARTICLE VIII THE ADMINISTRATIVE AGENT

8.1    Appointment and Authorization ................................................. 890
8.2    Power ......................................................................................... 90
8.3    Interest Holders ......................................................................... 90
8.4    Employment of Counsel; etc ...................................................... 901
8.5    Reliance ..................................................................................... 901
8.6    General Immunity ....................................................................... 91
8.7    Credit Analysis ........................................................................... 91
8.8    Administrative Agent and Affiliates ........................................... 92
8.9    Indemnification ........................................................................... 92
8.10    Security Documents ................................................................... 923
8.11    Collateral Matters ..................................................................... 923
8.12    Action by the Administrative Agent ......................................... 93
8.13    Successor Administrative Agent ............................................... 94
8.14    Authorization to Enter into Intercreditor Agreements. ............ 94
8.15    Erroneous Payments. ................................................................ 945

## ARTICLE IX MISCELLANEOUS

9.1    Waivers, Amendments; etc ........................................................ 97
9.2    Payment Dates ........................................................................... 99100
9.3    Notices ....................................................................................... 99100
9.4    Costs and Expenses ................................................................... 99100
9.5    Indemnification ........................................................................... 100
9.6    Severability ................................................................................. 1012
9.7    Headings ..................................................................................... 1012
9.8    Governing Law ........................................................................... 1012
9.9    Successors and Assigns ............................................................. 102
9.10    Execution in Counterparts ......................................................... 1056
9.11    Several Liability ......................................................................... 1056
9.12    Financial Information ................................................................. 1056
9.13    Entire Agreement ....................................................................... 106
9.14    Other Relationships ................................................................... 106
9.15    Consent to Jurisdiction ............................................................. 106
9.16    Waiver of Jury Trial ................................................................. 1067
9.17    USA Patriot Act ......................................................................... 1067
9.18    Confidentiality ........................................................................... 107
9.19    Replacement of Lenders ............................................................. 1078
9.20    Keepwell ..................................................................................... 108

9.21    Electronic Execution of Assignments and Certain Other Documents ................................ 1089

9.22    ABL/Term Intercreditor Agreement ................................ 1089

### ARTICLE X TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    Taxes ................................ 1089

10.2    Illegality ................................ 1134

10.3    Inability to Determine Rates ................................ 1134

10.4    Increased Costs ................................ 1145

10.5    Funding Losses ................................ 1156

10.6    Mitigation Obligations; Replacement of Lenders ................................ 116

10.7    Survival ................................ 1167

10.8    Amendment and Restatement ................................ 117

SCHEDULE I          -      Lenders/Commitments
SCHEDULE I-A        -      Units
SCHEDULE II         -      Specified Units
SCHEDULE III        -      Sunset Units
SCHEDULE 4.17       -      Labor Matters
SCHEDULE 4.23       -      Deposit Accounts
SCHEDULE 6.2(a)     -      Existing Indebtedness
SCHEDULE 6.2(s)     -      Existing Letters of Credit
SCHEDULE 6.3        -      Existing Liens
SCHEDULE 6.6        -      Permitted Investments
SCHEDULE 6.7        -      Affiliate Transactions
SCHEDULE 9.3        -      Administrative Agent's Office; Certain Addresses for Notices
ANNEX I             -      List of Jurisdictions in which the Borrower is Qualified to Do Business
ANNEX II            -      List of Subsidiaries; Jurisdictions of Incorporation and Qualification to do
                           Business
EXHIBIT A           -      Form of Opco Term Note
EXHIBIT B           -      Form of Opco Revolving Loan Note
EXHIBIT C           -      Form of Opco Guaranty
EXHIBIT D           -      Form of Notice of Borrowing
EXHIBIT E           -      Form of Assignment and Assumption Agreement
EXHIBIT F           -      Compliance Certificate

## AMENDED AND RESTATED OPCO CREDIT AGREEMENT

This AMENDED AND RESTATED OPCO CREDIT AGREEMENT (this "Agreement") effective as of the [____]30th day of April, 2025, by and between [WASH & WAX SYSTEMS LLC] ("Borrower"), [WASH & WAX INTERMEDIATE LLC] ("Holdings") thereto, the other Loan Parties party hereto, the Lenders and L/C Issuers now or hereafter parties hereto, and **BRIGHTWOOD LOAN SERVICES LLC**, in its capacity as Administrative Agent for the Lenders.

**WHEREAS**, on February 5, 2025 (the "Petition Date"), Zips and certain of its Affiliates and Subsidiaries (each, a "Debtor" and, collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court");

**WHEREAS**, following the Petition Date, pursuant to an interim order entered by the Bankruptcy Court (the "Interim DIP Order") the Debtors entered into that certain Senior Secured Super-Priority Priming Debtor-In-Possession Credit Agreement, dated as of February 10, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the Debtors, certain lenders party thereto (the "DIP Lenders") and Brightwood Loan Services LLC, as administrative agent (the "DIP Administrative Agent"), consisting of (a) "new money" term loans in an aggregate principal amount of $30,000,000 and (b) subject to the entry of a final order by the Bankruptcy Court (the "Final DIP Order"), "roll up" term loans in an aggregate principal amount of $52,500,000 (collectively, the "DIP Term Loans");

**WHEREAS**, on February 5, 2025, the Debtors filed the Joint Plan of Reorganization of Zips Car Wash, LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (as amended, supplemented or modified from time to time, the "Plan of Reorganization") and related disclosure statement with the Bankruptcy Court;

**WHEREAS**, on February 21, 2025, an Official Committee of Unsecured Creditors was appointed in the Chapter 11 Cases (the "Official Committee");

**WHEREAS**, on March 17, 2025, the Debtors, the DIP Lenders, and the Official Committee entered into a global settlement with respect to certain outstanding issues and claims in the Chapter 11 Cases (the "Bankruptcy Settlement");

**WHEREAS**, the terms of the Bankruptcy Settlement were set forth in an amended Final DIP Order and an amended Plan of Reorganization, each of which were filed with the Bankruptcy Court on March 17, 2025;

**WHEREAS**, on March 18, 2025, the Bankruptcy Court entered the Final DIP Order and approved entry into the DIP Credit Agreement, and all actions contemplated thereby, on a final basis;

**WHEREAS**, on April [_____]21, 2025, the Bankruptcy Court entered a confirmation order confirming the Plan of Reorganization (the "Confirmation Order") and on April [_____]30, 2025, the Plan of Reorganization went effective (the "Plan Effective Date");

**WHERAS**, in connection with the Plan of Reorganization, on the Plan Effective Date, the Borrower acquired substantially all of the Debtors' assets (other than certain assets of the Debtors that were transferred to the Debtors' unsecured creditors), as set forth in the Plan of Reorganization, in exchange for, among other things, the issuance by the Borrower to Zips of that certain note and security agreement, dated as of the Plan Effective Date (as amended, restated, amended and restated,

1

supplemented, or otherwise modified from time to time prior to the date hereof, the "Existing Opco Note"), in the original principal amount of $225,000,000 (the "Existing Opco Obligations");

**WHERAS**, pursuant to the Plan of Reorganization, the Lenders acquired all of the Debtors' right title and interest in and to the Existing Opco Note;

**WHEREAS**, in connection with the Plan Effective Date, the Borrower has asked the Lenders to provide the Borrower with (a) a revolving credit facility in an aggregate principal amount of $15,000,000 and (b) a term loan facility in an aggregate principal amount of $225,000,000, which will consist solely of the converted Existing Opco Obligations;

**WHEREAS**, the Lenders are willing to make the foregoing revolving credit facility and term loan available to the Borrower, subject to the terms and conditions set forth in this Agreement and the Plan of Reorganization; and

**WHEREAS**, pursuant to and in accordance with the terms of the Plan of Reorganization, ~~(a)~~ each ~~DIP Lender will, to the extent not otherwise paid in full in cash, exchange its DIP Term Loans for~~ Initial Term Loans, and (b) each Prepetition Term Loan Lender will exchange a portion of its ~~Prepetition Term Loan Claims~~Existing Opco Obligations for Initial Term Loans~~, in each case~~ on a pro-rata basis;

**NOW, THEREFORE**, in consideration of the terms and conditions contained herein, and of any loans or extensions of credit heretofore, now or hereafter made to or for the benefit of the Borrower by the Lenders and the Administrative Agent, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND OTHER TERMS

**1.1    Defined Terms.** The following terms when used in this Agreement shall, except where the context otherwise requires, have the following meanings:

"ABL Agent" means the administrative agent and/or collateral agent for the ABL Lenders under the ABL Facility and any successor, refinancing or replacement thereof.

"ABL Facility" means an asset-based lending facility with a borrowing base tied to accounts receivable and/or inventory or any other assets approved by Supermajority Lenders to be entered into by the Loan Parties, the ABL Agent and the ABL Lenders after the Closing Date on terms and pursuant to documentation reasonably satisfactory to the Supermajority Lenders.

"ABL Lenders" means the lenders under the ABL Facility and any successor, refinancing or replacement thereof.

"ABL/Term Intercreditor Agreement" means an intercreditor agreement executed in connection with an ABL Facility, to be entered into by and among the Administrative Agent and the ABL Agent, and acknowledged by the Loan Parties, in form and substance reasonably satisfactory to the Supermajority Lenders and the Borrower, as amended, restated, amended and restated, supplemented or otherwise modified or replaced from time to time.

"Acquisition" means (whether by purchase, exchange, issuance of Equity Interests or Equity Interests Equivalents, merger, reorganization, joint venture or otherwise) any transaction, or any series of related transactions by which the Borrower directly or indirectly (i) acquires any Person, which Person shall then become consolidated with the Borrower in accordance with GAAP, (ii) acquires all or

substantially all of the assets of any Person or any business, division or product line thereof or the acquisition of a portfolio of Real Property or leases of Real Property, (iii) acquires in excess of 50% of the Equity Interests or Equity Equivalents of any Person or otherwise causing such Person to become a Subsidiary of the Borrower, or (iv) merges, consolidates or otherwise enters into any other business combination with any Person to effect any of the transactions referred to in clauses (i), (ii) or (iii) above.

"Actual Tunnel Volume" means, for any period, the aggregate volume of tunnel car washes at each Mature Unit for such period.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to Term SOFR for such calculation; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" means Brightwood Loan Services LLC, as Administrative Agent for the Lenders, or any successor Administrative Agent hereunder.

"Administrative Questionnaire" means an administrative questionnaire to be completed and provided to the Administrative Agent in form and substance as provided by the Administrative Agent.

"Advance" means one or more advances under the Term Loan Commitments and/or Revolving Loan Commitments, as applicable.

"Affiliate" shall include, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with such Person.  For purposes of this definition, a Person shall be deemed to control another Person if the controlling Person owns or controls directly or indirectly twenty percent (20%) or more of the shares of stock, other Equity Interests or Equity Interests Equivalents or voting powers of the controlled Person.

"Aggregate Commitments" means the Commitments of all Lenders.

"Agreement" means this Opco Credit Agreement as originally executed and as amended, modified or supplemented from time to time.

"Applicable Margin" means, (i) for Term SOFR Loans, 5.50% per annum, and (ii) for Base Rate Loans, 4.50% per annum.

"Applicable Revolving Loan Percentage" means with respect to any Revolving Loan Lender at any time, the percentage (carried out to the ninth decimal place) of the total Revolving Loan Commitments represented by such Revolving Loan Lender's Revolving Loan Commitment at such time. If the Revolving Loan Commitments of each Revolving Loan Lender have been terminated or if the Aggregate Commitments have expired, then the Applicable Revolving Loan Percentage of each Revolving Loan Lender shall be determined based on the Applicable Revolving Loan Percentage of such Revolving Loan Lender most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Revolving Loan Percentage of each Lender is set forth opposite the name of such Lender on **Schedule I** or in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Term Loan Percentage" means with respect to any Term Loan Lender at any time, the percentage (carried out to the ninth decimal place) of the total Term Loan Commitments and the outstanding principal amount of the Term Loans represented by such Term Loan Lender's Term Loan Commitment and outstanding principal amount of the Term Loans owed to such Lender at such time.  If

the Term Loan Commitments of each Term Loan Lender have been terminated or if the Aggregate Commitments have expired, then the Applicable Term Loan Percentage of each Term Loan Lender shall be determined based on the Applicable Term Loan Percentage of such Term Loan Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Term Loan Percentage of each Lender is set forth opposite the name of such Lender on **Schedule I** or in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Unused Margin" means 0.50% per annum.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 9.9(b).

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.12(d).

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Bankruptcy Settlement" has the meaning specified in the recitals hereto.

"Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the sum of (x) the Adjusted Term SOFR calculated for each such day based on an Interest Period of three months determined two (2) Business Days prior to such day (but for the avoidance of doubt, not less than one percent (1.0%) per annum), plus (y) one percent (1.0%), in each instance, as of such day. For the avoidance of doubt, the Base Rate shall not at any time be less than 2.00% per annum. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate, the Adjusted Term SOFR shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR, as the case may be.

"Base Rate Loan" means any Advance accruing interest by reference to the Base Rate.

"Base Rate Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Benchmark" means, with respect to Term Loans, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to

the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 2.12</u>.

"<u>Benchmark Replacement</u>" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)      Daily Simple SOFR for an interest period of one month or three months, as applicable; or

(b)      the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Adjustment</u>" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"<u>Benchmark Replacement Date</u>" means a date and time determined by the Administrative Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; <u>provided</u> that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event

or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.12.

"Borrower" has the meaning specified in the recitals hereto.

"Brightwood" means Brightwood Loan Services LLC and any Affiliate thereof.

"Business Day" means any day on which commercial banks and foreign exchange markets are open for business in New York, New York.

"Capital Expenditures" means, for any Person for any period for which the amount thereof is to be determined, without duplication, the aggregate amount of all expenditures, whether or not made with proceeds of Indebtedness, by such Person and its Subsidiaries during such period for any purchase or other acquisition of any asset which is required to be classified as a fixed or capital asset on the

consolidated balance sheet of such Person prepared in accordance with GAAP, but excluding (a) expenditures that would otherwise qualify as Capital Expenditures made in connection with the replacement, substitution, restoration or repair of fixed or capital assets to the extent financed (i) from insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced, restored or repaired or (ii) with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (b) expenditures that would otherwise qualify as Capital Expenditures to the extent such expenditures constitute a reinvestment of Net Cash Proceeds from Dispositions permitted pursuant to Section 6.4 and expenditures to the extent that such expenditure is substantially contemporaneously reimbursable (and in any event within 60 days after such expenditures) to the Borrower or any of its Subsidiaries by a Person that is not a Loan Party or a Subsidiary thereof.

"Capital Lease" means, with respect to any Person, a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board) is required to be, classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligations" means, for any period for which the amount thereof is to be determined, any obligation of such Person to pay rent or other amounts under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Cash Rental Expense" means, for the relevant measurement period, all cash rental expense of the Borrower and its Subsidiaries actually paid during such measurement period, determined on a consolidated and combined basis, incurred under any rental agreements or leases, other than obligations in respect of any Capital Leases, calculated on a Pro Forma Basis; provided, that Cash Rental Expenses shall exclude (a) any common area maintenance expenses and (b) taxes; and provided, further, that for purposes of calculating Consolidated EBITDA such rental expenses paid in advance pursuant to clause (c) shall be deemed to be paid during the Test Period in which they would otherwise be due; and provided, further, rent that is deferred pursuant to an agreement shall be deemed paid on the date such rent arises or would be due and payable without giving effect to any agreement to defer such rent.

"Casualty Event" means any event that gives rise to the receipt by any Loan Party of any insurance proceeds (including business interruption insurance proceeds) or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, order, policy, rule, regulation or treaty, (b) any change in any law, order, policy, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, regulations or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, regulations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the occurrence of any of the following: (i) any Person (together with its Affiliates), directly or indirectly, other than the Permitted Holders (and their respective Affiliates), owns more than greater than fifty percent (50%) of the Equity Interests and Equity Interests Equivalents

of the Parent, (ii) Holdings ceases to own and control, directly or indirectly, one hundred percent (100%) of the Equity Interests and Equity Interests Equivalents of the Borrower, or (iii) the occurrence of any "change of control" under the ABL Facility.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Closing Date" means April [＿＿＿＿]30, 2025.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all present and future assets and properties of the Borrower and the Guarantors, whether real or personal, tangible or intangible, in which Liens are granted or purported to be granted pursuant to the Security Documents; provided, that Collateral shall not include any Excluded Assets.

"Commitment" means, for each Lender, the aggregate amount of such Lender's commitment to fund Loans as set forth on **Schedule I**, as such amount may be modified from time to time pursuant to the terms hereof.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate in substantially the form set forth as **Exhibit F**, completed and signed by a Responsible Officer of the Borrower.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 10.5 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Amortization Expense" means the amount of amortization expense deducted in determining Consolidated Net Income.

"Consolidated Depreciation Expense" means the amount of depreciation expense deducted in determining Consolidated Net Income.

"Consolidated EBITDA" means, for any period for which the amount thereof is to be determined, an amount equal to Consolidated Net Income for such measurement period; plus (a) the following, without duplication, in each case the extent deducted in calculating such Consolidated Net Income:

(i) Consolidated Interest Expense during such period,

(ii) Consolidated Amortization Expense during such period,

(iii) Consolidated Depreciation Expense during such period,

(iv) Consolidated Tax Expenses paid or accrued during such period,

(v) [reserved],

(vi) (x) Transaction Expenses and (y)(a) costs, fees and expenses of the Loan Parties associated with the ABL Facility, (b) any costs, fees, expenses and premiums paid to the ABL Agent and the ABL Lenders in connection with the ABL Facility and (c) any costs, fees and expenses paid to legal counsel or other consultants of or advisors to the ABL Agent or any ABL Lender in connection with the ABL Facility,

(vii) the aggregate amount of all costs, fees and expenses, during such period relating to, whether or not consummated, Equity Issuances, Debt Issuances, Permitted Acquisitions, Permitted Investments, or Dispositions,

(viii) [reserved];

(ix) the aggregate amount of all charges and losses during such period related to the early termination or extinguishment of any indebtedness,

(x) the aggregate amount of all net losses from discontinued operations (that are accounted for as such under GAAP) incurred during such period,

(xi) the aggregate amount of all net losses from Dispositions (other than Dispositions in the ordinary course of business) incurred during such period,

(xii) the aggregate amount of director fees, indemnities and reimbursements for expenses incurred in connection with attending board meetings that are paid to board members during such period,

(xiii) the aggregate amount of any non-cash charges, losses or expenses (including tax reclassification related to tax contingencies in a prior period and the excess of rent expense due to the use of straight line rent for GAAP over Cash Rental Expense during such period) reducing Consolidated Net Income during such period, but excluding any non-cash charge relating to write-offs or write-downs of inventory or accounts receivable or representing amortization of a prepaid cash item that was paid but not expensed in a prior period,

(xiv) the aggregate amount of restructuring and similar charges or reserves, severance, recruiting, relocation costs or non-recurring integration costs; provided that (i) such costs are reasonably identifiable, factually supportable and, to the extent requested by the Administrative Agent, are disclosed in reasonable itemization and detail to the Administrative Agent and (ii) that the aggregate amount added pursuant to this clause (xiv), when combined with the amounts of adjustments made in such period pursuant to clauses (xv), (xviii) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after

giving effect to such adjustments) for such period; provided, further, that the Transaction Expenses shall not be added back pursuant to this clause (xiv) and therefore shall not count against the maximum amount permitted to be added back hereunder,

(xv) the aggregate amount of other extraordinary, unusual and non-recurring cash losses and expenses; provided that the Borrower shall provide the Administrative Agent with notice and reasonable detail regarding the nature of such cash losses and expenses; provided further that the aggregate amount added pursuant to this clause (xv), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xviii) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xvi) any other non-cash charges, write-downs, expenses, losses or items for such period, including any impairment charges or any non-cash costs and/or expenses incurred pursuant to any management equity plan, stock option plan or any other stock subscription or shareholder agreement, or due to the application of FASB ASC No. 815-10 regarding hedging activity, FASB ASC No. 350 regarding impairment of goodwill, FASB ASC No. 480-10 regarding accounting for financial instruments with debt and equity characteristics, and non-cash foreign currency exchange losses,

(xvii) proceeds received from any business interruption insurance in an amount representing the earnings for the applicable period that such proceeds are intended to replace and to the extent not otherwise included in Consolidated Net Income,

(xviii) the aggregate amount of all costs, fees and expenses during such period relating to the pre-opening of New Units; provided that (i) the aggregate amount of any such costs, fees and expenses added pursuant to this clause (xviii) with respect to any single New Unit shall not exceed $200,000 and (ii) the aggregate amount added pursuant to this clause (xviii), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xv) and (xix) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xix) integration and other business optimization expenses, charges and losses incurred in such period; provided that (i) such costs are reasonably identifiable, factually supportable and, to the extent requested by the Administrative Agent, are disclosed in reasonable itemization and detail to the Administrative Agent and (ii) the aggregate amount added pursuant to this clause (xix), when combined with the amounts of adjustments made in such period pursuant to clauses (xiv), (xv) and (xviii) shall not exceed 25% of Consolidated EBITDA (calculated after giving effect to such adjustments) for such period,

(xx) [reserved],

(xxi) charges, losses or expenses to the extent indemnified, insured, reimbursed or reimbursable or otherwise covered by a third party (so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days),

(xxii) [reserved],

(xxiii) to the extent decreasing Consolidated Net Income, cash payments, costs, fees, expense and charges related to earnout obligations, performance fees and payouts, or other contingent obligations and amounts deducted in respect of purchasing accounting required or permitted by GAAP,

10

(xxiv) losses resulting from accruals and reserves that are established or adjusted as a result of any Permitted Acquisition in accordance with GAAP (including any adjustment of estimated payouts on earn-outs) or changes as a result of the adoption or modification of accounting policies during such period,

(xxv) without duplication of Section 6.1(c), proceeds received of any Equity Cure Contribution; provided that amounts added back pursuant to this clause (xxv) shall only be included in Consolidated EBITDA for the purposes set forth in Section 6.1(c) and shall not be included in Consolidated EBITDA for any other purpose, and

(xxvi) additional items as mutually agreed upon in writing by the Borrower and the Administrative Agent,

and minus (b) to the extent added in calculating such Consolidated Net Income, the aggregate amount of:

(i) all non-cash charges increasing Consolidated Net Income (other than with respect to payments actually received and the reversal of any accrual or reserve to the extent not previously added back in any prior period accrual of revenue or recording of receivables in the ordinary course of business) during such period,

(ii) all net gains from discontinued operations (that are accounted for as such under GAAP) incurred during such period,

(iii) all extraordinary gains during such period,

(iv) all gains resulting from the early termination or extinguishment of any Indebtedness,

(v) the aggregate amount of all net gains from Dispositions (other than Dispositions in the ordinary course of business) incurred during such period, and

(vi) the excess of Cash Rental Expense over rent expense due to the use of straight line rent for GAAP during such period.

Notwithstanding the foregoing, (i) the (positive or negative) 4-Wall EBITDA contribution of each Specified Unit with respect to any period occurring after February 28, 2025, shall be disregarded in the calculation of Consolidated EBITDA, (ii) the (positive or negative) 4-Wall EBITDA contribution of each Sunset Unit with respect to any period occurring after February 28, 2025, shall be disregarded in the calculation of Consolidated EBITDA; provided, that to the extent any Sunset Unit's lease terms are either extended to a date later than the Extension Date or its operations are not permanently discontinued on or prior to the Extension Date, in either case, (1) this clause (ii) shall not be applicable with respect to any such Sunset Unit and (2) to the extent applicable, the deemed historical Consolidated EBITDA numbers set forth in the table below shall be adjusted in a manner acceptable to the Administrative Agent to reflect the same and (iii) Consolidated EBITDA for each fiscal month set forth below shall be deemed to be the corresponding amount set forth opposite such fiscal month in the table below:

| Fiscal Month Ending | Consolidated EBITDA |
|---|---|
| February 28, 2024 | $[__] |

| | |
|---|---|
| March 31, 2024 | $[~~~~]5,497,738 |
| April 30, 2024 | $[~~~~]6,048,147 |
| May 31, 2024 | $[~~~~]3,615,979 |
| June 30, 2024 | $[~~~~]4,501,179 |
| July 31, 2024 | $[~~~~]3,684,457 |
| August 31, 2024 | $[~~~~]5,122,340 |
| September 30, 2024 | $[~~~~]3,404,351 |
| October 31, 2024 | $[~~~~]4,576,456 |
| November 30, 2024 | $[~~~~]1,765,565 |
| December 31, 2024 | $[~~~~]2,622,707 |
| January 31, 2025 | $[~~~~]4,752,906 |
| February 28, 2025 | $[~~~~]4,785,987 |

"Consolidated Fixed Charges" means, for any period for which the amount thereof is to be determined, the sum, without duplication of (a) Consolidated Interest Expense to the extent paid or payable in cash for such period, and (b) the principal amount of all scheduled amortization payments on all Indebtedness of the Borrower and its Subsidiaries consisting of Indebtedness for borrowed money (including debt obligations evidenced by promissory notes and other instruments), the principal portion of capital lease obligations and purchase money indebtedness of the Borrower and its Subsidiaries paid or payable for such period; provided, that for the purposes of calculating Consolidated Fixed Charges for any date of measurement from and after the Closing Date until the first anniversary of the Closing Date, each of the amounts set forth in clause (a) and (b) above shall equal the product of (1) such amounts paid or payable during the period from Closing Date through the date of measurement, multiplied by (2) the amount equal to (i) 365, divided by (ii) the number of days during the period from the Closing Date through the date of measurement.

"Consolidated Interest Expense" means, for any period for which the amount thereof is to be determined, the consolidated interest expense of the Borrower and its Subsidiaries (other than deferred financing costs and debt issuance costs), including (i) all interest on Indebtedness (including imputed interest related to Capital Leases), (ii) all amortization of debt discount and expense, (iii) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers' acceptances, and (iv) Swap Obligations of such Person and its Subsidiaries, to the extent required to be reflected on the income statement of such Person on a consolidated basis in accordance with GAAP.

"Consolidated Net Income" means, for any fiscal period, the consolidated net income (or loss) of the Borrower and its Subsidiaries determined on a consolidated basis in accordance with Modified GAAP; provided that (i) revenues received during any such period from sales of unlimited car wash monthly memberships, whether or not such revenues are recognized in accordance with Modified GAAP, shall be included in such net income (to the extent not otherwise included therein), and (ii) there shall be

excluded from such net income (to the extent otherwise included therein), without duplication:

(a) the net income (or loss) of any Person (other than a Subsidiary of Holdings) in which any Person other than Holdings, Borrower or any of its Subsidiaries has an ownership interest, except to the extent that cash in an amount equal to any such income has actually been received by Holdings, Borrower or any of its Subsidiaries from such Person during such period,

(b) the net income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings, the Borrower or any of its Subsidiaries or that Person's assets are acquired by Holdings, the Borrower or any of its Subsidiaries,

(c) the net income of any Subsidiary of Holdings during such period to the extent that the declaration and/or payment of dividends or similar distributions by such Subsidiary of that income is not permitted by operation of the terms of its Organizational Documents or any agreement, instrument, order or other legal requirement applicable to that Subsidiary or its equity holders during such period,

(d) the cumulative effect of a change in accounting principles, and

(e) any net extraordinary gains or net extraordinary losses.

"Consolidated Tax Expenses" means federal, state and local income tax expenses of the Borrower.

"control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "controlled" has the meaning correlative thereto.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Declined Proceeds" has the meaning specified in Section 2.1(k)(9).

"Debt Issuance" means the issuance by any Person of any Indebtedness.

"Debtor" or "Debtors" has the meaning specified in the recitals hereto.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Default" means any Event of Default and any event which with the giving of notice or lapse of time, or both, would become an Event of Default.

"Default Interest" shall have the meaning set forth in Section 2.1(h)(3).

"Default Rate" means a simple interest rate per annum equal to the sum of the otherwise then applicable interest rate plus (i) two percent (2%). With respect to amounts bearing interest at the Default Rate, for purposes of the foregoing sentence, the words "otherwise then applicable interest rate" shall be deemed to mean the Base Rate plus the Applicable Margin with respect to Base Rate Loans and the Adjusted Term SOFR plus the Applicable Margin with respect to Term SOFR Loans, as applicable.

"Defaulting Lender" means, subject to Section 2.10(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans, including participations in respect of Letters of Credit, within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the L/C Issuers or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit) within two (2) Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent or the L/C Issuers in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.10(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each Lender promptly following such determination.

"DIP Credit Agreement" as defined in the preamble hereto.

"DIP Administrative Agent" has the meaning specified in the recitals hereto.

"DIP Lender" has the meaning specified in the recitals hereto.

"DIP Term Loans" has the meaning specified in the recitals hereto.

"Disclosure Limitations" shall have the meaning set forth in Section 5.6.

"Disposition" means any sale, transfer, lease, exclusive license or other disposition of any property by any Person (including by way of issuance of Equity Interests of any Person). "Dispose" has the meaning correlative thereto.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any Equity Interests or Equity Interests Equivalent into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition,

(a)     matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments),

(b)     provides for the scheduled payments of dividends in cash,

(c)     is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests of the applicable Person and except as permitted by clause (a) above), in whole or in part, or

(d)     is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests or Equity Interests Equivalents that would constitute Disqualified Equity Interests, in the case of each of clauses (a), (b), (c) and (d) hereof, prior to the date that is ninety-one (91) days after the latest Maturity Date at the time of issuance;

provided that if such Equity Interests or Equity Interests Equivalents are issued pursuant to a plan for the benefit of future, current or former employees, directors, or officers of Holdings, the Borrower or its Subsidiaries or by any such plan to such employees, directors or officers, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Holdings, the Borrower or any Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's or officer's termination, death or disability.

"Dollars" or "$" means the basic unit of the lawful currency of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States of America.

"ECP Rules" means the final rules issued jointly by the Commodity Futures Trading Commission and the Securities and Exchange Commission as published in 77 FR 30596 (May 23, 2012), as may amended, modified or replaced from time to time.

"Effective Yield" has the meaning set forth in Section 2.1(b)(3).

"Eligible Assignee" means any Person (other than a natural person) that meets the requirements to be an assignee under Section 9.9 (subject to such consents, if any, as may be required under Section 9.9(b)); provided that, a Defaulting Lender shall not be an Eligible Assignee.

"Equipment" means all equipment, furniture and fixtures held or maintained at the Real Property or otherwise used in the ownership or operation of the Units, together with all additions and accessions thereto and replacements therefor.

"Equity Cure Contribution" has the meaning set forth in Section 6.1(c).

"Equity Interests" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Equity Interests Equivalents" means all securities convertible into or exchangeable for Equity Interests and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Equity Interests, whether or not presently convertible, exchangeable or exercisable.

"Equity Issuance" means any sale or issuance of any Equity Interests or Equity Interests Equivalents of the Borrower or any direct or indirect parent of the Borrower or the contribution to the capital of the Borrower or any direct or indirect parent of the Borrower, in each case, the proceeds of which are contributed to the common equity of the Borrower or any of its Subsidiaries.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations promulgated and rulings issued thereunder and under the Code, in each case as in effect from time to time.  References to sections of ERISA shall be construed to also refer to any successor sections.

"ERISA Affiliate" means any Person, including Affiliates or Subsidiaries of the Borrower, that is a member of any group of organizations or a controlled group of trades or businesses, as described in Sections 414(b), 414(c), 414(m) or 414(o) of the Code or Section 4001 of ERISA, of which the Borrower is a member.

"Erroneous Payment" has the meaning assigned to it in Section 8.15(a).

"Erroneous Payment Deficiency Assignment" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Impacted Class" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Return Deficiency" has the meaning assigned to it in Section 8.15(d).

"Erroneous Payment Subrogation Rights" has the meaning assigned to it in Section 8.15(d).

"Event of Default" means any Event of Default described in Article VII.

"Excess Cash Flow" means, for any Excess Cash Flow Period without duplication:

(a). the sum, without duplication, of:

i. Consolidated EBITDA for such Excess Cash Flow Period;

ii. the decrease, if any, in the Net Working Capital from the beginning to the end of such Excess Cash Flow Period; and

iii. to the extent received in cash, the deduction in clause (b)(iii) of the definition of Consolidated EBITDA;

(b). *minus*, the sum, without duplication, of:

16

    i.    the amount of any Consolidated Tax Expense paid or payable by Borrower and its Subsidiaries in cash with respect to such Excess Cash Flow Period and the amount of any Tax Distributions with respect to such Excess Cash Flow Period;

    ii.    Consolidated Interest Expense for such Excess Cash Flow Period;

    iii.    the increase, if any, in the Net Working Capital from the beginning to the end of such Excess Cash Flow Period;

    iv.    cash used for Capital Expenditures and Permitted Acquisitions (including with respect to fees and expenses and, with respect to any Permitted Acquisition, cash consideration, that are payable upon the closing of any Permitted Acquisition pursuant to any letter of intent or definitive purchase agreement with respect to such Permitted Acquisition to which the Borrower or any of its affiliates is a party), in each case to the extent financed with Internally Generated Funds;

    v.    the aggregate amount of all scheduled amortization payments of Indebtedness of the Borrower and its Subsidiaries to the extent funded with Internally Generated Funds;

    vi.    Restricted Payments pursuant to Section 6.10(e) paid in cash in accordance with the Loan Documents during such Excess Cash Flow Period;

    vii.    to the extent paid in cash, the add-backs in clauses (a)(vi), (a)(vii), (a)(xii), (a)(xiv), (a)(xv), (a)(xvii), (a)(xviii) and (a)(xxii) of the definition of Consolidated EBITDA; and

    viii.    the aggregate amount of add-backs in clause (a)(xix) of the definition of Consolidated EBITDA.

"Excess Cash Flow Period" means each fiscal year of the Borrower commencing with the fiscal year ending on December 31, 2026.

"Excluded Assets" means any of the following:

(a) any lease, license, franchise, charter, authorization, contract or agreement to which any Loan Party is a party, and any of its rights or interest thereunder, or any property subject to a purchase money security interest, capital lease obligation or other arrangement, if and to the extent that the pledge thereof or the grant of a security interest,

(i)

(A) is prohibited by or in violation of any law (including financial assistance laws, corporate benefit laws or otherwise), rule or regulation applicable to any Loan Party, except to the extent such prohibition is rendered ineffective under the Uniform Commercial Code,

(B) would be prohibited by the enforceable anti-assignment provisions of any contract (other than any such contract to which Holdings or any of its subsidiaries is the only counterparties) or law, rule or regulation

applicable to any Loan Party or with respect to any assets, to the extent such a grant or security interest would violate the terms of any contract with respect to such assets or would trigger termination of such contract (including any purchase money security interest, capital lease obligation or other arrangement) or any such material rights therein pursuant to any "change of control" or other provision or applicable law (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other applicable law), in each case, excluding any such contract or other agreement solely among the Loan Parties and any of their subsidiaries or controlled affiliates, or

   (C) requires any governmental or third party (other than a Loan Party or any of its subsidiaries or controlled affiliates) consent, approval, license or authorization that has not been obtained, except to the extent such limitation is rendered ineffective under the Uniform Commercial Code or other applicable law,

   (ii) is prohibited by or in violation of a term, provision or condition of any such lease, license, franchise, charter, authorization, contract or agreement; provided, however, that the Collateral shall include (and such security interest shall attach) at such time as the contractual or legal prohibition shall no longer be applicable and to the extent severable, shall attach to any portion of such lease, license, franchise, charter, authorization, contract or agreement not subject to the prohibitions specified in (i) or (ii) above (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other applicable Law in any relevant foreign jurisdiction); provided, further, that the exclusions referred to in this clause (a) shall not include any proceeds of any such lease, license, franchise, charter, authorization, contract or agreement;

(b)

   (i) Equity Interests or Equity Interests Equivalents that consist of the outstanding voting ownership interest of an Excluded Foreign Subsidiary,

   (ii) Equity Interests or Equity Interests Equivalents in joint ventures or any non-wholly owned subsidiaries, but only to the extent that (x) the Organizational Documents or other agreements with other equity holders of such joint ventures or non-wholly owned subsidiaries do not permit or restrict the pledge of such Equity Interests or Equity Interests Equivalents, or (y) the pledge of such Equity Interests or Equity Interests Equivalents (including any exercise of remedies) would result in a change of control, repurchase obligation or other adverse consequence to any of the Loan Parties or such subsidiary,

   (iii) Equity Interests or Equity Interests Equivalents of any Subsidiary that is a Subsidiary of a controlled foreign corporation as defined in the Code,

   (iv) margin stock,

   (v) any property or assets for which the creation or perfection of pledges of, or security interests in, would result in material adverse tax consequences to the Borrower

or any of its subsidiaries as reasonably determined by the Borrower and the Administrative Agent; and

(c)      any "intent-to-use" application for registration of a trademark filed pursuant to section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" or "Amendment to Allege Use" pursuant to section 1(d) of the Lanham Act, to the extent that, and during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law;

(d)

(i)      [reserved],

(ii)      any fee interest in owned real property that is not Material Real Property, and

(iii)      any fixtures affixed to any real property to the extent a security interest in such fixtures may not be perfected by a UCC-1 financing statement or a similar filing in any relevant foreign jurisdiction in the jurisdiction of organization of the applicable Loan Party, or, solely in the case of fixtures affixed to any Material Real Property, to the extent a security interest in such fixtures may not be perfected by the recording of a mortgage or UCC-1 financing statement in the jurisdiction where such Material Real Property is located;

(e)      motor vehicles, aircraft and other assets subject to certificates of title, except to the extent a security interest therein can be perfected by the filing of a UCC-1 financing statement;

(f)      letter of credit rights, except to the extent constituting supporting obligations in respect of other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a Uniform Commercial Code financing statement or a similar filing in any relevant foreign jurisdiction (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC-1 financing statement);

(g)      assets, if and to the extent that a security interest in such asset:

(i)      is prohibited by or in violation of any Law, rule or regulation applicable to any Loan Party or

(ii)      requires a consent (to the extent that any Loan Party has sought such consent using its commercially reasonable efforts) of any Governmental Authority, the lessor of any leased property or any third party that has not been obtained, except, in the case of clauses (i) and (ii), to the extent such prohibition or consent is rendered ineffective under the Uniform Commercial Code;

(h)      commercial tort claims that, in the reasonable determination of the Borrower, are not expected to result in a judgment in excess of $500,000;

(i)      (v) accounts holding cash collateral in respect of letters of credit permitted to be incurred pursuant to Sections 6.2(s) or 6.2(x), (w) payroll and other employee wage and benefit accounts, (x) tax accounts (including sales tax accounts), and (y) fiduciary or trust accounts, in each case of clauses (w) through (y), the funds or other property held in or maintained in any such account (as long as the

accounts described in such clauses (w) through (y) are used solely for such purposes), and (z) any other accounts so long as, with respect to this clause (z), the aggregate amount on deposit in each such account does not exceed $150,000 at the end of any business day and the aggregate amount on deposit in all such accounts does not exceed $500,000 at the end of any business day; and

(j)   assets in circumstances where the cost of obtaining a security interest in such assets, including the cost of title insurance, surveys or flood insurance (if necessary) would be excessive in light of the practical benefit to the Lenders afforded thereby as reasonably determined by the Borrower and the Administrative Agent.

"Excluded Foreign Subsidiary" means any direct or indirect Subsidiary of a Loan Party (i) that is a "controlled foreign corporation" as defined in the Code, (ii) all or substantially all of the assets of which consist of stock of one or more subsidiaries described in clause (i) above, or (iii) that is owned, directly or indirectly, by one or more Subsidiaries described in clause (i) above, in each case that has not previously guaranteed or pledged any of its assets or suffered a pledge of more than 65% of its voting stock, to secure, directly or indirectly, any indebtedness of the Borrower or any Guarantor that is a U.S. Person.

"Excluded Swap Obligation" means, with respect to Borrower, any Affiliate of Borrower or Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Borrower, such Affiliate or such Guarantor of, or the grant by such Borrower, such Affiliate or such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Borrower's, such Affiliate's or such Guarantor's failure for any reason not to constitute an "Eligible Contract Participant" as defined in Section 1a(18) of the Commodity Exchange Act (and the regulations thereunder), as further defined and modified by the ECP Rules (determined after giving effect to Section 9.20 and any other keepwell, support or other agreement for the benefit of such Borrower, such Affiliate or such Guarantor and any and all Guarantees of such Borrower's, such Affiliate's or such Guarantor's Swap Obligations by any other Borrower, Affiliate or the Guarantor), at the time the applicable Swap Obligation was entered into and at such other relevant time as provided in the ECP Rules or any other applicable law and to the extent that the providing of such Guarantee or the granting of such security interest by such Borrower, such Affiliate or such Guarantor would violate the ECP Rules or any other applicable law.  If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such Guarantee or Lien is or becomes excluded in accordance with the first sentence of this definition.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender or L/C Issuer, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender or L/C Issuer, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender or L/C Issuer with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender or L/C Issuer acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 9.19), or (ii) such Lender or L/C Issuer changes its lending office, except in each case to the extent that, pursuant to Section 10.1(a)(ii), (a)(iii) or (c), amounts with respect to such Taxes were payable either to such Lender's or L/C Issuer's assignor immediately before such Lender or L/C Issuer became a party hereto or to such Lender or L/C Issuer immediately before it changed its lending office, (c) Taxes attributable to

such Recipient's failure to comply with Section 10.1(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Opco Note" has the meaning specified in the recitals to this Agreement.

"Existing Opco Obligations" has the meaning specified in the recitals to this Agreement.

"Extension Date" means (i) in the case of the Unit located at 9500 North Rodney Parham Road in Little Rock, Arkansas, May 31, 2025, (ii) in the case of the Unit located at 4311 North State Line Avenue in Texarkana, Texas, July 31, 2025, and (iii) in the case of any other Sunset Unit, April 30, 2026.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing reasonably selected by it.

"Fee Letter" means that certain opco fee letter, dated as of the date hereof, by and between the Administrative Agent and the Borrower, providing for payment of the fees described therein, as amended, restated, supplemented or otherwise modified from time to time.

"Final DIP Order" has the meaning specified in the recitals hereto.

"Financial Covenants" the covenants, agreements and obligations set forth in Sections 6.1(a) and 6.1(b).

"First Lien Debt" means, as of any date of determination, Indebtedness of the type described in clauses (a), (b), (e), (f), (h) and (i) of the definition of Indebtedness (but in the case of clause (i) solely to the extent Guaranteeing Indebtedness described in clauses (a), (b), (d), (f) (but, in the case of earn-out obligations, only to the extent not paid when due) and (h)) that is secured by a first priority Lien on any assets of the Borrower, Holdings or any other Loan Party (and which Lien is not expressly subordinated or junior to the Liens securing the Obligations); provided that First Lien Debt shall not include Indebtedness in respect of letters of credit, except to the extent of drawn and unreimbursed amounts thereunder.

"First Lien Leverage Ratio" means, as of any date of determination, on a consolidated basis, the ratio of (a) First Lien Debt of the Borrower and its Subsidiaries as of such date to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for the Test Period ending on the last day of such fiscal quarter.

"Fixed Charge Coverage Ratio" means, as of any date of determination, the ratio of: (a) Consolidated EBITDA for the then most recently ended Test Period *minus* (i) the aggregate amount of Capital Expenditures made by Borrower and its Subsidiaries for such period to the extent funded with

Internally Generated Funds, *minus* (ii) all cash payments in respect of Consolidated Tax Expenses and, without duplication, Tax Distributions, made by the Borrower and its Subsidiaries during such period; to (b) Consolidated Fixed Charges for such period.

"Flood Insurance Laws" collectively, (i) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" means a rate of interest equal to 1.00% per annum.

"Foreign Lender" means, with respect to any Borrower (a) if such Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time; provided, that no change in the accounting principles used in the preparation of any financial statement hereafter adopted by the Borrower or any other Loan Party shall be given effect for purposes of measuring compliance with any provision of this Agreement unless the Borrower, Administrative Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP; provided, further that no effect shall be given to any change in GAAP for purposes of measuring compliance with any provision of this Agreement that would require leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee(s)" means all direct and indirect guarantees, sales with recourse, endorsements (other than for collection or deposit in the ordinary course of business) and other obligations (contingent or otherwise, including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) by any Person to pay, purchase, repurchase or otherwise acquire or become liable upon or in respect of any Indebtedness of any other Person, and, without limiting the generality of the foregoing, all obligations (contingent or otherwise) by any Person to purchase products, supplies or other tangible property or services for any

Person under agreements requiring payment therefor regardless of the non-delivery or non-furnishing thereof, or to make investments in any other Person, or to maintain the capital, working capital, solvency or general financial conditions of any other Person, or to indemnify any other Person against and hold him harmless from damages, losses and liabilities, all under circumstances intended to enable such other Person or Persons to discharge any Indebtedness or to comply with agreements relating to such Indebtedness or otherwise to assure or protect creditors against loss in respect of such Indebtedness. The amount of any Guarantee shall be deemed to be the amount of the Indebtedness of, or damages, losses or liabilities of, the other Person or Persons in connection with which the Guarantee is made or to which it is related unless the obligations under the Guarantee are limited to a determinable amount, in which case the amount of such Guarantee shall be deemed to be such determinable amount. The term "<u>Guarantee</u>" as a verb has a corresponding meaning. For the avoidance of doubt, the keepwell provided by Borrower, any Affiliate of Borrower or any Guarantor in <u>Section 9.20</u> shall constitute a Guarantee.

"<u>Guarantor(s)</u>" means, collectively, (i) Holdings, (ii) any Domestic Subsidiary that becomes a Guarantor in accordance with <u>Section 5.9</u>, and (iii) any other Person who executes and delivers a Guaranty of the Obligations, jointly and severally.

"<u>Guaranty</u>" means, individually or collectively, as the case may be, the Opco Guaranty made by the Guarantors in favor of Administrative Agent for the benefit of the Secured Parties in form substantially as attached hereto as **<u>Exhibit C</u>**.

"<u>Holdco Credit Agreement</u>" means that certain Credit Agreement, dated as of the Closing Date, by and among Parent, as the borrower, Brightwood, as the administrative agent, and the lenders from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Holdco Facility</u>" means the credit facility provided pursuant to the Holdco Credit Agreement.

"<u>Holdings</u>" has the meaning specified in the recitals hereto.

"<u>Impacted Loans</u>" has the meaning set forth in <u>Section 10.3(b)</u>.

"<u>Improvements</u>" means the buildings, and other facilities, amenities and improvements to be erected on the Real Property.

"<u>Incremental Effective Date</u>" has the meaning set forth in <u>Section 2.1(b)(1)</u>.

"<u>Incremental Facility</u>" has the meaning set forth in <u>Section 2.1(b)(1)</u>.

"<u>Incremental Facility Notice</u>" has the meaning set forth in <u>Section 2.1(b)(1)</u>.

"<u>Incremental Term Loan</u>" has the meaning set forth in <u>Section 2.1(b)(1)</u>.

"<u>Incremental Term Loan Commitment</u>" has the meaning set forth in <u>Section 2.1(b)(1)</u>.

"<u>Indebtedness</u>" means, as to any Person at a particular time, without duplication, the following: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) net obligations of such Person under any Swap Contract; (d) all obligations of such Person to pay the deferred purchase

price of property or services (other than (i) trade accounts and accrued expenses payable in the ordinary course of business and (A) not overdue by more than 90 days or (B) to the extent overdue by more than 90 days, are being contested by such person by appropriate proceedings in good faith), (ii) any earn-out obligation to the extent such obligation is not required to be reflected on such Person's balance sheet in accordance with GAAP, (iii) accruals for payroll and other liabilities accrued in the ordinary course of business); (e) indebtedness in respect of the foregoing (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (f) all Capital Lease Obligations; (g) all obligations of such Person in respect of Disqualified Equity Interests; (h) the principal balance of synthetic leases or other off-balance sheet financing arrangements; and (i) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of consolidated Indebtedness.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) (to the extent that such Indebtedness is non-recourse to such Person for amounts in excess of the value of the property securing such Indebtedness) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Parties" has the meaning specified in Section 9.5.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower or Guarantor under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Initial Term Loan" means Loans made pursuant to Section 2.1(a)(1).

"Initial Term Loan Commitment" means, for each Lender, the aggregate amount appearing opposite of such Lender's name under the heading "Initial Term Loan Commitments" as set forth on **Schedule I** or as set forth in an Assignment and Assumption Agreement delivered pursuant to Section 9.9(b), as such amount may be modified from time to time pursuant to the terms hereof, including as a result of any Incremental Term Loans; provided, that, it is understood and agreed that, as of the Closing Date, no Lender shall have any Initial Term Loan Commitment.

"Initial Term Loan Lender" means each Lender that has an Initial Term Loan Commitment or to which an Initial Term Loan is owed.

"Interest Payment Date" has the meaning set forth in Section 2.1(i)(4)(C).

"Interest Period" means with respect to any Term SOFR Loan, the period commencing on the date the relevant Advance is made and ending on the date which is one (1), three (3) or six (6) months thereafter, as selected by the Borrower by irrevocable written notice to the Administrative Agent not less than three (3) Business Days prior to the date the relevant Advance is made and each subsequent one (1), three (3) or six (6) month period thereafter, as selected by the Borrower by irrevocable written notice to

the Administrative Agent not less than three (3) Business Days prior to the last day of the then-current Interest Period with respect thereto.  For purposes of determining an Interest Period, a month means a period starting on one day in a calendar month and ending on a numerically corresponding date in the next calendar month.  Notwithstanding the foregoing, however, (i) any applicable Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any applicable Interest Period which begins on a day for which there is no numerically corresponding day in the calendar month during which such Interest Period is to end shall (subject to clause (i) above) end on the last day of such calendar month, (iii) no Interest Period shall extend beyond the Revolver Maturity Date or Term Loan Maturity Date, as applicable, or such earlier date as would interfere with the Borrower's repayment obligations hereunder, (iv) [reserved] or (v) no tenor that has been removed from this definition pursuant to Section 2.12(d) shall be available for specification by the Borrower in such written notice to the Administrative Agent. For the avoidance of doubt, notwithstanding any selection by Borrower of an Interest Period of longer than one (1) month, interest shall be payable on each Loan in accordance with Section 2.1(i)(4)(C).

"Interim DIP Order" has the meaning specified in the recitals hereto.

"Internally Generated Funds" means funds not constituting the proceeds of any Indebtedness, Debt Issuance, Equity Issuance, Disposition or Casualty Event (in each case, without regard to the exclusions from the definitions thereof).

"Investment" means, with respect to any Person, any loan, advance or extension of credit (other than to customers in the ordinary course of business) by such Person to, or any Guarantee or other contingent liability with respect to the capital stock, Indebtedness or other obligations of, or any contributions to the capital of, any other Person, or any ownership, purchase or other acquisition by such Person of any interest in any capital stock, limited partnership interest, general partnership interest, or other securities of any such other Person, other than an Acquisition; and "Invest," "Investing" or "Invested" means the making of an Investment.

"Issue" means, with respect to any Letter of Credit, to issue, extend the expiration date of, renew (including by failure to object to any automatic renewal on the last day such objection is permitted), increase the face amount of, or reduce or eliminate any scheduled decrease in the face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing.  The terms "Issued", "Issuance" and "Issuer" have correlative meanings.

"Knowledge" of the Borrower or Holdings means the actual knowledge of any Responsible Officer of the Borrower or Holdings, as applicable.

"L/C Issuer" means any Lender or an Affiliate thereof or a bank or other legally authorized Person, in each case, reasonably acceptable to the Administrative Agent and the Borrower, in such Person's capacity as an issuer of Letters of Credit hereunder; provided, that, the Borrower acknowledges and agrees that, as of the Closing Date, there is no L/C Issuer hereunder.

"L/C Reimbursement Agreement" has the meaning set forth in Section 2.1(d)(1)(C).

"L/C Reimbursement Date" has the meaning set forth in Section 2.1(d)(5).

"<u>L/C Reimbursement Obligation</u>" means, for any Letter of Credit, the obligation of the Borrower to the L/C Issuer thereof or to the Administrative Agent, as and when matured, to pay all amounts drawn under such Letter of Credit.

"<u>L/C Request</u>" has the meaning set forth in <u>Section 2.1(d)(2)</u>.

"<u>L/C Sublimit</u>" means $3,000,000; <u>provided</u>, that to the extent that, as of any date of determination, there is then no L/C Issuer under this Agreement, the L/C Sublimit shall be $0.00 as of such date.

"<u>Laws</u>" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"<u>Leases</u>" means each operating lease related to a Unit.

"<u>Lenders</u>" means (i) each Term Loan Lender and (ii) each Revolving Loan Lender, as the context may require.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"<u>Letter of Credit</u>" means documentary or standby letters of credit Issued for the account of the Borrower by L/C Issuers, and bankers' acceptances issued by the Borrower, for which the Administrative Agent and Lenders have incurred Letter of Credit Obligations.

"<u>Letter of Credit Obligations</u>" means all outstanding obligations incurred by the Administrative Agent and Lenders at the request of the Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the Issuance of Letters of Credit by L/C Issuers or the purchase of a participation as set forth in <u>Section 2.1(e)</u> with respect to any Letter of Credit. The amount of such Letter of Credit Obligations shall equal the maximum amount that may be payable by the Administrative Agent and Lenders thereupon or pursuant thereto.

"<u>Lien</u>" means, with respect to any interest in Property (whether real, personal or mixed and whether tangible or intangible) (a) any interest or right which secures the payment of Indebtedness or an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute or contract, and whether or not choate, vested or perfected, including any such interest or right arising from a mortgage, charge, pledge, negative pledge or other agreement not to lien or pledge, assignments, security interest, conditional sale, levy, execution, seizure, attachment, garnishment, conditional sale, Capital Lease or trust receipt, or arising from a lease, consignment or bailment given for security purposes, and (b) any exception to or defect in the title to or ownership interest in such Property, including, as applicable, reservations, rights of entry, possibilities of reverter, encroachments, easements, rights of way, restrictive covenants, leases and licenses. For purposes of this Agreement, the Borrower or any Subsidiary shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, Capital Lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"<u>Liquidity</u>" means, as of any date of determination, (i) the Unrestricted Cash of the Borrower and its Subsidiaries <u>plus</u> (ii) the Revolving Loan Unused Portion as of such date <u>plus</u> (iii) excess availability (or any similar term) under and as defined in the ABL Facility as of such date.

"<u>Loan</u>" means, individually or collectively, as the case may be, each Term Loan and each Revolving Loan.

"<u>Loan Document(s)</u>" means, individually or collectively, as the case may be, this Agreement (including, for the avoidance of doubt, any amendment of this Agreement), the Fee Letter, any Notes, the Guaranty, each Security Document, any ABL/Term Intercreditor Agreement, and all other documents, agreements and certificates executed or delivered in connection with or contemplated by this Agreement or any other document evidencing or securing a Loan or any other document that is mutually agreed by the Loan Parties and the Required Lenders to constitute a Loan Document, each as may be amended, modified or supplemented from time to time.

"<u>Loan Party</u>" means the Borrower and the Guarantors.

"<u>Master Agreement</u>" has the meaning set forth in the definition of Swap Contract.

"<u>Material Adverse Occurrence</u>" means any fact, circumstance or occurrence of any nature whatsoever (including any adverse determination in any litigation, arbitration, governmental investigation or proceeding) which taken alone or in combination with any other fact, circumstance or occurrence could reasonably be expected to have a material adverse effect on the (a) business, assets, financial condition or results of operations of Holdings, the Borrower and its Subsidiaries, taken as a whole, (b) rights and remedies of the Administrative Agent, taken as a whole, under any Loan Documents or (c) ability of the Loan Parties, taken as a whole, to perform their payment obligations under any Loan Documents; provided, that (i) the commencement of a proceeding under the Bankruptcy Code and the filing of the Chapter 11 Cases and (ii) the events and conditions related to or that led to the commencement of the Chapter 11 Cases, in each case, shall not constitute a Material Adverse Occurrence.

"<u>Material Real Property</u>" means any fee-owned Real Property having a fair market value, as reasonably determined by the Borrower in good faith, in excess of $1,000,000 as of the date the acquisition thereof (it being agreed that in no event shall an appraisal or other third-party valuation be required unless required by an applicable requirement of Law or requested by the Administrative Agent); *provided, however, that,* Material Real Property shall not include any fee-owned Real Property that constitutes Specified Real Estate.

"<u>Mature Unit</u>" means, as of any date of determination, any Unit that has been owned and operated by any Loan Party for at least 12 months, other than (a) any Unit that is not in operation as of such date, (b) any Unit that, as of such date, has been designated (or the Loan Parties intend to designate) for Disposition or closure, and (c) any Unit that, as of such date, has been designated (or the Loan Parties intend to designate) as a discontinued operation.

"<u>Maturity Date</u>" means the Revolver Maturity Date or the Term Loan Maturity Date, as applicable.

"<u>Modified GAAP</u>" means GAAP; <u>provided</u> that (a) sale-leaseback transactions in any financial statement shall be presented assuming that all consummated sale-leaseback transactions are successful sale-leaseback transactions for accounting purposes (i.e. consistent with the historical financial reporting practice of the Borrower prior to the Nineteenth Amendment Effective Date) and (b) no effect shall be given to any change in GAAP for purposes of financial reporting or measuring compliance with any

provision of this Agreement resulting from the effectiveness of Accounting Standard Codification 842 (or any other accounting standards codification with substantially similar effect) that would (i) require the presentation of sale-leaseback transactions in a manner inconsistent with the presentation of sale-leaseback transactions described in clause (a) or (ii) otherwise cause leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"MFN Adjustment" has the meaning set forth in Section 2.1(b)(3).

"Moody's" means Moody's Investors Service, Inc., or any successor to the rating agency business thereof.

"Multiemployer Plan" means any multiemployer plan as defined in Sections 3(37) or 4001(a)(3) of ERISA of, or contributed to by, the Borrower, any of its Subsidiaries or any ERISA Affiliate.

"Net Cash Proceeds" means:

(a)     with respect to any Disposition by the Borrower or any Subsidiary or any Casualty Event, the aggregate cash or cash equivalents proceeds (including cash or cash equivalents proceeds received pursuant to policies of insurance (including business interruption insurance) and by way of deferred payment of principal pursuant to a note, installment receivable or otherwise, but only as and when received) received by any Loan Party pursuant to such Disposition or Casualty Event net of (i) the reasonable direct costs relating to such Disposition or Casualty Event actually incurred by the Borrower or any Subsidiary (including sales commissions and legal, accounting and investment banking fees, commissions and expenses), (ii) any portion of such proceeds deposited in an escrow account pursuant to the documentation relating to such Disposition or Casualty Event (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to the applicable Loan Party), (iii) taxes paid or reasonably estimated by any Loan Party to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), (iv) amounts necessary to make Tax Distributions in order to pay federal, state and local income taxes (if any) imposed on such Disposition or Casualty Event; provided that to the extent any such amounts are not in fact made as a permitted Tax Distribution, any amount so deducted shall be included as Net Cash Proceeds and be subject to Section 2.1(k)(4), and (v) amounts required to be applied to the repayment of any principal amounts of Indebtedness (other than the Obligations) secured by a Lien on the asset subject to such Disposition or Casualty Event; and

(b)     with respect to any issuance of debt securities or other incurrence of Indebtedness (other than Indebtedness incurred in accordance with Section 6.2), the aggregate cash proceeds received by Holdings, the Borrower or any Subsidiary pursuant to such issuance or receipt, net of the reasonable direct costs paid or reasonably estimated by any Loan Party to be payable as a result thereof relating to such issuance (including reasonable sales and underwriter's commission).

"Net Working Capital" means the total current assets (excluding cash and cash equivalents) of the Borrower and its Subsidiaries minus the total current liabilities (excluding current portion of any Indebtedness under this Agreement and the current portion of any other long-term Indebtedness which would otherwise be included therein (including Capital Lease Obligations), current interest and current taxes) of the Borrower and its Subsidiaries, determined in accordance with Modified GAAP.

"New Unit" a carwash facility acquired, leased or constructed by the Borrower or any Affiliate thereof that is not a Unit on the Closing Date.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 9.1 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note(s)" means, individually or collectively, as the case may be, (a) the Term Notes (b) the Revolving Loan Note(s) (in form substantially as attached hereto as **Exhibit A** and **B**, respectively), and (c) such other promissory notes accepted by the Lenders in exchange for or in substitution of any such Notes.

"Notice of Borrowing" means the notice in the form of **Exhibit D** attached hereto to be delivered to the Administrative Agent pursuant to Section 2.1 or such other form as may be reasonably approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer of the Borrower.

"Obligations" means (i) all Loans, Advances, Letter of Credit Obligations, L/C Reimbursement Obligations, debts, liabilities, payment and performance obligations, covenants and duties of every kind, nature and description owing by the Borrower or the Guarantors to the Administrative Agent, the Lenders, any Lender or any L/C Issuer of any kind or nature, present or future, arising under this Agreement or any other Loan Document, whether direct or indirect (including those acquired by permitted assignment or participation), absolute or contingent, liquidated or unliquidated, due or to become due, now existing or hereafter arising and however acquired, (ii) all Rate Hedging Obligations owing at any time or from time to time by the Borrower or the Guarantors, or any of them, to the Lenders, any Lender or any Affiliate of any Lender (excluding, as to any Borrower or Guarantor, any Excluded Swap Obligations) (iii) all obligations of the Borrower or any Guarantor under any Related Treasury Management Arrangement and (iv) all Erroneous Payment Subrogation Rights.  The term includes all principal, interest, fees, charges, expenses, reasonable attorneys' fees, and any other sum chargeable (including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) to the Borrower or the Guarantors under this Agreement or any other Loan Document or in connection with any Rate Hedging Obligation or Related Treasury Management Arrangement.

"Organizational Documents" means (a) with respect to any corporation or company, its certificate or articles of incorporation, organization or association and its bylaws, (b) with respect to any limited partnership, its certificate or declaration of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, and (d) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, and in the case of any Foreign Subsidiary, any analogous organizational documents. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, enforced any Loan Document.

29

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.6).

"Parent" means Wash & Wax Holdings LLC, a Delaware limited liability company.

"Payment Recipient" has the meaning assigned to it in Section 8.15(a).

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Periodic Term SOFR Determination Day" has the meaning set forth in the definition of "Term SOFR".

"Permitted Acquisition" means any Acquisition, to the extent that each of the following conditions is satisfied:

(a)    no Default or Event of Default then exists or would result therefrom;

(b)    after giving effect to such transaction and/or series of related transactions on a Pro Forma Basis, the Borrower shall be in compliance with all of the Financial Covenants for the most recently ended Test Period;

(c)    after giving effect to such transaction and/or series of related transactions on a Pro Forma Basis, (i) the First Lien Leverage Ratio for the most recently ended Test Period shall not exceed (x) prior to the date that the Compliance Certificate for the fiscal quarter ended September 30, 2026, with a First Lien Leverage Ratio not to exceed [___] to 15.00 6[1] and (y) thereafter, with the Financial Covenants as of the last day of the most recently ended Test Period ending on or prior to such date and (ii) Liquidity shall not be less than $10,000,000;

(d)    neither the Borrower nor Holdings shall, in connection with any such transaction and/or series of related transactions, assume or remain liable with respect to any Indebtedness of the related sellers or the business, person or properties acquired, except to the extent permitted herein;

(e)    the Persons or businesses to be acquired shall be, or shall be engaged in, a business of the type that Borrower and its Subsidiaries are permitted to be engaged in under the Loan Documents and, to the extent required by the Security Documents, the Collateral acquired in connection with any such transaction and/or series of related transactions shall be made subject to the Administrative Agent's security in accordance with the Security Documents and the Loan Parties shall otherwise comply with the terms of the Loan Documents relating to additional guarantees and further assurances;

(f)    the Acquisition has been approved by the board of directors (or other equivalent governing body) of the person to be acquired;

(g)    with respect to such Acquisition or any of the series of related transactions, the Borrower shall have provided the Administrative Agent with (i) in each case only if made available to the Borrower prior to the consummation of such transaction, historical financial statements for the last three fiscal years

---

[1] NTD - to be closing leverage plus 0.5x.

of the Person or business to be acquired and unaudited financial statements thereof for the most recent interim period that is available and the comparable interim period for the prior year, (ii) a reasonably detailed description of all material information relating thereto and copies of all material documentation pertaining to such transaction, (iii) a Compliance Certificate after giving pro forma effect to such Permitted Acquisition on a Pro Forma Basis, and (iv) for Permitted Acquisitions with a purchase price in excess of $10,000,000, a quality of earnings report prepared for the Borrower by an independent certified accounting firm of nationally recognized standing;

(h)    at least three (3) Business Days prior to the proposed date of consummation of each such transaction, the Borrower shall have delivered to the Administrative Agent a certificate certifying that such transaction and related series of transactions complies with this definition (which shall have attached thereto reasonably detailed backup data and calculations showing such compliance); and

(i)    the aggregate amount of consideration paid in respect of Permitted Acquisitions after the Closing Date shall not exceed $40,000,000.

"Permitted Holders" means (a) the direct and indirect holders of Equity Interests or Equity Interests Equivalents of Holdings on the Closing Date, (b) the Qualified Owners, and (c) any "group" (within the meaning of Section 13(d) or Section 14(d) of the Securities Exchange Act of 1934, as amended) of which any of the foregoing are members; provided, that in the case of such "group" and without giving effect to the existence of such "group" or any other "group," such Persons specified in clauses (a) and/or (b) above, collectively, have beneficial ownership, directly or indirectly, of more than 50% of the aggregate ordinary voting power for election of directors represented by the issued and outstanding Equity Interests of Holdings held, directly or indirectly, by such "group."

"Permitted Expense Reimbursement and Indemnity Payments" means any reasonable expense reimbursement and customary indemnities payable pursuant to the Permitted Holders for services provided to the Loan Parties, including the provision of directors and officers, if applicable.

"Permitted Indebtedness" has the meaning set forth in Section 6.2.

"Permitted Investment" means any of the following Investments made by the Borrower or any of its Subsidiaries in any Person:  (i) obligations, with a maturity of less than two years from the date of acquisition thereof, issued by or unconditionally guaranteed by the United States of America or an agency or instrumentality thereof backed by the full faith and credit of the United States of America; (ii) direct obligations of any state of the United States, any subdivision or agency thereof or any municipality therein which are rated by S&P or Moody's in one of the top two rating classifications and maturing within two years of the date of acquisition thereof; (iii) certificates of deposit or banker's acceptances, maturing within two years of the date of acquisition thereof, issued by commercial banks organized under the laws of the United States or any state thereof, having capital, surplus and undivided profits aggregating not less than $100,000,000 or such lesser amount approved by Lenders in their reasonable discretion so as to attempt to accommodate Investments made with minority owned commercial banks and whose unsecured long-term debt is rated in one of the top two rating classifications by S&P or Moody's; (iv) commercial paper of any corporation organized under the laws of the United States or any state thereof, rated in one of the top two rating classifications by S&P or Moody's and with a maturity of less than 270 days from the date of acquisition thereof; (v) Investments existing as of the date of this Agreement and set forth on Schedule 6.6; (vi) extensions of trade credit arising or acquired in the ordinary course of business, and Investments received in settlements in the ordinary course of business of such extensions of trade credit; (vii) Investments by any Loan Party in any other Loan Party; (viii) loans or advances to employees of the Borrower or any of its Subsidiaries to finance travel, entertainment and relocation expenses in the ordinary course of business as presently conducted in an aggregate amount not

31

to exceed $250,000 at any one time outstanding; (ix) Permitted Acquisitions; (x) Investments of any Person existing at the time such Person becomes a Subsidiary of the Borrower or merges with the Borrower or any of its Subsidiaries as permitted hereunder so long as such Investments were not made in contemplation of such Person becoming a Subsidiary of the Borrower; (xi) Investments received in connection with the bankruptcy or reorganization of suppliers and customers or in the settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment; (xii) advances of payroll payments to employees in the ordinary course of business not to exceed $250,000 in the aggregate amount outstanding at any time; (xiii) promissory notes and other non-cash consideration received in connection with Dispositions permitted under Section 6.4; (xiv) investments, including Acquisitions, financed with the proceeds of Equity Issuances; (xv) loans and advances to Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such direct or indirect parent) in accordance with Section 6.10(f) or (g); (xvi) Guarantees by the Borrower or any of its Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; (xvii) Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests of Holdings (or any direct or indirect parent thereof) or the proceeds from the issuance thereof; and (xviii) other Investments by the Borrower and its Subsidiaries in an aggregate amount not to exceed $5,000,000 at any one time outstanding.

"Permitted Lien" has the meaning set forth in Section 6.3.

"Person" means any natural person, corporation, firm, joint venture, partnership, limited partnership, limited liability company, association, trust or other entity or organization, whether acting in an individual, fiduciary or other capacity, or any government or political subdivision thereof or any agency, department or instrumentality thereof.

"Petition Date" has the meaning specified in the recitals hereto.

"PIK Interest" has the meaning set forth in Section 2.1(j).

"Plan" means each employee benefit plan (as defined in Section 3(3) of ERISA) whether now in existence or hereafter instituted, of, or contributed to by, the Borrower or any ERISA Affiliate.

"Plan Effective Date" has the meaning specified in the recitals hereto.

"Plan of Reorganization" has the meaning specified in the recitals hereto.

"Prepetition Credit Agreement" means the Term Loan Credit Agreement (as defined in the Plan of Reorganization).

"Prepetition Term Loan Claim" means a Term Loan Claim (as defined in the Plan of Reorganization).

"Prepetition Term Loan Lender" means each lender under the Prepetition Credit Agreement.

"Prime Rate" means the rate of interest quoted in *The Wall Street Journal* (or another national publication reasonably selected by the Administrative Agent) as the U.S. "Prime Rate."

"Pro Forma Basis" means, with respect to compliance with any Financial Covenant or financial performance test hereunder for the applicable Test Period, in respect of any Specified Transaction, the making of such calculation after giving pro forma effect to:

(a)    the consummation of such Specified Transaction as of the first day of the applicable Test Period, as if such Specified Transaction had been consummated on the first day of such Test Period;

(b)    the assumption, incurrence or issuance of any Indebtedness by Holdings or any of its Subsidiaries (including any person which becomes a Subsidiary pursuant to or in connection with such Specified Transaction) in connection with such Specified Transaction, as if such Indebtedness had been assumed, incurred or issued (and the proceeds thereof applied) on the first day of such Test Period (with any such Indebtedness bearing interest during any portion of the applicable Test Period prior to the relevant acquisition at the weighted average of the interest rates applicable to such Indebtedness incurred during such Test Period);

(c)    the permanent repayment, retirement or redemption of any Indebtedness (other than revolving Indebtedness, except to the extent accompanied by a permanent commitment reduction) by Holdings or any of its Subsidiaries (including any person which becomes a Subsidiary pursuant to or in connection with such Specified Transaction) in connection with such Specified Transaction, as if such Indebtedness had been repaid, retired or redeemed on the first day of such Test Period;

(d)    the Cash Rental Expense attributable to the target, Property or other assets subject to a Specified Transaction consummated or occurring, as applicable, during the applicable Test Period, in each case, as if such Specified Transaction had been consummated on the first day of such Test Period; and

(e)    in the case of the consummation of any Specified Transaction in the form of a sale-leaseback transaction, Consolidated Net Income shall be adjusted to give effect to any lease payments that would have been made on the lease established in connection with any sale-leaseback transaction during the relevant Test Period assuming such sale-leaseback transaction had been consummated on the first day of such Test Period; and

(f)    the costs and expenses of any target that have not been assumed by Holdings or any of its Subsidiaries shall be disregarded to the extent such costs and expenses are reasonably identifiable, factually supportable and certified by a Responsible Officer, and any (i) cost and expenses of any such target that have been assumed in any Specified Transaction and (ii) incremental recurring costs and expenses incurred in connection with any Specified Transaction shall, in the case of each of (i) and (ii) be calculated as if such costs and expenses were assumed on the first day of such Test Period;

with clauses (a) through (f) calculated in a manner consistent with GAAP or Modified GAAP, as applicable, and the definition of Consolidated EBITDA and subject to, the limitations set forth in the definition of Consolidated EBITDA, including adjustments for restructuring charges or reserves and non-recurring integration costs.

"Proceeding" has the meaning ascribed to it in Section 9.5.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, and any right in respect of any of the foregoing.

"Purchasing Loan Party" has the meaning specified in Section 9.9(i).

"<u>Qualified ECP Guarantor</u>" means, at any time, each Borrower, Affiliate of Borrower or Guarantor with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"<u>Qualified Equity Interests</u>" means any Equity Interests or Equity Interests Equivalents that are not Disqualified Equity Interests.

"<u>Rate Hedging Obligations</u>" means any and all obligations of Borrower, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) under Swap Contracts which are entered into or maintained by any Borrower, Guarantor or any of their Affiliates with the Administrative Agent or a Lender or an Affiliate of the Administrative Agent or a Lender and which are not prohibited by the express terms of the Loan Documents.

"<u>Real Property</u>" means all real property or interests therein wherever situated now, heretofore or hereafter owned or ground (or space) leased by the Borrower pledged to Administrative Agent for the benefit of the Secured Parties as Collateral under any of the Security Documents.

"<u>Recipient</u>" means the Administrative Agent, any Lender or L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of any Borrower or Guarantor hereunder.

"<u>Register</u>" has the meaning ascribed to it in <u>Section 9.9(d)</u>.

"<u>Regulation D</u>," "<u>Regulation T</u>," "<u>Regulation U</u>" and "<u>Regulation X</u>" means Regulation D, Regulation T, Regulation U and Regulation X, respectively, of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"<u>Rejection Notice</u>" has the meaning specified in <u>Section 2.1(k)(9)</u>.

"<u>Related Indemnified Party</u>" has the meaning ascribed to it in <u>Section 9.5</u>.

"<u>Related Treasury Management Arrangement</u>" means all arrangements for the delivery of cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements, to or for the benefit of any Borrower, Guarantor or any of their Affiliates which are now or hereafter entered into or maintained with a Lender, the Administrative Agent or an Affiliate of a Lender or the Administrative Agent.

"<u>Relevant Governmental Body</u>" means the Board of Governors of the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve Bank of New York, or any successor thereto.

"<u>Required Lenders</u>" means Lenders holding (a) more than fifty percent (50%) of the sum of the Revolving Loan Commitments of all Lenders plus the Term Loan Commitments of all Lenders, plus the unpaid principal balance of the Term Loans, or (b) if the Commitments have been terminated, more than fifty percent (50%) of the aggregate outstanding principal amount of the Loans, plus Letter of Credit Obligations; <u>provided</u> that (i) if there are at least two Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this <u>proviso</u>), "Required Lenders" must include at least two

Lenders and (ii) the Commitments and Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"<u>Required Revolving Lenders</u>" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of the Revolving Loan Commitments then in effect, or (b) if the Revolving Loan Commitments have terminated, Lenders then holding more than fifty percent (50%) of the sum of the aggregate outstanding amount of Revolving Loans and outstanding Letter of Credit Obligations; <u>provided</u> that (i) if there are at least two Lenders holding Revolving Loan Commitments (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this <u>proviso</u>), "Required Revolving Lenders" must include at least two Lenders holding Revolving Loan Commitments and (ii) the Revolving Loan Commitments of any Defaulting Lender shall be disregarded in determining Required Revolving Lenders at any time.

"<u>Required Term Loan Lenders</u>" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of the Term Loan Commitments then in effect, or (b) if the Term Loan Commitments have terminated, Lenders then holding more than fifty percent (50%) of the sum of the aggregate outstanding amount of Term Loans; <u>provided</u> that (i) if there are at least two Lenders holding Term Loans or Term Loan Commitments (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this <u>proviso</u>), "Required Term Loan Lenders" must include at least two Lenders holding Term Loans or Term Loan Commitments and (ii) the Term Loan Commitments and Term Loans of any Defaulting Lender shall be disregarded in determining Required Term Loan Lenders at any time.

"<u>Resignation Effective Date</u>" has the meaning specified in <u>Section 8.13(a)</u>.

"<u>Responsible Officer</u>" means the chief executive officer, president, senior vice president, senior vice president (finance), vice president, chief financial officer, treasurer, manager of treasury activities or assistant treasurer or other similar officer or Person performing similar functions of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party.  To the extent requested by the Administrative Agent, each "Responsible Officer" will provide an incumbency certificate and to the extent requested by the Administrative Agent, appropriate authorization documentation, in form and substance reasonably satisfactory to the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.  Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"<u>Revolver Maturity Date</u>" means (a) April [_____]30, 2028[2]; or (b) such earlier date on which (1) payment in full of all outstanding Revolving Loans shall be due (whether by acceleration or otherwise) and (2) all obligations of the Revolving Loan Lenders to make Advances is terminated.

"<u>Revolving Loan</u>" means an Advance or Advances pursuant to the Revolving Loan Commitments.

"<u>Revolving Loan Commitment</u>" means, for each Lender, its obligation to fund its portion of the Revolving Loan in the aggregate amount appearing opposite of such Lender's name under the heading "Revolving Loan Commitments" as set forth on **<u>Schedule I</u>** or as set forth in an Assignment and

---

[2] NTD: 3 years after Closing Date.

Assumption Agreement delivered pursuant to <u>Section 9.9(b)</u>, as such amount may be modified from time to time pursuant to the terms hereof.

"<u>Revolving Loan Lender</u>" means, at any time, (a) so long as any Revolving Loan Commitment is in effect, any Lender that has a Revolving Loan Commitment at such time or (b) if the Revolving Loan Commitments have terminated or expired, any Lender to which a Revolving Loan is owed or that hold Letter of Credit Obligations at such time.

"<u>Revolving Loan Note</u>" has the meaning set forth in <u>Section 2.1(c)(3)</u>.

"<u>Revolving Loan Unused Fee</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Revolving Loan Unused Portion</u>" means the excess of the Revolving Loan Commitment on such date over the Total Revolving Outstandings on such date.

"<u>SBIA</u>" means the Small Business Investment Act of 1958, as amended.

"<u>S&P</u>" means Standard & Poor's Ratings Services, a division of the McGraw Hill Companies, Inc., or any successor to the rating agency business thereof.

"<u>SDN List</u>" has the meaning set forth in <u>Section 4.27</u>.

"<u>Secured Parties</u>" means, collectively, with respect to each of the Security Documents, the Administrative Agent, the Lenders, the L/C Issuers, and each Affiliate of the Administrative Agent or any Lender, which Affiliate is party to any Rate Hedging Obligations or any Related Treasury Management Arrangement and each agent or sub-agent appointed by the Administrative Agent from time to time pursuant to <u>Section 8.10</u>.

"<u>Security Agreement</u>" means the Security Agreement dated as of the Closing Date, entered into by the Borrower and the Guarantors in favor of the Administrative Agent for the benefit of the Secured Parties, as it may be amended, modified, restated or replaced from time to time.

"<u>Security Documents</u>" means and refer to the Security Agreement, the Perfection Certificate (as defined in the Security Agreement), the Guarantees and each other assignment, pledge or security agreement, instrument, certificate, financing statements, filings or document pursuant to which the Borrower, any Guarantor or any other Person shall grant or convey to the Administrative Agent or the Lenders a Lien in Collateral as security for all or any portion of the Obligations, whether now or hereafter in existence, as said agreements or documents may be amended, modified, restated or replaced from time to time, each in form and substance reasonably satisfactory to the Administrative Agent.

"<u>SOFR</u>" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"<u>Specified Loan Party</u>" means any Borrower, Affiliate of Borrower or Guarantor that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to <u>Section 9.20</u>).

"Specified Real Estate" means those certain real properties located at: (i) 7860 Mexico Road, St. Peters, MO 63375; (ii) 12 Junction Drive West, Glen Carbon, IL 62034; (iii) 6678 Mexico Road, St. Peters, MO 63376; and (iv) 994 Parkway, Sevierville, TN 37862, each of which are contemplated to be sold pursuant to the Plan of Reorganization.

"Specified Transaction" means any Investment (including any Acquisition), Disposition, incurrence or repayment of Indebtedness, Restricted Payment or Incremental Term Loan that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis".

"Specified Unit" means each Unit described on Schedule II.

"Subsidiary" of any Person means (i) any corporation of which more than 50% of the outstanding Equity Interests and Equity Interests Equivalents of any class or classes having ordinary voting power for the election of directors (irrespective of whether or not at the time Equity Interests or Equity Interests Equivalents of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is now or hereafter owned directly or indirectly by such Person, by such Person and one or more of its Subsidiaries, or by one or more of such Person's other Subsidiaries, (ii) any partnership, association, limited liability company, joint venture or other entity in which such Person, such Person and one or more of its Subsidiaries, or one or more of its Subsidiaries, is either a general partner or has an equity or voting interest of more than 50% at the time, and (iii) any other entity which is directly or indirectly controlled by such Person or one or more Subsidiaries of such Person or both; provided that, unless otherwise specified, any reference to "Subsidiary" means a Subsidiary of the Borrower.

"Sunset Unit" means each Unit described on Schedule III.

"Supermajority Lenders" means at any time  Lenders holding (a) at least seventy percent (70%) of the sum of the Revolving Loan Commitments of all Lenders plus the Term Loan Commitments of all Lenders, plus the unpaid principal balance of the Term Loans, or (b) if the Commitments have been terminated, at least seventy percent (70%) of the aggregate outstanding principal amount of the Loans, plus Letter of Credit Obligations; provided that (i) if there are (x) at least three Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Supermajority Lenders" must include at least three Lenders and (y) only two Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Supermajority Lenders" must include both Lenders and (ii) the Commitments and Loans of any Defaulting Lender shall be disregarded in determining Supermajority Lenders at any time.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligations" means with respect to any Borrower or Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, as amended from time to time.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Tax Distributions" has the meaning set forth in Section 6.10.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" means, collectively, the Initial Term Loans and any Incremental Term Loan.

"Term Loan Collateral Account" means a segregated deposit account which shall hold proceeds of Term Loan Priority Collateral and shall be subject to a Control Agreement in favor of the Administrative Agent and shall not be subject to a Control Agreement in favor of the ABL Lenders.

"Term Loan Commitment" means, for each Lender, such Lender's Initial Term Loan Commitment.

"Term Loan Lender" means each Lender that has a Term Loan Commitment or to which a Term Loan is owed.

"Term Loan Maturity Date" means April [~~            ~~]30, 2028,[3] or with respect to any Incremental Term Loan, the date set forth as such in the agreement among the Borrower and the Lenders providing such Incremental Term Loan.

"Term Loan Priority Collateral" means all "Term Loan Priority Collateral" as defined in the ABL/Term Intercreditor Agreement, or similar analogous term describing Collateral on which the Obligations have Lien priority over the ABL Facility.

"Term Note" has the meaning set forth in Section 2.1(a)(4).

"Term SOFR" means,

(a)    for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a

---

[3] ~~3 Years after Closing Date.~~

38

Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR (other than pursuant to clause (ii)(c) of the definition of "Base Rate").

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Test Period" in effect at any time means the most recent period of four consecutive fiscal quarters of the Borrower ended on or prior to such time (taken as one accounting period) in respect of which financial statements have been or are required to be delivered pursuant to Section 5.1(a) or (b), as applicable.  A Test Period may be designated by reference to the last day thereof (e.g., the "March 31, 2026 Test Period" refers to the period of four consecutive fiscal quarters of the Borrower ended on March 31, 2026), and a Test Period shall be deemed to end on the last day thereof.

"Total Revolving Outstandings" means, as of any date of determination, the aggregate outstanding principal amount of all Revolving Loans (excluding any PIK Interest that has been capitalized in respect of the Revolving Loans) and the Letter of Credit Obligations on such date.

"Transactions" means the transactions contemplated under the Plan of Reorganization and the Confirmation Order to occur on the effective date of the Plan of Reorganization and the Confirmation Order, including the entry into this Agreement and the other Loan Documents.

"Transaction Expenses" means any fees or expenses incurred or paid by Holdings, the Borrower or any of its (or their) Subsidiaries in connection with the Transactions, including restructuring and legal fees and expenses incurred in connection with the events leading up to the filing of the petition for relief under the Bankruptcy Code.

"<u>Unadjusted Benchmark Replacement</u>" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>Unit</u>" means, collectively, the property comprising the carwash locations described on **Schedule I-A** and the property comprising any New Unit.

"<u>United States</u>" and "<u>U.S.</u>" mean the United States of America.

"<u>Unrestricted Cash</u>" shall mean unrestricted cash and cash equivalents of the Borrower and its Subsidiaries to the extent such cash or cash equivalents are subject to a first priority perfected security interest in favor of the Administrative Agent through control agreements.

"<u>U.S. Government Securities Business Day</u>" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>U.S. Person</u>" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"<u>U.S. Tax Compliance Certificate</u>" has the meaning assigned thereto in <u>Section 10.1(e)(2)(B)(3)</u>.

"<u>4-Wall EBITDA</u>" means, with respect to each Unit for each period, the portion of Consolidated EBITDA attributable to such Unit during such period, excluding any allocations of corporate selling, general and administrative expenses allocated to that Unit.

"<u>Wash Club</u>" means any customer loyalty program maintained by a Mature Unit entitling members to unlimited car washes at such Mature Unit in exchange for a monthly fee.

"<u>Wash Club Membership</u>" means, for any period, the aggregate number of members of any Wash Club at each Mature Unit for the last calendar month of such period.

"<u>Zips</u>" means Zips Car Wash, LLC, an Arkansas limited liability company.

**1.2**     **Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     All undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Uniform Commercial Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Uniform Commercial Code, the definition contained in Article or Division 9 shall control.

(c)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

40

(1)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(2)    References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(3)    The term "including" is by way of example and not a limitation.

(4)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(e)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(f)    For purposes of calculating Consolidated EBITDA and any financial ratios or tests, including the First Lien Leverage Ratio and the Fixed Charge Coverage Ratio, Specified Transactions that have been made (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of Consolidated EBITDA or any such ratio is made shall be calculated on a Pro Forma Basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.

**1.3    Accounting Terms; Payment Dates**.    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, Modified GAAP, except as otherwise specifically prescribed herein. Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending December 31 or fiscal quarter ending March 31, June 30, September 30 or December 31 of the Borrower.  Unless the Borrower has requested an amendment pursuant to the process set out in the definition of "GAAP" with respect to the treatment of operating leases and Capitalized Lease Obligations under GAAP (or IFRS) and until such amendment has become effective, all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update (the "ASU") shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations, in each case, used for purposes of Article VII (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with the ASU (on a prospective or retroactive basis or otherwise) to be treated as Capitalized Lease Obligations in the financial statements to be delivered pursuant to Section 5.1.

**1.4    References to Agreements, Laws, Etc**.  Unless otherwise expressly provided herein, (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan

Document shall be construed as referring to such agreement, instrument or other document as may be from time to time amended, restated, amended and restated, supplemented or otherwise modified, extended, refinanced or replaced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications, extensions, refinancings or replacements set forth herein or in any Loan Document) and (b) any reference to any law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

**1.5** **Times of Day**. Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

**1.6** **Interest Rates**. The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability (other than arising from its or its Affiliates' gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable order) with respect to the administration, submission or any other matter related to the rates in the definition of "Term SOFR Reference Rate", "Adjusted Term SOFR" or "Term SOFR", or any component of such definitions or rates referred to in such definitions or with respect to any rate that is an alternative or replacement for or successor to any of such rate (including, without limitation, any Benchmark Replacement) or the effect of any of the foregoing.

<div align="center">

**ARTICLE II**
**THE ADVANCES**

</div>

**2.1** **The Advances**.

(a) Initial Term Loans.

(1) Subject to the terms and conditions set forth herein and in the Plan of Reorganization, ~~in satisfaction of (x) a portion of each Prepetition Term Loan Lender's Prepetition Term Loan Claim, each Prepetition~~ on the Closing Date, each Initial Term Loan Lender shall receive (and be deemed to have issued) ~~on the Closing Date~~ the aggregate principal amount of Initial Term Loans set forth on Schedule I hereto ~~and (y) each DIP Lender's DIP Term Loans (together with accrued and unpaid interest thereon), each DIP Lender shall receive (and be deemed to have issued)~~ set forth opposite such Initial Term Loan Lender's name, as a conversion of the Existing Opco Obligations held by such Initial Term Loan Lender on the Closing Date ~~the aggregate principal amount of Initial Term Loans set forth on Schedule I hereto~~. The Initial Term Loans may be converted to and continued as Term SOFR Loans and/or Base Rate Loans. Once paid, the Initial Term Loans may not be re-borrowed.

(2) The Borrower's obligation to pay the principal of, and interest on, any Term Loan shall be evidenced by the records of the Term Loan Lenders and, at the request of any applicable Term Loan Lender, by a term loan promissory note(s) in form substantially as attached hereto as **Exhibit A** (the "Term Note"). The entries made in the Register shall (absent manifest error) be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that the failure or delay of the Term Loan Lenders in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

(b) Incremental Facilities.

(1)    <u>Increase</u>.    The Borrower may, by written notice to the Administrative Agent from time to time after the Closing Date (each, an "<u>Incremental Facility Notice</u>"), increase the Term Loan Commitments or obtain additional term loan facilities; <u>provided</u> such additional term loan facilities not increasing the Term Loan Commitments will rank junior in right of payment and security with the Term Loans or are unsecured (each, whether or not a separate class, an "<u>Incremental Term Loan Commitment</u>" and the term loans thereunder, an "<u>Incremental Term Loan</u>";  each Incremental Term Loan Commitment is sometimes referred to herein individually as an "<u>Incremental Facility</u>" and collectively as the "<u>Incremental Facilities</u>"), in Dollars in an aggregate principal amount not to exceed $40,000,000 for all such Incremental Facilities and subject to the conditions set forth in clause (3) below; <u>provided</u> that no commitment of any Lender shall be increased without the consent of such Lender.  Such notice shall set forth (A) the amount of the Incremental Term Loan Commitment being requested, (which shall be in a minimum amount of $5,000,000 and in increments of $250,000 in excess thereof), (B) the date (an "<u>Incremental Effective Date</u>") on which such Incremental Facility is requested to become effective (which, unless otherwise agreed by the Administrative Agent, shall not be less than 10 Business Days nor more than 60 days after the date of such notice), and (C) whether the related Incremental Term Loan is to initially be a Term SOFR Loan or a Base Rate Loan (and, if a Term SOFR Loan, the Interest Period therefor).

(2)    <u>Allocations</u>.    Upon delivery of the applicable Incremental Facility Notice, the Administrative Agent will give notice thereof to each then-existing Lender of such Incremental Facility as an offer for all Lenders to provide such Incremental Facility pro rata according to the percentages of their respective Commitments.  If any Lender does not notify the Administrative Agent in writing that such Lender accepts its pro rata share of such offer in its entirety within ten (10) Business Days of such offer, that portion of the Incremental Facility not accepted by the applicable Lenders shall be offered to the applicable accepting Lenders on a non-pro rata basis.  If the applicable accepting Lenders do not accept the applicable Incremental Facility in its entirety on a non-pro rata basis within five (5) Business Days after such offer, that portion of the Incremental Facility not accepted by the applicable accepting Lenders may be offered by the Borrower to any Persons that would constitute Eligible Assignees.

(3)    <u>Conditions</u>.    No Incremental Facility shall become effective under this <u>Section 2.1(b)</u> unless, after giving effect to such Incremental Facility, the Loans to be made thereunder, and the application of the proceeds therefrom, (A) no Default or Event of Default shall exist at the time of funding or would exist after giving effect thereto, except in connection with any Permitted Acquisition where the Lenders providing such Incremental Term Loans have agreed that no payment or bankruptcy Event of Default will be the standard and which shall be subject to customary "SunGard" limitations to the extent the proceeds of such Incremental Term Loans are used to fund such Permitted Acquisition, (B) the Incremental Term Loans will rank pari passu or junior in right of payment and security with the Term Loans (other than Incremental Term Loans) and Revolving Loans or may be unsecured, (C) any Incremental Term Loan will have a final maturity no earlier than the maturity of the Initial Term Loans, (D) the weighted average life to maturity of any Incremental Term Loan shall be no shorter than that of the Initial Term Loans, (E) subject to clause (D) above, the amortization schedule applicable to any Incremental Term Loan shall be determined by the Borrower and the Lenders thereunder, (F) the all-in yield (whether in the form of interest rate margins, original issue discount, upfront fees or Adjusted Term SOFR or Base Rate floor greater than the floors applicable to the Initial Term Loans or similar yield related discounts, deductions or payments, with such increased amount being equated to interest margin on the basis of four year weighted average life to maturity for purposes of determining any increase to the applicable interest margin with respect to the Initial Term Loans) (the "<u>Effective Yield</u>") applicable to any Incremental Term Loan which is pari

43

passu in right of payment and security with the Initial Term Loan will be determined by the Borrower and the Lenders providing such Incremental Term Loan, but will not be higher than the corresponding Effective Yield for the Initial Term Loans, unless the interest rate margins with respect to the then existing Term Loans are increased by an amount equal to the difference between the Effective Yield with respect to such Incremental Term Loans and the corresponding Effective Yield on such existing Term Loans (the "MFN Adjustment"), (G) any Incremental Term Loan shall be on terms and pursuant to documentation to be determined by the Borrower and the applicable Lenders providing such Incremental Term Loan; provided, that, to the extent that any financial maintenance covenant and/or call protection provision is added for the benefit of any such Incremental Term Loan, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant or call protection provision is either (i) also added for the benefit of any existing Term Loans or (ii) only applicable after the latest maturity of the existing Term Loans, and (H) no Incremental Term Loan will be secured by assets other than Collateral or guaranteed by any person other than the Guarantors.

(4)     Required Amendments.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Facility, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence of such Incremental Facility and the Loans evidenced thereby, and any joinder agreement or amendment may, without the consent of the other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effectuate the provisions of this Section 2.1(b), and, for the avoidance of doubt, this Section 2.1(b) shall supersede any provisions in Section 9.1.  From and after each Incremental Effective Date, the Loans and Commitments established pursuant to this Section 2.1(b) shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and to the extent ranking *pari passu* with the Initial Term Loans shall, without limiting the foregoing, benefit equally and ratably from the guarantees and security interests created by the applicable Security Documents.  The Loan Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Liens and security interests granted by the applicable Security Documents continue to be perfected under the Uniform Commercial Code or otherwise after giving effect to the establishment of any such new Loans and Commitments.

(c)     Revolving Loan.

(1)     Subject to the terms and conditions set forth herein, the Revolving Loan Lenders severally agree to make Revolving Loan(s) to the Borrower, from time to time from the Closing Date to the Revolver Maturity Date, in an aggregate principal amount not to exceed the Revolving Loan Commitment.  The Revolving Loan is a revolving line of credit and amounts paid and prepaid on the Revolving Loan may be reborrowed hereunder. The Revolving Loan Commitment shall terminate on the Revolver Maturity Date.

(2)     Procedure for Revolving Loan Borrowing.  Each Advance of a Revolving Loan shall be made upon the Borrower's irrevocable written notice delivered to the Administrative Agent substantially in the form of a Notice of Borrowing or in a writing in any other form acceptable to the Administrative Agent, which notice must be received by the Administrative Agent prior to 12:00 p.m. on the requested date of the Advance.  Such Notice of Borrowing shall specify:

(A)     the amount of the Advance (which shall be in an aggregate minimum principal amount of $500,000); and

(B)     the requested Advance date, which shall be a Business Day.

Upon receipt of a Notice of Borrowing with respect to a Revolving Loan, the Administrative Agent will promptly notify each Revolving Loan Lender of such Notice of Borrowing and of the amount of such Lender's percentage of the Commitment with respect to such Advance.  Unless the Administrative Agent is otherwise directed in writing by the Borrower, the proceeds of each requested Advance after the Closing Date will be made available to the Borrower by the Administrative Agent by wire transfer of such amount to the Borrower pursuant to the wire transfer instructions provided to the Administrative Agent in writing.

(3)     The Borrower's obligation to pay the principal of, and interest on, the Revolving Loan shall be evidenced by the records of the Revolving Loan Lender and, at the request of any applicable Revolving Loan Lender, by a promissory note or notes in form substantially as attached hereto as **Exhibit B** (the "Revolving Loan Note").  The entries made in such records and/or on the schedule annexed to the Revolving Loan Note shall (absent manifest error) be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that the failure or delay of the Revolving Loan Lender in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Revolving Loan (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

(4)     Advances under the Revolving Loan shall be used by the Borrower for working capital and general corporate purposes of the Borrower and its Subsidiaries, including funding Capital Expenditures and Permitted Acquisitions.

(d)     Letters of Credit.

(1)     Conditions.  On the terms and subject to the conditions contained herein, the Borrower may request that one or more L/C Issuers Issue and one or more of the L/C Issuers will issue, in accordance with such L/C Issuers' usual and customary business practices, and for the account of the Loan Parties, Letters of Credit (denominated in Dollars) from time to time on any Business Day during the period from the Closing Date through the Revolver Maturity Date; provided, however, that no L/C Issuer shall Issue any Letter of Credit upon the occurrence of any of the following or, if after giving effect to such Issuance:

(A)     (i) the Revolving Loan Unused Portion would be less than zero or (ii) the Letter of Credit Obligations for all Letters of Credit would exceed the L/C Sublimit;

(B)     the expiration date of such Letter of Credit (i) is not a Business Day, (ii) is more than one year after the date of Issuance thereof or (iii) is later than seven (7) days prior to the Revolver Maturity Date; provided, however, that any Letter of Credit with a term not exceeding one year may provide for its renewal for additional periods not exceeding one year as long as (x) the Borrower and such L/C Issuer have the option to prevent such renewal before the expiration of such term or any

45

such period and (y) neither such L/C Issuer nor the Borrower shall permit any such renewal to extend such expiration date beyond the date set forth in <u>clause (iii)</u> above; or

(C)   (i) any fee due in connection with, and on or prior to, such Issuance has not been paid, (ii) such Letter of Credit is requested to be Issued in a form that is not acceptable to such L/C Issuer or (iii) such L/C Issuer shall not have received, each in form and substance reasonably acceptable to it and duly executed by the Borrower on behalf of the Loan Parties, the documents that such L/C Issuer generally uses in the ordinary course of business for the Issuance of letters of credit of the type of such Letter of Credit (collectively, the "<u>L/C Reimbursement Agreement</u>").

Furthermore, each L/C Issuer may elect only to Issue Letters of Credit in its own name and may only Issue Letters of Credit to the extent permitted by Law, and such Letters of Credit may not be accepted by certain beneficiaries such as insurance companies.  For each Issuance, the applicable L/C Issuer may, but shall not be required to, determine that, or take notice whether, the conditions precedent set forth in <u>Section 3.2</u> have been satisfied or waived in connection with the Issuance of any Letter of Credit; <u>provided</u>, <u>however</u>, that no Letters of Credit shall be Issued during the period starting on the first Business Day after the receipt by such L/C Issuer of notice from the Administrative Agent at the written direction of the Required Lenders that any condition precedent contained in <u>Section 3.2</u> is not satisfied and ending on the date all such conditions are satisfied or duly waived.

Notwithstanding anything else to the contrary herein, if any Lender is a Defaulting Lender, no L/C Issuer shall be obligated to Issue any Letter of Credit unless (w) the Defaulting Lender has been replaced in accordance with <u>Section 9.19</u> and <u>Section 9.19</u>, (x) the Letter of Credit Obligations of such Defaulting Lender have been cash collateralized, (y) the Revolving Loan Commitments of the other Lenders have been increased by an amount sufficient to satisfy the Administrative Agent that all future Letter of Credit Obligations will be covered by all Revolving Loan Lenders that are not Defaulting Lenders, or (z) the Letter of Credit Obligations of such Defaulting Lender have been reallocated to other Revolving Loan Lenders in a manner consistent with <u>Section 2.10(b)</u>.

(2)   <u>Notice of Issuance</u>.  The Borrower shall give the relevant L/C Issuer and the Administrative Agent a notice of any requested Issuance of any Letter of Credit, which shall be effective only if received by such L/C Issuer and the Administrative Agent not later than 12:00 p.m. on the third Business Day prior to the date of such requested Issuance.  Such notice shall be made in a writing or electronic transmission in any written form reasonably acceptable to such L/C Issuer (each, an "<u>L/C Request</u>").

(3)   <u>Reporting Obligations of L/C Issuers</u>.  Each L/C Issuer agrees to provide the Administrative Agent, in form and substance satisfactory to the Administrative Agent, each of the following on the following dates: (A) (i) on or prior to any Issuance of any Letter of Credit by such L/C Issuer, (ii) immediately after any drawing under any such Letter of Credit or (iii) immediately after any payment (or failure to pay when due) by the Borrower of any related L/C Reimbursement Obligation, notice thereof, which shall contain a reasonably detailed description of such Issuance, drawing or payment and the Administrative Agent shall provide copies of such notices to each Revolving Loan Lender reasonably promptly after receipt thereof; (B) upon the request of the Administrative Agent (or any Revolving Loan Lender through the Administrative Agent), copies of any Letter of Credit Issued by such L/C Issuer and any related L/C Reimbursement Agreement and such other documents and information as may reasonably be requested by Agent; and (C) on the first Business Day of each calendar week, a schedule of the

46

Letters of Credit Issued by such L/C Issuer, in form and substance reasonably satisfactory to Agent, setting forth the Letter of Credit Obligations for such Letters of Credit outstanding on the last Business Day of the previous calendar week.

(4)      Acquisition of Participations.  Upon any Issuance of a Letter of Credit in accordance with the terms of this Agreement resulting in any increase in the Letter of Credit Obligations, each Revolving Loan Lender shall be deemed to have acquired, without recourse or warranty, an undivided interest and participation in such Letter of Credit and the related Letter of Credit Obligations in an amount equal to its Applicable Revolving Loan Percentage of such Letter of Credit Obligations.

(5)      Reimbursement Obligations of the Borrower.  The Borrower agrees to pay to the L/C Issuer of any Letter of Credit, or to the Administrative Agent for the benefit of such L/C Issuer, each L/C Reimbursement Obligation owing with respect to such Letter of Credit no later than the first Business Day after the Borrower receives notice from such L/C Issuer or from the Administrative Agent that payment has been made under such Letter of Credit or that such L/C Reimbursement Obligation is otherwise due (the "L/C Reimbursement Date") with interest thereon computed as set forth in clause (A) below.  In the event that any L/C Reimbursement Obligation is not repaid by the Borrower as provided in this clause (5) (or any such payment by the Borrower is rescinded or set aside for any reason), such L/C Issuer shall promptly notify the Administrative Agent of such failure (and, upon receipt of such notice, the Administrative Agent shall notify each Revolving Loan Lender) and, irrespective of whether such notice is given, such L/C Reimbursement Obligation shall be payable on demand by the Borrower with interest thereon computed (A) from the date on which such L/C Reimbursement Obligation arose to the L/C Reimbursement Date, at the interest rate applicable during such period to Revolving Loans that are Base Rate Loans and (B) thereafter until payment in full, at the interest rate specified in Section 2.1(i)(3) to past due Revolving Loans that are Base Rate Loans (regardless of whether or not an election is made under such Section).

(6)      Reimbursement Obligations of the Revolving Loan Lenders.

(A)      Upon receipt of the notice described in clause (5) above from the Administrative Agent, each Revolving Loan Lender shall pay to the Administrative Agent for the account of such L/C Issuer its percentage of the Commitment of such Letter of Credit Obligations (as such amount may be increased pursuant to Section 2.10(b)).

(B)      By making any payment described in clause (A) above (other than during the continuation of an Event of Default under Section 7.1(f) or 7.1(g)), such Lender shall be deemed to have made a Revolving Loan to the Borrower, which, upon receipt thereof by the Administrative Agent for the benefit of such L/C Issuer, the Borrower shall be deemed to have used in whole to repay such L/C Reimbursement Obligation.  Any such payment that is not deemed a Revolving Loan shall be deemed a funding by such Lender of its participation in the applicable Letter of Credit and the Letter of Credit Obligation in respect of the related L/C Reimbursement Obligations. Such participation shall not otherwise be required to be funded.  Following receipt by any L/C Issuer of any payment from any Lender pursuant to this clause (6) with respect to any portion of any L/C Reimbursement Obligation, such L/C Issuer shall promptly pay to the Administrative Agent, for the benefit of such Lender, all amounts received by such L/C Issuer (or to the extent such amounts shall have been received by Agent for the benefit of such L/C Issuer, the Administrative Agent shall promptly pay to such Lender

47

all amounts received by the Administrative Agent for the benefit of such L/C Issuer) with respect to such portion.

(7)    Obligations Absolute.  The obligations of the Borrower and the Revolving Loan Lenders pursuant to clauses (4), (5) and (6) above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Agreement irrespective of (A) (i) the invalidity or unenforceability of any term or provision in any Letter of Credit, any document transferring or purporting to transfer a Letter of Credit, any Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (ii) any document presented under a Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or failing to comply with the terms of such Letter of Credit or (iii) any loss or delay, including in the transmission of any document, (B) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Loan Party) may have against the beneficiary of any Letter of Credit or any other Person, whether in connection with any Loan Document or any other Contractual Obligation or transaction, or the existence of any other withholding, abatement or reduction, (C) in the case of the obligations of any Revolving Loan Lender, (i) the failure of any condition precedent set forth in Section 3.2 to be satisfied (each of which conditions precedent the Revolving Loan Lenders hereby irrevocably waive) or (ii) any adverse change in the condition (financial or otherwise) of any Loan Party and (D) any other act or omission to act or delay of any kind of the Administrative Agent, any Lender or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this clause (vii), constitute a legal or equitable discharge of any obligation of the Borrower or any Revolving Loan Lender hereunder.  No provision hereof shall be deemed to waive or limit the Borrower's right to seek repayment of any payment of any L/C Reimbursement Obligations from the L/C Issuer under the terms of the applicable L/C Reimbursement Agreement or applicable law.

(e)    Termination or Reduction of Commitments. The Borrower may, upon written notice to the Administrative Agent, terminate, or from time to time permanently reduce the unused Revolving Loan Commitments; provided that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount $250,000 or any whole multiple of $50,000 in excess thereof, and (iii) any such partial reduction shall reduce the Revolving Loan Commitments of each Lender ratably based on such Applicable Revolving Loan Percentage. The Revolving Loan Commitments shall automatically be reduced to $0 and terminated immediately upon the closing of the loan documentation establishing an ABL Facility (it being understood and agreed that all outstanding Revolving Loans, together with all accrued but unpaid interest owing thereon and all other amounts owing in respect of the Revolving Loans shall be due and payable immediately upon such date in accordance with Section 2.1(k)(2)).  The Administrative Agent shall promptly notify the Lenders of any termination or reduction of unused Commitments under this Section 2.1(f). Any Revolving Loan Unused Fee accrued until the effective date of any termination or reduction of Commitments under this Section 2.1(f) shall be paid on the effective date of such termination or reduction.

(f)    Notes.  If requested by any Lender, the Advances made by such Lender shall be evidenced by, and be payable in accordance with the terms of the Term Note and Revolving Loan Note issued to such Lender, as applicable, made by the Borrower payable to the order of such Lender in a principal amount equal to the Commitment of such Lender; subject, however, to the provisions of such Note to the effect that the principal amount payable thereunder at any time shall not exceed the then unpaid principal amount of the Advances made by such

48

Lender. The Borrower hereby irrevocably authorizes each Lender to make or cause to be made, at or about the time of each Advance made by such Lender, an appropriate notation on the records of such Lender, reflecting the principal amount of such Advance, and such Lender shall make or cause to be made, on or about the time of receipt of payment of any principal of any Advance, an appropriate notation on its records reflecting such payment and such Lender will, prior to any transfer of any of such Note, endorse on the reverse side thereof the outstanding principal amount of the Advances evidenced thereby. Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances. The aggregate amount of all Advances set forth on the Register shall be conclusive evidence of the principal amount owing and unpaid on such Lender's Note, absent manifest error.

(g)     Promise to Pay. The Borrower hereby promises to pay in full to the Administrative Agent for the benefit of the Lenders the amount of all Obligations, including the principal amount of all Loans, together with accrued interest, fees and other amounts due thereon, all in accordance with the terms of this Agreement. All outstanding Obligations, including the outstanding principal amount of all Loans, together with unpaid accrued interest, fees and other amounts due thereon, shall be due and payable in full on the applicable Maturity Date. The Loans shall be payable as follows:

(1)     Term Loan. Commencing September 30, 2025, and continuing on the last day of each fiscal quarter of the Borrower thereafter, the Borrower shall make quarterly repayments of the principal amount of the Initial Term Loans established on the Closing Date in the aggregate principal amount equal to 0.25% of the principal amount of the Initial Term Loans established on the Closing Date; provided that, the principal amount of any Term Loan that constitutes PIK Interest shall not share in any repayment made or required to be made pursuant to this Section 2.1(g)(1). The entire remaining unpaid principal balance of the Term Loan (including PIK Interest), together with accrued but unpaid interest, shall be due and payable in full on the Term Loan Maturity Date.

(2)     Revolving Loans. The Borrower shall repay to the Administrative Agent, for the account of the Revolving Loan Lenders on the Revolver Maturity Date the aggregate unpaid principal amount of the Revolving Loans outstanding on such date, together with accrued but unpaid interest thereon.

(3)     Incremental Term Loans. The Borrower shall repay to the Administrative Agent, for the account of the Lenders who provided any Incremental Term Loans, on each date set forth in the amendment or other documentation relating to such Incremental Term Loan, such amount of such Incremental Term Loans as provided in such amendment or other documentation.

(h)     Interest on Advances. The Borrower agrees to pay interest on the aggregate outstanding principal amount of the Advances until paid in full as follows:

(1)     Term Loan. The Term Loan shall bear interest at the rates of, at Borrower's election pursuant to an appropriately delivered Notice of Borrowing, (I) with respect to Term SOFR Loans, the Adjusted Term SOFR plus the Applicable Margin, and (II) with respect to Base Rate Loans, the Base Rate plus the Applicable Margin.

(2)     Revolving Loan.

49

(A)    The Revolving Loan shall bear interest at the rates of, at Borrower's election pursuant to an appropriately delivered Notice of Borrowing, (I) with respect to Term SOFR Loans, the Adjusted Term SOFR plus the Applicable Margin, and (II) with respect to Base Rate Loans, the Base Rate plus the Applicable Margin.

(3)    <u>Default Interest</u>. While an Event of Default exists and is continuing or after acceleration, at the option of the Administrative Agent or the Required Lenders, the Borrower shall pay interest ("<u>Default Interest</u>") with respect to the principal of, or interest on, each Loan, any fee or any other amount payable by the Borrower hereunder that is not paid when due at the Default Rate.  All Default Interest under this clause (3) shall be payable in cash and on demand.

(4)    <u>Payment Dates</u>. Interest accrued on each Loan shall be payable, without duplication:

(A)    on the Revolver Maturity Date or Term Loan Maturity Date, as applicable;

(B)    in respect of any Loan, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan, on the principal amount so paid or prepaid; and

(C)    in respect of (i) any Base Rate Loan, on the last Business day of each month occurring after the Closing Date and (ii) any Term SOFR Loan, at the end of each Interest Period and, in addition, at the end of 90 days in the case of a six-month Interest Period (together with the applicable Maturity Date, each an "<u>Interest Payment Date</u>").

The Administrative Agent shall determine each interest rate applicable to the Loan in accordance with the terms hereof and, upon any rate change, shall promptly notify the Borrower of such rate in writing (or by telephone, promptly confirmed in writing).  Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(i)    <u>Calculation of Interest</u>.  All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Adjusted Term SOFR) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, <u>provided</u> that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.3</u>, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(j)    <u>PIK Interest</u>.

(1)    With respect to any and all interest that has accrued in respect of the Initial Term Loans during the period from and after the Closing Date and prior to the three-month anniversary of the Closing Date, 100% of such interest that has accrued and is payable shall be capitalized ("<u>PIK Interest</u>") (by adding such PIK Interest when paid to the principal amount of the

outstanding Initial Term Loans on the applicable Interest Payment Date and such additional principal shall automatically constitute part of the principal amount of the Initial Term Loans for purposes hereunder, including the accrual of interest thereon at the interest rate applicable to such Initial Term Loans);

(2)     With respect to any and all interest that has accrued in respect of the Initial Term Loans during the period on or after the three-month anniversary of the Closing Date and prior to the six-month anniversary of the Closing Date (the "Second PIK Period Interest"), (x) the portion of such Second PIK Period Interest that has accrued at a rate equal to Adjusted Term SOFR plus 2.50% shall be paid in cash and (y) the remainder of such Second PIK Period Interest shall also be paid in cash or, at the election of the Borrower (by delivery of written notice to the Administrative Agent at least one (1) Business Day prior to the applicable Interest Payment Date), if after giving pro forma effect to the payment of all (or such portion as, after giving effect to the cash-pay portion would allow the Borrower to satisfy the pro forma Liquidity requirement of this clause (y)) of such Second PIK Period Interest in cash, the Borrower's pro forma Liquidity will be less than $15,000,000, such portion of the remainder may instead be paid as PIK Interest;

(3)     With respect to any and all interest that has accrued in respect of the Initial Term Loans during the period on or after the six-month anniversary of the Closing Date and prior to the one-year anniversary of the Closing Date (the "Third PIK Period Interest"), (x) the portion of the Third PIK Period Interest that has accrued at a rate equal to Adjusted Term SOFR plus 2.50% shall be paid in cash and (y) the remainder of the Third PIK Period Interest shall also be paid in cash or, at the election of the Borrower (by delivery of written notice to the Administrative Agent at least one (1) Business Day prior to the applicable Interest Payment Date), if after giving pro forma effect to payment of all (or such portion as, after giving effect to the cash-pay portion would allow the Borrower to satisfy the pro forma Liquidity requirement of this clause (y)) of the Third PIK Period Interest in cash, the Borrower's pro forma Liquidity will be less than $10,000,000, such portion of the remainder may instead be paid as PIK Interest; and

(4)     With respect to any and all interest that has accrued in respect of the Initial Term Loans on or after the one-year anniversary of the Closing Date at the cash rate shall be paid in cash on each such Interest Payment Date; provided, that, any interest paid in connection with a prepayment of the Term Loans pursuant to Section 2.1(k), shall be payable all in cash, at the Adjusted Term SOFR or the Base Rate, as applicable.

(5)     Each Lender may determine in its sole discretion to record its PIK Interest as an increase in principal in the schedule annexed to its Notes or may request that such PIK Interest be evidenced by one or more additional Notes issued on the applicable Payment Date in the principal amount of such PIK Interest, provided, further, that the failure to request or obtain a promissory note to evidence the amount of such outstanding PIK interest shall not impair in any manner the enforceability of the Obligation of the Borrower with respect to the payment thereof or the accrual of interest with respect thereto.

(k)     Prepayment. Prepayments of the Loans shall be (or in the case of Section 2.1(k)(1), may be) made as set forth below:

(1)     The Borrower shall have the right, by giving written notice to the Administrative Agent (which such written notice shall be in a form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer) by not later than 1:00 p.m. on the fifteenth (15th) day

preceding the date of such prepayment, to prepay all or any portion of the aggregate principal amount of any Loan, without premium or penalty. Each partial prepayment shall be in an aggregate principal amount of not less than $500,000 and shall be accompanied by accrued interest to the date of prepayment on the amount prepaid. Borrower shall reimburse the Lenders and the Administrative Agent on demand for any amounts set forth in, and to the extent required by, Section 10.5.   Except as provided in the immediately succeeding sentence, voluntary prepayments of Term Loans shall be applied to reduce the repayments required by Section 2.1(h) in the inverse order of maturity (including the payment owing on the Maturity Date).

(2)      At any time that the sum of the Total Revolving Outstandings exceeds the aggregate Revolving Loan Commitments, including in connection with the reduction of the Revolving Loan Commitments concurrently with the closing of the loan documentation establishing the ABL Facility, the Borrower shall immediately prepay outstanding principal amount of the Revolving Loans in an amount equal to such excess (including the repayment in full in connection with the establishment of an ABL Facility).

(3)      Solely to the extent that any portion of such amount has been declined as a mandatory prepayment under the Holdco Credit Agreement by the applicable lenders thereunder, no later than fifteen (15) days following the date of delivery of annual audited financial statements for the fiscal year ending December 31, 2026 pursuant to Section 5.1(a) and thereafter no later than the date fifteen (15) days following the date of delivery of annual audited financial statements for each subsequent fiscal year pursuant to Section 5.1(a), the Borrower shall make a mandatory prepayment of the Term Loans (other than an Incremental Term Loan to the extent otherwise provided in the documentation relating to such Incremental Term Loan) in an amount equal to 50.0% of Excess Cash Flow for such Excess Cash Flow Period; provided that at the option of the Borrower, any voluntary prepayments of the Term Loans, Revolving Loans (to the extent accompanied by a permanent reduction of the corresponding Commitment; but excluding the repayment and termination of the Revolving Loan Commitments to the extent such repayment is financed with loans under the ABL Facility) and revolving loans under the ABL Facility (to the extent accompanied by a permanent reduction of the corresponding commitments) made during such fiscal year prior to the applicable Excess Cash Flow prepayment date (and without duplication in the next fiscal year) will reduce the amount of Excess Cash Flow prepayments required for such fiscal year on a dollar-for-dollar basis (to the extent paid with Internally Generated Funds and not deducted in the calculation of Excess Cash Flow for such Excess Cash Flow Period) in each case made during such fiscal year and at the option of the Borrower, made prior to the date of such Excess Cash Flow prepayment.

(4)      No later than five (5) Business Days following the receipt by Holdings or any of its Subsidiaries of Net Cash Proceeds from (a) any Casualty Event or any Disposition pursuant to Section 6.4(h) or Section 6.4(i), the Borrower shall make a mandatory prepayment of the Term Loans in an amount equal to 100.0% of such Net Cash Proceeds; provided that (A) the foregoing prepayment obligation shall not apply to the extent such Net Cash Proceeds, are reinvested or committed to be reinvested in other assets or property useful in the business of the Borrower and its Subsidiaries within 12 months, and if so committed to be reinvested, reinvested no later than one hundred eighty (180) days after the end of such 12-month period and (B) any such amounts to be reinvested shall be, immediately upon receipt thereof, placed into a Term Loan Collateral Account and held therein until such amounts are actually reinvested in accordance with this clause (4) and (b) any Disposition pursuant to Section 6.4(j), the Borrower shall make a mandatory prepayment of the Term Loans in an amount equal to 75.0% of such Net Cash Proceeds (the "Company Share"), with the remaining 25.0% of such Net Cash Proceeds distributed in accordance with the Plan of Reorganization and the Bankruptcy Settlement;

provided that (x) the foregoing prepayment obligation with respect to the Company Share shall not apply to the extent such Net Cash Proceeds, are reinvested or committed to be reinvested in other assets or property useful in the business of the Borrower and its Subsidiaries within 12 months, and if so committed to be reinvested, reinvested no later than one hundred (180) days after the end of such 12-month period and (y) any such amounts to be reinvested shall be, immediately upon receipt thereof, placed into a Term Loan Collateral Account and held therein until such amounts are actually reinvested in accordance with this clause (4);

(5)     No later than five (5) Business Days following the receipt by Holdings or any of its Subsidiaries of Net Cash Proceeds of any Indebtedness (except for Permitted Indebtedness (other than Permitted Indebtedness pursuant to Section 6.2(d)) by Holdings or any of its Subsidiaries, the Borrower shall make a mandatory prepayment of the Term Loans in an amount equal to 100.0% of such Net Cash Proceeds.

(6)     [Reserved].

(7)     [Reserved].

(8)     To the extent applicable, the Borrower shall reimburse the Lenders and the Administrative Agent on demand for amounts set forth in and, to the extent required by, Section 10.5. Borrower shall give the Administrative Agent prior written notice of any event or circumstances reasonably likely to give rise to a mandatory prepayment obligation under this Section 2.1(k) (including the date and an estimate of the aggregate amount of such mandatory prepayment) at least five (5) Business Days prior thereto; provided that the failure to give such notice shall not constitute a Default or an Event of Default but shall not relieve the Borrower of its obligation to make such mandatory prepayments. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower.

(9)     Each Term Loan Lender (or Required Term Loan Lenders on behalf of all Term Loan Lenders, to the extent that Required Term Loan Lenders determine that such cash should remain with the Borrower for liquidity purposes) may reject all or a portion of its pro rata share of any mandatory prepayment (such declined amounts, the "Declined Proceeds") of Term Loans required to be made pursuant to clauses (3), (4) or (5) of this Section 2.1(k) by providing written notice (each, a "Rejection Notice") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York time, two (2) Business Days prior to the prepayment date.

(A)     Each Rejection Notice shall specify the principal amount of the mandatory repayment of Term Loans to be rejected.  If a Term Loan Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans.

(B)     Any Declined Proceeds remaining shall be retained by the Borrower (or the applicable Subsidiary) and may be applied by the Borrower or such Subsidiary in any manner not prohibited by this Agreement.

(l)     In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and,

notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

**2.2**      <u>Election by Borrower</u>.

    (a)      <u>Interest Rate for Advances</u>. The Borrower may, upon irrevocable written notice to the Administrative Agent, elect (i) as of any Business Day, to convert any Term Loans or Revolving Loans (or any part thereof in an aggregate amount of not less than $100,000 or a higher integral multiple of $50,000) that (1) are Base Rate Loans into Term SOFR Loans or (2) are Term SOFR Loans into Base Rate Loans, or (ii) as of the last day of the applicable Interest Period, to continue any Term Loans or Revolving Loans that are Term SOFR Loans having Interest Periods expiring on such day (or any part thereof in an aggregate amount not less than $100,000 or a higher integral multiple of $50,000) as Term SOFR Loans with a new Interest Period; <u>provided</u> that any conversion of a Term SOFR Loan on a day other than the last day of an Interest Period therefor shall be subject to <u>Section 10.5</u>.

    (b)      <u>Lenders' Records</u>. The Borrower hereby irrevocably authorizes the Administrative Agent to make, or cause to be made, an appropriate notation on the Register, reflecting the date and original principal amount of each Advance made by any Lender, the dates for each period when such Advance is being maintained as a Term SOFR Loan, the interest rate for each such period and the dates of principal and interest payments on such Advance. The Register shall be conclusive evidence of the status of such Lender's Advances, absent manifest error. Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances.

    **2.3**      <u>Payments</u>. Any other provision of this Agreement to the contrary notwithstanding, the Borrower shall make each payment of interest (other than (i) PIK Interest, which shall be paid-in-kind in accordance with <u>Section 2.1(j)</u> on and principal of the Notes, and fees and other payments due under this Agreement (except as otherwise expressly provided herein), in immediately available funds to the Administrative Agent at its office referred to in <u>Section 9.3</u> not later than 2:00 p.m. on the date when due. Subject to <u>Section 10.1</u> (Taxes) hereof, payments by the Borrower under this Agreement shall be made without offset, counterclaim or other deduction and in such amounts as may be necessary in order that all such payments shall not be less than the amounts otherwise specified to be paid under this Agreement and the Notes. The Administrative Agent will promptly thereafter distribute like funds ratably to each Lender and each L/C Issuer (unless such amount is not to be shared ratably in accordance with the terms hereof).

    **2.4**      <u>Setoff; etc</u>. Upon the occurrence and during the continuance of an Event of Default, each Lender and each L/C Issuer and the Administrative Agent are hereby authorized at any time and from time to time, without prior notice to the Borrower (any such notice being expressly waived by the Borrower), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or Administrative Agent to or for the credit or the account of the Borrower or any of its Subsidiaries, including specifically any amounts held in any account maintained at such Lender, L/C Issuer or Administrative Agent, against any and all amounts which may be owed to the Administrative Agent or the Lenders, or any of them, by the Borrower, in connection with this Agreement or any Loan Document; <u>provided</u> that no Lender shall exercise any such right without the prior written consent of the Administrative Agent (at the direction of the Required Lenders). The rights of the Lenders, the L/C Issuers and the Administrative Agent under this <u>Section 2.4</u> are in addition to other rights and remedies (including other rights of set-off) which the

Lenders and the Administrative Agent may have under applicable law.  Each Lender and each L/C Issuer and the Administrative Agent agrees, severally and not jointly, to use reasonable efforts to notify the Borrower of any exercise of its rights pursuant to this <u>Section 2.4</u>, <u>provided</u>, <u>however</u>, that failure to provide such notice shall not affect any Lender's or the Administrative Agent's rights under this <u>Section 2.4</u> or the effectiveness of any action taken pursuant hereto; <u>provided</u>, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.10</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Lenders and the L/C Issuers, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender and each L/C Issuer agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

**2.5**     <u>**Sharing**</u>.  If any Lender shall obtain any payment (whether voluntary, involuntary, by application of offset or otherwise) on account of the Loans made by it in excess of such Lender's ratable share of payments on account of the Loans obtained by all the Lenders, such Lender shall purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; <u>provided</u> that, (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this <u>Section 2.5</u> shall not be construed to apply to (x) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to any Borrower or any Guarantor or any Affiliate thereof (as to which the provisions of this <u>Section 2.5</u> shall apply).  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this <u>Section 2.5</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including the right to setoff) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

**2.6**     <u>**Fees**</u>.

(a)     <u>Fee Letter</u>.  The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(b)     <u>Revolving Loan Unused Fee</u>.  Borrower shall pay to Administrative Agent for the account of each Revolving Loan Lender in accordance with its Applicable Revolving Loan Percentage, an unused fee (the "<u>Revolving Loan Unused Fee</u>") equal to the Applicable Unused Margin times the Revolving Loan Unused Portion for the period (including any portion thereof when Revolving Loan Lenders' obligations to lend shall be suspended by reason of the Borrower's inability to satisfy the conditions of <u>Article IV</u>) commencing on the Closing Date and continuing through the Revolver Maturity Date, computed on the actual daily amount of the Revolving Loan Unused Portion during the period for which payment is made. Such Revolving Loan Unused Fee shall be payable to Administrative Agent for the ratable benefit of Revolving Loan Lenders in arrears on the first day of each calendar quarter.

(c)      Letter of Credit Fee.  The Borrower agrees to pay to the Administrative Agent for the ratable benefit of the Revolving Loan Lenders, as compensation to such Lenders for Letter of Credit Obligations incurred hereunder, for each calendar quarter during which any Letter of Credit Obligation shall remain outstanding, a fee (the "Letter of Credit Fee") in an amount equal to the product of the daily undrawn face amount of all Letters of Credit Issued, guarantied or supported by risk participation agreements multiplied by a per annum rate to be agreed by the Borrower and the L/C Issuer.

(d)      Upfront Fees.  On the Closing Date the Borrower shall be deemed to have (i) paid to the Administrative Agent, for the ratable benefit Term Loan Lender, an upfront fee in an amount equal to two percent (2.00%) of the aggregate principal amount of the Term Loans deemed funded to the Borrower by such Term Loan Lender on the Closing Date, which upfront fee will be capitalized to the principal amount of the Term Loan on the Closing Date and (ii) borrowed, and each Revolving Loan Lender shall be deemed to have advanced, a Revolving Loan (on a cashless basis without the need for any Revolving Loan Lender to actually advance funds) in an amount equal to two percent (2.00%) of its Revolving Loan Commitment.  For the avoidance of doubt, the new Term Loans represented by the capitalization of the upfront fee contemplated by clause (i) above shall be in addition to each Term Loan Lender's Term Loans reflected on Schedule I.

**2.7      Lending Branch**.  Subject to the provisions of Section 10.6(a), each Lender may, at its option, elect to make, fund or maintain its Loans hereunder at the branch or office specified on the signature pages hereto or such other of its branches or offices as such Lender may from time to time elect.

**2.8      Application of Payments and Collections**.

(a)      Order of Application of Payments.  Subject to the provisions of subsection (b) below, all payments and prepayments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied, first to pay principal of and interest on any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, second ratably to pay all other Obligations in respect of fees, expenses, reimbursements or indemnities then due and payable, third ratably to pay interest then due in respect of the Loans, and fourth to pay the principal of the Loans then due and payable, and in the case of any prepayment of Term Loans, in the inverse order of maturity (including the payment owing on the Maturity Date).

(b)      Application of Payments After an Event of Default.  After the occurrence of an Event of Default and while the same is continuing, the Administrative Agent shall, unless the Administrative Agent and the Lenders and the L/C Issuers shall agree otherwise, apply all payments and prepayments in respect of any Obligations in the following order:

(1)      to pay interest on and then principal of any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

(2)      to pay Obligations in respect of any fees, expense reimbursements or indemnities then due to the Administrative Agent;

(3)     ratably to pay Obligations in respect of any fees, expenses, reimbursements or indemnities (other than principal and interest) payable to the Lenders and the L/C Issuers;

(4)     to the payment of interest on all Loans and any amounts due pursuant to Sections 10.4 and 10.5, to be allocated among the Lenders and the L/C Issuers pro rata based on the respective aggregate amounts of such accrued interest and amounts owed to them; and

(5)     to the payment of the outstanding principal amounts of all Loans and Obligations under Rate Hedging Obligations and Related Treasury Management Arrangements to be allocated among the Lenders, pro rata based on the respective outstanding principal amounts described in this clause (5) payable to them;

(c)     Each of the Lenders hereby irrevocably designates the Administrative Agent its attorney in fact for the purpose of receiving any and all payments to be made to such Lender in respect of Obligations held by it, and hereby directs each payor of any such payment to make such payment to the Administrative Agent. Each of the Lenders hereby further agrees that if, notwithstanding the foregoing, it should receive any such payment (including by set-off), it shall hold such payment in trust for, and promptly deliver such payment to, the Administrative Agent.

(d)     The Administrative Agent shall promptly distribute to each Lender and each L/C Issuer at its primary address set forth on the appropriate signature page hereof or at such other address as a Lender may notify the Administrative Agent in writing, such funds as such Lender and each L/C Issuer may be entitled to receive.

**2.9     [Reserved].**

**2.10    Defaulting Lenders.**

(a)     Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(1)     Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 9.1.

(2)     Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 2.4 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts

owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>fifth</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and <u>sixth</u>, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; <u>provided</u> that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in <u>Section 3.2</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender and each L/C Issuer irrevocably consents hereto.

(3)    <u>Certain Fees</u>.  No Defaulting Lender shall be entitled to receive any fee payable under <u>Section 2.6</u> for any period during which that Lender is a Defaulting Lender and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender. In the event that any reallocation of Letter of Credit Obligations occurs pursuant to <u>Section 2.10(c)</u>, during the period of time that such reallocation remains in effect, the Letter of Credit Fee payable with respect to such reallocated portion shall be payable to (A) all Revolving <u>Loan</u> Lenders based on their pro rata share of such reallocation or (B) to the L/C Issuer for any remaining portion not reallocated to any other Revolving <u>Loan</u> Lenders.  So long as a Lender is a Defaulting Lender, the Letter of Credit Fee payable with respect to any Letter of Credit Obligations of such Defaulting Lender that has not been reallocated pursuant to <u>Section 2.10(c)</u> shall be payable to the L/C Issuer.

(b)    <u>Reallocation</u>.  If any Revolving Loan Lender is a Defaulting Lender, all or a portion of such Defaulting Lender's Letter of Credit Obligations (unless such Lender is the L/C Issuer that Issued such Letter of Credit) shall, at the Administrative Agent's election at any time or upon any L/C Issuer's written request delivered to the Administrative Agent (whether before or after the occurrence of any Default or Event of Default), be reallocated to and assumed by the Revolving Loan Lenders that are not Defaulting Lenders in accordance with their pro rata Revolving Loan Commitments (calculated as if the Defaulting Lender's Revolving Loan Commitment was reduced to zero and each other Revolving Loan Lender's Revolving Loan Commitment had been increased proportionately), <u>provided</u> that no Revolving Loan Lender shall be reallocated any such amounts or be required to fund any amounts that would cause the sum of its outstanding Revolving Loans and outstanding Letter of Credit Obligations to exceed its Revolving Loan Commitment.

(c)    <u>Defaulting Lender Cure</u>.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with, with respect to Term Loans, their Applicable Term Loan Percentages, and with respect to Revolving Loans, their Applicable Revolving Loan Percentages,

whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**2.11**  **Rates**.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

**2.12**  **Benchmark Replacement Setting for Term Loans**.

(a)  Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Term Loan Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Term Loan Lenders comprising the Required Term Loan Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable, at the option of the Borrower, on a monthly or quarterly basis.

(b)     Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)     Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower and the Term Loan Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to paragraph (d) below and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Term Loan Lender (or group of Term Loan Lenders) pursuant to this Section 2.12, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.12.

(d)     Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (x) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (y) if a tenor that was removed pursuant to clause (x) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a Term SOFR Loan of, conversion to or continuation of Term SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

**ARTICLE III
CONDITIONS PRECEDENT**

**3.1** **Conditions Precedent to Effectiveness**. The effectiveness of this Agreement and the obligation of the Lenders to make any Advance on the Closing Date, is subject to the following conditions precedent:

(a) The Administrative Agent shall have received copies (in sufficient number for each of the Lenders to receive a copy) of all of the following, each in form and substance reasonably satisfactory to the Administrative Agent in all respects, and, if applicable, each dated the Closing Date or such earlier date as approved by the Administrative Agent:

(1) This Agreement, appropriately completed and duly executed by the parties hereto;

(2) The Notes, to the extent requested, appropriately completed and duly executed by the Borrower;

(3) The Guaranty, appropriately completed and duly executed and delivered by each of the Guarantors;

(4) The Security Agreement, appropriately completed and duly executed by the parties thereto;

(5) Uniform Commercial Code financing statements authorized by the applicable Loan Party as debtor, and naming the Administrative Agent as secured party with respect to the Collateral;

(6) Favorable legal opinions of Kirkland & Ellis LLP, counsel to the Loan Parties, and [Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.,]Gordon Rees Scully Mansukhani, LLP, special Arkansas counsel to the BorrowerLoan Parties, each addressed to the Administrative Agent and each of the Lenders;

(7) A certificate executed by a Responsible Officer or member of each Loan Party, certifying in the name of and on behalf of such Loan Party that (A) a true, correct and complete copy of its charter document, with all amendments thereto (as certified by the Secretary of State or similar state official), is attached to the certificate, (B) a true, correct and complete copy of its operating agreement or bylaws, with all amendments thereto, is attached to the certificate, (C) a correct and complete copy of the resolutions of its members or shareholders authorizing the execution, delivery and performance of the Loan Documents to which it is a party are attached to the certificate, and such resolutions have not been subsequently modified or repealed, (D) certificates of good standing dated within a reasonably close period of time prior to the Closing Date for such Loan Party issued by the Secretary of State or similar state official for each state in which such Loan Party is required to be qualified to do business are attached to the certificate and (E) signature and incumbency certificates of its officers executing any of the Loan Documents, all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification;

(8)      A certificate of the duly signed by a Responsible Officer of Borrower, certifying as to the solvency on the Closing Date of the Borrower and its Subsidiaries in a manner consistent with Section 4.21;

(9)      A Notice of Borrowing appropriately completed and duly executed by the Borrower;

(10)      Payment by the Borrower of all fees due on or prior to the Closing Date in accordance with the provisions of Section 2.6 which payment shall be nonrefundable;

(11)      Payment by the Borrower of all reasonable costs and expenses of the Administrative Agent (including reasonable and documented legal fees and expenses) incurred in connection with the preparation and execution of the Loan Documents and incident to all proceedings in connection with, transactions contemplated by, and documents relating to this Agreement and the Loan Documents, which payment shall be nonrefundable to the extent required by Section 9.4;

(12) A certificate from the applicable Loan Party's insurance broker or other evidence satisfactory to the Administrative Agent that all insurance required to be maintained pursuant to Section 5.7 is in full force and effect, together with endorsements naming the Administrative Agent, for the benefit of the Secured Parties, as additional insured and loss payee thereunder;

(12)      (13) The Loan Parties shall have executed and delivered a payoff letter, confirming that all obligations and Liens under the DIP Credit Agreement will be defeased in full on or prior to the Closing Date;

(13)      (14) Duly executed payoff letters and UCC-3 termination statements with respect to any Liens which are not Permitted Liens upon the Collateral, including for the avoidance of doubt all payoff letters and UCC-3 termination statements with respect to the Liens securing the Prepetition Term Loan Claims;

(14)      (15) Each Credit Party shall have obtained all governmental authorizations and all consents of other Persons, in each case that are necessary or advisable in connection with the transactions contemplated by the Loan Documents and each of the foregoing shall be in full force and effect. All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Loan Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired;

(15)      (16) A certified copy of the Confirmation Order as duly entered by the Bankruptcy Court and entered on the docket of the clerk of the Bankruptcy Court, following due notice to such creditors and other parties-in-interest as required by the Bankruptcy Court, provided that (x) no court of competent jurisdiction shall have issued any injunction, restraining order or other order with respect to the Confirmation Order which otherwise prohibits the consummation of the transactions described herein or the other transactions, or modifies such transactions, and no governmental or other action or proceeding shall have been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify

the transactions described herein or the other transactions, and (y) all conditions precedent to the effectiveness of the Plan of Reorganization (other than the occurrence of the Closing Date hereunder) shall have been satisfied;

(16)   (17) Evidence as to the payment in full on the Closing Date of all material allowed administrative expense claims, priority claims and other claims under the Plan of Reorganization required to be paid on the Closing Date in a manner satisfactory to the Required Lenders;

(17)   (18) Evidence that the form and substance of (i) a business plan and projections of the Loan Parties and (ii) the debt and equity capital structure of the Loan Parties and their parent entities (including Organizational Documents), in each case, after giving effect to the Transactions, are satisfactory to the Required Lenders;

(18)   (19) Evidence that the Transactions will be consummated on the Plan Effective Date and that the Plan Effective Date will occur in accordance with the Plan of Reorganization;

(19)   (20) Evidence that, other than as a result of the bankruptcy cases of the Loan Parties filed on the Petition Date and any successor cases (and the events resulting therefrom), since the Petition Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Occurrence;

(20)   (21) Evidence that there is no threatened or pending litigation or other proceedings with respect to the Transactions;

(21)   (22) The Holdco Facility shall be issued in accordance with the Plan of Reorganization, on terms and pursuant to documentation acceptable to the Required Lenders, and the Administrative Agent shall have received copies of the executed documentation for the same; and

(22)   (23) The Borrower and each of the Guarantors shall have provided the documentation and other information to the Administrative Agent (to the extent reasonably requested by the Administrative Agent in writing at least five (5) Business Days prior to the Closing Date) that are required by regulatory authorities under the applicable "know-your-customer" rules and regulations, including the PATRIOT Act, in each case at least two (2) Business Days prior to the Closing Date.

The making of the Advance hereunder shall not constitute a waiver by the Administrative Agent or any Lender of any right which the Administrative Agent or such Lender may have in the event that any certificate, agreement, financial statement or other document delivered pursuant to this Section 3.1 or otherwise in connection with the transactions contemplated by this Agreement shall prove to have been false or misleading in any respect.

**3.2**   **Conditions Precedent to All Advances**.  The obligation of the Lenders to make any Advance and the L/C Issuer to Issue Letters of Credit hereunder, including the establishment of the Initial Term Loans on the Closing Date, shall be further subject to the satisfaction of each of the following conditions immediately prior to or contemporaneously with each such Advance, unless waived in writing by the Administrative Agent:

(a)      A Notice of Borrowing and/or L/C Request appropriately completed and duly executed by the Borrower;

(b)      The representations and warranties set forth in <u>Article IV</u> and in each of the other Loan Documents are true and correct in all material respects on the date of and after giving effect to the making of the Advance or incurrence of Letter of Credit Obligations (except, in the case of any representation and warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or period, as the case may be) and any representation and warranty that is qualified by references to materiality or Material Adverse Occurrence or similar term or qualification, shall be true and correct in all respects, except that the representations and warranties set forth in <u>Section 4.5</u> as to the financial statements of the Borrower shall be deemed to be updated to refer to the audited and unaudited financial statements of the Borrower, as the case may be, most recently delivered to the Administrative Agent pursuant to <u>Section 5.1</u>; and

(c)      No Default or Event of Default shall then have occurred and be continuing on the date of the making of the Advance or incurrence of Letter of Credit Obligations.

The delivery of a Notice of Borrowing or L/C Request by the Borrower shall constitute a certification by the Borrower, binding upon the Borrower as to the matters set forth in subsections (b) and (c) above.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and each of the Lenders that as of the Closing Date and as of the date of each Advance,

**4.1      Organization; etc.** Each Loan Party is a limited liability company or corporation, as the case may be, validly organized and existing and in good standing under the laws of the state of its organization, has full power and authority to own its property and conduct its business as conducted by it and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence.  A list of jurisdictions in which such Loan Party is qualified to do business is set forth in <u>Annex I</u>.  Each Loan Party has full power and authority to enter into and to perform its obligations under the Loan Documents to which it is a party and, in the case of the Borrower only, to request Advances under this Agreement.  Each Loan Party has all licenses, permits and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its Property, except for permits, licenses, and rights the failure of which to have or obtain would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Occurrence.

**4.2      Due Authorization**.  The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party (a) have been duly authorized by all necessary corporate or limited liability company action, as the case may be, (b)  do not and will not conflict with, result in any violation of or constitute any default under, (i) any provision of the organizational, constitutive or governing documents (including, as applicable, articles of organization and operating agreements) of such Loan Party, (ii) any other material agreement binding on or applicable to such Loan Party, or (iii) any of their respective Property, or any law or governmental regulation or court decree or order binding upon or applicable to such Loan Party, or any of the Property and (c) will not result in the creation or imposition

of any Lien on any of such Loan Party's Property pursuant to the provisions of any agreement binding on or applicable to such Loan Party, or such Property, except any such Liens created pursuant to the Security Documents in favor of the Administrative Agent, for the benefit of the Secured Parties and Permitted Liens, except with respect to any breach, contravention or violation referred to in clauses (b) (ii) and (b)(iii), to the extent that such breach, contravention or violation would not reasonably be expected to result in a Material Adverse Occurrence.

**4.3**   **Subsidiaries**.  As of the Closing Date, no Loan Party has any Subsidiaries except those listed on <u>Annex II</u>, which correctly sets forth the name of each Subsidiary, the jurisdiction of its incorporation and the percentage ownership of each Subsidiary which is owned, of record or beneficially, by such Loan Party and/or one or more of its Subsidiaries.  Each Loan Party and its Subsidiaries has good and marketable title to all of the Equity Interests or Equity Interests Equivalents it owns in each of its Subsidiaries, free and clear of any Lien (other than any Liens in favor of the Administrative Agent for the benefit of the Secured Parties and inchoate Permitted Liens) and all such shares have been duly issued and are fully paid and non-assessable.  Each Loan Party has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and is duly licensed or qualified and in good standing in each other jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence.  As of the Closing Date, a list of the jurisdictions in which each Loan Party is qualified to do business is set forth on the attached <u>Annex II</u>.  Each Loan Party has full power and authority to own and operate its properties, to carry on its business as now conducted and to enter into and perform the Loan Documents to which it is a party.  Each Loan Party has all licenses, permits, and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its properties, except for permits, licenses, and rights the failure of which to have or obtain, individually or in the aggregate, is not, and will not result in, a Material Adverse Occurrence.

**4.4**   **Validity of the Agreement**.  Each Loan Document is the legal, valid and binding obligation of each Loan Party and is enforceable in accordance with its terms except that, as to enforcement of remedies, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' and secured parties' rights generally or by equitable principles relating to enforceability, regardless of whether considered in equity or at law.

**4.5**   **Financial Statements**.

(a)   The most recent financial statements furnished pursuant to <u>Section 5.1(a)</u> (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b)   The most recent financial statements furnished pursuant to <u>Section 5.1(b)</u> (i) were prepared in accordance with Modified GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes.

**4.6**     **Litigation; etc**.  There is no action, suit, claim, demand, disputes, cause of action, proceeding, arbitration or investigation at law or equity, or before or by any federal, state, local or other governmental department, commission, court, tribunal, board, bureau, agency or instrumentality, domestic or foreign, pending, or to the Knowledge of the Loan Parties, threatened in writing, against or affecting any Loan Party or any of its Properties, which if determined adversely would reasonably be expected to result in a Material Adverse Occurrence.

**4.7**     **Compliance with Law**.  No Loan Party is (a) in default or breach with respect to any judgment, order, writ, injunction, rule, regulation or decree of any court, governmental authority, department, commission, agency or arbitration board or tribunal or (b) in violation of any law, rule, regulation, ordinance or order relating to its or their respective businesses, in each case of (a) and (b) above, the breach, default or violation of which would reasonably be expected to result in a Material Adverse Occurrence.

**4.8**     **ERISA Compliance**.  With respect to each Plan which is an employee pension benefit plan (as defined in Section 3(2) of ERISA) that is intended to be qualified under Section 401(a) of the Code, the Internal Revenue Service has issued a determination that each such Plan is qualified in form under Section 401(a) and related provisions of the Code, and that each related trust or custodial account is exempt from taxation under Section 501(a) of the Code, and nothing has occurred since the date of that determination that could reasonably be expected to adversely affect the qualified status of such Plan.  All Plans comply with ERISA and other applicable laws, except as would not reasonably be expected to result in a Material Adverse Occurrence.  There exist with respect to the Loan Parties no Multiemployer Plans, for which a material withdrawal or termination liability may be incurred.  There exist with respect to all Plans or trusts:  (a) no failure to satisfy the minimum funding standard within the meaning of ERISA, whether or not waived; (b) no termination of any Plan or trust which would result in any material liability to the PBGC or any "reportable event," as that term is defined in ERISA, which is likely to constitute grounds for termination of any Plan or trust by the PBGC; (c) no "prohibited transaction," as that term is defined in ERISA, which is likely to subject the Borrower to any material tax or penalty on prohibited transactions imposed by Section 4975 of the Code, and (d) no pending disputes, arbitrations, claims, suits, grievances or governmental audits involving any Plan (other than routine claims for benefits payable under any such Plan) that could reasonably be expected (individually or in the aggregate) to result in a Material Adverse Occurrence.

**4.9**     **Title to Assets**.  Each Loan Party holds or will hold title to the Collateral, including any owned Real Property in fee simple and good, legal and marketable title to any Equipment, in each case and used in its business and pledged as Collateral for the Obligations, free and clear of all Liens except for Permitted Liens and other encumbrances permitted pursuant to Section 6.3, except where the failure to have such title would not reasonably be expected to result in a Material Adverse Occurrence.  Except for Uniform Commercial Code financing statements evidencing Permitted Liens, or Uniform Commercial Code financing statements for which terminations will be tendered to the Administrative Agent prior to or contemporaneously with the first Advance for any Unit, no financing statement under the Uniform Commercial Code as in effect in any jurisdiction and no other filing which names any Loan Party as debtor or which covers or purports to cover any of the Collateral, including Real Property or Equipment pledged as Collateral for the Obligations, will be effective and on file in any state or other jurisdiction, and no Loan Party will sign or authorize any such financing statement or filing or any security agreement authorizing any secured party thereunder to file any such financing statement or filing other than in favor of Administrative Agent.

**4.10**     **Use of Proceeds**.  Proceeds of the Loans shall be used (i) to pay certain fees, costs and expenses incurred in connection with the other transactions contemplated by this Agreement, and (ii) to

66

refinance certain Indebtedness of the Borrower and its Subsidiaries as contemplated by the Plan of Reorganization and (iii) to fund working capital and general corporate purposes.

**4.11** **Governmental Regulation**. No Loan Party is required to obtain any material consent, approval, authorization, permit or license which has not already been obtained from, or effect any material filing or registration (other than the filing of the Uniform Commercial Code financing statements) which has not already been effected with, any federal, state or local regulatory authority in connection with the execution and delivery of this Agreement or the performance, in accordance with their respective terms, of this Agreement or any other Loan Document except for any consent, approval, authorization, permit or license, the failure of which to obtain or make would not reasonably be expected to result in a Material Adverse Occurrence.

**4.12** **Margin Stock**. No part of any Advance shall be used at any time by any Loan Party to purchase or carry margin stock (within the meaning of Regulations T, U and X) or to extend credit to others for the purpose of purchasing or carrying any margin stock. No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purposes of purchasing or carrying any such margin stock. No part of the proceeds of any Advance will be used by any Loan Party for any purpose which violates, or which is inconsistent with, any regulations promulgated by the Board of Governors of the Federal Reserve System.

**4.13** **Investment Company Act**. No Loan Party is registered or required to be registered as an "investment company," or an "affiliated person" of, or a "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended. The making of the Advances, the application of the proceeds and repayment thereof by the Borrower and the performance by each Loan Party of the transactions contemplated by this Agreement will not violate any provision of said Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.

**4.14** **Accuracy of Information**. All written information heretofore furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders for purposes of or in connection with this Agreement or any transaction contemplated by this Agreement is, and all other such information furnished by or on behalf of such Loan Party to the Administrative Agent is, when considered as a whole, complete and correct in all material respects and did not, when delivered, contain any untrue statement of material fact or omit to state a fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements have been made (after giving effect to all supplements thereto).

**4.15** **Tax Returns; Audits**. Each Loan Party has filed all federal, and material state and local tax returns and other material reports which are required to be filed, and has paid all material taxes as shown on said returns and on all assessments received by any such Person (except for any assessments which are being contested in good faith by appropriate proceedings that will prevent a forfeiture or sale of any property and for which an adequate reserve has been provided on the books of such Loan Party in accordance with GAAP), to the extent that such taxes have become due or has obtained extensions with respect to the filing of such returns and has made provision in accordance with GAAP for the payment of taxes anticipated to be payable in connection with such returns. Each Loan Party has made all material required withholding deposits.

**4.16** **Environmental and Safety Regulations**. Each Loan Party is in compliance with all requirements of applicable federal, state and local environmental, pollution control, health and safety statutes, laws and regulations except for any noncompliance which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Occurrence and is not, to the knowledge

of each Loan Party, the subject of any federal or state investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, except for any investigation which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence.  The Borrower further represents and warrants that the Real Property and its intended use complies with all applicable laws, governmental regulations and the terms of any enforcement action by any federal, state, regional or local governmental agency regarding all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus under such laws, except in each case for any noncompliance which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence.  Each Loan Party further represents and warrants that no written notice, demand, request for information, citation, summons or order has been issued, no complaint has been filed, no penalty has been assessed and, to the knowledge of each Loan Party, no investigation or review is pending or threatened by any governmental or other entity with respect to any alleged failure by such Loan Party to comply in any respect with any of such environmental laws, except in each case which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence (each of the foregoing, an "Environmental Action").

      **4.17**    **Payment of Wages; Labor Matters**.  The Borrower is in compliance with the Fair Labor Standards Act, as amended, in all material respects, and the Borrower has paid all minimum and overtime wages required by law to be paid to their respective employees. There are no strikes, work stoppages, slowdowns or lockouts existing, pending or, to the Knowledge of the Loan Parties, threatened against or involving any Loan Party or any Subsidiary of any Loan Party, except for those that would reasonably be expected to result in a Material Adverse Occurrence.  Except as set forth on Schedule 4.17, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Loan Party or any Subsidiary of any Loan Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Loan Party or any Subsidiary of any Loan Party and (c) to the knowledge of any Loan Party, no such representative has sought certification or recognition with respect to any employee of any Loan Party or any Subsidiary of any Loan Party.

      **4.18**    **Intellectual Property**.  Each Loan Party owns, possesses or has the right to use all material licenses and rights to all patents, trademarks, trademark rights, trade names, trade name rights, trade dress, service marks, domain marks and copyrights necessary to conduct their business in all material respects as now being conducted, to the Knowledge of the Loan Parties, without material conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, in each case of all of the foregoing, except where the failure to own, possess or have the right to use such intellectual property, or conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person, would not reasonably be expected to result in a Material Adverse Occurrence.  All such material licenses and rights with respect to patents, trademarks, trademark rights, trade names, trade name rights, service marks and copyrights are, to the Knowledge of the Loan Parties, in full force and effect in all material respects.

      **4.19**    **Projections**.  The budget projections of the Borrower, furnished annually to the Administrative Agent, consisting of balance sheets, cash flow statements and income statements of the Borrower and its Subsidiaries after giving effect to the making of the Advances hereunder and the application of the proceeds thereof, together with supporting details and a statement of underlying assumptions, have been prepared in the light of the past business history of the Borrower and its

Subsidiaries and on the basis of the assumptions set forth therein, which assumptions are in the opinion of the Borrower reasonable at the time such budget projections were prepared (it being recognized that budget projections may differ from actual results and such differences may be material and such budget projections are subject to significant uncertainties and contingencies which are beyond the Borrower's control and no assurance can be given that any particular projection will be realized).

4.20    **Solvency**.  After giving effect to the transactions contemplated by this Agreement, as of the Closing Date, the Loan Parties and their Subsidiaries, on a consolidated and combined basis, have capital sufficient to carry on their business, are solvent and are able to pay their debts and obligations as they mature in the ordinary course.  After giving effect to the consummation of the transactions contemplated by this Agreement, as of the Closing Date, the Loan Parties and their Subsidiaries, on a consolidated and combined basis, now own Property having a value, both at fair valuation and at present fair saleable value, greater than the amount required to pay their debts, obligations and contingent liabilities as they mature in the ordinary course.

4.21    **No Material Adverse Occurrence**.  Since the date of the most recent audited financial statements submitted to the Administrative Agent and the Lenders as described in Section 4.5, there has occurred no event which is or which could reasonably be expected to result in a Material Adverse Occurrence.

4.22    **[Reserved]**.

4.23    **Deposit Accounts**.  Schedule 4.23 lists all banks and other financial institutions at which any Loan Party maintains deposit or other accounts as of the Closing Date, and such Schedule correctly identifies the name, address and any other relevant contact information reasonably requested by the Administrative Agent with respect to each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

4.24    **[Reserved]**.

4.25    **[Reserved].**

4.26    **Valid Liens**.  The Security Agreement and each other Security Document delivered pursuant hereto will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties to the secure the Obligations, legal, valid and enforceable Liens on, and security interests in, each Loan Party's right, title and interest in and to the Collateral thereunder, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Security Document), such Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of each Loan Party in such Collateral, in each case subject to no Liens other than the applicable Permitted Liens.

4.27    **Foreign Assets Control Regulations and Anti-Money Laundering**.  The Borrower is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  The Borrower (i) is not a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions,

(ii) is not a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is not controlled by (including by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

**4.28** **Patriot Act**.  The Loan Parties, each of their Subsidiaries and, to their knowledge, each of their Affiliates, are in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations.  No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

**4.29** **Insurance.**  The Borrower and its Subsidiaries maintain insurance policies with respect to their respective properties and business, in each case in compliance with Section 5.7.

**4.30** **SBA Matters.**  Each of Holdings and the Borrower acknowledges that Brightwood Capital SBIC I, LP is, and certain other Lenders may from time to time be or become, a Small Business Investment Company (as defined in the SBIA), subject to the rules and regulations contained in and promulgated under the SBIA. As of the Closing Date, each of Holdings and the Borrower, together with its "affiliates" (for purposes of this paragraph only, as that term is defined in Title 13, Code of Federal Regulations, §121.103), is a Small Business Concern (as defined in the SBIA). Neither Holdings nor any of its Subsidiaries presently engages in, and shall not hereafter engage in, any activities for which a Small Business Concern is prohibited from engaging in under the SBIA, nor shall any such Person use directly or indirectly the proceeds of the Loans for any purpose for which a Small Business Investment Company is prohibited from providing funds by the SBIA. The representations made by Holdings and Borrower in the SBA forms delivered on the Closing Date pursuant to Section 5.13 (or such later date of delivery) shall be deemed to be representations made by Holdings and Borrower as of the Closing Date (or such later date) under this Section 4.29.

**ARTICLE V**
**CERTAIN AFFIRMATIVE COVENANTS**

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Loan shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**5.1** **Financial Information; etc**.  The Borrower will furnish to the Administrative Agent copies of the following financial statements, reports and information:

(a)    (i) as soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year (or by May 31, 2026 in the case of the fiscal year ended December 31, 2025) of the Borrower (commencing with the fiscal year ended December 31, 2025), a copy of the consolidated and combined audited financial statements, including balance sheet, related statements of operations, and statements of cash flows, of the Borrower and its Subsidiaries for such fiscal year, with comparative figures for the preceding fiscal year, prepared in accordance with GAAP, certified without qualification or exception by Deloitte & Touche

LLP, or such other nationally recognized auditor that is not subject to qualification as to "going concern" or the scope of such audit (other than an upcoming maturity date of any Indebtedness (including the termination of the Revolving Loan Commitments or the commitments under any other revolving credit facility) occurring within one (1) year from the time such opinion is delivered), accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with GAAP for such period, and a written management's discussion and analysis of the financial condition and results of operations for such fiscal year, as compared to the previous fiscal year and budgeted amounts, and (ii) as soon as available, and in any event within thirty (30) days after the delivery of audited financial statements pursuant to clause (a)(i) above for the applicable fiscal year, a reasonably detailed unaudited reconciliation (which shall not be required to be (x) attached or appended to the Borrower's audited financial statements or (y) audited or reviewed in any manner by the Borrower's auditor) reflecting the audited financial statements presented in accordance with GAAP for such fiscal year, on the one hand, and management-prepared unaudited financial statements presented in accordance with Modified GAAP for such fiscal year, on the other hand;

(b)      (i) as soon as available and in any event within sixty (60) days after the end of each fiscal quarterly period of each fiscal year of the Borrower, consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with Modified GAAP for such period, (subject to year-end adjustments and the lack of footnotes), and a written management's discussion and analysis of the financial condition and results of operations for such fiscal quarter and the then elapsed portion of the fiscal year, as compared to the comparable periods in the previous fiscal year and budgeted amounts, and (ii) as soon as available and in any event within seventy (70) days after the end of each fiscal quarterly period of each fiscal year of the Borrower and no later than ten (10) days after delivery of reports pursuant to clause (i), a site-level "databook" for the last month of such fiscal quarter (substantially in the same form as has been previously delivered to the Administrative Agent) detailing the following information by site: for each Unit and with respect to each such quarterly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (e) volume of retail traffic, (f) volume of total traffic, (g) chemical expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(c)      (i) as soon as available and in any event within forty-five (45) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year and (ii) as soon as available and in any event within fifty-five (55) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower and no later than ten (10) days after delivery of the reports and certificates pursuant to clause (i), a site-level "databook" for such

71

fiscal month (substantially in the same form as has been previously delivered to the Administrative Agent) detailing the following information by site: for each Unit and with respect to each such monthly period, (a) revenue from such Unit's Wash Club, (b) revenue from retail, (c) total revenue, (d) Actual Tunnel Volume, (c) volume of retail traffic, (f) volume of total traffic, (g) chemical expenses, (h) expenses for labor, (i) expenses for repairs and maintenance, (j) expenses for utilities, (k) other costs of goods sold, (l) gross profit or loss, (m) expenses for rent, (n) other expenses, (o) 4-Wall EBITDA, and (p) Wash Club Membership;

(d)      with each financial statement required by Section 5.1(a) and Section 5.1(b) (other than the last fiscal quarter of such year) to be delivered to the Administrative Agent, a Compliance Certificate signed by a Responsible Officer of the Borrower;

(e)      promptly after the Borrower knows or has reason to know that any Default has occurred and is continuing or Material Adverse Occurrence has occurred, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice of such Default or Material Adverse Occurrence describing the same in reasonable detail and a description of the action that the Borrower has taken and proposes to take with respect thereto;

(f)      promptly after receipt thereof, but in any event not later than five (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, all final letters and reports to management of the Borrower prepared by its independent certified public accountants and the responses of the management of the Borrower thereto;

(g)      promptly following the commencement of any litigation, suit, administrative proceeding or arbitration relating to the Borrower or any of its Properties which if adversely determined would reasonably be expected to result in a Material Adverse Occurrence or otherwise relating in any way to the transactions contemplated by this Agreement, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice thereof describing the allegations of such litigation, suit, administrative proceeding or arbitration and the Borrower's response thereto;

(h)      promptly following the commencement of any Environmental Action, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice describing the allegations of such Environmental Action;

(i)      promptly following the occurrence of, but in any event not later than (5) Business Days after any Responsible Officer of the Borrower becomes aware thereof, any "reportable event" or "prohibited transaction" or the imposition of a withdrawal or termination liability within the meaning of ERISA in connection with any Plan or Multiemployer Plan that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower, and, when known, any action taken by the Internal Revenue Service, Department of Labor or PBGC that would reasonably be expected to result in a Material Adverse Occurrence to the Borrower with respect thereto;

(j)      within sixty (60) days of each fiscal year end thereafter, a copy of the updated annual budget and financing projections for the Borrower for each fiscal quarter for such fiscal year, with discussion of principal assumptions upon which such budget is based;

(k)      [reserved];

(l)     promptly upon the delivery to or receipt from the ABL Agent, copies of (i) all amendments, waivers or other material modifications to any of the loan documents governing the ABL Facility; (ii) copies of all material notices, including notices of default or acceleration with respect to the ABL Facility and (iii) monthly borrowing base certificates and, upon request of the Administrative Agent, any other material collateral reporting (including, without limitation, any other borrowing base certificates) required to be delivered to the ABL Lenders under the ABL Facility, if any; and

(m)     such other information with respect to the financial condition and operations of the Borrower as the Administrative Agent or any Lender may reasonably request (subject to the Disclosure Limitations).

Notwithstanding the foregoing, the obligations in paragraphs (a), (b), (c) and (j) of this Section 5.1 may be satisfied by furnishing the applicable financial statements or other information required by such paragraphs of Holdings, Parent (or any other parent company), in each case, within the time periods specified in such paragraphs; provided, that (i) to the extent such financial statements, reports or other information relate to Holdings, Parent (or any other parent company), such financial statements, reports and information shall be accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Holdings, Parent (or any other parent company), on the one hand, and the information relating to the Borrower on a standalone basis, on the other hand, which consolidating information shall be certified by a Responsible Officer of the Borrower as having been fairly presented in all materials respects.

5.2     **Maintenance of Existence; etc**.  Each Loan Party shall maintain and preserve its existence, and qualification and good standing in all states in which such qualification and good standing are required in order to conduct its business and own its property as conducted and owned in such states, except where the failure to do so would not reasonably be expected to result in a Material Adverse Occurrence.

5.3     **Maintenance of Properties**.  Each Loan Party will maintain or cause to be maintained in the ordinary course of business in good repair, working order and condition (reasonable wear and tear excepted) all material Properties used in their respective businesses (whether owned or held under lease), and from time to time make or cause to be made all necessary repairs, renewals, replacements, additions, betterments and improvements thereto, except to the extent the failure to maintain such Properties would not reasonably be expected to result in a Material Adverse Occurrence.

5.4     **Payment of Liabilities**.  Each Loan Party shall pay and discharge as the same may become due and payable, all material taxes, assessments and other governmental charges or levies against or on any of its Property, as well as all other lawful claims of any kind which, if unpaid, might become a Lien upon any of its Property; provided, however, that the foregoing shall not require such Loan Party to pay any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested diligently in good faith by appropriate proceedings that will prevent a forfeiture or sale of any Property and an adequate book reserve in accordance with GAAP shall have been set aside with respect thereto, but (with respect to claims that are not Taxes, assessments and other governmental charges or levies) only so long as such claim does not become a Lien on any assets of such Loan Party.

5.5     **Compliance with Laws**.  Each Loan Party shall carry on its business activities in substantial compliance with all applicable federal or state laws and all applicable rules, regulations and orders of all governmental bodies and offices having power to regulate or supervise its business activities, including all applicable environmental, pollution control, health and safety statutes, laws and regulations, except in each case where the failures to so comply would not reasonably be expected to result in a

Material Adverse Occurrence; provided that nothing in this Section 5.5 shall impair the obligations of the Loan Parties in Section 5.15. Each Loan Party shall maintain all material rights, liens, permits, certificates of compliance or grants of authority necessary for the conduct of its business, except where the failure to maintain would not reasonably be expected to result in a Material Adverse Occurrence. Each Loan Party agrees that the Real Property and its intended use will comply at all times with all applicable laws, governmental regulations and the terms of any enforcement action now or hereafter commenced by any federal, state, regional or local governmental agency, including all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended from time to time), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus, except where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence.

　　　　5.6　　**Books and Records; Inspection Rights; etc**. Each Loan Party shall keep (a) a system of accounting administered in accordance with GAAP and (b) books and records reflecting all of its business affairs and transactions in accordance with GAAP. Each Loan Party shall permit the Administrative Agent (accompanied by any Lender) or any representative thereof, at reasonable times and intervals, during normal business hours and upon reasonable notice to the Borrower, to visit the offices of such Loan Party, discuss financial matters with Responsible Officers of such Loan Party and with its independent public accountants (and by this provision each Loan Party authorizes its independent public accountants to participate in such discussions) and examine any of the such Loan Party's books and other company records in a non-disruptive manner; provided, that unless an Event of Default has occurred and is continuing there shall be no more than one such inspection or visit per year. Notwithstanding anything to the contrary in this Section 5.6, no Loan Party will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information, that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) the disclosure of which is restricted by binding agreements with a third party that is not a controlled Affiliate of any Loan Party (collectively, the "Disclosure Limitations").

　　　　5.7　　**Insurance**. Each Loan Party will:

　　　　　　(a)　　Maintain insurance including, but not limited to, business interruption coverage, and public liability coverage insurance from responsible companies in such amounts and against such risks to such Loan Party as is prudent and reasonably satisfactory to the Administrative Agent; provided that the Administrative Agent acknowledges that the insurance maintained by the Loan Parties as of the Closing Date is satisfactory;

　　　　　　(b)　　Keep its tangible assets insured by responsible companies against loss or damage by fire, theft, burglary, pilferage, loss in transit, explosions and hazards in amounts which are prudent for the carwash industry, in accordance with industry standards, all premiums thereon to be paid by the Loan Parties;

　　　　　　(c)　　With respect to each Unit, if at any time the area in which any Improvements located on such Unit is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), (i) obtain flood insurance in such total amount as required by Flood Insurance Laws, and otherwise comply with the Flood Insurance Laws and (ii) deliver to the Administrative Agent

evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent, including a copy of the flood insurance policy and a declaration page relating to the insurance policies required by this <u>Section 5.7</u> which shall (a) identify the addresses of each parcel of Real Property located in a special flood hazard area, (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (c) provide that the insurer will give the Administrative Agent thirty (30) days written notice of cancellation or non-renewal and shall include evidence of annual renewals of such insurance and (iii) shall be otherwise in form and substance satisfactory to the Administrative Agent;

(d)     Require that each insurance policy for the Collateral provide for at least thirty (30) days' prior written notice to the Administrative Agent of any termination of or proposed cancellation or non-renewal of such policy, or material reduction in coverage, and name the Administrative Agent for the Secured Parties as additional named loss payee or additional named insured, as applicable;

**5.8     ERISA**.  The Borrower agrees that all assumptions and methods used to determine the actuarial valuation of employee benefits, both vested and unvested, under any Plan, and each such Plan, will comply in all material respects with ERISA and other applicable laws.

(a)     The Borrower will not at any time permit any Plan to:

(1)     engage in any "prohibited transaction" for which an exemption is not available as such term is defined in Section 4975 of the Code or in Section 406 of ERISA;

(2)     fail to satisfy the minimum funding standard as such term is defined in Section 302 of ERISA, whether or not waived;

(3)     be terminated under circumstances which are likely to result in the imposition of a lien on the property of the Borrower pursuant to Section 4068 of ERISA, if and to the extent such termination is within the control of the Borrower; or

(4)     be operated or administered in a manner which is not in compliance with ERISA or any applicable provisions of the Code;

if the event or condition described in (1), (2), (3) or (4) above would reasonably be expected to subject the Borrower to a Material Adverse Occurrence.

(b)     Upon the request of the Administrative Agent or any Lender, the Borrower will furnish a copy of the annual report of each Plan (Form 5500) required to be filed with the Internal Revenue Service.  Copies of such annual reports shall be delivered no later than thirty (30) days after the date the copy is requested.

**5.9     Additional Subsidiary Guarantors; Post-Closing Requirements**.

(a)     Within thirty (30) days (or such longer period as agreed by the Administrative Agent in its discretion) after the Borrower or any of its Subsidiaries creates or acquires an entity which is or becomes a Subsidiary, cause such Person (other than an Excluded Foreign Subsidiary) to (i) become a Guarantor by executing and delivering to the Administrative Agent a counterpart of the Guaranty or such other document as the Administrative Agent shall reasonably deem appropriate for such purpose, (ii) take all such action and execute such agreements, documents and instruments, including execution and delivery of a counterpart

signature page to the Security Agreement and execution and delivery of such other Security Documents, that may be necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a first priority perfected security interest and Lien in any Collateral owned by such new Subsidiary and (iii) deliver to the Administrative Agent documents of the types referred to in Section 3.1(a)(7) and, if reasonably requested by the Administrative Agent, favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clauses (i) and (ii) of this subsection), all in form, content and scope reasonably satisfactory to the Administrative Agent.

(b)     The Borrower shall or shall cause the applicable Loan Parties to deliver to the Administrative Agent within sixty (60) days after the Closing Date (or such longer period as agreed by the Administrative Agent in its discretion), customary insurance endorsements naming the Administrative Agent, for the benefit of the Secured Parties, as lender loss payee/additional insured, as applicable, on behalf of the Secured Parties pursuant to the requirements of Section 5.7.

(c)     The Borrower shall or shall cause the applicable Loan Parties to deliver to the Administrative Agent within sixty (60) days after the Closing Date (or such longer period as agreed by the Administrative Agent in its discretion), control agreements with respect to bank accounts of the Borrower and its Subsidiaries to the extent required by Section 5.11.

(d)     To the extent requested by the Administrative Agent, with respect to any such Material Real Property owned by the Borrower and its Subsidiaries as of the Closing Date, within ninety (90) days after the Closing Date, or with respect to any Material Real Property acquired after the Closing Date, within ninety (90) days after the applicable date of acquisition thereof (or, in either case, such longer period as agreed by the Administrative Agent in its discretion), as applicable, deliver mortgages or deeds of trust (together with customary supporting documentation reasonably required by Administrative Agent, including title insurance), with respect to all Material Real Property owned by the Borrower and its Subsidiaries, in each case, in customary form and in form and substance reasonably satisfactory to the Administrative Agent; provided, that in no event shall any mortgages or supporting documentation be required with respect to the Specified Real Estate.

(e)     The Borrower shall deliver to the Administrative Agent consolidated and combined audited financial statements, including balance sheet, related statements of operations, and statements of cash flows, of the BorrowerZips and its Subsidiaries (i) for the fiscal year ended December 31, 2023 by JuneJuly 301, 2025 (or such later date as agreed by the Administrative Agent in its discretion) and (ii) for the fiscal year ended December 31, 2024 by [December 31, 2025] (or such later date as agreed by the Administrative Agent in its discretion).

(f)     The Borrower shall, or shall cause the applicable Loan Parties to, deliver to the Administrative Agent within thirty (30) days after the Closing Date (or such longer period as agreed by the Administrative Agent in its discretion) a certificate from the applicable Loan Party's insurance broker, or other evidence satisfactory to the Administrative Agent, that all insurance required to be maintained pursuant to Section 5.7 is in full force and effect, together with endorsements naming the Administrative Agent, for the benefit of the Secured Parties, as additional insured and loss payee thereunder.

5.10    **[Reserved]**.

5.11    **Cash Management Systems**.  Within sixty (60) days after the Closing Date, unless waived or extended by the Administrative Agent in its sole discretion, the Borrower shall enter into, and cause each depository, securities intermediary or commodities intermediary to enter into, control agreements subject to the provisions in the Security Agreement.

5.12    **Further Assurances**.  Promptly upon reasonable request by the Administrative Agent, the Borrower shall (and, subject to the limitations hereinafter set forth, shall cause the other Loan Parties to) take such additional actions and execute such documents as the Administrative Agent may reasonably request from time to time in order (i) to carry out the purposes of this Agreement or any other Loan Documents; provided, that the Borrower and the other Loan Parties shall not be obligated to take any such actions or execute such documents to the extent that such actions or documents would impose any additional obligations not set forth herein on such Loan Party, (ii) to subject to the Liens in the Collateral granted by any of the Security Documents any of the Collateral and (iii) to perfect and maintain the validity, effectiveness and priority of the Liens granted by any of the Security Documents and the Liens intended to be created thereby.

5.13    **SBA Matters**.  Each of Holdings and Borrower will, and will cause each of its Subsidiaries to: (a) upon the request of any Lender that is a Small Business Investment Company (as defined in the SBIA), repay such Lender's Loan in full (including the applicable prepayment fee), in immediately available funds, in the event that Borrower or any other Loan Party changes the nature of its business within one year after the Closing Date (or, if applicable, any later borrowing date hereunder) in a manner that would cause such Lender to have provided funds to Borrower or any other Loan Party pursuant to this Agreement or any other Loan Document in violation of 13 C.F.R. §§ 107.700-107.760 (as amended from time to time); (b) upon the request of any Lender that is a Small Business Investment Company or the SBA, (i) submit to such Lender and/or the SBA timely and accurate compliance reports at such times and in such form and containing such information as the SBA may determine to be necessary to enable the SBA to ascertain whether Borrower and each other Loan Party have complied or are complying with 13 C.F.R. Part 112 ("Part 112"), (ii) submit to such Lender such information as may be necessary to enable such Lender to meet its reporting requirements under Part 112, and (iii) permit the SBA to have access with advance written notice and during normal business hours to such of its books, records, accounts and other sources of information, and its facilities as may be pertinent to ascertain compliance with Part 112. Where any information required of the Borrower or any other Loan Party is in the exclusive possession of any other agency, institution or Person and such agency, institution or Person shall fail or refuse to furnish this information, Borrower and each other Loan Party shall so certify in its report and shall set forth what efforts it has made to obtain this information; and (c) upon any Lender's request, take any and all actions required to permit any Lender to comply with SBIA and applicable law, in the event such Lender is restricted or prohibited from holding Loans or Qualified Equity Interests in any Loan Party or any Affiliate thereof as a result of any noncompliance thereunder.

5.14    **OFAC; Patriot Act**.  The Loan Parties shall, and shall cause their Subsidiaries to, comply with the laws, regulations and executive orders referred to in Section 4.27 and Section 4.28 (subject to any materiality qualifiers set forth in such Section 4.27 and Section 4.28).

5.15    **Sale-Leaseback Accounting Treatment**. The Loan Parties shall, and shall cause their Subsidiaries to, employ best efforts to ensure that sale-leaseback transactions are treated as successful sale-leaseback transactions for GAAP accounting purposes. To the extent any sale-leaseback transactions are determined to be failed sale-leaseback(s) for accounting purposes under GAAP, Borrower shall promptly notify Administrative Agent (on behalf of itself and the Lenders).

**5.16** **Quarterly Lender Calls**. The Loan Parties shall, and shall cause their Subsidiaries to, participate in a meeting of the Lenders once during each fiscal quarter, to be held via teleconference, to discuss the financial performance of the Borrower and its Subsidiaries. Each such meeting shall be held at a time reasonably agreed between the Borrower and the Administrative Agent.

<div align="center">

**ARTICLE VI**
**FINANCIAL COVENANTS AND NEGATIVE COVENANTS**

</div>

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Advance shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**6.1** **Financial Covenants.**

(a) <u>Fixed Charge Coverage Ratio</u>. Commencing with the Test Period ending September 30, 2026, the Borrower shall not permit the Fixed Charge Coverage Ratio as of the last day of any Test Period to be less than 1.20 to 1.00.

(b) <u>First Lien Leverage Ratio</u>. Commencing with the Test Period ending September 30, 2026, the Borrower shall not permit the First Lien Leverage Ratio as of the date set forth in the table below for the Test Period ending on such date to be greater than the maximum ratio set forth in the table below opposite such date:

| Test Period | Maximum First Lien Leverage Ratio |
|---|---|
| Fiscal quarters ended September 30, 2026 and December 31, 2026 | 5.00:1.00 |
| Fiscal quarters ended March 31, 2027 and June 30, 2027 | 4.50:1.00 |
| Fiscal quarter ended September 30, 2027 and each fiscal quarter ended thereafter | 4.00:1.00 |

(c) <u>Equity Cure Contributions</u>. In the event the Borrower fails to comply with the Financial Covenants as oof any applicable Test Period, for purposes of determining compliance with the Financial Covenants, any cash equity contribution to the Borrower after the last day of the applicable fiscal quarter and on or prior to the day that is fifteen (15) Business Days after the day on which financial statements are required to be delivered for such fiscal quarter (each such contribution, an "<u>Equity Cure Contribution</u>") will, at the request of the Borrower, be included in the calculation of Consolidated EBITDA for purposes of determining compliance with the Financial Covenants for the applicable fiscal quarter and applicable subsequent periods; <u>provided</u>, that, in each case:

(1) (x) in any four fiscal quarter period, there shall be a period of at least two fiscal quarters in which no Equity Cure Contribution was made, and (y) only two Equity Cure Contributions may be made during the term of this Agreement,

(2)      the amount of any Equity Cure Contributions shall not exceed the amount required to cause the Borrower to be in compliance with the Financial Covenants,

(3)      all Equity Cure Contributions will be used solely for curing the Financial Covenants and will be disregarded for purposes of determining the availability of any baskets, pricing or step-downs with respect to other provisions contained in the Loan Documents and

(4)      there shall be no pro forma or other reduction of First Lien Debt (including by way of cash netting) using the proceeds of any Equity Cure Contribution for purposes of determining compliance for the fiscal quarter (and subsequent quarters in the applicable Test Period) in respect of which such Equity Cure Contribution was made.

For the avoidance of doubt, compliance with the then-applicable Financial Covenants set forth in this Section 6.1 with respect to (x) the fourth fiscal quarter of any fiscal year, shall be tested only based upon the Compliance Certificate delivered with respect to the annual financial statements referred to in Section 5.1(a) and (y) any other fiscal quarter shall be tested only based upon the Compliance Certificate delivered with respect to the quarterly financial statements referred to in Section 5.1(b).

**6.2**      **Limitations on Indebtedness**.  The Loan Parties shall not, and shall not permit any of their Subsidiaries to, create, assume, incur, issue, guarantee or otherwise become or remain obligated in respect of, or permit to be outstanding, any Indebtedness, except the following (the "Permitted Indebtedness"):

(a)      Indebtedness outstanding on the date hereof and listed on **Schedule 6.2(a)** and any refinancings, refundings, renewals or extensions thereof; provided that the principal amount of such Indebtedness is not increased from the original principal balance except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder;

(b)      the Obligations (including Incremental Term Loans);

(c)      Indebtedness representing deferred compensation to employees of any Loan Party incurred in the ordinary course of business or other similar arrangements incurred by such Person in connection with the any Permitted Acquisitions or any other Investment expressly permitted hereunder;

(d)      [reserved];

(e)      Indebtedness in the form of trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice, which Indebtedness shall not be secured by a Lien on any Property of the Borrower or its Subsidiaries;

(f)      Indebtedness of any Loan Party owed in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business or consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(g)     Indebtedness of a Loan Party in respect of performance bonds, bid bonds, appeal bonds, completion guaranties, surety bonds and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business, and any extension, renewal or refinancing thereof to the extent not provided to secure the repayment of other Indebtedness and to the extent that the amount of refinanced Indebtedness is not greater than the amount of Indebtedness being refinanced;

(h)     Indebtedness of a Loan Party arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(i)     Indebtedness consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(j)     Indebtedness incurred by a Loan Party in a Permitted Acquisition, any other Investment expressly permitted hereunder or any sale, in each case to the extent constituting indemnification obligations or obligations in respect of purchase price adjustments (including earn-outs and other deferred purchase price obligations) or other similar adjustments;

(k)     Guarantee(s) of any Loan Party incurred in the ordinary course of business in respect of obligations to suppliers, customers, franchisees, lessors and licensees;

(l)     obligations arising under any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantee(s) thereof;

(m)     Indebtedness of any Loan Party owing to another Loan Party;

(n)     Indebtedness (and Guarantees thereof) in respect of Swap Contracts designed to hedge against Holdings', the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks, in each case not for speculative purposes;

(o)     Indebtedness of any Loan Party assumed in connection with a Permitted Acquisition or Permitted Investment; provided that (i) such Indebtedness was not incurred or assumed in contemplation of such Permitted Acquisition or Permitted Investment, (ii) such Indebtedness is non-recourse to (and is not assumed by any of) the Borrower, Holdings or any Subsidiary (other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Guarantor after the Closing Date), (iii) the aggregate outstanding principal amount of all such Indebtedness shall not exceed $5,000,000 at any time, and (iv) no Default or Event of Default then exists or would result therefrom;

(p)     Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of Holdings (or any direct or indirect parent thereof)

80

permitted by Section 6.10; provided, that such Indebtedness shall be subordinated to the Obligations, on terms and conditions reasonably satisfactory to the Administrative Agent;

(q)    Guarantees by any Loan Party in respect of Indebtedness of any Loan Party otherwise permitted hereunder; provided that if such Indebtedness is subordinated to the Obligations, such Guarantee shall be subordinated to the same extent;

(r)    Indebtedness supported by a Letter of Credit, in a principal amount not to exceed the face amount of such Letter of Credit;

(s)    Indebtedness with respect to letters of credit listed on **Schedule 6.2(s)**;

(t)    Indebtedness for Real Property Taxes; provided the payment thereof is not required to be made pursuant to Section 5.4;

(u)    solely to the extent that the Supermajority Lenders have consented to the establishment of the ABL Facility, Indebtedness of any Loan Party under the ABL Facility in an aggregate principal amount not to exceed the amount permitted under the ABL/Term Intercreditor Agreement;

(v)    [Reserved];

(w)    Indebtedness with respect to Capital Leases and purchase money Indebtedness, in each case, incurred prior to or within one hundred and twenty (120) days after the acquisition, construction, lease or improvement of the applicable asset in an aggregate amount not to exceed $5,000,000 at any time;

(x)    to the extent that, as of any date of determination, there is no L/C Issuer hereunder and the ABL Facility has not yet been established, Indebtedness under commercial, trade and standby letters of credit (including reimbursement obligations with respect thereto) in the ordinary course of business or incurred in order to support or backstop any performance or surety bonds permitted to be issued and/or incurred under clause (g) above; and

(y)    any other Indebtedness of any Loan Party; provided that the aggregate outstanding principal amount of all such unsecured Indebtedness shall not exceed $5,000,000 at any time.

**6.3    Liens**.  The Loan Parties shall not, and will cause their Subsidiaries not to, create, incur, assume or permit to exist or to be created or assumed any Lien on any of its assets, whether now owned or hereafter acquired, except the following (the "Permitted Liens"):

(a)    Liens existing on the Closing Date and set forth on **Schedule 6.3**;

(b)    Liens arising by operation of law on the Real Property for real estate taxes and Liens securing Taxes, assessments or governmental charges or levies or the claims or demands of contractors, materialmen, mechanics, carriers, warehousemen, landlords and other like Persons; provided the payment thereof is not required to be made pursuant to Section 5.4 hereof;

(c)    Liens incurred or deposits made in the ordinary course of business (1) in connection with workmen's compensation, unemployment insurance, social security and other

like laws or (2) to secure the performance of letters of credit, bids, tenders, sales contracts, leases, statutory obligations, surety, appeal and performance bonds and other similar obligations not incurred in connection with the borrowing of money, the obtaining of advances or the payment of the deferred purchase price of the Real Property or Equipment and, in the case of this clause (2) only, not in excess of 2,500,000 in the aggregate outstanding at any one time;

(d)        attachments, judgment and other similar Liens arising in connection with court proceedings, provided the execution or other enforcement of such Liens is stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings in such manner as not to have the Real Property or Equipment subject to such Liens forfeitable in accordance with Section 5.4;

(e)        easements, rights-of-ways, reservations, exceptions, minor encroachments, rights of entry, restrictive covenants, licenses, restrictions and similar charges created or incurred in the ordinary course of business and not in connection with Indebtedness, and which in the aggregate do not materially detract from the value of any Real Property or materially impair or interfere with its use in the business operations of the Borrower and its Subsidiaries; including any such items included as exceptions in the title policy obtained by Administrative Agent related to the Real Property;

(f)        Liens in favor of the Borrower or any Guarantor;

(g)        Liens in favor of the Administrative Agent for the benefit of the Secured Parties or otherwise to secure the Obligations;

(h)        Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(i)        Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(j)        Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(k)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)        precautionary Uniform Commercial Code and similar filings;

(m)        Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted hereunder;

(n)        Liens on Property constituting Goods (as defined in the applicable Uniform Commercial Code), excluding inventory, but including Equipment and Fixtures (as defined in the applicable Uniform Commercial Code), securing obligations under leases of Units entered into in the ordinary course of business;

(o)        (i) Liens existing on property at the time of (and not in contemplation of) its acquisition or existing on the property of any Person at the time such Person becomes (and not in contemplation of such Person becoming) a Guarantor, in each case after the Closing Date; provided that (A) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Guarantor) and (B) the Indebtedness secured thereby is permitted under Section 6.2(o), and (ii) Liens incurred in connection with escrow arrangements or other agreements relating to a Permitted Acquisition or Permitted Investment permitted;

(p)        Liens in respect of the cash collateralization of Letters of Credit and letters of credit permitted by Sections 6.2(s) or 6.2(x);

(q)        Liens (i) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(r)        Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 7.1(h);

(s)        Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and not securing Indebtedness prohibited by this Agreement;

(t)        Liens securing Indebtedness permitted pursuant to Section 6.2(w);

(u)        the modification, replacement, renewal or extension of any Lien permitted by this Section 6.3; provided that (i) such Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 6.2;

(v)        Liens securing Indebtedness permitted by Section 6.2(u) (subject to the ABL/Term Intercreditor Agreement);

(w)        Liens securing Indebtedness or other obligations in an aggregate principal amount as of the date of initial attachment of such Lien not to exceed $5,000,000; and

(x)        Non-exclusive licenses or sublicenses of intellectual property granted in the ordinary course of business.

**6.4**    **Sales of Assets**.  The Loan Parties shall not, and will cause their Subsidiaries not to, make any Dispositions, except for:

(a)    Dispositions of obsolete, damaged, worn out, used or surplus Property (including for purposes of recycling), whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of Property no longer used or useful in the conduct of the business of the Borrower and the Subsidiaries;

(b)    Dispositions of Property to the extent that (i) such Property is exchanged for credit against the purchase price of similar replacement Property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement Property; provided that to the extent the Property being transferred constitutes Collateral such replacement Property shall constitute Collateral;

(c)    Dispositions of Property to the Borrower or any Subsidiary;

(d)    to the extent constituting a Disposition, any Loan Party and its Subsidiaries may enter into an consummation transactions expressly permitted by Section 6.3, Section 6.6 or Section 6.10;

(e)    Dispositions to the extent of any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by any Loan Party or its Subsidiaries to the extent allowable under Section 1031 of the Code (or comparable or successor provision);

(f)    Dispositions in connection with the unwinding of any Swap Contract;

(g)    the sale, license, sublicenses, transfer, lapse, abandonment, discontinuance or other Disposition of any Intellectual Property in the ordinary course of business or if determined by the Borrower or any Subsidiary in its reasonable business judgment that such Disposition is desirable in the conduct of its business;

(h)    Dispositions of any Property with a fair market value (as determined by the Borrower in its reasonable judgment) not to exceed $5,000,000 in the aggregate for all such Dispositions in any fiscal year;

(i)    Dispositions for a fair market value (as determined by the Borrower in its reasonable judgment), so long as, at the time of such Disposition, (i) no Event of Default has occurred and is continuing, and (ii) at least 75% of the consideration for such Disposition in excess of $2,500,000 consists of cash and cash equivalents (in each case free and clear of Liens at the time received); and

(j)    Dispositions of the Specified Real Estate for fair market value as reasonably determined by the Borrower; provided, that Dispositions of Specified Real Estate shall only be permitted pursuant to this clause (j) and not any other clause of this Section 6.4.

**6.5**    **Liquidations, Mergers and Consolidations**.  Except as permitted pursuant to Sections 6.6 and 6.8 and except for the merger, consolidation or amalgamation of any Loan Party or any Subsidiary of any Loan Party into any other Loan Party, the Loan Parties shall not, and will cause their Subsidiaries not to, liquidate or dissolve itself (or suffer any liquidation or dissolution) or otherwise wind up, or consolidate with or merge into any other Person; provided that any Subsidiary of the Borrower may

84

liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders so long as (A) no Event of Default shall result therefrom and (B) the surviving Person or the Person who receives the assets of such dissolving or liquidated Subsidiary that is Loan Party shall be a Loan Party.

**6.6** **Investments**.  The Loan Parties shall not, and will cause their Subsidiaries not to, permit to exist any Investment, except that, so long as no Event of Default then exists or is caused thereby, the Borrower and its Subsidiaries may make Permitted Investments.

**6.7** **Transactions with Affiliates**.  The Loan Parties shall not, and will cause their Subsidiaries not to, enter into any material transaction (including the purchase, sale or exchange of Property, the rendering of any service, the making of any Investment in an Affiliate or the repayment of any Indebtedness owed to an Affiliate) with an Affiliate (other than any such transactions among the Loan Parties and their Subsidiaries), except for:

(a) any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on Schedule 6.7, or any amendment thereto (so long as any such amendment is not adverse to the Lenders in any material respect as compared to the applicable agreement as in effect on the Closing Date);

(b) any material transaction in the ordinary course of business and pursuant to the reasonable requirements of the Loan Parties and their Subsidiaries business, upon terms which are fair and reasonable to the Loan Parties and their Subsidiaries and which are not less favorable to the Loan Parties and their Subsidiaries than would be obtained in a comparable transaction with a Person not an Affiliate;

(c) the Borrower may make Permitted Expense Reimbursement and Indemnity Payments; and

(d) all transactions contemplated by the Plan of Reorganization, including the entry into the Loan Documents and the issuance of the Holdco Facility and Equity Interests in any parent entity of the Borrower.

**6.8** **[Reserved]**.

**6.9** **Amendment and Waiver**.  The Loan Parties shall not, and will cause their Subsidiaries not to, (a) except in connection with a transaction otherwise permitted hereunder, enter into any material amendment of, or agree to or accept or consent to any material waiver of any of the material provisions of its Organizational Documents or (b) except to the extent permitted by the ABL/Term Intercreditor Agreement, amend, modify or change in any manner any term or condition of any of the loan documents governing the ABL Facility.

**6.10** **Restricted Payments**.  The Loan Parties shall not, and will cause their Subsidiaries not to, declare, pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests or Equity Interests Equivalents of any Loan Party or any direct or indirect parent thereof, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Loan Parties or any of their Subsidiaries (collectively, "Restricted Payments"), except that the Loan Parties and their Subsidiaries may:

(a)     Restricted Payments to allow for the distribution of "Excess Cash Flow" (as defined in the Holdco Credit Agreement as in effect on the Closing Date) to make mandatory prepayments required under the Holdco Credit Agreement in respect thereof, if any;

(b)     to the extent constituting Restricted Payments, make payments permitted by Section 6.7;

(c)     subject to the last paragraph in this Section 6.10, make Tax Distributions to the direct or indirect equity holders of Holdings;

(d)     to the extent constituting Restricted Payments, any Loan Party and their Subsidiaries may enter into and consummate transactions expressly permitted by Sections 6.6 and 6.8;

(e)     pay (or make Restricted Payments to allow Holdings or any direct or indirect parent thereof to pay) for the repurchase, retirement or other acquisition or retirement for value of Equity Interests or Equity Interests Equivalents of Holdings (or of any direct or indirect parent thereof) held by any future, present or former employee, director, consultant or distributor (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Borrower (or any direct or indirect parent of the Borrower) or any of its Subsidiaries upon the death, disability, retirement or termination of employment of any such Person or otherwise pursuant to any employee or director equity plan, employee or director stock option or profits interest plan or any other employee or director benefit plan or any agreement (including any separation, stock subscription, shareholder or partnership agreement) with any employee, director, consultant or distributor of the Borrower (or any direct or indirect parent of the Borrower) or any of its Subsidiaries in an aggregate amount after the Closing Date not to exceed, together with any payments made under any other Indebtedness permitted under Section 6.2(p), $500,000 in any calendar year, in each case so long as no Default or Event of Default has occurred and is continuing or would occur as a result thereof;

(f)     make any Restricted Payment the proceeds of which will be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) operating costs and expenses of Holdings or its direct or indirect parents which do not own other Subsidiaries besides Holdings, its Subsidiaries and any other direct or indirect parents of Holdings incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable solely to the ownership or operations of the Borrower and its Subsidiaries.

Notwithstanding anything to the contrary herein, for any taxable year in which the Borrower or Holdings are members of a group filing a consolidated, combined or similar income tax return ("Tax Group") of which any direct or indirect parent of Borrower or Holdings is the common parent, Borrower and Holdings may make tax distributions to Parent (and Parent may make further distributions to the parent of the Tax Group, if Parent is not the parent of the Tax Group) ("Tax Distributions"), the proceeds

of which will be used by the parent of the Tax Group to pay consolidated or combined U.S. federal, state, and local income taxes imposed on such parent to the extent such income taxes are attributable to the income of such parent, Holdings, Borrower and those Subsidiaries of Borrower that are members of such Tax Group (or any disregarded entity thereof); provided that the amount of such distributions in respect of any taxable period shall not, in the aggregate, exceed the amount that Holdings, Borrower and those Subsidiaries of Borrower that are members of such Tax Group (including income of any disregarded entity thereof) would have been required to pay in respect of such U.S. federal, state, or local income taxes (as the case may be) in respect of such taxable period if Holdings, Borrower and those Subsidiaries of Borrower paid such income taxes directly as a stand-alone consolidated or combined income tax group.

For the avoidance of doubt, Holdings and Borrower shall be permitted to make such payments on a quarterly basis during such taxable year based on its best estimate of the amounts permitted to be distributions in accordance with the definition of Tax Distributions; provided, further that the total amount of such quarterly distributions for any taxable year shall not exceed the total amount otherwise distributable in accordance with the definition of Tax Distributions and, if the aggregate amount of estimated Tax Distributions paid to any such parent of the Tax Group for any taxable year exceeds the amount that would be calculated as of the end of such taxable year, the excess shall be deducted from the amount of the next Tax Distribution otherwise payable to such parent of the Tax Group.

6.11    **Payments in Respect of Certain Indebtedness**.  The Loan Parties shall not, and will cause their Subsidiaries not to, (i) pay interest on any Indebtedness that (x) is subordinated in right of payment to the Obligations, or (y) secured by Liens on the Collateral on a junior basis to the Liens on the Collateral securing the Obligations (collectively, "Subordinated Indebtedness"), or (ii) prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Subordinated Indebtedness, except:

(a)     refinancings of such Subordinated Indebtedness pursuant to Section 6.2(a);

(b)      regularly scheduled interest and principal payments as and when due in respect of such Indebtedness, other than payments prohibited by the subordination provisions applicable thereto;

(c)      payments of or in respect of such Indebtedness made solely with Qualified Equity Interests (other than Equity Cure Contributions) in Holdings or the Borrower or the conversion of such Indebtedness into Qualified Equity Interests of Holdings or the Borrower; and

(d)      prepayments of intercompany Indebtedness permitted hereby owed by Holdings or any Subsidiary thereof to Holdings or any Subsidiary thereof, other than prepayments prohibited by the subordination provisions governing such Indebtedness.

**6.12**      **Change in Business**.  The Loan Parties shall not, and will cause their Subsidiaries not to, engage in any line of business that is (i) substantially different from those lines of business carried on by it on the Closing Date (or any reasonable extension thereof) and (ii) not ancillary, corollary, complimentary or related thereto.

**6.13**      **Changes in Accounting, Name and Jurisdiction of Organization**.  The Loan Parties shall not, and will cause their Subsidiaries not to, (i) change their fiscal year, (ii) change its name as it appears in official filings in its jurisdiction of organization or (iii) change its jurisdiction or form of organization, in the case of clauses (ii) and (iii), without at least ten (10) Business Days' prior written notice to the Administrative Agent and the acknowledgement of the Administrative Agent that all actions reasonably required by the Administrative Agent have been completed.

**6.14**      **No Negative Pledges**.  No Loan Party shall, and shall not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Subsidiary to pay dividends or make any other distribution on any of such Subsidiary's Equity Interests or Equity Interests Equivalents or to pay fees, including management fees, or make other payments and distributions to the Borrower or any Subsidiary, except pursuant to the terms of the Loan Documents.  No Loan Party shall, and shall not permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any contractual obligation prohibiting or otherwise restricting the existence of any Lien upon any Collateral in favor of the Administrative Agent to secure the Obligations, whether now owned or hereafter acquired except (i) in connection with any document or instrument governing Liens permitted herein, provided that any such restriction contained therein relates only to the Property subject to such Permitted Liens or (ii) with consent of the Administrative Agent.   Nothing in this Section 6.14 shall prohibit (1) this Agreement or any of the other Loan Documents, (2) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted hereunder pending the consummation of such sale, (3) restrictions imposed by applicable law, (4) any agreement in effect at the time a Person first became a Subsidiary of any Loan Party, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary and such restrictions are limited to such Subsidiary and its Subsidiaries, (5) in the case of any Subsidiary that is not a wholly-owned Subsidiary of Holdings, restrictions and conditions imposed by its Organizational Documents or any related joint venture, shareholder or similar agreements, or (6) contained in the Holdco Credit Agreement or any financing documentation governing Indebtedness permitted to be incurred hereunder that are incurred by a Subsidiary that is not required to be a Guarantor, so long as such restrictions operate only upon the occurrence and during the continuance of an event of default under the documentation governing such Indebtedness and only impose restrictions on such Subsidiary and its Subsidiaries.

**6.15**    **Holding Company Status**.  Notwithstanding anything contained in this Agreement or the other Loan Documents to the contrary, Holdings shall not (a)

(a)    own or acquire any assets other than the Equity Interests and Equity Interests Equivalents of its Subsidiaries that are Loan Parties or become Loan Parties in accordance with the terms hereof and its own Equity Interests or Equity Interests Equivalents, and, to the extent cash is temporarily transferred through Holdings to effectuate a transaction expressly permitted by this Agreement, such cash during such transfer,

(b)    incur any liabilities other than (i) minimal liabilities necessary to maintain its separate organizational existence and to pay reasonable overhead expenses of Loan Parties and their Subsidiaries and (ii) those incurred under or permitted by this Agreement and the other Loan Documents to which it is a party,

(c)    incur any Indebtedness other than the Obligations and Guarantees of the other Loan Parties' obligations permitted by this Agreement,

(d)    engage in any trade, business or operations (other than acting as a holding company for the equity of its Subsidiaries) and any administrative activities incidental or reasonably related thereto,

(e)    merge, amalgamate or consolidate with any other Person,

(f)     sell or otherwise transfer any of its assets,

(g)    permit or suffer to exist any Lien on any of its assets other than Permitted Liens, or

(h)    accept or receive any Loans or Collateral (other than distributions that are expressly permitted by Section 6.12); provided that nothing herein shall prevent Holdings from incurring liabilities with respect to Taxes as required by Law.

**6.16**    **Use of Proceeds**.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, use the proceeds of the Advances other than for lawful purposes and in accordance with Sections 4.10 and 4.12.

<h3 style="text-align:center">ARTICLE VII<br>EVENTS OF DEFAULT</h3>

**7.1**    **Events of Default**.  The term "Event of Default" means any of the following events occurring for whatever reason, whether voluntary or involuntary, effected by operation of law, judgment, order or otherwise:

(a)    A failure to pay when and as due any principal amount of the Loans or to pay any L/C Reimbursement Obligation;

(b)    A default in the payment when and as due of any interest on the Loans or of fees or other amounts payable to the Lenders pursuant to this Agreement and such failure continues for period of three (3) Business Days after delivery of written notice to Borrower;

(c)        A default in the due performance and observance of any of the covenants or agreements contained in (i) Sections 5.1(e) (solely with respect to delivery of a notice of a Default), 5.2, 5.14 or Article VI, or (ii) Sections 5.1(a), 5.1(b), 5.1(c) or 5.1(d), and, in any case of this clause (ii), such failure continues for a period of five (5) Business Days;

(d)        A default (other than those defaults specifically described in other subsections of this Section 7.1) by any Loan Party in the due performance and observance of any of the covenants contained in this Agreement or any other Loan Document and such failure continues for a period of thirty (30) days after the earlier to occur of (i) the date upon which a Responsible Officer of the Borrower becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by the Administrative Agent or Required Lenders;

(e)        The Borrower or any Subsidiary thereof (i) fails to make any payment beyond the applicable grace period, if any, in respect of (x) the ABL Facility or (y) its other Indebtedness (other than the Obligations) having an aggregate outstanding principal amount (individually or in the aggregate with all other such Indebtedness as to which such a failure shall exist) in excess of $2,500,000 or (ii) fails to observe or perform any other agreement or condition relating to the ABL Facility or any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the ABL Agent or ABL Lenders or the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, the obligations under the ABL Facility or such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem the obligations under the ABL Facility or such Indebtedness to be made, prior to its stated maturity; provided that such failure is unremedied and is not waived by the holders of such Indebtedness prior to the termination of the Commitments and acceleration of the Loans pursuant to Section 7.2;

(f)        An involuntary case under any applicable federal or state bankruptcy, insolvency or similar laws shall be commenced against any Loan Party and the petition shall not be dismissed, stayed, bonded or discharged within ninety (90) days after the commencement of the case; the entry of a decree or order by a court having jurisdiction in the premises in respect of any Loan Party under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law; or the entry of a decree or order by a court having jurisdiction in the premises appointing a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the any Loan Party or of any substantial part of the property of any Loan Party, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days;

(g)        The commencement by any Loan Party of or consent to, a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law or the request or consent by it to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of either of any Loan Party or of any substantial part of the property of any Loan Party, or the making by it of a general assignment for the benefit of creditors, or the failure by the Borrower to pay its debts generally as they become due, or the taking of any action by the Borrower in furtherance thereof;

90

(h)       One or more judgments (i) for the payment of money in an aggregate amount in excess of $2,500,000 (other than any such judgment covered by insurance (other than under a self-insurance program) to the extent a claim therefor has been made in writing and liability therefor has not been denied by the insurer), shall be rendered against any Loan Party and the same shall remain undischarged for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder); during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of a Loan Party to enforce any such judgment or (ii) in the case of non-monetary judgments, which would reasonably be expected to result in a Material Adverse Occurrence, and which, in any case, remains undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days (or in any event later than five (5) days prior to the date of any proposed sale thereunder);

(i)       Any Loan Document or any material provision of any Loan Document shall at any time and for any reason cease to be valid and binding on or enforceable against any Loan Party party thereto or any Loan Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any security interest and Lien on the Collateral purported to be granted to the Administrative Agent for the benefit of the Secured Parties by any Security Document shall for any reason (other than as expressly permitted hereunder or pursuant to the terms thereof) cease to be in full force and effect or create a valid security interest in any material portion of the Collateral or such security interest shall for any reason (other than the failure of the Administrative Agent to take any action within its control) cease to be a perfected security interest with the priority stated in the Security Documents, except (in each case) (x) to the extent that any such grant, perfection or priority is not required pursuant to the terms hereof or the Security Documents and (y) to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(j)       The occurrence of a Change of Control;

(k)       Any representation or warranty made or deemed made by any Loan Party in this Agreement or any other Loan Document shall be untrue, incorrect or misleading in any material respect when made or deemed made;

(l)       The occurrence of an Event of Default (as defined in the Holdco Credit Agreement); provided, that to the extent that such Event of Default (as defined in the Holdco Credit Agreement) is waived pursuant to the terms of the Holdco Credit Agreement prior to the acceleration thereof, the Event of Default contemplated by this clause (l) shall automatically be deemed to have been cured concurrently with such waiver; or

(m)       There shall be at any time any failure to satisfy the minimum funding standard as defined in ERISA or in Section 412 of the Code, whether or not waived, with respect to any Plan maintained by the Borrower, or to which the Borrower has any liabilities, or any trust created thereunder that would reasonably be expected to result in a Material Adverse Occurrence; or a trustee shall be appointed by PBGC or a federal district court to administer such Plan; or PBGC shall institute proceedings to terminate any such Plan; or the Borrower shall incur any liability to PBGC in connection with the termination of any such Plan; or any Plan or trust created under any Plan of the Borrower shall engage in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which would subject the Borrower to the tax or penalty on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code that results in a Material Adverse Occurrence.

**7.2**     **Action If Event of Default**.  If an Event of Default described in Section 7.1(f) or (g) shall occur, to the extent permitted by law, the full unpaid principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder shall automatically be due and payable without any declaration, notice, presentment, protest or demand of any kind (all of which are hereby waived) and the obligation of the Lenders and the L/C Issuers to make additional Advances shall automatically terminate.  If any Event of Default other than pursuant to Section 7.1(f) or (g) shall occur and be continuing, the Required Lenders, upon written notice to the Borrower (which shall be given by the Administrative Agent at the request of the Required Lenders), may terminate the Lenders' obligation to make additional Advances and may declare the outstanding principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder to be due and payable without other notice to the Borrower, presentment, protest or demand of any kind (all of which are hereby waived), and the obligation of the L/C Issuer to Issue Letters of Credit shall automatically terminate, whereupon the full unpaid amount of the Loans and any and all other Obligations, which shall be so declared due and payable shall bear interest at the Default Rate and shall be and become immediately due and payable.

**7.3**     **Remedies**.

(a)     Upon acceleration of the Loans, as provided in Section 7.2, the Administrative Agent shall, at the request of the Required Lenders, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and/or under applicable law.

(b)     The Administrative Agent, personally or by attorney, shall, at the request of the Required Lenders, proceed to protect and enforce its rights and the rights of the Lenders by pursuing any available remedy, including a suit or suits in equity or at law, whether for damages or for the specific performance of any obligation, covenant or agreement contained in this Agreement or in the Notes, or in aid of the execution of any power herein or therein granted, or for the enforcement of any other appropriate legal or equitable remedy, as the Administrative Agent shall deem most effectual to collect the payments then due and thereafter to become due on the Notes or under this Agreement, to enforce performance and observance of any obligation, agreement or covenant of the Borrower hereunder or under the Notes or to protect and enforce any of the Administrative Agent's or any Lender's rights or duties hereunder.

(c)     Upon acceleration of the Loans, as provided in Section 7.2, to the extent permitted by law, the Administrative Agent shall, if so directed by the Required Lenders, have the right to the appointment of a receiver for the Collateral of the Loan Parties pledged to secure the Obligations, both to operate and to sell such Collateral, and the Borrower hereby consents to such right and such appointment and hereby waives, to the fullest extent permitted by applicable law, any objection the Borrower may have thereto or the right to have a bond or other security posted by the Administrative Agent on behalf of the Lenders in connection therewith.

(d)     No remedy herein conferred upon or reserved to the Administrative Agent or any Lender is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or under any other Loan Document now or hereafter existing at law, in equity or by statute.

(e)     Each Lender agrees that it will not take any action, nor institute any actions or proceedings, against the Borrower hereunder or under any Loan Document, without the prior written consent of the Required Lenders or, as may be provided in this Agreement or the

other Loan Documents, at the direction of the Administrative Agent with the consent of the Required Lenders.

**7.4**     **Cash Collateral for Letters of Credit**.  If an Event of Default has occurred and is continuing, this Agreement (or the Revolving Loan Commitment) shall be terminated for any reason or if otherwise required by the terms hereof, the Administrative Agent shall, upon request of Required Revolving Loan Lenders, demand (which demand shall be deemed to have been delivered automatically upon any acceleration of the Loans and other obligations hereunder pursuant to Section 7.3), and the Borrower shall thereupon deliver to Agent, to be held for the benefit of the L/C Issuer, the Administrative Agent and the Lenders entitled thereto, an amount of cash equal to 105% of the amount of Letter of Credit Obligations as additional collateral security for Obligations in respect of any outstanding Letter of Credit.  The Administrative Agent may at any time apply any or all of such cash and cash collateral to the payment of any or all of the Loan Parties' Obligations in respect of any Letters of Credit.  Pending such application, the Administrative Agent may (but shall not be obligated to) invest the same in an interest bearing account in the Administrative Agent's name, for the benefit of the L/C Issuer, the Administrative Agent and the Lenders entitled thereto, under which deposits are available for immediate withdrawal, at such bank or financial institution as the L/C Issuer and the Administrative Agent may, in their discretion, select.

## ARTICLE VIII
## THE ADMINISTRATIVE AGENT

**8.1**     **Appointment and Authorization**.  Each Lender and each L/C Issuer hereby irrevocably appoints the Administrative Agent as the Administrative Agent of such Lender and authorizes the Administrative Agent to act on such Lender's behalf to the extent provided herein or under any of the other Loan Documents, and to take such other action and exercise such other powers as may be reasonably incidental thereto.  Each Lender and each L/C Issuer hereby agrees that it will require any transferee of any of such Lender's interests in its Loans to irrevocably appoint and authorize the Administrative Agent as such transferee's Administrative Agent in accordance with the terms hereof. Notwithstanding the use of the term "agent," it is expressly understood and agreed that the Administrative Agent shall not have any fiduciary responsibilities to any Lender by reason of this Agreement and that the Administrative Agent is merely acting as the representative of the Lenders with only those duties as are expressly set forth in this Agreement and the other Loan Documents.  In its capacity as the Lenders' contractual representative, the Administrative Agent (i) does not hereby assume any fiduciary duties to the Loan Parties, any of the Lenders or any other Person (and no such fiduciary duties shall be implied) and (ii) is acting as an independent contractor, the rights and duties of which are limited to those expressly set forth in this Agreement and the other Loan Documents.  The Borrower, on behalf of the Loan Parties, and each of the Lenders hereby agrees to assert no claim against the Administrative Agent on any agency theory or any other theory of liability for breach of fiduciary duty, all of which claims the Borrower and each Lender and each L/C Issuer hereby waives.

**8.2**     **Power**.  The Administrative Agent shall have and may exercise such powers under this Agreement and any other Loan Documents as are specifically delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including enforcement or collection of the Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and all holders of the Notes; provided, however, that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to any Loan Document or applicable law.  The Administrative Agent shall not have any implied

duties or any obligation to take any action under this Agreement or any other Loan Document except such action as is specifically provided by this Agreement or any other Loan Document to be taken by the Administrative Agent.

**8.3** **Interest Holders**. The Administrative Agent may treat each Lender and each L/C Issuer, or the Person designated in the last notice filed with the Administrative Agent, whether under <u>Section 9.3</u> or <u>9.9</u>, or otherwise hereunder, as the holder of all of the interests of such Lender in its Loans until written notice of transfer, signed by such Lender or such L/C Issuer (or the Person designated in the last notice filed with the Administrative Agent) and by the Person designated in such written notice of transfer, in form and substance satisfactory to the Administrative Agent, shall have been filed with the Administrative Agent.

**8.4** **Employment of Counsel; etc**. The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document, and any instrument, agreement or document executed, issued or delivered pursuant to or in connection herewith or therewith, by or through employees, agents and attorneys-in-fact and shall not be answerable for the default or misconduct of any such employee, agent or attorney-in-fact selected by it with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf of the Administrative Agent). The Administrative Agent shall be entitled to rely on advice of counsel (including counsel who are the employees of the Administrative Agent) selected by the Administrative Agent concerning all matters pertaining to the agency hereby created and its duties under any of the Loan Documents.

**8.5** **Reliance**. The Administrative Agent shall be entitled to rely upon and shall not be under a duty to examine or pass upon the validity, effectiveness, genuineness of this Agreement, any other Loan Document or any notice, consent, waiver, amendment, certificate, affidavit, letter, telegram, statement, paper, document or writing furnished pursuant to this Agreement or any other Loan Document, and the Administrative Agent shall be entitled to assume (absent actual knowledge to the contrary) that the same are valid, effective and genuine, have been signed or sent by the proper Person(s) and are what they purport to be. The Administrative Agent shall be entitled to assume that no Default has occurred and is continuing unless it has actual knowledge, or has been notified in writing by the Borrower, of such fact, or has been notified by a Lender in writing that such Lender considers that a Default has occurred and is continuing, and such Lender shall specify in detail the nature thereof in writing. The Administrative Agent shall not be liable hereunder for any action taken or omitted to be taken except for its own gross negligence or willful misconduct. The Administrative Agent shall provide promptly each Lender and each L/C Issuer with copies of such documents received from the Borrower pursuant to the terms of this Agreement or any other Loan Document as such Lender may reasonably request.

**8.6** **General Immunity**. Neither the Administrative Agent nor any of the Administrative Agent's directors, officers, agents, attorneys or employees shall be liable or responsible in any manner to the Borrower, any Lender, any L/C Issuer or any other Person for any action taken or omitted to be taken by it or them under the Loan Documents or in connection therewith except for any liability imposed by law for its own willful misconduct or gross negligence. Without limitation on the generality of the foregoing, the Administrative Agent: (a) shall not be responsible to any Lender or any L/C Issuer for any recitals, statements, warranties, representations, or failure or delay of performance under the Loan Documents or any agreement or document related thereto or for the financial condition of the Borrower; (b) shall not be responsible for the authenticity, accuracy, completeness, value, validity, effectiveness, due execution, legality, genuineness, enforceability or sufficiency of any of the Loan Documents, any provisions thereof or any document contemplated thereby; (c) shall not be responsible for the validity, genuineness, creation, perfection or priority of any of the Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security; (d) shall not be bound to ascertain or inquire as to the performance or observance of any

of the terms, covenants or conditions of any of the Loan Documents on the part of the Borrower or of any of the terms of any such agreement by any party thereto and shall have no duty to inspect the property (including the books and records) of the Borrower; (e) shall incur no liability under or in respect of any of the Loan Documents or any other document or Collateral by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, cable or telex) furnished pursuant to this Agreement or any other Loan Document; (f) shall incur no liability to the Borrower or any other Person as a consequence of any failure or delay in performance by or any breach by, any Lender or Lenders or any L/C Issuer of any of its or their obligations under this Agreement; and (g) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by the Administrative Agent.

8.7     **Credit Analysis**.  Each Lender and each L/C Issuer has made, and shall continue to make, its own independent investigation or evaluation of the operations, business, property and condition, financial and otherwise, of the Borrower in connection with the making of its commitments hereunder and has made, and will continue to make, its own independent appraisal of the creditworthiness of the Borrower.  Without limiting the generality of the foregoing, each Lender and each L/C Issuer acknowledges that prior to the execution of this Agreement, it had this Agreement and all other Loan Documents and such other documents or matters as it deemed appropriate relating thereto reviewed by its own legal counsel as it deemed appropriate, and it is satisfied with the form and substance of this Agreement and all other Loan Documents.  Each Lender and each L/C Issuer agrees and acknowledges that neither the Administrative Agent nor any of its directors, officers, attorneys or employees makes any representation or warranties about the creditworthiness of the Borrower or with respect to the due execution, legality, validity, genuineness, effectiveness, sufficiency or enforceability of this Agreement or any other Loan Documents, or the validity, genuineness, execution, perfection or priority of Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any Collateral or other security.  Each of the Lenders and L/C Issuers shall use its commercially reasonable efforts to provide the other Lenders and L/C Issuers with any credit or other material information which comes into the possession of such Lender or L/C Issuer on or before a Default or Event of Default or at any time thereafter with respect to the operations, business, property, condition or creditworthiness of the Borrower but no Lender or L/C Issuer shall have any liability to any other Lender or L/C Issuer for its inadvertent failure to do so.  Each Lender or L/C Issuer, upon the request of another Lender or L/C Issuer, shall deliver to such other Lender or L/C Issuer any financial statement, report, certificate or other document required to be delivered to the Lenders pursuant to <u>Section 5.1</u> which the requesting Lender did not receive.  Except as explicitly provided herein, neither the Administrative Agent nor any Lender or L/C Issuer has any duty or responsibility, either initially or on a continuing basis, to provide any other Lender or L/C Issuer with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before a Default or an Event of Default or at any time thereafter.

8.8     **Administrative Agent and Affiliates**.  With respect to the Loans made by it and the Notes issued to it, the Administrative Agent, in its individual capacity, shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not an Administrative Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent in its individual capacity.  The Administrative Agent, in its individual capacity, and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, the Borrower, and any Person who may do business with or own securities of the Borrower, all as if it were not an Administrative Agent and without any duty to account therefor to the Lenders.

8.9     **Indemnification**.  The Lenders jointly and severally agree to indemnify and hold harmless the Administrative Agent and its officers, directors, employees and agents (to the extent not

reimbursed by the Borrower), ratably according to their respective Commitments, from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent or any of its officers, directors, employees or agents, in any way relating to or arising out of any investigation, litigation or proceeding concerning or relating to the transaction contemplated by this Agreement or any of the other Loan Documents, or any of them, or any action taken or omitted by the Administrative Agent or any of its officers, directors, employees or agents, under any of the Loan Documents; provided, however, that no Lender shall be liable for any portion of such claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of the Administrative Agent or any of its officers, directors, employees or agents.  Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for such Lender's proportionate share of any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent or its officers, directors, employees or agents in connection with the preparation, execution, administration, or enforcement of, or legal advice in respect of rights or responsibilities under any of, the Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower.

**8.10    Security Documents**.  The Administrative Agent, as collateral agent hereunder and under the Security Documents, is hereby authorized to act on behalf of the Secured Parties, in its own capacity and through other agents and sub-agents appointed by it in good faith, under the Security Documents, provided that the Administrative Agent shall not agree to the release of any Collateral, or any property encumbered by any mortgage, pledge or security interests except in compliance with Section 8.11.  In connection with its role as secured party with respect to the Collateral hereunder, the Administrative Agent shall act as collateral agent, for itself and for the ratable benefit of the Lenders, and such role as Administrative Agent shall be disclosed on all appropriate accounts, filings, mortgages, and other Collateral documentation.

**8.11    Collateral Matters**.  The Administrative Agent is authorized on behalf of all the Lenders without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to the Security Documents or any Collateral thereunder which may be necessary to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Security Documents.  The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral (i) upon termination of the Commitments and payment in full of all Loans and all other Obligations of the Borrower known to the Administrative Agent and payable under this Agreement or any other Loan Document; (ii) constituting Property sold or to be sold or disposed of to a Person that is not a Loan Party as part of or in connection with any Disposition permitted hereunder; (iii) consisting of an instrument evidencing Indebtedness or other debt instrument, if the Indebtedness evidenced thereby has been paid in full; or (iv) if approved, authorized or ratified in writing by all the Lenders.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section 8.11, provided that the absence of any such confirmation for whatever reason shall not affect the Administrative Agent's rights under this Section 8.11.  In the event that any landlord in favor of which the Borrower has granted a Permitted Lien on Excluded Assets requests an acknowledgement that the Collateral does not include any Excluded Assets secured by such Permitted Lien (a "Permitted Lien Acknowledgement"), the Administrative Agent shall deliver a Permitted Lien Acknowledgement to such landlord, on terms and conditions, and subject to documentation reasonably acceptable to the Administrative Agent and, if required by such landlord, shall amend any UCC-1 financing statements filed against a Loan Party in favor of the Administrative Agent to exclude the specific Excluded Assets that are the subject of such Permitted Lien Acknowledgement.

**8.12**    **Action by the Administrative Agent**.

(a)    The Administrative Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights with which it may be vested and with respect to taking or refraining from taking any action or actions which it may be able to take under or in respect of, this Agreement, unless the Administrative Agent shall have been instructed by the Required Lenders to exercise or refrain from exercising such rights or to take or refrain from taking such action; <u>provided</u> that the Administrative Agent shall not exercise any rights under <u>Section 7.3</u> of this Agreement except upon the request of the Required Lenders or of all the Lenders, where expressly required by this Agreement.  The Administrative Agent shall incur no liability under or in respect of this Agreement with respect to anything which it may do or refrain from doing in the exercise of its judgment or which may seem to it to be necessary or desirable in the circumstances, except for its gross negligence or willful misconduct as determined by a final, non-appealable order of a court having jurisdiction over the subject matter.

(b)    The Administrative Agent shall not be liable to the Lenders or to any Lender in acting or refraining from acting under this Agreement or any other Loan Document in accordance with the instructions of the Required Lenders or of all the Lenders, where expressly required by this Agreement, and any action taken or failure to act pursuant to such instructions shall be binding on all Lenders.

(c)    <u>Notice of Default or Event of Default</u>.    In the event that the Administrative Agent or any Lender shall acquire actual knowledge, or shall have been notified in writing, of any Default (other than through a notice by one party hereto to all other parties), such Lender shall promptly notify the Administrative Agent and the Administrative Agent shall promptly notify the Lenders, and the Administrative Agent shall take such action and assert such rights under this Agreement and the other Loan Documents as the Required Lenders (or all the Lenders, where expressly required by this Agreement) shall request in writing, and the Administrative Agent shall not be subject to any liability by reason of its acting pursuant to any such request.  If the Required Lenders shall fail to request the Administrative Agent to take action or to assert rights under this Agreement in respect of any Default within ten (10) days after their receipt of the notice of any Default from the Administrative Agent or any Lender, or shall request inconsistent action with respect to such Default, the Administrative Agent may, but shall not be required to, take such action and assert such rights as it deems in its discretion to be advisable for the protection of the Lenders, except that, if the Required Lenders have instructed the Administrative Agent not to take such action or assert such right, in no event shall the Administrative Agent act contrary to such instructions.

**8.13    Successor Administrative Agent**.  The Administrative Agent may resign at any time as Administrative Agent under the Loan Documents by giving thirty (30) days' prior written notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), have the right to appoint a successor Administrative Agent hereunder that is organized under the laws of the United States of America or a political subdivision thereof.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any state thereof and having a combined capital and surplus of at least $250,000,000. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.  Upon the acceptance of any appointment as Administrative Agent under the Loan Documents by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After any retiring Administrative Agent's resignation as Administrative Agent under the Loan Documents, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under the Loan Documents.

**8.14    Authorization to Enter into Intercreditor Agreements.**  Each Lender consents to and authorizes Administrative Agent's execution and delivery of any intercreditor or subordination agreements (including, without limitation, any ABL/Term Intercreditor Agreement and any agreement among lenders) from time to time as contemplated by the terms hereof on behalf of such Lender and agrees to be bound by the terms and provisions thereof, including any purchase option contained therein.

**8.15    Erroneous Payments**.

(a)    If the Administrative Agent notifies a Term Loan Lender, or Secured Party, or any Person who has received funds on behalf of a Term Loan Lender or Secured Party, such Term Loan Lender (any such Term Loan Lender, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Term Loan Lender, Secured Party or other Payment Recipient on its behalf)  (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Term Loan Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative

Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)      Without limiting immediately preceding clause (a), each Term Loan Lender, or Secured Party, or any Person who has received funds on behalf of a Term Loan Lender or Secured Party hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Term Loan Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(1)      (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(2)      such Term Loan Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.15(b).

(c)      Each Term Loan Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Term Loan Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Term Loan Lender or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)      In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Term Loan Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Term Loan Lender at any time, (i) such Term Loan Lender shall be deemed to have assigned its Term Loans (but not its Term Loan Commitments) of the relevant class with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Term Loans (but not Term Loan Commitments) of the Erroneous Payment  Impacted Class, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption Agreement as to which the Administrative Agent and such parties are participants) with respect to such Erroneous

99

Payment Deficiency Assignment, and such Term Loan Lender shall deliver any Notes evidencing such Term Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Term Loan Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Term Loan Lender shall become a Term Loan Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Term Loan Lender shall cease to be a Term Loan Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Term Loan Commitments which shall survive as to such assigning Term Loan Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Term Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Term Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Term Loan Lender shall be reduced by the net proceeds of the sale of such Term Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Term Loan Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Term Loan Commitments of any Term Loan Lender and such Term Loan Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Term Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Term Loan Lender or Secured Party under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "Erroneous Payment Subrogation Rights").

(e)      The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(f)      To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)      Each party's obligations, agreements and waivers under this Section 8.15 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Term Loan Lender the termination of the Term Loan Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

Notwithstanding anything else to the contrary herein, this Section 8.15 shall not apply to any funds received by any L/C Issuer or any Revolving Loan Lender, whether received as a

payment, prepayment or repayment of principal, interest, fees, distribution or otherwise. For the purpose of this <u>Section 8.15</u> only, the term "Secured Party" shall not include any L/C Issuer or any Revolving Loan Lender.

# ARTICLE IX
# MISCELLANEOUS

**9.1**    <u>**Waivers, Amendments; etc**</u>.  The provisions of this Agreement, including the closing conditions set forth herein, may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders:

(a)    that no amendment, waiver or consent shall:

(1)    extend or increase the Commitment of any Lender or subject a Lender to any additional obligations, without the written consent of such Lender,

(2)    reduce the principal of, or interest on, the Loans or any fees or other amounts payable to any Lender or any L/C Issuer (including L/C Reimbursement Obligations and PIK Interest payable pursuant to <u>Section 2.1(j)</u>) hereunder without the written consent of such Lender or L/C Issuer; <u>provided</u>, that, notwithstanding the foregoing or anything else in this clause (a), any waiver or modification to the MFN Adjustment shall require the consent of each Lender adversely affected thereby except to the extent in connection with (A) a "first out" or "priming" Incremental Term Loan incurred in accordance with clause (6) below, (B) Senior Indebtedness incurred in accordance with clause (8) below, or (C) any other Incremental Term Loan with respect to which a ratable opportunity to participate is offered to all Term Loan Lenders, in each of which such cases such MFN Adjustment may be waived or amended by the Supermajority Lenders;

(3)    postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable to any Lender or any L/C Issuer hereunder, or any scheduled reduction of Commitments, without the written consent of such Lender or L/C Issuer,

(4)    reduce the percentage of Lenders which shall be required for the Lenders or any of them to take any action hereunder, or the definition of "Required Lenders", "Supermajority Lenders", "Required Revolving Lenders" or "Required Term Loan Lenders" unless in writing and signed by all the Lenders (with respect to "Required Lenders" or "Supermajority Lenders"), all of the Revolving <u>Loan</u> Lenders (with respect to "Required Revolving Lenders") or all of the Term Loan Lenders (with respect to "Required Term Loan Lenders"), as applicable,

(5)    discharge the Borrower from its obligations under the Loan Documents, unless in writing and signed by all the Lenders and the L/C Issuers,

(6)    subject to clause (8) below with respect to Senior Priority Indebtedness, other than in connection with amendments to this Agreement to (x) change the payment priorities with respect to the Loans under this Agreement in order to reflect a "first-out" structure with respect to the Revolving Loan or (y) allow for a "first out" or "priming" Incremental Term Loan to the extent the opportunity to ratably participate in such Incremental

Term Loan is offered to all Term Loan Lenders (in each case, which shall only require consent of the Supermajority Lenders), amend <u>Section 2.8</u> or this <u>Section 9.1</u>, or any other provision of this Agreement or any other Loan Document in a manner that would alter the pro rata sharing or application of payments, or the pro rata treatment of the Lenders, or alter any payment waterfall or the priority or order of application of any proceeds or payments, unless in writing and signed by all Lenders and the L/C Issuers (it being understood and agreed that any separate "agreement among lenders" executed and/or acknowledged by the Lenders shall not constitute a "Loan Document" for purposes of this subclause (6)),

(7)     (x) release the security interest in all or substantially all of the Collateral granted to the Administrative Agent, for the benefit of the Secured Parties, under the Security Documents or (y) discharge Guarantors representing all or substantially all of the value of the Guarantors, in each case, unless agreed in writing by all the Lenders and the L/C Issuers or except as specifically permitted hereby or thereby as of the Closing Date,

(8)     unless agreed in writing by all the Lenders and the L/C Issuers, (x) to subordinate the priority of any of the Liens on all or substantially all Collateral in favor of the Administrative Agent, for the benefit of the Secured Parties, in favor of any other creditor of the Loan Parties or class of Lenders hereunder, (y) subordinate any of the Obligations in right of payment to any other indebtedness of the Loan Parties or indebtedness hereunder  or (z) subordinate the payment priority of the Loans (including the Term Loans and the Revolving Loans, which shall maintain the same relative priority among them) as set forth in a post-default waterfall or any similar provision providing for payment priority among the Loans hereunder (any such payment senior Class, "<u>Senior Priority Indebtedness</u>") (or agree to any amendment, waiver or modification that would facilitate any of the foregoing) (any such other indebtedness or other obligations, to which such liens securing any of the Obligations or such Obligations, as applicable, are subordinated, "<u>Senior Indebtedness</u>"), in either case of subclause (x), (y) or (z), unless (A) Supermajority Lenders shall have agreed and (B) each directly adversely affected Term Loan Lender and Revolving <u>Loan</u> Lender has been offered a *bona fide* opportunity to fund or otherwise provide its *pro rata* share (based on the amount of Loans or Revolving Loan Commitments that are directly adversely affected thereby held by each Lender in respect of such Term Loans and/or Revolving Loans) of the Senior Indebtedness on the same terms (other than *bona fide* backstop fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction; such fees and expenses, "<u>Ancillary Fees</u>") as offered to all other providers (or their affiliates) of the Senior Indebtedness and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its *pro rata* share of the fees and any other similar benefit (other than Ancillary Fees) of the Senior Indebtedness afforded to the providers of the Senior Indebtedness (or any of their affiliates) in connection with providing the Senior Indebtedness pursuant to a written offer made to each such adversely affected Lender describing the material terms of the arrangements pursuant to which the Senior Indebtedness is to be provided, which offer shall remain open to each such adversely affected Lender for a period of not less than five (5) Business Days; provided~~-~~ that:

(A)     <u>any Lender may designate any of its Affiliates to provide such priming Indebtedness on its behalf with the existing Obligations of such Lender being treated, for purposes hereof, as though such Lender had provided such priming Indebtedness itself;</u>

(B)     ~~(A)~~ any such offer may be made on a post-closing basis via syndication,

(C) ~~(B)~~ any ABL Facility permitted by clause (10) below shall not be subject to the foregoing; and

(D) ~~(C)~~ subordination to any capital lease or similar acquisition financing shall not be subject to the foregoing.

(9)    permit or facilitate the purchase, repayment or retirement for value of any Loans on a non-*pro rata* basis with respect to the other Loans of the same Class, unless such purchase, repayment or retirement is offered to all such Lenders holding Loans of the same Class on the same terms or all Lenders agree in writing; and

(10)    permit the incurrence of an ABL Facility (i) having a commitment in excess of $50,000,000 or (ii) which is being provided by any existing Lender (or its Affiliates) holding greater than 15% of the outstanding Term Loans as of the date of incurrence of such ABL Facility, except to the extent that each Lender is given the opportunity to ratably participate in such ABL Facility, in either case, without the written consent of each Lender;

(b)    no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any Note;

(c)    the consent of the Borrower shall not be required in connection with amendments to this Agreement to change the payment priorities with respect to the Loans under this Agreement in order to reflect a "first-out" structure with respect to the Revolving Loan, so long as such amendments are not adverse to the Borrower and the other Loan Parties; and

(d)    any amendment, modification or consent expressly permitted by Section 2.12 shall be permitted to be made as referenced therein and shall not require the consent of the Required Lenders or any other Lender.

No failure or delay on the part of the Administrative Agent, any Lender or the holder of any Note in exercising any power or right under this Agreement or any Note shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right. No notice to or demand on the Borrower in any case shall entitle it to any notice or demand in similar or other circumstances.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

**9.2    Payment Dates**.    Except as expressly provided in this Agreement, whenever any payment to be made hereunder by or to the Lenders or to the holder of any Note shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day, and

such extension of time shall be included in computing the fees or interest payable on such next succeeding Business Day.

**9.3** **Notices**. All communications and notices provided under this Agreement shall be in writing by in writing (including email or facsimile transmission), telecopy or personal delivery and if it the Borrower addressed or delivered to the Borrower at its address shown on the signature page hereof or if to the Administrative Agent delivered to it at the address shown on **Schedule 9.3** attached hereto, or to any party at such other address as may be designated by such party in a notice to the other parties. Any notice shall be deemed given when transmitted by email, telecopier or, when personally delivered, if mailed properly addressed, shall be deemed given upon the third Business Day after the placing thereof in the United States mail, postage prepaid.

**9.4** **Costs and Expenses**. The Borrower agrees to pay, or reimburse, the Administrative Agent for all expenses reasonably incurred for the preparation of this Agreement, including exhibits, and the Loan Documents and any amendments hereto or thereto or consents or waivers hereunder or thereunder as may from time to time hereafter be required thereby or by the transactions contemplated hereby, including, but not limited to, the fees and out-of-pocket expenses of the Administrative Agent, charges and disbursements of special counsel to the Administrative Agent from time to time incurred in connection with the preparation and execution of this Agreement and any document relevant to this Agreement, including the Loan Documents, any amendments hereto or thereto, or consents or waivers hereunder or thereunder, and the consideration of legal questions relevant hereto and thereto. The Borrower agrees to pay, or reimburse, the Administrative Agent and each Lender and each L/C Issuer upon demand for all costs and expenses (including attorneys', auditors' and accountants' fees and expenses) reasonably incurred and arising out of the transactions contemplated by this Agreement and the Loan Documents, in connection with any work-out or restructuring of the transactions contemplated hereby and by the Loan Documents and any collection or enforcement of the obligations of the Borrower hereunder or thereunder, whether or not suit is commenced, including attorneys' fees and legal expenses (limited to one (1) primary counsel for the Administrative Agent and, if deemed appropriate by the Administrative Agent, one (1) counsel in each relevant jurisdiction and any special counsel (except in the case of actual or perceived conflict, in which case one (1) additional counsel for each Lender and each L/C Issuer similarly situated in respect of such conflict)) in connection with any appeal of a lower court's order or judgment. The obligations of the Borrower under this Section 9.4 shall survive any termination of this Agreement.

**9.5** **Indemnification**. In consideration of the execution and delivery of this Agreement by the Administrative Agent and the Lenders, the Borrower agrees to indemnify and hold harmless the Administrative Agent, each Lender and each L/C Issuer and their respective Affiliates, officers, directors, employees, shareholders, agents, successors and assigns (the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities and expenses (other than the expenses to be paid or reimbursed pursuant to Section 9.4 above), joint or several, to which any such Indemnified Party may become subject arising out of or in connection with this Agreement and the other transactions contemplated hereby, the Advances and the use of proceeds thereof in connection with any claim, litigation, investigation or proceeding (any of the foregoing, a "Proceeding") relating to any of the foregoing, regardless of whether any such Indemnified Party is a party hereto or whether a Proceeding is brought by a third party or by you any Loan Party or Affiliate of a Loan Party, and to reimburse each such Indemnified Party within ten (10) days of receipt of an invoice for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; it being understood and agreed that no Loan Party shall be required to reimburse legal fees or expenses of more than one counsel to all Indemnified Parties, taken as a whole and in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel to each group of affected Indemnified Parties similarly

situated taken as a whole (and, if reasonably necessary as determined by the Administrative Agent, a single local counsel for all Indemnified Parties taken as a whole in each relevant jurisdiction and, in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel in each relevant jurisdiction to each group of affected Indemnified Parties similarly situated taken as a whole); provided that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent (x) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Party or any Related Indemnified Party (as defined below), (y) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from a material breach of the material obligations of any Indemnified Party or any of its Related Indemnified Parties under this Agreement or any of the Loan Documents at a time when no Loan Party has breached its obligations hereunder in any material respect, or (z) they relate to any dispute solely among Indemnified Parties at a time when no Loan Party has breached its obligations hereunder or any other Loan Document in any material respect (other than any claims against the Administrative Agent in its capacity or in fulfilling its role as Administrative Agent, but not any other person or entity party to any such Proceeding).

Notwithstanding any other provision of this Agreement or any Loan Document, (i) no Indemnified Party or Related Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of any Indemnified Party and (ii) none Loan Parties, any of their Affiliates or any Indemnified Party or Related Indemnified Party shall be liable for any indirect, special, punitive or consequential damages incurred in connection with this Agreement or the transactions contemplated herein (provided that this provision shall not limit the Loan Parties' indemnification obligations set forth above).  For purposes hereof, a "Related Indemnified Party" of an Indemnified Party means (1) any controlling person or controlled affiliate of such Indemnified Party, (2) the respective directors, trustees, officers, or employees of such Indemnified Party or any of its controlling persons or controlled Affiliates and (3) the respective agents or advisors of such Indemnified Party or any of its controlling persons or controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnified Party, controlling person or such controlled Affiliate; provided that each reference to a controlled Affiliate or controlling person in this paragraph pertains to a controlled Affiliate or controlling person involved in the negotiation of this Agreement and the other Loan Documents.

No Loan Party shall be liable for any settlement of any Proceedings effected without the Borrower's consent (which consent shall not be unreasonably conditioned, withheld or delayed), but if settled with the Borrower's written consent or if there is a final judgment for the plaintiff in any such Proceedings, the Borrower agrees to indemnify and hold harmless each Indemnified Party from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this Section 9.5.  No Loan Party shall, without the prior written consent of an Indemnified Party, effect any settlement or consent to the entry of any judgment of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Party, unless (i) such settlement includes an unconditional release of such Indemnified Party in form and substance reasonably satisfactory to such Indemnified Party from all liability on claims that are the subject matter of such Proceedings, and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party.

The provisions of this Section 9.5 shall survive termination of this Agreement and payment in full of the Notes. This <u>Section 9.5</u> shall not apply with respect to Taxes, other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**9.6** **Severability**. Any provision of this Agreement, the Notes or any other Loan Document executed pursuant hereto which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, the Notes or any other Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

**9.7** **Headings**. The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions hereof.

**9.8** **Governing Law**. This Agreement and the Notes shall each be deemed to be a contract made under, governed by and interpreted pursuant to the internal laws (and not the law of conflicts) of the State of New York.

**9.9** **Successors and Assigns.**

(a) This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns except that: (i) the Borrower may not assign or transfer its rights hereunder without the prior written consent of all of the Lenders and the Administrative Agent; and (ii) any assignment by a Lender must be made in compliance with subsection (b) below and any participation by a Lender must be made in compliance with subsection (c) below. Notwithstanding clause (ii) of this subsection (a), any Lender may at any time, without the consent of Borrower or the Administrative Agent, assign all or any portion of its rights under this Agreement and its Notes to a Federal Reserve Bank. Except to the extent otherwise required by its context, the word "Lender" and "L/C Issuer" where used in this Agreement means and includes any such assignee and such assignee shall be bound by and have the benefits of this Agreement the same as if such holder had been a signatory hereto.

(b) (i) Any Lender may, in the ordinary course of its business and in accordance with applicable law, at any time assign to one or more banks or other entities that are Eligible Assignees all or a portion of its Commitments, Advances owing to it, and its rights and obligations under this Agreement in respect thereof in accordance with the provisions of this subsection (b). Each assignment shall be of a constant, and not a varying, ratable percentage of the assigning Lender's rights and obligations under this Agreement and each Eligible Assignee shall assume a pro rata share of the assigning Lender's obligations determined by the percentage of the Commitments assigned for the period from the effective date of the assignment through the Revolver Maturity Date or Term Loan Maturity Date, as applicable. Such assignment shall be substantially in the form of the Assignment and Assumption Agreement attached as **Exhibit E** hereto (the "<u>Assignment and Assumption Agreement</u>") and shall not be permitted hereunder unless:

(1) the amount of the Loans, Commitment and/or Letter of Credit Obligations assigned by the assigning Lender pursuant to each assignment shall be at least $1,000,000 in the aggregate (or the entirety of such assigning Lender's Loans, Commitment and/or Letter of Credit Obligations, as applicable, if less), or

(2)      such assignment is to another Lender or an Affiliate of a Lender, in which case no minimum amount shall apply.

(ii) The consent of the Administrative Agent and, provided no Default or Event of Default then exists, the Borrower (which consents shall not be unreasonably withheld or delayed) shall be required prior to an assignment becoming effective with respect to a transferee which is not a Lender, an Affiliate of a Lender, or an Approved Fund.  The Borrower's consent shall be deemed to have been given unless the Borrower objects within ten (10) Business Days after receipt of notice of such assignment.  Notwithstanding anything herein to the contrary:

(1)      except to the extent otherwise agreed by the Required Lenders (and subject to a right of first offer to existing Lenders as described in clause (2) below), prior to the one-year anniversary of the Closing Date, no Lender may assign any portion of its Loans or Commitments hereunder other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund;

(2)      from and after the one-year anniversary of the Closing Date, no Lender may assign any portion of its Loans or Commitments hereunder (other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund), unless the proposed assignor Lender notifies the Administrative Agent in writing of the proposed terms of such assignment and the Administrative Agent provides to each then-existing Lender an offer for all Lenders to purchase their pro rata portion of such Loans and Commitments being assigned, according to the percentages of their respective Loans and Commitments at the same terms agreed by the proposed assignee.

(A)      If any Lender does not notify the Administrative Agent in writing that such Lender agrees to purchase its pro rata share of such assigned Loans and Commitments at such proposed terms in its entirety within ten (10) Business Days of such offer, that portion of the assigned Loans and Commitments not accepted by the applicable Lenders shall be offered to the applicable accepting Lenders on a non-pro rata basis at the same proposed terms; and

(B)      If the applicable accepting Lenders do not accept the remainder of the proposed assigned Loans and Commitments at such proposed terms in its entirety on a non-pro rata basis within five (5) Business Days after such offer, that portion of the proposed assigned Loans and Commitments not accepted by the applicable accepting Lenders may be offered by the assigning Lender to any Persons that would constitute Eligible Assignees.

(iii) Upon (i) delivery to the Administrative Agent of an executed Assignment and Assumption Agreement, together with any required consents and (ii) payment of a $3,500 fee to the Administrative Agent for processing such assignment, such assignment shall become effective on the effective date specified in such Assignment and Assumption Agreement; provided, that:

(1)      if an assignment by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such assignment and

(2)      if an assignment by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates

107

or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such assignment (unless waived or reduced by the Administrative Agent).

(iv) On and after the effective date of such assignment, such transferee, if not already a Lender, shall for all purposes be a Lender party to this Agreement and any other Loan Documents executed by the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party hereto, and no further consent or action by the Borrower, the Lenders or the Administrative Agent shall be required to release the transferor Lender with respect to the percentage of the  Commitment and Advances assigned to such transferee Lender.     To the extent requested by the applicable Lenders, upon the consummation of any assignment pursuant to this Section 9.9, the Administrative Agent and the Borrower shall make appropriate arrangements so that replacement Notes are issued to such transferor Lender and new Notes or, as appropriate, replacement Notes, are issued to such transferee Lender, in each case in principal amounts reflecting their Commitment, as adjusted pursuant to such assignment.

(c)

(1)     Prior to the one-year anniversary of the Closing Date, no Lender may sell participations in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder) other than to its Affiliates or to an existing Lender (or an Affiliate of an existing Lender) or to an Approved Fund;

(2)     From and after the one-year anniversary of the Closing Date, each Lender and each L/C Issuer may, without the consent of the Borrower, sell participations to one or more banks or other entities that are Eligible Assignees in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of, and obligations under, Section 10.1 and of the cost protection provisions contained in Section 10.4, as well as Sections 9.19 and 10.6 to the extent of the Lender selling such participation and the Borrower's aggregate obligations with respect to Section 10.1 and  Section 10.4 shall not be increased by reason of such participation, provided that such participant shall not be entitled to the benefits of Sections 10.1 and 10.4 unless such participant complies with Section 10.1(e) as (and to the extent) applicable, as if such participant were a Lender (it being understood that the documentation required under Section 10.1(e) shall be delivered to the participating Lender) (iv) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right (and shall not limit its rights) to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers with respect to any fees payable hereunder (to the extent such participants are entitled to such fees) or the amount of principal of or the rate at which interest is payable on the Loans, or the dates fixed for payments of principal of or interest on the Loans). Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other

obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement.

(d)     The Administrative Agent shall maintain a copy of each Assignment and Assumption Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and the principal amount of the Loans owing to, each Lender and each L/C Issuer pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary. It is the intent of the parties that the Obligations shall be treated as issued in registered form under Section 5f. 103-1(c) of the United States Treasury Regulations. Upon the Administrative Agent's receipt of a duly completed Assignment and Assumption Agreement executed by an assigning Lender, an assignee Lender that is an Eligible Assignee and, to the extent required hereunder, the Borrower, such Eligible Assignee's completed Administrative Questionnaire (unless the assignee is already a Lender), the fee referred to in Section 9.9(b) above, and any written consent to such assignment required by such subsection, the Administrative Agent shall accept such Assignment and Assumption Agreement and record the information contained therein in the Register. No assignment shall be effected for purposes of this Agreement unless it has been recorded in the Register as provided in this subsection.

(e)     Notwithstanding anything to the contrary contained in this Section 9.9, a Lender that is a fund that invests in bank loans may pledge all or a portion of its rights in connection with this Agreement to the trustee or other agent for holders of obligations owed, or securities issued, by such fund as security for such obligations or securities, provided that any foreclosure or other exercise of remedies by such trustee shall be subject, in all respects, to the provisions of this Section 9.9 regarding assignments. No pledge described in the immediately preceding sentence shall release any such Lender from its obligations hereunder.

(f)     Except as specifically set forth in this Section 9.9, nothing in this Agreement, expressed or implied, is intended to or shall confer on any Person other than the respective parties hereto and thereto and their successors and assignees permitted hereunder and thereunder any benefit or any legal or equitable right, remedy or other claim under this Agreement or any Notes.

(g)     The provisions of this Section 9.9 shall not apply to any purchase of participations among the Lenders pursuant to Section 2.5.

(h)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender

109

hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with, with respect to Term Loans, its Applicable Term Loan Percentage, and with respect to Revolving Loans, its Applicable Revolving Loan Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(i)      Any Lender may assign all or any portion of its Term Loans hereunder to any Loan Party (any such Person, a "Purchasing Loan Party"), but only if, (i) such assignment is made solely in exchange for cash consideration, pursuant to a process open to all Lenders holding Loans of the same Class pursuant to customary procedures to be agreed between the Borrower and the Administrative Agent at the time of any such auction (including pursuant to a "Dutch auction" or "reverse Dutch auction," and which shall include the ability of the Borrower to purchase Term Loans at a discount to par) offered on a *pro rata* basis among Lenders holding Loans of the same Class, (ii) any such purchased Term Loans shall be automatically and permanently cancelled immediately upon acquisition thereof by the Purchasing Loan Party and no longer outstanding for any purpose hereunder, (iii) no such assignment shall be made with the proceeds of any Revolving Loans, and (iv) no Event of Default has occurred or is continuing, or would result therefrom.

**9.10**   **Execution in Counterparts**.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**9.11**   **Several Liability**.  The Obligations of the Administrative Agent and each of the Lenders hereunder are several, not joint.

**9.12**   **Financial Information**.   The Borrower assumes responsibility for keeping itself informed of its own financial condition and the financial condition of any and all endorsers and/or other guarantors of all or any part of the Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Obligations, or any part thereof, that diligent inquiry would reveal, and the Borrower agrees that the Administrative Agent, the Lenders and the L/C Issuers shall have no duty to advise the Borrower of information known to them regarding such condition or any such circumstances.

**9.13**   **Entire Agreement**.  Except as otherwise expressly provided herein, this Agreement and the other documents described or contemplated herein embody the entire agreement and understanding among the parties hereto and thereto and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

**9.14**   **Other Relationships**.   No relationship created hereunder or under any other Loan Document shall in any way affect the ability of the Administrative Agent or its Affiliates and each Lender and each L/C Issuer or their respective Affiliates to enter into or maintain business relationships with the Borrower beyond the relationships specifically contemplated by this Agreement and the other Loan Documents.

**9.15**   **Consent to Jurisdiction**.   BORROWER HEREBY IRREVOCABLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF,

OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS
AGREEMENT OR THE NOTES OR ANY OTHER LOAN DOCUMENT AND HEREBY
IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR
PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR,
TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.
BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY
EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE
MAINTENANCE OF SUCH ACTION OR PROCEEDING.   EACH PARTY IRREVOCABLY
CONSENTS TO THE SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY
OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING BY THE
MAILING BY UNITED STATES CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OF COPIES
OF SUCH PROCESS TO SUCH BORROWER'S ADDRESS REFERENCED IN SECTION 9.3.   EACH
PARTY AGREES THAT A JUDGMENT, FINAL BY APPEAL OR EXPIRATION OF TIME TO
APPEAL WITHOUT AN APPEAL BEING TAKEN, IN ANY SUCH ACTION OR PROCEEDING
SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON
THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.   NOTHING IN THIS
SECTION SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY
OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE ADMINISTRATIVE
AGENT, ANY LENDER OR L/C ISSUER TO BRING ANY ACTION OR PROCEEDING AGAINST
SUCH BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

**9.16** **Waiver of Jury Trial**.   THE BORROWER, THE ADMINISTRATIVE AGENT AND
THE LENDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY
ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS
AGREEMENT OR ANY NOTE, OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED
HEREUNDER OR THEREUNDER.

**9.17** **USA Patriot Act**.   Each Lender and each L/C Issuer that is subject to the Act (as
hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby
notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L.
107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record
information that identifies the Borrower, which information includes the name and address of the
Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to
identify the Borrower in accordance with the Act.   The Borrower shall, promptly following a request by
the Administrative Agent or any Lender, provide all documentation and other information that the
Administrative Agent or such Lender requests in order to comply with its ongoing obligations under
applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**9.18** **Confidentiality**.

(a)      Each of the Administrative Agent, each Lender and each L/C Issuer
agree to maintain the confidentiality of information obtained by it pursuant to any Loan
Document, except that such information may be disclosed (i) with the Borrower's written
consent, (ii) in any legal, judicial, administrative proceeding or compulsory process or otherwise
as required by applicable law or regulations (in which case such Person agrees to promptly notify
the Borrower to the extent practicable and permitted by applicable law); (iii) upon the request or
demand of any Governmental Authority having jurisdiction over the Administrative Agent, such
Lender, such L/C Issuer or their respective Affiliates (in which case such Person agrees to, except
with respect to any audit or examination conducted by bank accountants, any governmental bank
or insurance regulatory authority exercising examination or regulatory authority, or any
regulatory requests made by the National Association of Insurance Commissioners, promptly

notify the Borrower to the extent lawfully permitted to do so); (iv) to officers, directors, trustees, agents, members, partners, equity holders, approved and managed funds, employees, attorneys, prospective investors, accountants and advisors of the Administrative Agent, any Lender or any L/C Issuer who are informed of the confidential nature of such information and are or have been advised of their obligation to keep such information confidential solely on a need-to-know basis in connection with the transactions contemplated by this Agreement; (v) to any Affiliates of the Administrative Agent, any Lender or any L/C Issuer (provided that any such Affiliate is advised of its obligation to retain such information as confidential) on a need-to-know basis in connection with the transactions contemplated by this Agreement; (vi) to the extent any such information becomes publicly available other than by reason of disclosure in breach of this Agreement; and (vii) in connection with the exercise or enforcement of any right or remedy under any Loan Document.

**9.19**   **Replacement of Lenders**.  If the Borrower is entitled to replace a Lender or L/C Issuer pursuant to the provisions of Section 10.6, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender or L/C Issuer and the Administrative Agent, require such Lender or L/C Issuer to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.9), all of its interests, rights (other than its existing rights to payments pursuant to Sections 10.1 and 10.4 with respect to payments made prior to such assignment) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender or L/C Issuer, if a Lender or L/C Issuer accepts such assignment), provided that:

(a)   the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 9.9(b);

(b)   such Lender or L/C Issuer shall have received payment of an amount equal to 100% of the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 10.5) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)   in the case of any such assignment resulting from a claim for compensation under Section 10.4 or payments required to be made pursuant to Section 10.1, such assignment will result in a reduction in such compensation or payments thereafter;

(d)   such assignment does not conflict with applicable Laws; and

(e)   in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender or L/C Issuer shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or L/C Issuer or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**9.20**   **Keepwell**.  Each of Borrower, Affiliate of Borrower and Guarantor that is a Qualified ECP Guarantor at the time the Guarantee or the grant of a Lien under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified

Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this Article IX voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full. Borrower, each Affiliate of Borrower and Guarantor intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

    **9.21    Electronic Execution of Assignments and Certain Other Documents**. The words "delivery," "execute," "execution," "signed," "signature," and words of like import in any Loan Document or any other document executed in connection herewith shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary neither the Administrative Agent nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent or such Lender pursuant to procedures approved by it and provided further without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

    **9.22    ABL/Term Intercreditor Agreement**. Notwithstanding anything to the contrary contained herein or in any other Loan Document, in the event of a conflict or inconsistency between the terms of this Agreement and the terms of the ABL/Term Intercreditor Agreement, if any, the terms of the ABL/Term Intercreditor Agreement shall prevail.

<div align="center">

**ARTICLE X**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

</div>

    **10.1    Taxes**.

        (a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

            (i)    Any and all payments by or on account of any obligation of any Borrower or Guarantor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Laws (as determined in the good faith discretion of the applicable withholding agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Borrower or Guarantor, then the Administrative Agent or such Borrower or Guarantor shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

            (ii)    If any Borrower or Guarantor or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal

backup withholding and withholding taxes, from any payment on account of any obligation of the Borrower or Guarantor under any Loan Document, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code and provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower or Guarantor shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 10.1) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)     If any Borrower or Guarantor or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment on account of any obligation of the Borrower or Guarantor under any Loan Document, then (A) such Borrower or Guarantor or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Borrower or Guarantor or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and, if paid by the Administrative Agent, the Administrative Agent shall provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower or Guarantor shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 10.1) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     Payment of Other Taxes by Borrower and/or Guarantor.  Without limiting the provisions of subsection (a) above, Borrower and/or Guarantor shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     Tax Indemnifications.

(i)     Each Borrower and Guarantor shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 10.1) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)     Each Lender and each L/C Issuer shall, and does hereby, severally indemnify and shall make payment in respect thereof within ten (10) days after demand therefor, (A) the Administrative Agent against any Indemnified Taxes attributable to such Lender

or L/C Issuer (but only to the extent that any Borrower or Guarantor has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower and/or Guarantor to do so), and (B) the Administrative Agent and the Borrower and/or Guarantor, as applicable, against any Taxes attributable to such Lender's or L/C Issuer's failure to comply with the provisions of Section 9.9(c) relating to the maintenance of a Participant Register, and (C) the Administrative Agent and the Borrower and/or Guarantor, as applicable, against any Excluded Taxes attributable to such Lender or L/C Issuer, in each case, that are payable or paid by the Administrative Agent or a Borrower or Guarantor in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender and each L/C Issuer hereby authorizes the Administrative Agent, Borrower or Guarantor to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document or otherwise payable by the Administrative Agent, Borrower or Guarantor from any other source against any amount due to the Administrative Agent, Borrower or Guarantor under this clause (ii).

(d)    Evidence of Payments.  As soon as practicable after any payment of Taxes by any Borrower or Guarantor to a Governmental Authority, as provided in this Section 10.1, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders; Tax Documentation.

(i)    Any Lender or L/C Issuer that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender or L/C Issuer, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender or L/C Issuer is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.1(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's or L/C Issuer's reasonable judgment such completion, execution or submission would subject such Lender or L/C Issuer to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    any Lender or L/C Issuer that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender or L/C Issuer becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the

115

Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender or L/C Issuer is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender or L/C Issuer shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender or L/C Issuer becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender or L/C Issuer claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed originals of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender or L/C Issuer claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "<u>U.S. Tax Compliance Certificate</u>") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(4)      to the extent a Foreign Lender or L/C Issuer is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if the Foreign Lender or L/C Issuer is a partnership and one or more direct or indirect partners of such Foreign Lender or L/C Issuer are claiming the portfolio interest exemption, such Foreign Lender or L/C Issuer may provide a U.S. Tax Compliance Certificate satisfactory to the Administrative Agent on behalf of each such direct and indirect partner;

(C)      any Foreign Lender or L/C Issuer shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender or L/C Issuer becomes a Lender or L/C Issuer under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies (or originals, as required) of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary

documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)      if a payment made to a Lender or L/C Issuer under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or L/C Issuer were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or L/C Issuer shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender or L/C Issuer has complied with such Lender's or L/C Issuer's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(E)      the Administrative Agent shall deliver to the Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that the Administrative Agent is a U.S. Person exempt from U.S. federal backup withholding tax.

(iii)      Each Lender and L/C Issuer agrees that if any form or certification it previously delivered pursuant to this Section 10.1 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)      Treatment of Certain Refunds.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or L/C Issuer, or have any obligation to pay to any Lender or L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such Lender or L/C Issuer.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes ("Refund") as to which it has been indemnified by any Borrower or Guarantor or with respect to which any Borrower or Guarantor has paid additional amounts pursuant to this Section 10.1, it shall pay to such Borrower or Guarantor an amount equal to such Refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower or Guarantor under this Section 10.1 with respect to the Taxes giving rise to such Refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such Refund), provided that each Borrower or Guarantor, upon the request of the Recipient, agrees to repay the amount paid over to such Borrower or Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such Refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to such Borrower or Guarantor pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such Refund had not been deducted, withheld or otherwise imposed and the

117

indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Borrower or Guarantor or any other Person.

(g)     Survival.  Each party's obligations under this Section 10.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or L/C Issuer, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**10.2     Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Term SOFR Reference Rate, or to determine or charge interest rates based upon the Term SOFR Reference Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market or the banking market generally, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (a) any obligation of such Lender to make or continue Term SOFR Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR Reference Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loans, and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Term SOFR Reference Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Term SOFR Reference Rate.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**10.3     Inability to Determine Rates**.

(a)     If in connection with any request for a Term SOFR Loan, or a continuation thereof, (i)  the Administrative Agent determines that (A)  Dollar deposits are not being offered to banks in the London interbank eurodollar market or, in the case of Term SOFR Loans, the banking market generally, for the applicable amount and Interest Period of such Term SOFR Loan, or (B) adequate and reasonable means do not exist for determining the Adjusted Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan or in connection with an existing or proposed Base Rate Loan (in each case with respect to clause (i), "Impacted Loans"), or (ii) the Administrative Agent or the Required Lenders determine that for any reason Adjusted Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.

Thereafter, (x) the obligation of the Lenders to make or maintain Term SOFR Loans shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Adjusted Term SOFR component of the Base Rate, the utilization of the Adjusted Term SOFR component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for an Advance of or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for an Advance of Base Rate Loans in the amount specified therein.

(b)        Notwithstanding the foregoing, if the Administrative Agent has made the determination described in clause (a)(i) of this Section, the Administrative Agent in consultation with the Borrower and the Required Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (1) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under clause (a)(i) of this Section, (2) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (3) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof.

**10.4    Increased Costs**.

(a)        <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)        impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 10.4(e)</u>) or L/C Issuer;

(ii)        subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes) and (C) Connection Income Taxes on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)        impose on any Lender or L/C Issuer, the London interbank market or the banking market generally any other condition, cost or expense affecting this Agreement or Term SOFR Loans made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making, continuing or maintaining any Loan or Letter of Credit the interest on which is determined by reference to the Term SOFR Reference Rate (or of maintaining its obligation to make any such Loan or Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or L/C Issuer (whether of principal, interest or any other amount) then, upon request of such Lender or L/C Issuer, the Borrower will

119

pay to such Lender or L/C Issuer such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender or L/C Issuer determines that any Change in Law affecting such Lender or any Lending Office of such Lender, or L/C Issuer or such Lender's or L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, or Letter of Credit Obligations held by such L/C Issuer, to a level below that which such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or L/C issuer's policies and the policies of such Lender's or L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender or L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or L/C Issuer or such Lender's or L/C Issuer's holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender or L/C Issuer the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender or L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section 10.4 shall not constitute a waiver of such Lender's or L/C Issuer's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender or L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or L/C Issuer notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

**10.5**    **Funding Losses**.  Upon written demand of any Lender or L/C Issuer (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost, liability or expense (excluding loss of anticipated profits or margin) actually incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)    any assignment of a Term SOFR Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 9.19;

120

including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender or L/C Issuer in connection with the foregoing.

**10.6**    **Mitigation Obligations; Replacement of Lenders**.

(a)    Designation of a Different Lending Office.  If any Lender or L/C Issuer requests compensation under Section 10.4, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or L/C Issuer or any Governmental Authority for the account of any Lender or L/C Issuer pursuant to Section 10.1, or if any Lender gives a notice pursuant to Section 10.2, then at the request of the Borrower, such Lender or L/C Issuer shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans or Letters of Credit hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 10.1 or 10.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 10.2, as applicable, and (ii) in each case, would not subject such Lender or L/C Issuer to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or L/C Issuer.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or L/C Issuer in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender or L/C Issuer requests compensation under Section 10.4, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or L/C Issuer or any Governmental Authority for the account of any Lender or L/C Issuer pursuant to Section 10.1 and, in each case, such Lender or L/C Issuer has declined or is unable to designate a different lending office in accordance with Section 10.6(a) that eliminates the need to pay additional amounts for Indemnified Taxes under Section 10.1 or compensation under Section 10.4, the Borrower may replace such Lender or L/C Issuer in accordance with Section 9.19.

**10.7**    **Survival**.  All of the Borrower's obligations under this Sections 10.4 and 10.5 shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

**10.8**    **Amendment and Restatement**.  The Borrower, Holdings, the Administrative Agent and the Lenders hereby agree that upon the effectiveness of the amendment and restatement of the Existing Opco Note by this Agreement, the terms and provisions of the Existing Opco Note shall be and hereby are amended and restated in their entirety by the terms and provisions of this Agreement.  By execution of this Agreement each party hereto hereby agrees that (i) this Agreement is given as a substitution for, and not as a payment of, the obligations of the Borrower and the other obligors existing under the Existing Opco Note prior to the effectiveness of this Agreement and (ii) this Agreement does not constitute a novation of the Existing Opco Note.

[Signature pages follow]

121

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**"BORROWER"**

**[WASH & WAX & WASH SYSTEMS LLC]**, a Delaware limited liability company

By:_____
    Name:
    Title:

**"HOLDINGS"**

**[WASH & WAX & WASH INTERMEDIATE LLC]**, a Delaware limited liability company

By:_____
    Name:
    Title:

**"ADMINISTRATIVE AGENT"**

**BRIGHTWOOD LOAN SERVICES LLC**, in its
capacity as Administrative Agent

By:_____
    Name:
    Title:


By:_____
    Name:_
    Title:


Address:  810 Seventh Avenue, 26th Floor
           New York, NY 10019
           Attention: _____

**"LENDER"**

**BRIGHTWOOD LOAN SERVICES LLC**, in its capacity as a Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Address:  810 Seventh Avenue, 26th Floor
        New York, NY 10019
        Attention: Sam Sullivan, Mia Ellis and Brett Murray

**"LENDER"**[4]

_____, in its capacity as a Lender

By:_____
    Name:
    Title:

Address: _____

---

[4] ~~NTD: Lender sig pages and allocations to be confirmed.~~

**"LENDER"**

_____, in its capacity as a Lender

By:_____
　　　Name:
　　　Title:


Address: _____

## Exhibit C

**Identities of Members of the New Board**

[*Filed at Docket No. 360.*]

**Exhibit D**

**Assumed Executory Contracts and Unexpired Leases Schedule**

      Article V of the Plan provides that on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected (to the extent applicable) will be deemed rejected by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected (to the extent applicable) by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

      Article V of the Plan further provides that entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, and related Cure amounts with respect thereto, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule (if any), pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Plan or in this Plan Supplement, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any Final Order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

      Article V of the Plan further provides that except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

      Article V of the Plan further provides that to the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Article V of the Plan further provides that notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule or the Rejected Executory Contracts and Unexpired Leases Schedule (if any) at any time up to forty-five (45) days after the Effective Date. The Debtors or the Reorganized Debtors, as applicable, shall File with the Bankruptcy Court and serve on the applicable counterparty any change to the Rejected Executory Contracts and Unexpired Leases Schedule, Assumed Executory Contracts and Unexpired Leases Schedule, and any applicable counterparty shall have fourteen (14) days from the Filing of such notice to File an objection with the Bankruptcy Court.

Article V of the Plan further provides that to the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

Article V of the Plan further provides that if certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Combined Hearing (to the extent not resolved by the parties prior to the Combined Hearing.

Pursuant to the Restructuring Transactions Memorandum, all Executory Contracts and Unexpired Leases Assumed or otherwise held by Zips Car Wash, LLC are hereby assigned to Zips Car Wash Holdings, LLC.

Certain documents, or portions thereof, contained in this **Exhibit D** and this Plan Supplement remain subject to continued review by the Debtors, the Required Consenting Term Loan Lenders, and interested parties with respect thereto. The respective rights of the Debtors and the Required Consenting Term Loan Lenders are expressly reserved, subject to the terms and conditions set forth in the Plan to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court.

## Exhibit D(i)

**Assumed Leases[1]**

---

[1] Certain of the Assumed Leases reflected in this Exhibit D(i) were listed on the Assumed Leases (Conditional) Schedule in the previous Plan Supplement filed at Docket No. 360

**Zips Car Wash, LLC, et al**
*Assumed Real Property Leases [1]*
*As of April 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Cure Amount | Property Address Street Address | City | State | Zip | Counterparty Address Landlord | Parent Company | Attention | Street Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4040 Winder Highway, LLC | Zips Car Wash, LLC | Lease Agreement dated March 9, 2018 | 0206 - GAFLO_WinderHwy | 2,636.78 | 4040 Winder Hwy | Flowery Branch | GA | 30542 | 4040 Winder Highway, LLC | | c/o Gene Mirvis | 19464 39th Avenue | Miami | FL | 33160 |
| B&C Grand Strand Properties, LLC | Zips Car Wash, LLC | Amended and Restated Lease dated December 29, 2016 | 0137 - SCMYR_JoeWhite | 8,666.58 | 1942 10th Ave N | Myrtle Beach | SC | 29577 | B&C Grand Strand Properties, LLC | | Attn: Lease Administration | P.O. Box 7577 | Myrtle Beach | SC | 29572 |
| Bartmart II, LLC | Zips Car Wash, LLC | Lease Agreement dated January 17, 2020 | 906 - NCFOR_College | 1,819.48 | 1822 Hwy 74A Bypass | Forest City | NC | 28043 | Bartmart II, LLC | | Attn: Jason A. Bartley, Manager | 110 Surry Path Court | Winston-Salem | NC | 27104 |
| BLVY Partners CLTZ Tyvola, LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated May 2, 2019 | 952 - NCCHA_Tyvola | - | 1036 Tyvola Rd | Charlotte | NC | 28217 | BLVY Partners CLTZ Tyvola, LLC | Willow Oak | Attn: David Head | 500 East Blvd, Suite 204 | Charlotte | NC | 28203 |
| BLVY Partners CLTZ Wilkinson, LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated May 2, 2019 | 953 - NCCHA_Wilkinson | - | 3401 Wilkinson Blvd | Charlotte | NC | 28208 | BLVY Partners CLTZ Wilkinson, LLC | Willow Oak | Attn: David Head | 500 East Blvd, Suite 204 | Charlotte | NC | 28203 |
| Broadstone ZCW Portfolio, LLC | Zips Car Wash, LLC | Amended and Restated Master Lease Agreement dated December 21, 2023 | 801 - FLBOY_Congress | 5,614.05 | 3008 S Congress Ave | Boynton Beach | FL | 33426 | Broadstone ZCW Portfolio, LLC | | c/o Broadstone Real Estate, LLC Attn: Portfolio Manager | 800 Clinton Square | Rochester | NY | 14604 |
| Broadstone ZCW Portfolio, LLC | Zips Car Wash, LLC | Master Lease Agreement dated December 27, 2017 | 0323 - KYLEX_NewCircle | 2,058.06 | 440 W New Circle Rd | Lexington | KY | 40511 | Broadstone ZCW Portfolio, LLC | | c/o Broadstone Real Estate, LLC Attn: Portfolio Manager | 800 Clinton Square | Rochester | NY | 14604 |
| | | | 126 - TNALC_Hall | 2,853.36 | 220 S Hall Rd | Alcoa | TN | 37701 | | | | | | | |
| | | | 323 - OKTUL_61st | 2,266.16 | 10220 E 61 St | Tulsa | OK | 74133 | | | | | | | |
| | | | 702 - KSWIC_Webb | 2,980.05 | 700 N Webb Rd | Wichita | KS | 67206 | | | | | | | |
| | | | 840 - FLMIL_Hwy90 | 3,229.64 | 6155 Hwy 90 | Milton | FL | 32570 | | | | | | | |
| Broadstone ZCW Portfolio, LLC | Zips Car Wash, LLC | Master Lease Agreement dated July 17, 2018 | 602 - TXTEX_Stateline | 3,566.24 | 4311 N State Line Ave | Texarkana | TX | 75503 | Broadstone ZCW Portfolio, LLC | | c/o Broadstone Real Estate, LLC Attn: Portfolio Manager | 800 Clinton Square | Rochester | NY | 14604 |
| | | | 703 - KSWIC_Maple | 2,804.60 | 3825 W Maple St | Wichita | KS | 67213 | | | | | | | |
| | | | 705 - KSWIC_S.Maize | 2,578.40 | 1506 S Maize Rd | Wichita | KS | 67209 | | | | | | | |
| | | | 841 - FLPAC_Woodbine | 3,619.25 | 4254 Woodbine Rd | Pace | FL | 32571 | | | | | | | |
| Country Orchard Estates, Inc. | Zips Car Wash, LLC | Lease Agreement dated December 8, 2021 | 0324 - KYLEX_Richmond | - | 2576 Richmond Rd | Lexington | KY | 40509 | Country Orchard Estates, Inc. | | Attn: David Burton | 277 La Colina Drive | Redlands | CA | 92374 |
| Country Orchard Estates, Inc. | Zips Car Wash, LLC | Lease Agreement dated December 8, 2021 | 0326 - KYLEX_Sharkey | - | 1776 Sharkey Way | Lexington | KY | 40511 | Country Orchard Estates, Inc. | | Attn: David Burton | 277 La Colina Drive | Redlands | CA | 92374 |
| DNA Miracle Properties, LLC | Zips Car Wash, LLC | Lease Agreement dated April 15, 2019 | 135 - TNKNO_Clinton | - | 6655 Clinton Hwy | Knoxville | TN | 37912 | DNA Miracle Properties, LLC | | Attn: James D. Wamble | 224 Bramerton Court | Franklin | TN | 37069 |
| Exp Wash RE Portfolio Owner I, LLC | Zips Car Wash, LLC | Second Amended and Restated Master Lease Agreement dated September 29, 2017 | 0103 - SCSEN_Jennings | 3,627.59 | 1113 Jennings Ave | Seneca | SC | 29678 | Exp Wash RE Portfolio Owner I, LLC | Secure Properties | Attn: Kevin Ross | 450 Lexington Ave, Unit 4539 | New York | NY | 10037 |
| | | | 0200 - GACOR_FinisSprings | 3,436.73 | 155 Finis Springs Dr | Cornelia | GA | 30531 | | | | | | | |
| | | | 0201 - GACOM_Hwy441 | 4,739.75 | 40091 Hwy 441 | South Commerce | GA | 30529 | | | | | | | |
| | | | 203 - ARROG_Walnut | 2,892.26 | 2851 W Walnut St | Rogers | AR | 72756 | | | | | | | |
| | | | 225 - ARLIT_RodneyParham | 2,496.82 | 9500 N Rodney Parham Rd | Little Rock | AR | 72227 | | | | | | | |
| F.M. Hammad Irrevocable Trust | Zips Car Wash, LLC | Lease Agreement dated September 9, 2019 | 134 - TNKNO_Maynardville | - | 7229 Maynardville Pike | Knoxville | TN | 37918 | F.M. Hammad Irrevocable Trust | | Attn: Kaled Hammad | 4729 Lennon Ave. | Arlington | TX | 76016 |
| FSC ZCW Lynchburg VA, LLC | Zips Car Wash, LLC | Deed of Lease dated November 15, 2018 | 0600 - VALYN_Wards | - | 3805 Wards Rd | Lynchburg | VA | 24502 | FSC ZCW Lynchburg VA, LLC | Four Springs | Attn: Cynthia M. Daly | 1901 Main Street | Lake Como | NJ | 07719 |
| FSC ZCW Roanoke VA, LLC | Zips Car Wash, LLC | Deed of Lease dated November 15, 2018 | 0601 - VAROA_Challenger | 6,650.00 | 4035 Challenger Ave NE | Roanoke | VA | 24012 | FSC ZCW Roanoke VA, LLC | Four Springs | Attn: Cynthia M. Daly | 1901 Main Street | Lake Como | NJ | 07719 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated February 26, 2019 | 0307 - KYLOU_Breckenridge | 4,459.59 | 3000 Brenckenridge Ln | Louisville | KY | 40220 | Getty Leasing, Inc. | | Attn: Mark Olear | 292 Madison Avenue, 9th Floor | New York | NY | 10017 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated October 22, 2019 | 924 - NCROC_E.Broad | 3,001.01 | 1704 E Broad St | Rockingham | NC | 28379 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated October 31, 2019 | 0304 - KYLOU_S.Hurstbourne | 3,381.41 | 4590 S Hurstbourne Pkwy | Louisville | KY | 40299 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated December 16, 2019 | 968 - NCKAN_S.Cannon | 3,836.48 | 1402 S Cannon Blvd | Kannapolis | NC | 28083 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated March 13, 2020 | 0603 - VASAL_W.Main | 3,333.01 | 1706 W Main St | Salem | VA | 24153 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated July 23, 2020 | 960 - NCGRE_PyramidsVillage | 3,841.20 | 2109 Pyramids Village Blvd | Greensboro | NC | 27405 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Ingles Markets, Incorporated | Zips Car Wash, LLC | Outparcel Lease Agreement dated April 20, 2018 | 905 - NCOTE_Tunnel | 2,784.80 | 1143 Tunnel Rd | Asheville | NC | 28805 | Ingles Markets, Incorporated | | Attn: Real Estate Department | P.O.Box 6676 | Asheville | NC | 28816 |
| Ingles Markets, Incorporated | Zips Car Wash, LLC | Outparcel Lease Agreement dated April 20, 2018 | 907 - NCASH_SmokeyPark | 2,784.80 | 153 Smokey Park Hwy | Asheville | NC | 28806 | Ingles Markets, Incorporated | | Attn: Real Estate Department | P.O.Box 6676 | Asheville | NC | 28816 |
| Ingles Markets, Incorporated | Zips Car Wash, LLC | Outparcel Lease Agreement dated April 20, 2018 | 908 - NCMAR_W.Henderson | 2,784.80 | 709 W Henderson St | Marion | NC | 28752 | Ingles Markets, Incorporated | | Attn: Real Estate Department | P.O.Box 6676 | Asheville | NC | 28816 |
| Ingles Markets, Incorporated | Zips Car Wash, LLC | Outparcel Lease Agreement dated April 20, 2018 | 959 - NCLIN_E.Main | 2,784.80 | 2116 E Main St | Lincolnton | NC | 28092 | Ingles Markets, Incorporated | | Attn: Real Estate Department | P.O.Box 6676 | Asheville | NC | 28816 |
| JB5117 Poplar, LLC | Zips Car Wash, LLC | Lease Agreement dated December 23, 2015 | 105 - TNMEM_Poplar | - | 4831 Poplar Ave | Memphis | TN | 38117 | JB5117 Poplar, LLC | | Attn: James Burks | 1400 W. Markham, Suite 301 | Little Rock | AR | 72201 |
| Joseph H. Campbell | Zips Car Wash, LLC | Lease Agreement dated February 1, 2015 | 961 - NCGRE_Battleground | 1,044.86 | 2300 Battleground Ave | Greensboro | NC | 27408 | Joseph H. Campbell | | | 2221 Lane Road | Greensboro | NC | 27408 |

**Zips Car Wash, LLC, et al**
*Assumed Real Property Leases [1]*
*As of April 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Cure Amount | Property Address | | | | Counterparty Address | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Street Address | City | State | Zip | Landlord | Parent Company | Attention | Street Address | City | State | Zip |
| Kubera Financial Group, Inc.; and Kalidindi Family Holdings, LLC | Zips Car Wash, LLC | Lease Agreement dated March 8, 2018 | 121 - TNKNO_Middlebrook | - | 9740 Middlebrook Pike | Knoxville | TN | 37931 | Kubera Financial Group, Inc.; and Kalidindi Family Holdings, LLC | | | 5005 W Royal Ln., Suite 216 | Irving | TX | 75063 |
| Mathis Apartments, Inc | Zips Car Wash, LLC | Lease Agreement dated August 28, 2019 | 133 - TNKNO_W.Kingston | 2,820.11 | 7365 Kingston Pike | Knoxville | TN | 37919 | Mathis Apartments, Inc | | | 2633 Morning Dove Lane | Charleston | SC | 29414 |
| MDC Coast 7, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated September 21, 2017 | 120 - TNATH_Decatur | - | 1208 Decatur Pike | Athens | TN | 37303 | MDC Coast 7, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 122 - TNKNO_MossGrove | - | 106 Moss Grove Boulevard | Knoxville | TN | 37922 | | | | | | | |
| | | | 125 - TNMAR_Foch | - | 1106 Foch St | Maryville | TN | 37801 | | | | | | | |
| | | | 128 - TNCHA_JacCate | - | 9025 Jac Cate Rd | Ooltewah | TN | 37363 | | | | | | | |
| | | | 130 - TNOAK_S.Illinois | - | 102 S Illinois Ave | Oak Ridge | TN | 37830 | | | | | | | |
| | | | 620 - TXSAN_Bandera | - | 11816 Bandera Rd | Helotes | TX | 78023 | | | | | | | |
| | | | 704 - KSWIC_N.Maize | - | 1329 N Maize Rd | Wichita | KS | 67212 | | | | | | | |
| | | | 901 - NCWEA_Gill | - | 1 Gill Rd | Weaverville | NC | 28787 | | | | | | | |
| | | | 903 - NCASH_Tunnel | - | 125 Tunnel Rd | Asheville | NC | 28805 | | | | | | | |
| | | | 904 - NCARD_Airport | - | 360 Airport Rd | Arden | NC | 28704 | | | | | | | |
| MDC Coast 16, LLC | Zips Car Wash, LLC | Amended and Restated Master Land and Building Lease Agreement dated December 23, 2020 | 0306 - KYLOU_Bardstown | - | 4405 Bardstown Rd | Louisville | KY | 40218 | MDC Coast 16, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0410 - MOBRI_CharlesRock | - | 11647 St. Charles Rock Rd | Bridgeton | MO | 63044 | | | | | | | |
| | | | 0411 - MOOFA_HwyK | - | 1008 Hwy K | O'Fallon | MO | 63366 | | | | | | | |
| | | | 0412 - MOSTL_E.Page | - | 9430 Page Ave | St. Louis | MO | 63132 | | | | | | | |
| | | | 0414 - MOSTL_Meramec | - | 4453 Meramec Bottom Rd | St. Louis | MO | 63129 | | | | | | | |
| | | | 0413 - MOSTL_S.Kingshighway | - | 3410 S Kingshighway Blvd | St. Louis | MO | 63139 | | | | | | | |
| MDC Coast 20, LLC | Zips Car Wash, LLC | Lease Agreement dated December 28, 2018 | 0502 - ILGRA_Niedringhaus | - | 1511 Niedringhaus Ave | Granite City | IL | 62040 | MDC Coast 20, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| MDC NC1, LP; Realty Income Illinois Properties 1, LLC; and MDC Coast 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated December 15, 2022 | 0123 - SCNCH_Rivers | - | 5506 Rivers Ave | North Charleston | SC | 29406 | MDC NC1, LP; Realty Income Illinois Properties 1, LLC; and MDC Coast 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0202 - GACAR_JoeFrankHarris | - | 733 Joe Frank Harris Pkwy SE | Cartersville | GA | 30120 | | | | | | | |
| | | | 0203 - GACAR_Park | - | 802 S Park St | Carrollton | GA | 30117 | | | | | | | |
| | | | 0400 - MOSTL_Gravois | - | 11355 Gravois Rd | St. Louis | MO | 63126 | | | | | | | |
| | | | 0503 - ILPON_Hwy162 | - | 4192 Hwy 162 | Pontoon Beach | IL | 62040 | | | | | | | |
| | | | 106 - TNARL_Airline | - | 6083 Old Airline Rd | Arlington | TN | 38002 | | | | | | | |
| | | | 127 - TNKNO_MountainGrove | 4,320.00 | 7525 Mountain Grove Dr | Knoxville | TN | 37920 | | | | | | | |
| | | | 129 - TNCRO_N.Main | - | 1688 N Main St | Crossville | TN | 38555 | | | | | | | |
| | | | 131 - TNCHA_Hwy58 | - | 4907 TN #58 | Chattanooga | TN | 37416 | | | | | | | |
| | | | 309 - OKOKC_Classen | - | 2801 N Classen Blvd | Oklahoma City | OK | 73106 | | | | | | | |
| | | | 649 - TXMCK_S.Custer | - | 1590 S Custer Rd | McKinney | TX | 75070 | | | | | | | |
| | | | 950 - NCCHA_Albemarle | - | 5740 Albemarle Rd | Charlotte | NC | 28212 | | | | | | | |
| | | | 951 - NCCHA_N.Tryon | - | 7910 N Tryon St | Charlotte | NC | 28262 | | | | | | | |
| | | | 955 - NCHIC_Hwy70 | - | 1975 Hwy 70 | Hickory | NC | 28602 | | | | | | | |
| | | | 0124 - SCWAL_BellsHwy | - | 2048 Bells Hwy | Walterboro | SC | 29488 | | | | | | | |
| | | | 2102 - WIMAN_Calumet | - | 3601 Calumet Ave | Manitowoc | WI | 54220 | | | | | | | |
| | | | 2103 - WISAU_E.GreenBay | - | 475 E Green Bay Ave | Saukville | WI | 53080 | | | | | | | |
| | | | 1101 - MNALE_44th | - | 604 44th Ave W | Alexandria | MN | 56308 | | | | | | | |
| | | | 1102 - MNBAX_Universal | - | 7560 Universal Dr N | Baxter | MN | 56425 | | | | | | | |
| | | | 1103 - MNMOO_28th | - | 3410 28th Ave S | Moorhead | MN | 56560 | | | | | | | |
| | | | 1104 - MNDET_Richwood | - | 100 Richwood Rd | Detroit Lakes | MN | 56501 | | | | | | | |
| | | | 310 - OKEDM_E.Memorial | - | 1821 E Memorial Rd | Oklahoma City | OK | 73131 | | | | | | | |
| MDC NC2, LP | Zips Car Wash, LLC | Master Land and Building Agreement dated March 28, 2019 | 930 - NCCLA_Hwy70 | - | 11571 US Hwy 70 Business W | Clayton | NC | 27520 | MDC NC2, LP | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 931 - NCFUQ_Purfoy | - | 7510 Purfoy Rd | Fuquay Varina | NC | 27526 | | | | | | | |
| | | | 932 - NCRAL_BrierCreek | - | 9200 Brier Creek Pkwy | Raleigh | NC | 27617 | | | | | | | |
| | | | 933 - NCRAL_WakeForest | - | 2402 Wake Forest Rd | Raleigh | NC | 27608 | | | | | | | |
| | | | 934 - NCWAK_S.Main | - | 2121 S Main St | Wake Forest | NC | 27587 | | | | | | | |
| MDC NC2, LP | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated April 25, 2019 | 923 - NCHIG_S.Main | - | 2608 S Main St | High Point | NC | 27263 | MDC NC2, LP | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |

**Zips Car Wash, LLC, et al**

*Assumed Real Property Leases* [1]

*As of April 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Cure Amount | Street Address | City | State | Zip | Landlord | Parent Company | Attention | Street Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Property Address | | | | Counterparty Address | | | | | | |
| MDC NC2, LP; and Realty Income Properties 21, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated May 18, 2022 | 0605 - VALYN_OldForest | - | 3210 Old Forest Rd | Lynchburg | VA | 24501 | MDC NC2, LP; and Realty Income Properties 21, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0604 - VALYN_Timberlake | - | 7616 Timberlake Rd | Lynchburg | VA | 24502 | | | | | | | |
| | | | 0607 - VAFOR_Forest | - | 17559 Forest Rd | Forest | VA | 24551 | | | | | | | |
| | | | 962 - NCDUR_MartinLutherKing | - | 1031 MLK Jr Pkwy | Durham | NC | 27713 | | | | | | | |
| | | | 0606 - VADAN_PineyForest | - | 550 Piney Forest Rd | Danville | VA | 24540 | | | | | | | |
| Micha Mottale, as Trustee of the Micha Mottale Trust of 2023 | Zips Car Wash, LLC | Amended and Restated Lease Agreement dated December 21, 2023 | 651 - TXPRO_W.University | 3,344.03 | 5090 W University Dr | Prosper | TX | 75078 | Micha Mottale, as Trustee of the Micha Mottale Trust of 2023 | | | 7504 Via Capri | La Jolla | CA | 92037 |
| MIKI Properties LLC – Roselle | Zips Car Wash, LLC | Land and Building Lease Agreement dated April 17, 2024 | 220016 - ILGLE_W.Roosevelt | - | 375 W Roosevelt Rd | Glen Ellyn | IL | 60137 | MIKI Properties LLC – Roselle | | Attn: David Dalesandro, President | 590 Kildeer Drive | Bolingbrook | IL | 60440 |
| Mohamed Merabet and Yamina Sebbah | Zips Car Wash, LLC | Amended and Restated Lease Agreement dated April 28, 2023 | 802 - FLMIA_27th | - | 17551 NW 27th Ave | Miami Gardens | FL | 33056 | Mohamed Merabet and Yamina Sebbah | | | 11071 Marin Street | Coral Gables | FL | 33156 |
| NADG NNN ZCW (OK) LLP | Zips Car Wash, LLC | Lease Agreement dated March 2, 2022 | 324 - OKGLE_141st | 2,111.61 | 91 W 141st St | Glenpool | OK | 74033 | NADG NNN ZCW (OK) LLP | | c/o North American Development Group | 2718 Fairmount Street | Dallas | TX | 75201 |
| Patrick M. Cullen | Zips Car Wash, LLC | Ground Lease dated May 19, 2017 | 902 - NCASH_Patton | 24,599.59 | 886 Patton Ave | Asheville | NC | 28806 | Patrick M. Cullen | | | 431 La Mesa Dr | Palo Alto | CA | 94028 |
| Placentia PM, LLC | Zips Car Wash, LLC | Amended and Restated Lease Agreement dated October 24, 2023 | 650 - TXLIT_FM423 | 3,601.32 | 2073 FM 423 | Little Elm | TX | 75068 | Placentia PM, LLC | | | 517 17th Street | Huntington Beach | CA | 92648 |
| Primax Properties, LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated May 2, 2019 | 956 - NCMAT_E.Independence | 1,473.40 | 9331 E Independence Blvd | Matthews | NC | 28105 | Primax Properties, LLC | | c/o Marie McLucas | 1100 E Morehead Street | Charlotte | NC | 28204 |
| Primera Towne Square II, LLC | Zips Car Wash, LLC | Lease Agreement dated May 7, 2021 | Plano Office | 3,552.93 | 8400 Belleview Drive. Suite #210 | Plano | TX | 75024 | Primera Towne Square II, LLC | | Attn: Towne Square Place Property | 8400 Belleview Dr, Suite #130 | Plano | TX | 75024 |
| Pro Clean of Lake Worth Inc. | Zips Car Wash, LLC | Lease Agreement dated December 20, 2017 | 804 - FLLAK_Pinehurst | 2,612.89 | 3952 Pinehurst Dr | Lake Worth | FL | 33467 | Pro Clean of Lake Worth Inc. | | c/o Gene Mirvis | 19464 39th Ave | Miami | FL | 33160 |
| Realty Income Properties 17, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated October 4, 2022 | 0504 - ILADD_W.Lake | - | 625 W Lake St | Addison | IL | 60101 | Realty Income Properties 17, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0505 - ILVIL_W.Roosevelt | - | 153 Roosevelt Rd | Villa Park | IL | 60181 | | | | | | | |
| | | | 0506 - ILAUR_N.Farnsworth | - | 1427 N Farnsworth Ave | Aurora | IL | 60505 | | | | | | | |
| | | | 0507 - ILCHI_W.54th | - | 7150 W 54th St | Chicago | IL | 60638 | | | | | | | |
| | | | 0508 - ILCAR_N.Gary | - | 1251 N Gary Ave | Carol Stream | IL | 60188 | | | | | | | |
| | | | 0509 - ILBOL_E.Boughton | - | 600 E Boughton Rd | Bolingbrook | IL | 60440 | | | | | | | |
| | | | 0510 - ILNOR_N.Mannheim | - | 2100 N Mannheim Rd | Northlake | IL | 60164 | | | | | | | |
| | | | 0511 - ILROS_W.Lake | - | 900 W Lake St | Roselle | IL | 60172 | | | | | | | |
| | | | 0512 - ILCHI_W.Grand | - | 6948 W Grand Ave | Chicago | IL | 60707 | | | | | | | |
| | | | 0513 - ILBOL_S.Weber | - | 246 S Weber Rd | Bolingbrook | IL | 60490 | | | | | | | |
| | | | 0514 - ILNAP_E.Ogden | - | 850 E Ogden Ave | Naperville | IL | 60540 | | | | | | | |
| Realty Income Properties 17, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated November 15, 2022 | 678 - TXMCK_Stacy | - | 6209 Stacy Rd | McKinney | TX | 75070 | Realty Income Properties 17, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 17, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated October 18, 2022 | 141 - TNMEM_Whitten | 358.00 | 1984 Whitten Rd | Memphis | TN | 38111 | Realty Income Properties 17, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 21, LLC; and Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 23, 2022 | 0217 - GACOV_Hwy142 | - | 9191 Hwy 142 | Covington | GA | 30014 | Realty Income Properties 21, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | Amended and Restated Master Land and Building Lease Agreement dated May 12, 2022 | 0216 - GAMIL_LogCabin | - | 103 Log Cabin Rd NE | Milledgeville | GA | 31061 | Realty Income Properties 21, LLC; and Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0213 - GASAV_Abercorn | - | 10000 Abercorn St | Savannah | GA | 31406 | | | | | | | |
| | | | 0214 - GASAV_Commercial | - | 302 Commercial Dr | Savannah | GA | 31406 | | | | | | | |
| | | | 0215 - GASAV_Hwy80 | - | 4747 US-80 | Savannah | GA | 31410 | | | | | | | |
| | | | 0701 - INJAS_Newton | - | 3661 Newton St | Jasper | IN | 47546 | | | | | | | |
| Realty Income Properties 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated May 16, 2019 | 138 - TNPOW_E.Emory | - | 592 E Emory Rd | Powell | TN | 37849 | Realty Income Properties 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 17, 2019 | 139 - TNKNO_MillerPlace | - | 2935 Miller Place Way | Knoxville | TN | 37924 | Realty Income Properties 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated May 21, 2019 | 0302 - KYLOU_N.DixieHwy | - | 4711 Dixie Hwy | Louisville | KY | 40216 | Realty Income Properties 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0303 - KYLOU_S.DixieHwy | - | 9500 Dixie Hwy | Louisville | KY | 40272 | | | | | | | |
| | | | 0700 - INCLA_LewisClark | - | 701 E Lewis And Clark Pkwy | Clarksville | IN | 47129 | | | | | | | |
| Realty Income Properties 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated May 30, 2019 | 0800 - NMCLO_N.Prince | - | 3101 N Prince St | Clovis | NM | 88101 | Realty Income Properties 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0801 - NMROS_N.Main | - | 3616 N Main St | Roswell | NM | 88201 | | | | | | | |
| | | | 660 - TXANG_Sherwood | - | 4106 Sherwood Way | San Angelo | TX | 76901 | | | | | | | |
| | | | 661 - TXANG_Knickerbocker | - | 3402 Knickerbocker Rd | San Angelo | TX | 76904 | | | | | | | |
| | | | 662 - TXANG_N.Bryant | - | 2704 N Bryant Blvd | San Angelo | TX | 76903 | | | | | | | |
| | | | 663 - TXPLA_Olton | - | 4101 Olton Rd | Plainview | TX | 79072 | | | | | | | |
| Realty Income Properties 29, LLC | Zips Car Wash, LLC | Lease Agreement dated December 28, 2018 | 0104 - SCROC_Cherry | 4,175.76 | 2178 Cherry Rd | Rock Hill | SC | 29732 | Realty Income Properties 29, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |

**Zips Car Wash, LLC, et al**
*Assumed Real Property Leases [1]*
*As of April 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Cure Amount | Street Address | City | State | Zip | Landlord | Parent Company | Attention | Street Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Property Address | | | Counterparty Address | | | |
| Realty Income Properties 29, LLC | Zips Car Wash, LLC | Master Lease Agreement dated December 28, 2018 | 0122 - SCNCH_AshleyPhosphate | - | 3955 Ashley Phosphate Rd | North Charleston | SC | 29418 | Realty Income Properties 29, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0300 - KYLOU_DixieHwy | - | 7773 Dixie Hwy | Louisville | KY | 40258 | | | | | | | |
| | | | 2104 - WIFON_W.Johnson | - | 123 W Johnson St | Fond Du Lac | WI | 54935 | | | | | | | |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated August 16, 2022 | 677 - TXFRI_Eldorado | - | 2835 El Dorado Pkwy | Frisco | TX | 75033 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 676 - TXLEW_N.Josey | - | 6100 N Josey Ln | Lewisville | TX | 75056 | | | | | | | |
| | | | 675 - TXDAL_Lemmon | - | 5006 Lemmon Ave | Dallas | TX | 75209 | | | | | | | |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 21, 2022 | 672 - TXGRA_Hwy377 | - | 3601 E US Hwy 377 | Granbury | TX | 76049 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated January 30, 2023 | 0327 - KYNIC_Marlene | - | 130 Marlene Dr | Nicholasville | KY | 40356 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 8, 2022 | 653 - TXROC_S.Goliad | - | 2360 S Goliad St | Rockwall | TX | 75032 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 652 - TXFLO_Justin | - | 3005 Justin Rd | Flower Mound | TX | 75028 | | | | | | | |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 16, 2022 | 0328 - KYWIN_Codelia | - | 160 Codelia Dr | Winchester | KY | 40391 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated July 7, 2022 | 673 - TXNEW_Walton | - | 23685 Walton Ave | New Caney | TX | 77357 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| River City Clean LLC | Zips Car Wash, LLC | Master Land and Building Lease dated September 1, 2022 | 140 - TNMEM_W.Poplar | - | 3294 Poplar Ave | Memphis | TN | 38111 | River City Clean LLC | Northwest Group Inc | | 7150 SW Fir Loop | Tigard | OR | 97223 |
| Roanoke Zips LLC | Zips Car Wash, LLC | Lease Agreement dated April 4, 2019 | 0602 - VAROA_Dale | - | 2121 Dale Ave SE | Roanoke | VA | 24013 | Roanoke Zips LLC | | | 1721 Besley Rd. | Vienna | VA | 22182 |
| Rocket Properties Boise, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 3301 - IDBOI_W.Fairview | 8,338.06 | 12345 W Fairview Ave | Boise | ID | 83713 | Rocket Properties Boise, LLC | Rocket Express | c/o Rocket Express LLC Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| Rocket Properties Meridian, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 3303 - IDMER_W.IslandGreen | 10,179.83 | 1717 W Island Green Dr | Meridian | ID | 83646 | Rocket Properties Meridian, LLC | Rocket Express | c/o Rocket Express LLC Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| Rocket Properties Midvale, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 4101 - UTMID_W.7200 | 5,306.04 | 150 W 7200 S | Midvale | UT | 84047 | Rocket Properties Midvale, LLC | Rocket Express | c/o Rocket Express LLC Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| Rocket Properties South Jordan, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 4102 - UTSOU_S.Redwood | 8,338.06 | 11399 S Redwood Rd | South Jordan | UT | 84095 | Rocket Properties South Jordan, LLC | Rocket Express | c/o Rocket Express LLC Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| Rocket Properties Twin, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 3302 - IDTWI_BlueLakes | 8,338.06 | 1122 Blue Lakes Boulevard N | Twin Falls | ID | 83301 | Rocket Properties Twin, LLC | Rocket Express | c/o Rocket Express LLC Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| RTS Orchards, LLC | Zips Car Wash, LLC | Lease Agreement dated November 22, 2019 | 124 - TNKNO_Western | - | 4416 Western Ave | Knoxville | TN | 37921 | RTS Orchards, LLC | | Attn: Terry Nugent | 4831 Calloway Drive, Suite 102 | Bakersfield | CA | 93312 |
| S.C.P. LLC | Zips Portfolio III, LLC | Amended and Restated Lease Agreement dated October 11, 2019 | 803 - FLMIR_Palm | 2,374.54 | 1801 Palm Ave | Miramar | FL | 33025 | S.C.P. LLC | | | 17 Via Amanti | Newport Coast | CA | 92657 |
| SCF RC Funding IV | Zips Car Wash, LLC | Third Amended and Restated Master Lease Agreement dated September 29, 2017 | 0100 - SCAND_Clemson | - | 4102 Clemson Blvd | Anderson | SC | 29621 | SCF RC Funding IV | Essential Realty | c/o Essential Properties Realty Trust LLC | 47 Hulfish Street, Suite # 210 | Princeton | NJ | 08542 |
| | | | 226 - ARBRY_N.Reynolds | - | 1900 N Reynolds Rd | Bryant | AR | 72022 | | | | | | | |
| | | | 404 - LASHR_Youree | - | 8660 Youree Dr | Shreveport | LA | 71115 | | | | | | | |

**Zips Car Wash, LLC, et al**

*Assumed Real Property Leases [1]*

*As of April 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Cure Amount | Property Address | | | | Counterparty Address | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Street Address | City | State | Zip | Landlord | Parent Company | Attention | Street Address | City | State | Zip |
| Spirit Master Funding X, LLC | Zips Car Wash, LLC | Amended and Restated Master Lease Agreement dated March 29, 2017 | 104 - TNMEM_Hwy64 | - | 9809 Hwy 64 | Arlington | TN | 38002 | Spirit Master Funding X, LLC | Realty Income | c/o Spirit SPE Manager, LLC Attn: Portfolio Servicing | 2727 N. Harwood Street, Suite 300 | Dallas | TX | 75201 |
| | | | 202 - ARSPR_Thompson | - | 1112 S Thompson St | Springdale | AR | 72764 | | | | | | | |
| | | | 207 - ARSIL_Hwy412 | - | 300 Hwy 412 | Siloam Springs | AR | 72761 | | | | | | | |
| | | | 220 - ARSHE_Hwy107 | - | 7900 Hwy 107 | Sherwood | AR | 72120 | | | | | | | |
| | | | 303 - OKOKC_Reno | - | 5807 W Reno Ave | Oklahoma City | OK | 73127 | | | | | | | |
| | | | 305 - OKOKC_Penn | - | 12425 N Pennsylvania Ave | Oklahoma City | OK | 73120 | | | | | | | |
| | | | 307 - OKEDM_SantaFe | - | 1308 S Santa Fe Ave | Edmond | OK | 73003 | | | | | | | |
| | | | 601 - TXTEX_Richmond | - | 2806 Richmond Rd | Texarkana | TX | 75503 | | | | | | | |
| | | | 622 - TXSAN_W.Culebra | - | 10623 Culebra Rd | San Antonio | TX | 78251 | | | | | | | |
| | | | 623 - TXSAN_FM78 | - | 8242 FM 78 | Converse | TX | 78109 | | | | | | | |
| | | | 626 - TXSAN_PatBooker | - | 2809 Pat Booker Rd | Universal City | TX | 78148 | | | | | | | |
| | | | 2101 - WISHE_Washington | - | 2612 Washington Ave | Sheboygan | WI | 53081 | | | | | | | |
| | | | 0322 - KYLEX_N.Limestone | - | 1537 N Limestone | Lexington | KY | 40505 | | | | | | | |
| Spirit Realty, L.P. | Zips Car Wash, LLC | Amended and Restated Master Lease Agreement dated August 4, 2022 | 1106 - MNBAX_Glory | - | 7361 Glory Rd | Baxter | MN | 56425 | Spirit Realty, L.P. | Realty Income | Attn: Property Management | 2727 N. Harwood Street, Suite 300 | Dallas | TX | 75201 |
| | | | 1107 - MNGRA_Hwy169 | - | 135 SE 29th St | Grand Rapids | MN | 55744 | | | | | | | |
| | | | 0142 - SCMYR_N.KingsHwy | - | 8010 N Kings Hwy | Myrtle Beach | SC | 29572 | | | | | | | |
| | | | 0804 - NMALA_N.Whitesands | - | 3399 N White Sands Blvd | Alamogordo | NM | 88310 | | | | | | | |
| | | | 5101 - NDFAR_25th | 341.90 | 1345 25th Ave S | Fargo | ND | 58103 | | | | | | | |
| | | | 1105 - MNDET_Hwy10 | - | 1415 US-10 | Detroit Lakes | MN | 56501 | | | | | | | |
| | | | 0803 - NMALA_S.WhiteSands | - | 905 S White Sands Blvd | Alamogordo | NM | 88310 | | | | | | | |
| | | | 935 - NCHOL_GrandHill | - | 301 Grand Hill Place | Holly Springs | NC | 27540 | | | | | | | |
| | | | 936 - NCGOL_N.Berkeley | - | 508 N Berkeley Blvd | Goldsboro | NC | 27534 | | | | | | | |
| | | | 0308 - KYLOU_CaneRun | - | 4860 Cane Run Rd | Louisville | KY | 40216 | | | | | | | |
| | | | 0210 - GADAL_DallasACworth | - | 8875 Dallas Acworth Hwy | Dallas | GA | 30132 | | | | | | | |
| | | | 0130 - SCMYR_International | - | 593 International Dr | Myrtle Beach | SC | 29579 | | | | | | | |
| | | | 0131 - SCMYR_Agnes | - | 2755 Agnes Ln | Myrtle Beach | SC | 29577 | | | | | | | |
| | | | 0132 - SCMYR_N.Hwy17 | - | 1212 Hwy 17 S | North Myrtle | SC | 29582 | | | | | | | |
| | | | 0211 - GAWAT_HogMountain | - | 1000 Hog Mountain Rd | Watkinsville | GA | 30677 | | | | | | | |
| | | | 0134 - SCMYR_Hwy17 | - | 1604 Hwy 17 N | North Myrtle | SC | 29582 | | | | | | | |
| | | | 0135 - SCMYR_Hwy501 | - | 2089 Hwy 501 | Myrtle Beach | SC | 29577 | | | | | | | |
| | | | 0136 - SCMUR_GardenCity | - | 509 Garden City Connector | Murrells Inlet | SC | 29576 | | | | | | | |
| | | | 0138 - SCBLU_FordingIsland | - | 1008 Fording Island Rd | Bluffton | SC | 29910 | | | | | | | |
| | | | 0141 - SCOKA_BaylorBrook | - | 7 Baylor Brook Dr | Okatie | SC | 29909 | | | | | | | |
| | | | 0140 - SCHIL_BWilliamHilton | - | 1008 William Hilton Pkwy | Hilton Head | SC | 29928 | | | | | | | |
| | | | 0139 - SCBLU_Pinellas | - | 8250 Pinellas Dr | Bluffton | SC | 29910 | | | | | | | |
| | | | 0212 - GAROC_Chattahoochee | - | 1464 Chattahoochee Dr | Rockmart | GA | 30153 | | | | | | | |
| | | | 670 - TXAUS_Hwy290 | - | 13519 Hwy 290 W | Austin | TX | 78737 | | | | | | | |
| | | | 671 - TXDAL_Forest | - | 3541 Forest Ln | Dallas | TX | 75234 | | | | | | | |
| | | | 674 - TXDAL_Ross | - | 5021 Ross Ave | Dallas | TX | 75206 | | | | | | | |
| Store Capital Acquisitions, LLC | Zips Portfolio II, LLC | Lease Agreement dated January 23, 2018 | 706 - KSDER_Rock | - | 2825 N Rock Rd | Derby | KS | 67037 | Store Capital Acquisitions, LLC | STORE Capital | Attn: Michael T. Bennett | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| Store Capital Acquisitions, LLC | Zips Portfolio II, LLC | Lease Agreement dated February 13, 2018 | 920 - NCWIN_Oxford | 4,553.00 | 3910 Oxford Station Way | Winston-Salem | NC | 27103 | Store Capital Acquisitions, LLC | STORE Capital | Attn: Michael T. Bennett | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| Store Capital Acquisitions, LLC | Zips Portfolio II, LLC | Lease Agreement dated December 14, 2017 | 628 - TXSAN_E.Culebra | - | 1431 Culebra Rd | San Antonio | TX | 78201 | Store Capital Acquisitions, LLC | STORE Capital | Attn: Michael T. Bennett | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |

[1] For the avoidance of doubt, the Leases referenced herein include any amendments or modifications thereto.

**Zips Car Wash, LLC, et al**
*Assumed Real Property Leases* [1]
*As of April 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Cure Amount | Property Address Street Address | City | State | Zip | Landlord | Parent Company | Attention | Counterparty Address Street Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Store Master Funding VII, LLC | Zips Portfolio I, LLC | Eight Amended and Restated Master Lease Agreement dated January 18, 2022 | 201 - ARFAY_Wedington | - | 3107 W Wedington Dr | Fayetteville | AR | 72704 | Store Master Funding VII, LLC | STORE Capital | Attn: Asset Management | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| | | | 204 - ARROG_Pleasant | - | 2000 W Pleasant Grove Rd | Rogers | AR | 72758 | | | | | | | |
| | | | 205 - ARBEN_Walton | - | 1004 S Walton Blvd | Bentonville | AR | 72712 | | | | | | | |
| | | | 221 - ARLIT_Shackleford | - | 2702 S Shackleford Rd | Little Rock | AR | 72205 | | | | | | | |
| | | | 304 - ARNLR_Maumelle | - | 12301 Maumelle Blvd | Little Rock | AR | 72113 | | | | | | | |
| | | | 227 - ARLIT_Hwy10 | - | 14021 Cantrell Rd | Little Rock | AR | 72223 | | | | | | | |
| | | | 402 - LASHR_N.Market | 3,232.00 | 2910 Kitty Ln | Shreveport | LA | 71107 | | | | | | | |
| | | | 501 - MSOLI_Goodman | 1,156.00 | 6810 Goodman Rd | Olive Branch | MS | 38654 | | | | | | | |
| | | | 0902 - OHCIN_Montgomery | - | 12167 Montgomery Rd | Hamilton | OH | 45249 | | | | | | | |
| | | | 707 - KSAND_Andover | - | 565 S Andover Rd | Andover | KS | 67002 | | | | | | | |
| | | | 0415 - MOSTP_Jungermann | 433.44 | 1525 Jungermann Rd | St. Peters | MO | 63376 | | | | | | | |
| Store Master Funding VII, LLC | Zips Portfolio II, LLC | Eighth Amended and Restated Master Lease Agreement dated August 17, 2021 | 101 - TNMEM_Germantown | - | 1565 N Germantown Pkwy | Cordova | TN | 38016 | Store Master Funding VII, LLC | STORE Capital | Attn: Asset Management | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| | | | 102 - TNMEM_Hacks | - | 4234 Hacks Cross Rd | Memphis | TN | 38125 | | | | | | | |
| | | | 103 - TNMEM_Raleigh | - | 5796 Raleigh Lagrange Rd | Memphis | TN | 38134 | | | | | | | |
| | | | 136 - TNCOO_Neal | - | 420 Neal St | Cookeville | TN | 38501 | | | | | | | |
| | | | 137 - TNCOO_Willow | - | 693 S Willow Ave | Cookeville | TN | 38501 | | | | | | | |
| | | | 921 - NCWIN_University | - | 5211 University Pkwy | Winston-Salem | NC | 27106 | | | | | | | |
| | | | 0205 - GACLE_JesseMae | - | 71 Jesse Mae Thurmond Connector | Cleveland | GA | 30528 | | | | | | | |
| | | | 922 - NCCLE_Stadium | - | 6317 Stadium Dr | Clemmons | NC | 27012 | | | | | | | |
| | | | 0207 - GAWOO_Eagle | - | 2907 Eagle Dr | Woodstock | GA | 30189 | | | | | | | |
| | | | 0420 - MOWAR_N.Charles | - | 719 N Charles St | Warrensburg | MO | 64093 | | | | | | | |
| | | | 720 - KSSHA_Nieman | - | 6401 Nieman Rd | Shawnee | KS | 66203 | | | | | | | |
| | | | 0421 - MOJOP_S.Rangeline | - | 1530 S Rangeline Rd | Joplin | MO | 64804 | | | | | | | |
| | | | 0209 - GALOG_Athens | - | 125 Athens Hwy | Loganville | GA | 30052 | | | | | | | |
| | | | 0208 - GAGRA_Loganville | - | 2585 Loganville Hwy | Grayson | GA | 30017 | | | | | | | |
| Store Master Funding VII, LLC | Zips Portfolio III, LLC | Sixth Amended and Restated Master Lease Agreement dated December 30, 2022 | 301 - OKNOR_Sonoma | - | 950 Sonoma Park Dr | Norman | OK | 73071 | Store Master Funding VII, LLC | STORE Capital | Attn: Asset Management | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| | | | 302 - OKOKC_NWExpress | - | 7323 NW Expressway | Oklahoma City | OK | 73132 | | | | | | | |
| | | | 304 - OKOKC_Western | - | 8300 S Western Ave | Oklahoma City | OK | 73139 | | | | | | | |
| | | | 306 - OKOKC_MacArthur | - | 13408 N Macarthur Blvd | Oklahoma City | OK | 73142 | | | | | | | |
| | | | 320 - OKTUL_Sheridan | - | 3912 S Sheridan Rd | Tulsa | OK | 74145 | | | | | | | |
| | | | 321 - OKTUL_Riverside | - | 9553 Riverside Pkwy | Tulsa | OK | 74137 | | | | | | | |
| | | | 322 - OKBRO_Kenosha | - | 3450 W Kenosha St | Broken Arrow | OK | 74012 | | | | | | | |
| | | | 640 - TXARL_Little | - | 4651 Little Rd | Arlington | TX | 76017 | | | | | | | |
| | | | 641 - TXBUR_Wilshire | - | 797 SW Wilshire Blvd | Burleson | TX | 76028 | | | | | | | |
| | | | 645 - TXFOR_Westworth | - | 6705 Westworth Blvd | Westworth | TX | 76114 | | | | | | | |
| | | | 646 - TXHUR_Precinct | - | 1641 Precinct Line Rd | Hurst | TX | 76054 | | | | | | | |
| | | | 647 - TXMAN_Debbie | - | 701 W Debbie Ln | Mansfield | TX | 76063 | | | | | | | |
| | | | 648 - TXSAG_McLeroy | - | 100 E Mcleroy Blvd | Saginaw | TX | 76179 | | | | | | | |
| | | | 0422 - MOWEB_S.Madison | - | 1309 S Madison St | Webb City | MO | 64870 | | | | | | | |
| | | | 0320 - KYGEO_Osborne | - | 104 Osbourne Way | Georgetown | KY | 40324 | | | | | | | |
| | | | 0321 - KYLEX_GreyLag | - | 2320 Grey Lag Way | Lexington | KY | 40509 | | | | | | | |
| | | | 664 - TXFOR_Quebec | - | 5900 Quebec St | Fort Worth | TX | 76135 | | | | | | | |
| | | | 665 - TXBUR_E.RendonCrowley | - | 301 E Rendon Crowley Rd | Burleson | TX | 76028 | | | | | | | |
| UK Kids Car Wash, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated October 4, 2023 | 0325 - KYLEX_S.Broadway | 2,896.39 | 1250 S Broadway | Lexington | KY | 40504 | UK Kids Car Wash, LLC | | c/o Mr. James M. Coffey III | 466 River Street | Norwell | MA | 02061 |
| 600 Willow Properties LLC | Zips Car Wash, LLC | Lease Agreement dated March 8, 2018 | 123 - TNKNO_E.Kingston | 2,955.29 | 5615 Kingston Pike | Knoxville | TN | 37919 | 600 Willow Properties LLC | | | 105 Fairfield Dr | Short Hills | NJ | 07078 |
| William Giffen and Christine Labrenz as Joint Tenants with Rights of Suvivorship | Zips Car Wash, LLC | Lease Agreement dated April 12, 2018 | 0101 - SCAND_Hwy81 | - | 2117 N Hwy 81 | Anderson | SC | 29621 | William Giffen and Christine Labrenz as Joint Tenants with Rights of Suvivorship | | | 77 Madrone Avenue | Pescadero | CA | 94060 |
| Windy Hill Water Park, Inc. | Zips Car Wash, LLC | Lease dated September 15, 2017 | 0133 - SCMYR_S.Hwy17 | 1,050.00 | 4404 Hwy 17 S | North Myrtle | SC | 29582 | Windy Hill Water Park, Inc. | | c/o Carroll Rogers | 306 Ocean View Dr. | Myrtle Beach | SC | 49272 |
| Zips Jett 1, LLC | Zips Car Wash, LLC | Lease Agreement dated January 9, 2018 | 643 - TXDAL_Northwest | 4,219.02 | 3505 W Northwest Hwy | Dallas | TX | 75220 | Zips Jett 1, LLC | Zips Real Estate | c/o Equity Investment Group Attn: Anthony M. Zirille, Esq. | 127 W. Berry Street, Suite 300 | Fort Wayne | IN | 46802 |

**Zips Car Wash, LLC, et al**

*Assumed Real Property Leases* [1]

*As of April 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Cure Amount | Property Address | | | | Counterparty Address | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Street Address | City | State | Zip | Landlord | Parent Company | Attention | Street Address | City | State | Zip |
| Zips Jett 2, LLC | Zips Car Wash, LLC | Lease Agreement dated January 9, 2018 | 644 - TXFOR_Denton | 4,219.02 | 6221 Denton Hwy | Haltom City | TX | 76148 | Zips Jett 2, LLC | Zips Real Estate | c/o Equity Investment Group Attn: Anthony M. Zirille, Esq. | 127 W. Berry Street, Suite 300 | Fort Wayne | IN | 46802 |
| Zips Patterson Street, LLC | Zips Car Wash, LLC | Lease Agreement dated May 2, 2019 | 954 - NCGRE_Patterson | 6,548.42 | 2806 Patterson St | Greensboro | NC | 27407 | Zips Patterson Street, LLC | Zips Real Estate | c/o Zips Real Estate II, LLC Attn: Anthony M. Zirille, Esq. | 127 W. Berry Street, Suite 300 | Fort Wayne | IN | 46802 |
| Zips Roswell I, LLC; and Zips Roswell II, LLC | Zips Car Wash, LLC | Lease Agreement dated February 10, 2020 | 0802 - NMROS_S.Main | 4,809.30 | 1101 S Main St | Roswell | NM | 88203 | Zips Roswell I, LLC; and Zips Roswell II, LLC | Zips Real Estate | c/o Zips Real Estate, LLC and Zips Real Estate II, LLC Attn: Anthony M. Zirille, Esq. | 127 W. Berry Street, Suite 300 | Fort Wayne | IN | 46802 |

---

[1] For the avoidance of doubt, the Leases referenced herein include any amendments or modifications thereto.

## <u>Exhibit D(i)-1</u>

**Assumed Leases Redline**

**Zips Car Wash, LLC, et al**
*Assumed Real Property Leases* [1]
*As of April ~~17~~ 30, 2025*

| | | | | | Property Address | | | | ~~Landlord~~Counterparty Address | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Counterparty** | **Debtor Counterparty** | **Description of Agreement** | **Store Number / Property ID** | **Cure Amount** | **Street Address** | **City** | **State** | **Zip** | **Landlord** | **Parent Company** | **Attention** | **Street Address** | **City** | **State** | **Zip** |
| 4040 Winder Highway, LLC | Zips Car Wash, LLC | Lease Agreement dated March 9, 2018 | 0206 - GAFLO_WinderHwy | 2,636.78 | 4040 Winder Hwy | Flowery Branch | GA | 30542 | 4040 Winder Highway, LLC | | c/o Gene Mirvis | 19464 39th Avenue | Miami | FL | 33160 |
| B&C Grand Strand Properties, LLC | Zips Car Wash, LLC | Amended and Restated Lease Agreement dated December 29, 2016 | 0137 - SCMYR_JoeWhite | 8,666.58 | 1942 10th Ave N | Myrtle Beach | SC | 29577 | B&C Grand Strand Properties, LLC | | Attn: Lease Administration | P.O. Box 7577 | Myrtle Beach | SC | 29572 |
| Bartmart II, LLC | Zips Car Wash, LLC | Lease Agreement dated January 17, 2020 | 906 - NCFOR_College | 1,819.48 | 1822 Hwy 74A Bypass | Forest City | NC | 28043 | Bartmart II, LLC | | Attn: Jason A. Bartley, Manager | 110 Surry Path Court | Winston-Salem | NC | 27104 |
| BLVY Partners CLTZ Tyvola, LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated May 2, 2019 | 952 - NCCHA_Tyvola | - | 1036 Tyvola Rd | Charlotte | NC | 28217 | BLVY Partners CLTZ Tyvola, LLC | Willow Oak | Attn: David Head | 500 East Blvd, Suite 204 | Charlotte | NC | 28203 |
| BLVY Partners CLTZ Wilkinson, LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated May 2, 2019 | 953 - NCCHA_Wilkinson | - | 3401 Wilkinson Blvd | Charlotte | NC | 28208 | BLVY Partners CLTZ Wilkinson, LLC | Willow Oak | Attn: David Head | 500 East Blvd, Suite 204 | Charlotte | NC | 28203 |
| Broadstone ZCW Portfolio, LLC | Zips Car Wash, LLC | Amended and Restated Master Lease Agreement dated December 21, 2023 | 801 - FLBOY_Congress | 5,614.05 | 3008 S Congress Ave | Boynton Beach | FL | 33426 | Broadstone ZCW Portfolio, LLC | | c/o Broadstone Real Estate, LLC<br>Attn: Portfolio Manager | 800 Clinton Square | Rochester | NY | 14604 |
| | | | 0323 - KYLEX_NewCircle | 2,058.06 | 440 W New Circle Rd | Lexington | KY | 40511 | | | | | | | |
| Broadstone ZCW Portfolio, LLC | Zips Car Wash, LLC | Master Lease Agreement dated December 27, 2017 | 126 - TNALC_Hall | 2,853.36 | 220 S Hall Rd | Alcoa | TN | 37701 | Broadstone ZCW Portfolio, LLC | | c/o Broadstone Real Estate, LLC<br>Attn: Portfolio Manager | 800 Clinton Square | Rochester | NY | 14604 |
| | | | 323 - OKTUL_61st | 2,266.16 | 10220 E 61 St | Tulsa | OK | 74133 | | | | | | | |
| | | | 702 - KSWIC_Webb | 2,980.05 | 700 N Webb Rd | Wichita | KS | 67206 | | | | | | | |
| | | | 840 - FLMIL_Hwy90 | 3,229.64 | 6155 Hwy 90 | Milton | FL | 32570 | | | | | | | |
| Broadstone ZCW Portfolio, LLC | Zips Car Wash, LLC | Master Lease Agreement dated July 17, 2018 | 602 - TXTEX_Stateline | 3,566.24 | 4311 N State Line Ave | Texarkana | TX | 75503 | Broadstone ZCW Portfolio, LLC | | c/o Broadstone Real Estate, LLC<br>Attn: Portfolio Manager | 800 Clinton Square | Rochester | NY | 14604 |
| | | | 703 - KSWIC_Maple | 2,804.60 | 3825 W Maple St | Wichita | KS | 67213 | | | | | | | |
| | | | 705 - KSWIC_S.Maize | 2,578.40 | 1506 S Maize Rd | Wichita | KS | 67209 | | | | | | | |
| | | | 841 - FLPAC_Woodbine | 3,619.25 | 4254 Woodbine Rd | Pace | FL | 32571 | | | | | | | |
| Country Orchard Estates, Inc. | Zips Car Wash, LLC | Lease Agreement dated December 8, 2021 | 0324 - KYLEX_Richmond | - | 2576 Richmond Rd | Lexington | KY | 40509 | Country Orchard Estates, Inc. | | Attn: David Burton | 277 La Colina Drive | Redlands | CA | 92374 |
| Country Orchard Estates, Inc. | Zips Car Wash, LLC | Lease Agreement dated December 8, 2021 | 0326 - KYLEX_Sharkey | - | 1776 Sharkey Way | Lexington | KY | 40511 | Country Orchard Estates, Inc. | | Attn: David Burton | 277 La Colina Drive | Redlands | CA | 92374 |
| DNA Miracle Properties, LLC | Zips Car Wash, LLC | Lease Agreement dated April 15, 2019 | 135 - TNKNO_Clinton | - | 6655 Clinton Hwy | Knoxville | TN | 37912 | DNA Miracle Properties, LLC | | Attn: James D. Wamble | 224 Bramerton Court | Franklin | TN | 37069 |
| Exp Wash RE Portfolio Owner I, LLC | Zips Car Wash, LLC | Second Amended and Restated Master Lease Agreement dated September 29, 2017 | 0103 - SCSEN_Jennings | 3,627.59 | 1113 Jennings Ave | Seneca | SC | 29678 | Exp Wash RE Portfolio Owner I, LLC | Secure Properties | Attn: Kevin Ross | 450 Lexington Ave, Unit 4539 | New York | NY | 10037 |
| | | | 0200 - GACOR_FinisSprings | 3,436.73 | 155 Finis Springs Dr | Cornelia | GA | 30531 | | | | | | | |
| | | | 0201 - GACOM_Hwy441 | 4,739.75 | 40091 Hwy 441 | South Commerce | GA | 30529 | | | | | | | |
| | | | 203 - ARROG_Walnut | 2,892.26 | 2851 W Walnut St | Rogers | AR | 72756 | | | | | | | |
| | | | 225 - ARLIT_RodneyParham | 2,496.82 | 9500 N Rodney Parham Rd | Little Rock | AR | 72227 | | | | | | | |
| F.M. Hammad Irrevocable Trust | Zips Car Wash, LLC | Lease Agreement dated September 9, 2019 | 134 - TNKNO_Maynardville | - | 7229 Maynardville Pike | Knoxville | TN | 37918 | F.M. Hammad Irrevocable Trust | | Attn: Kaled Hammad | 4729 Lennon Ave. | Arlington | TX | 76016 |
| FSC ZCW Lynchburg VA, LLC | Zips Car Wash, LLC | Deed of Lease dated November 15, 2018 | 0600 - VALYN_Wards | - | 3805 Wards Rd | Lynchburg | VA | 24502 | FSC ZCW Lynchburg VA, LLC | Four Springs | Attn: Cynthia M. Daly | 1901 Main Street | Lake Como | NJ | 07719 |
| FSC ZCW Roanoke VA, LLC | Zips Car Wash, LLC | Deed of Lease dated November 15, 2018 | 0601 - VAROA_Challenger | 6,650.00 | 4035 Challenger Ave NE | Roanoke | VA | 24012 | FSC ZCW Roanoke VA, LLC | Four Springs | Attn: Cynthia M. Daly | 1901 Main Street | Lake Como | NJ | 07719 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated February 26, 2021 | 0307 - KYLOU_Breckenridge | 4,459.59 | 3000 Brenckenridge Ln | Louisville | KY | 40220 | Getty Leasing, Inc. | | Attn: Mark Olear | 292 Madison Avenue, 9th Floor | New York | NY | 10017 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated October 22, 2019 | 924 - NCROC_E.Broad | 3,001.01 | 1704 E Broad St | Rockingham | NC | 28379 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated October 31, 2019 | 0304 - KYLOU_S.Hurstbourne | 3,381.41 | 4590 S Hurstbourne Pkwy | Louisville | KY | 40299 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated December 16, 2019 | 958 - NCKAN_S.Cannon | 3,836.48 | 1402 S Cannon Blvd | Kannapolis | NC | 28083 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated March 13, 2020 | 0603 - VASAL_W.Main | 3,333.01 | 1706 W Main St | Salem | VA | 24153 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Getty Leasing, Inc. | Zips Car Wash, LLC | Land and Building Lease Agreement dated July 23, 2020 | 960 - NCGRE_PyramidsVillage | 3,841.20 | 2109 Pyramids Village Blvd | Greensboro | NC | 27405 | Getty Leasing, Inc. | | Attn: Mark Olear | Two Jericho Plaza, Suite 110, Wing C | Jericho | NY | 11753 |
| Ingles Markets, Incorporated | Zips Car Wash, LLC | Outparcel Lease Agreement dated April 20, 2018 | 905 - NCOTE_Tunnel | 2,784.80 | 1143 Tunnel Rd | Asheville | NC | 28805 | Ingles Markets, Incorporated | | Attn: Real Estate Department | P.O.Box 6676 | Asheville | NC | 28816 |
| Ingles Markets, Incorporated | Zips Car Wash, LLC | Outparcel Lease Agreement dated April 20, 2018 | 907 - NCASH_SmokeyPark | 2,784.80 | 153 Smokey Park Hwy | Asheville | NC | 28806 | Ingles Markets, Incorporated | | Attn: Real Estate Department | P.O.Box 6676 | Asheville | NC | 28816 |
| Ingles Markets, Incorporated | Zips Car Wash, LLC | Outparcel Lease Agreement dated April 20, 2018 | 908 - NCMAR_W.Henderson | 2,784.80 | 709 W Henderson St | Marion | NC | 28752 | Ingles Markets, Incorporated | | Attn: Real Estate Department | P.O.Box 6676 | Asheville | NC | 28816 |
| Ingles Markets, Incorporated | Zips Car Wash, LLC | Outparcel Lease Agreement dated April 20, 2018 | 959 - NCLIN_E.Main | 2,784.80 | 2116 E Main St | Lincolnton | NC | 28092 | Ingles Markets, Incorporated | | Attn: Real Estate Department | P.O.Box 6676 | Asheville | NC | 28816 |
| JB5117 Poplar, LLC | Zips Car Wash, LLC | Lease Agreement dated December 23, 2015 | 105 - TNMEM_Poplar | - | 4831 Poplar Ave | Memphis | TN | 38117 | JB5117 Poplar, LLC | | Attn: James Burks | 1400 W. Markham, Suite 301 | Little Rock | AR | 72201 |
| Joseph H. Campbell | Zips Car Wash, LLC | Lease Agreement dated February 1, 2015 | 961 - NCGRE_Battleground | 1,044.86 | 2300 Battleground Ave | Greensboro | NC | 27408 | Joseph H. Campbell | | | 2221 Lane Road | Greensboro | NC | 27408 |
| Kubera Financial Group, Inc.; and<br>Kalidindi Family Holdings, LLC | Zips Car Wash, LLC | Lease Agreement dated March 8, 2018 | 121 - TNKNO_Middlebrook | - | 9740 Middlebrook Pike | Knoxville | TN | 37931 | Kubera Financial Group, Inc.; and<br>Kalidindi Family Holdings, LLC | | | 5005 W Royal Ln., Suite 216 | Irving | TX | 75063 |
| Mathis Apartments, Inc | Zips Car Wash, LLC | Lease Agreement dated August 28, 2019 | 133 - TNKNO_W.Kingston | 2,820.11 | 7365 Kingston Pike | Knoxville | TN | 37919 | Mathis Apartments, Inc | | | 2633 Morning Dove Lane | Charleston | SC | 29414 |
| MDC Coast 7, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated September 21, 2017 | 120 - TNATH_Decatur | - | 1208 Decatur Pike | Athens | TN | 37303 | MDC Coast 7, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 122 - TNKNO_MossGrove | - | 106 Moss Grove Boulevard | Knoxville | TN | 37922 | | | | | | | |
| | | | 125 - TNMAR_Foch | - | 1106 Foch St | Maryville | TN | 37801 | | | | | | | |
| | | | 128 - TNCHA_JacCate | - | 9025 Jac Cate Rd | Ooltewah | TN | 37363 | | | | | | | |
| | | | 130 - TNOAK_S.Illinois | - | 102 S Illinois Ave | Oak Ridge | TN | 37830 | | | | | | | |
| | | | 620 - TXSAN_Bandera | - | 11816 Bandera Rd | Helotes | TX | 78023 | | | | | | | |
| | | | 704 - KSWIC_N.Maize | - | 1329 N Maize Rd | Wichita | KS | 67212 | | | | | | | |
| | | | 901 - NCWEA_Gill | - | 1 Gill Rd | Weaverville | NC | 28787 | | | | | | | |
| | | | 903 - NCASH_Tunnel | - | 125 Tunnel Rd | Asheville | NC | 28805 | | | | | | | |
| | | | 904 - NCARD_Airport | - | 360 Airport Rd | Arden | NC | 28704 | | | | | | | |
| MDC Coast 16, LLC | Zips Car Wash, LLC | Amended and Restated Master Land and Building Lease Agreement dated December 23, 2020 | 0306 - KYLOU_Bardstown | - | 4405 Bardstown Rd | Louisville | KY | 40218 | MDC Coast 16, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0410 - MOBRI_CharlesRock | - | 11647 St. Charles Rock Rd | Bridgeton | MO | 63044 | | | | | | | |
| | | | 0411 - MOOFA_HwyK | - | 1008 Hwy K | O'Fallon | MO | 63366 | | | | | | | |
| | | | 0412 - MOSTL_E.Page | - | 9430 Page Ave | St. Louis | MO | 63132 | | | | | | | |
| | | | 0414 - MOSTL_Meramec | - | 4453 Meramec Bottom Rd | St. Louis | MO | 63129 | | | | | | | |
| | | | 0413 - MOSTL_S.Kingshighway | - | 3410 S Kingshighway Blvd | St. Louis | MO | 63139 | | | | | | | |
| MDC Coast 20, LLC | Zips Car Wash, LLC | Lease Agreement dated December 28, 2018 | 0502 - ILGRA_Niedringhaus | - | 1511 Niedringhaus Ave | Granite City | IL | 62040 | MDC Coast 20, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| MDC NC1, LP;<br>Realty Income Illinois Properties 1, LLC; and<br>MDC Coast 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated December 15, 2022 | 0123 - SCNCH_Rivers | - | 5506 Rivers Ave | North Charleston | SC | 29406 | MDC NC1, LP;<br>Realty Income Illinois Properties 1, LLC; and<br>MDC Coast 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0202 - GACAR_JoeFrankHarris | - | 733 Joe Frank Harris Pkwy SE | Cartersville | GA | 30120 | | | | | | | |
| | | | 0203 - GACAR_Park | - | 802 S Park St | Carrollton | GA | 30117 | | | | | | | |
| | | | 0400 - MOSTL_Gravois | - | 11355 Gravois Rd | St. Louis | MO | 63126 | | | | | | | |
| | | | 0503 - ILPON_Hwy162 | - | 4192 Hwy 162 | Pontoon Beach | IL | 62040 | | | | | | | |
| | | | 106 - TNARL_Airline | - | 6083 Old Airline Rd | Arlington | TN | 38002 | | | | | | | |
| | | | 127 - TNKNO_MountainGrove | 4,320.00 | 7525 Mountain Grove Dr | Knoxville | TN | 37920 | | | | | | | |
| | | | 129 - TNCRO_N.Main | - | 1688 N Main St | Crossville | TN | 38555 | | | | | | | |
| | | | 131 - TNCHA_Hwy58 | - | 4907 TN #58 | Chattanooga | TN | 37416 | | | | | | | |
| | | | 309 - OKOKC_Classen | - | 2801 N Classen Blvd | Oklahoma City | OK | 73106 | | | | | | | |
| | | | 649 - TXMCK_S.Custer | - | 1590 S Custer Rd | McKinney | TX | 75070 | | | | | | | |
| | | | 950 - NCCHA_Albemarle | - | 5740 Albemarle Rd | Charlotte | NC | 28212 | | | | | | | |
| | | | 951 - NCCHA_N.Tryon | - | 7910 N Tryon St | Charlotte | NC | 28262 | | | | | | | |
| | | | 955 - NCHIC_Hwy70 | - | 1975 Hwy 70 | Hickory | NC | 28602 | | | | | | | |
| | | | 0124 - SCWAL_BellsHwy | - | 2048 Bells Hwy | Walterboro | SC | 29488 | | | | | | | |
| | | | 2102 - WIMAN_Calumet | - | 3601 Calumet Ave | Manitowoc | WI | 54220 | | | | | | | |
| | | | 2103 - WISAU_E.GreenBay | - | 475 E Green Bay Ave | Saukville | WI | 53080 | | | | | | | |
| | | | 1101 - MNALE_44th | - | 604 44th Ave W | Alexandria | MN | 56308 | | | | | | | |
| | | | 1102 - MNBAX_Universal | - | 7560 Universal Dr N | Baxter | MN | 56425 | | | | | | | |
| | | | 1103 - MNMOO_28th | - | 3410 28th Ave S | Moorhead | MN | 56560 | | | | | | | |
| | | | 1104 - MNDET_Richwood | - | 100 Richwood Rd | Detroit Lakes | MN | 56501 | | | | | | | |
| | | | 310 - OKEDM_E.Memorial | - | 1821 E Memorial Rd | Oklahoma City | OK | 73131 | | | | | | | |
| MDC NC2, LP | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated March 28, 2019 | 930 - NCCLA_Hwy70 | - | 11571 US Hwy 70 Business W | Clayton | NC | 27520 | MDC NC2, LP | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 931 - NCFUQ_Purfoy | - | 7510 Purfoy Rd | Fuquay Varina | NC | 27526 | | | | | | | |
| | | | 932 - NCRAL_BrierCreek | - | 9200 Brier Creek Pkwy | Raleigh | NC | 27617 | | | | | | | |
| | | | 933 - NCRAL_WakeForest | - | 2402 Wake Forest Rd | Raleigh | NC | 27608 | | | | | | | |
| | | | 934 - NCWAK_S.Main | - | 2121 S Main St | Wake Forest | NC | 27587 | | | | | | | |
| MDC NC2, LP | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated April 25, 2019 | 923 - NCHIG_S.Main | - | 2608 S Main St | High Point | NC | 27263 | MDC NC2, LP | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| MDC NC2, LP; and<br>Realty Income Properties 21, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated May 18, 2022 | 0605 - VALYN_OldForest | - | 3210 Old Forest Rd | Lynchburg | VA | 24501 | MDC NC2, LP; and<br>Realty Income Properties 21, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0604 - VALYN_Timberlake | - | 7616 Timberlake Rd | Lynchburg | VA | 24502 | | | | | | | |
| | | | 0607 - VAFOR_Forest | - | 17559 Forest Rd | Forest | VA | 24551 | | | | | | | |
| | | | 962 - NCDUR_MartinLutherKing | - | 1031 MLK Jr Pkwy | Durham | NC | 27713 | | | | | | | |
| | | | 0606 - VADAN_PineyForest | - | 550 Piney Forest Rd | Danville | VA | 24540 | | | | | | | |
| Micha Mottale, as Trustee of the Micha Mottale Trust of 2023 | Zips Car Wash, LLC | Amended and Restated Lease Agreement dated December 21, 2023 | 651 - TXPRO_W.University | 3,344.03 | 5090 W University Dr | Prosper | TX | 75078 | Micha Mottale, as Trustee of the Micha Mottale Trust of 2023 | | | 7504 Via Capri | La Jolla | CA | 92037 |
| MIKI Properties LLC – Roselle | Zips Car Wash, LLC | Land and Building Lease Agreement dated April 17, 2024 | 220016 - ILGLE_W.Roosevelt | - | 375 W Roosevelt Rd | Glen Ellyn | IL | 60137 | MIKI Properties LLC – Roselle | | Attn: David Dalesandro, President | 590 Kildeer Drive | Bolingbrook | IL | 60440 |
| Mohamed Merabet and Yamina Sebbah | Zips Car Wash, LLC | Amended and Restated Lease Agreement dated April 28, 2023 | 802 - FLMIA_27th | - | 17551 NW 27th Ave | Miami Gardens | FL | 33056 | Mohamed Merabet and Yamina Sebbah | | | 11071 Marin Street | Coral Gables | FL | 33156 |
| NADG NNN ZCW (OK) LLP | Zips Car Wash, LLC | Lease Agreement dated March 2, 2018 | 324 - OKGLE_141st | 2,111.61 | 91 W 141st St | Glenpool | OK | 74033 | NADG NNN ZCW (OK) LLP | | c/o North American Development Group | 2718 Fairmount Street | Dallas | TX | 75201 |
| Patrick M. Cullen | Zips Car Wash, LLC | Ground Lease dated May 19, 2017 | 902 - NCASH_Patton | 24,599.59 | 886 Patton Ave | Asheville | NC | 28806 | Patrick M. Cullen | | | 431 La Mesa Dr | Palo Alto | CA | 94028 |
| Placentia PM, LLC | Zips Car Wash, LLC | Amended and Restated Lease Agreement dated October 24, 2023 | 650 - TXLIT_FM423 | 3,601.32 | 2073 FM 423 | Little Elm | TX | 75068 | Placentia PM, LLC | | | 517 17th Street | Huntington Beach | CA | 92648 |
| Primax Properties, LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated May 2, 2019 | 956 - NCMAT_E.Independence | 1,473.40 | 9331 E Independence Blvd | Matthews | NC | 28105 | Primax Properties, LLC | | c/o Marie McLucas | 1100 E Morehead Street | Charlotte | NC | 28204 |
| Primera Towne Square II, LLC | Zips Car Wash, LLC | Lease Agreement dated May 7, 2021 | Plano Office | 3,552.93 | 8400 Belleview Drive, Suite #210 | Plano | TX | 75024 | Primera Towne Square II, LLC | | Attn: Towne Square Place Property Manager | 8400 Belleview Dr, Suite #130 | Plano | TX | 75024 |
| Pro Clean of Lake Worth Inc. | Zips Car Wash, LLC | Lease Agreement dated December 20, 2017 | 804 - FLLAK_Pinehurst | 2,612.89 | 3952 Pinehurst Dr | Lake Worth | FL | 33467 | Pro Clean of Lake Worth Inc. | | c/o Gene Mirvis | 19464 39th Ave | Miami | FL | 33160 |
| Realty Income Properties 17, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated October 4, 2022 | 0504 - ILADD_W.Lake | - | 625 W Lake St | Addison | IL | 60101 | Realty Income Properties 17, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0505 - ILVIL_W.Roosevelt | - | 153 Roosevelt Rd | Villa Park | IL | 60181 | | | | | | | |

[1] For the avoidance of doubt, the Leases referenced herein include any amendments or modifications thereto.

**Zips Car Wash, LLC, et al**
*Assumed Real Property Leases* [1]
*As of April ~~17~~ 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Cure Amount | Property Address: Street Address | Property Address: City | Property Address: State | Property Address: Zip | ~~Landlord~~Counterparty Address: Landlord | Parent Company | Attention | Street Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 0506 - ILAUR_N.Farnsworth | - | 1427 N Farnsworth Ave | Aurora | IL | 60505 | | | | | | | |
| | | | 0507 - ILCHI_W.54th | - | 7150 W 54th St | Chicago | IL | 60638 | | | | | | | |
| | | | 0508 - ILCAR_N.Gary | - | 1251 N Gary Ave | Carol Stream | IL | 60188 | | | | | | | |
| | | | 0509 - ILBOL_E.Boughton | - | 600 E Boughton Rd | Bolingbrook | IL | 60440 | | | | | | | |
| | | | 0510 - ILNOR_N.Mannheim | - | 2100 N Mannheim Rd | Northlake | IL | 60164 | | | | | | | |
| | | | 0511 - ILROS_W.Lake | - | 900 W Lake St | Roselle | IL | 60172 | | | | | | | |
| | | | 0512 - ILCHI_W.Grand | - | 6948 W Grand Ave | Chicago | IL | 60707 | | | | | | | |
| | | | 0513 - ILBOL_S.Weber | - | 246 S Weber Rd | Bolingbrook | IL | 60490 | | | | | | | |
| | | | 0514 - ILNAP_E.Ogden | - | 850 E Ogden Ave | Naperville | IL | 60540 | | | | | | | |
| Realty Income Properties 17, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated November 15, 2022 | 678 - TXMCK_Stacy | - | 6209 Stacy Rd | McKinney | TX | 75070 | Realty Income Properties 17, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 17, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated October 18, 2022 | 141 - TNMEM_Whitten | 358.00 | 1984 Whitten Rd | Memphis | TN | 38111 | Realty Income Properties 17, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 21, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 23, 2022 | 0217 - GACOV_Hwy142 | - | 9191 Hwy 142 | Covington | GA | 30014 | Realty Income Properties 21, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 21, LLC; and<br>Realty Income Properties 30, LLC | Zips Car Wash, LLC | Amended and Restated Master Land and Building Lease Agreement dated May 12, 2022 | 0216 - GAMIL_LogCabin | - | 103 Log Cabin Rd NE | Milledgeville | GA | 31061 | Realty Income Properties 21, LLC; and<br>Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0213 - GASAV_Abercorn | - | 10000 Abercorn St | Savannah | GA | 31406 | | | | | | | |
| | | | 0214 - GASAV_Commercial | - | 302 Commercial Dr | Savannah | GA | 31406 | | | | | | | |
| | | | 0215 - GASAV_Hwy80 | - | 4747 US-80 | Savannah | GA | 31410 | | | | | | | |
| | | | 0701 - INJAS_Newton | - | 3661 Newton St | Jasper | IN | 47546 | | | | | | | |
| Realty Income Properties 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated May 16, 2019 | 138 - TNPOW_E.Emory | - | 592 E Emory Rd | Powell | TN | 37849 | Realty Income Properties 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 17, 2019 | 139 - TNKNO_MillerPlace | - | 2935 Miller Place Way | Knoxville | TN | 37924 | Realty Income Properties 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated May 21, 2019 | 0302 - KYLOU_N.DixieHwy | - | 4711 Dixie Hwy | Louisville | KY | 40216 | Realty Income Properties 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0303 - KYLOU_S.DixieHwy | - | 9500 Dixie Hwy | Louisville | KY | 40272 | | | | | | | |
| | | | 0700 - INCLA_LewisClark | - | 701 E Lewis And Clark Pkwy | Clarksville | IN | 47129 | | | | | | | |
| Realty Income Properties 26, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated May 30, 2019 | 0800 - NMCLO_N.Prince | - | 3101 N Prince St | Clovis | NM | 88101 | Realty Income Properties 26, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0801 - NMROS_N.Main | - | 3616 N Main St | Roswell | NM | 88201 | | | | | | | |
| | | | 660 - TXANG_Sherwood | - | 4106 Sherwood Way | San Angelo | TX | 76901 | | | | | | | |
| | | | 661 - TXANG_Knickerbocker | - | 3402 Knickerbocker Rd | San Angelo | TX | 76904 | | | | | | | |
| | | | 662 - TXANG_N.Bryant | - | 2704 N Bryant Blvd | San Angelo | TX | 76903 | | | | | | | |
| | | | 663 - TXPLA_Olton | - | 4101 Olton Rd | Plainview | TX | 79072 | | | | | | | |
| Realty Income Properties 29, LLC | Zips Car Wash, LLC | Lease Agreement dated December 28, 2018 | 0104 - SCROC_Cherry | 4,175.76 | 2178 Cherry Rd | Rock Hill | SC | 29732 | Realty Income Properties 29, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 29, LLC | Zips Car Wash, LLC | Master Lease Agreement dated December 28, 2018 | 0122 - SCNCH_AshleyPhosphate | - | 3955 Ashley Phosphate Rd | North Charleston | SC | 29418 | Realty Income Properties 29, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 0300 - KYLOU_DixieHwy | - | 7773 Dixie Hwy | Louisville | KY | 40258 | | | | | | | |
| | | | 2104 - WIFON_W.Johnson | - | 123 W Johnson St | Fond Du Lac | WI | 54935 | | | | | | | |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated August 16, 2022 | 677 - TXFRI_Eldorado | - | 2835 El Dorado Pkwy | Frisco | TX | 75033 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 676 - TXLEW_N.Josey | - | 6100 N Josey Ln | Lewisville | TX | 75056 | | | | | | | |
| | | | 675 - TXDAL_Lemmon | - | 5006 Lemmon Ave | Dallas | TX | 75209 | | | | | | | |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 21, 2022 | 672 - TXGRA_Hwy377 | - | 3601 E US Hwy 377 | Granbury | TX | 76049 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated January 30, 2023 | 0327 - KYNIC_Marlene | - | 130 Marlene Dr | Nicholasville | KY | 40356 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 8, 2022 | 653 - TXROC_S.Goliad | - | 2360 S Goliad St | Rockwall | TX | 75032 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| | | | 652 - TXFLO_Justin | - | 3005 Justin Rd | Flower Mound | TX | 75028 | | | | | | | |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated June 16, 2022 | 0328 - KYWIN_Codella | - | 160 Codella Dr | Winchester | KY | 40391 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| Realty Income Properties 30, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated July 7, 2022 | 673 - TXNEW_Walton | - | 23685 Walton Ave | New Caney | TX | 77357 | Realty Income Properties 30, LLC | Realty Income | Attn: Legal Department | 11995 El Camino Real | San Diego | CA | 92130 |
| River City Clean LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated September 1, 2022 | 140 - TNMEM_W.Poplar | - | 3294 Poplar Ave | Memphis | TN | 38111 | River City Clean LLC | Northwest Group Inc | | 7150 SW Fir Loop Suite 202 | Tigard | OR | 97223 |
| Roanoke Zips LLC | Zips Car Wash, LLC | Lease Agreement dated April 4, 2019 | 0602 - VAROA_Dale | - | 2121 Dale Ave SE | Roanoke | VA | 24013 | Roanoke Zips LLC | | | 1721 Besley Rd. | Vienna | VA | 22182 |
| Rocket Properties Boise, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 3301 - IDBOI_W.Fairview | 8,338.06 | 12345 W Fairview Ave | Boise | ID | 83713 | Rocket Properties Boise, LLC | Rocket Express | c/o Rocket Express LLC<br>Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| Rocket Properties Meridian, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 3303 - IDMER_W.IslandGreen | 10,179.83 | 1717 W Island Green Dr | Meridian | ID | 83646 | Rocket Properties Meridian, LLC | Rocket Express | c/o Rocket Express LLC<br>Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| Rocket Properties Midvale, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 4101 - UTMID_W.7200 | 5,306.04 | 150 W 7200 S | Midvale | UT | 84047 | Rocket Properties Midvale, LLC | Rocket Express | c/o Rocket Express LLC<br>Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| Rocket Properties South Jordan, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 4102 - UTSOU_S.Redwood | 8,338.06 | 11399 S Redwood Rd | South Jordan | UT | 84095 | Rocket Properties South Jordan, LLC | Rocket Express | c/o Rocket Express LLC<br>Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| Rocket Properties Twin, LLC | Zips Portfolio IV, LLC | Land and Building Lease Agreement dated November 30, 2021 | 3302 - IDTWI_BlueLakes | 8,338.06 | 1122 Blue Lakes Boulevard N | Twin Falls | ID | 83301 | Rocket Properties Twin, LLC | Rocket Express | c/o Rocket Express LLC<br>Attn: Joe and Janet Russell | 1205 E. Warm Springs Ave. | Boise | ID | 83712 |
| RTS Orchards, LLC | Zips Car Wash, LLC | Lease Agreement dated November 22, 2019 | 124 - TNKNO_Western | - | 4416 Western Ave | Knoxville | TN | 37921 | RTS Orchards, LLC | | Attn: Terry Nugent | 4831 Calloway Drive, Suite 102 | Bakersfield | CA | 93312 |
| S.C.P. LLC | Zips Portfolio III, LLC | Amended and Restated Lease Agreement dated September 11, 2018 | 803 - FLMIR_Palm | 2,374.54 | 1801 Palm Ave | Miramar | FL | 33025 | S.C.P. LLC | | | 17 Via Amanti | Newport Coast | CA | 92657 |
| SCF RC Funding IV | Zips Car Wash, LLC | Third Amended and Restated Master Lease Agreement dated September 29, 2017 | 0100 - SCAND_Clemson | - | 4102 Clemson Blvd | Anderson | SC | 29621 | SCF RC Funding IV | Essential Realty | c/o Essential Properties Realty Trust LLC<br>Attn: Hillary Hai | 47 Hulfish Street, Suite # 210 | Princeton | NJ | 08542 |
| | | | 226 - ARBRY_N.Reynolds | - | 1900 N Reynolds Rd | Bryant | AR | 72022 | | | | | | | |
| | | | 404 - LASHR_Youree | - | 8660 Youree Dr | Shreveport | LA | 71115 | | | | | | | |
| Spirit Master Funding X, LLC | Zips Car Wash, LLC | Amended and Restated Master Lease Agreement dated March 29, 2017 | 104 - TNMEM_Hwy64 | - | 9809 Hwy 64 | Arlington | TN | 38002 | Spirit Master Funding X, LLC | Realty Income | c/o Spirit SPE Manager, LLC<br>Attn: Portfolio Servicing | 2727 N. Harwood Street, Suite 300 | Dallas | TX | 75201 |
| | | | 202 - ARSPR_Thompson | - | 1112 S Thompson St | Springdale | AR | 72764 | | | | | | | |
| | | | 207 - ARSIL_Hwy412 | - | 300 Hwy 412 | Siloam Springs | AR | 72761 | | | | | | | |
| | | | 220 - ARSHE_Hwy107 | - | 7900 Hwy 107 | Sherwood | AR | 72120 | | | | | | | |
| | | | 303 - OKOKC_Reno | - | 5807 W Reno Ave | Oklahoma City | OK | 73127 | | | | | | | |
| | | | 305 - OKOKC_Penn | - | 12425 N Pennsylvania Ave | Oklahoma City | OK | 73120 | | | | | | | |
| | | | 307 - OKEDM_SantaFe | - | 1308 S Santa Fe Ave | Edmond | OK | 73003 | | | | | | | |
| | | | 601 - TXTEX_Richmond | - | 2806 Richmond Rd | Texarkana | TX | 75503 | | | | | | | |
| | | | 622 - TXSAN_W.Culebra | - | 10623 Culebra Rd | San Antonio | TX | 78251 | | | | | | | |
| | | | 623 - TXSAN_FM78 | - | 8242 FM 78 | Converse | TX | 78109 | | | | | | | |
| | | | 626 - TXSAN_PatBooker | - | 2809 Pat Booker Rd | Universal City | TX | 78148 | | | | | | | |
| | | | 2101 - WISHE_Washington | - | 2612 Washington Ave | Sheboygan | WI | 53081 | | | | | | | |
| | | | 0322 - KYLEX_N.Limestone | - | 1537 N Limestone | Lexington | KY | 40505 | | | | | | | |
| Spirit Realty, L.P. | Zips Car Wash, LLC | Amended and Restated Master Lease Agreement dated August 4, 2022 | 1106 - MNBAX_Glory | - | 7361 Glory Rd | Baxter | MN | 56425 | Spirit Realty, L.P. | Realty Income | Attn: Property Management | 2727 N. Harwood Street, Suite 300 | Dallas | TX | 75201 |
| | | | 1107 - MNGRA_Hwy169 | - | 135 SE 29th St | Grand Rapids | MN | 55744 | | | | | | | |
| | | | 0142 - SCMYR_N.KingsHwy | - | 8010 N Kings Hwy | Myrtle Beach | SC | 29572 | | | | | | | |
| | | | 0804 - NMALA_N.Whitesands | - | 3399 N White Sands Blvd | Alamogordo | NM | 88310 | | | | | | | |
| | | | 5101 - NDFAR_25th | 341.90 | 1345 25th Ave S | Fargo | ND | 58103 | | | | | | | |
| | | | 1105 - MNDET_Hwy10 | - | 1415 US-10 | Detroit Lakes | MN | 56501 | | | | | | | |
| | | | 0803 - NMALA_S.WhiteSands | - | 905 S White Sands Blvd | Alamogordo | NM | 88310 | | | | | | | |
| | | | 935 - NCHOL_GrandHill | - | 301 Grand Hill Place | Holly Springs | NC | 27540 | | | | | | | |
| | | | 936 - NCGOL_N.Berkeley | - | 508 N Berkeley Blvd | Goldsboro | NC | 27534 | | | | | | | |
| | | | 0308 - KYLOU_CaneRun | - | 4860 Cane Run Rd | Louisville | KY | 40216 | | | | | | | |
| | | | 0210 - GADAL_DallasACworth | - | 8875 Dallas Acworth Hwy | Dallas | GA | 30132 | | | | | | | |
| | | | 0130 - SCMYR_International | - | 593 International Dr | Myrtle Beach | SC | 29579 | | | | | | | |
| | | | 0131 - SCMYR_Agnes | - | 2755 Agnes Ln | Myrtle Beach | SC | 29577 | | | | | | | |
| | | | 0132 - SCMYR_N.Hwy17 | - | 1212 Hwy 17 S | North Myrtle | SC | 29582 | | | | | | | |
| | | | 0211 - GAWAT_HogMountain | - | 1000 Hog Mountain Rd | Watkinsville | GA | 30677 | | | | | | | |
| | | | 0134 - SCMYR_Hwy17 | - | 1604 Hwy 17 N | North Myrtle | SC | 29582 | | | | | | | |
| | | | 0135 - SCMYR_Hwy501 | - | 2089 Hwy 501 | Myrtle Beach | SC | 29577 | | | | | | | |
| | | | 0136 - SCMUR_GardenCity | - | 509 Garden City Connector | Murrells Inlet | SC | 29576 | | | | | | | |
| | | | 0138 - SCBLU_FordingIsland | - | 1008 Fording Island Rd | Bluffton | SC | 29910 | | | | | | | |
| | | | 0141 - SCOKA_BaylorBrook | - | 7 Baylor Brook Dr | Okatie | SC | 29909 | | | | | | | |
| | | | 0140 - SCHIL_BWilliamHilton | - | 1008 William Hilton Pkwy | Hilton Head | SC | 29928 | | | | | | | |
| | | | 0139 - SCBLU_Pinellas | - | 8250 Pinellas Dr | Bluffton | SC | 29910 | | | | | | | |
| | | | 0212 - GAROC_Chattahoochee | - | 1464 Chattahoochee Dr | Rockmart | GA | 30153 | | | | | | | |
| | | | 670 - TXAUS_Hwy290 | - | 13519 Hwy 290 W | Austin | TX | 78737 | | | | | | | |
| | | | 671 - TXDAL_Forest | - | 3541 Forest Ln | Dallas | TX | 75234 | | | | | | | |
| | | | 674 - TXDAL_Ross | - | 5021 Ross Ave | Dallas | TX | 75206 | | | | | | | |
| Store Capital Acquisitions, LLC | Zips Portfolio II, LLC | Lease Agreement dated January 23, 2018 | 706 - KSDER_Rock | - | 2825 N Rock Rd | Derby | KS | 67037 | Store Capital Acquisitions, LLC | STORE Capital | Attn: Michael T. Bennett | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| Store Capital Acquisitions, LLC | Zips Portfolio II, LLC | Lease Agreement dated February 13, 2018 | 920 - NCWIN_Oxford | 4,553.00 | 3910 Oxford Station Way | Winston-Salem | NC | 27103 | Store Capital Acquisitions, LLC | STORE Capital | Attn: Michael T. Bennett | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| Store Capital Acquisitions, LLC | Zips Portfolio II, LLC | Lease Agreement dated December 14, 2017 | 628 - TXSAN_E.Culebra | - | 1431 Culebra Rd | San Antonio | TX | 78201 | Store Capital Acquisitions, LLC | STORE Capital | Attn: Michael T. Bennett | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| Store Master Funding VII, LLC | Zips Portfolio I, LLC | Eight Amended and Restated Master Lease Agreement dated January 18, 2022 | 201 - ARFAY_Wedington | - | 3107 W Wedington Dr | Fayetteville | AR | 72704 | Store Master Funding VII, LLC | STORE Capital | Attn: Asset Management | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |

[1] For the avoidance of doubt, the Leases referenced herein include any amendments or modifications thereto.

**Zips Car Wash, LLC, et al**
*Assumed Real Property Leases* [1]
*As of April ~~17~~ 30, 2025*

| | | | | | Property Address | | | | ~~Landlord~~Counterparty Address | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Counterparty** | **Debtor Counterparty** | **Description of Agreement** | **Store Number / Property ID** | **Cure Amount** | **Street Address** | **City** | **State** | **Zip** | **Landlord** | **Parent Company** | **Attention** | **Street Address** | **City** | **State** | **Zip** |
| | | | 204 - ARROG_Pleasant | - | 2000 W Pleasant Grove Rd | Rogers | AR | 72758 | | | | | | | |
| | | | 205 - ARBEN_Walton | - | 1004 S Walton Blvd | Bentonville | AR | 72712 | | | | | | | |
| | | | 221 - ARLIT_Shackleford | - | 2702 S Shackleford Rd | Little Rock | AR | 72205 | | | | | | | |
| | | | 223 - ARNLR_Maumelle | - | 12301 Maumelle Blvd | Little Rock | AR | 72113 | | | | | | | |
| | | | 227 - ARLIT_Hwy10 | - | 14021 Cantrell Rd | Little Rock | AR | 72223 | | | | | | | |
| | | | 402 - LASHR_N.Market | 3,232.00 | 2910 Kitty Ln | Shreveport | LA | 71107 | | | | | | | |
| | | | 501 - MSOLI_Goodman | 1,156.00 | 6810 Goodman Rd | Olive Branch | MS | 38654 | | | | | | | |
| | | | 0902 - OHCIN_Montgomery | - | 12167 Montgomery Rd | Hamilton | OH | 45249 | | | | | | | |
| | | | 707 - KSAND_Andover | - | 565 S Andover Rd | Andover | KS | 67002 | | | | | | | |
| | | | 0415 - MOSTP_Jungermann | 433.44 | 1525 Jungermann Rd | St. Peters | MO | 63376 | | | | | | | |
| Store Master Funding VII, LLC | Zips Portfolio II, LLC | Eigth Amended and Restated Master Lease Agreement dated August 17, 2021 | 101 - TNMEM_Germantown | - | 1565 N Germantown Pkwy | Cordova | TN | 38016 | Store Master Funding VII, LLC | STORE Capital | Attn: Asset Management | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| | | | 102 - TNMEM_Hacks | - | 4234 Hacks Cross Rd | Memphis | TN | 38125 | | | | | | | |
| | | | 103 - TNMEM_Raleigh | - | 5795 Raleigh Lagrange Rd | Memphis | TN | 38134 | | | | | | | |
| | | | 136 - TNCOO_Neal | - | 420 Neal St | Cookeville | TN | 38501 | | | | | | | |
| | | | 137 - TNCOO_Willow | - | 693 S Willow Ave | Cookeville | TN | 38501 | | | | | | | |
| | | | 921 - NCWIN_University | - | 5211 University Pkwy | Winston-Salem | NC | 27106 | | | | | | | |
| | | | 0205 - GACLE_JesseMae | - | 71 Jesse Mae Thurmond Connector | Cleveland | GA | 30528 | | | | | | | |
| | | | 922 - NCCLE_Stadium | - | 6317 Stadium Dr | Clemmons | NC | 27012 | | | | | | | |
| | | | 0207 - GAWOO_Eagle | - | 2907 Eagle Dr | Woodstock | GA | 30189 | | | | | | | |
| | | | 0420 - MOWAR_N.Charles | - | 719 N Charles St | Warrensburg | MO | 64093 | | | | | | | |
| | | | 720 - KSSHA_Nieman | - | 6401 Nieman Rd | Shawnee | KS | 66203 | | | | | | | |
| | | | 0421 - MOJOP_S.Rangeline | - | 1530 S Rangeline Rd | Joplin | MO | 64804 | | | | | | | |
| | | | 0209 - GALOG_Athens | - | 125 Athens Hwy | Loganville | GA | 30052 | | | | | | | |
| | | | 0208 - GAGRA_Loganville | - | 2585 Loganville Hwy | Grayson | GA | 30017 | | | | | | | |
| Store Master Funding VII, LLC | Zips Portfolio III, LLC | Sixth Amended and Restated Master Lease Agreement dated December 30, 2022 | 301 - OKNOR_Sonoma | - | 950 Sonoma Park Dr | Norman | OK | 73071 | Store Master Funding VII, LLC | STORE Capital | Attn: Asset Management | 8377 E. Hartford Drive, Suite 100 | Scottsdale | AZ | 85255 |
| | | | 302 - OKOKC_NWExpress | - | 7323 NW Expressway | Oklahoma City | OK | 73132 | | | | | | | |
| | | | 304 - OKOKC_Western | - | 8300 S Western Ave | Oklahoma City | OK | 73139 | | | | | | | |
| | | | 306 - OKOKC_MacArthur | - | 13408 N Macarthur Blvd | Oklahoma City | OK | 73142 | | | | | | | |
| | | | 320 - OKTUL_Sheridan | - | 3912 S Sheridan Rd | Tulsa | OK | 74145 | | | | | | | |
| | | | 321 - OKTUL_Riverside | - | 9553 Riverside Pkwy | Tulsa | OK | 74137 | | | | | | | |
| | | | 322 - OKBRO_Kenosha | - | 3450 W Kenosha St | Broken Arrow | OK | 74012 | | | | | | | |
| | | | 640 - TXARL_Little | - | 4651 Little Rd | Arlington | TX | 76017 | | | | | | | |
| | | | 641 - TXBUR_Wilshire | - | 797 SW Wilshire Blvd | Burleson | TX | 76028 | | | | | | | |
| | | | 645 - TXFOR_Westworth | - | 6705 Westworth Blvd | Westworth | TX | 76114 | | | | | | | |
| | | | 646 - TXHUR_Precinct | - | 1641 Precinct Line Rd | Hurst | TX | 76054 | | | | | | | |
| | | | 647 - TXMAN_Debbie | - | 701 W Debbie Ln | Mansfield | TX | 76063 | | | | | | | |
| | | | 648 - TXSAG_McLeroy | - | 100 E Mcleroy Blvd | Saginaw | TX | 76179 | | | | | | | |
| | | | 0422 - MOWEB_S.Madison | - | 1309 S Madison St | Webb City | MO | 64870 | | | | | | | |
| | | | 0320 - KYGEO_Osborne | - | 104 Osbourne Way | Georgetown | KY | 40324 | | | | | | | |
| | | | 0321 - KYLEX_GreyLag | - | 2320 Grey Lag Way | Lexington | KY | 40509 | | | | | | | |
| | | | 664 - TXFOR_Quebec | - | 5900 Quebec St | Fort Worth | TX | 76135 | | | | | | | |
| | | | 665 - TXBUR_E.RendonCrowley | - | 301 E Rendon Crowley Rd | Burleson | TX | 76028 | | | | | | | |
| UK Kids Car Wash, LLC | Zips Car Wash, LLC | Master Land and Building Lease Agreement dated October 4, 2023 | 0325 - KYLEX_S.Broadway | 2,896.39 | 1250 S Broadway | Lexington | KY | 40504 | UK Kids Car Wash, LLC | | c/o Mr. James M. Coffey III | 466 River Street | Norwell | MA | 02061 |
| 600 Willow Properties LLC | Zips Car Wash, LLC | Lease Agreement dated March 8, 2018 | 123 - TNKNO_E.Kingston | 2,955.29 | 5615 Kingston Pike | Knoxville | TN | 37919 | 600 Willow Properties LLC | | | 105 Fairfield Dr | Short Hills | NJ | 07078 |
| William Giffen and Christine Labrenz as Joint Tenants with Rights of Suvivorship | Zips Car Wash, LLC | Lease Agreement dated April 12, 2018 | 0101 - SCAND_Hwy81 | - | 2117 N Hwy 81 | Anderson | SC | 29621 | William Giffen and Christine Labrenz as Joint Tenants with Rights of Suvivorship | | | 77 Madrone Avenue | Pescadero | CA | 94060 |
| Windy Hill Water Park, Inc. | Zips Car Wash, LLC | Lease dated September 15, 2017 | 0133 - SCMYR_S.Hwy17 | 1,050.00 | 4404 Hwy 17 S | North Myrtle | SC | 29582 | Windy Hill Water Park, Inc. | | c/o Carroll Rogers | 306 Ocean View Dr. | Myrtle Beach | SC | 49272 |
| Zips Jett 1, LLC | Zips Car Wash, LLC | Lease Agreement dated January 9, 2018 | 643 - TXDAL_Northwest | 4,219.02 | 3505 W Northwest Hwy | Dallas | TX | 75220 | Zips Jett 1, LLC | Zips Real Estate | c/o Equity Investment Group<br>Attn: Anthony M. Zirille, Esq. | 127 W. Berry Street, Suite 300 | Fort Wayne | IN | 46802 |
| Zips Jett 2, LLC | Zips Car Wash, LLC | Lease Agreement dated January 9, 2018 | 644 - TXFOR_Denton | 4,219.02 | 6221 Denton Hwy | Haltom City | TX | 76148 | Zips Jett 2, LLC | Zips Real Estate | c/o Equity Investment Group<br>Attn: Anthony M. Zirille, Esq. | 127 W. Berry Street, Suite 300 | Fort Wayne | IN | 46802 |
| Zips Patterson Street, LLC | Zips Car Wash, LLC | Lease Agreement dated May 2, 2019 | 954 - NCGRE_Patterson | 6,548.42 | 2806 Patterson St | Greensboro | NC | 27407 | Zips Patterson Street, LLC | Zips Real Estate | c/o Zips Real Estate II, LLC<br>Attn: Anthony M. Zirille, Esq. | 127 W. Berry Street, Suite 300 | Fort Wayne | IN | 46802 |
| Zips Roswell I, LLC; and<br>Zips Roswell II, LLC | Zips Car Wash, LLC | Lease Agreement dated February 10, 2020 | 0802 - NMROS_S.Main | 4,809.30 | 1101 S Main St | Roswell | NM | 88203 | Zips Roswell I, LLC; and<br>Zips Roswell II, LLC | Zips Real Estate | c/o Zips Real Estate, LLC and Zips Real Estate II, LLC<br>Attn: Anthony M. Zirille, Esq. | 127 W. Berry Street, Suite 300 | Fort Wayne | IN | 46802 |

[1] For the avoidance of doubt, the Leases referenced herein include any amendments or modifications thereto.

## **Exhibit D(ii)**

## **Assumed Contracts**

**Zips Car Wash, LLC, et al**

*Assumed Contracts - Non Real Property*

*As of April 30, 2025*

| No. | Action | Counterparty | Debtor Counterparty | Description of Agreement | Cure Amount | Street Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|
| 1 | ASSUME | AMP MEMBERSHIPS LLC | ZIPS CAR WASH, LLC | PLATFORM SOFTWARE AND SERVICES AGREEMENT, AS AMENDED, DATED AS OF JUN 16,2023 | $88,563.60 | ATTN: GENERAL COUNSEL 7005 E 46TH AVE DR UNIT B | DENVER | CO | 80216 |
| 2 | ASSUME | ARCHITECTURAL GRAPHICS, INC. | ZIPS CAR WASH, LLC | MASTER SERVICES AGREEMENT, DATED AS OF FEB 25,2025 | $0.00 | ATTN: GENERAL COUNSEL 412 N CEDAR BLUFF RD. | KNOXVILLE | TN | 37923 |
| 3 | ASSUME | ASCEND TECHNOLOGIES LLC D/B/A EDAFIO TECHNOLOGY PARTNERS | ZIPS CAR WASH, LLC | MASTER SERVICES CONTRACT, AS AMENDED, DATED AS OF AUG 03,2023 | $343,781.83 | ATTN: GENERAL COUNSEL 1000 W MARKHAM ST STE 110 | LITTLE ROCK | AR | 72201 |
| 4 | ASSUME | ASHISH PAREEK | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 5 | ASSUME | ATLANTIC STREET CAPITAL ADVISORS INC | ZIPS CAR WASH, LLC | CONSULTING AGREEMENT | $650,000.00 | 16415 ADDISON RD STE 655 | ADDISON | TX | 75001 |
| 6 | ASSUME | ATLANTIC STREET CAPITAL MANAGEMENT LLC | EXPRESS CAR WASH HOLDINGS, LLC | CONSULTING SERVICES AGREEMENT | | 281 TRESSER BLVD STE 601 | STAMFORD | CT | 06901 |
| 7 | ASSUME | BASEM AYBEF | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 8 | ASSUME | CANEY HOLDINGS LLC | ZIPS CAR WASH, LLC | SIGN LICENSE AGREEMENT, DATED AS OF NOV 01,2024 | $0.00 | ATTN: ASSET MANAGER PO BOX 34584 | HOUSTON | TX | 77234 |
| 9 | ASSUME | CARDLYTICS INC | ZIPS CAR WASH, LLC | RECIPROCAL NON-DISCLOSURE AGREEMENT, AS AMENDED, DATED AS OF SEP 20,2024 | $0.00 | ATTN: GENERAL COUNSEL 675 PONCE DE LEON AVENUE NE, SUITE 4100 | ATLANTA | GA | 30308 |
| 10 | ASSUME | CAROLINA WASTE & RECYCLING LLC | ZIPS CAR WASH, LLC | CUSTOMER SERVICE AGREEMENT, DATED AS OF JAN 10,2025 | $0.00 | ATTN: GENERAL COUNSEL 4285 PACE ST | NORTH CHARLESTON | SC | 29405 |
| 11 | ASSUME | CHANDLER SIGNS LLC | ZIPS CAR WASH, LLC | DISPLAY LEASE AGREEMENT, DATED AS OF AUG 20,2024 | | ATTN: GENERAL COUNSEL 14201 SOVEREIGN RD STE 101 | FORT WORTH | TX | 76155 |
| 12 | ASSUME | CHANDLER SIGNS LLC AND PATTISON SIGN GROUP INC | ZIPS CAR WASH, LLC | MASTER SERVICES AGREEMENT, DATED AS OF MAY 07,2024 | $28,687.80 | ATTN: GENERAL COUNSEL 520 WEST SUMMIT HILL DR UNIT 702 | KNOXVILLE | TN | 37902 |
| 13 | ASSUME | CISION US INC | ZIPS CAR WASH, LLC | SERVICE ORDER, DATED AS OF AUG 09,2024 | $2,681.89 | ATTN: GENERAL COUNSEL 300 S RIVERSIDE PLAZA | CHICAGO | IL | 60606 |
| 14 | ASSUME | CONCUR TECHNOLOGIES INC | ZIPS CAR WASH, LLC | SIGNED ORDER AGREEMENT, DATED AS OF APR 30,2024 | $48,682.81 | ATTN: GENERAL COUNSEL 601 108TH AVE NE STE 1000 | BELLEVUE | WA | 98004 |
| 15 | ASSUME | CONSOLIDATED ADMIN SERVICES, LLC | ZIPS CAR WASH, LLC | FSA AND DCAP ADMINISTRATIVE SERVICES AGREEMENT, AS AMENDED, DATED AS OF JAN 30,2017 | $1,057.50 | P.O. BOX 1513 | CABOT | AR | 72023 |
| 16 | ASSUME | CORCENTRIC PAYMENT LLC | ZIPS CAR WASH, LLC | SERVICES AGREEMENT IN SEPTEMBER 7TH 2021, AS AMENDED | $0.00 | ATTN: GENERAL COUNSEL 62861 COLLECTIONS CENTER DR | CHICAGO | IL | 60693 |
| 17 | ASSUME | CREATIVE PLANNING, LLC FKA LOCKTON INVESTMENT ADVISORS, LLC | ZIPS CAR WASH, LLC | ADVISORY SERVICES AGREEMENT, DATED AS OF AUG 31,2021 | $0.00 | ATTN: GENERAL COUNSEL 5454 W 110TH ST | OVERLAND PARK | KS | 66211 |
| 18 | ASSUME | CRESTWOOD ASSOCIATES LLC | ZIPS CAR WASH, LLC | PROFESSIONAL SERVICE AGREEMENT, DATED AS OF NOV 17,2020 | $14,859.46 | ATTN: GENERAL COUNSEL 1501 E WOODFIELD RD STE 113E | SCHAUMBURG | IL | 60173 |
| 19 | ASSUME | CULLIGAN WATER FKA QUENCH WATER USA FKA ARTESIAN WATER | ZIPS CAR WASH, LLC | SERVICE AGREEMENT, AS AMENDED, DATED AS OF MAY 12,2023 | $12,930.18 | ATTN: GENERAL COUNSEL 2214 PADDOCK WAY STE 150 | GRAND PRAIRIE | TX | 75050 |
| 20 | ASSUME | CYRIAC THOMAS | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 21 | ASSUME | DATAMAX INC. | ZIPS CAR WASH, LLC | EQUIPMENT LEASE AGREEMENT, DATED AS OF SEP 05,2022 | $1,388.81 | PO BOX 2235 | ST. LOUIS | MO | 63109 |
| 22 | ASSUME | DATASITE LLC | ZIPS CAR WASH, LLC | STATEMENT OF WORK, DATED AS OF JUN 27,2024 | $0.00 | ATTN: GENERAL COUNSEL 733 S. MARQUETTE AVE, | MINNEAPOLIS | MN | 55402 |
| 23 | ASSUME | DAVID MILLER | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 24 | ASSUME | DOMO INC | ZIPS CAR WASH, LLC | SERVICE ORDER, DATED AS OF MAY 01,2024 | | ATTN: FINANCE DEPARTMENT 802 E 1050 S | AMERICAN FORK | UT | 84003 |
| 25 | ASSUME | DOMO INC | ZIPS CAR WASH, LLC | SUBSCRIPTION SERVICE ORDER AGREEMENT, DATED AS OF MAY 01,2024 | $35,109.91 | ATTN: FINANCE DEPARTMENT 802 E 1050 S | AMERICAN FORK | UT | 84003 |
| 26 | ASSUME | ECO-TECH LLC | ZIPS CAR WASH, LLC | SALES ORDER AGREEMENT, DATED AS OF JAN 22,2025 | $0.00 | ATTN: GENERAL COUNSEL PO BOX 36557 | LOUISVILLE | KY | 40233 |
| 27 | ASSUME | EXPRESS CARWASH EQUIPMENT LLC | ZIPS PORTFOLIO II, LLC | AGREEMENT FOR MAINTENANCE PROGRAM PROPOSAL, DATED AS OF OCT 15,2024 | | ATTN: GENERAL COUNSEL 4014 E 143RD STREET | GRANDVIEW | MO | 64030 |
| 28 | ASSUME | EXPRESS CARWASH EQUIPMENT LLC | ZIPS PORTFOLIO II, LLC | AGREEMENT FOR PREVENTATIVE MAINTENANCE PROGRAM PROPOSAL, DATED AS OF OCT 15,2024 | $16,985.70 | ATTN: GENERAL COUNSEL 4014 E 143RD STREET | GRANDVIEW | MO | 64030 |
| 29 | ASSUME | FEDEX OFFICE AND PRINT SERVICES INC | ZIPS CAR WASH, LLC | U.S. CORPORATE ACCOUNT PROGRAM AGREEMENT, DATED AS OF MAY 24,2022 | $34,033.78 | ATTN: GENERAL COUNSEL 7900 LEGACY DR | PLANO | TX | 75024 |
| 30 | ASSUME | FUTURE ENERGY SOLUTIONS CONTRACTS NO 1 LLLP FUTURE ENERGY SOLUTIONS MAINTENANCE LLC | ZIPS CAR WASH, LLC | ENERGY SAVINGS AGREEMENT, AS AMENDED, DATED AS OF NOV 21,2017 | $0.00 | ATTN: GENERAL COUNSEL PROSPECT PARK 5400 NW 35TH AVE | FORT LAUDERDALE | FL | 33309 |
| 31 | ASSUME | GENEX SERVICES, LLC | ZIPS CAR WASH, LLC | SERVICE AGREEMENT | $1,275.00 | PO BOX 88026 | CHICAGO | IL | 60680 |
| 32 | ASSUME | GIL CASTRO | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 33 | ASSUME | HERO DIGITAL LLC | ZIPS CAR WASH, LLC | PROFESSIONAL SERVICE AGREEMENT, INCORPORATED VENDOR LETTER EXECUTED AS OF FEB 28, 2025 | $0.00 | ATTN: GENERAL COUNSEL 1 N DEARBORN ST STE 725 | CHICAGO | IL | 60602 |
| 34 | ASSUME | INGLES MARKETS, INCORPORATED | ZIPS CAR WASH, LLC | MASTER DEVELOPMENT AGREEMENT, DATED AS OF APR 20,2018 | $0.00 | ATTN: GENERAL COUNSEL P.O.BOX 6676 | ASHEVILLE | NC | 28816 |
| 35 | ASSUME | JB DEVELOPMENT, INC. | ZIPS CAR WASH, LLC | DEVELOPMENT FEE AGREEMENT, AS AMENDED, DATED AS OF OCT 07,2022 | $0.00 | 590 KILDEER DR. | BOLINGBROOK | IL | 60440 |
| 36 | ASSUME | JET BRITE CAR WASH, INC. | ZIPS CAR WASH, LLC | LICENSE AGREEMENT, AS AMENDED | $0.00 | 590 KILDEER DR. | BOLINGBROOK | IL | 60440 |
| 37 | ASSUME | MCS COMMERCIAL LLC | ZIPS CAR WASH, LLC | MASTER SERVICE AGREEMENT, AS AMENDED, DATED AS OF SEP 25,2024 | $468,929.16 | ATTN: ANDREW NOLAN, PRESIDENT 350 HIGHLAND DR STE 100 | LEWISVILLE | TX | 75067 |
| 38 | ASSUME | MEIJER INC. | ZIPS CAR WASH, LLC | EASEMENT ACCESS AGREEMENT | $9,675.00 | PO BOX 74008449 | CHICAGO | IL | 60674-8449 |
| 39 | ASSUME | MICHAEL JARED | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 40 | ASSUME | MICHELE GLOOR | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 41 | ASSUME | NESCTC SECURITY AGENCY LLC | ZIPS CAR WASH, LLC | MASTER AGREEMENT FOR SECURITY SERVICES, DATED AS OF MAY 03,2023 | $0.00 | ATTN: MICHAEL J MALLOY, PRESIDENT 46 MOLTER ST | CRANSTON | RI | 02910 |
| 42 | ASSUME | OLD SEVILLE WASTE EXPERTS | ZIPS CAR WASH, LLC | WASTE MANAGEMENT AGREEMENT, DATED AS OF MAR 01,2025 | $0.00 | ATTN: GENERAL COUNSEL 1388 COUNTRY CLUB RD | GULF BREEZE | FL | 32563 |
| 43 | ASSUME | ONE CLICK VIRTUAL SUPPORT | ZIPS CAR WASH, LLC | SERVICE AGREEMENT | $33,006.80 | ATTN: GENERAL COUNSEL ONE CLICK VIRTUAL SUPPORT HEADQUARTER | QUEZON CITY | | 1127, PHILIPPINES |

**Zips Car Wash, LLC, et al**

*Assumed Contracts - Non Real Property*

*As of April 30, 2025*

| No. | Action | Counterparty | Debtor Counterparty | Description of Agreement | Cure Amount | Street Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|
| 44 | ASSUME | OUTFRONT MEDIA LLC | ZIPS CAR WASH, LLC | SIGN LOCATION LEASE, DATED AS OF MAY 01,2021 | $0.00 | ATTN: GENERAL COUNSEL 8767 N HANLEY RD | ST LOUIS | MO | 63134 |
| 45 | ASSUME | PAYCOM PAYROLL LLC D/B/A PAYCOM | ZIPS CAR WASH, LLC | SERVICE PROPOSAL FORM, DATED AS OF JUN 12,2024 | $0.00 | ATTN: GENERAL COUNSEL 7501 W MEMORIAL RD | OKLAHOMA CITY | OK | 73142 |
| 46 | ASSUME | PUBLIC STORAGE | ZIPS CAR WASH, LLC | RENTAL AGREEMENT, DATED AS OF NOV 14,2022 | $0.00 | ATTN: GENERAL COUNSEL 944 CREIGHTON RD | PENSACOLA | FL | 32504 |
| 47 | ASSUME | REBECCA LATACZ | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 48 | ASSUME | ROCKET PROPERTIES BOISE, LLC; ROCKET PROPERTIES MERIDIAN, LLC; ROCKET PROPERTIES TWIN, LLC; ROCKET PROPERTIES MIDVALE, LLC; AND ROCKET PROPERTIES SOUTH JORDAN, LLC | ZIPS CAR WASH, LLC | UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE | $0.00 | C/O ROCKET EXPRESS LLC ATTN: JOE AND JANET RUSSELL 1205 E. WARM SPRINGS AVE | BOISE | ID | 83,712.00 |
| 49 | ASSUME | SALESFORCE INC | ZIPS CAR WASH, LLC | SIGNED ORDER AGREEMENT Q-07320588, DATED AS OF JUN 01,2023 | $1,538.88 | ATTN: GENERAL COUNSEL SALESFORCE TOWER 415 MISSION ST, 3RD FLOOR | SAN FRANCISCO | CA | 94105 |
| 50 | ASSUME | SALESFORCE INC | ZIPS CAR WASH, LLC | SIGNED ORDER AGREEMENT Q-06019891, DATED AS OF AUG 01,2022 | | ATTN: GENERAL COUNSEL SALESFORCE TOWER 415 MISSION ST, 3RD FLOOR | SAN FRANCISCO | CA | 94105 |
| 51 | ASSUME | SAMUEL FUENTES | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 52 | ASSUME | SECURE SPACE STORAGE | ZIPS CAR WASH, LLC | STORAGE SPACE LEASE AGREEMENT, DATED AS OF FEB 10,2025 | $0.00 | ATTN: GENERAL COUNSEL 3519 NORTH SALEM RD | FAYETTEVILLE | AR | 72704 |
| 53 | ASSUME | SHRED-IT USA | ZIPS CAR WASH, LLC | SERVICE AGREEMENT | $121.83 | ATTN: GENERAL COUNSEL 28883 NETWORK PLACE | CHICAGO | IL | 60673-1288 |
| 54 | ASSUME | SONNY'S CARWASH SERVICES | ZIPS CAR WASH, LLC | MONTHLY PREVENTATIVE MAINTENANCE SCHEME - BOWLING GREEN, DATED AS OF FEB 04,2025 | | ATTN: GENERAL COUNSEL 2710 PEMBERTON DR | APOPKA | FL | 32703 |
| 55 | ASSUME | SONNY'S CARWASH SERVICES | ZIPS CAR WASH, LLC | MONTHLY PREVENTATIVE MAINTENANCE SCHEME - OWENSBORO, DATED AS OF FEB 04,2025 | | ATTN: GENERAL COUNSEL 2710 PEMBERTON DR | APOPKA | FL | 32703 |
| 56 | ASSUME | SONNY'S CARWASH SERVICES | ZIPS CAR WASH, LLC | PREVENTATIVE MAINTENANCE AGREEMENT - BOWLING GREEN, DATED AS OF FEB 04,2025 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 57 | ASSUME | SONNY'S CARWASH SERVICES | ZIPS CAR WASH, LLC | PREVENTATIVE MAINTENANCE AGREEMENT - OWENSBORO, DATED AS OF MAR 04,2025 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 58 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - COVINGTON, DATED AS OF SEP 17,2024 | $4,084,093.52 | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 59 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - FRISCO, DATED AS OF SEP 17,2024 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 60 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - LEMMON, DATED AS OF SEP 17,2024 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 61 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - LEWISVILLE, DATED AS OF SEP 17,2024 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 62 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - ROSS, DATED AS OF SEP 17,2024 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 63 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | MASTER SERVICES AGREEMENT, AS AMENDED, DATED AS OF MAR 15,2023 | | ATTN: GENERAL COUNSEL 5605 HIATUS RD | TAMARAC | FL | 33321 |
| 64 | ASSUME | STERICYCLE INC | ZIPS CAR WASH, LLC | STANDARD AGREEMENT, DATED AS OF NOV 28,2023 | $0.00 | ATTN: GENERAL COUNSEL 2355 WAUKEGAN RD | BANNOCKBURN | IL | 60015 |
| 65 | ASSUME | STRIPE INC | ZIPS CAR WASH, LLC | SERVICES FEE AGREEMENT | $126,661.70 | ATTN: GENERAL COUNSEL 354 OYSTER POINT BLVD | SAN FRANCISCO | CA | 94080 |
| 66 | ASSUME | STRIPE INC | ZIPS CAR WASH, LLC | SUBSCRIPTION FEE AGREEMENT | | ATTN: GENERAL COUNSEL 354 OYSTER POINT BLVD | SAN FRANCISCO | CA | 94080 |
| 67 | ASSUME | TALENTCARE LLC | ZIPS CAR WASH, LLC | PROFESSIONAL SERVICES AGREEMENT, AS AMENDED, DATED AS OF DEC 13,2021 | $44,616.50 | ATTN: GENERAL COUNSEL 1108 LAVACA ST STE 110-111 | AUSTIN | TX | 78701 |
| 68 | ASSUME | TALX CORPORATION, A PROVIDER OF EMPLOYERS EDGE SERVICES | ZIPS CAR WASH, LLC | UNIVERSAL SERVICE AGREEMENT, DATED AS OF DEC 18,2020 | $3,188.92 | ATTN: GENERAL COUNSEL 4076 PAYSPHERE CIRCLE | CHICAGO | IL | 60674-4076 |
| 69 | ASSUME | TAMBOURINE | ZIPS CAR WASH, LLC | DIGITAL MARKETING SERVICES AGREEMENT, DATED AS OF DEC 12,2024 | $7,450.00 | ATTN: GENERAL COUNSEL 100 W CYPRESS CREEK RD STE 550 | FORT LAUDERDALE | FL | 33309 |
| 70 | ASSUME | TANGO ANALYTICS LLC | ZIPS CAR WASH, LLC | SUBSCRIPTION ORDER FORM, AS AMENDED, DATED AS OF JUN 27,2022 | $11,810.59 | ATTN: GENERAL COUNSEL 9797 ROMBAUER RD STE 450 | DALLAS | TX | 75019 |
| 71 | ASSUME | THE LAMAR COMPANIES | ZIPS CAR WASH, LLC | LOCATION LEASE AGREEMENT, DATED AS OF DEC 01,2021 | $0.00 | ATTN: GENERAL COUNSEL PO BOX 1900 | DUNCAN | SC | 29334 |
| 72 | ASSUME | THE ZELLMAN GROUP LLC | ZIPS CAR WASH, LLC | RECIPROCAL NON-DISCLOSURE AND CIVIL RECOVERY SERVICES AGREEMENTS, DATED AS OF FEB 06,2023 | $0.00 | ATTN: GENERAL COUNSEL 2200 NORTHERN BLVD STE 103 | GREENVALE | NY | 11548 |
| 73 | ASSUME | VINCE CINO | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 74 | ASSUME | WELCOMEMAT SERVICES INC | ZIPS CAR WASH, LLC | FUNDRAISING ORGANIZER AND PROFESSIONAL SERVICES AGREEMENT, DATED AS OF FEB 14,2024 | | ATTN: GENERAL COUNSEL PO BOX 570807 | ATLANTA | GA | 30357 |
| 75 | ASSUME | WELCOMEMAT SOLUTIONS INC | ZIPS CAR WASH, LLC | MARKETING AGREEMENT AND STATEMENT OF WORK ORIGINALLY DATED 5.15.23, AS AMENDED | $589.45 | ATTN: GENERAL COUNSEL 540 DEVALL DR STE 301 | AUBURN | AL | 36832 |
| 76 | ASSUME | WESTPORT PROPERTIES INC / WESTPORT BRAINERD SELF STORAGE LLC D/B/A US STORAGE CENTERS | ZIPS CAR WASH, LLC | SELF STORAGE RENTAL AGREEMENT, DATED AS OF JUN 21,2024 | $0.00 | ATTN: GENERAL COUNSEL 16231 STATE HWY 371 N | BRAINERD | MN | 56401 |
| 77 | ASSUME | WOVEN BRANDS LLC | ZIPS CAR WASH, LLC | SUBSCRIPTION AGREEMENT, DATED AS OF SEP 01,2020 | $38,280.00 | ATTN: GENERAL COUNSEL 8304 GUILFORD AVE STE A | INDIANAPOLIS | IN | 46220 |
| 78 | ASSUME | YEXT INC | ZIPS CAR WASH, LLC | MASTER SUBSCRIPTION AGREEMENT, AS AMENDED, DATED AS OF NOV 25,2024 | $14,350.33 | ATTN: GENERAL COUNSEL 61 NINTH AVE | NEW YORK | NY | 10011 |
| 79 | ASSUME | ZACH MUEHL | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 80 | ASSUME | ZAK HEMPHILL | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 81 | ASSUME | ZENDESK | ZIPS CAR WASH, LLC | SERVICE ORDER FORM | $11,500.00 | ATTN: GENERAL COUNSEL 989 MARKET ST | SAN FRANCISCO | CA | 94103 |

**Zips Car Wash, LLC, et al**
*Assumed Contracts - Non Real Property*
*As of April 30, 2025*

| No. | Action | Counterparty | Debtor Counterparty | Description of Agreement | Cure Amount | Street Address | City | State | Zip |
|-----|--------|--------------|---------------------|------------------------|-------------|----------------|------|-------|-----|
| 82 | ASSUME | ZRE DIXIE OUTPARCEL LLC | ZIPS CAR WASH, LLC | ACCESS EASEMENT, AS AMENDED, DATED AS OF NOV 13,2020 | $303.25 | ATTN: GENERAL COUNSEL 127 WEST BERRY ST STE 300 | FORT WAYNE | IN | 46802 |

**Exhibit D(ii)-1**

**Assumed Contracts Redline**

**Zips Car Wash, LLC, et al**

*Assumed Contracts - Non Real Property*

*As of April ~~19~~ 30, 2025*

| No. | Action | Counterparty | Debtor Counterparty | Description of Agreement | Cure Amount | Street Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|
| 1 | ASSUME | AMP MEMBERSHIPS LLC | ZIPS CAR WASH, LLC | PLATFORM SOFTWARE AND SERVICES AGREEMENT, AS AMENDED, DATED AS OF JUN 16,2023 | $88,563.60 | ATTN: GENERAL COUNSEL 7005 E 46TH AVE DR UNIT B | DENVER | CO | 80216 |
| 2 | ASSUME | ARCHITECTURAL GRAPHICS, INC. | ZIPS CAR WASH, LLC | MASTER SERVICES AGREEMENT, DATED AS OF FEB 25,2025 | $0.00 | ATTN: GENERAL COUNSEL 412 N CEDAR BLUFF RD. | KNOXVILLE | TN | 37923 |
| 3 | ASSUME | ASCEND TECHNOLOGIES LLC D/B/A EDAFIO TECHNOLOGY PARTNERS | ZIPS CAR WASH, LLC | MASTER SERVICES CONTRACT, AS AMENDED, DATED AS OF AUG 03,2023 | $343,781.83 | ATTN: GENERAL COUNSEL 1000 W MARKHAM ST STE 110 | LITTLE ROCK | AR | 72201 |
| 4 | ASSUME | ASHISH PAREEK | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 5 | ASSUME | ATLANTIC STREET CAPITAL ADVISORS INC | ZIPS CAR WASH, LLC | CONSULTING AGREEMENT | $650,000.00 | 16415 ADDISON RD STE 655 | ADDISON | TX | 75001 |
| 6 | ASSUME | ATLANTIC STREET CAPITAL MANAGEMENT LLC | EXPRESS CAR WASH HOLDINGS, LLC | CONSULTING SERVICES AGREEMENT | | 281 TRESSER BLVD STE 601 | STAMFORD | CT | 06901 |
| 7 | ASSUME | BASEM AYBEF | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 8 | ASSUME | CANEY HOLDINGS LLC | ZIPS CAR WASH, LLC | SIGN LICENSE AGREEMENT, DATED AS OF NOV 01,2024 | $0.00 | ATTN: ASSET MANAGER PO BOX 34584 | HOUSTON | TX | 77234 |
| 9 | ASSUME | CARDLYTICS INC | ZIPS CAR WASH, LLC | RECIPROCAL NON-DISCLOSURE AGREEMENT, AS AMENDED, DATED AS OF SEP 20,2024 | $0.00 | ATTN: GENERAL COUNSEL 675 PONCE DE LEON AVENUE NE, SUITE 4100 | ATLANTA | GA | 30308 |
| 10 | ASSUME | CAROLINA WASTE & RECYCLING LLC | ZIPS CAR WASH, LLC | CUSTOMER SERVICE AGREEMENT, DATED AS OF JAN 10,2025 | $0.00 | ATTN: GENERAL COUNSEL 4285 PACE ST | NORTH CHARLESTON | SC | 29405 |
| 11 | ASSUME | CHANDLER SIGNS LLC | ZIPS CAR WASH, LLC | DISPLAY LEASE AGREEMENT, DATED AS OF AUG 20,2024 | $28,687.80 | ATTN: GENERAL COUNSEL 14201 SOVEREIGN RD STE 101 | FORT WORTH | TX | 76155 |
| 12 | ASSUME | CHANDLER SIGNS LLC AND PATTISON SIGN GROUP INC | ZIPS CAR WASH, LLC | MASTER SERVICES AGREEMENT, DATED AS OF MAY 07,2024 | | ATTN: GENERAL COUNSEL 520 WEST SUMMIT HILL DR UNIT 702 | KNOXVILLE | TN | 37902 |
| 13 | ASSUME | CISION US INC | ZIPS CAR WASH, LLC | SERVICE ORDER, DATED AS OF AUG 09,2024 | $2,681.89 | ATTN: GENERAL COUNSEL 300 S RIVERSIDE PLAZA | CHICAGO | IL | 60606 |
| 14 | ASSUME | CONCUR TECHNOLOGIES INC | ZIPS CAR WASH, LLC | SIGNED ORDER AGREEMENT, DATED AS OF APR 30,2024 | $48,682.81 | ATTN: GENERAL COUNSEL 601 108TH AVE NE STE 1000 | BELLEVUE | WA | 98004 |
| 15 | ASSUME | CONSOLIDATED ADMIN SERVICES, LLC | ZIPS CAR WASH, LLC | FSA AND DCAP ADMINISTRATIVE SERVICES AGREEMENT, AS AMENDED, DATED AS OF JAN 30,2017 | $1,057.50 | P.O. BOX 1513 | CABOT | AR | 72023 |
| 16 | ASSUME | CORICENTRIC PAYMENT LLC | ZIPS CAR WASH, LLC | SERVICES AGREEMENT IN SEPTEMBER 7TH 2021, AS AMENDED | $0.00 | ATTN: GENERAL COUNSEL 62861 COLLECTIONS CENTER DR | CHICAGO | IL | 60693 |
| 17 | ASSUME | CREATIVE PLANNING, LLC FKA LOCKTON INVESTMENT ADVISORS, LLC | ZIPS CAR WASH, LLC | ADVISORY SERVICES AGREEMENT, DATED AS OF AUG 31,2021 | $0.00 | ATTN: GENERAL COUNSEL 5454 W 110TH ST | OVERLAND PARK | KS | 66211 |
| 18 | ASSUME | CRESTWOOD ASSOCIATES LLC | ZIPS CAR WASH, LLC | PROFESSIONAL SERVICE AGREEMENT, DATED AS OF NOV 17,2020 | $14,859.46 | ATTN: GENERAL COUNSEL 1501 E WOODFIELD RD STE 113E | SCHAUMBURG | IL | 60173 |
| 19 | ASSUME | CULLIGAN WATER FKA QUENCH WATER USA FKA ARTESIAN WATER | ZIPS CAR WASH, LLC | SERVICE AGREEMENT, AS AMENDED, DATED AS OF MAY 12,2023 | $12,930.18 | ATTN: GENERAL COUNSEL 2214 PADDOCK WAY STE 550 | GRAND PRAIRIE | TX | 75050 |
| 20 | ASSUME | CYRIAC THOMAS | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 21 | ASSUME | DATAMAX INC. | ZIPS CAR WASH, LLC | EQUIPMENT LEASE AGREEMENT, DATED AS OF SEP 05,2022 | $1,388.81 | PO BOX 2235 | ST. LOUIS | MO | 63109 |
| 22 | ASSUME | DATASITE LLC | ZIPS CAR WASH, LLC | STATEMENT OF WORK, DATED AS OF JUN 27,2024 | $0.00 | ATTN: GENERAL COUNSEL 733 S. MARQUETTE AVE, | MINNEAPOLIS | MN | 55402 |
| 23 | ASSUME | DAVID MILLER | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 24 | ASSUME | DOMO INC | ZIPS CAR WASH, LLC | SERVICE ORDER, DATED AS OF MAY 01,2024 | $35,109.91 | ATTN: FINANCE DEPARTMENT 802 E 1050 S | AMERICAN FORK | UT | 84003 |
| 25 | ASSUME | DOMO INC | ZIPS CAR WASH, LLC | SUBSCRIPTION SERVICE ORDER AGREEMENT, DATED AS OF MAY 01,2024 | | ATTN: FINANCE DEPARTMENT 802 E 1050 S | AMERICAN FORK | UT | 84003 |
| 26 | ASSUME | ECO-TECH LLC | ZIPS CAR WASH, LLC | SALES ORDER AGREEMENT, DATED AS OF JAN 22,2025 | $0.00 | ATTN: GENERAL COUNSEL PO BOX 36557 | LOUISVILLE | KY | 40233 |
| 27 | ASSUME | EXPRESS CARWASH EQUIPMENT LLC | ZIPS PORTFOLIO II, LLC | AGREEMENT FOR MAINTENANCE PROGRAM PROPOSAL, DATED AS OF OCT 15,2024 | $16,965.70 | ATTN: GENERAL COUNSEL 4014 E 143RD STREET | GRANDVIEW | MO | 64030 |
| 28 | ASSUME | EXPRESS CARWASH EQUIPMENT LLC | ZIPS PORTFOLIO II, LLC | AGREEMENT FOR PREVENTATIVE MAINTENANCE PROGRAM PROPOSAL, DATED AS OF OCT 15,2024 | | ATTN: GENERAL COUNSEL 4014 E 143RD STREET | GRANDVIEW | MO | 64030 |
| 29 | ASSUME | FEDEX OFFICE AND PRINT SERVICES INC | ZIPS CAR WASH, LLC | U.S. CORPORATE ACCOUNT PROGRAM AGREEMENT, DATED AS OF MAY 24,2022 | $34,033.76 | ATTN: GENERAL COUNSEL 7900 LEGACY DR | PLANO | TX | 75024 |
| 30 | ASSUME | FUTURE ENERGY SOLUTIONS CONTRACTS NO 1 LLLP FUTURE ENERGY SOLUTIONS MAINTENANCE LLC | ZIPS CAR WASH, LLC | ENERGY SAVINGS AGREEMENT, AS AMENDED, DATED AS OF NOV 21,2017 | $0.00 | ATTN: GENERAL COUNSEL PROSPECT PARK 5400 NW 35TH AVE | FORT LAUDERDALE | FL | 33309 |
| 31 | ASSUME | GENEX SERVICES, LLC | ZIPS CAR WASH, LLC | SERVICE AGREEMENT | $1,275.00 | PO BOX 68026 | CHICAGO | IL | 60680 |
| 32 | ASSUME | GIL CASTRO | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 33 | ASSUME | HERO DIGITAL LLC | ZIPS CAR WASH, LLC | PROFESSIONAL SERVICE AGREEMENT, INCORPORATED VENDOR LETTER EXECUTED AS OF FEB 26, 2025 | $0.00 | ATTN: GENERAL COUNSEL 1 N DEARBORN ST STE 725 | CHICAGO | IL | 60602 |
| 34 | ASSUME | INGLES MARKETS, INCORPORATED | ZIPS CAR WASH, LLC | MASTER DEVELOPMENT AGREEMENT, DATED AS OF APR 20,2018 | $0.00 | ATTN: GENERAL COUNSEL P.O.BOX 6676 | ASHEVILLE | NC | 28816 |
| 35 | ASSUME | JB DEVELOPMENT, INC. | ZIPS CAR WASH, LLC | DEVELOPMENT FEE AGREEMENT, AS AMENDED, DATED AS OF OCT 07,2022 | $0.00 | 500 KILDEER DR. | BOLINGBROOK | IL | 60440 |
| 36 | ASSUME | JET BRITE CAR WASH, INC. | ZIPS CAR WASH, LLC | LICENSE AGREEMENT, AS AMENDED | $0.00 | 500 KILDEER DR. | BOLINGBROOK | IL | 60440 |
| 37 | ASSUME | MCS COMMERCIAL LLC | ZIPS CAR WASH, LLC | MASTER SERVICE AGREEMENT, AS AMENDED, DATED AS OF SEP 25,2024 | $468,929.16 | ATTN: ANDREW NOLAN, PRESIDENT 350 HIGHLAND DR STE 100 | LEWISVILLE | TX | 75067 |
| 38 | ASSUME | MEIJER INC. | ZIPS CAR WASH, LLC | EASEMENT ACCESS AGREEMENT | $9,675.00 | PO BOX 74008449 | CHICAGO | IL | 60674-8449 |
| 39 | ASSUME | MICHAEL JARED | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 40 | ASSUME | MICHELE GLOOR | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 41 | ASSUME | NESCTC SECURITY AGENCY LLC | ZIPS CAR WASH, LLC | MASTER AGREEMENT FOR SECURITY SERVICES, DATED AS OF MAY 03,2023 | $0.00 | ATTN: MICHAEL J MALLOY, PRESIDENT 46 MOLTER ST | CRANSTON | RI | 02910 |
| 42 | ASSUME | OLD SEVILLE WASTE EXPERTS | ZIPS CAR WASH, LLC | WASTE MANAGEMENT AGREEMENT, DATED AS OF MAR 01,2025 | $0.00 | ATTN: GENERAL COUNSEL 1388 COUNTRY CLUB RD | GULF BREEZE | FL | 32563 |
| 43 | ASSUME | ONE CLICK VIRTUAL SUPPORT | ZIPS CAR WASH, LLC | SERVICE AGREEMENT | $33,006.80 | ATTN: GENERAL COUNSEL ONE CLICK VIRTUAL SUPPORT HEADQUARTER | QUEZON CITY | | 1127, PHILIPPINES |
| 44 | ASSUME | OUTFRONT MEDIA LLC | ZIPS CAR WASH, LLC | SIGN LOCATION LEASE, DATED AS OF MAY 01,2021 | $0.00 | ATTN: GENERAL COUNSEL 8767 N HANLEY RD | ST LOUIS | MO | 63134 |
| 45 | ASSUME | PAYCOM PAYROLL LLC D/B/A PAYCOM | ZIPS CAR WASH, LLC | SERVICE PROPOSAL FORM, DATED AS OF JUN 12,2024 | $0.00 | ATTN: GENERAL COUNSEL 7501 W MEMORIAL RD | OKLAHOMA CITY | OK | 73142 |

Zips Car Wash, LLC, et al
*Assumed Contracts - Non Real Property*
*As of April ~~19~~ 30, 2025*

| No. | Action | Counterparty | Debtor Counterparty | Description of Agreement | Cure Amount | Street Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|
| 46 | ASSUME | PUBLIC STORAGE | ZIPS CAR WASH, LLC | RENTAL AGREEMENT, DATED AS OF NOV 14,2022 | $0.00 | ATTN: GENERAL COUNSEL 844 CREIGHTON RD | PENSACOLA | FL | 32504 |
| 47 | ASSUME | REBECCA LATACZ | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 48 | ASSUME | ROCKET PROPERTIES BOISE, LLC; ROCKET PROPERTIES MERIDIAN, LLC; ROCKET PROPERTIES TWIN, LLC; ROCKET PROPERTIES MIDVALE, LLC; AND ROCKET PROPERTIES SOUTH JORDAN, LLC | ZIPS CAR WASH, LLC | UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE | $0.00 | C/O ROCKET EXPRESS LLC ATTN: JOE AND JANET RUSSELL 1205 E. WARM SPRINGS AVE | BOISE | ID | 83,712.00 |
| 48/49 | ASSUME | SALESFORCE INC | ZIPS CAR WASH, LLC | SIGNED ORDER AGREEMENT Q-07320588, DATED AS OF JUN 01,2023 | $1,538.88 | ATTN: GENERAL COUNSEL SALESFORCE TOWER 415 MISSION ST, 3RD FLOOR | SAN FRANCISCO | CA | 94105 |
| 49/50 | ASSUME | SALESFORCE INC | ZIPS CAR WASH, LLC | SIGNED ORDER AGREEMENT Q-06019891, DATED AS OF AUG 01,2022 | | ATTN: GENERAL COUNSEL SALESFORCE TOWER 415 MISSION ST, 3RD FLOOR | SAN FRANCISCO | CA | 94105 |
| 50/51 | ASSUME | SAMUEL FUENTES | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 51/52 | ASSUME | SECURE SPACE STORAGE | ZIPS CAR WASH, LLC | STORAGE SPACE LEASE AGREEMENT, DATED AS OF FEB 10,2025 | $0.00 | ATTN: GENERAL COUNSEL 3519 NORTH SALEM RD | FAYETTEVILLE | AR | 72704 |
| 52/53 | ASSUME | SHRED-IT USA | ZIPS CAR WASH, LLC | SERVICE AGREEMENT | $121.83 | ATTN: GENERAL COUNSEL 28883 NETWORK PLACE | CHICAGO | IL | 60673-1288 |
| 53/54 | ASSUME | SONNY'S CARWASH SERVICES | ZIPS CAR WASH, LLC | MONTHLY PREVENTATIVE MAINTENANCE SCHEME - BOWLING GREEN, DATED AS OF FEB 04,2025 | | ATTN: GENERAL COUNSEL 2710 PEMBERTON DR | APOPKA | FL | 32703 |
| 54/55 | ASSUME | SONNY'S CARWASH SERVICES | ZIPS CAR WASH, LLC | MONTHLY PREVENTATIVE MAINTENANCE SCHEME - OWENSBORO, DATED AS OF FEB 04,2025 | | ATTN: GENERAL COUNSEL 2710 PEMBERTON DR | APOPKA | FL | 32703 |
| 55/56 | ASSUME | SONNY'S CARWASH SERVICES | ZIPS CAR WASH, LLC | PREVENTATIVE MAINTENANCE AGREEMENT - BOWLING GREEN, DATED AS OF FEB 04,2025 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 56/57 | ASSUME | SONNY'S CARWASH SERVICES | ZIPS CAR WASH, LLC | PREVENTATIVE MAINTENANCE AGREEMENT - OWENSBORO, DATED AS OF MAR 04,2025 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 57/58 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - COVINGTON, DATED AS OF SEP 17,2024 | $4,084,093.52 | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 58/59 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - FRISCO, DATED AS OF SEP 17,2024 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 59/60 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - LEMMON, DATED AS OF SEP 17,2024 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 60/61 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - LEWISVILLE, DATED AS OF SEP 17,2024 | | ATTN: GENERAL COUNSEL 5870 HIATUS RD | TAMARAC | FL | 33321 |
| 61/62 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | LEASE AND SUBSCRIPTION AGREEMENT - ROSS, DATED AS OF SEP 17,2024 | | ATTN: GENERAL COUNSEL | TAMARAC | FL | 33321 |
| 62/63 | ASSUME | SONNY'S ENTERPRISES LLC | ZIPS CAR WASH, LLC | MASTER SUBSCRIPTION AGREEMENT, AS AMENDED, DATED AS OF MAR 15,2023 | | ATTN: GENERAL COUNSEL | TAMARAC | FL | 33321 |
| 63/64 | ASSUME | STERICYCLE INC | ZIPS CAR WASH, LLC | STANDARD AGREEMENT, DATED AS OF NOV 28,2023 | $0.00 | ATTN: GENERAL COUNSEL 2355 WAUKEGAN RD | BANNOCKBURN | IL | 60015 |
| 64/65 | ASSUME | STRIPE INC | ZIPS CAR WASH, LLC | SERVICES FEE AGREEMENT | $126,661.70 | ATTN: GENERAL COUNSEL 354 OYSTER POINT BLVD | SAN FRANCISCO | CA | 94080 |
| 65/66 | ASSUME | STRIPE INC | ZIPS CAR WASH, LLC | SUBSCRIPTION FEE AGREEMENT | | ATTN: GENERAL COUNSEL 354 OYSTER POINT BLVD | SAN FRANCISCO | CA | 94080 |
| 66/67 | ASSUME | TALENTCARE LLC | ZIPS CAR WASH, LLC | PROFESSIONAL SERVICES AGREEMENT, AS AMENDED, DATED AS OF DEC 13,2021 | $44,616.50 | ATTN: GENERAL COUNSEL 1108 LAVACA ST | AUSTIN | TX | 78701 |
| 67/68 | ASSUME | TALX CORPORATION, A PROVIDER OF EMPLOYERS EDGE SERVICES | ZIPS CAR WASH, LLC | UNIVERSAL SERVICES AGREEMENT, DATED AS OF DEC 18,2020 | $3,188.80 | ATTN: GENERAL COUNSEL 4076 PAYSPHERE CIRCLE | CHICAGO | IL | 60674-4076 |
| 68/69 | ASSUME | TAMBOURINE | ZIPS CAR WASH, LLC | DIGITAL MARKETING SERVICES AGREEMENT, DATED AS OF DEC 12,2024 | $7,450.00 | ATTN: GENERAL COUNSEL 100 W CYPRESS CREEK RD STE 550 | FORT LAUDERDALE | FL | 33309 |
| 69/70 | ASSUME | TANGO ANALYTICS LLC | ZIPS CAR WASH, LLC | SUBSCRIPTION ORDER FORM, AS AMENDED, DATED AS OF JUN 27,2022 | ~~$10,334.05~~ $11,810.59 | ATTN: GENERAL COUNSEL 9797 ROMBAUER RD STE 450 | DALLAS | TX | 75019 |
| 70/71 | ASSUME | THE LAMAR COMPANIES | ZIPS CAR WASH, LLC | LOCATION LEASE AGREEMENT, DATED AS OF DEC 01,2021 | $0.00 | ATTN: GENERAL COUNSEL | DUNCAN | SC | 29334 |
| 71/72 | ASSUME | THE ZELLMAN GROUP LLC | ZIPS CAR WASH, LLC | RECIPROCAL NON-DISCLOSURE AND CIVIL RECOVERY SERVICES AGREEMENTS, DATED AS OF FEB 06,2023 | $0.00 | ATTN: GENERAL COUNSEL 2200 NORTHERN BLVD | GREENVILLE | NY | 11548 |
| 72/73 | ASSUME | VINCE CINO | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 73/74 | ASSUME | WELCOMEMAT SERVICES INC | ZIPS CAR WASH, LLC | FUNDRAISING ORGANIZER AND PROFESSIONAL SERVICES AGREEMENT, DATED AS OF FEB 14,2024 | $589.45 | ATTN: GENERAL COUNSEL PO BOX 570807 | ATLANTA | GA | 30357 |
| 74/75 | ASSUME | WELCOMEMAT SOLUTIONS LLC | ZIPS CAR WASH, LLC | MARKETING AGREEMENT AND STATEMENT OF WORK ORIGINALLY DATED 5.15.23, AS AMENDED | | ATTN: GENERAL COUNSEL 540 DEVALL DR | AUBURN | AL | 36832 |
| 75/76 | ASSUME | WESTPORT PROPERTIES INC / WESTPORT BRAINERD SELF STORAGE LLC D/B/A US STORAGE CENTERS | ZIPS CAR WASH, LLC | SELF STORAGE RENTAL AGREEMENT, DATED AS OF JUN 21,2024 | $0.00 | ATTN: GENERAL COUNSEL 16231 STATE HWY 371 N | BRAINERD | MN | 56401 |
| 76/77 | ASSUME | WOVEN BRANDS LLC | ZIPS CAR WASH, LLC | SUBSCRIPTION AGREEMENT, DATED AS OF SEP 01,2020 | $38,280.00 | ATTN: GENERAL COUNSEL 6304 GUILFORD AVE STE A | INDIANAPOLIS | IN | 46220 |
| 77/78 | ASSUME | YEXT INC | ZIPS CAR WASH, LLC | MASTER SUBSCRIPTION AGREEMENT, AS AMENDED, DATED AS OF NOV 25,2024 | $14,359.33 | ATTN: GENERAL COUNSEL 61 NINTH AVE | NEW YORK | NY | 10011 |
| 78/79 | ASSUME | ZACH MUEHL | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 79/80 | ASSUME | ZAK HEMPHILL | ZIPS CAR WASH, LLC | RETENTION AGREEMENT, DATED AS OF FEB 03, 2025 | $0.00 | [REDACTED] | | | |
| 80/81 | ASSUME | ZENDESK | ZIPS CAR WASH, LLC | SERVICE ORDER FORM | $11,500.00 | ATTN: GENERAL COUNSEL | SAN FRANCISCO | CA | 94103 |
| 81/82 | ASSUME | ZRE DIXIE OUTPARCEL LLC | ZIPS CAR WASH, LLC | ACCESS EASEMENT, AS AMENDED, DATED AS OF NOV 13,2020 | $303.25 | ATTN: GENERAL COUNSEL 127 WEST BERRY ST STE 300 | FORT WAYNE | IN | 46802 |

**Exhibit E**

**Rejected Executory Contracts and Unexpired Leases Schedule**

Article V of the Plan provides that on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected (to the extent applicable) will be deemed rejected by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected (to the extent applicable) by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Article V of the Plan further provides that entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, and related Cure amounts with respect thereto, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule (if any), pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Plan or in this Plan Supplement, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any Final Order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Article V of the Plan further provides that except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Article V of the Plan further provides that to the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Article V of the Plan further provides that notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule or the Rejected Executory Contracts and Unexpired Leases Schedule (if any) at any time up to forty-five (45) days after the Effective Date. The Debtors or the Reorganized Debtors, as applicable, shall File with the Bankruptcy Court and serve on the applicable counterparty any change to the Rejected Executory Contracts and Unexpired Leases Schedule, Assumed Executory Contracts and Unexpired Leases Schedule, and any applicable counterparty shall have fourteen (14) days from the Filing of such notice to File an objection with the Bankruptcy Court.

Article V of the Plan further provides that to the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

Article V of the Plan further provides that if certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Combined Hearing (to the extent not resolved by the parties prior to the Combined Hearing.

Certain documents, or portions thereof, contained in this **Exhibit E** and this Plan Supplement remain subject to continued review by the Debtors, the Required Consenting Term Loan Lenders, and interested parties with respect thereto. The respective rights of the Debtors and the Required Consenting Term Loan Lenders are expressly reserved, subject to the terms and conditions set forth in the Plan to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Combined Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.

**<u>Exhibit E(i)</u>**

**Rejected Leases**

**Zips Car Wash, LLC, et al**

*Rejected Leases* [1]

*As of April 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Abandoned Personal Property | Effective Rejection Date | Property Address | | | | Counterparty Address | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Street Address | City | State | Zip | Landlord | Parent Company | Attention | Street Address | City | State | Zip |
| 314 Main, LLC | Zips Car Wash, LLC | Lease Agreement dated July 22, 2022 | LittleRock | Office furniture, janitorial supplies, fixtures, office supplies, cleaning agents belonging to certain of the Debtors' vendors, and signage | 4/30/2025 | 314 Main Street | North Little Rock | AR | 72114 | 314 Main, LLC | Moses Tucker Partners | Attn: Senior Property Manager | 200 River Market Ave., Suite 501 | Little Rock | AR | 72201 |
| BBR Oil IX, LLC | Zips Car Wash, LLC | Lease Agreement dated August 28, 2018 | 0121 - SCMTP_Hwy17 | Office furniture, janitorial supplies, fixtures, office supplies, cleaning agents belonging to certain of the Debtors' vendors, and signage | 4/30/2025 | 2727 N Hwy 17 | Mount Pleasant | SC | 29466 | BBR Oil IX, LLC | | Attn: David Baker | 116 E College Street, Suite 1 | Iowa City | IA | 52240 |
| Cyark Siloam LLC | Zips Car Wash, LLC | Lease Agreement dated May 25, 2021 | 206 - ARSPR_W.Sunset | Office furniture, janitorial supplies, fixtures, office supplies, cleaning agents belonging to certain of the Debtors' vendors, and signage | 4/30/2025 | 6600 W Sunset Ave | Springdale | AR | 72762 | Cyark Siloam LLC | | Attn: Elizabeth Young | 1404 Jean St. | Springdale | AR | 72762 |
| Nightingale Pineville LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated December 11, 2020 | 957 - NCPIN_Towne | Office furniture, janitorial supplies, fixtures, office supplies, cleaning agents belonging to certain of the Debtors' vendors, and signage | 5/31/2025 | 201 Towne Centre Blvd | Pineville | NC | 28134 | Nightingale Pineville LLC | | Attn: Romi Jayswal | 7200 Carosan Lane | Charlotte | NC | 28270 |

[1] For the avoidance of doubt, the Leases referenced herein include any amendments or modifications thereto.

**<u>Exhibit E(i)-1</u>**

**Rejected Leases Redline**

**Zips Car Wash, LLC, et al**

*Rejected Leases [1]*
*As of April 17 30, 2025*

| Counterparty | Debtor Counterparty | Description of Agreement | Store Number / Property ID | Abandoned Personal Property | Effective Rejection Date | Property Address | | | | Landlord~~Counterparty~~ Address | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Street Address | City | State | Zip | Landlord | Parent Company | Attention | Street Address | City | State | Zip |
| 314 Main, LLC | Zips Car Wash, LLC | Lease Agreement dated July 22, 2022 | LittleRock | Office furniture, janitorial supplies, fixtures, office supplies, cleaning agents belonging to certain of the Debtors' vendors, and signage | 4/30/2025 | 314 Main Street | North Little Rock | AR | 72114 | 314 Main, LLC | Moses Tucker Partners | Attn: Senior Property Manager | 200 River Market Ave., Suite 501 | Little Rock | AR | 72201 |
| BBR Oil IX, LLC | Zips Car Wash, LLC | Lease Agreement dated August 28, 2018 | 0121 - SCMTP_Hwy17 | Office furniture, janitorial supplies, fixtures, office supplies, cleaning agents belonging to certain of the Debtors' vendors, and signage | 4/30/2025 | 2727 N Hwy 17 | Mount Pleasant | SC | 29466 | BBR Oil IX, LLC | | Attn: David Baker | 116 E College Street, Suite 1 | Iowa City | IA | 52240 |
| Cyark Siloam LLC | Zips Car Wash, LLC | Lease Agreement dated May 25, 2021 | 206 - ARSPR_W.Sunset | Office furniture, janitorial supplies, fixtures, office supplies, cleaning agents belonging to certain of the Debtors' vendors, and signage | 4/30/2025 | 6600 W Sunset Ave | Springdale | AR | 72762 | Cyark Siloam LLC | | Attn: Elizabeth Young | 1404 Jean St. | Springdale | AR | 72762 |
| Nightingale Pineville LLC | Zips Car Wash, LLC | Land and Building Lease Agreement dated December 11, 2020 | 957 - NCPIN_Towne | Office furniture, janitorial supplies, fixtures, office supplies, cleaning agents belonging to certain of the Debtors' vendors, and signage | 05/31/2025 | 201 Towne Centre Blvd | Pineville | NC | 28134 | Nightingale Pineville LLC | | Attn: Romi Jayswal | 7200 Carosan Lane | Charlotte | NC | 28270 |

[1] For the avoidance of doubt, the Leases referenced herein include any amendments or modifications thereto.

## **<u>Exhibit F</u>**

**Schedule of Retained Causes of Action**

[*Filed at Docket No. 320.*]

## Exhibit G

**Restructuring Transactions Memorandum**

## Restructuring Transactions Memorandum

Pursuant to the *Amended Joint Plan of Reorganization of Zips Cash Wash, LLC and its Debtor Affiliates* [Docket No. 230] (as may be amended, modified or supplemented from time to time, the "Plan"), the Debtors currently anticipate that the following steps shall occur as set forth below.  All terms used but not defined herein shall have the meaning set forth in the Plan.

The following description of the Restructuring Transactions is intended only as a summary and should be read in conjunction with the Plan.  To the extent there is any inconsistency between the Restructuring Transactions Memorandum, on the one hand, and the Plan, on the other hand, the Plan shall govern.

Step 1   On or before the Effective Date, an agent for the holders of the Term Loan Claims forms Wash & Wax Holdings, LLC ("NewCo, LLC"), which will elect to be treated as a corporation for U.S. federal income tax purposes. NewCo, LLC forms Wash & Wax Intermediate, LLC ("Sub 1, LLC"), which will elect to be treated as a corporation for U.S. federal income tax purposes. Sub 1, LLC forms Wash & Wax Systems, LLC ("Sub 2, LLC"), which will elect to be treated as a corporation for U.S. federal income tax purposes.

Step 2   On or before the Effective Date, all intercompany claims between Transferred Entities and Liquidating Entities are released and canceled.

Step 3   On or before the Effective Date: (a) the equity of certain entities listed on **Schedule 1** owning property being sold after the Effective Date (the "Post-Emergence Sales"), to the extent not already owned directly by Zips Car Wash, LLC, are distributed to Zips Car Wash, LLC; (b) Zips Car Wash, LLC contributes the equity interests of its directly-owned subsidiaries listed on **Schedule 2** that are being transferred pursuant to the Transfer (the "Transferred Entities") to Zips Car Wash Holdings, LLC, a newly-formed holding LLC ("HoldCo LLC"); (c)  each of the Liquidating Entities assign any assets (other than the property subject to the Post-Emergence Sales) that they own (other than Intercompany Interests) to HoldCo LLC, and HoldCo LLC assumes any obligations under the Plan that are not being discharged from the Liquidating Entities *provided, that*, for the avoidance of doubt, no entity is assuming any obligation from ASC – Zips Holdings, Inc., other than compliance costs associated with filing final tax returns; and (d) Zips Car Wash, LLC forms the GUC Trust. Each of the Transferred Entities is treated as a disregarded entity for U.S. federal income tax and applicable state tax purposes.

Step 4   On the Effective Date, NewCo, LLC contributes 100% of its common stock (the "New Common Equity") to Sub 1, LLC in exchange for equity of Sub 1, LLC. Sub 1, LLC will then contribute the New Common Equity to Sub 2, LLC in exchange for equity of Sub 2, LLC. NewCo, LLC issues New HoldCo Loans and contributes the NewCo Loans to Sub 1, LLC in exchange for equity of Sub 1, LLC. Sub 1, LLC will then contribute the New HoldCo Loans to Sub 2, LLC in exchange for equity of Sub 2, LLC.

Step 5   On the Effective Date, the Debtors transfer the GUC Trust Assets (other than the proceeds of the Post-Emergence Sales) to the GUC Trust.

Step 6   Zips Car Wash LLC transfers  the equity of  HoldCo LLC to Sub 2, LLC, in exchange for (a) the equity of NewCo, LLC; and (b) the New OpCo Term Loans (which shall, for the avoidance of doubt, be issued by Sub 2, LLC) and New HoldCo Loans (the "Transfer"). In connection with the Transfer, Zips Car Wash, LLC distributes consideration under the Plan to Holders of Claims in satisfaction of the Debtors' obligations under the Plan, including: (a) each holder of the Term Loan Claims receives its pro rata share (as calculated under the Plan) of the New Common Equity and its pro rata share (as calculated under the Plan) of the New OpCo Term Loans and New HoldCo Loans; and (b) each holder of the General Unsecured Claims receives its pro rata share of GUC Trust interests.

Step 7   As promptly as practicable following the Effective Date, the Post-Emergence Sales are consummated.  25% of the net proceeds of the Post-Emergence Sales are transferred by the Debtors to the GUC Trust, and 75% of the net proceeds of the Post-Emergence Sales are transferred to the Reorganized Debtors.

Step 8   Following the consummation of the Post-Emergence Sales, Interests in Express Car Wash Holdings, LLC are cancelled.

Step 9   As promptly as practicable following the consummation of the Post-Emergence Sales, all Debtor and non-Debtor entities listed on **Schedule 3** (the "Liquidating Entities") are wound down and liquidated.

## **Schedule 1**

ZCW Garrett Avenue, LLC

Car Wash STL 7860 Mexico, LLC

ZCW Sevierville, LLC

Zips 6678 Mexico Road, LLC

## **Schedule 2**

Zips Portfolio I, LLC

Zips Portfolio II, LLC

Zips Portfolio III, LLC

Zips Portfolio IV, LLC

Zips 2900 Wade Hampton, LLC

Zips 6050 Wade Hampton, LLC

Zips 3107 N. Pleasantburg, LLC

## Schedule 3

Zips Car Wash, LLC

Zips Operating Holdings, LLC

Express Car Wash Holdings, LLC

ASC – Zips Holdings, Inc.

ZCW Garrett Avenue, LLC

Car Wash STL 7860 Mexico, LLC

ZCW Sevierville, LLC

Zips 6678 Mexico Road, LLC

Car Wash DFW Main Street, LLC

Car Wash JAX Beach, LLC

Car Wash JAX Dunn, LLC

Car Wash JAX San Jose, LLC

Car Wash JAX South Side, LLC

Car Wash OKC 2nd, LLC

Car Wash SAN Hwy 46, LLC

Car Wash SHV Pines, LLC

ZCW Atlantic Boulevard, LLC

ZCW Baymeadows Road, LLC

ZCW Benton Road, LLC

ZCW Blanding Boulevard, LLC

ZCW Fredericksburg Road, LLC

ZCW Limestone, LLC

ZCW Little Elm, LLC

ZCW Mansfield Road, LLC

ZCW New Circle, LLC

ZCW Seguin, LLC

ZCW Sevierville, LLC

ZCW Shreveport Barksdale Highway, LLC

ZCW Woodstock, LLC

Zips 6678 Mexico Road, LLC

Zips Moncks Corner, LLC

ZCW Brannon Crossing Parcel, LLC

ZCW Fond Du Lac, LLC

ZCW Garrett Ave, LLC

ZCW Georgetown, LLC

ZCW Grey Lag, LLC

ZCW Prosper, LLC

ZCW Richmond Road, LLC

ZCW Sharkey, LLC

ZCW Sheboygan, LLC

## **Exhibit G-1**

**Restructuring Transactions Memorandum Redline**

# Restructuring Transactions Memorandum

Pursuant to the *Amended Joint Plan of Reorganization of Zips Cash Wash, LLC and its Debtor Affiliates* [Docket No. 230] (as may be amended, modified or supplemented from time to time, the "Plan"), the Debtors currently anticipate that the following steps shall occur as set forth below. All terms used but not defined herein shall have the meaning set forth in the Plan.

The following description of the Restructuring Transactions is intended only as a summary and should be read in conjunction with the Plan. To the extent there is any inconsistency between the Restructuring Transactions Memorandum, on the one hand, and the Plan, on the other hand, the Plan shall govern.

Step 1    On or before the Effective Date, an agent for the holders of the Term Loan Claims forms Wash & Wax Holdings, LLC ("NewCo, LLC"), which will elect to be treated as a corporation for U.S. federal income tax purposes. NewCo, LLC forms Wash & Wax Intermediate, LLC ("Sub 1, LLC"), which will elect to be treated as a corporation for U.S. federal income tax purposes. Sub 1, LLC forms Wash & Wax Systems, LLC ("Sub 2, LLC"), which will elect to be treated as a corporation for U.S. federal income tax purposes.

Step 2    On or before the Effective Date, all intercompany claims between Transferred Entities and Liquidating Entities are released and canceled.

Step 3    On or before the Effective Date: (a) the equity of certain entities listed on **Schedule 1** owning property being sold after the Effective Date (the "Post-Emergence Sales"), to the extent not already directly owned by Zips Car Wash, LLC, are distributed to Zips Car Wash, LLC; (b) Zips Car Wash, LLC ~~may~~ contributes the equity interests of its directly-owned subsidiaries listed on **Schedule 2** that are being transferred pursuant to the Transfer (the "Transferred Entities") to Zips Car Wash Holdings, LLC, a newly-formed holding LLC ("HoldCo LLC"); (c) ~~*either* (1) if HoldCo LLC is formed,~~ each of the Liquidating Entities assign any assets (other than the property subject to the Post-Emergence Sales) that they own (other than Intercompany Interests) to HoldCo LLC, and HoldCo LLC assumes any obligations under the Plan that are not being discharged from the Liquidating Entities; ~~*or* (2) if HoldCo LLC is not formed, Liquidating Entities other than Zips Car Wash, LLC assign any assets that they own (other than Intercompany Interests) to Zips Car Wash, LLC, and Zips Car Wash, LLC assumes any obligations under the Plan that are not being discharged from the Liquidating Entities,~~ *provided, that*, for the avoidance of doubt, no entity is assuming any obligation from ASC – Zips Holdings, Inc., other than compliance costs associated with filing final tax returns; and (d) Zips Car Wash, LLC forms the GUC Trust. Each of the Transferred Entities is treated as a disregarded entity for U.S. federal income tax and applicable state tax purposes.

Step 4   On the Effective Date, [NewCo, LLC] contributes 100% of its common stock (the "New Common Equity") to [Sub 1, LLC] in exchange for equity of [Sub 1, LLC]. [Sub 1, LLC] will then contribute the New Common Equity to [Sub 2, LLC] in exchange for equity of [Sub 2, LLC]. [NewCo, LLC] issues New HoldCo Loans and contributes the NewCo Loans to [Sub 1, LLC] in exchange for equity of [Sub 1, LLC]. [Sub 1, LLC] will then contribute the New HoldCo Loans to [Sub 2, LLC] in exchange for equity of [Sub 2, LLC].

Step 5   On the Effective Date, the Debtors transfer the GUC Trust Assets (other than the proceeds of the Post-Emergence Sales) to the GUC Trust.

Step 6   Zips Car Wash LLC transfers[1](a) the equity of ~~either (x) HoldCo LLC or (y) the Transferred Entities, as the case may be; (b) any other assets that it directly owns (including on account of the intercompany transfers in Step 3); and (c) certain other obligations under the Plan, including the obligation to pay over 75% of the proceeds of the Post-Emergence Sales,~~ HoldCo LLC to Sub 2, LLC, in exchange for (a) the equity of [NewCo, LLC]; and (b) ~~the assumption of obligations under the Plan (including, for the avoidance of doubt, obligations assumed by Zips Car Wash, LLC or HoldCo LLC, as the case may be, from the Liquidating Entities); and (c)~~ the New OpCo Term Loans (which shall, for the avoidance of doubt, be issued by [Sub 2, LLC]) and New HoldCo Loans (the "Transfer").   In connection with the Transfer, Zips Car Wash, LLC distributes consideration under the Plan to Holders of Claims in satisfaction of the Debtors' obligations under the Plan, including: (a) each holder of the Term Loan Claims receives its pro rata share (as calculated under the Plan) of the New Common Equity and its pro rata share (as calculated under the Plan) of the New OpCo Term Loans and New HoldCo Loans; and (b) each holder of the General Unsecured Claims receives its pro rata share of GUC Trust interests.

Step 7   As promptly as practicable following the Effective Date, the Post-Emergence Sales are consummated.  25% of the net proceeds of the Post-Emergence Sales are transferred by the Debtors to the GUC Trust, and 75% of the net proceeds of the Post-Emergence Sales are transferred to the Reorganized Debtors.

Step 8   Following the consummation of the Post-Emergence Sales, Interests in Express Car Wash Holdings, LLC are cancelled.

Step 9   As promptly as practicable following the consummation of the Post-Emergence Sales, all Debtor and non-Debtor entities listed on **Schedule ~~2~~3** (the "Liquidating Entities") are

---

[1]   ~~As an alternative, [Sub 2, LLC] may form a disregarded LLC ("MergerSub") and either (a) MergerSub will be merged with and into Zips Cash Wash, LLC with Zips Cash Wash, LLC surviving, or (b) Zips Car Wash, LLC will be merged with and into MergerSub with MergerSub surviving.~~

wound down and liquidated.

## **Schedule 1**

ZCW Garrett Avenue, LLC

Car Wash STL 7860 Mexico, LLC

ZCW Sevierville, LLC

Zips 6678 Mexico Road, LLC

## Schedule 2

Zips Portfolio I, LLC

Zips Portfolio II, LLC

Zips Portfolio III, LLC

Zips Portfolio IV, LLC

Zips 2900 Wade Hampton, LLC

Zips 6050 Wade Hampton, LLC

Zips 3107 N. Pleasantburg, LLC

## Schedule 3

Zips Car Wash, LLC

Zips Operating Holdings, LLC

Express Car Wash Holdings, LLC

ASC – Zips Holdings, Inc.

ZCW Garrett Avenue, LLC

Car Wash STL 7860 Mexico, LLC

ZCW Sevierville, LLC

Zips 6678 Mexico Road, LLC

Car Wash DFW Main Street, LLC

Car Wash JAX Beach, LLC

Car Wash JAX Dunn, LLC

Car Wash JAX San Jose, LLC

Car Wash JAX South Side, LLC

Car Wash OKC 2nd, LLC

Car Wash SAN Hwy 46, LLC

Car Wash SHV Pines, LLC

ZCW Atlantic Boulevard, LLC

ZCW Baymeadows Road, LLC

ZCW Benton Road, LLC

ZCW Blanding Boulevard, LLC

ZCW Fredericksburg Road, LLC

ZCW Limestone, LLC

ZCW Little Elm, LLC

ZCW Mansfield Road, LLC

ZCW New Circle, LLC

ZCW Seguin, LLC

ZCW Sevierville, LLC

ZCW Shreveport Barksdale Highway, LLC

ZCW Woodstock, LLC

Zips 6678 Mexico Road, LLC

Zips Moncks Corner, LLC

ZCW Brannon Crossing Parcel, LLC

ZCW Fond Du Lac, LLC

ZCW Garrett Ave, LLC

ZCW Georgetown, LLC

ZCW Grey Lag, LLC

ZCW Prosper, LLC

ZCW Richmond Road, LLC

ZCW Sharkey, LLC

ZCW Sheboygan, LLC

## **Exhibit H**

**GUC Trust Agreement**

[*Filed at Docket No. 360.*]